# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TLC Vision (USA) Corporation, *et al.*,[1] | ) Case No. 09-      (   ) |
| | ) |
| Debtors. | ) Joint Administration Requested |

## MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS: (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN SENIOR SECURED SUPERPRIORITY POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 361, 362, 363(c), 363(e), 364(c), 364(d) AND 364(e) AND (B) UTILIZE CASH COLLATERAL OF PREPETITION SECURED LENDERS, (II) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SENIOR SECURED LENDERS AND (III) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (together, the "Debtors")

respectfully represent as follows:

### Preliminary Statement

1.      By this motion (this "Motion"), the Debtors request entry of interim and final

orders (together, the "DIP Orders") authorizing the Debtors to, among other things: (a) obtain

secured, superpriority postpetition financing with priority over certain secured indebtedness and

with administrative priority pursuant to the terms and conditions of that certain Senior Secured

Super Priority Debtor-in-Possession Credit Agreement dated as of December 15, 2009 (as it may

be amended, supplemented, restated or otherwise modified from time to time, the "DIP Credit

Agreement"),[2] by and among the Debtors, the lenders party thereto from time to time (the "DIP

Lenders," and, together with the DIP Agent, the "DIP Secured Parties"), and Cantor Fitzgerald

---

[1]  The Debtors in the cases, along with the last four digits of each Debtor's federal tax identification number and address, are: TLC Vision (USA) Corporation (6220) 16305 Swingley Ridge Road, Chesterfield, MO 63017; TLC Vision Corporation (1150) 5280 Solar Drive, Suite 300, Mississauga, Ontario, L4W 5M8; and TLC Management Services, Inc. (0374) 1209 Orange Street, Wilmington, DE 19801.

[2]  The DIP Credit Agreement, along with other related loan documents, are collectively referred to herein as the "DIP Documents".

Securities, as collateral agent and administrative agent (in such capacity, the "DIP Agent"), for and on behalf of itself and the DIP Lenders, pursuant to sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), and 507 of title 11 of the United States Code (11 U.S.C. §§ 101–1532, the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), on an interim basis and on a final basis, in an aggregate amount not to exceed $15 million (the "DIP Facility");[3] (b) use cash collateral pursuant to section 363 of the Bankruptcy Code; and (c) grant adequate protection pursuant to sections 361, 362, 363, 364, and 507 of the Bankruptcy Code to Wells Fargo Bank, N.A. (in such capacity, the "Prepetition Agent"), as collateral agent and administrative agent for the Prepetition Lenders (as defined below). A copy of the DIP Credit Agreement is attached hereto as **Exhibit A**. Pending a final hearing on this Motion (the "Final Hearing"), the Debtors request that the financing be approved on an interim basis. A copy of the proposed interim order (the "Interim DIP Order")[4] granting certain of the relief requested herein and approving the DIP Credit Agreement on an interim basis is attached hereto as **Exhibit B**. In support of the Motion, the Debtors rely upon and incorporate by reference the *Declaration of Michael F. Gries, Chief Restructuring Officer of the Debtors, in Support of First Day Pleadings* (the "Gries Declaration"), which was filed with the Court concurrently herewith.

## Jurisdiction

2. The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

3. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3] All obligations of the Debtors arising under the DIP Facility shall hereinafter be referred to as the "DIP Obligations".

[4] Capitalized terms not otherwise defined herein shall have the meaning set forth in the Interim DIP Order.

1076/74009-001 Current/15791233v7
RLF1 3518765v.1

4.    The bases for the relief requested herein are sections 105, 361, 362, 363 and 364 of the Bankruptcy Code, Rules 2002, 4001 and 9014 of the Bankruptcy Rules, and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## Background

5.    On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief with the Court under chapter 11 of the Bankruptcy Code. The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases (the "Chapter 11 Cases") and, as of the date of the filing of this Motion, no official committees have been appointed or designated. Concurrently with the filing of this Motion, the Debtors have sought procedural consolidation and joint administration of the Chapter 11 Cases.

6.    The factual background relating to the Debtors' commencement of these Chapter 11 cases is set forth in detail in the Gries Declaration.

## Relief Requested

7.    The Debtors request that the Court authorize them to obtain senior secured, superpriority postpetition financing with priority over certain secured indebtedness and with administrative priority consisting of a multiple draw senior term loan facility in an aggregate amount not to exceed $15 million pursuant to the terms of this Motion, the DIP Credit Agreement and the Interim and Final DIP Orders.

8.    The proposed financing will be provided by the DIP Agent and the DIP Lenders. It will be secured by post-petition liens that are senior to all prepetition liens and obligations other than certain liens otherwise permitted by the Prepetition Credit Documents (as defined

1076/74009-001 Current/15791233v7
RLF1 3518765v.1

below) (to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition Liens as of the Petition Date, the "Permitted Encumbrances"). As such, the liens created under the DIP Credit Agreement are priming liens with respect to all liens existing on the Petition Date that are not Permitted Encumbrances (including the Prepetition Liens).

9.     Pending entry of the final order authorizing the DIP Credit Agreement (the "Final DIP Order"), the Debtors request that the Court authorize the Debtors, on an interim basis, to: (a) borrow up to $7.5 million pursuant to the terms of the DIP Credit Agreement; (b) use cash collateral as provided in the Interim DIP Order; (c) grant to the DIP Secured Parties the liens and superpriority claims described herein; (d) provide adequate protection to the Prepetition Lenders, as described herein and in the Interim DIP Order; (e) approve the proposed notice of the Final Hearing; and (f) schedule the Final Hearing.

