# **Exhibit A**

DIP Credit Agreement

$15,000,000

# SENIOR SECURED SUPER PRIORITY DEBTOR IN POSSESSION CREDIT AGREEMENT

Dated as of December__, 2009

among

TLC VISION (USA) CORPORATION

TLC VISION CORPORATION

TLC MANAGEMENT SERVICES INC.

each as a debtor and a debtor in possession and as joint and several Borrowers

and

THE GUARANTORS NAMED HEREIN

as Guarantors

and

THE LENDERS NAMED HEREIN

as Lenders

and

CANTOR FITZGERALD SECURITIES

as Collateral Agent and Administrative Agent

# TABLE OF CONTENTS

ARTICLE I     DEFINITIONS AND ACCOUNTING TERMS ............................................. 2

    Section 1.01.    Certain Defined Terms.................................................................. 2
    Section 1.02.    Computation of Time Periods; Other Definitional Provisions....................................................................................... 24
    Section 1.03.    Accounting Terms........................................................................ 24

ARTICLE II     AMOUNT AND TERMS OF THE TERM LOANS................................... 24

    Section 2.01.    Term Loan Commitments.............................................................. 24
    Section 2.02.    Making the Term Loans................................................................ 25
    Section 2.03.    Repayment of Term Loans............................................................ 26
    Section 2.04.    Prepayments................................................................................ 26
    Section 2.05.    Interest........................................................................................ 27
    Section 2.06.    Fees ............................................................................................ 28
    Section 2.07.    Increased Costs, Etc.................................................................... 28
    Section 2.08.    Payments and Computations......................................................... 30
    Section 2.09.    Taxes .......................................................................................... 32
    Section 2.10.    Sharing of Payments, Etc............................................................. 34
    Section 2.11.    Use of Proceeds.......................................................................... 35
    Section 2.12.    Defaulting Lenders...................................................................... 35
    Section 2.13.    Evidence of Debt......................................................................... 36
    Section 2.14.    Extension of Maturity Date.......................................................... 37
    Section 2.15.    Joint and Several Obligations; Administrative Borrower............ 38

ARTICLE III     CONDITIONS TO EFFECTIVENESS AND OF LENDING ..................... 40

    Section 3.01.    Conditions Precedent to Borrowing Interim Order Amount........ 40
    Section 3.02.    Conditions to Borrowings in Excess of the Interim Order Amount ....................................................................................... 44
    Section 3.03.    Conditions Precedent to All Borrowings ..................................... 45
    Section 3.04.    Determinations Under Section 3.01 and 3.02 .............................. 46

ARTICLE IV     REPRESENTATIONS AND WARRANTIES............................................. 47

    Section 4.01.    Representations and Warranties of Borrowers ............................ 47

ARTICLE V     COVENANTS ...................................................................................... 53

    Section 5.01.    Affirmative Covenants................................................................. 53
    Section 5.02.    Negative Covenants .................................................................... 59
    Section 5.03.    Reporting Requirements .............................................................. 65
    Section 5.04.    Financial Covenants.................................................................... 68

ARTICLE VI     EVENTS OF DEFAULT......................................................................... 70

    Section 6.01.    Events of Default ........................................................................ 70
    Section 6.02.    Remedies upon Default................................................................ 73

ARTICLE VII    THE AGENTS ................................................................. 74

Section 7.01.    Authorization and Action............................................ 74
Section 7.02.    Agents' Reliance, Etc................................................. 76
Section 7.03.    Rights as a Lender..................................................... 76
Section 7.04.    Lender Credit Decision .............................................. 76
Section 7.05.    Indemnification ........................................................ 77
Section 7.06.    Successor Agents ..................................................... 78
Section 7.07.    Notice of Default....................................................... 78
Section 7.08.    No Reliance on Administrative Agent's Customer
                 Identification Program ................................................ 78

ARTICLE VIII    PRIORITY AND COLLATERAL SECURITY ........................................... 79

Section 8.01.    Superpriority Claims and Collateral Security ............................. 79
Section 8.02.    Collateral Security Perfection ........................................... 80
Section 8.03.    Guarantees................................................................ 80
Section 8.04.    No Discharge; Survival of Claims ........................................ 80

ARTICLE IX    MISCELLANEOUS ................................................................ 81

Section 9.01.    Amendments, Etc ......................................................... 81
Section 9.02.    Notices, Etc ............................................................. 82
Section 9.03.    No Waiver; Remedies .................................................... 83
Section 9.04.    Costs and Expenses ..................................................... 83
Section 9.05.    Right of Set-off ........................................................ 85
Section 9.06.    Binding Effect .......................................................... 85
Section 9.07.    Assignments and Participations ......................................... 86
Section 9.08.    Execution in Counterparts............................................... 90
Section 9.09.    Confidentiality ........................................................ 90
Section 9.10.    Public Disclosure ...................................................... 90
Section 9.11.    Release  or Subordination of Collateral/Release of
                 Guarantor ............................................................. 91
Section 9.12.    Patriot Act Notice .................................................... 91
Section 9.13.    Jurisdiction, Etc....................................................... 91
Section 9.14.    Governing Law ......................................................... 92
Section 9.15.    Waiver of Jury Trial................................................... 92
Section 9.16.    Release ............................................................... 92

A/73160038.15

## SCHEDULES

| | | |
|---|---|---|
| Schedule I | - | Commitments and Lending Offices |
| Schedule II | - | Canadian Refractive Centers |
| Schedule III | - | Guarantors |
| Schedule 4.01(b) | - | Loan Parties |
| Schedule 4.01(f) | - | Disclosed Litigation |
| Schedule 4.01(n) | - | Environmental Disclosure |
| Schedule 4.01(p) | - | Liens |
| Schedule 4.01(q) | - | Investments |
| Schedule 5.02(b) | - | Debt |

## EXHIBITS

| | | |
|---|---|---|
| Exhibit A | - | Form of Note |
| Exhibit B | - | Form of Notice of Borrowing |
| Exhibit C | - | Form of Assignment and Acceptance |
| Exhibit D-1 | - | Form of U.S. Security Agreement |
| Exhibit D-2 | - | Form of Canadian Security Agreement |
| Exhibit E | - | Form of Guaranty |
| Exhibit F-1 | - | Form of Opinion of Canadian Counsel |
| Exhibit F-2 | - | Form of Opinion of U.S. Counsel |
| Exhibit G | - | Form of Intercreditor Agreement |

This SENIOR SECURED SUPER PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT dated as of December [__], 2009 among TLC VISION (USA) CORPORATION, a Delaware corporation and a debtor and a debtor in possession ("*Holdco*"), TLC VISION CORPORATION, a New Brunswick corporation and a debtor and debtor in possession ("*Parent*"), TLC MANAGEMENT SERVICES INC., a Delaware corporation and a debtor and a debtor in possession ("*TLC Management*", and together with Holdco and Parent, the "*Borrowers*"), the Guarantors (as hereinafter defined), the Lenders (as hereinafter defined), Cantor Fitzgerald Securities, as collateral agent (together with any successor collateral agent appointed pursuant to Article VII, the "*Collateral Agent*") for the Secured Parties (as hereinafter defined) and administrative agent (together with any successor administrative agent appointed pursuant to Article VII, the "*Administrative Agent*" and, together with the Collateral Agent, the "*Agents*") for the Lenders (as hereinafter defined).

PRELIMINARY STATEMENTS:

WHEREAS, on December [__], 2009 (the "*Petition Date*"), the Borrowers commenced voluntary cases under Chapter 11 of the Bankruptcy Code (the "*Chapter 11 Cases*") in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*");

WHEREAS, subsequent to the Petition Date, Parent filed a petition seeking ancillary relief under Part IV of the Companies' Creditors Arrangement Act (Canada) (the "*CCAA*") in the Ontario Superior Court of Justice (Commercial List) (the "*Canadian Court*") (the "*Canadian Case*", and together with the Chapter 11 Cases, the "*Cases*"));

WHEREAS, the Borrowers intend to continue to operate their business pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, prior to the Petition Date, Holdco, as borrower (in its capacity as such, the "*Prepetition Borrower*"), Parent and the other guarantors party thereto, as guarantors (in their capacity as such, collectively, the "*Prepetition Guarantors*"), the lenders party thereto (the "*Prepetition Lenders*"), and Wells Fargo Bank, National Association, as administrative agent and collateral agent (in its capacity as such, the "*Prepetition Agent*") entered into that certain Amended and Restated Credit Agreement dated as of June 21, 2007 (as amended and in effect from time to time, the "*Prepetition Credit Agreement*"), pursuant to which the Prepetition Lenders extended credit to Prepetition Borrower on the terms set forth therein;

WHEREAS, as of the Petition Date, the Prepetition Lenders under the Prepetition Credit Agreement are owed, together with any and all interest, fees, expense reimbursement and indemnification obligations, reimbursement obligations in respect of letters of credit and other obligations under the Prepetition Credit Agreement, an aggregate principal amount equal to $101,715,175.71 and CAD $1,000,000 in obligations incurred directly by the Prepetition Borrower (the "*Prepetition Lender Debt*");

WHEREAS, the Borrowers have requested that the Lenders provide financing to the Borrowers consisting of a senior secured super priority term loan facility in a principal amount of up to $15,000,000 (the "*Facility*") pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code;

WHEREAS, the Lenders have indicated their willingness to agree to extend the Facility to the Borrowers, all on terms and conditions set forth herein and in the other Loan Documents and in accordance with Sections 364(c) and 364(d) of the Bankruptcy Code, so long as:

(a)     such postpetition credit obligations are (i) secured by Liens on substantially all of the property, rights and interests, real and personal, tangible and intangible, of the Borrowers, whether now owned or hereafter acquired, subject in priority only to certain Liens and the Carve-Out, as hereinafter provided, and (ii) given superpriority status as provided in the Interim Order and, on and after the entry thereof, the Final Order;

(b)     each Guarantor has jointly and severally guaranteed such postpetition credit obligations and each Guarantor's obligations are secured by Liens on substantially all of the property and interest, real and personal, tangible and intangible, of such Guarantor, whether now owned or hereafter acquired,

(c)     the Prepetition Lenders shall receive certain adequate protection for use of cash collateral and the priming of their prepetition Liens securing the obligations of the Prepetition Borrower and Prepetition Guarantors in respect of the Prepetition Lender Debt; and

WHEREAS, the Borrowers have agreed to provide such collateral security, superpriority claims and adequate protection, subject to the approval of the Bankruptcy Court.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01.  Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"*Administrative Agent*" has the meaning specified in the preamble to this Agreement.

"*Administrative Agents' Account*" means the account of the Administrative Agent specified by the Administrative Agent in writing to the Lenders from time to time.

"*Administrative Borrower*" has the meaning specified in Section 2.15(h).

"*Affiliate*" means, as to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person or is a director or officer of such Person.  For purposes of this definition, the term "control" (including the terms "controlling," "controlled by" and "under common control with") of a Person means the possession, direct or indirect, of the power to vote 5% or more of the Voting Interests of such

2

Person or to direct or cause the direction of the management and policies of such Person, whether through the ownership of Voting Interests, by contract or otherwise.

"*Agents*" has the meaning specified in the preamble to this Agreement.

"*Agent Parties*" has the meaning specified in Section 9.02(c).

"*Agreement*" shall mean this Senior Secured Super Priority Debtor in Possession Credit Agreement, as amended, supplemented, replaced, or otherwise modified from time to time.

"*Approved Fund*" means any Person (other than a natural person) engaged in making, purchasing, holding, or investing in commercial loans and similar extensions of credit and that is advised, administered, or managed by a Lender, a Prepetition Lender, an Affiliate of a Lender or an Affiliate of a Prepetition Lender (or an entity or an Affiliate of an entity that administers, advises or manages a Lender or a Prepetition Lender); and with respect to any Lender or Prepetition Lender that is an investment fund, any other investment fund that invests in loans and that is advised, administered or managed by the same investment advisor as such Lender or a Prepetition Lender or by an Affiliate of such investment advisor.

"*Assignment and Acceptance*" means an assignment and acceptance entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 9.07 or by the definition of "Eligible Assignee"), and accepted by the Administrative Agent, in accordance with Section 9.07 and in substantially the form of Exhibit C hereto or any other form approved by the Administrative Agent.

"*Bankruptcy Code*" Title 11, United States Code, as now and hereafter in effect, or any applicable successor statute.

"*Bankruptcy Court*" has the meaning specified in the recitals to this Agreement.

"*Bankruptcy Law*" means the Bankruptcy Code, CCAA, BIA, or any similar foreign, federal or state law for the relief of debtors.

"*BIA*" means the Bankruptcy and Insolvency Act (Canada).

"*Borrowers*" has the meaning specified in the preamble to this Agreement.

"*Borrowing*" means a borrowing hereunder consisting of simultaneous Term Loans made by the Lenders.

"*Budget*" means a cash flow forecast for the period from the Petition Date to the date one hundred fifty (150) days after the Petition Date (provided, that to the extent the Maturity Date is extended in accordance with Section 2.14, the Administrative Borrower shall, concurrently with the prior written notice specified in Section 2.14, deliver to the Administrative Agent an updated Budget through the new Maturity Date, in form and substance reasonably satisfactory to the Required Lenders), which sets forth on a weekly basis cash receipts and disbursements (including, without limitation, line item entries for professional fees and expenses

3

by firm and the anticipated uses of the Facility) in form and substance satisfactory to the Required Lenders and the Borrowers, a summary of which shall be attached as Exhibit A to the Interim Order.

