(vii) A certificate of the Secretary or an Assistant Secretary of each Loan Party certifying the names and true signatures of the officers of such Loan Party authorized to sign each Loan Document to which it is or is to be a party and the other documents to be delivered hereunder and thereunder.

(viii) A certificate dated the Closing Date signed by the Chief Financial Officer of the Administrative Borrower, to the effect that (A) each of the representations and warranties of the Loan Parties contained in Article IV hereof is true and correct in all material respects as of the Closing Date; provided, that any representation or warranty that is qualified by materiality, "Material Adverse Effect" or similar language shall be true and correct in all respects as of the Closing Date and (B) all conditions to the effectiveness of this Agreement set forth in this Article III other than those which are subject to the discretion, satisfaction, consent or approval of the Agents (or any of them) or any Lender, have been satisfied (or, if applicable, waived) in all respects.

(ix) Evidence of insurance naming the Collateral Agent as additional insured and loss payee with such responsible and reputable insurance companies or associations, and in such amounts and covering such risks, as is satisfactory to the Required Lenders, including, without limitation, business interruption insurance.

(x) Favorable opinions of Torys LLP, Canadian counsel to Parent and other Canadian Loan Parties, Stewart, McKelvey, Stikling & Scales, New Brunswick counsel to Parent and other Canadian Loan Parties, and Proskauer Rose, LLP, U.S. counsel for the other Loan Parties, substantially in the forms of Exhibit F-1 and F-2, respectively, hereto.

(b) Since October 31, 2009 (i) there shall have occurred no Material Adverse Change and no material adverse change in the Collateral taken as a whole and (ii) there has been no material increase in the liabilities, liquidated or contingent, of Parent and its Subsidiaries, taken as a whole (other than the liabilities in respect of the Term Loans under the Loan Documents), or material decrease in the assets of Parent and its Subsidiaries taken as a whole.

(c) There shall exist no action, suit, investigation, litigation or proceeding affecting Parent or any of its Subsidiaries pending or threatened before any Governmental Authority that (i) would be reasonably likely to have a Material Adverse Effect other than the matters described on Schedule 4.01(f) hereto (the "**Disclosed Litigation**") or (ii) purports to affect the legality, validity or enforceability of any Loan Document or the consummation of the transactions contemplated thereby, and there shall have been no adverse change in the status, or financial effect on any Loan Party or any of its Subsidiaries, of the Disclosed Litigation from that described on Schedule 4.01(f) hereto.

(d) All Governmental Authorizations and third party consents and approvals necessary in connection with the transactions contemplated by the Loan Documents shall have been obtained (without the imposition of any conditions that are not acceptable to the Lenders) and shall remain in effect; all applicable waiting periods in connection with the transactions contemplated by the Loan Documents shall have expired without any action being taken by any competent authority, and no law or regulation shall be applicable in the judgment of the Lenders,

42

in each case that restrains, prevents or imposes materially adverse conditions upon the transactions contemplated by the Loan Documents or the rights of the Loan Parties or their Subsidiaries freely to transfer or otherwise dispose of, or to create any Lien on, any properties now owned or hereafter acquired by any of them.

(e)     Reserved.

(f)     The Borrowers shall have filed the Chapter 11 Cases in the Bankruptcy Court on or before December 21, 2009.

(g)     The Bankruptcy Court shall have entered the Interim Order, in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders, within three (3) Business Days of the Petition Date, and such order shall be in full force and effect and shall not have been modified or amended (unless otherwise approved by the Required Lenders), reversed, stayed or subject to a motion for reargument or reconsideration. If the Interim Order is the subject of a pending appeal in any respect, none of the Interim Order, the making of the Term Loans, or the performance by the Borrowers of any of the Obligations shall be the subject of a presently effective stay pending appeal. The Loan Parties, the Agents and the Lenders shall be entitled to rely in good faith upon the Interim Order, notwithstanding objection thereto or appeal therefrom by an interested party. The Loan Parties, the Agents and the Lenders shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objections or appeal unless the relevant order has been stayed by a court of competent jurisdiction.

(h)     The Closing Date shall have occurred within two (2) Business Days of the date that the Bankruptcy Court shall have entered the Interim Order.

(i)     The Administrative Agent shall have received a duly executed copy of the Plan Support Agreement, pursuant to which the Consenting Lenders agree to vote in favor of, and to support in all other respects, the Plan of Reorganization, and no party to the Plan Support Agreement shall have withdrawn its support or refused to abide by the terms thereof.

(j)     First day orders with respect to customary first day motions, including motions concerning payment of critical vendors, cash management and payment of wages and other employee benefits shall have been approved and entered by the Bankruptcy Court and shall be in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders.

(k)     All orders (if any) providing for payment of prepetition indebtedness of the Loan Parties or affecting in any way the Obligations or the Collateral submitted for entry in the Cases shall be in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders and, as entered, shall not deviate from the form thereof approved by the Lenders in any material respect which is adverse to the interests of the Lenders.

(l)     The Canadian Court shall have entered (i) all appropriate orders as are reasonably satisfactory to the Required Lenders, which shall correspond to the orders entered by the Bankruptcy Court in connection with the Cases, and (ii) an order of recognition of the Chapter 11 Cases in respect of Parent under the CCAA (the "***Recognition Order***"), which

43

(w) recognizes the Chapter 11 Cases in respect of Parent as "foreign proceedings" (as defined under Part IV of the CCAA), (x) imposes a stay of proceedings in respect of Parent, (y) recognizes the Interim Order with respect to the Facility in respect of Parent and (z) authorizes a superpriority charge and senior priming security interest in favor of the Collateral Agent and the Secured Parties.

(m)     Reserved.

(n)     The Administrative Agent shall have received (i) the Budget prepared in good faith based upon reasonable assumptions and (ii) a weekly report with respect to the Budget from the Restructuring Monitor, in the case of each of (i) and (ii), reasonably satisfactory in all respects to the Administrative Agent and the Required Lenders, it being recognized by the Administrative Agent and the Lenders that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by the Budget may differ from the projected results.

(o)     (i) The Restructuring Monitor shall be in place and operating as of the first day of the Chapter 11 Cases pursuant to an engagement letter, in form and substance reasonably satisfactory to the Required Lenders, and such engagement letter shall be in full force and effect, and (ii) the Borrowers shall have filed a motion with the Bankruptcy Court seeking approval of the engagement of such Restructuring Monitor.

(p)     The Administrative Agent shall have received a true and complete copy of the documents relating to the sale of the Canadian Refractive Centers duly executed by the parties thereto, which shall be in form and substance reasonably satisfactory to the Required Lenders.

(q)     The Borrowers shall have filed a motion to approve an order to permit the sale of certain assets of Parent (including the sale of the Canadian Refractive Centers) on the Petition Date.

(r)     The Security Agreements shall, upon entry of the applicable Order, be effective to create in favor of the applicable Agent a legal, valid and enforceable first priority security interest in and lien upon the Collateral subject to the Carve Out and Liens permitted to be equal or superior in priority pursuant to this Agreement. All filings, recordings, deliveries of instruments and other actions necessary or desirable in the opinion of the Administrative Agent to protect and preserve such security interests shall have been duly effected. The Administrative Agent shall have received evidence thereof in form and substance satisfactory to it.

(s)     Reserved.

(t)     The Administrative Agent shall have received all documentation and other information required by bank regulatory authorities under applicable "know your customer" and Anti-Money Laundering rules and regulations, including, without limitation, the Patriot Act, as it shall have reasonably requested.

SECTION 3.02. <u>Conditions to Borrowings in Excess of the Interim Order Amount</u>. The obligation of each Lender to make any Term Loan in excess of the Interim

44

Amount shall be subject to the satisfaction or waiver in accordance with <u>Section 9.01</u> hereof of the following conditions precedent:

(a)     The Bankruptcy Court shall have entered the Final Order, which Final Order shall continue and confirm matters addressed in the Interim Order and shall not have been amended or modified (unless otherwise approved by the Required Lenders), stayed or reversed thereafter or subject to a motion for reargument or consideration. The Final Order shall authorize an extension of credit under the Facility in an amount not greater than the Final Order Amount. If the Final Order is the subject of a pending appeal in any respect, neither the Interim Order nor the making of the Term Loans, or the performance by the Borrowers of any of the Obligations shall be the subject of a presently effective stay pending appeal. The Borrowers, the Agents and the Lenders shall be entitled to rely in good faith upon the Final Order notwithstanding the objection thereto or appeal therefrom by any interested party. The Borrowers, the Agents and the Lenders shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objection or appeal unless the relevant order has been stayed by a court of competent jurisdiction.

(b)     The Administrative Agent shall have received all amendments to the relevant lease agreements between Parent and Intralase Corp., a Delaware corporation, in form and substance reasonably satisfactory to the Required Lenders, duly executed by the parties thereto.

(c)     The Loan Parties shall have used all reasonable efforts to seek a settlement of the claims by Michael Aronsky, M.D., Carol Hoffman, M.D., George Pronesti, M.D., and Anthony Zacchei, M.D. (collectively, the "***Kremer Claims***") against Parent and its Subsidiaries, in form and substance satisfactory to the Required Lenders.

(d)     The Loan Parties shall have entered into Control Account Agreements, in form and substance reasonably satisfactory to the Agents and Required Lenders, with respect to each of their deposit accounts set forth on Schedule II to each of the Security Agreements and made such other adjustments to their cash management arrangements as shall have been requested by the Administrative Agent, which arrangements shall be approved by the Bankruptcy Court in connection with a first day motion.

SECTION 3.03.  <u>Conditions Precedent to All Borrowings</u>. (a) The obligation of each Lender to make any Term Loan on the occasion of each Borrowing (including the initial Borrowing), shall be subject to the satisfaction or waiver in accordance with Section 9.01 hereof of the further conditions precedent that on the date of such Borrowing:

(i)     the following statements shall be true and the acceptance by the Borrowers of the proceeds of such Borrowing shall constitute a representation and warranty by the Borrowers that both on the date of the applicable Notice of Borrowing and the date of such Borrowing, such statements are true:

(A)     the representations and warranties of each Loan Party contained in each Loan Document are correct in all material respects on and as of such date, before and after giving effect to such Borrowing and to the application of the proceeds therefrom, as though made on and as of such date, other than any

45

such representations or warranties that, by their terms, refer to a specific date other than the date of such Borrowing, in which case such representations and warranties were true and correct in all material respects as of such specific date; provided, that any representation or warranty that is qualified by materiality, "Material Adverse Effect" or similar language shall be true and correct in all respects on such respective dates and

(B)     no Default or Event of Default has occurred and is continuing, or would result from such Borrowing;

(ii)     the Administrative Agent shall have received a Notice of Borrowing, in form and substance reasonably satisfactory to it; and

(iii)     the Borrowers shall have paid (i) to the Administrative Agent, for the benefit of the Secured Parties, all accrued and unpaid fees and expenses due to the Secured Parties in connection with the transactions contemplated by the Loan Documents (including accrued and unpaid fees and expenses described in any fee letters executed by the Borrowers in connection with this Agreement or in connection with any Lender's commitment to provide financing under the Facility), (ii) to legal counsel and financial advisers to the Required Prepetition Lenders (including, without limitation, Special Counsel, the Financial Advisor, Stikeman Elliott LLP, as Canadian counsel and Pachulski Stang Ziehl & Jones LLP, as Delaware counsel), all accrued and unpaid fees and expenses then due and payable to each of them under or in connection with the Prepetition Loan Documents and the refinancing or restructuring of the financing thereunder in the nature of a "work-out" or other similar proceeding involving creditors' rights generally and any proceeding ancillary thereto (including, without limitation, the Cases), in the case of each of (i) and (ii), regardless of whether any grace period under the agreements pursuant to which the applicable fees and expenses are payable has expired; and

(iv)     the Administrative Agent shall have received such other approvals, opinions or documents as the Required Lenders through the Administrative Agent may reasonably request.

(b)     Each Borrowing hereunder shall constitute a representation and warranty by the Borrowers as of the date of such Borrowing that the conditions contained in this Section 3.03 have been satisfied.

SECTION 3.04.  Determinations Under Section 3.01 and 3.02.  For purposes of determining compliance with the conditions specified in Section 3.01 or Section 3.02, as applicable,, each Lender shall be deemed to have consented to, approved or accepted or to be satisfied with each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to the Lenders unless an officer of the Administrative Agent responsible for the transactions contemplated by the Loan Documents shall have received written notice from such Lender prior to the Closing Date specifying its objection thereto and, such Lender shall not have made available to the Administrative Agent such Lender's ratable portion of such Borrowing.

46

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

SECTION 4.01. <u>Representations and Warranties of Borrowers</u>. Each Borrower represents and warrants as follows:

(a)     Each Loan Party and each of its Subsidiaries (i) is a corporation, limited liability company, limited liability partnership or limited partnership duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation, (ii) is duly qualified and in good standing as a foreign corporation or company in each other jurisdiction in which it owns or leases property or in which the conduct of its business requires it to so qualify or be licensed except where the failure to so qualify or be licensed would not be reasonably likely to have a Material Adverse Effect and (iii) has all requisite corporate, limited liability company, limited liability partnership or partnership (as applicable) power and authority (including, without limitation, all Governmental Authorizations) to own or lease and operate its properties and to carry on its business as now conducted and as proposed to be conducted. All of the outstanding Equity Interests of Holdco, TLC Management, and each other wholly owned Subsidiary of Parent have been validly issued, are fully paid and non-assessable and are owned by Parent free and clear of all Liens, except Permitted Liens and those created under the Collateral Documents, the Prepetition Loan Documents, the Interim Order and the Final Order.

(b)     Set forth on <u>Schedule 4.01(b)</u> hereto is a complete and accurate list of all Loan Parties, showing as of the date hereof (as to each Loan Party) the jurisdiction of its organization, the address of its principal place of business and, as to each Loan Party organized in the United States or a state thereof, its U.S. taxpayer identification number. As of the date hereof, the copy of the charter of each Loan Party and each amendment thereto provided pursuant to <u>Section 3.01(a)(v)</u> is a true and correct copy of each such document, each of which is valid and in full force and effect. All of the outstanding Equity Interests in each Loan Party's Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by such Loan Party or one or more of its Subsidiaries free and clear of all Liens, except Permitted Liens and those created under the Collateral Documents, the Interim Order, the Final Order or under applicable law or under the charter, bylaws, limited liability company agreement, partnership agreement or other constituent documents of such Loan Party.

(c)     Subject to approval of the Bankruptcy Court and pursuant to the Order, the execution, delivery and performance by each Loan Party of each Loan Document to which it is or is to be a party, and the consummation of the transactions contemplated thereby, are within such Loan Party's corporate, limited liability company, limited liability partnership or limited partnership (as applicable) powers, have been duly authorized by all necessary corporate, limited liability company, limited liability partnership or limited partnership (as applicable) action, and do not (i) contravene such Loan Party's charter, bylaws, limited liability company agreement, partnership agreement or other constituent documents, (ii) violate any law, rule, regulation (including, without limitation, Regulation X of the Board of Governors of the Federal Reserve System), order, writ, judgment, injunction, decree, determination or award, (iii) conflict with or result in the breach of, or constitute a default or require any payment to be made under, any contract, loan agreement, indenture, mortgage, deed of trust, lease or other instrument binding on

47

or affecting any Loan Party, any of its Subsidiaries or any of their properties or (iv) except for the Liens created under the Loan Documents, result in or require the creation or imposition of any Lien upon or with respect to any of the properties of any Loan Party or any of its Subsidiaries. No Loan Party or any of its Subsidiaries is in violation of any such law, rule, regulation, order, writ, judgment, injunction, decree, determination or award or in breach of any such contract, loan agreement, indenture, mortgage, deed of trust, lease or other instrument, the violation or breach of which would be reasonably likely to have a Material Adverse Effect.