## Prepetition Debt Structure

10.     Prior to the commencement of the Chapter 11 Cases, pursuant to that certain Amended and Restated Credit Agreement dated as of June 21, 2007 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Prepetition Credit Agreement") by and among Debtor TLC Vision (USA) Corporation (the "Prepetition Borrower"), Debtor TLC Vision Corporation (as guarantor), the other additional guarantors party thereto, the lenders from time to time party thereto (the "Prepetition Lenders"), and the Prepetition Agent, the Prepetition Lenders provided revolving and term loans and a letter of credit facility to the Prepetition Borrower and provided other financial accommodations to or for the benefit of the other Debtors and the Additional Guarantors (as defined in the Prepetition Credit Documents) (the "Prepetition Facility"). The Prepetition Credit Agreement, together with all other loan and security

agreements related to, referenced in or executed in connection therewith, are collectively referred to herein as the "Prepetition Credit Documents" and are available upon request from counsel to the Debtors or counsel to the Prepetition Agent. All obligations of the Debtors arising under the Prepetition Credit Agreement or any other Prepetition Credit Document, including, without limitation, (a) the outstanding principal amount of all Term Advances (as defined in the Prepetition Credit Documents), (b) the outstanding principal amount of all Revolving Credit Advances (as defined in the Prepetition Credit Documents), (c) the outstanding LC Exposure (as defined in the Prepetition Credit Documents), and (d) accrued and unpaid interest, fees, expenses, disbursements (including, without limitation, attorneys' fees, related expenses and disbursements), indemnification obligations, reimbursement obligations in respect of letters of credit and other charges of whatever nature, whether or not contingent, whenever arising, due or owing in respect thereof to the extent and as provided for in the Prepetition Credit Documents, shall hereinafter be referred to as the "Prepetition Obligations."

11.     As more fully set forth in the Prepetition Credit Documents, prior to the Petition Date, the Debtors and the Additional Guarantors (the "Grantors") granted to the Prepetition Agent, for the benefit of itself and the Prepetition Lenders, security interests in and liens (the "Prepetition Liens") on substantially all of the assets of each Grantor, whether now or hereafter acquired by such Grantor, wherever located, and whether now or hereafter existing or arising (all collectively referred to as the "Collateral" thereunder) including, but not limited to: (i) all Account Collateral; (ii) all Equipment; (iii) all Receivables; (iv) all Related Contracts; (v) all Security Collateral; (vi) Assigned Agreements; (vii) all Commercial Tort Claims Collateral;

1076/74009-001 Current/15791233v7
RLF1 3518765v.1

(viii) all Intellectual Property Collateral; and (ix) all Inventory (collectively, the "Prepetition Collateral").[5]

12.     The Prepetition Facility also requires the Debtors to maintain various financial and non-financial covenants as defined in the Prepetition Credit Agreement.  On February 28, 2008, the Debtors obtained from their Prepetition Lenders that certain Amendment No. 1 to the Prepetition Credit Agreement, which loosened the total leverage ratio and fixed charge leverage ratio financial covenants and amended certain components thereof, provided administrative flexibility to facilitate borrowings and the release of collateral, and amended the definition of Applicable Margin to be 4.00% for Base Rate Advances and 5.00% for Eurodollar Rate Advances.

13.     On April 3, 2009, the Debtors obtained from their Prepetition Lenders that certain Limited Waiver and Amendment No. 2 to the Prepetition Credit Agreement, which provided a short-term financial debt covenant compliance waiver to cure the existing defaults, as well as further amendments to the Prepetition Facility.  In addition, it provided financial debt covenant relief effective March 31, 2009 through May 31, 2009.  Limited Waiver and Amendment No. 2 was amended as of April 30, 2009 to extend the time for certain deliverables, including to May 18, 2009 for a detailed operational and financial restructuring plan.

14.     On June 8, 2009, the Debtors obtained from their Prepetition Lenders that certain Limited Waiver, Consent and Amendment No. 3 to the Prepetition Credit Agreement, dated June 5, 2009 and continuing through June 30, 2009.  Limited Waiver, Consent and Amendment No. 3 provided, among other things, a limited waiver expiring June 30, 2009 of certain defaults,

---

[5]  All defined terms used to describe the Prepetition Collateral shall have the meanings ascribed to them in the Prepetition Credit Documents.  Nothing contained herein shall be construed so as to limit the scope of the Prepetition Liens.  Reference is made to the Prepetition Credit Documents for a complete description of the Prepetition Collateral.

1076/74009-001 Current/15791233v7
RLF1 3518765v.1

amended certain terms of the Prepetition Credit Agreement, consented to the dissolution of several inactive subsidiaries, provided for the payment by the Debtors of certain fees and expenses incurred by the Prepetition Lenders, delayed mandatory payment of $1.4 million of principal arising from a tax refund, and released any claims the Debtors may have had against the Prepetition Lenders. As of June 30, 2009, the Debtors failed to make various mandatory payments of principal and interest under the Prepetition Credit Agreement and related amendments.