"***Business Day***" means a day of the year on which banks are not required or authorized by law to close in New York City and, if the applicable Business Day relates to any Term Loans, on which dealings are carried on in the London interbank market.

"***Canadian Case***" has the meaning specified in the recitals to this Agreement.

"***Canadian Court***" has the meaning specified in the recitals to this Agreement.

"***Canadian Loan Parties***" means, collectively, Parent and each Subsidiary of Parent organized under the laws of Canada or any province thereof.

"***Canadian Intellectual Property Security Agreement***" means the Intellectual Property Security Agreement granted by certain Loan Parties in favor of the Collateral Agent for the Secured Parties substantially in the form of Exhibit A to the Canadian Security Agreement.

"***Canadian Plan***" means a pension plan for employees of any Loan Party or Subsidiary or other Affiliate thereof, which plan is or is required to be registered under any Canadian federal or provincial pension benefits legislation and/or under the Income Tax Act (Canada).

"***Canadian Refractive Centers***" means (a) the refractive centers owned by Parent and set forth on Schedule II hereto and (b) all of the Equity Interests owned by Parent in TLC The Laser Center (Moncton), Inc., an Ontario corporation.

"***Canadian Security Agreement***" has the meaning specified in Section 3.01(a)(iii).

"***Capital Expenditures***" means, for any Person for any period, the sum of, without duplication, (a) all expenditures made, directly or indirectly, by such Person or any of its Subsidiaries during such period for equipment, fixed assets, real property or improvements, or for replacements or substitutions therefor or additions thereto, that have been or should be, in accordance with GAAP, reflected as additions to property, plant or equipment on a balance sheet of such Person or have a useful life of more than one year plus (b) the aggregate principal amount of all Debt (including Obligations under Capitalized Leases) assumed or incurred in connection with any such expenditures. For purposes of this definition, the purchase price of equipment that is purchased simultaneously with the trade-in of existing equipment or with insurance proceeds shall be included in Capital Expenditures only to the extent of the gross amount of such purchase price less the credit granted by the seller of such equipment for the equipment being traded in at such time or the amount of such proceeds, as the case may be.

"***Capitalized Leases***" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases.

4

*"Carve Out"* means, the following expenses: (a) statutory fees payable to the United States Trustee pursuant to 28 U.S.C. Section 1930(a)(6) and all fees and disbursements payable to the information officer in the Canadian Case as determined by order of the Canadian Court; and (b) subject to the terms and conditions of the Order, all fees and disbursements incurred by (i) legal counsel for the Parent in the Canadian Case, and (ii) the Borrowers and/or the Creditors' Committee for any attorneys and a single financial advisor for the Borrowers and Creditors' Committee respectively, retained by final order of the Bankruptcy Court (which order has not been reversed, vacated, or stayed, unless such stay has been vacated) pursuant to Sections 327 or 1103(a) of the Bankruptcy Code to the extent allowed by order of the Bankruptcy Court (which order has not been reversed, vacated, or stayed, unless such stay has been vacated) under Sections 328, 330 and/or 331 of the Bankruptcy Code and any interim compensation procedures order, but solely to the extent such fees and disbursements are within the corresponding amounts set forth in the Budget and were reflected as estimated fees and expenses of such professionals in the most recent Budget delivered by the Borrowers to the Administrative Agent prior to the date that such fees and disbursements were incurred; *provided*, that, following a notice to the Borrowers from the Administrative Agent of the occurrence of an Event of Default, the amount of the Carve Out shall not exceed $250,000 plus the amount of any compensation or reimbursement of budgeted expenses and fees incurred, awarded or paid prior to the occurrence of an Event of Default in respect of which the Carve Out is invoked.

*"Cases"* has the meaning specified in the recitals to this Agreement.

*"Cash Equivalents"* means any of the following, to the extent owned by Parent or any of its Subsidiaries free and clear of all Liens other than Liens created under the Collateral Documents, the Interim Order and the Final Order and having a maturity of not greater than 90 days from the date of issuance thereof: (a) readily marketable direct obligations of the Government of the United States or any agency or instrumentality thereof or obligations unconditionally guaranteed by the full faith and credit of the Government of the United States, and (b) insured certificates of deposit of or time deposits with any commercial bank that (i) is a Lender or a member of the Federal Reserve System, (ii) is organized under the laws of the United States or any State thereof, and (iii) has combined capital and surplus of at least $1 billion.

*"CCAA"* has the meaning specified in the recitals to this Agreement.

*"CERCLA"* means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time, 42 U.S.C. § 9601 et seq.

*"CERCLIS"* means the Comprehensive Environmental Response, Compensation and Liability Information System maintained by the U.S. Environmental Protection Agency.

*"Change of Control"* means the occurrence of any of the following: (a) Parent shall own less than 100% of the Voting Interests in any Borrower; or (b) any Person or two or more Persons acting in concert shall have acquired beneficial ownership (within the meaning of Rule 13d-3 of the Securities and Exchange Commission under the Securities Exchange Act of 1934), directly or indirectly, of Voting Interests of Parent (or other securities convertible into such Voting Interests) representing 30% or more of the combined voting power of all Voting

5

Interests of any Borrower; or (c) during any period of up to 24 consecutive months, commencing after the date of this Agreement, Continuing Directors shall cease for any reason to constitute a majority of the board of directors of Parent; or (d) any Person or two or more Persons acting in concert shall have acquired by contract or otherwise, or shall have entered into a contract or arrangement that, upon consummation, will result in its or their acquisition of the power to exercise, directly or indirectly, a controlling influence over the management or policies of Parent.

"*Chapter 11 Cases*" has the meaning specified in the recitals to this Agreement.

"*CIP Regulations*" has the meaning specified in Section 7.08.

"*Closing Date*" has the meaning specified in Section 3.01.

"*Collateral*" means all "Collateral" referred to in the Collateral Documents and all other property that is or is intended to be subject to any Lien in favor of the Collateral Agent for the benefit of the Secured Parties.

"*Collateral Agent*" has the meaning specified in the preamble to this Agreement.

"*Collateral Agent's Office*" means, with respect to the Collateral Agent or any successor Collateral Agent, the office of such Agent as such Agent may from time to time specify to the Administrative Borrower and the Administrative Agent.

"*Collateral Documents*" means the Security Agreements, the Intellectual Property Security Agreements, each of the collateral documents, instruments and agreements delivered pursuant to Section 5.01(j), and each other agreement that creates or purports to create a Lien in favor of the Collateral Agent for the benefit of the Secured Parties.

"*Commitment*" means, with respect to any Lender at any time, the amount set forth opposite such Lender's name on Schedule I hereto under the caption "Commitment" or, if such Lender has entered into one or more Assignment and Acceptances, the amount set forth for such Lender in the Register maintained by the Administrative Agent pursuant to Section 9.07(d) as such Lender's "Commitment," as such amount may be reduced at or prior to such time pursuant to Section 2.04.

"*Communications*" has the meaning specified in Section 9.02(b).

"*Consenting Lenders*" has the meaning set forth in the Plan Support Agreement in effect on the Closing Date.

"*Consolidated*" refers to the consolidation of accounts in accordance with GAAP.

"*Continuing Directors*" means the directors of Parent on the Closing Date and each other director if, in each case, such other director's nomination for election to the board of directors of Parent is recommended by at least a majority of the then Continuing Directors.

6

"***Control Account Agreement***" means a control account agreement executed and delivered as required by Section 5.01(l) and 5.02(t) hereof in favor of the Collateral Agent, for the benefit of the Secured Parties.

"***Controlled Cash***" means collectively, the Owned Cash and Non-Owned Controlled Cash.

"***Controlled Loan Party***" means any Loan Party that is either Parent or a wholly owned Subsidiary of Parent.

"***Creditors' Committee***" means the Official Unsecured Creditors' Committee to be appointed by the United States Trustee in relation to the Chapter 11 Cases, as applicable.

"***Current Assets***" of any Person means all assets of such Person that would, in accordance with GAAP, be classified as current assets of a company conducting a business the same as or similar to that of such Person, after deducting adequate reserves in each case in which a reserve is proper in accordance with GAAP.

"***Current Liabilities***" of any Person means (a) all Debt of such Person except Funded Debt, (b) all amounts of Funded Debt of such Person required to be paid or prepaid within one year after such date and (c) all other items (including taxes accrued as estimated) that in accordance with GAAP would be classified as current liabilities of such Person.

"***Debt***" of any Person means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all Obligations of such Person for the deferred purchase price of property or services (other than trade payables not overdue by more than 120 days incurred in the ordinary course of such Person's business), (c) all Obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all Obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Obligations of such Person as lessee under Capitalized Leases, (f) all Obligations of such Person under acceptance, letter of credit or similar facilities, (g) all Obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interests in such Person or any other Person or any warrants, rights or options to acquire such Equity Interests, valued, in the case of Redeemable Preferred Interests, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, (h) all Guaranteed Debt and Synthetic Debt of such Person and (i) all indebtedness and other payment Obligations referred to in clauses (a) through (h) above of another Person secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Lien on property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness or other payment Obligations.

"***Debt for Borrowed Money***" of any Person means, at any date of determination, the sum of (a) all items that, in accordance with GAAP, would be classified as indebtedness on a Consolidated balance sheet of such Person at such date, (b) all Obligations of such Person under

acceptance, letter of credit or similar facilities at such date and (c) all Synthetic Debt of such Person at such date.

"*Default*" means any Event of Default or any event that would constitute an Event of Default but for the passage of time or the requirement that notice be given or both.

"*Default Interest*" has the meaning set forth in <u>Section 2.05(b)</u>.

"*Defaulted Loan*" means, with respect to any Lender at any time, the portion of any Term Loan required to be made by such Lender to the Borrowers pursuant to <u>Section 2.01</u> or <u>Section 2.02</u> at or prior to such time that has not been made by such Lender or by the Administrative Agent for the account of such Lender pursuant to <u>Section 2.02(d)</u> as of such time. In the event that a portion of a Defaulted Loan shall be deemed made pursuant to <u>Section 2.12(a)</u>, the remaining portion of such Defaulted Loan shall be considered a Defaulted Loan originally required to be made pursuant to <u>Section 2.01</u> on the same date as the Defaulted Loan so deemed made in part.

"*Defaulted Amount*" means, with respect to any Lender at any time, any amount required to be paid by such Lender to any Agent or any other Lender hereunder or under any other Loan Document at or prior to such time that has not been so paid as of such time, including, without limitation, any amount required to be paid by such Lender to (a) the Administrative Agent pursuant to <u>Section 2.02(d)</u> to reimburse the Administrative Agent for the amount of any Term Loan made by the Administrative Agent for the account of such Lender, (b) any other Lender pursuant to <u>Section 2.10</u> to purchase any participation in Term Loans owing to such other Lender and (c) any Agent pursuant to <u>Section 7.05</u> to reimburse such Agent for such Lender's ratable share of any amount required to be paid by the Lenders to such Agent as provided therein. In the event that a portion of a Defaulted Amount shall be deemed paid pursuant to <u>Section 2.12(b)</u>, the remaining portion of such Defaulted Amount shall be considered a Defaulted Amount originally required to be paid hereunder or under any other Loan Document on the same date as the Defaulted Amount so deemed paid in part.

"*Defaulting Lender*" means, at any time, any Lender that, at such time, owes a Defaulted Loan or a Defaulted Amount.

"*DIP Proceeds Controlled Account*" means the account of the Borrowers specified by the Administrative Borrower in writing to the Administrative Agent prior to the Closing Date, which shall be subject to a Control Account Agreement.

"*Disclosed Litigation*" has the meaning specified in <u>Section 3.01(c)</u>.

"*Disposition*" or "*Dispose*" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"*Dollar*" and "*$*" means the lawful money of the United States.

8

"***Eligible Assignee***" means (a) a Lender; (b) a Prepetition Lender; (c) an Affiliate of a Lender; (d) an Affiliate of a Prepetition Lender; (e) an Approved Fund; and (f) any other Person (other than an individual) (i) approved by the Required Lenders or (ii) to whom a contemporaneous assignment of a <u>pro rata</u> portion of the assigning Lender's Prepetition Lender Debt is made; *provided, however,* that neither any Loan Party nor any Affiliate of a Loan Party shall qualify as an Eligible Assignee under this definition.

"***Environmental Action***" means any action, suit, demand, demand letter, claim, notice of non-compliance or violation, notice of liability or potential liability, investigation, proceeding, consent order or consent agreement relating in any way to any Environmental Law, any Environmental Permit or Hazardous Material or arising from alleged injury or threat to health, safety or the environment, climate or natural resources, including, without limitation, (a) by any governmental or regulatory authority for enforcement, cleanup, removal, response, remedial or other actions, damages or response costs and (b) by any governmental or regulatory authority or third party for damages, response costs, contribution, indemnification, cost recovery, compensation or declaratory or injunctive relief.

"***Environmental Law***" means all applicable current and future Federal, state, local and foreign laws (including common laws), statutes, regulations, rules having the force and effect of law, ordinances, codes, orders, writs, judgments, injunctions, decrees or judicial or agency interpretations, policies or guidance, in each case relating to pollution or protection of the environment, climate, health, safety or natural resources, or the presence, release of, discharge of, exposure to, or the generation, manufacture, processing, distribution, use, handling, transportation, treatment, storage, disposal, recycling of or the arrangement for such activities, with respect to Hazardous Materials.