(d)     Except for the entry of the Order, no Governmental Authorization (other than the approval of the Bankruptcy Court), and no notice to or filing with, any Governmental Authority or any other third party is required for (i) the due execution, delivery, recordation, filing or performance by any Loan Party of any Loan Document to which it is or is to be a party, or for the consummation of the transactions contemplated thereby (ii) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (iii) the perfection or maintenance of the Liens created under the Collateral Documents (including the first priority nature thereof, subject to the Carve Out and Liens permitted to be equal or superior in priority pursuant to this Agreement) or (iv) the exercise by any Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for the filings required to create, perfect or preserve security interests under the Collateral Documents. All applicable waiting periods in connection with the transactions contemplated by the Loan Documents have expired without any action having been taken by any competent authority restraining, preventing or imposing materially adverse conditions upon the transactions contemplated by the Loan Documents or the rights of the Loan Parties or their Subsidiaries freely to transfer or otherwise dispose of, or to create any Lien on, any properties now owned or hereafter acquired by any of them.

(e)     This Agreement has been, and each other Loan Document when delivered hereunder will have been, duly executed and delivered by each Loan Party party thereto. Upon entry of the Order, this Agreement is, and each other Loan Document when delivered hereunder will be, the legal, valid and binding obligation of each Loan Party party thereto, enforceable against such Loan Party in accordance with its terms.

(f)     Except for the Cases, there is no action, suit, investigation, litigation or proceeding affecting any Loan Party or any of its Subsidiaries, including any Environmental Action, pending or to the knowledge of Parent, threatened before any Governmental Authority or arbitrator that (i) would be reasonably likely to have a Material Adverse Effect (other than the Disclosed Litigation) or (ii) purports to affect the legality, validity or enforceability of any Loan Document or the consummation of the transactions contemplated thereby, and there has been no adverse change in the status, or financial effect on any Loan Party or any of its Subsidiaries, of the Disclosed Litigation from that described on Schedule 4.01(f) hereto.

(g)     The Consolidated and, if otherwise provided, consolidating balance sheets of Parent and its Subsidiaries as at December 31, 2008, and the related Consolidated and, if otherwise provided, consolidating statements of income and Consolidated statement of cash flows of Parent and its Subsidiaries for the fiscal year then ended, accompanied by an opinion of Ernst & Young, LLP, independent public accountants, and the Consolidated and, if otherwise provided, consolidating balance sheets of Parent and its Subsidiaries as at September 30, 2009,

48

and the related Consolidated and, if otherwise provided, consolidating statements of income and Consolidated statement of cash flows of Parent and its Subsidiaries for the three months then ended, duly certified by the Chief Financial Officer of the Administrative Borrower, copies of which have been furnished to each Lender, fairly present, subject, in the case of said balance sheet as at September 30, 2009, and said statements of income and cash flows for the three months then ended, to year end audit adjustments and the absence of footnotes, the Consolidated and, if otherwise provided, consolidating financial condition of Parent and its Subsidiaries as at such dates and the Consolidated and, if otherwise provided, consolidating results of operations of Parent and its Subsidiaries for the periods ended on such dates, all in accordance with generally accepted accounting principles applied on a consistent basis (subject to year end audit adjustments and the absence of footnotes).

(h)     The Consolidated and, if otherwise provided, consolidating forecasted balance sheets, statements of income and statements of cash flows of Parent and its Subsidiaries delivered to the Lenders were prepared in good faith on the basis of the assumptions stated therein, which assumptions were fair in light of the conditions existing at the time of delivery of such forecasts, and represented, at the time of delivery, the Loan Parties' best estimate of their future financial performance, it being acknowledged and agreed that the Loan Parties do not guaranty the realization or achievement of any forecasts or forward-looking statements delivered to the Administrative Agent and the Lenders pursuant to this Section 4.01(h).

(i)     No written information, exhibit or report furnished by or on behalf of any Loan Party (at such Loan Party's explicit direction) to any Agent or any Lender in connection with the negotiation and syndication of the Loan Documents or pursuant to the terms of the Loan Documents contained any untrue statement of a material fact or omitted to state a material fact necessary to make the statements made therein not misleading, it being acknowledged and agreed that the Loan Parties do not guaranty the realization or achievement of any forecasts or forward-looking statements delivered to the Administrative Agent and the Lenders Parties pursuant to this Section 4.01(i).

(j)     No Loan Party is engaged in the business of extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Term Loan will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock.

(k)     Neither any Loan Party nor any of its Subsidiaries is an "investment company," or an "affiliated person" of, or "promoter" or "principal underwriter" for, an "investment company," as such terms are defined in the Investment Company Act of 1940, as amended. Neither the making of any Term Loan, nor the application of the proceeds or repayment thereof by the Borrowers, nor the consummation of the other transactions contemplated by the Loan Documents, will violate any provision of any such Act or any rule, regulation or order of the Securities and Exchange Commission thereunder or equivalent under the applicable securities laws of other jurisdictions.

(l)     Neither any Loan Party nor any of its Subsidiaries is a party to any indenture, loan or credit agreement or any lease or other agreement or instrument or subject to

49

any charter or corporate restriction that would be reasonably likely to have a Material Adverse Effect.

(m)     No Loan Party nor any ERISA Affiliate maintains, sponsors, participates in, contributes to or has any obligation to contribute to any Plan or Multiemployer Plan, or has within the last six years, maintained, sponsored, participated in or contributed to, or had any obligation to contribute to, any Plan or Multiemployer Plan; no Loan Party nor any ERISA Affiliate has incurred any material liability under Title I or Title IV of ERISA with respect to any Plan or Multiemployer Plan for which any Loan Party could reasonably be expected to be liable; and no condition exists that would reasonably be expected to subject any Loan Party to any material tax, fine, Lien or other liability imposed by ERISA, the Internal Revenue Code or other applicable law with respect to any Plan or Multiemployer Plan.

(n)     (i)     To the knowledge of the executive officers of Parent, except as otherwise set forth on Part I of Schedule 4.01(n) hereto, the operations and properties of each Loan Party and each of its Subsidiaries comply in all material respects with all applicable Environmental Laws and Environmental Permits, all past non-compliance with Environmental Laws and Environmental Permits has been resolved without ongoing obligations or costs, and no circumstances exist that would be reasonably likely to (A) form the basis of an Environmental Action against any Loan Party or any of its Subsidiaries or any of their properties that could have a Material Adverse Effect or (B) cause any such property to be subject to any restrictions on ownership, occupancy, use or transferability under any Environmental Law;

(ii)     To the knowledge of the executive officers of Parent, except as otherwise set forth on Part II of Schedule 4.01(n) hereto, none of the properties currently or formerly owned or operated by any Loan Party or any of its Subsidiaries is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list; there are no and never have been any underground or aboveground storage tanks or any surface or sub-surface impoundments, septic tanks, pits, wells, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned or operated by any Loan Party or any of its Subsidiaries or on any property formerly owned or operated by any Loan Party or any of its Subsidiaries; there is no asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party or any of its Subsidiaries; and Hazardous Materials have not been released, discharged or disposed of on any property currently or formerly owned or operated by any Loan Party or any of its Subsidiaries; and

(iii)     To the knowledge of the executive officers of Parent, except as otherwise set forth on Part III of Schedule 4.01(n) hereto, neither any Loan Party nor any of its Subsidiaries is undertaking, and has not completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any governmental or regulatory authority or the requirements of any Environmental Law; and all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or formerly owned or

50

operated by any Loan Party or any of its Subsidiaries have been treated or disposed of in a manner not reasonably expected to result in material liability to any Loan Party or any of its Subsidiaries.

(o)     [Reserved].

(p)     Set forth on <u>Schedule 4.01(p)</u> hereto is a complete and accurate list of all Liens on the property or assets of any Loan Party or any of its Subsidiaries, showing as of the date hereof the lienholder thereof, the principal amount of the obligations secured thereby and the property or assets of such Loan Party or such Subsidiary subject thereto.

(q)     Set forth on <u>Schedule 4.01(q)</u> hereto is a complete and accurate list of all Investments held by any Loan Party or any of its Subsidiaries (other than Investments in Loan Parties) on the date hereof, showing as of the date hereof the amount, obligor or issuer and maturity, if any, thereof.

(r)     Parent and its Subsidiaries (i) are not in violation of any applicable Requirement of Law, including any building, zoning, occupational safety and health, fair employment, equal opportunity, pension, environmental control, health care, certificate of need, health care facility licensing or similar federal, state or local law, ordinance or regulation, relating to the ownership or operation of their respective businesses or assets, (ii) have not failed to obtain any license, permit, certificate or other governmental authorization necessary for the conduct of their businesses or the ownership and operation of their assets, (iii) have not received any notice from any Governmental Authority, and to their knowledge no such notice is pending or threatened, alleging that Parent or any of its Subsidiaries has violated, or has not complied with, any Requirement of Law, condition or standard applicable with respect to any of the foregoing, and (iv) are not a party to any agreement or instrument, or subject to any judgment, order, writ, rule, regulation, code or ordinance, except to the extent that any violation, noncompliance, failure, agreement, judgment, etc. as described in clauses (i) through (iv) will not have a Material Adverse Effect.

(s)     Parent and its Subsidiaries have all licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates of need, accreditations and other authorizations necessary for the lawful conduct of their respective businesses or operations wherever now conducted and as planned to be conducted, pursuant to all applicable statutes, laws, ordinances, rules and regulations of all Governmental Authorities having, asserting or claiming jurisdiction over Parent or any of its Subsidiaries or over any part of their respective operations, except to the extent that the cumulative effect of noncompliance with the foregoing will not have a Material Adverse Effect. Copies of all material licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates of need, accreditations and other authorizations shall be provided to the Administrative Agent upon request. Neither Parent nor any of its Subsidiaries is in default under any of such licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates of need, accreditations and other authorizations, and no event has occurred, and no condition exists, that with the giving of notice, the passage of time or both would constitute a default thereunder or would result in the suspension, revocation, impairment, forfeiture or non-renewal of any thereof, except to the extent that the cumulative effect of all such defaults, events, conditions,

suspensions, revocations, impairments, forfeitures and non-renewals will not have a Material Adverse Effect. The continuation, validity and effectiveness of all such licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates of need, accreditations and other authorizations will not be adversely affected by the transactions contemplated by this Agreement. Parent and its Subsidiaries know of no reason why they will not be able to maintain after the date hereof all licenses, permits, approvals, registrations, contracts, consents, franchises, qualifications, certificates of need, accreditations and other authorizations necessary or appropriate to conduct the businesses of Parent and its Subsidiaries as now conducted and presently planned to be conducted.

(t)     Upon the entry of the applicable Order, such Order shall be effective to establish and perfect the Collateral Agent's security interest in the Collateral; provided, that the Collateral Agent may take any steps it deems necessary, in its sole discretion, to attach or perfect the Liens, which steps may include the filing of financing statements, mortgages, notices of liens or other similar documents. The Collateral Agent's rights with respect to the Collateral are not subject to any setoff, claims, withholdings, or other defenses.

(u)     To the knowledge of the Borrowers, no facts exist that (individually or in the aggregate) would result in any material change in the Budget. The Budget is based upon good faith estimates and assumptions believed by the Loan Parties to be reasonable at the time made, has been prepared on the basis of the assumptions stated therein and reflects the reasonable estimates of the Loan Parties of the results of operations and other information projected therein, it being recognized by the Lenders that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by the Budget may differ from the projected results.

(v)     Parent and its Subsidiaries have filed or caused to be filed all U.S. federal, state, local, and all non-U.S. provincial and other material tax returns that are required to be filed by it, all such tax returns were when filed, and continue to be, true, correct and complete in all material respects, and the filer thereof has paid (or caused to be paid) all taxes shown to be due and payable on said returns or on any material assessments made against it or any of its property and all other material taxes, fees or other charges imposed on it or any of its property by any Governmental Authority (other than the amounts which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of Parent or its Subsidiaries, as the case may be); and no material tax Lien has been filed with respect to the property of Parent or any of its Subsidiaries and, to the knowledge of each Loan Party, no material claim is being asserted, with respect to any such tax, fee or other charge that could reasonably be expected to result in the filing of a tax Lien with respect to the property of Parent or any of its Subsidiaries.

(w)     Each of the Parent and its Subsidiaries is insured, in accordance with Section 9 of the Security Agreements, by insurers of recognized financial responsibility against such losses and risks and in such amounts as are prudent and customary in the businesses in which it is engaged; and none of Parent or any of its Subsidiaries (i) has received notice from any insurer or agent of such insurer that material expenditures will have to be made in order to continue such insurance or (ii) has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage

52

from similar insurers at a cost that would not reasonably be expected to have a Material Adverse Effect, other than changes to such coverage and costs that may be necessitated by or result from the Borrowers' status as debtors in possession.

(x)     To the extent applicable, each Loan Party is in compliance, in all material respects, with the Patriot Act.

## ARTICLE V

## COVENANTS

SECTION 5.01. Affirmative Covenants. So long as any Term Loan or any other Obligation (other than contingent indemnification and reimbursement Obligations in respect of which no claim for payment has been asserted by the Person entitled thereto) of any Loan Party under any Loan Document shall remain unpaid, each Loan Party will:

(a)     Compliance with Laws, Etc. Comply, and cause each of its Subsidiaries to comply, in all material respects, with all applicable laws, rules, regulations and orders, such compliance to include, without limitation, compliance with ERISA, the Racketeer Influenced and Corrupt Organizations Chapter of the Organized Crime Control Act of 1970 and Healthcare Laws.

(b)     Payment of Taxes, Etc. Pay and discharge, and cause each of its Subsidiaries to pay and discharge, before the same shall become delinquent, (i) all taxes, assessments and governmental charges or levies imposed upon it or upon its property and (ii) all lawful claims that, if unpaid, might by law become a Lien upon its property; *provided, however*, that neither Parent nor any of its Subsidiaries shall be required to pay or discharge any such tax, assessment, charge or claim that is being contested in good faith and by proper proceedings and as to which appropriate reserves are being maintained, unless and until any Lien resulting therefrom attaches to its property and becomes enforceable against its other creditors.

(c)     Compliance with Environmental Laws. Comply, and cause each of its Subsidiaries and all lessees and other Persons operating or occupying its properties to comply, in all material respects, with all applicable Environmental Laws and Environmental Permits; obtain and renew, and cause each of its Subsidiaries to obtain and renew, all Environmental Permits necessary for its operations and properties; and conduct, and cause each of its Subsidiaries to conduct, any investigation, study, sampling and testing, and undertake any cleanup, removal, remedial or other action necessary to remove and clean up all Hazardous Materials from any of its properties, in accordance with the requirements of all Environmental Laws; *provided, however*, that neither Parent nor any of its Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances.

(d)     Maintenance of Insurance. Maintain, and cause each of its Subsidiaries to maintain, insurance (including, without limitation, business interruption) with responsible and reputable insurance companies or associations in such amounts and covering such risks as is

53

usually carried by companies engaged in similar businesses and owning similar properties in the same general areas in which such Loan Party or such Subsidiary operates.

(e)     Preservation of Corporate Existence, Etc.  Preserve and maintain, and cause each of its Subsidiaries to preserve and maintain, its existence, legal structure, legal name, rights (charter and statutory), permits, licenses, approvals, privileges and franchises; *provided* that neither Parent nor any of its Subsidiaries shall be required to preserve any right, permit, license, approval, privilege or franchise if the Board of Directors of Parent or such Subsidiary, after consultation with the Restructuring Monitor, reasonably determines that the preservation thereof is no longer desirable in the conduct of the business of such Loan Party or such Subsidiary, as the case may be, and that the loss thereof is not disadvantageous in any material respect to such Loan Party, such Subsidiary or the Lenders.

(f)     Visitation Rights.  At any time during normal business hours, permit representatives of the Required Lenders (including legal and financial advisers, auditors, appraisers, and any other consultants engaged from time to time at the direction of the Required Lenders) to examine and make copies of and abstracts from the records and books of account of, and visit the properties of, Parent and any of its Subsidiaries, and to discuss the affairs, finances and accounts of Parent and any of its Subsidiaries with any of their officers or directors and with their independent certified public accountants.

(g)     Keeping of Books.  Keep, and cause each of its Subsidiaries to keep, proper books of record and account, in which full and correct entries shall be made of all financial transactions and the assets and business of Parent and each such Subsidiary in accordance with generally accepted accounting principles in effect from time to time.

(h)     Maintenance of Properties, Etc.  Maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, all of its properties that are used or useful in the conduct of its business in good working order and condition, ordinary wear and tear excepted.