15. On August 3, 2009, the Debtors obtained from their Prepetition Lenders that certain Limited Waiver and Amendment No. 4 to the Prepetition Credit Agreement, dated June 30, 2009. Limited Waiver and Amendment No. 4, among other things, provided a limited waiver through September 9, 2009 of certain defaults and provided that the Prepetition Lenders would, until September 9, 2009, forbear from exercising their rights arising out of the non-payment of certain principal, interest and other payments previously due. The amendment also amended certain terms of the Prepetition Credit Agreement, provided for the accrual of default interest at an additional 2% per annum over otherwise applicable rates, and released any claims the Debtors may have had against the Prepetition Lenders.

16. On September 11, 2009, the Debtors obtained from their Prepetition Lenders that certain Limited Waiver and Amendment No. 5 to the Prepetition Credit Agreement, dated as of September 8, 2009. Limited Waiver and Amendment No. 5 (as amended), among other things, provided a limited waiver through November 15, 2009 of certain defaults and provided that the Prepetition Lenders would, until November 15, 2009, forbear from exercising their rights arising out of the non-payment of certain principal, interest and other payments previously due.

17. As of the Petition Date, the Debtors were indebted under the Prepetition Credit Documents in an amount not less than $105 million, comprised of (a) the outstanding principal amount of all Term Advances equal to $76,659,696.92; (b) the outstanding principal amount of all Revolving Credit Advances equal to $23,400,000.00; (c) the outstanding LC Exposure equal to US $50,000 and CAD $1,000,000; (d) certain hedging agreement obligations; and (e) accrued and unpaid interest, fees and expenses.

**Debtors' Proposed Postpetition Financing Arrangement**

**A.      Background of the Postpetition Financing Arrangement**

18. Prior to the Petition Date, the Debtors considered various sources of postpetition financing, including financing from the DIP Secured Parties. In considering those options, the Debtors recognized that the obligations owed to the Prepetition Lenders are secured by virtually all of their property, such that either: (a) the liens of the Prepetition Lenders would have to be primed to obtain postpetition financing; or (b) the Debtors would have to find a postpetition lender willing to extend credit that would be junior to the liens of the Prepetition Lenders. Because the Prepetition Lenders advised the Debtors' representatives that they would not consent to be primed by any other postpetition lender, borrowing from another postpetition lender or lending group that required liens and claims senior to that of the Prepetition Lenders likely could only be accomplished through an extended, contested hearing to determine compliance with the requirements of section 364(d) of the Bankruptcy Code. Moreover, in the current marketplace, the likelihood of finding a third party lender to provide the necessary financing subordinate to the liens of the Prepetition Lenders is very low.

19. In view of these circumstances, the DIP Agent, together with the DIP Lenders, is willing to extend postpetition financing on the terms and conditions described herein, subordinate only to the Permitted Encumbrances. The Debtors concluded that the proposal

8

offered by the DIP Agent was desirable because, among other things, it permits the Debtors to secure necessary postpetition financing to continue operations and avoid an extended, contested hearing under section 364(d) of the Bankruptcy Code.

**B.    Negotiations**

20.    The Debtors and the DIP Agent engaged in extensive, arms'-length negotiations with respect to the terms and conditions of the DIP Credit Agreement and Interim DIP Order. Importantly, the DIP Credit Agreement and Interim DIP Order provide that the Debtors may draw immediately (on an interim basis) to meet their administrative and operational obligations during the early stages of the Chapter 11 Cases, a critical period for preserving their going-concern values.

21.    The Debtors, the DIP Agent and the Prepetition Agent have also agreed upon a budget (the "Budget") projecting cash flow for a period of 13 weeks. On a weekly basis, the Debtors will provide to the DIP Agent and the Prepetition Agent an updated Budget and variance report. The Debtors believe that the Budget is achievable and will allow them to operate and pay their postpetition obligations as they mature.

22.    The DIP Agent and the Prepetition Agent have consented to the proposed DIP Facility, including the granting of priming liens in connection therewith.

**C.    Material Terms of the DIP Credit Agreement[6]**

| Borrowers: | TLC Vision (USA) Corporation, TLC Vision Corporation and TLC Management Services, Inc. |
|---|---|
| Commitment: | A multiple draw senior term loan facility in an aggregate amount not to exceed $15 million. |
| Borrowing Availability: | Advances will be up to $7.5 million per draw, the first of which will be available on the date of entry of the Interim Order, and the second will be |

---

[6] The terms set forth in this chart are for convenience. To the extent that there is any difference between the terms set forth in this chart and those set forth in the applicable DIP Documents, the terms contained in the DIP Documents shall control.