"***Environmental Permit***" means any permit, approval, identification number, license, registration, notification, exemption or other authorization required under any Environmental Law.

"***Equity Interests***" means, with respect to any Person, shares of capital stock of (or other ownership or profit interests in) such Person, warrants, options or other rights for the purchase or other acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or other acquisition from such Person of such shares (or such other interests), and other ownership or profit interests in such Person (including, without limitation, partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are authorized or otherwise existing on any date of determination.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"***ERISA Affiliate***" means any Person that for purposes of Title IV of ERISA is a member of the controlled group of any Loan Party, or that is under common control with any Loan Party, within the meaning of Section 414(b), (c), (m) or (o) of the Internal Revenue Code.

9

"***Eurocurrency Liabilities***" has the meaning specified in Regulation D of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"***Eurodollar Rate***" means the higher of (a) the applicable British Bankers' Association LIBOR Rate for deposits in Dollars for any Interest Period, as reported on Page 3750 (or such other page as may replace that page) on the Dow Jones Telerate Screen (British Bankers Association) or on any successor or substitute page of such service as of 11:00 a.m. (London time) two Business Days prior to the first day of such Interest Period; *provided, that*, if no such British Bankers' Association LIBOR Rate is available to the Administrative Agent, the Eurodollar Rate for the relevant Interest Period shall instead be the rate at which deposits in Dollars are offered for such relevant Interest Period to major banks in the London interbank market for the applicable Interest Period as of approximately 11:00 a.m. (London time) two Business Days prior to the first day of such Interest Period and (b) three percent (3%) per annum.

"***Eurodollar Rate Reserve Percentage***" for any Interest Period for all Term Loans comprising part of the same Borrowing means the reserve percentage (if any) applicable two (2) Business Days before the first day of such Interest Period under regulations issued from time to time by the Board of Governors of the Federal Reserve System (or any successor) for determining the maximum reserve requirement (including, without limitation, any emergency, supplemental or other marginal reserve requirement) for a member bank of the Federal Reserve System in New York City with respect to liabilities or assets consisting of or including Eurocurrency Liabilities (or with respect to any other category of liabilities that includes deposits by reference to which the interest rate on Term Loans is determined) having a term equal to such Interest Period.

"***Events of Default***" has the meaning specified in <u>Section 6.01</u>.

"***Exit Fee***" has the meaning specified in <u>Section 2.06</u>.

"***Extension Fee***" has the meaning specified in <u>Section 2.06</u>.

"***Extraordinary Receipt***" means any cash received by or paid to or for the account of any Person not in the ordinary course of business, including, without limitation, aggregate amount of tax refunds received, pension plan reversions, proceeds of insurance (including, without limitation, any key man life insurance but excluding proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings), condemnation awards (and payments in lieu thereof), indemnity payments and any purchase price adjustment received in connection with any purchase agreement; *provided, however*, that an Extraordinary Receipt shall not include cash receipts received from proceeds of insurance, condemnation awards (or payments in lieu thereof) or indemnity payments to the extent that such proceeds, awards or payments are received by any Person in respect of any third party claim against such Person and applied to pay (or to reimburse such Person for its prior payment of) such claim and the costs and expenses of such Person with respect thereto.

"***Facility***" has the meaning specified in the recitals to this Agreement.

"***Federal Funds Rate***" means, for any period, a fluctuating interest rate per annum equal for each day during such period to the weighted average of the rates on overnight

10

Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"*Fee Letter*" means the fee letter dated [_____], 2009 between the Borrowers and the Administrative Agent.

"*Final Order*" means a final order of the Bankruptcy Court authorizing and approving this Agreement and the other Loan Documents on a final basis and entered following a final hearing in form and substance satisfactory to the Administrative Agent and the Required Lenders, the Borrowers, and their respective counsel.

"*Final Order Amount*" means, at any time, $15,000,000 minus the Interim Order Amount, as such amount may be reduced at or prior to such time pursuant to Section 5.02(e).

"*Final Order Funding Date*" means the date on which the Final Order is entered.

"*Financial Advisor*" means Gordian Group LLC or such other financial advisor as may be engaged by the Special Counsel from time to time.

"*Fiscal Year*" means a fiscal year of Parent and its Consolidated Subsidiaries ending on December 31 in any calendar year.

"*Fund*" means any Person (other than an individual) that is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"*Funded Debt*" of any Person means all Debt of such Person that by its terms matures more than one year after the date of determination or matures within one year from such date but is renewable or extendible, at the option of such Person, to a date more than one year after such date or arises under a revolving credit or similar agreement that obligates the lender or lenders to extend credit during a period of more than one year after such date, including, without limitation, all amounts of Funded Debt of such Person required to be paid or prepaid within one year after the date of determination.

"*GAAP*" has the meaning specified in Section 1.03.

"*Governmental Authority*" means any nation or government, any state, province, city, municipal entity or other political subdivision thereof, and any governmental, executive, legislative, judicial, administrative or regulatory agency, department, authority, instrumentality, commission, board, bureau or similar body, whether federal, state, provincial, territorial, local or foreign.

"*Governmental Authorization*" means any authorization, approval, consent, franchise, license, covenant, order, ruling, permit, certification, exemption, notice, declaration or

11

similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority.

"***Guaranteed Debt***" means, with respect to any Person, any Obligation or arrangement of such Person to guarantee or intended to guarantee any Debt, leases, dividends or other payment Obligations ("***primary obligations***") of any other Person (the "***primary obligor***") in any manner, whether directly or indirectly, including, without limitation, (a) the direct or indirect guarantee, endorsement (other than for collection or deposit in the ordinary course of business), co making, discounting with recourse or sale with recourse by such Person of the Obligation of a primary obligor, (b) the Obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement or (c) any Obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof. The amount of any Guaranteed Debt shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guaranteed Debt is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Guaranteed Debt) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"***Guarantors***" means the Subsidiaries of Parent (other than Borrowers) listed on Schedule III hereto and each other Subsidiary of Parent that shall be required to execute and deliver a Guaranty pursuant to Section 5.01(j).

"***Guaranty***" means the Guaranty made by the Guarantors in favor of the Secured Parties, substantially in the form of Exhibit E, together with each other guaranty and guaranty supplement delivered pursuant to Section 5.01(j), in each case as amended, amended and restated, modified or otherwise supplemented.

"***Hazardous Materials***" means (a) any petroleum or petroleum products, by-products or breakdown products, and all other hydrocarbons, radioactive or nuclear materials, asbestos or asbestos-containing materials, polychlorinated biphenyls and radon gas, chlorofluorocarbons and all other ozone-depleting substances and (b) any other chemical, material or substance or waste designated, classified, prohibited, limited or regulated as hazardous or toxic or as a pollutant or contaminant under any Environmental Law.

"***Healthcare Law***" means:

(a)     (i) the federal Anti-Kickback Statute (42 U.S.C. §1320a-7b), (ii) the Stark Law (42 U.S.C. §1395nn and §1395(q)), (iii) the civil False Claims Act (31 U.S.C. §3729 et seq.), (iv) Sections 1320a-7a and 1320a-7b of Title 42 of the United States Code, (v)

12

applicable state statutes similar to any of the foregoing and (vi) the regulations promulgated pursuant to such federal and state statutes;

(b)     the federal Food, Drug & Cosmetic Act (21 U.S.C. §§301 et seq.) and the regulations promulgated pursuant thereto;

(c)     the Health Insurance Portability and Accountability Act of 1996 (Pub. L. No. 104-191) and the regulations promulgated pursuant thereto;

(d)     laws, rules and regulations governing Medicare and Medicaid;

(e)     the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (Pub. L. No. 108-173) and the regulations promulgated pursuant thereto;

(f)     quality, safety and accreditation standards and requirements of all applicable state laws or regulatory bodies;

(g)     any applicable law relating to the Borrowers' or any Subsidiary's ownership, management or operation of a healthcare facility or business, or assets used in connection therewith;

(h)     any applicable law relating to the billing or submission of claims, collection of accounts receivable, underwriting the cost of, or provision of management or administrative services in connection with, any and all of the foregoing, by Parent or any of its Subsidiaries; and

(i)     any and all other applicable healthcare laws, regulations, manual provisions, policies and administrative guidance having the force of law with respect to each of (a) through (h) above, as may be amended from time to time.

"*Hedge Agreements*" means interest rate swap, cap or collar agreements, interest rate future or option contracts, currency swap agreements, currency future or option contracts and other hedging agreements.

"*Holdco*" has the meaning specified in the preamble to this Agreement.

"*Indemnified Party*" has the meaning specified in Section 9.04(b).

"*Information*" means, all information received from Parent or any of its Subsidiaries relating to Parent or any of its Subsidiaries or any of their respective businesses, other than any such information that is available to or in the possession of the Administrative Agent, any Lender or their Representatives on a non confidential basis prior to disclosure by Parent or any of its Subsidiaries; *provided* that, such information was or is clearly identified at the time of delivery as confidential or that is subsequently classified in a separate communication as confidential.

"*Initial Pledged Debt*" has the meaning specified in the Security Agreements.

"*Initial Pledged Equity*" has the meaning specified in the Security Agreements.

"*Intellectual Property Security Agreement*" means, collectively, the Canadian Intellectual Property Security Agreement and the U.S. Intellectual Property Security Agreement.

"*Intercreditor Agreement*" means an intercreditor agreement among the Agents, the Prepetition Agents and the Loan Parties, in substantially the form of Exhibit G hereto.

"*Interest Period*" means, for each Term Loan comprising part of the same Borrowing, the period commencing on the date of such Term Loan, and ending on the last day of the period selected by the Administrative Borrower pursuant to the provisions below and, thereafter, each subsequent period commencing on the last day of the immediately preceding Interest Period and ending on the last day of the period selected by the Administrative Borrower pursuant to the provisions below. The duration of each such Interest Period shall be one month; *provided, however*, that:

> (a)     whenever the last day of any Interest Period would otherwise occur on a day other than a Business Day, the last day of such Interest Period shall be extended to occur on the next succeeding Business Day, provided, however, that, if such extension would cause the last day of such Interest Period to occur in the next following calendar month, the last day of such Interest Period shall occur on the next preceding Business Day; and

> (b)     whenever the first day of any Interest Period occurs on a day of an initial calendar month for which there is no numerically corresponding day in the next succeeding calendar month, such Interest Period shall end on the last Business Day of such succeeding calendar month.

"*Interim Order*" means the Interim Order pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (a) approving postpetition financing pursuant to the Facility and the making of Term Loans in an aggregate amount not to exceed the Interim Order Amount, (b) authorizing use of cash collateral, (c) granting Liens and providing superpriority administrative expense status, (d) granting adequate protection, (e) modifying the automatic stay, and (f) scheduling a final hearing with respect to the Chapter 11 Cases (including the Budget), to be entered on the docket of the Chapter 11 Cases within three (3) Business Days of the Petition Date.

"*Interim Order Amount*" means, at any time, up to $7,500,000, as such amount may be reduced at or prior to such time pursuant to Section 5.02(e).

"*Internal Revenue Code*" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"*Investment*" in any Person means any loan or advance to such Person, any purchase or other acquisition of any Equity Interests or Debt or the assets comprising a division or business unit or a substantial part or all of the business of such Person, any capital contribution to such Person or any other direct or indirect investment in such Person, including, without limitation, any acquisition by way of a merger or consolidation (or similar transaction)

14

and any arrangement pursuant to which the investor incurs Debt of the types referred to in clause (h) or (i) of the definition of "Debt" in respect of such Person.

"*Kremer Claims*" has the meaning specified in <u>Section 3.02(c)</u>.

"*Lenders*" means the banks, financial institutions and other institutional lenders listed on the signature pages hereof as Lenders and each Person that shall become a Lender hereunder pursuant to <u>Section 9.07</u> for so long as such Lender or Person, as the case may be, shall be a party to this Agreement as a Lender.

"*Lending Office*" means, with respect to any Lender, the office of such Lender specified as its "**Lending Office**" opposite its name on <u>Schedule I</u> hereto or in the Assignment and Acceptance pursuant to which it became a Lender (or, if no such office is specified), such other office of such Lender as such Lender may from time to time specify in writing to the Administrative Borrower and the Administrative Agent.

"*Lien*" means any lien, security interest, hypothecation or other charge or encumbrance of any kind, or any other type of preferential arrangement, including, without limitation, the lien or retained security title of a conditional vendor and any easement, right of way or other encumbrance on title to real property.

"*Liquidity*" means, as of any date, the aggregate amount of all Controlled Cash as of such date.

"*Liquidity Guidelines*" means collectively, the TLC Current System Payment Guidelines and the TLC Current System Receivables Practices.

"*Loan Documents*" means (a) this Agreement, (b) the Notes, (c) the Guaranties, (d) the Collateral Documents, and (e) the Fee Letter, each of (a) through (e) as amended.

"*Loan Parties*" means the Borrowers and the Guarantors.

"*Margin Stock*" has the meaning specified in Regulation U.

"*Material Adverse Change*" means any material adverse change in the business, condition (financial or otherwise), operations, performance, assets or liabilities of Parent and its Subsidiaries, taken as a whole.