(i)     Transactions with Affiliates.  Conduct, and cause each of its Subsidiaries to conduct, all transactions otherwise permitted under the Loan Documents with any of their Affiliates on terms that are fair and reasonable and no less favorable to such Loan Party or Subsidiary than it would obtain in a comparable arm's length transaction with a Person not an Affiliate and in connection therewith shall not, and shall not permit any of its Subsidiaries to, enter into any agreement requiring payments inconsistent with the foregoing, *provided* that the foregoing shall not apply to (i) transactions between Loan Parties and (ii) customary fees to, and indemnifications of, non-officer directors of the Loan Parties in compliance with the Budget (subject to the proviso in Section 5.04(a)).

(j)     Covenant to Guarantee Obligations and Give Security.  Upon (i) the formation or acquisition of any new direct or indirect Subsidiaries by any Loan Party or any such Subsidiary which on the date hereof is not a Guarantor or (ii) the acquisition of any property by any Loan Party, which, in the judgment of the Collateral Agent, constitutes Collateral and shall not already be subject to a perfected first priority (subject to the Carve Out and Liens permitted to be equal or superior in priority pursuant to this Agreement) security interest in favor of the

54

Collateral Agent for the benefit of the Secured Parties, then in each case at the Borrowers' expense:

(A)     in connection with the formation or acquisition of a Subsidiary within ten (10) days after such formation or acquisition, cause each such Subsidiary, and cause each direct and indirect parent of such Subsidiary (if it has not already done so), to duly execute and deliver to the Collateral Agent a guaranty or guaranty supplement, in form and substance satisfactory to the Collateral Agent and the Required Lenders, guaranteeing the other Loan Parties' obligations under the Loan Documents;

(B)     within ten (10) days after such formation or acquisition, furnish to the Collateral Agent a description of the real and personal properties of such Subsidiary or the real and personal properties so acquired, in each case in detail satisfactory to the Collateral Agent and the Required Lenders;

(C)     within ten (10) days after (A) such acquisition of property by any Loan Party, duly execute and deliver, and cause each Loan Party to duly execute and deliver, to the Collateral Agent such additional mortgages, pledges, assignments, security agreement supplements, intellectual property security agreement supplements and other security agreements as specified by, and in form and substance satisfactory to the Collateral Agent and the Required Lenders, securing payment of all the Obligations of such Loan Party under the Loan Documents and constituting Liens on all such properties and (B) such formation or acquisition of any new Subsidiary, duly execute and deliver and cause such Subsidiary and each Loan Party acquiring Equity Interests in such Subsidiary to duly execute and deliver to the Collateral Agent mortgages, pledges, assignments, security agreement supplements, intellectual property security agreement supplements and other security agreements as specified by, and in form and substance satisfactory to the Collateral Agent and the Required Lenders, securing payment of all of the obligations of such Subsidiary or Loan Party, respectively, under the Loan Documents;

(D)     within fifteen (15) days after such formation or acquisition, take, and cause each Loan Party and each newly acquired or newly formed Subsidiary to take, whatever action (including, without limitation, the recording of mortgages, the filing of Uniform Commercial Code financing statements, the giving of notices and the endorsement of notices on title documents) may be necessary or advisable in the opinion of the Collateral Agent to vest in the Collateral Agent (or in any representative of the Collateral Agent designated by it) valid and subsisting Liens on the properties purported to be subject to the mortgages, pledges, assignments, security agreement supplements, intellectual property security agreement supplements and security agreements delivered pursuant to this Section 5.01(j), enforceable against all third parties in accordance with their terms;

A/73160038.15

(E)     within thirty (30) days after such formation or acquisition, deliver to the Collateral Agent, upon the request of the Collateral Agent in its sole discretion, a signed copy of a favorable opinion, addressed to the Collateral Agent and the other Secured Parties, of counsel for the Loan Parties acceptable to the Collateral Agent and the Required Lenders as to (1) the matters contained in clauses (A), (C) and (D) above, (2) such guaranties, guaranty supplements, mortgages, pledges, assignments, security agreement supplements, intellectual property security agreement supplements and security agreements being legal, valid and binding obligations of each Loan Party party thereto enforceable in accordance with their terms and as to the matters contained in clause (D) above, (3) such recordings, filings, notices, endorsements and other actions being sufficient to create valid perfected Liens on such properties, and (4) such other matters as the Collateral Agent and the Required Lenders may reasonably request;

(F)     as promptly as practicable after such formation or acquisition, deliver, upon the request of the Collateral Agent in its sole discretion, to the Collateral Agent with respect to each parcel of real property owned or held by each Loan Party and each newly acquired or newly formed Subsidiary title reports, surveys and engineering, soils and other reports, and environmental assessment reports, each in scope, form and substance satisfactory to the Collateral Agent and the Required Lenders, *provided*, *however*, that to the extent that any Loan Party or any of its Subsidiaries shall have otherwise received any of the foregoing items with respect to such real property, such items shall, promptly after receipt thereof, be delivered to the Collateral Agent; and

(G)     at any time and from time to time, promptly execute and deliver, and cause each Loan Party and each newly acquired or newly formed Subsidiary to execute and deliver, any and all further instruments and documents and take, and cause each Loan Party and each newly acquired or newly formed Subsidiary to take, all such other action as the Collateral Agent may deem necessary or desirable in obtaining the full benefits of, or in perfecting and preserving the Liens of, such guaranties, mortgages, pledges, assignments, security agreement supplements, intellectual property security agreement supplements and security agreements;

provided, that notwithstanding anything to the contrary in this Section 5.01(j), the Loan Parties shall only be required to use commercially reasonable efforts to cause each non-wholly owned Subsidiary of any Loan Party to comply with the provisions of this Section 5.01(j).

(k)     Further Assurances. (i) Promptly upon request by any Agent, or any Lender through the Administrative Agent, correct, and cause each of its Subsidiaries promptly to correct, any material defect or error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof,

(ii)     promptly upon request by any Agent, or any Lender through the Administrative Agent, do, execute, acknowledge, deliver any and all acts, deeds, conveyances, pledge agreements, mortgages, deeds of trust, trust deeds, assignments,

56

financing statements and continuations thereof, termination statements, notices of assignment, transfers, certificates, assurances and other instruments as any Agent, or any Lender through the Administrative Agent, may reasonably require from time to time (and consent to the Agents recording or filing such instrument) in order to (A) carry out more effectively the purposes of the Loan Documents, (B) to the fullest extent permitted by applicable law, subject any Loan Party's or any of its Subsidiaries' properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Collateral Documents, (C) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder and (D) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Secured Parties the rights granted or now or hereafter intended to be granted to the Secured Parties under any Loan Document or under any other instrument executed in connection with any Loan Document to which any Loan Party or any of its Subsidiaries is or is to be a party, and cause each of its Subsidiaries to do so; and

(iii)     no later than 30 days following the Closing Date, provide evidence of receipt of ratings for the Facility from Moody's and S&P, in each case acceptable to the Required Lenders.

(l)     **Control Account Agreements.** Deposit all cash held or received by it (other than the proceeds of the Term Loans, which shall be deposited in the DIP Proceeds Controlled Account) into any account held by TLC Management, which is subject to a Control Account Agreement pursuant to which the Agents are granted a first priority security interest in respect of such cash, in form and substance satisfactory to the Administrative Agent and the Required Lenders, duly executed by the financial institution at which such account is maintained. So long as no Default or Event of Default has occurred and is continuing, the Borrowers may withdraw amounts from such account to make payments consistent with the Budget.

(m)     **Preparation of Environmental Reports.** At the reasonable request of the Administrative Agent or the Collateral Agent from time to time, provide to the Lenders within sixty (60) days after such request, at the expense of the Borrowers, an environmental site assessment report for any of its or its Subsidiaries' properties described in such request, prepared by an environmental consulting firm acceptable to the Required Lenders, indicating the presence or absence of Hazardous Materials and the estimated cost of any compliance, removal or remedial action in connection with any Hazardous Materials on such properties; without limiting the generality of the foregoing, if any Agent or the Required Lenders determine at any time that a material risk exists that any such report will not be provided within the time referred to above, such Agent or the Required Lenders may retain an environmental consulting firm to prepare such report at the expense of the Borrowers, and each Loan Party hereby grants and agrees to cause any Subsidiary that owns any property described in such request to grant at the time of such request to the Agents, the Lenders, such firm and any agents or representatives thereof an irrevocable non-exclusive license, subject to the rights of tenants, to enter onto their respective properties to undertake such an assessment.

(n)     **Healthcare Matters.** Notify the Administrative Agent of (i)any receipt by any Loan Party of notice of any investigation or audit, or pending or threatened proceedings

relating to, any material violation by any Loan Party or any of its Subsidiaries of any Healthcare Law, including, without regard to materiality, (A) any investigation or audit or proceeding involving violation of any of the Medicare and/or Medicaid fraud and abuse provisions and (B) any criminal or civil investigation initiated, claim filed or disclosure required by the Office of the Inspector General, the Department of Justice, Centers for Medicare and Medicaid Services (formerly the Health Care Financing Administration), or any other governmental authority, and (ii) any receipt by any Loan Party of a written recommendation from any governmental authority or other regulatory body that any Loan Party should have its licensure, provider or supplier number or accreditation suspended, revoked, or limited in any material way, or have its eligibility to participate in Medicare, Medicaid or any other government program to accept assignments or rights to reimbursement under Medicaid, Medicare, or any other government program regulations suspended, revoked, or limited in any material way.

(o) <u>Maintenance of Ratings</u>. At all times from and after the date 30 days following the Closing Date, maintain ratings for the Facility from Moody's and S&P, in each case acceptable to the Required Lenders.

(p) <u>Due Diligence</u>. Use, and cause each of its Subsidiaries to use, its best efforts to provide all due diligence materials reasonably requested by the Administrative Agent or the Required Lenders or their legal and financial advisors (including due diligence materials with respect to any proposed asset sales and any severance obligations of Parent or any of its Subsidiaries to any employees or former employees).

(q) <u>Use of Proceeds</u>. Use, and cause each of its Subsidiaries to use, the proceeds of the Term Loans only in accordance with the Budget and in compliance with <u>Section 5.04(a)</u>.

(r) <u>Critical Vendors</u>. Cause the Borrowers to file a motion with the Bankruptcy Court seeking approval of payment of critical vendors of the Borrowers acceptable to the Required Lenders no later than three (3) Business Days after the Petition Date.

(s) <u>Filing of Claims, Schedules, and Statement of Affairs in the Cases</u>. Cause the Borrowers to file the respective schedules and statements of affairs with the Bankruptcy Court no later than fifteen (15) days after the Petition Date.

(t) <u>Last Day to File Claims</u>. Cause the Borrowers to obtain an order from the Bankruptcy Court setting the bar date for prepetition claims in the Chapter 11 Case no later than twenty (20) days after the Borrowers filed their respective schedules and statements of affairs with the Bankruptcy Court.

(u) <u>Interim Order</u>. Cause the Borrowers to file a motion with the Bankruptcy Court to approve the Interim Order on the Petition Date.

(v) <u>Call Center</u>. Cause the Borrowers to file all necessary motions with the Bankruptcy Court seeking approval of (i) the rejection of the lease of Parent's call center located at 5280 Solar Drive, City of Mississauga, Province of Ontario, and (ii) any settlement with I.T. Weapons Inc. with respect to the lease of the new call center located at 1535 Meyerside Drive,

Unit 15 and 16, Mississauga, Ontario, Canada, if requested and approved by the Required Lenders, in the case of each (i) and (ii), no later than ten (10) days after the Petition Date.

(w) <u>Cash Management System</u>. Cause the Borrowers to file on the Petition Date a motion with the Bankruptcy Court to approve the cash management systems used by the Borrowers, in a form reasonably satisfactory to the Required Lenders.

(x) <u>Vision Source, L.P.</u> Take reasonable steps at all times to enforce their rights with respect to all distributions and payments owing to it or any of its Subsidiaries by Vision Source, L.P. (including, without limitation, payments due under the promissory note dated as of August 1, 2002, as amended, issued by Vision Source, L.P. in favor of TLC Capital Corporation, a Delaware corporation).

(y) <u>Canadian Refractive Centers</u>. Cause the Borrowers to use their best efforts to sell the Canadian Refractive Centers on terms and conditions satisfactory to the Required Lenders.

(z) <u>Parent's Assets</u>. Cause the Borrowers to file all necessary motions with the Bankruptcy Court and Canadian Court, as soon as practicable, to seek approval to transfer substantially all assets from Parent to Holdco (other than the Canadian Refractive Centers).

(aa) <u>Canadian Court</u>. Cause the Borrowers to seek all appropriate orders of the Canadian Court, reasonably satisfactory to the Required Lenders, which shall correspond to such court orders entered by the Bankruptcy Court, in each case within seven (7) days of the entry of such order by the Bankruptcy Court.

(bb) <u>Restructuring Monitor</u>. Cause (i) the Restructuring Monitor to be in place and operating pursuant to an engagement letter, in form and substance reasonably satisfactory to the Required Lenders, and (ii) such engagement letter to remain in full force and effect.

(cc) <u>Kremer Claims</u>. To the extent that settlement of the Kremer Claims, in form and substance satisfactory to the Required Lenders, is not reached on or before January 15, 2010, file and diligently pursue appropriate contested proceedings seeking to subordinate the Kremer Claims to the obligations owing to general unsecured creditors of Parent and its Subsidiaries.

SECTION 5.02. <u>Negative Covenants</u>. So long as any Term Loan or any other Obligation (other than contingent indemnification and reimbursement Obligations in respect of which no claim for payment has been asserted by the Person entitled thereto) of any Loan Party under any Loan Document shall remain unpaid, each Loan Party will not, at any time:

(a) <u>Liens, Etc.</u> Create, incur, assume or suffer to exist, or permit any of its Subsidiaries to create, incur, assume or suffer to exist, any Lien on or with respect to any of its properties of any character (including, without limitation, accounts) whether now owned or hereafter acquired, or sign or file or suffer to exist, or permit any of its Subsidiaries to sign or file or suffer to exist, under the Uniform Commercial Code (or similar law) of any jurisdiction, a financing statement that names any Loan Party or any of its Subsidiaries as debtor, or sign or

59

suffer to exist, or permit any of its Subsidiaries to sign or suffer to exist, any security agreement authorizing any secured party thereunder to file such financing statement, or assign, or permit any of its Subsidiaries to assign, any accounts or other right to receive income, except:

    (i)    Liens created pursuant to the Loan Documents, Interim Order and the Final Order;

    (ii)    Permitted Liens;

    (iii)    Liens existing on the date hereof and described on <u>Schedule 4.01(p)</u> hereto;

    (iv)    purchase money Liens upon or in real property or equipment acquired or held by Parent or any of its Subsidiaries in the ordinary course of business to secure the purchase price of such property or equipment or to secure Debt incurred solely for the purpose of financing the acquisition, construction, improvement or installation of any such property or equipment to be subject to such Liens, or Liens existing on any such property or equipment at the time of acquisition (other than any such Liens created in contemplation of such acquisition that do not secure the purchase price), or extensions, renewals or replacements of any of the foregoing for the same or a lesser amount; *provided, however,* that no such Lien shall extend to or cover any property other than the property or equipment being acquired, constructed, improved or installed (or the proceeds of any of the foregoing), and no such extension, renewal or replacement shall extend to or cover any property not theretofore subject to the Lien being extended, renewed or replaced; and *provided further* that the aggregate principal amount of the Debt hereafter incurred secured by Liens permitted by this clause (iv) shall not exceed the amount permitted under <u>Section 5.02(b)(iv)</u> at any time outstanding; and

    (v)    Liens arising under Capitalized Leases permitted under <u>Section 5.02(b)(iv)</u> *provided* that no such Lien shall extend to or cover any Collateral or assets other than the assets subject to such Capitalized Leases (or the proceeds thereof).