1076/74009-001 Current/15791233v7
RLF1 3518765v.1

| | |
|---|---|
| | available upon entry of the Final Order. |
| Use of Proceeds: | The proceeds of the DIP Facility shall be used solely in accordance with the terms and conditions of the DIP Credit Agreement, and in accordance with the Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreement and the Interim and Final DIP Orders) |
| Term/Maturity Date: | The DIP Facility shall mature on that date (the "Maturity Date") which is the earliest of (a) (i) 45 days after the date of the entry of the Interim Order, if a Final Order has not been entered by such date, or (ii) 150 days after the Petition Date, unless extended pursuant to the DIP Credit Agreement, (b) the effective date of a confirmed plan of reorganization for the Debtors, (c) the date a sale or sales of all or substantially all of the Debtors' assets is consummated under section 363 of the Bankruptcy Code, (d) the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or a proposal or liquidation of any or all or substantially all of the assets of TLC Vision Corporation or any of the guarantors under the *Bankruptcy and Insolvency Act* (Canada) ("BIA"), (e) the dismissal of any of the Chapter 11 Cases, and (f) approval by the Bankruptcy Court or any Canadian court exercising jurisdiction over any Debtor (the "Canadian Court") of any other debtor-in-possession financing unless (A) in the event that the liens securing such indebtedness are senior to or *pari passu* with liens securing the obligations under the Prepetition Credit Agreement but junior to the liens securing the DIP Facility, entry into such financing is consented to by the Required Lenders (as defined in the Prepetition Credit Agreement) and (B) in the event that the liens securing such indebtedness are senior to or *pari passu* with the liens securing the DIP Facility, entry into such financing is consented to by both the Required DIP Lenders and the Required Lenders. Upon the request of the Borrowers, the Maturity Date may be extended by up to 60 days (such request may be made by the Borrowers not more than once). |
| Security/Priority and Liens: | Subject to the Carve Out (as defined below) and Permitted Liens, all obligations of the Debtors under or in respect of the DIP Facility (i) will be entitled to superpriority claim status pursuant to section 364(c)(1) of the Bankruptcy Code, and (ii) will be secured by a first priority perfected security interest pursuant to section 364(c)(2) and (c)(3) and section 364(d) of the Bankruptcy Code in all of the property of each Debtor, whether now owned or hereafter acquired, including, without limitation, the following (collectively, the "DIP Collateral"): (A) all of the existing and after acquired real and personal, tangible and intangible assets of Debtors, including, without limitation, all cash, cash equivalents, bank accounts, accounts, other receivables, chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable), equipment, franchise rights, patents, trade names, trademarks, copyrights, intellectual property, general intangibles, investment property (including all capital stock and other equity interests in subsidiaries), |

1076/74009-001 Current/15791233v7
RLF1 3518765v.1

| | |
|---|---|
| | supporting obligations, letter of credit rights, money or other assets that now or hereafter come into the possession, custody or control of the DIP Agent or any DIP Lender, commercial tort claims, all proceeds of real property leases, causes of action, and all substitutions, accessions and proceeds of the foregoing (including insurance proceeds), (B) all avoidance power claims and actions under section 549 of the Bankruptcy Code relating to postpetition transfers of DIP Collateral and any proceeds thereof, and subject to entry of the Final Order, all avoidance power claims or actions under chapter 5 of the Bankruptcy Code and any proceeds thereof and (C) any unencumbered assets of each Debtor. Subject to entry of the Final Order, the security interest will not be subject to sections 510, 549, 550 and 551 of the Bankruptcy Code nor shall the DIP Collateral be surcharged pursuant to section 506(c) of the Bankruptcy Code. The Debtors' obligations under or in respect of the DIP Facility will be senior in right of payment to the obligations of the Debtors to the Prepetition Lenders. |
| Carve-Out: | (a) Statutory fees payable to the United States Trustee pursuant to 28 U.S.C. Section 1930(a)(6) and all fees and expenses payable to the information officer in the Canadian Case; and (b) subject to the terms and conditions of the Order, all fees and disbursements incurred by the (i) Torys LLP, as Canadian counsel to TLC Vision Corporation; and (ii) Borrowers and/or the Creditors' Committee for any attorneys and a single financial advisor for the Borrowers and Creditors' Committee respectively, retained by final order of the Bankruptcy Court (which order has not been reversed, vacated, or stayed, unless such stay has been vacated) pursuant to sections 327 or 1103(a) of the Bankruptcy Code to the extent allowed by order of the Bankruptcy Court (which order has not been reversed, vacated, or stayed, unless such stay has been vacated) or the Canadian Court under sections 328, 330 and/or 331 of the Bankruptcy Code and any interim compensation procedures order, but solely to the extent such fees and disbursements are within the corresponding amounts set forth in the Budget and were reflected as estimated fees and expenses of such professionals in the most recent Budget delivered by the Borrowers to the Administrative Agent prior to the date that such fees and disbursements were incurred (collectively, the "Case Professionals Carve Out"); *provided*, that, following Termination Declaration, the amount of the Case Professionals Carve Out shall not exceed $250,000 plus the amount of any compensation or reimbursement of budgeted expenses and fees incurred, awarded or paid prior to the occurrence of an Event of Default in respect of which the Carve Out is invoked. |
| Fees: | (a) An extension fee in an amount equal to 2.00% of the outstanding amount of the DIP Facility at such time, fully earned and payable on any date the Maturity Date shall be extended; (b) an exit fee in an amount equal to 2.00% of the outstanding amount of the DIP Facility, fully earned and payable on the Maturity Date or if earlier, the date on which the DIP |