"*Material Adverse Effect*" means a material adverse effect on (a) the business, condition (financial or otherwise), operations, performance, assets or liabilities of Parent and its Subsidiaries, taken as a whole, (b) the rights and remedies of any Agent or any Lender under any Loan Document or (c) the ability of any Loan Party to perform its Obligations under any Loan Document to which it is or is to be a party.

"*Maturity Date*" means the date (subject to extension in accordance with Section 2.14) that is the earliest of (a) (i) forty-five (45) days after the date of the entry of the Interim Order if a Final Order has not been entered by such date, or (ii) one hundred fifty (150) days after the Petition Date, (b) the effective date of the Plan of Reorganization, (c) the date on which

15

a sale or sales of all or substantially all of the Borrowers' assets is consummated under Section 363 of the Bankruptcy Code, (d) the date of conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code or any equivalent proceeding in the Canadian Case, (e) except as expressly contemplated by the Plan Term Sheet, a proposal or liquidation of any or all or substantially all of the assets of any of the Borrowers or Guarantors under the BIA, (f) the dismissal of any of the Cases, and (g) approval by the Bankruptcy Court of any debtor-in-possession financing for the Borrowers or any of its Affiliates (other than the Facility) unless (i) in the event that the Liens securing such indebtedness are senior to or pari passu with Liens securing the obligations under the Prepetition Credit Agreement but junior to the Liens securing the Facility, entry into such financing is consented to by the Required Prepetition Lenders and (ii) in the event that the Liens securing such indebtedness are senior to or pari passu with the Liens securing the Facility, entry into such financing is consented to by both the Required Lenders and the Required Prepetition Lenders.

"***Measurement Period***" means each period of four consecutive fiscal quarters of Parent.

"***Medicaid***" means, collectively, the healthcare assistance program established by Title XIX of the Social Security Act (42 U.S.C. §§1396 et seq.) and any statutes succeeding thereto, and all laws, rules, regulations, manuals, orders or guidelines pertaining to such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

"***Medicaid Regulations***" means, collectively, (a) all federal statutes (whether set forth in Title XIX of the Social Security Act or elsewhere) affecting the medical assistance program established by Title XIX of the Social Security Act and any statutes succeeding thereto; (b) all applicable provisions of all federal rules, regulations, manuals and orders of all Governmental Authorities promulgated pursuant to or in connection with the statutes described in clause (a) above and all federal administrative, reimbursement and other guidelines of all Governmental Authorities having the force of law promulgated pursuant to or in connection with the statutes described in clause (a) above; (c) all state statutes and plans for medical assistance enacted in connection with the statutes and provisions described in clauses (a) and (b) above; and (d) all applicable provisions of all rules, regulations, manuals and orders of all Governmental Authorities promulgated pursuant to or in connection with the statutes described in clause (c) above and all state administrative, reimbursement and other guidelines of all Governmental Authorities having the force of law promulgated pursuant to or in connection with the statutes described in clause (c) above, in each case as may be amended, supplemented or otherwise modified from time to time.

"***Medical Reimbursement Programs***" shall mean a collective reference to the Medicare and Medicaid programs and any other health care program operated by or financed in whole or in part by any foreign or domestic federal, state or local government.

"***Medicare***" means, collectively, the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act (42 U.S.C. §§1395 et seq.) and any statutes succeeding thereto, and all laws, rules, regulations, manuals, orders or guidelines

16

pertaining to such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

"*Medicare Regulations*" means, collectively, all federal statutes (whether set forth in Title XVIII of the Social Security Act or elsewhere) affecting the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act and any statutes succeeding thereto; together with all applicable provisions of all rules, regulations, manuals and orders and administrative, reimbursement and other guidelines having the force of law of all Governmental Authorities promulgated pursuant to or in connection with any of the foregoing, as each may be amended, supplemented or otherwise modified from time to time.

"*Moody's*" means Moody's Investors Service, Inc.

"*Multiemployer Plan*" means a multiemployer plan, as defined in Section 3(37) of ERISA, to which any Loan Party or any ERISA Affiliate is making or has an obligation to make contributions, or has within any of the preceding six plan years made or had an obligation to make contributions.

"*Multiple Employer Plan*" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of any Loan Party or any ERISA Affiliate and at least one Person other than the Loan Parties and the ERISA Affiliates or (b) was so maintained and in respect of which any Loan Party or any ERISA Affiliate could reasonably be expected to have liability under Section 4043, 4064 or 4069 of ERISA in the event of a withdrawal from such plan or if such plan has been or were to be terminated.

"*Net Cash Proceeds*" means:

(a)     with respect to any sale, lease, transfer or other disposition of any asset of Parent or any of its Subsidiaries (other than any sale, lease, transfer or other disposition of assets pursuant to clause Section 5.02(e), the excess, if any, of (i) the sum of cash and Cash Equivalents received in connection with such sale, lease, transfer or other disposition (including any cash or Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Debt (other than Debt under the Loan Documents) that is secured by such asset and that is required to be repaid in connection with such sale, lease, transfer or other disposition thereof, (B) the reasonable and customary out-of-pocket costs, fees, commissions, premiums and expenses incurred by Parent or its Subsidiaries, (C) federal, state, provincial, foreign and local taxes reasonably estimated (on a Consolidated basis) to be actually payable within the current or the immediately succeeding tax year as a result of any gain recognized in connection therewith and (D) a reasonable reserve (which reserve shall be deposited into an escrow account with the Collateral Agent) for any purchase price adjustment or any indemnification payments (fixed and contingent) attributable to the seller's obligations to the purchaser undertaken by Parent or any of its Subsidiaries in connection with such sale, lease, transfer or other disposition (but excluding any purchase price adjustment or any indemnity that, by its terms, will not under any circumstances be made prior to the final maturity of the Facility); *provided*, *however*, that Net Cash Proceeds shall not

17

include any such amounts to the extent such amounts are reinvested in capital assets used or useful in the business of Parent and its Subsidiaries within 6 months after the date of receipt thereof;

(b)      with respect to the incurrence or issuance of any Debt by Parent or any of its Subsidiaries (other than Debt incurred or issued pursuant to Section 5.02(b)), the excess of (i) the sum of the cash and Cash Equivalents received in connection with such incurrence or issuance over (ii) the underwriting discounts and commissions or other similar payments, and other out-of-pocket costs, fees, commissions, premiums and expenses incurred by Parent or any of its Subsidiaries in connection with such incurrence or issuance to the extent such amounts were not deducted in determining the amount referred to in clause (i);

(c)      with respect to the sale or issuance of any Equity Interests (including, without limitation, the receipt of any capital contribution) by Parent, the excess of (i) the sum of the cash and Cash Equivalents received in connection with such sale or issuance over (ii) the underwriting discounts and commissions or similar payments, and other out-of-pocket costs, fees, commissions, premiums and expenses, incurred by Parent or any of its Subsidiaries in connection with such sale or issuance to the extent such amounts were not deducted in determining the amount referred to in clause (i); *provided, however*, that Net Cash Proceeds shall not include any funds received in connection with the exercise of stock options granted to employees or directors of Parent or any of its Subsidiaries; and

(d)      with respect to any Extraordinary Receipt that is not otherwise included in clause (a), (b) or (c) above, the sum of the cash and Cash Equivalents received in connection therewith; *provided, however*, that Net Cash Proceeds shall not include any such amounts to the extent such amounts are reinvested in capital assets used or useful in the business of Parent and its Subsidiaries within 6 months after the date of receipt thereof.

"*Non-Owned Controlled Cash*" means, as of any date, all cash (a) which is held in a deposit account over which a Controlled Loan Party has the exclusive contractual right and unrestricted power at any time to withdraw such cash, and in the ordinary course does so no less frequently than weekly, and (b) which, upon such withdrawal and deposit into a deposit account of a Controlled Loan Party subject to a Control Account Agreement, will then be Controlled Loan Parties Controlled Cash.

"*Note*" means a promissory note of the Borrowers payable to the order of any Lender (or at a Lender's request, payable to such Lender and its registered assigns), in substantially the form of Exhibit A hereto, evidencing the indebtedness of the Borrowers to such Lender resulting from the Term Loan(s) made by such Lender, as amended.

"*Notice of Borrowing*" has the meaning specified in Section 2.02(a).

"*NPL*" means the National Priorities List under CERCLA.

"*Obligation*" means, with respect to any Person, any payment, performance or other obligation of such Person of any kind, including, without limitation, any liability of such

18

Person on any claim, whether or not the right of any creditor to payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured or unsecured, and whether or not such claim is discharged or stayed. Without limiting the generality of the foregoing, the Obligations of any Loan Party under the Loan Documents include (a) the obligation to pay principal, interest, charges, expenses, fees, attorneys' fees and disbursements, indemnities and other amounts payable by such Loan Party under any Loan Document, and (b) the obligation of such Loan Party to reimburse any amount in respect of any of the foregoing that any Lender, in its sole discretion, may elect to pay or advance on behalf of such Loan Party.

"*Orders*" means the Interim Order and the Final Order; and "*Order*" means whichever of the Interim Order or the Final Order is then in effect.

"*Other Taxes*" has the meaning specified in Section 2.09(b).

"*Owned Cash*" means, as of any date, all cash and Cash Equivalents which are (a) legally, beneficially and exclusively owned by any Controlled Loan Party, (b) held in a deposit account or securities account of such Controlled Loan Party subject to a Control Account Agreement, (c) subject to no obligation to segregate or hold in trust for the benefit of third parties and (d) subject to no Liens other than Liens created under the Loan Documents and the Prepetition Loan Documents and customary Liens in favor of a bank or other depository institution securing obligations owed to such bank or other depository institution in respect of or arising out of such deposit account.

"*Parent*" has the meaning specified in the recitals to this Agreement.

"*Patriot Act*" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. 107-56, signed into law October 26, 2001.

"*PBGC*" means the Pension Benefit Guaranty Corporation (or any successor).

"*Permitted Liens*" means such of the following as to which no enforcement, collection, execution, levy or foreclosure proceeding shall have been commenced (except as are being challenged in good faith and by proper proceedings by the applicable Loan Party(ies) and for which adequate reserves in accordance with GAAP have been established on the books of such Loan Party(ies)): (a) Liens for taxes, assessments and governmental charges or levies to the extent not required to be paid under Section 5.01(b); (b) Liens imposed by law, such as materialmen's, mechanics', carriers', workmen's and repairmen's Liens and other similar Liens arising in the ordinary course of business securing obligations that (i) are not overdue for a period of more than 30 days and (ii) individually or together with all other Permitted Liens outstanding on any date of determination do not materially adversely affect the use of the property to which they relate; (c) pledges or deposits in the ordinary course of business to secure obligations under workers' compensation laws or similar legislation or to secure public or statutory obligations; (d) deposits to secure the performance of bids, trade contracts and leases (other than Debt), statutory obligations, surety bonds (other than bonds related to judgments or litigation), performance bonds and other obligations of a like nature incurred in the ordinary course of business; (e) Liens securing judgments (or the payment of money) not constituting a

19

Default under Section 6.01(f) or securing appeal or other surety bonds related to such judgments; and (f) easements, rights of way and other similar encumbrances on title to real property that do not render title to the property encumbered thereby unmarketable or materially adversely affect the use of such property for its present purposes.

"***Person***" means an individual, partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture or other entity, or a government or any political subdivision or agency thereof.

"***Petition Date***" has the meaning specified in the recitals hereto.

"***Plan***" means a Single Employer Plan, a Multiple Employer Plan or a Canadian Plan.

"***Plan of Reorganization***" means the plan of reorganization for the Borrowers, in form and substance satisfactory to the Required Lenders, that is consistent in all material respects with the terms of the Plan Support Agreement and Plan Term Sheet.

"***Plan Support Agreement***" means that certain plan support agreement among the Loan Parties and the Consenting Lenders.

"***Plan Term Sheet***" means the Plan Term Sheet attached as Exhibit A to the Plan Support Agreement.

"***Platform***" has the meaning specified in Section 9.02(b).

"***Pledged Debt***" has the meaning specified in the Security Agreements.

"***Pledged Equity***" has the meaning specified in the Security Agreements.

"***PPSA***" means the Personal Property Security Act (Ontario), the Civil Code of Quebec or any other applicable Canadian federal or provincial statute pertaining to the granting, perfecting, publication, priority or ranking of security interests, liens, hypothecs on property, whether real, personal, mixed, moveable or immoveable, and any successor statutes, together with any regulations thereunder, in each case as in effect from time to time, and any reference to any section of any such statute shall be construed to also refer to any successor section thereof.

"***Preferred Interests***" means, with respect to any Person, Equity Interests issued by such Person that are entitled to a preference or priority over any other Equity Interests issued by such Person upon any distribution of such Person's property and assets, whether by dividend or upon liquidation.

"***Prepetition Agents***" has the meaning specified in the recitals to this Agreement.

"***Prepetition Borrower***" has the meaning specified in the recitals to this Agreement.

"***Prepetition Credit Agreement***" has the meaning specified in the recitals to this Agreement.

"***Prepetition Loan Documents***" means the Prepetition Credit Agreement and all security and other documents relating thereto or entered into in connection therewith.

"***Prepetition Guarantors***" has the meaning specified in the recitals to this Agreement.

"***Prepetition Lender Debt***" has the meaning specified in the recitals to this Agreement.