    (b)    <u>Debt</u>. Create, incur, assume or suffer to exist, or permit any of its Subsidiaries to create, incur, assume or suffer to exist, any Debt, except:

    (i)    Debt under the Loan Documents;

    (ii)    Debt under the Prepetition Loan Documents;

    (iii)    (A)    unsecured Debt arising in respect of purchasing card and/or corporate credit card programs not to exceed in the aggregate $1,000,000 at any time outstanding, and (B) unsecured Debt (not specified in clause (A) above) not to exceed in the aggregate $2,000,000 at any time outstanding, in the case of each of (A) and (B), as reflected in the Budget;

    (iv)    (x) Capitalized Leases and Debt secured by purchase money Liens existing on the date hereof and listed on Schedule 5.02(b) hereto; provided that

such Capitalized Leases and Debt shall not be refinanced, and Capitalized Leases and Debt secured by purchase money Liens hereafter incurred not to exceed an aggregate principal amount of $1,500,000 at any time outstanding, and (y) in the case of Capitalized Leases and Debt secured by purchase money Liens to which any Subsidiary of Parent is a party, Debt of Parent of the type described in clause (i) of the definition of "*Debt*" guaranteeing the Obligations of such Subsidiary under such Capitalized Leases and Debt secured by purchase money Liens;

(v)     Debt owed to any Borrower or a wholly owned Subsidiary of Parent, which Debt shall (x) in the case of Debt owed to a Loan Party, constitute Pledged Debt, (y) be on terms acceptable to the Administrative Agent and the Required Lenders and (z) be otherwise permitted under the provisions of Section 5.02(f); and

(vi)     Debt not otherwise specified above and existing on the date hereof and described in Schedule 5.02(b) hereto; provided that such Debt shall not be refinanced.

(c)     Change in Nature of Business. Make, or permit any of its Subsidiaries to make, any material change in the nature of its business as carried on at the date hereof.

(d)     Mergers, Etc. Merge into or consolidate with any Person or permit any Person to merge into it, or permit any of its Subsidiaries to do so except that any Subsidiary of Parent may merge into or consolidate with any other Subsidiary of Parent; *provided* that in the case of any such merger or consolidation, the Person formed by such merger or consolidation shall be a wholly owned Subsidiary of Parent and provided further that (i) in the case of any such merger or consolidation to which a Guarantor is a party, the Person formed by such merger or consolidation shall be a Guarantor, (ii) notwithstanding the foregoing, no merger or consolidation shall be consummated between a Borrower and a Person that is not a Borrower, (iii) in each case, immediately before and after giving effect thereto, no Default shall have occurred and be continuing and, (iv) in the case of any such merger to which Parent is a party, Parent is the surviving entity.

(e)     Sales, Etc. of Assets. Sell, lease, transfer or otherwise dispose of, or permit any of its Subsidiaries to sell, lease, transfer or otherwise dispose of, any assets, or grant any option or other right to purchase, lease or otherwise acquire, or permit any of its Subsidiaries to grant any option or other right to purchase, lease or otherwise acquire, any assets, except

(i)     the sale of the Canadian Refractive Centers on terms and conditions satisfactory to the Required Lenders; provided that the Borrowers shall, on the date of receipt by any of them or any of their respective Subsidiaries of the Net Cash Proceeds from such sale, prepay the Term Loans pursuant to, and in the amount set forth in, Section 2.04 and apply the remaining Net Cash Proceeds, if any, in accordance with Section 2.04;

(ii)     sales of excess, obsolete or worn out equipment in the ordinary course of its business;

61

(iii)    sales, transfers or other dispositions of assets among Loan Parties subject to Section 5.01(i) hereof;

(iv)    the sale of any assets constituting a Cash Equivalent and maintained in a Securities Account, subject to the terms and conditions of the applicable Securities Account Control Agreement; and

(v)    mergers and consolidations permitted under Section 5.02(d), Investments permitted under Section 5.02(f) and transactions permitted under Section 5.02(g).

(f)    Investments in Other Persons.  Make or hold, or permit any of its Subsidiaries to make or hold, any Investment in any Person, except:

(i)    Investments by Parent and its Subsidiaries in their Subsidiaries outstanding on the date hereof;

(ii)    loans and advances to employees in the ordinary course of the business of Parent and its Subsidiaries as presently conducted in an aggregate principal amount not to exceed $50,000 at any time outstanding;

(iii)    Investments by Parent and its Subsidiaries in Cash Equivalents; and

(iv)    Investments existing on the date hereof and described on Schedule 4.01(q) hereto;

(g)    Restricted Payments.  Declare or pay any dividends, purchase, redeem, retire, defease or otherwise acquire for value any of its Equity Interests now or hereafter outstanding, return any capital to its stockholders, partners or members (or the equivalent Persons thereof) as such, make any distribution of assets, Equity Interests, obligations or securities to its stockholders, partners or members (or the equivalent Persons thereof) as such, or permit any of its Subsidiaries to do any of the foregoing, or permit any of its Subsidiaries to purchase, redeem, retire, defease or otherwise acquire for value any Equity Interests in Parent, except, so long as no Default shall have occurred and be continuing at the time of any action described below or would result therefrom: (i) each Subsidiary of the Parent may make dividends or other distributions to each Loan Party and to each other owner of Equity Interests of such Subsidiary based on their relative ownership interests of such Equity Interests and consistent with the constituent documents of such Subsidiary and its course of dealings with the owners of its Equity Interests (including, without limitation, to allow such Loan Party or other owner to pay its franchise fees or similar taxes and fees required to maintain its corporate existence and its income taxes or the incomes taxes of any consolidated or affiliated group of which it is a member; and (ii) the Borrowers may declare and pay cash dividends to Parent not to exceed $200,000 in the aggregate to permit Parent to pay (A) reasonable and customary corporate and operating expenses (including reasonable out of pocket expenses for legal, administrative and accounting services provided by third parties, and compensation, benefits and other amounts payable to officers and employees in connection with their employment in the ordinary course of

62

business and to board of director observers) and (B) franchise fees or similar taxes and fees required to maintain its organizational existence.

(h)     **Amendments of Constitutive Documents.**  Amend, or permit any of its Subsidiaries to amend, its certificate of incorporation or bylaws or other constitutive documents other than as required by law or as does not have a materially adverse effect on the interests of the Lenders, in each case, as promptly disclosed to the Administrative Agent.

(i)     **Accounting Changes.**  Make or permit, or permit any of its Subsidiaries to make or permit, any change in (i) accounting policies or reporting practices, except as required or permitted by generally accepted accounting principles, or (ii) Fiscal Year.

(j)     **Prepayments, Etc., of Debt.**  (i) Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment in violation of any subordination terms of, any Debt, except the prepayment of the Term Loan in accordance with the terms of this Agreement or (ii) amend, modify or change in any manner any term or condition of any Subordinated Debt, or permit any of its Subsidiaries to do any of the foregoing.

(k)     **Negative Pledge.**  Enter into or suffer to exist, or permit any of its Subsidiaries to enter into or suffer to exist, any agreement prohibiting or conditioning the creation or assumption of any Lien upon any of its property or assets except (i) agreements in favor of the Secured Parties or (ii) prohibitions or conditions under (A) any purchase money Debt permitted by Section 5.02(b)(iv) solely to the extent that the agreement or instrument governing such Debt prohibits a Lien on the property acquired with the proceeds of such Debt or (B) any Capitalized Lease permitted by Section 5.02(b)(iv) solely to the extent that such Capitalized Lease prohibits a Lien on the property subject thereto.

(l)     **Speculative Transactions.**  Engage, or permit any of its Subsidiaries to engage, in any transaction involving commodity options or futures contracts or any similar speculative transactions.

(m)     **Hedge Agreements.**  Enter or permit any of its Subsidiaries to enter into any Hedge Agreement.

(n)     **Restrictions Affecting Subsidiaries.**  Directly or indirectly, enter into or suffer to exist, or permit any of its Subsidiaries to enter into or suffer to exist, any agreement or arrangement limiting the ability of any of its Subsidiaries to declare or pay dividends or other distributions in respect of its Equity Interests to the Borrowers or repay or prepay any Debt owed to, make loans or advances to, or otherwise transfer assets to or make Investments in, the Borrowers or any Subsidiary of the Borrowers (whether through a covenant restricting dividends, loans, asset transfers or investments, a financial covenant or otherwise), except the Loan Documents; *provided*, that this Section shall not limit the ability of any Subsidiary to pay the Borrowers or another Subsidiary for goods or services provided in the ordinary course of business.

(o)     **ERISA.**  Maintain, sponsor, participate in or contribute to any Plan or Multiemployer Plan; or incur any material liability under Title I or any liability under Title IV of

ERISA for which any Loan Party could be reasonably expected to be liable, or permit any of its Subsidiaries or ERISA Affiliates to do any of the foregoing.

(p)     Material Amendments. Make, or permit any of its Subsidiaries to make, any material amendment to any agreements with any employee or independent contractor (including, without limitation, any optometrist or surgeon providing refractive laser or other services) unless the Loan Parties reasonably determine that such amendment results in cash savings or improved liquidity for the Loan Parties after consultation with the Required Lenders.

(q)     Prepetition Indebtedness. Pay or discharge, or permit any of its Subsidiaries to pay or discharge, or cause to be paid or discharged, any Debt of such Loan Party incurred before the Petition Date other than payments:

(i)     approved by the Bankruptcy Court and consented to by the Required Lenders;

(ii)     consistent with the Budget;

(iii)     required to be made to the Prepetition Agents and the Prepetition Lenders pursuant to the Orders (including, without limitation, amounts payable to the Special Counsel, the Financial Adviser, Stikeman Elliott LLP, as Canadian counsel, and Pachulski Stang Ziehl & Jones LLP, as Delaware counsel, each in connection with their representation of certain Prepetition Lenders); and

(iv)     as required in the Plan of Reorganization, on or about the effective date of the Plan of Reorganization (except as otherwise expressly provided for therein).

None of the Loan Parties shall, without the consent of the Required Lenders, file any motion with the Bankruptcy Court in accordance with Section 546(h) of the Bankruptcy Code seeking to return any goods shipped to any of the Loan Parties prior to the Petition Date.

(r)     Bankruptcy Chapter 11 Cases. Seek, consent or suffer to exist or permit any of its Subsidiaries to seek, consent or suffer to exist (i) any modification, stay, vacation or amendment to the Orders; (ii) a priority claim for any administrative expense or unsecured claim against any Borrower or any Guarantor (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of any kind specified in Section 503(b) or 507(b) of the Bankruptcy Code or, from and after the entry of the Final Order, Section 506(c) of the Bankruptcy Code) equal to or superior to the priority claim of the applicable Agent and the Lenders in respect to the Obligations other than the Carve Out; and (iii) any Lien on any Collateral having a priority equal or superior to the Liens in favor of the applicable Agent and the Lenders in respect of the Obligations or the Liens in favor of the applicable Prepetition Agent and the Prepetition Lenders in respect of the Prepetition Lender Debt, in each case other than Liens expressly permitted to be equal or superior in priority pursuant to this Agreement.

64

(s)     Success and Other Similar Fees.  Make, or permit any of its Subsidiaries to make payment of any success, transaction, opinion or similar fee to any financial adviser engaged by Parent or any of its Subsidiaries or Affiliates.

(t)     Control Account Agreements.  Permit the aggregate amount of cash maintained by any Loan Party at any financial institution at any time to exceed $5,000 for more than one Business Day unless such Loan Party has (i) executed and delivered to the Agents a Control Account Agreement, in form and substance reasonably satisfactory to the Required Lenders and executed by such financial institution, and (ii) taken all other steps necessary or, in the opinion of the Collateral Agent, desirable to ensure that the Collateral Agent has a perfected first priority security interest in such cash (subject to the Carve Out and Liens permitted to be equal or superior in priority pursuant to this Agreement); *provided*, that if such Loan Party is unable to obtain such agreement from such financial institution, such Loan Party shall promptly transfer all cash maintained at such financial institution to a financial institution from which such Loan Party has obtained such an agreement.

(u)     DIP Proceeds Controlled Account.   Deposit any cash held or received by it into the DIP Proceeds Controlled Account other than proceeds of the Term Loans in accordance with the terms hereof.

SECTION 5.03.Reporting Requirements.  So long as any Term Loan or any other Obligation (other than contingent indemnification and reimbursement Obligations in respect of which no claim for payment has been asserted by the Person entitled thereto) of any Loan Party under any Loan Document shall remain unpaid, or any Lender shall have any Commitment hereunder, each Loan Party will cause to be furnished to the Agents and the Lenders:

(a)     Default Notice.  As soon as possible and in any event within two days after any executive officer of any Loan Party is actually aware of the occurrence of each Default or any event, development or occurrence reasonably likely to have a Material Adverse Effect continuing on the date of such statement, a statement of the Chief Financial Officer of the Administrative Borrower setting forth details of such Default and the action taken and proposed to be taken with respect thereto.

(b)     Annual Financials.  As soon as available and in any event within 90 days after the end of each Fiscal Year, a copy of the annual audit report for such year for Parent and its Subsidiaries, including therein Consolidated and, if otherwise provided, consolidating balance sheets of Parent and its Subsidiaries as of the end of such Fiscal Year and Consolidated and, if otherwise provided, consolidating statements of income and a Consolidated statement of cash flows of Parent and its Subsidiaries for such Fiscal Year, in each case accompanied by (i) an opinion as to such audit report of Ernst & Young, LLP or other independent public accountants of recognized standing acceptable to the Required Lenders and (ii) a report of such independent public accountants as to Parent's internal controls required under Section 404 of the Sarbanes-Oxley Act of 2002, if any, in each case certified in a manner to which the Required Lenders have not objected, together with (A) a certificate of such accounting firm to the Lenders stating that in the course of the regular audit of the business of Parent and its Subsidiaries, which audit was conducted by such accounting firm in accordance with generally accepted auditing standards, such accounting firm has obtained no knowledge that a Default has occurred and is continuing,

or if, in the opinion of such accounting firm, a Default has occurred and is continuing, a statement as to the nature thereof, (B) a schedule in form satisfactory to the Administrative Agent and the Required Lenders of the computations used by such accountants in determining, as of the end of such Fiscal Year, compliance with the covenants contained in Section 5.04 and (C) a certificate of the Chief Financial Officer of the Administrative Borrower stating that (1) no Default has occurred and is continuing or, if a Default has occurred and is continuing, a statement as to the nature thereof and the action that has been taken and is proposed with respect thereto and (2) Parent and its Subsidiaries have paid to each appropriate taxing authority the full amount that each is required to pay in respect of income tax for such year.

(c)     Quarterly Financials.  As soon as available and in any event within 45 days after the end of each of the first three quarters of each Fiscal Year, Consolidated and, if otherwise provided, consolidating balance sheets of Parent and its Subsidiaries as of the end of such quarter and Consolidated and, if otherwise provided, consolidating statements of income and Consolidated statement of cash flows of Parent and its Subsidiaries for the period commencing at the end of the previous fiscal quarter and ending with the end of such fiscal quarter and a Consolidated and, if otherwise provided, consolidating statements of income and a Consolidated statement of cash flows of Parent and its Subsidiaries for the period commencing at the end of the previous Fiscal Year and ending with the end of such quarter, setting forth in each case in comparative form the corresponding figures for the corresponding date or period of the preceding Fiscal Year, all in reasonable detail and duly certified (subject to normal year-end audit adjustments and the absence of footnotes) by the Chief Financial Officer of the Administrative Borrower as having been prepared in accordance with GAAP, together with (i) a certificate of said officer stating that no Default has occurred and is continuing or, if a Default has occurred and is continuing, a statement as to the nature thereof and the action that has been taken and is proposed with respect thereto and (ii) a schedule in form satisfactory to the Administrative Agent and the Required Lenders of the computations used by Parent and its Subsidiaries in determining compliance with the covenants contained in Section 5.04.

(d)     Cash Flow Forecast.  On Thursday of each week (or, if such day is not a Business Day, on the immediately succeeding Business Day), rolling thirteen week Consolidated cash flow forecasts of Parent and its Subsidiaries and an updated comparison to the budgeted amounts from the prior week's Consolidated cash flow projections in a form satisfactory to the Required Lenders.