1076/74009-001 Current/15791233v7
RLF1 3518765v.1

| | |
|---|---|
| | Facility is paid in full and all commitments of the DIP Lenders under the DIP Facility have terminated in full; (c) a closing fee in the amount of $175,000; (d) a facility fee in an amount equal to 1.50% of the aggregate commitments under the DIP Facility, fully earned and payable on the Closing Date; (e) an unused fee in an amount equal to 0.75% of the average daily undrawn amount of the DIP Facility, fully earned and payable quarterly in arrears; (f) an agency fee in an amount equal to $75,000, fully earned and payable on the Closing Date; and (g) a backstop fee in the amount of $275,000, fully earned and payable on the Closing Date. |
| Interest Rate: | A rate per annum equal to one month LIBOR Rate (as defined in the DIP Credit Agreement) plus 10.00%, due and payable in cash in arrears, on (a) the last day of each month and (b) the Maturity Date. |
| Default Rate Interest: | The rate otherwise in effect *plus* 2.00%. |
| Events of Default: | Events of default appropriate for debtor in possession financing of this size, type and purpose and acceptable to the DIP Lenders, including, without limitation:<br><br>Breach or Non-Compliance. Failure to pay interest, principal, or fees under the DIP Facility when due; any representation or warranty in the Documentation is incorrect in any material respect; breach of any affirmative (subject to any applicable grace periods agreed to by the DIP Agent and the DIP Lenders), negative or financial covenant; failure to comply with the Budget; material deterioration in the value of the DIP Collateral; any post-petition judgment in excess of an amount to be agreed or which would divest the Debtors of any assets; any Debtor being enjoined from conducting business; disruption of business operations of any Debtor; material damage to or loss of assets; the appointment in any of the Cases of a chapter 11 trustee or an examiner with expanded powers, the appointment of a receiver, interim-receiver, receiver and manager or a trustee in bankruptcy under the CCAA or BIA with respect to any of the Debtors or any of the guarantors; the grant of any super priority administrative expense claim or any Lien which is *pari passu* with or senior to those of the DIP Agent and the DIP Lenders; any payment of pre-petition debt (other than (i) payments under customary first day orders reasonably acceptable to the Required DIP Lenders, and (ii) other payments as may be approved by the Bankruptcy Court that are reasonably acceptable to the Required DIP Lenders); the Bankruptcy Court's or the Canadian Court's entry of an order granting relief from the automatic stay or stay, as applicable to permit foreclosure of security interests in assets of the Debtors of a value in excess of an amount to be agreed; an order terminating exclusivity having been entered (or requested, unless actively contested by the Debtors); failure of the Bankruptcy Court to enter, within 45 days after the date of the entry of the Interim Order, a final order (the "Final Order") with respect to the DIP Financing and permitting extensions of credit under the DIP Facility not to exceed $15,000,000 in principal amount and in form and substance |

| | |
|---|---|
| | reasonably satisfactory to the Required DIP Lenders; any reversal, revocation or modification without the consent of the DIP Agent and the Required DIP Lenders of such order or any other order of the Bankruptcy Court with respect to the Cases and affecting the DIP Facility.<br><br>Plan and Disclosure Statement. Failure of the Debtors to file with the Bankruptcy Court a plan of reorganization and a disclosure statement, in form and substance reasonably satisfactory to the Required DIP Lenders, within 10 business days of the Petition Date.<br><br>Order Approving Disclosure Statement. Failure of the Debtors to obtain an order from the Bankruptcy Court approving the disclosure statement in form and substance reasonably satisfactory to the Required DIP Lenders, within 60 days of the Petition Date.<br><br>Order Confirming Plan. Failure of the Debtors to obtain an order from the Bankruptcy Court confirming the plan of reorganization, in form and substance reasonably satisfactory to the Required DIP Lenders, within 120 days of the Petition Date.<br><br>Effectiveness of Plan. Failure of the plan of reorganization, which shall include, without limitation, the Reorganized Capital Structure, to become effective within 150 days of the Petition Date.<br><br>Interim Order. Failure of the Interim Order, in form and substance reasonably satisfactory to the Required DIP Lenders, to be entered on or before 3 days after filing of the motion to approve the Interim Order.<br><br>Insolvency Proceeding. A chapter 11, chapter 7, BIA or CCAA filing of TLC Vision (USA) Corporation or TLC Vision Corporation is commenced without the prior consent of the Required DIP Lenders.<br><br>Insolvency Proceeding of Subsidiaries. A chapter 11, chapter 7, BIA or CCAA filing of any direct and indirect domestic and foreign subsidiaries of TLC Vision Corporation is commenced, or an involuntary filing is initiated against any direct and indirect domestic and foreign subsidiaries of TLC Vision Corporation.<br><br>Material Adverse Effect. A material adverse effect on the business, assets, liabilities (actual or contingent), operations, condition (financial or otherwise), results of operations or prospects of TLC Vision Corporation and its subsidiaries taken as a whole.<br><br><br>Prepetition Credit Agreement Events of Default. Events of Default of the same type as those in the Prepetition Credit Agreement (other than with respect to bankruptcy and insolvency). |
| Remedies on Event of Default: | In addition to other customary remedies, immediately upon the occurrence and during the continuance of an Event of Default, the DIP Agent may declare all obligations owing under the DIP Facility to be immediately due and payable. Upon the occurrence and during the continuance of an Event |