"***Prepetition Lenders***" has the meaning specified in the recitals to this Agreement.

"***Recognition Order***" has the meaning specified in <u>Section 3.01(l)</u>.

"***Redeemable***" means, with respect to any Equity Interest, any such Equity Interest that (a) the issuer has undertaken to redeem at a fixed or determinable date or dates, whether by operation of a sinking fund or otherwise, or upon the occurrence of a condition not solely within the control of the issuer or (b) is redeemable at the option of the holder.

"***Register***" has the meaning specified in <u>Section 9.07(d)</u>.

"***Registrar***" has the meaning specified in <u>Section 9.07(d)</u>.

"***Regulation U***" means Regulation U of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"***Representatives***" has the meaning specified in <u>Section 9.09</u>.

"***Required Lenders***" means, at any time, Lenders owed or holding at least a majority in interest of the sum of (a) the aggregate outstanding principal amount of the Term Loans and (b) prior to the Final Order Funding Date, the aggregate unfunded portion (if any) of the Total Commitments at such time; *provided, however,* that if any Lender shall be a Defaulting Lender at such time, there shall be excluded from the determination of Required Lenders at such time (i) the aggregate principal amount of the Term Loans owing to such Lender (in its capacity as a Lender) and outstanding at such time and (ii) prior to the Final Order Funding Date, the aggregate unfunded portion (if any) of the Commitments of such Lender (in its capacity as a Lender) at such time.

"***Required Prepetition Lenders***" shall have the same meaning as the term "Required Lenders" in the Prepetition Credit Agreement.

"***Requirement of Law***" shall mean, as to any Person, (a) the partnership agreement, charter, certificate of incorporation, articles of incorporation, bylaws, operating agreement or other organizational or governing documents of such Person, (b) any federal, state or local law, treaty, ordinance, rule or regulation, and (c) any order, decree or determination of a

21

court, arbitrator or other Governmental Authority; in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"*Responsible Officer*" shall mean, as to any Person, either (a) its president, chief executive officer or chief financial officer, or (b) with respect to financial matters, its president, chief executive officer or chief financial officer.

"*Restructuring Monitor*" means Mr. Robert Troisio of Morris Anderson & Associates Ltd.

"*S&P*" means Standard & Poor's, a division of the McGraw Hill Companies, Inc.

"*Secured Obligations*" has the meaning specified in Section 2 of the Security Agreements.

"*Secured Parties*" means the Agents and the Lenders.

"*Securities Account*" has the meaning specified in the Security Agreements.

"*Securities Account Control Agreement*" has the meaning specified in the Security Agreements.

"*Security Agreements*" means, collectively, the Canadian Security Agreement and the U.S. Security Agreement.

"*Securitization*" has the meaning specified in Section 9.07(j).

"*Securitization Liabilities*" has the meaning specified in Section 9.07(j).

"*Securitization Party*" has the meaning specified in Section 9.07(j).

"*Securitizing Party*" has the meaning specified in Section 9.07(j).

"*Single Employer Plan*" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, (a) that is or was maintained for employees of any Loan Party or any ERISA Affiliate and no Person other than the Loan Parties and the ERISA Affiliates or (b) to which any Loan Party or any ERISA Affiliate contributes or has any obligation to contribute, or (c) with respect to which any Loan Party could have reasonably be expected to have any liability, either actual or contingent, under Section 4062 or 4069 of ERISA in the event such plan has been or were to be terminated.

"*Special Counsel*" means Bingham McCutchen LLP or such other counsel as may be approved by the Required Lenders.

"*Subordinated Debt*" means Debt subordinated to the obligations under this Agreement on terms reasonably satisfactory to the Required Lenders.

"*Subsidiary*" of any Person means any corporation, partnership, joint venture, limited liability company, trust or estate of which (or in which) more than 50% of (a) the issued

and outstanding capital stock having ordinary voting power to elect a majority of the Board of Directors of such corporation (irrespective of whether at the time capital stock of any other class or classes of such corporation shall or might have voting power upon the occurrence of any contingency), (b) the interest in the capital or profits of such partnership, joint venture or limited liability company or (c) the beneficial interest in such trust or estate is at the time directly or indirectly owned or controlled by such Person, by such Person and one or more of its other Subsidiaries or by one or more of such Person's other Subsidiaries.

"***Superpriority Claim***" means a claim against a Borrower or its estate in the Chapter 11 Cases which is an administrative expense claim having priority over (a) any and all allowed administrative expenses, and (b) unsecured claims now existing or hereafter arising, including, without limitation, administrative expenses of the kind specified in Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 or 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code (including, subject to entry of the Final Order, Section 506(c)).

"***Synthetic Debt***" means, with respect to any Person, without duplication of any clause within the definition of "Debt," all (a) Obligations of such Person under any lease that is treated as an operating lease for financial accounting purposes and a financing lease for tax purposes (i.e., a "synthetic lease"), (b) Obligations of such Person in respect of transactions entered into by such Person, the proceeds from which would be reflected on the financial statements of such Person in accordance with GAAP as cash flows from financings at the time such transaction was entered into (other than as a result of the issuance of Equity Interests) and (c) Obligations of such Person in respect of other transactions entered into by such Person that are not otherwise addressed in the definition of "Debt" or in clause (a) or (b) above that are intended to function primarily as a borrowing of funds (including, without limitation, any minority interest transactions that function primarily as a borrowing).

"***Taxes***" has the meaning specified in Section 2.09(a).

"***Term Loan***" has the meaning specified in Section 2.01.

"***Term Loan Percentage***" means as to any Lender (a) at any time before the Closing Date, the percentage which such Lender's Commitment then constitutes of the Total Commitments, (b) at any time after the Closing Date but before the Final Order Funding Date, the percentage which the sum of (i) the aggregate principal amount of such Lender's Term Loans then outstanding and (ii) the unfunded portion (if any) of such Lender's Commitments then constitutes of the sum of (A) the aggregate principal amount of the Term Loans then outstanding and (B) the unfunded portion (if any) of the Total Commitments on such date), and (c) at any time after the Final Order Funding Date, the percentage which the aggregate principal amount of such Lender's Term Loans then outstanding constitutes of the aggregate principal amount of the Term Loans then outstanding.

"***Total Commitments***" means the aggregate Commitments of all Lenders.

"***TLC Current System Payment Guidelines***" means the payment guidelines maintained by Parent and its Subsidiaries as of the date hereof with respect to the terms and conditions governing payments to be made to trade creditors.

23

"***TLC Current System Receivables Practices***" means the practices maintained by Parent and its Subsidiaries as of the date hereof with respect to the terms on which receivables are settled, compromised and/or paid.

"***U.S. Debtors***" means Holdco and TLC Management.

"***U.S. Intellectual Property Security Agreement***" means the Intellectual Property Security Agreement granted by certain Loan Parties in favor of the Collateral Agent for the Secured Parties substantially in the form of Exhibit A to the U.S. Security Agreement.

"***U.S. Security Agreement***" has the meaning specified in <u>Section 3.01(a)(iii)</u>.

"***Voting Interests***" means shares of capital stock issued by a corporation, or equivalent Equity Interests in any other Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even if the right so to vote has been suspended by the happening of such a contingency.

"***Working Capital***" shall mean the remainder of (a) Current Assets less Cash Equivalents minus (b) Current Liabilities less Debt referred to in subclause (a) of the definition thereof due within 12 months of the date of determination.

SECTION 1.02. <u>Computation of Time Periods; Other Definitional Provisions</u>. In this Agreement and the other Loan Documents in the computation of periods of time from a specified date to a later specified date, the word "***from***" means "from and including" and the words "***to***" and "***until***" each mean "to but excluding." References in the Loan Documents to any agreement or contract "***as amended***" shall mean and be a reference to such agreement or contract as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms.

SECTION 1.03. <u>Accounting Terms</u>. All accounting terms not specifically defined herein shall be construed in accordance with generally accepted accounting principles consistent with those applied in the preparation of the financial statements referred to in <u>Section 4.01(g)</u> ("***GAAP***").

## ARTICLE II

## AMOUNT AND TERMS OF THE TERM LOANS

SECTION 2.01. <u>Term Loan Commitments</u>. Each Lender severally agrees, on the terms and conditions hereinafter set forth, to make a term loan or loans (each, a "***Term Loan***") to the Borrowers in two (2) advances, which shall, in each case, be deposited into the DIP Proceeds Controlled Account. The Borrowers shall only be entitled to withdraw amounts from the DIP Proceeds Controlled Account if (a) the aggregate amount of Controlled Cash in all accounts (other than the DIP Proceeds Controlled Account held by the Borrowers (whether or not subject to a Control Account Agreement) is less than $3,000,000 at such time, (b) no Default or Event of Default has occurred and is continuing (other than with respect to the initial advance, any Default or Event of Default arising solely as a result of a breach of Section 5.04(b) hereof), and (c) the

A/73160038.15

Administrative Agent shall have received a certificate from the Chief Financial Officer of the Administrative Borrower, in form and substance reasonably satisfactory to the Required Lenders, certifying as to the aggregate amount of Controlled Cash in all accounts (other than the DIP Proceeds Controlled Account) held by the Borrowers (whether or not subject to a Control Account Agreement). The first advance of Term Loans shall be made on the Closing Date in an aggregate amount for each Lender equal to such Lender's Term Loan Percentage of the Interim Order Amount, but in no event shall such amount exceed such Lender's Commitment. The second and final advance of Term Loans shall be made on the Final Order Funding Date in an aggregate amount for each Lender equal to such Lender's Term Loan Percentage of the Final Order Amount; provided, that with respect to each Lender, the aggregate amount of the Term Loans made pursuant to this sentence and the previous sentence shall not exceed such Lender's Commitment. Each Term Loan may be repaid or prepaid in accordance with the provisions hereof, but once repaid or prepaid may not be reborrowed.

SECTION 2.02. Making the Term Loans. (a) Each Borrowing shall be made on notice, given not later than 12:00 p.m. (New York time) on the third Business Day prior to the date of the hearing for approval of the Interim Order or the Final Order, as the case may be, by the Administrative Borrower to the Administrative Agent, which shall give to each Lender prompt notice thereof by telecopier or electronic communication. Each such notice of a Borrowing (a "*Notice of Borrowing*") shall be by telephone, confirmed immediately in writing, or by telecopier or electronic communication, in substantially the form of Exhibit B hereto, specifying therein the requested Interim Order Amount in the case of the Borrowing on the Closing Date or Final Order Amount in the case of the Borrowing on the Final Order Funding Date. Each Lender shall, before 11:00 a.m. (New York City time) on the date of such Borrowing, make available for the account of its Lending Office to the Administrative Agent at the Administrative Agent's Account, in same day funds, such Lender's ratable portion of such Borrowing in accordance with the respective Commitments under the Facility of the Lenders. After the Administrative Agent's receipt of such funds and upon fulfillment of the applicable conditions set forth in Article III, the Administrative Agent will make such funds available to the Borrowers by transfer of such funds to the DIP Proceeds Controlled Account in like funds as received.

(b)     Each Notice of Borrowing shall be irrevocable and binding on the Borrowers. The Borrowers shall indemnify each Lender against any loss, cost or expense incurred by such Lender as a result of any failure to fulfill on or before the date for such Borrowing the applicable conditions set forth in Article III, including, without limitation, any loss (including loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Lender to fund the Term Loans to be made by such Lender as part of such Borrowing when such Term Loans, as a result of such failure, is not made on such date.

(c)     Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's ratable portion of such Borrowing, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Borrowing in accordance with subsection (a) of this Section 2.02, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrowers on such date a

A/73160038.15

corresponding amount. If and to the extent that such Lender shall not have so made such ratable portion available to the Administrative Agent, such Lender and the Borrowers severally agree to repay or pay to the Administrative Agent forthwith on demand such corresponding amount and to pay interest thereon, for each day from the date such amount is made available to the Borrowers until the date such amount is repaid or paid to the Administrative Agent, at (i) in the case of the Borrowers, the interest rate applicable at such time under Section 2.05 to Term Loans comprising such Borrowing and (ii) in the case of such Lender, the Federal Funds Rate. If such Lender shall pay to the Administrative Agent such corresponding amount, such amount so paid shall constitute such Lender's Term Loan as part of such Borrowing for all purposes.

(d)     The failure of any Lender to make the Term Loans to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Term Loans on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Term Loans to be made by such other Lender on the date of any Borrowing.

SECTION 2.03. Repayment of Term Loans. The Borrowers shall repay to the Administrative Agent for the ratable account of the Lenders the aggregate outstanding principal amount of the Term Loans on the Maturity Date (or on such earlier date on which the Term Loans become due and payable pursuant to Article VI), together with any and all accrued and unpaid interest thereon (which amounts shall be reduced as a result of the application of prepayments in accordance with Section 2.04).

SECTION 2.04. Prepayments. (a) Optional. Any Borrower may, upon at least one Business Day's notice to the Administrative Agent stating the proposed date and aggregate principal amount of the prepayment, and if such notice is given, the Borrowers shall prepay the outstanding aggregate principal amount of the Term Loans comprising part of the same Borrowing in whole or ratably in part, together with accrued interest to the date of such prepayment on the aggregate principal amount prepaid; *provided, however*, that (x) each partial prepayment shall be in an aggregate principal amount of $500,000 or an integral multiple of $500,000 in excess thereof and (y) if any prepayment is made on a date other than the last day of an Interest Period for such Term Loan, the Borrowers shall also pay any amounts owing pursuant to Section 9.04(c).