(e)     Chief Financial Officer Report and Certificate.  On Thursday of each week (or, if such day is not a Business Day, on the immediately succeeding Business Day),

(i)     a report of the Chief Financial Officer of the Administrative Borrower which sets forth:

(A)     a reconciliation of actual results for the prior week to the corresponding amounts reflected in the Budget, with explanations for any variance in any line item in excess of 10%;

(B)     a reconciliation of each of "total operating cash receipts" and "total operating cash disbursements" (as reflected in the Budget and measured

66

weekly on a cumulative basis starting with the period ending three (3) weeks after the Petition Date) to the corresponding amounts reflected in the Budget, with explanations for any variance by line item in excess of 10%;

(C)     information with respect to asset sales, cost savings, facility closures and such other information reasonably requested by the Required Lenders; and

(ii)     a certificate of the Chief Financial Officer of the Administrative Borrower (A) stating that no proceeds of the Term Loans have been used for any item not set forth in the Budget and (B) as to (1) Liquidity as of Friday of the previous week, (2) any changes to or non-compliance with either of the Liquidity Guidelines through Friday of the previous week, together with reasonable supporting detail and calculations, (3) the aggregate amount of severance obligations due and payable to all employees or former employees of Parent or any of its Subsidiaries during the previous week, and (4) the aggregate amount of severance payments made to all employees or former employees of Parent and any of its Subsidiaries during the previous week.

(f)     Litigation. Promptly after the commencement thereof, notice of all actions, suits, investigations, litigation and proceedings before any Governmental Authority affecting any Loan Party or any of its Subsidiaries of the type described in Section 4.01(f), and promptly after the occurrence thereof, notice of any adverse change in the status or the financial effect on any Loan Party or any of its Subsidiaries of the Disclosed Litigation from that described on Schedule 4.01(f) hereto. Promptly after receipt thereof, notice of any Governmental Authority or other Person that such Governmental Authority or other Person has rescinded or not renewed, or intends to rescind or not renew, any material license, accreditations and approvals of any Governmental Authorities and all other Persons necessary for any Loan Party or any of its Subsidiaries to own its assets or to carry on its business.

(g)     Securities Reports. Promptly after the sending or filing thereof, copies of all proxy statements, financial statements and reports that any Loan Party or any of its Subsidiaries sends to its stockholders, and copies of all regular, periodic and special reports, and all registration statements, that any Loan Party or any of its Subsidiaries files with the Securities and Exchange Commission or any governmental authority that may be substituted therefor, or with any national securities exchange.

(h)     Creditor Reports. Promptly after the furnishing thereof, copies of any statement or report furnished to any holder of Debt securities of any Loan Party or of any of its Subsidiaries pursuant to the terms of any indenture, loan or credit or similar agreement and not otherwise required to be furnished to the Lender pursuant to any other clause of this Section 5.03(h).

(i)     Environmental Conditions. Promptly after the assertion or occurrence thereof, notice of any Environmental Action against or of any noncompliance by any Loan Party or any of its Subsidiaries or any of their respective properties, with any Environmental Law or Environmental Permit that could reasonably be expected to have a Material Adverse Effect, as well as any actual or threatened release, pollution or other environmental condition at or from

67

any of the properties of any Loan Party or any of its Subsidiaries, that could reasonably be expected to constitute a violation of any Environmental Law.

(j)　　Real Property. As soon as available and in any event within 30 days after the end of each Fiscal Year, a list and description (including the street address, county or other relevant jurisdiction, state, record owner, book value thereof and, in the case of leases of property, lessor, lessee, expiration date and annual rental cost thereof) of all real property acquired or leased by any Loan Party during such Fiscal Year.

(k)　　Insurance. As soon as available and in any event no later than January 15th of each year, a report summarizing the insurance coverage (specifying type, amount and carrier) in effect for Parent and its Subsidiaries as of the last day of the immediately preceding Fiscal Year and containing such additional information as any Agent, or any Lender through the Administrative Agent, may reasonably specify.

(l)　　Casualty Losses. Promptly upon learning of any casualty loss or event not insured against in an amount in excess of $100,000, notice of such loss or event.

(m)　　Other Information. Such other information respecting the business, condition (financial or otherwise), operations, performance, properties or prospects of any Loan Party or any of its Subsidiaries as any Agent, or any Lender through the Administrative Agent, may from time to time reasonably request, including without limitation updating any information previously provided pursuant to Section 9.12 hereof.

(n)　　Monthly Financials. As soon as available and in any event within thirty (30) days after the end of each month, Consolidated balance sheets, statements of income and statements of cash flows of Parent and its Subsidiaries (i) for such month, and (ii) for the portion of the Fiscal Year then ended, setting forth in each case, in comparative form, the corresponding figures for the corresponding date or period of the preceding Fiscal Year, all in reasonable detail and duly certified by the Chief Financial Officer of the Administrative Borrower as having been prepared in accordance with GAAP (subject to normal year-end adjustments and the absence of footnotes, together with a certificate of said officer stating that no Default has occurred and is continuing or, if a Default has occurred and is continuing, a statement as to the nature thereof and the action that has been taken and is proposed with respect thereto and, an updated comparison to the budgeted amounts for such period set forth in the Budget, in a form satisfactory to the Required Lenders.

(o)　　Termination of Contracts, Etc. Promptly after the occurrence thereof, written notice of (i) termination of any material contract to which any Loan Party is a party, (ii) failure of any franchisee to make any payment in an aggregate amount in excess of $250,000 more than three months past due to any Subsidiary, and (iii) any tax audit or assessment of taxes on any Loan Party.

SECTION 5.04. Financial Covenants. So long as any Term Loan or any other Obligation (other than contingent indemnification and reimbursement Obligations in respect of which no claim for payment has been asserted by the Person entitled thereto) of any Loan Party under any Loan Document shall remain unpaid, or any Lender shall have any Commitment hereunder, each Loan Party will:

68

(a)    <u>Budget Compliance</u>. Not make or permit any of its Subsidiaries to make payments other than those set forth in the Budget; *provided*, that:

    (i)    "total operating cash receipts" (as reflected in the Budget and measured weekly on a cumulative basis starting with the period ending three (3) weeks after the Petition Date) may be less than the corresponding amounts set forth in the Budget if such "total operating cash receipts" (A) for all cumulative weekly periods ending from the date three (3) weeks after the Petition Date to the date six (6) weeks after the Petition Date, are not less than 88% of the corresponding amounts reflected in the Budget, (B) for all cumulative weekly periods ending from the date seven (7) weeks after the Petition Date to the date twelve (12) weeks after the Petition Date, are not less than 90% of the corresponding amounts reflected in the Budget, and (C) for all cumulative weekly periods ending from and after the date thirteen (13) weeks after the Petition Date, are not less than 92.5% of the corresponding amounts reflected in the Budget;

    (ii)    "total operating cash disbursements" (as reflected in the Budget and measured weekly on a cumulative basis starting with the period ending three (3) weeks after the Petition Date) may be more than the corresponding amounts set forth in the Budget if such "total operating cash disbursements" (A) for all cumulative weekly periods ending from the date three (3) weeks after the Petition Date to the date six (6) weeks after the Petition Date, are not more than 112% of the corresponding amounts reflected in the Budget, (B) for all cumulative weekly periods ending from the date seven (7) weeks after the Petition Date to the date twelve (12) weeks after the Petition Date, are not more than 110% of the corresponding amounts reflected in the Budget, and (C) for all cumulative weekly periods ending from and after the date thirteen (13) weeks after the Petition Date, are not more than 107.5% of the corresponding amounts reflected in the Budget;

    (iii)    each of the line items for "marketing" and "occupancy" respectively (as reflected in the Budget and measured weekly on a rolling three (3) week basis starting with the period ending three (3) weeks after the Petition Date) may be more than the corresponding amounts set forth in the Budget if each such line item is not more than 115% of the corresponding amounts reflected in the Budget; and

    (iv)    the sum of the line items for "refractive center procedures" and "refractive access procedures" (as reflected in the Budget and measured weekly on a rolling three (3) week basis starting with the period ending three (3) weeks after the Petition Date) may be less than the sum of the corresponding amounts set forth in the Budget if such sum is not less than 85% of the sum of the corresponding amounts reflected in the Budget.

(b)    <u>Minimum Liquidity</u>. Cause minimum Liquidity at all times to be no less than $2,500,000.

(c)    <u>Capital Expenditures</u>. Make, or permit any of its Subsidiaries to make, any Capital Expenditures that would cause the aggregate of all Capital Expenditures made by

A/73160038.15

Parent and its Subsidiaries during any Fiscal Year to exceed the amounts as set forth in the Budget.

## ARTICLE VI

## EVENTS OF DEFAULT

SECTION 6.01. Events of Default. If any of the following events ("*Events of Default*") shall occur and be continuing:

(a) (i) the Borrowers shall fail to pay any principal of any Term Loan when the same shall become due and payable or (ii) the Borrowers shall fail to pay any interest on any Term Loan, or any Loan Party shall fail to make any other payment under any Loan Document, in each case under this clause (ii) within three (3) calendar days after the same shall become due and payable;

(b) any representation or warranty made by any Loan Party (or any of its officers) under or in connection with any Loan Document shall prove to have been incorrect in any material respect when made;

(c) Parent shall fail to perform or observe any term, covenant or agreement contained in Section 5.01(e) or (i), Section 5.02 or Section 5.04;

(d) any Loan Party shall fail to perform or observe any other term, covenant or agreement contained in any Loan Document on its part to be performed or observed if such failure shall remain unremedied for fifteen (15) days after the earlier of the date on which (i) any executive officer of a Loan Party becomes actually aware of such failure or (ii) written notice thereof shall have been given to the Borrowers by any Agent or any Lender;

(e) (i) any Loan Party or any of its Subsidiaries shall fail to pay any principal of, premium or interest on or any other amount payable in respect of any postpetition Debt, or any prepetition Debt if, by order of the Bankruptcy Court issued with respect to such prepetition Debt, the default thereunder entitles the holder thereof to relief from the automatic stay of Section 362 of the Bankruptcy Code, in an aggregate amount in excess of $250,000 (excluding Debt outstanding under the Loan Documents), or (ii) if any other event (other than with respect to the filing of the Cases) shall occur or condition shall exist under any agreement or instrument relating to any such Debt and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of such Debt or otherwise to cause, or to permit the holder thereof to cause, such Debt to mature, or (iii) if any such Debt shall be declared to be due and payable or required to be prepaid or redeemed (other than by a regularly scheduled required prepayment or redemption), purchased or defeased, or (iv) an offer to prepay, redeem, purchase or defease such Debt shall be required to be made, in the case of each (ii) through (iv), prior to the stated maturity thereof;

(f) any judgments or orders, either individually or in the aggregate, for the payment of money in excess of $250,000 (after application of any insurance as to which the applicable insurance company has accepted responsibility to cover such judgment or order, but

inclusive of any deductible amount) shall be rendered against any Loan Party or any of its Subsidiaries after the Petition Date and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be any period of fifteen (15) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

(g)     any non monetary judgment or order shall be rendered against any Loan Party or any of its Subsidiaries after the Petition Date that is reasonably likely to have a Material Adverse Effect, and there shall be any period of fifteen (15) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

(h)     any provision of any Loan Document after delivery thereof pursuant to Section 3.01 or Section 5.01(j) shall for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against any Loan Party party to it, or any such Loan Party shall so state in writing;

(i)     any Collateral Document or financing statement after delivery thereof pursuant to Section 3.01 or Section 5.01(j) shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected first priority (subject to the Carve Out and other Liens permitted to be equal or superior in priority under this Agreement) lien on and security interest in Collateral purported to be covered thereby, except as otherwise provided in such Collateral Document;

(j)     a Change of Control shall occur;

(k)     (i) any Loan Party shall be enjoined from conducting any material part of its business, (ii) there shall occur any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes the cessation or substantial curtailment of a material portion of the revenue producing activities of Parent or any of its Subsidiaries, or (iii) there shall occur any damage to, or loss, theft or destruction of, any assets of any Loan Party or any of its Subsidiaries, that are used or useful in a material portion of their business (not fully covered by insurance as to which the applicable insurance company has accepted full responsibility to cover such damage, loss, theft or destruction);

(l)     the Bankruptcy Court (or the Canadian Court, as applicable) shall enter any order (i) amending, reversing, revoking, supplementing, altering, staying, vacating, rescinding or otherwise modifying the Interim Order, the Final Order or any other order with respect to the Chapter 11 Cases affecting in any material respect this Agreement or the Loan Documents, without the Required Lenders' consent, (ii) appointing a Chapter 11 trustee or an examiner, with enlarged powers relating to the operation of the business pursuant to Section 1104 of the Bankruptcy Code (powers beyond those set forth in Section 1106(a)(3) and (4) and 1106(b) of the Bankruptcy Code) in the Chapter 11 Cases, or a receiver, interim-receiver, receiver and manager, trustee in bankruptcy of any official with similar powers under CCAA or BIA with respect to any of the Borrowers, any of the Guarantors or any of their respective assets, (iii) dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, or (iv) granting relief from the automatic stay to any

A/73160038.15

creditor holding or asserting a Lien or reclamation claim on the assets of any of Borrower to permit such creditor to foreclose upon or to reclaim Collateral with a value in excess of $250,000;

(m)     a motion shall be filed by any of the Borrowers for the approval of any other Superpriority Claim in the Chapter 11 Cases (other than the Carve Out) which is pari passu with or senior to the claims of any of the Agents or the Lenders against any of the Loan Parties unless after giving effect to the transactions contemplated by such motion, all Obligations of any Loan Party under the Loan Documents (other than contingent indemnification and reimbursement Obligations in respect of which no claim for payment has been asserted by the Person entitled thereto) shall be paid in full in cash;

(n)     [Reserved];

(o)     the failure of the Bankruptcy Court to enter the Interim Order, in form and substance reasonably satisfactory to the Required Lenders, within seven (7) days after the filing of the motion to approve the Interim Order;

(p)     the failure of the Borrowers to have filed with the Bankruptcy Court the Plan of Reorganization and a disclosure statement with respect thereto, each in form and substance reasonably satisfactory to the Required Lenders (including, without limitation, the terms set forth in the Plan Term Sheet), within ten (10) Business Days of the Petition Date;

(q)     the failure of the Bankruptcy Court to enter the Final Order, in form and substance reasonably satisfactory to the Required Lenders (including, without limitation, approval of the Facility) within forty-five (45) days after the date of entry of the Interim Order;

(r)     the failure of the Borrowers to obtain an order from the Bankruptcy Court approving the disclosure statement with respect to the Plan of Reorganization, in form and substance reasonably satisfactory to the Required Lenders, within sixty (60) days of the Petition Date;

(s)     the failure of the Borrowers to obtain an order from the Bankruptcy Court (and in the case of Parent, the Canadian Court) confirming the Plan of Reorganization, in form and substance reasonably satisfactory to the Required Lenders (including, without limitation, the terms set forth in the Plan Term Sheet), within one hundred and twenty (120) days of the Petition Date;

(t)     the failure of the Plan of Reorganization, in form and substance reasonably satisfactory to the Required Lenders, to become effective within one hundred and fifty (150) days of the Petition Date;

(u)     the failure of the Borrowers to comply in all material respects with the Orders or any other order of the Bankruptcy Court applicable to the Borrowers;

(v)     any of the Borrowers shall file a motion in any of the Chapter 11 Cases (i) except as provided in the Orders or in the Plan of Reorganization, to use cash collateral of the Lenders under Section 363(c) of the Bankruptcy Code without the Required Lenders' consent,

(ii) to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, or (iii) to take any other action or actions adverse to the Lenders or their rights and remedies hereunder or under any of the other Loan Documents or any of the documents evidencing or creating the Secured Parties' interest in any of the Collateral;

(w)    any Material Adverse Effect shall occur;

(x)    the occurrence of (i) any material deterioration in the value of the Collateral of the Loan Parties taken as whole or (ii) any material damage to or loss of assets of the Loan Parties taken as a whole (after application of any insurance as to which the applicable insurance company has accepted responsibility to cover such damage or loss, but inclusive of any deductible amount);

(y)    an order terminating exclusivity has been entered by the Bankruptcy Court or requested of the Bankruptcy Court unless actively contested by the Borrowers;

(z)    (i)    any filing with respect to any Borrower, whether voluntary or involuntary, under Chapter 11 or Chapter 7 of the Bankruptcy Code, BIA or CCAA, shall be commenced without the prior consent of the Required Lenders, or (ii) any filing with respect to any direct or indirect Subsidiary of Parent (other than Holdco and TLC Management), whether voluntary or involuntary, under Chapter 11 or Chapter 7 of the Bankruptcy Code, BIA or CCAA shall have been commenced; or

(aa)    the Restructuring Monitor shall cease to be in place and operating pursuant to an engagement letter, in form and substance reasonably satisfactory to the Required Lenders, or such engagement letter shall cease to be in full force and effect,

then, and in any such event, with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Administrative Borrower, declare (A) the Commitments of each Lender and the obligation of each Lender to make Term Loans to be terminated, whereupon the same shall forthwith terminate, and (B) the Term Loans, all interest thereon and all other amounts payable under this Agreement and the other Loan Documents to be forthwith due and payable, whereupon the Term Loans, all such interest and all such amounts shall be forthwith due and payable.