| | |
|---|---|
| | of Default and following the giving of 3 business days' notice to the Debtors, the official committee(s) of creditors of the Debtors and the United States Trustee, the DIP Agent and the DIP Lenders shall have relief from the automatic stay and may, (a) (i) sweep any or all of the cash in the DIP Proceeds Controlled Account to prepay the DIP Term Loans and/ or (ii) sweep any or all of the cash in the DIP Controlled Accounts to prepay the DIP Term Loans, and (b) foreclose on all or any portion of the DIP Collateral, collect accounts receivable and apply the proceeds thereof to the obligations, occupy the Debtors' premises, execute going out-of-business sales or otherwise exercise remedies against the DIP Collateral permitted by applicable nonbankruptcy law.  During such (3) business day notice period, the Debtors shall be entitled to an emergency hearing with the Bankruptcy Court for the sole purpose of contesting whether an Event of Default has occurred.  Unless during such period the Bankruptcy Court determines that an Event of Default has not occurred and/or is not continuing, the automatic stay, as to the DIP Lenders and the DIP Agent, shall be automatically terminated at the end of such notice period and without further notice or order.  Upon the occurrence and during the continuance of an Event of Default, in addition to all rights and remedies available to the DIP Lenders at law and in equity and all rights and remedies granted to the DIP Lenders pursuant to the terms of the DIP Order and the Documentation, the Debtors agree that upon a direction from the Required DIP Lenders, the Debtors shall pursue an immediate sale of the DIP Collateral pursuant to the provisions of section 363 of the Bankruptcy Code in a manner satisfactory to the Required DIP Lenders and the proceeds of such sale shall be used to pay the obligations owing to the DIP Lenders. |
| Budget: | The "Budget" means a cash flow forecast and operating budget for a period of 13 weeks (as may be extended pursuant to the terms hereof) from the Petition Date, which sets forth on a weekly basis cash receipts and disbursements (including, without limitation, line item entries for professional fees and expenses by firm, and the anticipated uses of the DIP Facility).  Any updates or changes to the Budget must be reasonably satisfactory to the Required DIP Lenders.  The Debtors and the guarantors shall be required to comply with the Budget as provided below.<br><br>The Debtors shall not make any disbursements other than those set forth in the Budget; subject to variances as permitted pursuant to Section 5.04 of the DIP Credit Agreement. |

## D.  Provisions that Potentially Implicate Local Rule 4001-2

23.    Rule 4001-2 of the Local Rules requires that certain provisions contained in the

Interim DIP Order and/or the DIP Credit Agreement be highlighted, and that the Debtors must

provide justification for the inclusion of such highlighted provision(s). The Debtors believe that certain provisions of the Interim DIP Order and/or the DIP Credit Agreement may implicate Local Rule 4001-2, and that such provisions are justified and necessary in the context and circumstances of the Chapter 11 Cases.

24. Local Rule 4001-2(a)(i)(B) requires a movant to point out provisions that bind the estates or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or debt or waive claims against the secured creditor without giving parties in interest at least 75 days from the entry of the order or 60 days from the date a creditors' committee is formed to investigate such matters. *See* Del. Bankr. L.R. 4001-2(a)(i)(B). The Interim DIP Order provides waivers of the type referenced in Local Rule 4001-2(a)(i)(B) as it relates to the claims and liens of the DIP Lenders, but is in compliance with the Local Rules as it provides a challenge period commensurate with the Local Rules. *See* Interim DIP Order at Paragraphs E and 30.

25. Local Rule 4001-2(a)(i)(C) requires explicit disclosure of provisions that seek to waive, without notice, the estate's rights under section 506(c) of the Bankruptcy Code. Although the Interim DIP Order indicates that the Debtors will request in the Final Order a provision waiving the estate's rights under section 506(c) of the Bankruptcy Code, such provision is not presently in the Interim DIP Order and would not take effect until after notice and a final hearing. See Interim DIP Order at Paragraphs H, 7, 8, 12, 13 and 32.

26. Local Rule 4001-2(a)(i)(D) provides for additional disclosure with respect to provisions that immediately grant liens on the Debtors' claims or causes of action under sections 544, 545, 547, 548, and 549 of the Bankruptcy Code (the "Avoidance Claims"). The Interim DIP Order provides that the DIP Collateral shall not include any Avoidance Claims or the

1076/74009-001 Current/15791233v7
RLF1 3518765v.1

proceeds thereof, other than the proceeds of any avoidance action brought pursuant to section 549 of the Bankruptcy Code to recover any post-Petition Date transfer of collateral. The Debtors will request authority to grant a lien on all other Avoidance Claims in the Final Order. *See* Interim DIP Order at Paragraph 6.

**E.     Use of Cash Collateral and Proposed Adequate Protection**

27.     In order to address their working capital needs and fund their reorganization efforts, the Debtors also require the use of cash collateral of the Prepetition Lenders (the "Cash Collateral"). The use of Cash Collateral will provide the Debtors with the additional necessary capital with which to operate their business, pay their employees, maximize value and pursue the sale process.

28.     The Prepetition Lenders have consented to the Debtors' use of Cash Collateral in the ordinary course of business in accordance with the Budget, subject to the adequate protection liens and payments discussed below, and the other terms and conditions set forth in the Interim DIP Order.

29.     The Prepetition Lenders have requested and are entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of their interests in collateral under the Prepetition Credit Agreement to the extent that there is a diminution in the value of such collateral from and after the Petition Date. As adequate protection for any such diminution in value, the Prepetition Lenders shall be granted, pursuant to sections 361, 363(e), and 364(c) of the Bankruptcy Code, additional and replacement security interests and liens (the "Prepetition Replacement Liens") in the Collateral (defined below) in and upon all existing and after-acquired real and personal, tangible and intangible, assets of the Debtors (the "Collateral"), but the Collateral shall not include Avoidance Claims (other than proceeds of any avoidance action

brought pursuant to section 549 of the Bankruptcy Code).