(b)     Mandatory. (i) If any Loan Party or any of its Subsidiaries Disposes of any property or assets, including, without limitation, any of the Canadian Refractive Centers, whether pursuant to a sale under Section 363 of the Bankruptcy Code or otherwise (other than any Disposition of any property or assets permitted by Section 5.02(e)) and sales or issuances by Parent of its Equity Interests referred to in clause (ii) below), the Borrowers shall prepay an aggregate principal amount of Term Loans equal to 100% of all such Net Cash Proceeds immediately upon receipt thereof by such Loan Party or such Subsidiary. The Interim Order Amount and the Final Order Amount, as applicable, shall be reduced by an amount equal to the amount of Net Cash Proceeds from any sale of property or assets described in this Section 2.04(b)(i) in excess of the amount applied to reduce the aggregate outstanding amount of the Term Loans to zero, unless otherwise agreed by the Required Lenders.

(ii)     Upon the sale or issuance by any Loan Party or any of its Subsidiaries of any of its Equity Interests (other than sales or issuances of Equity Interests in connection with customary compensation or benefit programs), the Borrowers shall prepay an aggregate principal amount of Term Loans equal to 100% of all Net Cash Proceeds received therefrom immediately upon receipt thereof.

(iii)     Upon the incurrence or issuance by any Loan Party or any of its Subsidiaries of any Indebtedness (other than Indebtedness expressly permitted to be incurred or issued pursuant to Section 5.02(b)), the Borrowers shall prepay an aggregate principal amount of Term Loans equal to 100% of all Net Cash Proceeds received therefrom immediately upon receipt thereof by such Loan Party or such Subsidiary.

(iv)     Upon the receipt of any proceeds from an Extraordinary Receipt not otherwise included in this Section 2.04(b), the Borrowers shall prepay an aggregate principal amount of Term Loans equal to 100% of all Net Cash Proceeds received therefrom immediately upon receipt thereof by such Loan Party or such Subsidiary.

(v)     All prepayments under this subsection (b) shall be made together with (A) accrued interest to the date of such prepayment on the principal amount prepaid, and (B) any amounts owing pursuant to Section 9.04(c).

(vi)     Notwithstanding anything contained herein to the contrary, Section 2.04(b)(i) – (iv) shall not apply to any of the following transactions:

(A)     incurrence of trade payables;

(B)     vendor or leasehold financing; or

(C)     distributions or dividends paid to minority partners or received from majority owners governed by existing operating agreements or practice,

in the case of each of (A), (B), and (C), in compliance with the Budget (subject to the proviso in Section 5.04(a)).

SECTION 2.05.  Interest. (a) Scheduled Interest. The Borrowers shall jointly and severally pay interest on the unpaid principal amount of each Term Loan owing to each Lender from the date of such Term Loan until such principal amount shall be paid in full at a rate per annum equal at all times during each Interest Period for such Term Loan to the sum of (A) the Eurodollar Rate for such Interest Period for such Term Loan plus (B) ten percent (10.00%) per annum, payable in cash in arrears on the last day of such Interest Period and the date such Term Loan shall be paid in full.

(b)     Default Interest. Upon the occurrence and during the continuance of an Event of Default, the principal amount of all Term Loans and all other due and unpaid Obligations shall bear interest ("*Default Interest*") at a rate per annum equal at all times to 2.00% per annum above the rate per annum described in Section 2.05(a). All such interest shall be payable on demand by the Required Lenders in cash.

(c)     Notice of Interest Period and Interest Rate.  Promptly after receipt of a Notice of Borrowing pursuant to Section 2.02(a), or a notice of selection of an Interest Period pursuant to the terms of the definition of "Interest Period," the Administrative Agent shall give notice to the Administrative Borrower and each Lender of the applicable Interest Period and the interest rate determined by the Administrative Agent for purposes of clause (a) above.

SECTION 2.06.  Fees.  The Borrowers jointly and severally agree to pay to the Administrative Agent, for the *pro rata* accounts of the Lenders, (a) an exit fee (the "***Exit Fee***") equal to 2.00% of the aggregate principal amount of the Facility on the Closing Date, payable on the earlier of (i) the Maturity Date, and (ii) the date on which the Facility is paid in full and all Commitments of the Lenders are terminated in full, (b) an extension fee (the "***Extension Fee***") equal to 2.00% of the outstanding amount of the Facility, payable on any date the Maturity Date is extended pursuant to Section 2.14 hereof or otherwise, and (c) an unused fee equal to 0.75% of the average daily undrawn amount of the Facility during each calendar quarter, payable in arrears quarterly on the last day of each March, June, September, and December, commencing December 31, 2009, and on the Maturity Date.  The Borrowers further agree jointly and severally to pay to the Administrative Agent for its own account or, as the case may be, for the account of the Lenders, the fees in the amounts and on the dates from time to time agreed to in writing by the Administrative Borrower on the one hand and the Administrative Agent and/or any Lenders, on the other.

SECTION 2.07.  Increased Costs, Etc.  (a)  If, due to either (i) the introduction of or any change in or in the interpretation of any law or regulation or (ii) the compliance with any guideline or request from any central bank or other governmental authority (whether or not having the force of law), in each case after the date of this Agreement or, if later, the date on which the affected Lender became a Lender under this Agreement, there shall be any increase in the cost to any Lender of agreeing to make or of making, funding or maintaining Term Loans (excluding, for purposes of this Section 2.07, any such increased costs resulting from (A) Taxes or Other Taxes (as to which Section 2.09 shall govern) and (B) changes in the basis of taxation of overall net income or overall gross income by the United States or by the foreign jurisdiction or state under the laws of which such Lender is organized or has its Lending Office or any political subdivision thereof), then the Borrowers shall from time to time, upon written demand by such Lender to the Administrative Borrower (with a copy of such demand to the Administrative Agent), pay to the Administrative Agent for the account of such Lender additional amounts sufficient to compensate such Lender for such increased cost; and *provided, however,* that the Borrowers shall not be responsible for costs under this Section 2.07(a) arising more than 180 days prior to receipt by the Administrative Borrower of the demand from the affected Lender pursuant to this Section 2.07(a); and *provided further* that a Lender claiming additional amounts under this Section 2.07(a) agrees to use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to designate a different Lending Office if the making of such a designation would avoid the need for, or reduce the amount of, such increased cost that may thereafter accrue and would not, in the reasonable judgment of such Lender, be otherwise disadvantageous to such Lender.  A certificate as to the amount of such increased cost, submitted to the Administrative Borrower by such Lender, shall be conclusive and binding for all purposes, absent manifest error.

(b)     If any Lender determines that compliance with any law or regulation or any guideline or request from any central bank or other governmental authority (whether or not having the force of law), in each case after the date of this Agreement or, if later, the date on which the affected Lender became a Lender under this Agreement, affects or would affect the amount of capital required or expected to be maintained by such Lender or any Person controlling such Lender and that the amount of such capital is increased by or based upon the existence of such Lender's commitment to lend hereunder, then, upon written demand by such Lender to the Administrative Agent (with a copy of such demand to the Administrative Agent), the Borrowers shall pay to the Administrative Agent for the account of such Lender, from time to time as specified by such Lender, additional amounts sufficient to compensate such Lender in the light of such circumstances, to the extent that such Lender reasonably determines such increase in capital to be allocable to the existence of such Lender's commitment to lend hereunder; *provided, however*, that the Borrowers shall not be responsible for costs under this Section 2.07(b) arising more than 180 days prior to receipt by the Administrative Borrower of the demand from the affected Lender pursuant to this Section 2.07(b). A certificate as to such amounts submitted to the Administrative Borrower by such Lender shall be conclusive and binding for all purposes, absent manifest error.

(c)     Notwithstanding any other provision of this Agreement, if the introduction of or any change in or in the interpretation of any law or regulation shall make it unlawful, or any central bank or other governmental authority shall assert that it is unlawful, for any Lender or its Lending Office to perform its obligations hereunder to make Term Loans as to which the rate of interest is determined by reference to the Eurodollar Rate or to continue to fund or maintain Term Loans hereunder as to which the rate of interest is determined by reference to the Eurodollar Rate, then, on notice thereof and demand therefor by such Lender to the Administrative Borrower through the Administrative Agent, (i) the obligation of such Lender to make Term Loans as to which the rate of interest is determined with reference to the Eurodollar Rate shall forthwith be suspended until the Administrative Agent shall notify the Administrative Borrower that such Lender has determined that the circumstances causing such suspension no longer exist (but such Lender shall make Term Loans in an amount equal to the amount of Term Loans that would have been made by such Lender at such time in the absence of such circumstances and such Term Loans shall bear interest at the rate equal to such Lender's actual costs of making or maintaining such Term Loans plus ten percent (10.00%) per annum), and (ii) such Lender's Term Loans then bearing interest at a rate of interest determined with reference to the Eurodollar Rate, if any, shall be converted automatically to Term Loans bearing interest at the rate equal to such Lender's actual costs of making or maintaining such Term Loans plus ten percent (10.00%) per annum on the last day of each Interest Period applicable to such Term Loans or within such earlier period as may be required by law; *provided, however*, that, before making any such demand, such Lender agrees to use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to designate a different Lending Office if the making of such a designation would allow such Lender or its Lending Office to continue to perform its obligations to make Term Loans or to continue to fund or maintain Term Loans and would not, in the commercially reasonable judgment of such Lender, be otherwise disadvantageous to such Lender.

(d)     In the event that any Lender demands payment of costs or additional amounts pursuant to this Section 2.07 or Section 2.09 or asserts, pursuant to Section 2.07(c), that

29

it is unlawful for such Lender to make Term Loans bearing interest at a rate of interest determined with reference to the Eurodollar Rate or becomes a Defaulting Lender then (subject to such Lender's right to rescind such demand or assertion within ten (10) days after the notice from the Administrative Borrower referred to below) the Administrative Borrower may, upon twenty (20) days' prior written notice to such Lender and the Administrative Agent, elect to cause such Lender to assign its Term Loans and Commitments in full to one or more Persons selected by the Administrative Borrower so long as (i) each such Person satisfies the criteria of an Eligible Assignee and is reasonably satisfactory to the Administrative Agent, (ii) such Lender receives payment in full in cash of the outstanding principal amount of all Term Loans made by it and all accrued and unpaid interest thereon and all other amounts due and payable to such Lender as of the date of such assignment (including, without limitation, amounts owing pursuant to this Section 2.07 and Section 2.09) and (iii) each such assignee agrees to accept such assignment and to assume all obligations of such Lender hereunder in accordance with Section 9.07.

SECTION 2.08. Payments and Computations. (a) The Borrowers shall make each payment hereunder and under the other Loan Documents, irrespective of any right of counterclaim or set-off (except as otherwise provided in Section 2.12), not later than 11:00 a.m. (New York City time) on the day when due in U.S. dollars to the Administrative Agent at the Administrative Agent's Account in same day funds, with payments being received by the Administrative Agent after such time being deemed to have been received on the next succeeding Business Day. The Administrative Agent will promptly thereafter cause like funds to be distributed (i) if such payment by the Borrowers is in respect of principal, interest, commitment fees or any other Obligation then payable hereunder and under the other Loan Documents to more than one Lender, to such Lenders for the account of their respective Lending Offices ratably in accordance with the amounts of such respective Obligations then payable to such Lenders and (ii) if such payment by the Borrowers is in respect of any Obligation then payable hereunder to one Lender, to such Lender for the account of its Lending Office, in each case to be applied in accordance with the terms of this Agreement. Upon its acceptance of an Assignment and Acceptance and recording of the information contained therein in the Register pursuant to Section 9.07(d), from and after the effective date of such Assignment and Acceptance, the Administrative Agent shall make all payments hereunder and under the other Loan Documents in respect of the interest assigned thereby to the assignee thereunder, and the parties to such Assignment and Acceptance shall make all appropriate adjustments in such payments for periods prior to such effective date directly between themselves.

(b)     The Borrowers hereby authorize each Lender and each of its Affiliates, if and to the extent payment owed to such Lender is not made when due hereunder or under the other Loan Documents to charge from time to time, to the fullest extent permitted by law, against any or all of the Borrowers' accounts with such Lender or such Affiliate any amount so due.

(c)     All computations of interest shall be made by the Administrative Agent based on the Eurodollar Rate or the Federal Funds Rate, as applicable, and each computation of interest or of fees, as applicable, shall be made by the Administrative Agent on the basis of a year of 360 days, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest or fees are payable. Each

30

determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(d)     For the purposes of the *Interest Act* (Canada) and disclosure thereunder, whenever any interest or any fee to be paid hereunder or in connection herewith is to be calculated on the basis of a 360-day or 365-day year, the yearly rate of interest to which the rate used in such calculation is equivalent is the rate so used multiplied by the actual number of days in the calendar year in which the same is to be ascertained and divided by 360 or 365, as applicable. The rates of interest under this Agreement are nominal rates, and not effective rates or yields. The principle of deemed reinvestment of interest does not apply to any interest calculation under this Agreement.