SECTION 6.02. Remedies upon Default. Upon the occurrence and during the continuance of an Event of Default, following the giving of three (3) Business Days' written notice to the Administrative Borrower, the Creditors Committee and the United States Trustee, unless the Bankruptcy Court determines that an Event of Default has not occurred and/or is not continuing, the automatic stay shall automatically be terminated at the end of such three (3) Business Day period without further notice or order and, subject to the terms and conditions of the Intercreditor Agreement, the Agents and the Lenders, shall be permitted to (a) sweep any or all cash in the DIP Proceeds Controlled Account and any other account of a Loan Party subject to a Control Account Agreement to prepay the Term Loans and to pay all other Obligations of any Loan Party under the Loan Documents to the Secured Parties, (b) foreclose on all or any portion of the Collateral and collect accounts receivable and apply the proceeds thereof to the Obligations of any Loan Party under the Loan Documents, (c) occupy the Loan Parties'

73

premises, (d) execute going-out-of business sales and (e) otherwise exercise remedies permitted by applicable nonbankruptcy law. During such three (3) Business Day notice period described in the first sentence of this Section 6.02, the Borrowers and any Creditors' Committee shall be entitled to an emergency hearing with the Bankruptcy Court for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing. Upon the occurrence and during the continuance of an Event of Default upon the direction of the Required Lenders, the Borrowers shall pursue an immediate sale of the Collateral (including, without limitation, the Canadian Refractive Centers) pursuant to the provisions of Section 363 of the Bankruptcy Code, in a manner satisfactory to the Required Lenders, proceeds of which shall be used to pay the Obligations of any Loan Party under the Loan Documents to the Secured Parties.

## ARTICLE VII

## THE AGENTS

SECTION 7.01. Authorization and Action. (a) Each Lender hereby appoints and authorizes each Agent to take such action as agent on its behalf and to exercise such powers and discretion under this Agreement and the other Loan Documents as are delegated to such Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto. As to any matters not expressly provided for by the Loan Documents (including, without limitation, enforcement or collection of the Obligations of the Loan Parties), no Agent shall be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders (or if so required under this Agreement, all Lenders), and such instructions shall be binding upon all Lenders and all holders of Notes; *provided, however*, that no Agent shall be required to take any action that, in such Agent's reasonable opinion, could expose such Agent to personal liability or that is contrary to this Agreement or applicable law.

(b) In furtherance of the foregoing, each Lender hereby appoints and authorizes the Collateral Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Secured Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Collateral Agent shall be entitled to the benefits of this Article VII (including, without limitation, Section 7.05) as though the Collateral Agent were an "Agent" under the Loan Documents, as if set forth in full herein with respect thereto.

(c) Each Lender hereby appoints the Collateral Agent and each other Lender as agent and bailee for the purpose of perfecting the security interests in and liens upon the Collateral in assets which, in accordance with Article 9 of the Uniform Commercial Code, can be perfected only by possession or control (or where the security interest of a secured party with possession or control has priority over the security interest of another secured party) and the Collateral Agent and each Lender hereby acknowledges that it holds possession of or otherwise controls any such Collateral for the benefit of the Collateral Agent and the Lenders as secured party. Should any Lender obtain possession or control of any such Collateral, such Lender shall notify the Collateral Agent thereof, and, promptly upon the Collateral Agent's request therefor

74

shall deliver such Collateral to the Collateral Agent or in accordance with the Collateral Agent's instructions. Each Loan Party by its execution and delivery of this Agreement hereby consents to the foregoing.

(d)     Any Agent may execute any of its duties under this Agreement or any other Loan Document (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents or of exercising any rights and remedies thereunder at the direction of the Administrative Agent) by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to such duties.

(e)     With respect to the release of Collateral, the Lenders hereby irrevocably authorize the Collateral Agent, at its option and in its discretion, to release any Lien granted to or held by the Collateral Agent upon any property covered by this Agreement or the other Loan Documents or to release a Subsidiary from its obligations as Guarantor, if applicable, and to execute and deliver all documents referred to in <u>Section 9.11</u> (i) upon termination or expiration of the Commitments, the payment and satisfaction of all Obligations (other than contingent indemnification and reimbursement Obligations in respect to which no claim for payment has been asserted by the Person entitled thereto) arising with respect to the Term Loans (including, without limitation, all fees and expenses payable hereunder and under the other Loan Documents); or (ii) constituting property being sold or disposed of in compliance with the provisions of the Loan Documents (and the Collateral Agent may rely in good faith conclusively on any certificate stating that the property is being sold or disposed of in compliance with the provisions of the Loan Documents, without further inquiry); *provided, however,* that (A) the Collateral Agent shall not be required to execute any release on terms which, in the Collateral Agent's opinion, would expose the Collateral Agent to liability or create any obligation or entail any consequence other than the release of such Liens without recourse or warranty, and (B) such release shall not in any manner discharge, affect or impair any Liens upon all interests retained, all of which shall continue to constitute part of the Collateral covered by the Loan Documents.

(f)     Notwithstanding any provision to the contrary elsewhere in this Agreement, no Agent shall have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Agents. The duties of the Agents shall be mechanical and administrative in nature. Without limiting the generality of the foregoing, the use of the term "agent" herein or in the other Loan Documents (or any similar term) with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

SECTION 7.02. <u>Agents' Reliance, Etc.</u>  Neither any Agent nor any Agent Party shall be liable for any action taken or omitted to be taken by it or them under or in connection with the Loan Documents, except for its or their own gross negligence or willful misconduct. Without limitation of the generality of the foregoing, each Agent: (a) may consult with legal counsel (including counsel for any Loan Party), independent public accountants and other

experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (b) makes no warranty or representation (including with regard to the existence, value or collectibility of the Collateral) to any Lender and shall not be responsible to any Lender for any statements, warranties or representations (whether written or oral) made in or in connection with the Loan Documents; (c) shall not have any duty to ascertain or to inquire as to the performance, observance or satisfaction of any of the terms, covenants or conditions of any Loan Document on the part of any Loan Party or the existence at any time of any Default under the Loan Documents or to inspect the property (including the books and records) of any Loan Party; (d) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the existence, perfection or priority of any lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto, or for any failure of any Loan Party to perform its obligations hereunder or thereunder; (e) shall incur no liability under or in respect of any Loan Document by acting upon any notice, consent, certificate or other instrument or writing (which may be by telegram, telecopy or electronic communication) believed by it to be genuine and signed or sent by the proper party or parties; and (f) shall incur no liability for any apportionment or distribution of payments made in good faith pursuant to Section 2.08 without any gross negligence or willful misconduct, and if any such apportionment or distribution is subsequently determined to have been made in error but without any gross negligence or willful misconduct, the sole recourse of any Lender to whom payment was due but not made, shall be to recover from the other Lenders any payment in excess of the amount which they are determined to be entitled to (and such other Lenders hereby covenant and agree to return promptly to such Lender any erroneous payment received by them).

SECTION 7.03. <u>Rights as a Lender</u>. Each Lender serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated, include each Lender serving as an Agent hereunder in its individual capacity. Such Lenders and their Affiliates may accept deposits from, lend money to, act as trustee under the indentures of, accept investment banking engagements from and generally engage in any kind of business with, any Loan Party, any of its Subsidiaries and any Person that may do business with or own securities of any Loan Party or any such Subsidiary, all as if such Lenders were not Agents and without any duty to account therefor to the other Lenders No Agent shall have any duty to disclose any information obtained or received by it or any of its Affiliates relating to any Loan Party or any of its Subsidiaries to the extent such information was obtained or received in any capacity other than as such Agent.

SECTION 7.04. <u>Lender Credit Decision</u>. Each Lender expressly acknowledges that neither the Agents nor any other Agent Party have made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs or property of a Loan Party or any Affiliate of a Loan Party or any acceptance or consent to any such review, shall be deemed to constitute any representation or warranty by any Agent to any Lender as to any matter, including as to whether Agent Parties have disclosed material information in their possession. Each Lender also acknowledges that it has, independently and without reliance upon any Agent or any other Lender and based on the financial statements referred to in Section 4.01 and such other documents and information as it has deemed

appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon any Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Agents hereunder, the Agents shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any affiliate of a Loan Party that may come into the possession of an Agent or Agent Party.

SECTION 7.05. Indemnification. (a) Each Lender severally agrees to indemnify each Agent and each other Agent Party (to the extent not promptly reimbursed by the Borrowers) from and against such Lender's ratable share (determined as provided below) of any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against such Agent or Agent Party in any way relating to or arising out of the Loan Documents or any action taken or omitted by such Agent' under the Loan Documents (collectively, the "*Indemnified Costs*"); *provided, however*, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's or Agent Party's gross negligence or willful misconduct as found in a final, non-appealable judgment by a court of competent jurisdiction; *provided*, further, that no action by any Agent or Agent Party taken or refrained from in accordance with the directions or consent of the Required Lenders (or if so required under this Agreement, all Lenders) shall be deemed to constitute gross negligence or willful misconduct of such Agent or Agent Party for purposes of this Section 7.05. Without limitation of the foregoing, each Lender agrees to reimburse each Agent promptly upon demand for its ratable share of any costs and expenses (including, without limitation, fees and expenses of counsel) payable by the Borrowers under Section 9.04, to the extent that such Agent is not promptly reimbursed for such costs and expenses by the Borrowers. In the case of any investigation, litigation or proceeding giving rise to any Indemnified Costs, this Section 7.05 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.

(b)     For purposes of this Section 7.05, each Lender's ratable share of any amount shall be determined, at any time, according to the sum of (i) the aggregate principal amount of the Term Loans outstanding at such time and owing to such Lender and (ii) the aggregate unused portion of such Lender's Commitments at any time prior to the Final Order Funding Date. The failure of any Lender to reimburse any Agent, promptly upon demand for its ratable share of any amount required to be paid by the Lender to such Agent as provided herein shall not relieve any other Lender of its obligation hereunder to reimburse such Agent for its ratable share of such amount, but no Lender shall be responsible for the failure of any other Lender to reimburse such Agent, for such other Lender's ratable share of such amount. Without prejudice to the survival of any other agreement of any Lender hereunder, the agreement and obligations of each Lender contained in this Section 7.05 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under the other Loan Documents.

SECTION 7.06. Successor Agents. Any Agent may resign at any time by giving written notice thereof to the Lenders and the Administrative Borrower and may be removed at

any time with or without cause by the Required Lenders upon 3 Business Days notice; *provided, however,* that any removal of the Administrative Agent will not be effective until it has also been replaced as Collateral Agent and released from all of its obligations in respect thereof; *provided, further,* that the successor Administrative Agent shall not be required, but shall be permitted, to act as replacement Collateral Agent. Upon any such resignation or removal, the Required Lenders shall have the right to appoint a successor Agent. If no successor Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within 30 days after the retiring Agent's giving of notice of resignation or the Required Lenders' removal of the retiring Agent, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent, which shall be a Lender or a commercial bank organized under the laws of the United States or of any State thereof and having a combined capital and surplus of at least $250,000,000. Upon the acceptance of any appointment as Agent hereunder by a successor Agent and, in the case of a successor Collateral Agent, upon the execution and filing or recording of such financing statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted by the Collateral Documents, such successor Agent shall succeed to and become vested with all the rights, powers, discretion, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations under the Loan Documents. If within 45 days after written notice is given of the retiring Agent's resignation or removal under this <u>Section 7.06</u> no successor Agent shall have been appointed and shall have accepted such appointment, then on such 45th day (a) the retiring Agent's resignation or removal shall become effective, (b) the retiring Agent shall thereupon be discharged from its duties and obligations under the Loan Documents and (c) the Required Lenders shall thereafter perform all duties of the retiring Agent under the Loan Documents until such time, if any, as the Required Lenders appoint a successor Agent as provided above. After any retiring Agent's resignation or removal hereunder as Agent shall have become effective, the provisions of this <u>Article VII</u> shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.

SECTION 7.07. <u>Notice of Default</u>. No Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless such Agent has received notice from a Lender or Loan Party referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that any Agent receives such a notice, such Agent shall promptly give notice thereof to the Lenders. Each Agent shall take such action with respect to such Default or Event of Default in accordance with <u>Section 7.01</u>.

SECTION 7.08. <u>No Reliance on Administrative Agent's Customer Identification Program</u>. Each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates or assignees, may rely on the Administrative Agent to carry out such Lender's , Affiliate's or assignee's customer identification program, or other obligations required or imposed under or contained in 21 CFR 103.121 (as hereafter amended or replaced, the "CIP Regulations"), or any other Anti-Terrorism Law, including any programs involving any of the following items relating to or in connection with the Borrowers, their Affiliates or their agents, the Loan Documents or the transactions hereunder or contemplated hereby: (1) any identity verification procedures, (2) any record-keeping, (3) comparisons with government

A/73160038.15

lists, (4) customer notices or (5) other procedures required under the CIP Regulations or such other laws.

# ARTICLE VIII

## PRIORITY AND COLLATERAL SECURITY

SECTION 8.01. <u>Superpriority Claims and Collateral Security</u>.

(a)      The Borrowers jointly and severally warrant and covenant that, except as otherwise expressly provided in this paragraph, upon the entry of the applicable Order, the Obligations of any Loan Party under the Loan Documents:

(i)      shall at all times constitute a Superpriority Claim in the Chapter 11 Case of the Borrowers having priority, pursuant to Section 364(c)(1) and 507(b) of the Bankruptcy Code (subject only to the Carve Out), over the other administrative claims of any entity, including, without limitation any claims under Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code (including, subject to entry of the Final Order, Section 506(c)), and shall at all times be senior to the rights of the Loan Parties, the Loan Parties' estates, any successor trustee to the extent permitted by law, or any other creditor in the Chapter 11 Cases;

(ii)      pursuant to Sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code and the Security Agreements, shall at all times be secured by, and each Loan Party hereby grants to the Collateral Agent, for the benefit of the Secured Parties, a continuing, valid, binding, enforceable, non-avoidable and automatically properly perfected post-petition security interest and first priority (subject to the Carve Out and Liens permitted to be equal or superior in priority pursuant to this Agreement) Lien on all existing and after acquired real and personal property and other assets of the Borrowers, tangible and intangible, whether now owned by or owing to, or hereafter acquired by or arising in favor of the Loan Parties, whether owned or consigned by or to, or leased from or to the Loan Parties and regardless of where located, including without limitation, (A) the Collateral (as defined in the Security Agreements), (B) all avoidance power claims and actions arising under Section 549 of the Bankruptcy Code relating to postpetition transfers of Collateral and any proceeds thereof, (C) subject to entry of the Final Order, all avoidance power claims and actions under Chapter 5 of the Bankruptcy Code and any proceeds thereof, (D) subject to entry of the Final Order, the security interest will not be subject to Section 551 of the Bankruptcy Code nor shall Collateral be surcharged pursuant to Section 506(c) of the Bankruptcy Code, and (E) any unencumbered assets of the Loan Parties.

(b)      The Borrowers jointly and severally warrant and covenant that, except as otherwise expressly provided in this <u>Section 8.01</u>, upon the entry of the Recognition Order, the Obligations of the Parent under the Loan Documents shall at all times be secured by a superpriority charge and senior priming security interest over all of the present and future assets

79

of the Parent with priority over all existing liens and security (subject to the Carve Out and Liens permitted to be equal or superior in priority pursuant to this Agreement).