30. The Prepetition Replacement Liens shall have the same priority as the liens securing the Prepetition Obligations, shall be junior only to the liens securing the DIP Facility, and shall be junior to the Carve-Out (as defined in the Interim DIP Order). The Prepetition Replacement Liens are and shall be valid, perfected, enforceable and effective as of the date of the entry of the Interim DIP Order, without any further action by the parties and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or other agreements.

31. In addition to the Prepetition Replacement Liens, the Debtors propose to grant and/or pay the Prepetition Lenders the following, among other things, as adequate protection:

    a. an allowed superpriority administrative claim, which shall have priority (except with respect to the Carve-Out and the superpriority claim status applicable to the DIP Facility) under sections 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code, and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726(b), 1113, 1114 and, if approved in the Final DIP Order, section 506(c) of the Bankruptcy Code; and

    b. payments in cash in the amount of interest at the default rate and fees accruing from and after the Petition Date, including, without limitation, amounts payable to legal and financial advisors of the Prepetition Agent and other amounts (other than principal) due or accruing from and after the Petition Date under the Prepetition Credit Agreement at the times required therein.

32. The foregoing claims and payments are to be granted to the Prepetition Lenders because, among other things, the Debtors will continue to use the Cash Collateral and other collateral under the Prepetition Credit Agreement in the Debtors' ongoing operations until the entry of the Final DIP Order.

1076/74009-001 Current/15791233v7
RLF1 3518765v.1

## The DIP Facility Should Be Authorized

33.     Approval of the DIP Facility will provide the Debtors with immediate and ongoing access to borrowing availability to pay their current and ongoing operating expenses, including postpetition wages and salaries and utility and vendor costs. Unless these expenses are paid, the Debtors will have no access to working capital to fund their operations and shall be forced to cease operations, which would likely: (a) result in irreparable harm to their business; (b) deplete going concern value; and (c) jeopardize the Debtors' ability to restructure their businesses, assets and other financial obligations. The credit provided under the DIP Credit Agreement and the use of Cash Collateral will enable the Debtors to continue to satisfy their vendors, service their customers, pay their employees and operate their business in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of their estates for the benefit of all stakeholders. The availability of credit under the DIP Credit Agreement will provide confidence to the Debtors' creditors that will enable and encourage them to continue their relationships with the Debtors. Finally, the implementation of the DIP Credit Agreement will be viewed favorably by the Debtors' vendors, employees and customers, thereby promoting a successful chapter 11 process. Accordingly, the timely approval of the relief requested herein is imperative.

34.     Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt: (a) with priority over any and all administrative expenses, as specified in sections 503(b) or 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364. The Debtors propose to obtain the financing set forth in the DIP

1076/74009-001 Current/15791233v7
RLF1 3518765v.1

Credit Agreement by providing, *inter alia,* superpriority claims, security interests and liens pursuant to section 364(c)(1), (2), (3) and 364(d) of the Bankruptcy Code.

35.     The Debtors' liquidity needs can be satisfied only if the Debtors are immediately authorized to borrow under the DIP Facility and to use such proceeds to fund their operations. The Debtors have been unable to procure sufficient financing in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, as an administrative expense under section 364(a) or (b) of the Bankruptcy Code or in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code.    The Debtors have not been able to obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein.

36.     Bankruptcy courts grant a debtor considerable deference in acting in accordance with its business judgment. *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.),* 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 of the Bankruptcy Code is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *see also In re Funding Sys. Asset Mgmt. Corp.,* 72 B.R. 87 (Bankr. W.D. Pa. 1987); *In re Curlew Valley Assocs.,* 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); *In re Simasko Prod. Co.,* 47 B.R. 444, 449 (D. Colo. 1985).

37.     Furthermore, section 364(d) of the Bankruptcy Code does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must

1076/74009-001 Current/15791233v7
RLF1 3518765v.1

demonstrate sufficient efforts to obtain financing without the need to grant a senior lien. *Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most lend money only in return for a senior secured position"); *In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (debtor adequately established that some degree of priming of loan was necessary if debtor were to obtain funding).

38.     Substantially all of the Debtors' assets are encumbered and the Debtors have been unable to procure the required funding absent granting the proposed superpriority claims and liens. The Debtors submit that the circumstances of this case require the Debtors to obtain financing pursuant to sections 364(c) and 364(d) of the Bankruptcy Code and, accordingly, the DIP Credit Agreement reflects the exercise of their sound business judgment.

39.     The terms and conditions of the DIP Credit Agreement are fair and reasonable and were negotiated extensively by well-represented, independent parties in good faith and at arms'-length. Accordingly, the DIP Secured Parties and all obligations incurred under the DIP Credit Agreement should be accorded the benefits of section 364(e) of the Bankruptcy Code.

## The Use of Cash Collateral Should Be Approved

40.     Under section 363(c)(2) of the Bankruptcy Code, a debtor in possession may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use ... in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). The Debtors require the use of Cash Collateral to fund their day-to-day operations. Indeed, absent such relief, the Debtors' business will be brought to an immediate halt, with damaging consequences for the Debtors and their estates and creditors.