(e)     If any provision of this Agreement would oblige a Canadian Loan Party to make any payment of interest or other amount payable to any Secured Party in an amount or calculated at a rate which would be prohibited by law or would result in a receipt by that Secured Party of "interest" at a "criminal rate" (as such terms are construed under the Criminal Code (Canada)), then, notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, that would not be so prohibited by applicable law or so result in a receipt by that Secured Party of "interest" at a "criminal rate", such adjustment to be effected, to the extent necessary (but only to the extent necessary), as follows:

(i)      first, by reducing the amount or rate of interest; and

(ii)     thereafter, by reducing any fees, commissions, costs, expenses, premiums and other amounts required to be paid which would constitute interest for purposes of section 347 of the *Criminal Code* (Canada).

(f)     Whenever any payment hereunder or under the other Loan Documents shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest; *provided, however,* that, if such extension would cause payment of interest on or principal of Term Loans to be made in the next following calendar month, such payment shall be made on the next preceding Business Day.

(g)     Unless the Administrative Agent shall have received notice from the Administrative Borrower prior to the date on which any payment is due to any Lender hereunder that the Borrowers will not make such payment in full, the Administrative Agent may assume that the Borrowers have made such payment in full to the Administrative Agent on such date and the Administrative Agent may, in reliance upon such assumption, cause to be distributed to each such Lender on such due date an amount equal to the amount then due such Lender. If and to the extent the Borrowers shall not have so made such payment in full to the Administrative Agent, each such Lender shall repay to the Administrative Agent forthwith on demand such amount distributed to such Lender together with interest thereon, for each day from the date such amount is distributed to such Lender until the date such Lender repays such amount to the Administrative Agent, at the Federal Funds Rate.

31

(h)     If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the manner in which, such funds are to be applied, unless otherwise directed by the Lenders, the Administrative Agent, after the payment of all expenses due under the Loan Documents, shall distribute such funds to each of the Lenders in accordance with such Lender's pro rata share of the aggregate principal amount of all Term Loans outstanding at such time, in payment of such of the outstanding Term Loans or other Obligations then owing to such Lender.

SECTION 2.09.  Taxes.  (a)  Any and all payments by any Loan Party to or for the account of any Lender or any Agent hereunder or under any other Loan Document shall be made, in accordance with Section 2.08 or the applicable provisions of such other Loan Document, if any, free and clear of and without deduction for any and all present or future taxes, levies, imposts, fees, deductions, charges or withholdings, and all liabilities with respect thereto, *excluding*, in the case of each Lender and each Agent, taxes that are imposed on its overall net income by the United States, including any branch profit taxes, and taxes that are imposed on its overall net income (and franchise taxes imposed in lieu thereof), including any branch profits taxes, by the state or foreign jurisdiction under the laws of which such Lender or such Agent, as the case may be, is organized or any political subdivision thereof and, in the case of each Lender, taxes that are imposed on its overall net income (and franchise taxes imposed in lieu thereof), including any branch profits taxes by the state or foreign jurisdiction of such Lender's Lending Office or any political subdivision thereof or where such Lenders are otherwise conducting business (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities in respect of payments hereunder or under any other Loan Document being hereinafter referred to as "*Taxes*").  If any Loan Party shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under any other Loan Document to any Lender or any Agent, (i) the sum payable by such Loan Party shall be increased as may be necessary so that after such Loan Party and the Administrative Agent have made all required deductions (including deductions applicable to additional sums payable under this Section 2.09) such Lender or such Agent, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) such Loan Party shall make all such deductions and (iii) such Loan Party shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

(b)     In addition, each Loan Party shall pay any present or future stamp, documentary, excise, property, intangible, mortgage recording or similar taxes, charges or levies that arise from any payment made by such Loan Party hereunder or under any other Loan Documents or from the execution, delivery or registration of, performance under, or otherwise with respect to, this Agreement or the other Loan Documents (hereinafter referred to as "*Other Taxes*").

(c)     The Loan Parties shall indemnify each Lender and each Agent for and hold them harmless against the full amount of Taxes and Other Taxes, and for the full amount of Taxes imposed or asserted by any jurisdiction on amounts payable under this Section 2.09, imposed on or paid by such Lender or such Agent (as the case may be) and any liability (including penalties, additions to tax, interest and expenses) arising therefrom or with respect thereto, whether or not such amounts were correctly or legally imposed by the relevant

32

Governmental Authority. This indemnification shall be made within 30 days from the date such Lender or such Agent (as the case may be) makes written demand therefor.

(d)    Within 30 days after the date of any payment of Taxes, the appropriate Loan Party shall furnish to the Administrative Agent, at its address referred to in Section 9.02, the original or a certified copy of a receipt evidencing such payment, to the extent such a receipt is issued therefor, or other written proof of payment thereof that is reasonably satisfactory to the Administrative Agent. In the case of any payment hereunder or under the other Loan Documents by or on behalf of a Loan Party through an account or branch outside the United States or by or on behalf of a Loan Party by a payor that is not a United States person, if such Loan Party determines that no Taxes are payable in respect thereof, such Loan Party shall furnish, or shall cause such payor to furnish, to the Administrative Agent, at such address, an opinion of counsel acceptable to the Administrative Agent stating that such payment is exempt from Taxes. For purposes of subsections (d) and (e) of this Section 2.09, the terms "*United States*" and "*United States person*" shall have the meanings specified in Section 7701 of the Internal Revenue Code.

(e)    Each Lender entitled to an exemption from, or reduction or, withholding tax shall, on or prior to the date of its execution and delivery of this Agreement in the case of each Lender party to this Agreement as of the date hereof and on the date of the Assignment and Acceptance pursuant to which it becomes a Lender in the case of each other Lender, and from time to time thereafter as reasonably requested in writing by the Administrative Borrower (but only so long thereafter as such Lender remains lawfully able to do so), provide each of the Administrative Agent and the Administrative Borrower with two original Internal Revenue Service Forms W-8ECI or W-8BEN or (in the case of a Lender that has certified in writing to the Administrative Agent that it is not (i) a "bank" (as defined in Section 881(c)(3)(A) of the Internal Revenue Code), (ii) a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code) of any Loan Party or (iii) a controlled foreign corporation related to any Loan Party (within the meaning of Section 864(d)(4) of the Internal Revenue Code)), Internal Revenue Service Form W-8BEN, as appropriate, or any successor or other form prescribed by the Internal Revenue Service, or any such form or forms as may be required under the laws of any jurisdiction other than the United States as a condition to exemption from, or reduction of, withholding tax in such jurisdiction, certifying that such Lender is exempt from or entitled to a reduced rate of United States or Canadian withholding tax on payments pursuant to this Agreement or any other Loan Document or, in the case of a Lender that has certified that it is not a "bank" as described above, certifying that such Lender is a foreign corporation, partnership, estate or trust. If the forms provided by a Lender at the time such Lender first becomes a party to this Agreement indicate a United States or other interest withholding tax rate, as applicable, in excess of zero, withholding tax at such rate shall be considered excluded from Taxes unless and until such Lender provides the appropriate forms certifying that a lesser rate applies, whereupon withholding tax at such lesser rate only shall be considered excluded from Taxes for periods governed by such forms; *provided, however*, that if, at the effective date of the Assignment and Acceptance pursuant to which a Lender becomes a party to this Agreement, the Lender assignor was entitled to payments under subsection (a) of this Section 2.09 in respect of United States withholding tax with respect to interest paid at such date, then, to such extent, the term Taxes shall include (in addition to withholding taxes that may be imposed in the future or other amounts otherwise includable in Taxes) withholding tax, if any, applicable with respect to the Lender assignee on such date. If any form or document referred to

33

in this subsection (e) requires the disclosure of information, other than information necessary to compute the tax payable and information required on the date hereof by Internal Revenue Service Form W-8BEN or W-8ECI or the related certificate described above, or any forms required by any jurisdiction other than the United States that the applicable Lender reasonably considers to be confidential, such Lender shall give notice thereof to the Administrative Borrower and shall not be obligated to include in such form or document such confidential information.

(f)     For any period with respect to which a Lender has failed to provide the Administrative Borrower with the appropriate form, certificate or other document described in subsection (e) above (other than if such failure is due to a change in law, or in the interpretation or application thereof, occurring after the date on which a form, certificate or other document originally was required to be provided or if such form, certificate or other document otherwise is not required under subsection (e) above), such Lender shall not be entitled to indemnification under subsection (a) or (c) of this Section 2.09 with respect to Taxes imposed by the United States or Canada by reason of such failure; *provided, however*, that should a Lender become subject to Taxes because of its failure to deliver a form, certificate or other document required hereunder, the Loan Parties shall take such steps as such Lender shall reasonably request to assist such Lender to recover such Taxes.

SECTION 2.10.  Sharing of Payments, Etc.  If any Lender shall obtain at any time any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise, other than as a result of an assignment or participation pursuant to Section 9.07) (a) on account of Obligations due and payable to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations due and payable to such Lender at such time to (ii) the aggregate amount of the Obligations due and payable to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations due and payable to all Lenders hereunder and under the other Loan Documents at such time obtained by all the Lenders at such time or (b) on account of Obligations owing (but not due and payable) to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations owing to such Lender at such time to (ii) the aggregate amount of the Obligations owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time obtained by all Lenders at such time, such Lender shall forthwith purchase from the other Lender such interests or participating interests in the Obligations due and payable or owing to them, as the case may be, as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; *provided, however*, that if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each other Lender shall be rescinded and each such other Lender shall repay to the purchasing Lender the purchase price to the extent of such Lender's ratable share (according to the proportion of (A) the purchase price paid to such Lender to (B) the aggregate purchase price paid to all Lenders) of such recovery together with an amount equal to such Lender's ratable share (according to the proportion of (1) the amount of such other Lender's required repayment to (2) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered.  The Loan

34

Parties agree that any Lender so purchasing an interest or participating interest from another Lender pursuant to this Section 2.10 may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of set-off) with respect to such interest or participating interest, as the case may be, as fully as if such Lender were the direct creditor of the Loan Parties in the amount of such interest or participating interest, as the case may be.

SECTION 2.11. Use of Proceeds. The proceeds of the Term Loans shall be used solely in accordance with the Budget in compliance with Section 5.04(a).

SECTION 2.12. Defaulting Lenders. (a) In the event that, at any one time, (i) any Lender shall be a Defaulting Lender, (ii) such Defaulting Lender shall owe a Defaulted Loan to the Borrowers and (iii) the Borrowers shall be jointly and severally required to make any payment hereunder or under any other Loan Document to or for the account of such Defaulting Lender, then the Borrowers (or any of them) may, so long as no Default shall occur or be continuing at such time and to the fullest extent permitted by applicable law, set off and otherwise apply the Obligation of the Borrowers to make such payment to or for the account of such Defaulting Lender against the obligation of such Defaulting Lender to make such Defaulted Loan. In the event that, on any date, the Borrowers (or any of them) shall so set off and otherwise apply their obligation to make any such payment against the obligation of such Defaulting Lender to make any such Defaulted Loan on or prior to such date, the amount so set off and otherwise applied by the Borrowers shall constitute for all purposes of this Agreement and the other Loan Documents a Term Loan by such Defaulting Lender made on the date of such setoff under the Facility pursuant to which such Defaulted Loan was originally required to have been made pursuant to Section 2.01. Such Term Loans shall be considered, for all purposes of this Agreement, to comprise part of the Borrowing in connection with which such Defaulted Loan was originally required to have been made pursuant to Section 2.01. The Administrative Borrower shall notify the Administrative Agent at any time the Borrowers(or any of them) exercise their right of set-off pursuant to this subsection (a) and shall set forth in such notice (A) the name of the Defaulting Lender and the Defaulted Loan required to be made by such Defaulting Lender and (B) the amount set off and otherwise applied in respect of such Defaulted Loan pursuant to this subsection (a). Any portion of such payment otherwise required to be made by the Borrowers to or for the account of such Defaulting Lender which is paid by the Borrowers, after giving effect to the amount set off and otherwise applied by the Borrowers pursuant to this subsection (a), shall be applied by the Administrative Agent as specified in subsection (b) or (c) of this Section 2.12.

(b)     In the event that, at any one time, (i) any Lender shall be a Defaulting Lender, (ii) such Defaulting Lender shall owe a Defaulted Amount to any Agent or any of the other Lenders and (iii) the Borrowers shall make any payment hereunder or under any other Loan Document to the Administrative Agent for the account of such Defaulting Lender, then the Administrative Agent may, on its behalf or on behalf of such other Agents or such other Lenders and to the fullest extent permitted by applicable law, apply at such time the amount so paid by the Borrowers to or for the account of such Defaulting Lender to the payment of each such Defaulted Amount to the extent required to pay such Defaulted Amount. In the event that the Administrative Agent shall so apply any such amount to the payment of any such Defaulted Amount on any date, the amount so applied by the Administrative Agent shall constitute for all purposes of this Agreement and the other Loan Documents payment, to such extent, of such

Defaulted Amount on such date. Any such amount so applied by the Administrative Agent shall be retained by the Administrative Agent or distributed by the Administrative Agent to such other Agents or such other Lenders in the following order of priority:

> (i) *first*, to the Agents for any Defaulted Amounts then owing to them, in their capacities as such, ratably in accordance with such respective Defaulted Amounts then owing to the Agents;

> (ii) *second*, to the Lenders for any Defaulted Amounts then owing to them, ratably in accordance with such respective Defaulted Amounts then owing to them; and

> (iii) *third,* to such Defaulting Lender.