(c)     Such Superpriority Claim and Liens referred to in <u>Section 8.01(a)</u> shall be subject to the Carve Out, but shall otherwise be senior in priority to the adequate protection Liens securing the Prepetition Lender Debt and all other Liens on the assets and properties of the Borrowers other than Liens permitted under this Agreement, entitled to priority under applicable nonbankruptcy law.

SECTION 8.02.  <u>Collateral Security Perfection</u>.  The Borrowers agree to take all action that any Agent or the Required Lenders may reasonably request as a matter of nonbankruptcy law to perfect and protect the Collateral Agent's Liens for the benefit of the Secured Parties upon the Collateral and for such Liens to obtain the priority therefor contemplated hereby, including, without limitation, executing and delivering such documents, instruments and financing statements, providing such notices to third parties, obtaining such consents from any Governmental Authority and providing such other instruments and documents in recordable form, as the Collateral Agent or the Required Lenders may reasonably request. Each Loan Party hereby irrevocably authorizes the Collateral Agent at any time and from time to time to file in any filing office in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of such Loan Party or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the Uniform Commercial Code of the State of Delaware or such other jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) provide any other information required by part 5 of Article 9 of the Uniform Commercial Code of the State of Delaware or such other jurisdiction for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether any Loan Party is an organization, the type of organization and any organization identification number issued to such Loan Party, and (ii) in the case of a financing statement filed as a fixture filing, a sufficient description of real property to which the Collateral relates. Each Borrower agrees to furnish any such information to the Agents promptly upon request. Notwithstanding the provisions of this <u>Section 8.02</u>, the Agents and the Lenders shall have the benefit of the Interim Order and the Final Order.

SECTION 8.03.  <u>Guarantees</u>.  The Obligations shall be guaranteed by the Guarantors pursuant to the terms of the Guaranty.

SECTION 8.04.  <u>No Discharge; Survival of Claims</u>.  Pursuant to Section 1141(d)(4) of the Bankruptcy Code, the Borrowers hereby waive any discharge of the Obligations with respect to any plan of reorganization that shall not provide for the payment in full in cash of the Obligations (other than contingent indemnification and reimbursement Obligations in respect of which no claim for payment has been asserted by the Person entitled thereto) under this Facility.

80

# ARTICLE IX

## MISCELLANEOUS

SECTION 9.01. <u>Amendments, Etc</u>. No amendment or waiver of any provision of this Agreement or the Notes, nor consent to any departure by any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed by the Required Lenders, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided, however*, that (a) no amendment, waiver or consent shall, unless in writing and signed by all Lenders (other than any Lender that is, at such time, a Defaulting Lender), do any of the following at any time:

      (i)     waive any of the conditions specified in <u>Section 3.01</u> or, in the case of the initial Borrowing, <u>Section 3.03</u>.

      (ii)     change the number of Lenders or the percentage of (x) the Commitments or (y) the aggregate unpaid principal amount of the Term Loans, that, in each case, shall be required for the Lenders or any of them to take any action hereunder;

      (iii)     release one or more Guarantors (or otherwise limit such Guarantors' liability with respect to the Obligations owing to the Agents and the Lender under the Guaranties) if such release or limitation is in respect of all or substantially all of the value of the Guaranties to the Lenders;

      (iv)     release all or substantially all of the Collateral in any transaction or series of related transactions;

      (v)     amend this Section 9.01; or

      (vi)     reduce the percentage specified in the definition of "Required Lenders".

(b)     no amendment, waiver or consent shall, unless in writing and signed by the Required Lenders and each Lender specified below for such amendment, waiver or consent:

      (i)     increase the Commitments of a Lender without the consent of such Lender;

      (ii)     reduce the principal of, or stated rate of interest on, the Term Loans owed to a Lender or any fees or other amounts stated to be payable hereunder or under the other Loan Documents to such Lender without the consent of such Lender; or

      (iii)     postpone any date scheduled for any payment of principal of, or interest on, the Term Loans pursuant to <u>Section 2.03</u> or <u>Section 2.05</u> or any date fixed for any payment of fees hereunder in each case payable to a Lender without the consent of such Lender;

A/73160038.15

*provided further* that no amendment, waiver or consent shall, unless in writing and signed by an Agent in addition to the Lenders required above to take such action, affect the rights or duties of such Agent under this Agreement or the other Loan Documents.

SECTION 9.02. <u>Notices, Etc.</u> (a) All notices and other communications provided for hereunder shall be either (x) in writing (including telecopy or electronic communication) and mailed, telecopied or delivered or (y) as and to the extent set forth in <u>Section 9.02(b)</u> and in the proviso to this <u>Section 9.02(a)</u>, in an electronic medium and delivered as set forth in <u>Section 9.02(b)</u>, if to any Loan Party, to the Administrative Borrower at its address at 16305 Swingley Ridge Road, Suite 300, Chesterfield, Missouri 63017, Attention: Patricia Larson and Jane Franzier, Facsimile No. (636) 534-2301, E-mail Address: patricia.larson@tlcvision.com and jane.franzier@tlcvision.com; if to any Lender party to this Agreement, at its Lending Office specified opposite its name on <u>Schedule I</u> hereto, with a copy to Proskauer Rose LLP at Three First National Plaza, 70 West Madison, Suite 3800, Chicago, IL 60602-4342, Attention Mark K. Thomas, Esq. and Paul V. Possinger, Esq., Facsimile No. (312) 962-3551, Email Address: mthomas@proskauer.com and ppossinger@proskauer.com; if to any other Lender, at its Lending Office specified in the Assignment and Acceptance pursuant to which it became a Lender; if to the Administrative Agent or the Collateral Agent, at its address at 110 East 59th Street, New York, NY 10022, Attention: Stephen P. Ewald, Facsimile No. (917) 677-8224, E-mail Address: sewald@cantor.com; or, as to any party, at such other address as shall be designated by such party in a written notice to the other parties; *provided, however*, that materials and information described in <u>Section 9.02(b)</u> shall be delivered to the Administrative Agent in accordance with the provisions thereof or as otherwise specified to the Administrative Borrower by the Administrative Agent. All such notices and other communications shall, when mailed, telecopied, or e-mailed, be effective when deposited in the mails, transmitted by telecopier or sent by electronic communication, respectively, except that notices and communications to any Agent pursuant to Article II, III or VII shall not be effective until received by such Agent. Delivery by telecopier or other electronic means of an executed counterpart of a signature page to any amendment or waiver of any provision of this Agreement or the Notes shall be effective as delivery of an original executed counterpart thereof.

(b)     Each Borrower hereby agrees that it will provide to the Agents all information, documents and other materials that it is obligated to furnish to the Agents pursuant to the Loan Documents, including, without limitation, all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) relates to a request for a new Borrowing, (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default or Event of Default under this Agreement or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Borrowing thereunder (all such non-excluded communications being referred to herein collectively as "***Communications***"), by transmitting the Communications in an electronic/soft medium in a format acceptable to the applicable Agent to an electronic mail address specified by the applicable Agent to the Administrative Borrower. In addition, the Administrative Borrower agrees to continue to provide the Communications to each Agent in the manner specified in the Loan Documents but only to the extent requested by the applicable Agent. The Borrower further agrees that the Agents may make the Communications available to the Lenders by posting the

82

Communications on IntraLinks® or a substantially similar electronic transmission system (the *"Platform"*).

(c)     THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE". THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS, OR THE ADEQUACY OF THE PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE AGENT PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM. IN NO EVENT SHALL ANY AGENT OR ANY OF ITS AFFILIATES OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, PARTNERS, AGENTS, ADVISORS OR REPRESENTATIVES (COLLECTIVELY, "AGENT PARTIES") HAVE ANY LIABILITY TO ANY LOAN PARTY, ANY LENDER PARTY OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING, WITHOUT LIMITATION, DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY AGENT PARTY IS FOUND IN A FINAL NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH AGENT PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(d)     Each Agent agrees that the receipt of the Communications by such Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to such Agent for purposes of the Loan Documents. Each Lender agrees that notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents. Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and (ii) that the foregoing notice may be sent to such e-mail address. Nothing herein shall prejudice the right of any Agent Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

SECTION 9.03. No Waiver; Remedies. No failure on the part of any Lender or Agent to exercise, and no delay in exercising, any right hereunder or under any Note or any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

SECTION 9.04. Costs and Expenses. (a) The Borrowers agree to pay on demand (i) all reasonable costs and expenses of each Agent in connection with the preparation, execution, delivery, administration, modification and amendment of, or any consent or waiver under, the

Loan Documents (including, without limitation, (A) all due diligence, collateral review, syndication, transportation, computer, duplication, appraisal, audit, insurance, consultant, search, filing and recording fees and expenses, (B) the reasonable fees and expenses of counsel for each Agent with respect thereto, with respect to advising such Agent as to its rights and responsibilities, or the perfection, protection or preservation of rights or interests, under the Loan Documents, with respect to negotiations with any Loan Party or with other creditors of any Loan Party or any of its Subsidiaries arising out of any Default or any events or circumstances that may give rise to a Default and with respect to presenting claims in or otherwise participating in or monitoring any bankruptcy, insolvency, refinancing or restructuring of the financing under the Loan Documents in the nature of a "work-out" or other similar proceeding involving creditors' rights generally and any proceeding ancillary thereto), (ii) all reasonable fees and expenses of counsel for the Required Lenders (including, without limitation, Special Counsel, Stikeman Elliott LLP, as Canadian counsel, and Pachulski Stang Ziehl & Jones LLP, as Delaware counsel) with respect to any matter referred to in clause (a)(i) hereof to the same extent as if it were an Agent thereunder, and (iii) all costs and expenses of each Agent and each Lender in connection with the enforcement of the Loan Documents, whether in any action, suit or litigation, or any bankruptcy, insolvency or other similar proceeding affecting creditors' rights generally (including, without limitation, the reasonable fees and expenses of counsel for Agents and each Lender with respect thereto).

(b)     The Borrowers agree to indemnify, defend and save and hold harmless each Agent, each Lender and each of their Affiliates and their respective officers, directors, employees, agents and advisors (each, an "***Indemnified Party***") from and against, and shall pay on demand, any and all claims, damages, losses, disbursements associated with monitoring of the Cases, all appraisal charges and other liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) (i) the Facility, the actual or proposed use of the proceeds of the Term Loans, the Loan Documents, or any of the transactions contemplated thereby, or (ii) the actual or alleged presence of Hazardous Materials on any property of any Loan Party or any of its Subsidiaries or any Environmental Action relating in any way to any Loan Party or any of its Subsidiaries, except to the extent such claim, damage, loss, disbursement, charge, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 9.04(b) applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, its directors, shareholders or creditors, any Indemnified Party or any other Person, and whether or not any Indemnified Party is otherwise a party thereto. The Borrowers also agree not to assert any claim against any Agent, any Lender or any of their Affiliates, or any of their respective officers, directors, employees, agents and advisors, on any theory of liability, for special, indirect, consequential or punitive damages arising out of or otherwise relating to the Facility, the actual or proposed use of the proceeds of the Term Loans, the Loan Documents, or any of the transactions contemplated by the Loan Documents.

84

(c)     If any payment of principal of any Term Loan is made by the Borrowers to or for the account of a Lender other than on the last day of the Interest Period for such Term Loan, as a result of a payment pursuant to Section 2.04, acceleration of the maturity of the Term Loans pursuant to Section 6.01 or for any other reason, by an Eligible Assignee to a Lender other than on the last day of the Interest Period for such Term Loan upon an assignment of rights and obligations under this Agreement pursuant to Section 9.07, as a result of a demand by the Borrowers pursuant to Section 2.07(d), or if the Borrowers fail to make any payment or prepayment of any Term Loans for which a notice of prepayment has been given or that is otherwise required to be made, whether pursuant to Section 2.03, Section 2.04 or Section 6.01 or otherwise, the Borrowers shall, upon demand by such Lender (with a copy of such demand to the Administrative Agent), pay to the Administrative Agent for the account of such Lender any amounts required to compensate such Lender for any additional losses, costs or expenses that it may reasonably incur as a result of such payment or such failure to pay or prepay, as the case may be, including, without limitation, any loss (including loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any Lender to fund or maintain such Term Loan.

(d)     If any Loan Party fails to pay when due any costs, expenses or other amounts payable by it under any Loan Document, including, without limitation, fees and expenses of counsel and indemnities, such amount may be paid on behalf of such Loan Party by the Administrative Agent or any Lender, in its sole discretion.

(e)     Without prejudice to the survival of any other agreement of any Loan Party hereunder or under any other Loan Document, the agreements and obligations of the Borrowers contained in Section 2.07 and Section 2.09 and this Section 9.04 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under any of the other Loan Documents.

SECTION 9.05.  Right of Set-off.  Upon (a) the occurrence and during the continuance of any Event of Default or (b) the acceleration of the Term Loans pursuant to the provisions of Section 6.01, each Agent and each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and otherwise apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Agent, such Lender or such Affiliate to or for the credit or the account of any Loan Party against any and all of the Obligations of such Loan Party now or hereafter existing under the Loan Documents, irrespective of whether such Agent or such Lender shall have made any demand under this Agreement and although such Obligations may be unmatured.  Each Agent and each Lender agrees promptly to notify the Borrowers after any such set-off and application; *provided, however*, that the failure to give such notice shall not affect the validity of such set-off and application.  The rights of each Agent and each Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including, without limitation, other rights of set-off) that such Agent, such Lender and their respective Affiliates may have.

SECTION 9.06.  Binding Effect.  This Agreement shall become effective when it shall have been executed by the Borrowers, Guarantors and each Agent, and the Administrative Agent shall have been notified by each initial Lender that such initial Lender has executed it, and

85

thereafter shall be binding upon and inure to the benefit of the Borrowers, Guarantors, each Agent and each Lender and their respective successors and assigns, except that none of the Borrowers shall have the right to assign its rights hereunder or any interest herein without the prior written consent of each Lender.

SECTION 9.07. Assignments and Participations. (a) Each Lender may and, so long as no Default shall have occurred and be continuing, if demanded by the Administrative Borrower pursuant to Section 2.07(d) upon at least five Business Days' notice to such Lender and the Administrative Agent, will assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Commitment or Commitments, the Term Loans owing to it and the Note or Notes held by it); *provided, however,* that (i) except in the case of an assignment to a Person that, immediately prior to such assignment, was a Lender, an Affiliate of any Lender or an Approved Fund of any Lender or an assignment of all of a Lender's rights and obligations under this Agreement, the aggregate amount of the Commitments being assigned to such Eligible Assignee pursuant to such assignment (determined as of the date of the Assignment and Acceptance with respect to such assignment) shall in no event be less than $1,000,000 (or such lesser amount as shall be approved by the Administrative Agent and, except during the initial syndication of the Commitments and the Term Loans, so long as no Default shall have occurred and be continuing at the time of effectiveness of such assignment, the Administrative Borrower), (ii) each such assignment shall be to an Eligible Assignee, (iii) each such assignment made as a result of a demand by the Administrative Borrower pursuant to Section 2.07(d) shall be arranged by the Borrowers after consultation with the Administrative Agent and shall be either an assignment of all of the rights and obligations of the assigning Lender under this Agreement or an assignment of a portion of such rights and obligations made concurrently with another such assignment or other such assignments that together cover all of the rights and obligations of the assigning Lender under this Agreement, (iv) no Lender shall be obligated to make any such assignment as a result of a demand by the Administrative Borrower pursuant to Section 2.07(d) unless and until such Lender shall have received one or more payments from either the Borrowers or one or more Eligible Assignees in an aggregate amount at least equal to the aggregate outstanding principal amount of the Term Loans owing to such Lender, together with accrued interest thereon to the date of payment of such principal amount and all other amounts payable to such Lender under this Agreement, and (v) the parties to each such assignment shall execute and deliver to the Administrative Agent, for its acceptance and recording in the Register, an Assignment and Acceptance, and shall deliver any Note or Notes (if any) subject to such assignment (provided such delivery may occur after an assignment is effective), and shall pay a processing and recordation fee of $3,500; *provided, however,* that for each such assignment made as a result of a demand by the Administrative Borrower pursuant to Section 2.07(d), the Borrowers shall pay to the Administrative Agent the applicable processing and recordation fee.