1076/74009-001 Current/15791233v7
RLF1 3518765v.1

The interests of the Prepetition Lenders in the Cash Collateral will be protected by the adequate protection set forth above. Additionally, the Prepetition Lenders have consented to the use of the Cash Collateral on the terms set forth herein and in the Interim DIP Order. Accordingly, the Debtors' request to use Cash Collateral in the operation of their business and administration of the Chapter 11 Cases should be approved.

## The Proposed Adequate Protection Should Be Authorized

41.     Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by [a debtor in possession], the court, with or without a hearing, shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief. 11 U.S.C. § 361. What constitutes adequate protection must be decided on a case-by-case basis. *See In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985); *In re Shaw Indus., Inc.*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003). The focus of the requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citation omitted).

42.     The Prepetition Lenders have agreed to the Debtors' use of Cash Collateral and the Debtors' entry into the DIP Credit Agreement in consideration for the adequate protection set forth above. Accordingly, the adequate protection proposed herein to protect the Prepetition

1076/74009-001 Current/15791233v7
RLF1 3518765v.1

Lenders' interests in the Prepetition Collateral is fair and reasonable and sufficient to satisfy the requirements of sections 363(c)(2) and (e) of the Bankruptcy Code.

**The Automatic Stay Should Be Modified on a Limited Basis**

43.    The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtors to:   (a) grant the security interests, liens and superpriority claims described above with respect to the DIP Secured Parties and the Prepetition Lenders, as the case may be, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (b) permit the DIP Secured Parties to exercise, upon the occurrence of and during the continuance of an event of default (in certain circumstances, upon three (3) business days' notice of such occurrence and subject to the jurisdiction of this Court), all rights and remedies under the DIP Credit Agreement; and (c) implement the terms of the proposed Interim and Final DIP Orders.

44.    Stay modifications of this kind are ordinary and standard features of postpetition debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable and fair under the present circumstances.

**Interim Approval Should Be Granted**

45.    Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fourteen (14) days after the service of such motion.   Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

1076/74009-001 Current/15791233v7
RLF1 3518765v.1

46.     Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtors request that the Court conduct an expedited preliminary hearing on this Motion and (a) authorize the Debtors to use Cash Collateral and borrow under the DIP Facility on an interim basis, pending entry of a final order, in order to (i) maintain and finance the ongoing operations of the Debtors and (ii) avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest, and (b) schedule a hearing to consider entry of a final order.

47.     The Debtors have an urgent and immediate need for cash to continue to operate. Currently, the Debtors do not have sufficient unencumbered funds with which to operate their business on an ongoing basis. Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending a final hearing on the Motion, the Debtors will be immediately and irreparably harmed. The availability of interim loans under the DIP Facility will provide necessary assurance to the Debtors' vendors, employees and customers of their ability to meet their near-term obligations. Failure to meet these obligations and to provide these assurances likely would have a long-term negative impact on the value of the Debtors' business, to the detriment of all parties in interest. Furthermore, the lack of an interim facility would result in accelerated cash demands on the Debtors. Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtors and facilitating their reorganization efforts.

## Notice

48.     Notice of this Motion shall be provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) the Steering Committee of Lenders; (d) counsel to the Steering Committee of Lenders; (e) the Securities and Exchange Commission; (f) the Internal Revenue Service; (g) the Office of the

United States Attorney for District of Delaware; (h) the agent to the proposed debtor-in-possession lender; (i) Harris Bank, as the Debtors' primary bank deposit; (j) counsel to the Prepetition Agent, (k) the Prepetition Agent, (l) counsel to the proposed DIP Agent, (m) the Debtors' secured creditors of record; and (n) the banks that process disbursements in the Debtors' cash management system. In light of the nature of the relief requested, the Debtors submit that no further notice is required. As this Motion is seeking first-day relief, notice of this Motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m). Due to the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no further notice of this Motion is required.

*[Remainder of page intentionally left blank]*

1076/74009-001 Current/15791233v7
RLF1 3518765v.1

WHEREFORE, for the reasons set forth herein and in the Gries Declaration filed concurrently herewith, the Debtors respectfully request that the Court enter the Interim DIP Order, substantially in the form attached hereto as **Exhibit B**; and grant such other and further relief as is just and proper.

Dated: December 21, 2009
Wilmington, Delaware

**RICHARDS, LAYTON & FINGER, P.A.**

Mark D. Collins (DE Bar No. 2981)
Michael J. Merchant (DE Bar No. 3854)
Chun I. Jang (DE Bar No. 4790)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

– and –

**PROSKAUER ROSE LLP**
Mark K. Thomas (*pro hac vice* pending)
Paul V. Possinger (*pro hac vice* pending)
Jeremy T. Stillings (*pro hac vice* pending)
Three First National Plaza
70 West Madison, Suite 3800
Chicago, Illinois 60602-4342
Telephone: (312) 962-3550
Facsimile: (312) 962-3551

- and –

**PROSKAUER ROSE LLP**
Richard J. Corbi (*pro hac vice* pending)
1585 Broadway
New York, New York 10036
Telephone: (212) 969-3000
Facsimile: (212) 969-2900

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

1076/74009-001 Current/15791233v7
RLF1 3518765v.1