Any portion of such amount paid by the Borrowers for the account of such Defaulting Lender remaining after giving effect to the amount applied by the Administrative Agent pursuant to this subsection (b) shall be distributed by the Administrative Agent to such Lender and applied by such Lender to the Obligations owing to such Lender at such time under this Agreement and the other Loan Documents ratably in accordance with the respective amounts of such Obligations outstanding at such time.

(c) The rights and remedies against a Defaulting Lender under this Section 2.12 are in addition to other rights and remedies that the Borrowers may have against such Defaulting Lender with respect to any Defaulted Loan and that any Agent or any Lender may have against such Defaulting Lender with respect to any Defaulted Amount.

SECTION 2.13. Evidence of Debt. (a) Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such Lender resulting from each Term Loan owing to such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder. The Borrowers agree that upon notice by any Lender to the Administrative Borrower (with a copy of such notice to the Administrative Agent) to the effect that a promissory note or other evidence of indebtedness is required or appropriate in order for such Lender to evidence (whether for purposes of pledge, enforcement or otherwise) the Term Loans owing to, or to be made by, such Lender, the Borrowers shall promptly execute and deliver to such Lender, with a copy to the Administrative Agent, a Note, in substantially the form of Exhibit A hereto payable to the order of such Lender (or, at such Lender's request, payable to such Lender and its registered assigns), in a principal amount equal to the Term Loans of such Lender. All references to Notes in the Loan Documents shall mean Notes, if any, to the extent issued hereunder.

(b) The Register maintained by the Administrative Agent pursuant to Section 9.07(d) shall record (i) the date and amount of each Borrowing made hereunder, and, if appropriate, the Interest Period applicable thereto, (ii) the terms of each Assignment and Acceptance delivered to and accepted by it, (iii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder and (iv) the amount of any sum received by the Administrative Agent from the Borrowers hereunder and each Lender's share thereof.

(c)     Entries made in good faith by the Administrative Agent in the Register pursuant to subsection (b) above, and by each Lender in its account or accounts pursuant to subsection (a) above, shall be *prima facie* evidence of the amount of principal and interest due and payable or to become due and payable from the Borrowers to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement, absent manifest error; *provided, however*, that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or in such account or accounts shall not limit or otherwise affect the obligations of the Borrowers under this Agreement.

SECTION 2.14. Extension of Maturity Date.

(a)     Requests for Extension. The Administrative Borrower may, upon no less than ten (10) Business Days' prior written notice from the Administrative Borrower to the Administrative Agent, request that the Maturity Date be extended by up to sixty (60) days. Such request may be made by the Administrative Borrower not more than once.

(b)     Conditions to Extension of Maturity Date. The agreement of the Administrative Agent and each Lender to extend the Maturity Date shall be subject, in each case, to the satisfaction, or waiver by the Required Lenders, of the following conditions precedent:

(i)     the Administrative Borrower shall have delivered to the Administrative Agent, in form and substance reasonably satisfactory to the Required Lenders, a certificate of each Loan Party, executed by a duly authorized officer of such Loan Party (A) certifying and attaching the resolutions adopted by such Loan Party approving or consenting to such extension of the Maturity Date and (B) certifying that, before and after giving effect to such extension of the Maturity Date, (I) the representations and warranties contained in Section 4.01 and the other Loan Documents are true and correct in all material respects on and as of the existing Maturity Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they are true and correct in all material respects as of such earlier date; provided, that any representation or warranty that is qualified by "materiality", "Material Adverse Effect" or similar language shall be true and correct in all respects on such respective dates, and (II) no Default or Event of Default exists or is continuing;

(ii)     the Administrative Borrower shall have delivered to the Administrative Agent, in form and substance reasonably satisfactory to the Required Lenders, projections demonstrating compliance, on a pro forma basis, with the financial covenants set forth in Section 5.04, for the period through which the Administrative Borrower has requested such extension of the Maturity Date;

(iii)     the Administrative Borrower shall have delivered to the Administrative Agent, in form and substance reasonably satisfactory to the Required Lenders, an updated Budget for the period through which the Borrower has requested such extension of the Maturity Date;

37

(iv)     no Default or Event of Default shall exist or be continuing or will occur as a result of or immediately after giving effect to any such extension;

(v)     the Administrative Borrower shall have paid to the Administrative Agent, for the pro rata account of each Lender, the Extension Fee payable pursuant to Section 2.06; and

(vi)     the Administrative Borrower shall have delivered all such instruments, documents and agreements as the Administrative Agent may reasonably request, duly executed and delivered by each party thereto.

(c)     Conflicting Provisions. This Section 2.14 shall supersede any provisions in Section 8.01 to the contrary.

SECTION 2.15.  Joint and Several Obligations; Administrative Borrower.

(a)     Each of the Borrowers is accepting joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Lenders under this Agreement, for the mutual benefit, directly and indirectly, of each of the Borrowers and in consideration of the undertakings of each other Borrower to accept joint and several liability for the Obligations.

(b)     Each of the Borrowers, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers with respect to the payment and performance of all of the Obligations (including, without limitation, any Obligations arising under this Section 2.15), it being the intention of the parties hereto that all of the Obligations shall be the joint and several Obligations of each of the Borrowers without preferences or distinction among them.

(c)     If and to the extent that any of the Borrowers shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrowers will make such payment with respect to, or perform, such Obligation.

(d)     The Obligations of each of the Borrowers under the provisions of this Section 2.15 constitute full recourse Obligations of each of the Borrowers enforceable against each such Person to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement or any other circumstance whatsoever.

(e)     Except as otherwise expressly provided in this Agreement, each of the Borrowers hereby waives notice of acceptance of its joint and several liability, notice of any Term Loans made under this Agreement, notice of any action at any time taken or omitted by the Lenders under or in respect of any of the Obligations, and, generally, to the extent permitted by applicable law, all demands, notices and other formalities of every kind in connection with this Agreement. Each of the Borrowers hereby assents to, and waives notice of, any extension or postponement of the time for the payment of any of the Obligations, the acceptance of any payment of any of the Obligations, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by the Lenders at any time or times in respect of any

38

default by any of the Borrowers in the performance or satisfaction of any term, covenant, condition or provision of this Agreement, any and all other indulgences whatsoever by the Lenders in respect of any of the Obligations, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of the Obligations or the addition, substitution or release, in whole or in part, of any of the Borrowers. Without limiting the generality of the foregoing, to the extent permitted by law, each of the Borrowers assents to any other action or delay in acting or failure to act on the part of the Lenders with respect to the failure by any of the Borrowers to comply with any of its respective Obligations, including, without limitation, any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder, which might, but for the provisions of this <u>Section 2.15</u>, afford grounds for terminating, discharging or relieving any of the Borrowers, in whole or in part, from any of its Obligations under this <u>Section 2.15</u>, it being the intention of each of the Borrowers that, so long as any of the Obligations hereunder remain unsatisfied, the Obligations of such Borrowers under this <u>Section 2.15</u> shall not be discharged except by performance and then only to the extent of such performance. The Obligations of each of the Borrowers under this <u>Section 2.15</u> shall not be diminished or rendered unenforceable by any winding up, reorganization, arrangement, liquidation, re-construction or similar proceeding with respect to any of the Borrowers or the Lenders. The joint and several liability of the Borrowers hereunder shall continue in full force and effect notwithstanding any absorption, merger, amalgamation or any other change whatsoever in the name, membership, constitution or place of formation of any of the Borrowers or the Lenders.

(f)     The provisions of this <u>Section 2.15</u> are made for the benefit of the Lenders and their successors and permitted assigns, and may be enforced in good faith by them from time to time against any or all of the Borrowers as often as the occasion therefor may arise and, to the extent permitted by law, without requirement on the part of the Lenders first to marshal any of their claims or to exercise any of their rights against any other Borrower or to exhaust any remedies available to them against any other Borrower or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy. The provisions of this <u>Section 2.15</u> shall remain in effect until all of the Obligations (other than contingent indemnification and reimbursement Obligations in respect of which no claim for payment has been asserted by the Person entitled thereto) shall have been paid in full or otherwise fully satisfied. If at any time, any payment, or any part thereof, made in respect of any of the Obligations, is rescinded or must otherwise be restored or returned by the Lenders, the provisions of this <u>Section 2.15</u> will forthwith be reinstated in effect, as though such payment had not been made.

(g)     Any notice, request, waiver, consent or other action made, given or taken by any Borrower in connection with the Loan Documents shall bind all Borrowers.

(h)     Each Borrower hereby authorizes Holdco to act as agent for each Borrower (in such capacity, the "***Administrative Borrower***") and to execute and deliver on behalf of each Borrower such notices, requests, waivers, consents, certificates and other documents, and to take any and all actions required or permitted to be delivered or taken by any Borrower hereunder.

# ARTICLE III

## CONDITIONS TO EFFECTIVENESS AND OF LENDING

SECTION 3.01. <u>Conditions Precedent to Borrowing Interim Order Amount</u>. Section 2.01 of this Agreement shall become effective on and as of the first date on or before [_____], 2009 (the "***Closing Date***") on which the following conditions precedent have been satisfied in a manner satisfactory to the Administrative Agent and the Required Lenders (and the obligation of each Lender to make any Term Loan on the occasion of the initial Borrowing hereunder is subject to the satisfaction or waiver in accordance with <u>Section 9.01</u> hereof of such conditions precedent before or concurrently with the Closing Date):

(a)      The Administrative Agent shall have received on or before the Closing Date the following, each dated such day (unless otherwise specified), in form and substance satisfactory to the Administrative Agent and the Required Lenders (unless otherwise specified) and (except for the Notes) in sufficient copies for each Lender:

(i)      Executed counterparts of this Agreement and the Guaranty.

(ii)      The Notes to the extent requested by the Lenders pursuant to the terms of <u>Section 2.13</u>.

(iii)      A security agreement substantially in the form of <u>Exhibit D-1</u> hereto (the "***U.S. Security Agreement***") and a security agreement substantially in the form of <u>Exhibit D-2</u> hereto (the "***Canadian Security Agreement***"), each duly executed by each applicable Loan Party, together with:

(A)      certificates representing the Initial Pledged Equity (to the extent certificated) referred to therein accompanied by undated stock powers executed in blank and instruments evidencing the Initial Pledged Debt referred to therein, endorsed in blank;

(B)      financing statements in a form appropriate for filing under the Uniform Commercial Code or PPSA, as applicable, for all jurisdictions that the Administrative Agent may deem necessary or desirable in order to perfect and protect the first priority (subject to the Carve Out and Liens permitted to be equal or superior in priority pursuant to this Agreement) liens and security interests created under the Security Agreements, covering the Collateral described in the Security Agreements;

(C)      the Intellectual Property Security Agreements duly executed by each applicable Loan Party;

(D)      evidence of the completion of all other recordings and filings of or with respect to the Security Agreements that the Administrative Agent may deem necessary or desirable in order to perfect and protect the security interest created thereunder;

A/73160038.15

(E)     evidence of the insurance required by the terms of the Security Agreements; and

(F)     evidence that all other actions that the Administrative Agent may deem necessary or desirable in order to perfect and protect the first priority (subject to the Carve Out and Liens permitted to be equal or superior in priority pursuant to this Agreement) liens and security interests created under the Security Agreements has been taken (including, without limitation, receipt of duly executed landlords' and bailees' waiver and consent agreements to the extent required under the Security Agreements).

(iv)     Certified copies of the resolutions of the Board of Directors (or equivalent entity) of each Loan Party (and to the extent required by the constituent documents of such Loan Party, the written consent of each of the holders of the Equity Interests of such Loan Party required to give written consent by such constituent documents) approving each Loan Document to which it is or is to be a party, and of all documents evidencing other necessary corporate action and governmental and other third party approvals and consents, if any, with respect to each Loan Document to which it is or is to be a party.

(v)     A copy of a certificate of the Secretary of State of the jurisdiction of organization of each Loan Party (or certificate of status in respect of Parent and other Canadian Loan Parties), dated reasonably near the Closing Date, certifying (A) as to a true and correct copy of the constituent documents of such Loan Party and each amendment thereto on file in such Secretary's office and that such amendments are the only amendments to such Loan Party's constituent documents on file in such Secretary's office, and (B) that such Loan Party is duly organized and in good standing or presently subsisting under the laws of the State of the jurisdiction of its organization.

(vi)     A certificate of each Loan Party signed on behalf of such Loan Party by its President or a Vice President and its Secretary or any Assistant Secretary, dated the Closing Date (the statements made in which certificate shall be true on and as of the Closing Date), certifying as to (A) the absence of any amendments to the constituent documents of such Loan Party since the date of the Secretary of State's certificate referred to in Section 3.01(a)(v), (B) a true and correct copy of the organizational documents of such Loan Party as in effect on the Closing Date, (C) the due organization and good standing or valid existence of such Loan Party as an entity organized under the laws of the jurisdiction of its organization, and the absence of any proceeding for the dissolution or liquidation of such Loan Party, (D) the truth in all material respects of the representations and warranties contained in the Loan Documents as though made on and as of the Closing Date; provided, that any representation or warranty that is qualified by materiality, "Material Adverse Effect" or similar language shall be true and correct in all respects on and as of the Closing Date and (E) in the case of the certificate from each Borrower, the absence of any event occurring and continuing, or resulting from the initial Borrowing, that constitutes a Default.

41