(b)     Upon such execution, delivery, acceptance and recording, from and after the effective date specified in such Assignment and Acceptance, (i) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations of a Lender hereunder and (ii) the Lender assignor thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights (other than its rights under Section 2.07 and Section 2.09 to the extent any claim

thereunder relates to an event arising prior to such assignment) and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto).

(c)     By executing and delivering an Assignment and Acceptance, each Lender assignor thereunder and each assignee thereunder confirm to and agree with each other and the other parties thereto and hereto as follows:  (i) other than as provided in such Assignment and Acceptance, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with any Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto; (ii) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Loan Party or the performance or observance by any Loan Party of any of its obligations under any Loan Document or any other instrument or document furnished pursuant thereto; (iii) such assignee confirms that it has received a copy of this Agreement, together with copies of the financial statements referred to in <u>Section 4.01</u> and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon any Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (v) such assignee confirms that it is an Eligible Assignee; (vi) such assignee appoints and authorizes each Agent to take such action as agent on its behalf and to exercise such powers and discretion under the Loan Documents as are delegated to such Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all of the obligations that by the terms of this Agreement are required to be performed by it as a Lender.

(d)     The Term Loans shall be issued in registered form and shall be transferable only upon a register (the "***Register***") maintained by the Administrative Agent as Registrar (the "***Registrar***"), acting solely for this purpose as an agent of the Borrowers.  The Registrar shall maintain the Register at its address referred to in <u>Section 9.02</u> for the recordation of the names and addresses of the owners of the Term Loans and any related Notes from time to time.  The Registrar shall record each transfer of the Term Loans and any related Notes to a transferee on the Register upon written notification by the registered owner of such transfer (with the Registrar being allowed to rely conclusively on any such notification).  The entries in the Register shall be conclusive, and the Borrowers, the Agents and Lenders may deem and treat the Person whose name is recorded in the Register pursuant to the terms hereof as the owner of the Term Loans and any related Notes for the purpose of receiving payment of, or on account of, the principal and interest due on the Loans and any related Notes and for all other purposes, notwithstanding notice to the contrary; provided that, failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Commitments or Borrower's Obligations in respect of any Term Loan.  The Register shall be available for inspection by the Borrowers and the Lenders, at any reasonable time and from time to time upon reasonable prior

notice. Each Borrower hereby designates the Administrative Agent to serve as the Borrowers' agent solely for purposes of maintaining the Register as provided in this Section 9.07, and each Borrower hereby agrees that, to the extent such entity serves in such capacity, the Administrative Agent and its affiliates, officers, directors, employees and agents shall constitute an "Indemnified Party" under Section 9.04(b).

At the request of the registered owner of any Term Loan and any related Notes, the Registrar shall note a collateral assignment of such Term Loan and any related Notes on the Register and, provided that the Registrar has been given the name and address of such collateral assignee, the Registrar (i) shall not permit any further transfers of such Term Loan and any related Notes on the Register absent receipt of written consent to such transfers from such collateral assignee and (ii) shall record the transfer of such Term Loan and any related Notes on the Register to such collateral assignee (or such collateral assignee's designee, nominee or assignee) upon written request by such collateral assignee.

(e)     Upon its receipt of an Assignment and Acceptance executed by an assigning Lender and an assignee, the Administrative Agent shall, if such Assignment and Acceptance has been completed and is in substantially the form of Exhibit C hereto, (i) accept such Assignment and Acceptance, (ii) record the information contained therein in the Register and (iii) give prompt notice thereof to the Administrative Borrower and each other Agent. In the case of any assignment by a Lender, within five (5) Business Days after its receipt of such notice, the Administrative Borrower, at its own expense, shall execute and deliver to the Administrative Agent, upon receipt of and in exchange for the surrendered Note or Notes (if any) if such Note is requested by the Eligible Assignee, a new Note in an amount equal to the Commitment assumed by it pursuant to such Assignment and Acceptance and, if any assigning Lender that had a Note or Notes prior to such assignment has retained a Commitment hereunder, upon such Lender's request a new Note in an amount equal to the Commitment retained by it hereunder. Such new Note or Notes shall be dated the effective date of such Assignment and Acceptance and shall otherwise be in substantially the form of Exhibit A.

(f)     Each Lender may sell participations to one or more Persons (other than any Loan Party or any of its Affiliates) in or to all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Commitments, the Term Loans owing to it and the Note or Notes (if any) held by it); *provided, however*, that (i) such Lender's obligations under this Agreement (including, without limitation, its Commitments) shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) such Lender shall remain the holder of any such Note for all purposes of this Agreement, (iv) the Borrowers, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (v) no participant under any such participation shall have any right to approve any amendment or waiver of any provision of any Loan Document, or any consent to any departure by any Loan Party therefrom, except to the extent that such amendment, waiver or consent would reduce the principal of, or interest on, the Term Loans or any fees or other amounts payable hereunder, in each case to the extent subject to such participation, postpone any date fixed for any payment of principal of, or interest on, the Term Loans or any fees or other amounts payable hereunder, in each case to the extent subject to

88

such participation, or release all or substantially all of the Collateral or the value of the Guaranties.

(g)     Any Lender may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 9.07, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrowers furnished to such Lender by or on behalf of the Borrowers; *provided, however*, that, prior to any such disclosure, the assignee or participant or proposed assignee or participant shall agree in writing to preserve the confidentiality of any Information received by it from such Lender in accordance with Section 9.09(f).

(h)     Notwithstanding any other provision set forth in this Agreement, any Lender may at any time create a security interest in all or any portion of its rights under this Agreement (including, without limitation, the Term Loans owing to it and the Note or Notes (if any) held by it) in favor of any Federal Reserve Bank in accordance with Regulation A of the Board of Governors of the Federal Reserve System.

(i)     Notwithstanding anything to the contrary contained herein, any Lender that is a Fund may create a security interest in all or any portion of the Term Loans owing to it and any Note or Notes held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; *provided* that, unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 9.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(j)     In addition to any other assignment permitted pursuant to this Section 9.07, the Loan Parties hereby acknowledge that (i) the Lenders, their Affiliates and Approved Funds ("*Securitizing Parties*") may sell or securitize the Term Loans (a "*Securitization*") through the pledge of the Term Loans as collateral security for loans to a Securitizing Party or the assignment or issuance of direct or indirect interests in the Term Loans (such as, for instance, collateralized loan obligations), and (ii) such Securitization may be rated by a rating agency. The Loan Parties shall reasonably cooperate with the Securitizing Parties to effect the Securitization including, without limitation, by (A) amending this Agreement and the other Loan Documents, and executing such additional documents, as reasonably requested by the Lenders in connection with the Securitization; *provided* that (1) any such amendment or additional documentation does not impose material additional costs on Borrowers and (2) any such amendment or additional documentation does not materially adversely affect the rights, or materially increase the obligations, of the Borrowers under the Loan Documents or change or affect in a manner adverse to the Borrowers the financial terms of the Term Loans, (B) providing such information as may be reasonably requested by the Lenders or rating agencies in connection with the rating of the Term Loans or the Securitization, and (C) providing a certificate (1) agreeing to indemnify the Securitizing Parties, or any party providing credit support or otherwise participating in the Securitization, including any investors in a securitization entity (collectively, the "*Securitization Parties*") for any losses, claims, damages or liabilities (the "*Securitization Liabilities*") to which the Securitizing Parties or such Securitization Parties may become subject

89

insofar as the Securitization Liabilities arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in any Loan Document or in any writing delivered by or on behalf of any Loan Party to the Securitizing Parties in connection with any Loan Document or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein, or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading, and such indemnity shall survive any transfer by the Lenders or their successors or assigns of the Term Loans, and (2) agreeing to reimburse the Loan Parties and the other Securitization Parties for any legal or other expenses reasonably incurred by such Persons in connection with defending the Securitization Liabilities.

SECTION 9.08. <u>Execution in Counterparts</u>. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery by telecopier or other electronic means of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart of this Agreement.

SECTION 9.09. <u>Confidentiality</u>. Each Agent and Lender agrees to maintain the confidentiality of the Information, except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, counsel, accountants, advisors, investors, and other representatives (collectively, "***Representatives***") (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), or to rating agencies, (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) to any assignee or pledgee of or participant in, or any prospective assignee or pledge of or participant in, any of its rights or obligations under this Agreement, provided that such parties agree to be bound by confidentiality provisions substantially similar to those hereunder, and to the Representatives of the foregoing parties, (g) with the consent of the Borrowers, or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this <u>Section 9.09</u> or (ii) becomes available to any Agent, any Lender, or any of their respective Representatives on a non-confidential basis from a source other than the Borrowers. The terms of this provision shall supersede and replace any previous agreement regarding the non-disclosure of confidentiality of the Information. This provision shall terminate upon termination of this Agreement. Any Person required to maintain the confidentiality of Information as provided in this <u>Section 9.09</u> shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

SECTION 9.10. <u>Public Disclosure</u>. (a) Other than pleadings filed in the Bankruptcy Court in connection with the Chapter 11 Cases, no Loan Party or Affiliate thereof will in the future issue any press releases or other public disclosure using the name of any Agent

or its Affiliates or any Lender or its Affiliates or referring to this Agreement or the other Loan Documents without at least two (2) Business Days' prior notice to the Administrative Agent and without the prior written consent of the relevant party, which shall not be unreasonably withheld, unless (and only to the extent that) such Loan Party or Affiliate is required to do so under law and then, in any event, such Loan Party or Affiliate will consult with the Administrative Agent before issuing such press release or other public disclosure.

(b)     No Lender or Affiliate thereof will in the future issue any press releases or other public disclosure (including, without limitation, the publication of a tombstone or similar advertising material relating to the financing transactions contemplated by this Agreement) using the name of any Borrower or its Affiliates or referring to this Agreement or the other Loan Documents without at least two (2) Business Days' prior notice to the Administrative Borrower and without the prior written consent of the Administrative Borrower, which shall not be unreasonably withheld, unless (and only to the extent that) such Lender or Affiliate is required to do so under law and then, in any event, such Lender or Affiliate will consult with the Administrative Borrower before issuing such press release or other public disclosure. The Administrative Agent reserves the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.

SECTION 9.11. Release or Subordination of Collateral/Release of Guarantor. Upon the sale, lease, transfer or other disposition of any item of Collateral or the incurrence of Liens permitted under Section 5.02(a)(iv) or Section 5.02(a)(v) (or the sale of a Loan Party that is a Subsidiary of any Borrower) in accordance with the terms of the Loan Documents, the Collateral Agent will release its Lien on and security interest in such Collateral, or release or subordinate its Lien in case of Liens permitted under Section 5.02(a)(iv) or Section 5.02(a)(v), and, at the Borrowers' expense, execute and deliver to such Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents or subordinate the Lien of the applicable Agent on such item of Collateral to such Lien in accordance with the terms of the Loan Documents.

SECTION 9.12. Patriot Act Notice. Each Lender and each Agent (for itself and not on behalf of any Lender) hereby notifies the Loan Parties that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender or such Agent, as applicable, to identify such Loan Party in accordance with the Patriot Act. The Borrowers shall, and shall cause each of their Subsidiaries to, provide such information and take such actions as are reasonably requested by any Agent or any Lender in order to assist the Agents and the Lenders in maintaining compliance with the Patriot Act.

SECTION 9.13. Jurisdiction, Etc. (a) Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Bankruptcy Court, and any appellate court therefrom, in any action or proceeding arising out of or relating to this Agreement or any of the other Loan Documents to which it is a party, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action

91

or proceeding may be heard and determined in the Bankruptcy Court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement or any of the other Loan Documents in the courts of any jurisdiction.

(b)     Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any of the other Loan Documents to which it is a party in the Bankruptcy Court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)     Each of Holdco, TLC Management and each Guarantor hereby irrevocably appoints the Administrative Borrower as its authorized agent to accept service of process in any suit, action or proceeding arising out of or relating to this Agreement or any of the other Loan Documents, and agrees that such service of process may be made upon the Administrative Borrower and that the failure of the Administrative Borrower to give any notice of any such service of process shall not impair or affect the validity of such service or of any judgment rendered in any action or proceeding based thereon. Each of Holdco, TLC Management and each Guarantor hereby further irrevocably consents to the service of process in any such action or proceeding by the mailing thereof by any Lender by registered or certified mail, postage pre-paid, to it at its address specified herein.

SECTION 9.14. <u>Governing Law</u>. This Agreement and the Notes shall be governed by, and construed in accordance with, the laws of the State of New York.

SECTION 9.15. <u>Waiver of Jury Trial</u>. Each of the Borrowers, the Guarantors, the Agents and the Lenders irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to any of the Loan Documents, the Term Loans, or the actions of any Agent or any Lender in the negotiation, administration, performance or enforcement thereof.

SECTION 9.16. <u>Release</u>. Subject to applicable terms of the Interim Order and Final Order, each Loan Party hereby acknowledges effective upon entry of the Final Order, that no Loan Party has a defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all or any part of such Loan Party's liability to repay the Agents or any Lender as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from the Agents or any Lender. Each Loan Party, in its own right, on behalf of their bankruptcy estates, and on behalf of all their successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them, (collectively, the "*Releasing Parties*"), hereby fully, finally and forever releases and discharges the Agents and Lenders and all of their respective past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "*Released Parties*") of and

92

from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which in each case are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the Orders, and the transactions contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.

A/73160038.15

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**BORROWERS**

TLC VISION (USA) CORPORATION

By:_____
  Name:
  Title:

TLC VISION CORPORATION

By:_____
  Name:
  Title:

TLC MANAGEMENT SERVICES INC.

By:_____
  Name:
  Title:

## GUARANTORS

AMERICAN EYE INSTRUMENTS, INC.
LASER EYE SURGERY, INC.
LASER VISION CENTERS, INC.
LVCI CALIFORNIA, LLC
      By:    Laser Vision Centers, Inc., its Member
SIGHTPATH MEDICAL INC.
OR PARTNERS, INC.
O.R. PROVIDERS, INC.
SOUTHEAST MEDICAL, INC.
SOUTHERN OPHTHALMICS, INC.
TLC CAPITAL CORPORATION
TLC FLORIDA EYE LASER CENTER, LLC
      By:    TLC THE LASER CENTER
            (INSTITUTE) INC., ITS MEMBER
TLC LASER EYE CENTERS (ATAC), LLC
TLC LASER EYE CENTERS (REFRACTIVE I) INC.
TLC MIDWEST EYE LASER CENTER, INC.
TLC THE LASER CENTER (ANNAPOLIS) INC.
TLC THE LASER CENTER (BALTIMORE
MANAGEMENT) LLC
TLC THE LASER CENTER (BALTIMORE) INC.
TLC THE LASER CENTER (BOCA RATON)
LIMITED PARTNERSHIP
      By:    (NORTHEAST) INC., ITS GENERAL
            PARTNER
TLC THE LASER CENTER (CAROLINA) INC.
TLC THE LASER CENTER (CONNECTICUT) L.L.C.
      By:    TLC THE LASER CENTER
            (NORTHEAST) INC., ITS SOLE
            MEMBER
TLC THE LASER CENTER (INSTITUTE) INC.
TLC THE LASER CENTER (NORTHEAST) INC.
TLC VC, LLC
TLC VISION SOURCE, INC.
TLC WHITTEN LASER EYE ASSOCIATES, LLC
      By:    TLC THE LASER CENTER
            (NORTHEAST) INC., ITS MEMBER
TRUVISION, INC.
TRUVISION CONTACTS, INC.
TRUVISION PROVIDER ONLINE SERVICES, INC.
VALLEY LASER EYE CENTER, LLC
By:    LASER VISION CENTERS, INC., ITS SOLE
        MEMBER


By:_____
      Name:
      Title:

TLC THE LASER CENTER (MONCTON) INC.
RHEO CLINIC INC.

VISION CORPORATION

By:_____
     Name:
     Title:

**AGENTS**

Cantor Fitzgerald Securities,
as Administrative Agent and Collateral Agent


By:_____
Name:
Title:

# LENDERS