| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TLC Vision (USA) Corporation, *et al.*,[1] | ) | Case No. 09-      (   ) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |

## DECLARATION OF MICHAEL F. GRIES, CHIEF RESTRUCTURING OFFICER FOR THE DEBTORS, IN SUPPORT OF FIRST DAY PLEADINGS

I, Michael F. Gries, hereby declare as follows:

1.     I am the Chief Restructuring Officer for each of the above-captioned debtors and debtors in possession (collectively, the "Debtors"). In this capacity, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

2.     To enable the Debtors to minimize the adverse effects of the commencement of the above-captioned chapter 11 cases (the "Chapter 11 Cases") on their businesses, thereby preserving and maximizing the value of the Debtors' estates, the Debtors have requested various types of relief in the "first day" pleadings and applications (each, a "First Day Pleading") described below.[2] I am familiar with the contents of each First Day Pleading (including the exhibits and schedules thereto) and I believe that the relief sought in each First Day Pleading: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value; (b) constitutes a critical element to achieving a successful restructuring of the Debtors; and (c) best serves the Debtors' estates and creditors' interests.

---

[1]  The Debtors in the cases, along with the last four digits of each Debtor's federal tax identification number and address, are: TLC Vision (USA) Corporation (6220) 16305 Swingley Ridge Road, Chesterfield, MO 63017; TLC Vision Corporation (1150) 5280 Solar Drive, Suite 300, Mississauga, Ontario, L4W 5M8; and TLC Management Services, Inc. (0374) 1209 Orange Street, Wilmington, DE 19801.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Pleading.

3. Except as otherwise indicated, all facts set forth herein are based upon: (a) my personal knowledge, (b) information learned from my review of relevant documents, and (c) information supplied to me by other members of the Debtors' management and the Debtors' advisors. I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

**Background**

4. On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (11 U.S.C. §§ 101–1532, as amended, the "Bankruptcy Code"), commencing the Chapter 11 Cases. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases and, as of the date hereof, no official committees have been appointed or designated. Concurrently herewith, the Debtors filed a motion seeking joint administration of the Chapter 11 Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), as described below.

**I.      ORGANIZATIONAL STRUCTURE: OVERVIEW OF DEBTORS' OPERATIONS**

5. TLC Vision (USA) Corporation ("TLC USA"), a Delaware corporation, is a wholly-owned subsidiary of TLC Vision Corporation ("TLC Canada"), a Canadian corporation. TLC Canada is traded on the NASDAQ Global Market under the symbol "TLCV" and on the Toronto Stock Exchange under the symbol "TLC." TLC Management Services Inc., ("TLC MSI", and together with TLC USA and TLC Canada, the "Debtors"), a Delaware corporation, is a wholly-owned subsidiary of TLC USA and employs virtually all of the non-executive employees of the Debtors and their non-debtor affiliates.

6.     Founded in 1993 by a predecessor of the Debtors and their non-debtor affiliates, (collectively, the "Company"), the Company has grown into one of North America's premier eye care service companies. Despite the current economic climate, the Company maintains a leading position in refractive, cataract and optometric markets. The Company operates distinct lines of business, described in greater detail below, which include: (a) owning and providing management services to 71 refractive laser centers in the United States and Canada, (b) providing doctors and medical facilities with equipment, supplies, and technicians in 40 states, and (c) providing marketing, practice development and purchasing power to independently owned optometric centers under the Vision Source® brand. The Company's U.S. corporate headquarters is located in St. Louis, Missouri. The Debtors, generally speaking, are administrative entities that provide corporate services to a variety of affiliated medical services company.

7.     Debtors TLC USA and TLC MSI provide management and related services to the Company's operations in the United States, which include more than 30 non-debtor affiliates of the Debtors. These entities do not provide health care services and do not have patients. Debtor TLC Canada primarily provides management and related services to the Company's operations in Canada, but directly owns and manages certain refractive centers in Canada. Among other things, the Debtors provide critical cash management, personnel and other administrative services to their numerous non-debtor affiliates. As described below, the Company's cash management system is fully integrated and the Company expects that the flow of funds between and among the Company's Debtor and non-debtor entities will not be adversely affected by the Commencement of the Chapter 11 Cases.

## A.  Refractive Centers

8.  The Company, almost exclusively through its non-debtor entities, owns and provides management services to refractive laser centers in the United States and Canada that provide an environment for doctors to treat common refractive vision disorders such as myopia (nearsightedness), hyperopia (farsightedness) and astigmatism.   At these refractive centers, optometrists and ophthalmologists affiliated with the Company perform corrective laser surgery using excimer laser technology.

9.  Because most states prohibit the Company from practicing medicine, employing physicians to practice medicine on the Company's behalf, or employing optometrists to render optometric services on the Company's behalf, the Company's activities generally are limited to owning and providing management services to refractive centers and affiliating with other health care providers.   The Company, therefore, developed and implemented a comprehensive co-management model under which it not only establishes and provides management services to refractive centers, but also coordinates the activities of the various doctors, including the primary care and surgical doctors, who assess and perform various operative and non-operative medical procedures.   In connection with this co-management model, the Company has developed proprietary management and administrative software that is designed to assist eye care professionals in providing high levels of patient care and which they utilize in substantially all of the Company's refractive centers.

10.  Accordingly, the success of the Company's operations depends in large part on the Company's ability to enter into agreements on acceptable terms with a sufficient number of health care providers, including institutions and eye care doctors, to render surgical and or other professional services at the centers.

11.     Laser eye surgery is considered an elective procedure and is therefore not covered by most insurance providers, including the provincial health care plans in Canada and Medicare and Medicaid in the United States. As a result, the primary sources of revenue generated by the refractive center business is derived from: (a) amounts charged to patients for procedures performed at laser centers and collected by the Company on behalf of the medical care professional who performed the procedure; (b) management and facility fees paid by doctors who use the center to perform laser vision correction procedures; and (c) administrative fees for billing and collection services from doctors who co-manage patients treated at the centers.

**B.     Doctor Services**

12.     The Company's doctor services business provides a variety of services and products directly to doctors and facilities in which the doctors perform surgeries. Primarily through non-debtor subsidiaries, the Company: (a) furnishes doctors and medical facilities with mobile or fixed site refractive and cataract surgery equipment, supplies, technicians and diagnostic products, and (b) owns and provides management to single-specialty ambulatory surgery centers..

13.     The Company's mobile cataract segment provides mobile and fixed site technology and service to doctors and hospitals to support cataract surgery as well as treatment of other eye diseases in approximately 41 states.

14.     The Company's refractive access segment assists surgeons by providing mobile and fixed site corrective laser surgery refractive technology and value support services such as training, technical support and equipment maintenance. The Company's mobile access systems are provided by means of a proprietary patented Roll-On/Roll-Off laser system which is transported between doctors' offices to provide temporary in-office use of the laser equipment.

The Company's fixed site lasers, primarily used by surgeons who perform more than 40 procedures per month, are permanently located at a surgeon's office, or such other location where eye surgeries are performed such as ambulatory surgery centers. Surgeons using mobile or fixed site lasers do not operate under the TLC name and pay a fee to the Company for each procedure performed using the Company's equipment.

15.    The Company also provides doctor services through its surgical and secondary care center segment. This is a minor segment through which the Company maintains ownership interests in several refractive practices and ambulatory surgical centers. These businesses are conducted through non-debtor entities.

## C.    Eye Care

16.    The Company, through non-debtor entities, provides franchise opportunities to independent optometrists and other qualified care providers. The Company's optometric franchising segment provides marketing, practice development and purchasing power to independently-owned and operated practices in the U.S. and Canada under the Vision Source® brand.

## II.    PRE-PETITION CAPITAL STRUCTURE

## A.    Credit Facility

17.    On June 21 2007, certain of the Debtors entered into that certain Amended and Restated Credit Agreement (as amended and restated, and modified from time to time, the "Prepetition Credit Agreement") for a $110.0 million credit facility (the "Prepetition Facility") among TLC USA, TLC Canada, as guarantor, the additional guarantors, the lenders party thereto (the "Prepetition Lenders"), and Wells Fargo Bank, National Association (in such capacity, the "Prepetition Agent"). The obligations under the Prepetition Credit Agreement are secured by a

first priority security interest in and liens upon substantially all the assets of the Debtors, including the Debtors' cash and cash equivalents, and consists of both senior term debt and a revolver as follows:

    a)    A senior term debt, totaling $85.0 million, with a six-year term and required amortization payments of 1% per annum plus a percentage of excess cash flow (as defined in the Credit Agreement) and sales of assets or borrowings outside of the normal course of business.

    b)    A revolving credit facility, totaling $25.0 million with a five-year term. As of the Petition Date, $23.4 million was outstanding under this portion of the facility.

    c)    Interest on the facility is calculated based on either prime rate or the London Interbank Offered Rate (LIBOR) plus a margin. Effective June 30, 2009, the Debtors began incurring 2% default rate interest and all LIBOR advances with interest periods ending on or after June 30, 3009 automatically converted to prime rate advances.

**18.**    The Prepetition Facility, among other things, requires the Debtors to maintain various financial and non-financial covenants as defined in the Credit Agreement. On multiple occasions prior to the Petition Date, the Debtors executed amendments to the Prepetition Facility, multiple of which modified the Prepetition Facility to prevent, cure or waive the Debtors' defaults (past or prospective) under such facility. On September 11, 2009, the Debtors executed that certain Limited Waiver and Amendment No. 5 to the Credit Agreement, dated as of September 8, 2009. The Limited Waiver and Amendment No. 5 (as amended), among other things, provided a limited waiver through November 15, 2009 of certain defaults and provided that the Prepetition Lenders would, until November 15, 2009, forbear from exercising their rights arising out of the non-payment of certain principal, interest and other payments previously due under the Prepetition Facility. The Limited Waiver and Amendment No. 5 expired on November

15, 2009, and the Debtors have operated without any further waiver or forbearance agreement since that date.

## B. Interest Rate Swap Agreement

19.     As required under the Prepetition Facility, the Debtors entered into certain interest rate swap agreements to eliminate the variability of cash required for interest payments for a majority of the total variable rate debt.

20.     On July 10, 2009, based on asserted defaults, Citibank N.A. terminated certain swap agreement, effective as of July 9, 2009. As a result of this termination, Citibank asserts it is owed approximately $1,625,000, which amount would be added to the balance of the Debtors' senior secured debt under the Prepetition Credit Agreement.

## C. Equipment and Capital Financing

21.     Prior to the Petition Date, the Debtors entered into various capital leases, primarily to obtain lasers and other medical equipment. The Debtors primarily utilize VISX lasers manufactured by Abbott Medical Optics, Inc. "AMO" for refractive surgery. The Debtors do not have an exclusive manufacturing agreement with AMO, as their laser technologies are available on a non-exclusive basis to all LASIK providers. The majority of the Debtors' capital leases are governed by that certain master lease with AMO dated as of May 17, 2006, which covers 60 Intralase laser machines. The payment obligations arising under this master lease are approximately $7.9 million in the aggregate over the next five years.

## III. EVENTS AND FACTORS LEADING UP TO THE CHAPTER 11 FILINGS

22.     The Debtors experienced financial difficulties for several years prior to the Petition Date, including recurring losses from continuing operations of $98.3 million and $35.3 million for the years ended December 31, 2008 and 2007, respectively. Nonetheless, the Debtors

started 2008 with their best quarter in their history. During the quarter ended March 31, 2008, refractive center revenue was up 14% over the prior year, consolidated net income was up 75%, earnings per diluted share were up 142%, operating cash flow was up 49% and total debt was reduced by 6%. The reason for this great quarter was two-fold. First, the Debtors reaped the benefits of successfully transitioning their refractive centers to a new, robust operating model that had been built in 2007. Second, the economy, although challenged, was operating under a consumer confidence index of 95 at the start of the year. Ultimately, however, the unprecedented economic conditions that unfolded over the course of 2008 and 2009 took their toll on the Debtors.

23. The foundation of the Debtors' primary business, laser vision correction, is generally not reimbursed by health care insurance companies or other third-party payors and is therefore impacted by changes in economic and stock market conditions, unemployment rates, consumer confidence and discretionary spending patterns. The deepening recession in the fourth quarter of 2008 and through much of 2009 had a significant impact on the Debtors' operations, resulting in a sharp decline in their financial performance. As a result, the Debtors' liquidity became progressively constrained. By the end of 2008, the Debtors experienced a more than 20% annual decline in refractive center and shared access procedures. The resulting precipitous decline in operating revenue led the Debtors to fall out of compliance with the primary financial covenants under the Prepetition Facility.

24. In response to the deteriorating economic environment, the Debtors implemented a series of initiatives to reduce their costs of operation to levels commensurate with the new lower level of refractive procedures. The Debtors have continued to implement cost reduction and cash generation initiatives, including reductions in headcount, freezing or reducing salaries

and benefits, reductions in discretionary spending including direct to consumer marketing, reductions in overhead costs, lower capital spending, the sale of surplus assets, and the closure of underperforming refractive centers/mobile refractive routes. In addition, the Debtors continued the diversification of their business model focusing on the doctor services and eye care businesses where services are reimbursed by third party insurance or Medicare, which is critical in an economy where discretionary spending slowed dramatically.

25. In addition, the Debtors engaged advisors to help them explore various alternatives to restructure their balance sheet, including selling the entire business or significant assets, seeking capital infusions, or restructuring their current debt. The freezing of the financial markets that began in the late summer and fall of 2008, however, limited the ability of companies such as the Debtors to access the capital markets and ultimately prevented the Debtors from completing any of the alternatives they were exploring.

26. Therefore, the Debtors focused their attention on working with the Prepetition Lenders to create a more flexible capital structure reflective of the challenges within the economy. The Debtors began active discussions with the Prepetition Lenders to ensure that they had sufficient liquidity in excess of what is available under the Prepetition Facility. These discussions resulted in a series of waivers and amendments to the Credit Facility. Nonetheless, the Debtors were unable to make interest and principal payments under the Prepetition Facility and, when it became apparent that they could not service the debt arising under the Prepetition Facility, the Debtors entered into discussions with the Prepetition Lenders to secure both a short-term financial debt covenant compliance waiver to cure existing defaults and to execute a plan support agreement to be implemented though the filing of the Chapter 11 Cases.

27.     These negotiations resulted in the execution of a Plan Support Agreement with certain of the Prepetition Lenders (the "Plan Support Agreement"), which outlines the terms of a plan of reorganization supportable by both the Debtors and a majority of the Prepetition Lenders.[3] The Plan Support Agreement provides for a mechanism to satisfy all of the Debtors' essential creditors, doctors, employees, customers and patients, and to de-leverage their balance sheet to enable them to emerge with a more manageable debt load.

28.     Specifically, the Plan Support Agreement provides that, in exchange for and in full satisfaction of the secured obligations under the Prepetition Facility of approximately $101 million (consisting of the outstanding $76,667,280.72 principal amount of the term loans and the outstanding $23.4 million principal amount of the revolving loans), the Prepetition Lenders would receive, upon the Debtors' emergence from chapter 11: (a) newly-issued senior secured notes in the amounts of $50 million and $30 million, respectively, and (b) substantially all of the newly-issued common stock of reorganized TLC Canada. In addition, the Debtors intend to sell substantially all of their interests in the Canadian refractive centers in the Chapter 11 Cases, the proceeds of which will be used to pay in part the debtor-in-possession financing facility for which the Debtors seek authority to consummate concurrently herewith. Accordingly, the Plan Support Agreement contemplates the filing of a plan of reorganization converting over $100 million of secured claims and funded indebtedness into approximately $80 million of secured notes and substantially all of the equity in the reorganized Debtors. The new secured notes would have flexible terms that the Debtors believe can be serviced.

---

[3] As of the Petition Date, Prepetition Lenders holding approximately 55% of the debt under the Prepetition Facility had executed the Plan Support Agreement. The Debtors and these consenting Prepetition Lenders believe that they will be able to obtain acceptance of a plan of reorganization by requisite holders of the debt under the Prepetition Facility.

29.     The Debtors believe that the restructuring of their debt as proposed in the Plan

Support Agreement presents an ideal opportunity to reduce and adjust their debt and will result

in a capital structure that is suitable to and manageable by the Company.  As of the date hereof,

the Debtors already have nearly sufficient support from the Prepetition Lenders to allow the

Debtors to confirm a plan of reorganization based upon the Plan Support Agreement and thus

exit chapter 11 expediently and with minimal disruption to their businesses.  The Debtors further

believe that, with this restructuring behind them, their business model, unfettered by the current

amount of senior debt, will allow the business to sustain growth and profitability in the coming

years.

### First Day Pleadings

**I.      PROCEDURAL PLEADINGS**

**A.      Motion of the Debtors for an Order Directing Joint Administration of Chapter 11 Cases Pursuant to Bankruptcy Rule 1015(b) (the "Joint Administration Motion")**

30.     Joint administration of the Chapter 11 Cases will permit the Clerk of the Court to

use a single general docket for all of the Debtors' cases and to combine notices to creditors and

other parties in interest of the Debtors' respective estates.  The Debtors anticipate that numerous

notices, applications, motions, and other pleadings, hearings and orders in these cases will affect

all of the Debtors.

31.     Joint administration will save time and money and avoid duplicative and

potentially confusing filings by permitting parties in interest to:  (a) use a single caption on all

documents that will be served and filed in the Chapter 11 Cases; and (b) file pleadings in one

case rather than in multiple cases.  Joint administration will also protect parties in interest by

ensuring that parties in each of the Debtors' respective Chapter 11 Cases will be apprised of the

various matters before the Court in these cases. Joint administration of the Chapter 11 Cases will ease the administrative burden for the Court and all parties in interest.

32.     The rights of the respective creditors of each of the Debtors will not be adversely affected by joint administration of these cases because the relief sought in the Joint Administration Motion is purely procedural and is in no way intended to affect substantive rights. Each creditor and other party in interest will maintain whatever rights it has against the particular estate in which it allegedly has a claim or interest.

**B.     Motion for Entry of an Order Authorizing TLC Vision Corporation to Act as Foreign Representative Pursuant to 11 U.S.C. § 1505 (the "<u>Foreign Representative Motion</u>")**

33.     The Debtors have operations in Canada in addition to their United States operations. In connection with the filing of the Chapter 11 Cases, TLC Vision will initiate proceedings (the "<u>CCAA Proceedings</u>") seeking ancillary relief under the Companies Creditors Arrangement Act (Canada) (the "<u>CCAA</u>") with the Ontario Superior Court of Justice (Commercial List), (the "<u>Canadian Court</u>"). In order for the Canadian Court to recognize the Chapter 11 Cases as a "foreign proceeding" so that the CCAA Proceedings may be coordinated with the Chapter 11 Cases, TLC Vision must make a showing to the Canadian Court that it has been authorized to act as the Foreign Representative of the Debtors' estates.

**II.     OPERATIONAL MOTIONS**

**A.     Motion of the Debtors for Entry of Interim and Final Orders: (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Post-petition Financing Pursuant to 11 U.S.C. §§ 361, 362, 363(c), 363(e), 364(c), 364(d) and 364(e) and (B) Utilize Cash Collateral of Prepetition Secured Lenders, (II) Granting Adequate Protection to the Prepetition Senior Secured Lenders and (III) Granting Related Relief (the "<u>DIP Financing Motion</u>")**

34.     The Debtors request entry of interim and final orders (together, the "<u>DIP Orders</u>") authorizing the Debtors to, among other things: (a) obtain secured, superpriority post-petition

financing with priority over certain secured indebtedness and with administrative priority pursuant to the terms and conditions of that certain Senior Secured Super Priority Debtor-in-Possession Credit Agreement dated on or about December 20, 2009 (as it may be amended, supplemented, restated or otherwise modified from time to time, the "DIP Credit Agreement"),[4] by and among the Debtors, the lenders party thereto from time to time (the "DIP Lenders," and, together with the DIP Agent, the "DIP Secured Parties"), and Cantor Fitzgerald Securities, as collateral agent and administrative agent (in such capacity, the "DIP Agent"), for and on behalf of itself and the DIP Lenders, on an interim basis and on a final basis, in an aggregate amount not to exceed $15 million (the "DIP Facility");[5] (b) use cash collateral pursuant to section 363 of the Bankruptcy Code; and (c) grant adequate protection to Wells Fargo Bank, N.A. (in such capacity, the "Prepetition Agent"), as collateral agent and administrative agent for the Prepetition Lenders (as defined below). A copy of the DIP Credit Agreement is attached to the DIP Financing Motion as **Exhibit A**.

35. The Debtors request that the Court authorize them to obtain senior secured, superpriority post-petition financing with priority over certain secured indebtedness and with administrative priority consisting of a multiple draw senior term loan facility in an aggregate amount not to exceed $15 million pursuant to the terms of this Motion, the DIP Credit Agreement and the Interim and Final DIP Orders.

36. The proposed financing will be provided by the DIP Agent and the DIP Lenders. It will be secured by post-petition liens that are senior to all prepetition liens and obligations other than certain liens otherwise permitted by the Prepetition Credit Documents (to the extent

---

[4] The DIP Credit Agreement, along with other related loan documents, are collectively referred to as the "DIP Documents".

[5] All obligations of the Debtors arising under the DIP Facility are referred to as the "DIP Obligations".

any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition Liens as of the Petition Date, the "Permitted Encumbrances"). As such, the liens created under the DIP Credit Agreement are priming liens with respect to all liens existing on the Petition Date that are not Permitted Encumbrances (including the Prepetition Liens).

37.     Pending entry of the final order authorizing the DIP Credit Agreement (the "Final DIP Order"), the Debtors request that the Court authorize the Debtors, on an interim basis, to: (a) borrow up to $7.5 million pursuant to the terms of the DIP Credit Agreement; (b) use cash collateral as provided in the Interim DIP Order; (c) grant to the DIP Secured Parties the liens and superpriority claims; (d) provide adequate protection to the Prepetition Lenders; (e) approve the proposed notice of the Final Hearing; and (f) schedule the Final Hearing.

38.     Prior to the Petition Date, the Debtors considered various sources of post-petition financing, including financing from the DIP Secured Parties. In considering those options, the Debtors recognized that the obligations owed to the Prepetition Lenders are secured by virtually all of their property, such that either: (a) the liens of the Prepetition Lenders would have to be primed to obtain post-petition financing; or (b) the Debtors would have to find a post-petition lender willing to extend credit that would be junior to the liens of the Prepetition Lenders. Because the Prepetition Lenders advised the Debtors' representatives that they would not consent to be primed by any other post-petition lender, borrowing from another post-petition lender or lending group that required liens and claims senior to that of the Prepetition Lenders likely could only be accomplished through an extended, contested hearing to determine compliance with the requirements of section 364(d) of the Bankruptcy Code. Moreover, in the current marketplace, the likelihood of finding a third party lender to provide the necessary financing subordinate to the liens of the Prepetition Lenders is very low.

39.     The Debtors concluded that the proposal offered by the DIP Agent was desirable because, among other things, it permits the Debtors to secure necessary post-petition financing to continue operations and avoid an extended, contested hearing under section 364(d) of the Bankruptcy Code.

40.     The Debtors and the DIP Agent engaged in extensive, arms'-length negotiations with respect to the terms and conditions of the DIP Credit Agreement and Interim DIP Order. Importantly, the DIP Credit Agreement and Interim DIP Order provide that the Debtors may draw immediately (on an interim basis) to meet their administrative and operational obligations during the early stages of the Chapter 11 Cases, a critical period for preserving their going-concern values.

41.     The Debtors, the DIP Agent and the Prepetition Agent have also agreed upon a budget (the "Budget") projecting cash flow for a period of 13 weeks. On a weekly basis, the Debtors will provide to the DIP Agent and the Prepetition Agent an updated Budget and variance report. The Debtors believe that the Budget is achievable and will allow them to operate and pay their post-petition obligations as they mature.

42.     In order to address their working capital needs and fund their reorganization efforts, the Debtors require the use of cash collateral of the Prepetition Lenders (the "Cash Collateral"). The use of Cash Collateral will provide the Debtors with the additional necessary capital with which to operate their business, pay their employees, maximize value and pursue the sale process.

43.     The Prepetition Lenders have consented to the Debtors' use of Cash Collateral in the ordinary course of business in accordance with the Budget, subject to certain adequate protection liens and payments, and the other terms and conditions set forth in the Interim DIP

Order. The Prepetition Lenders have requested, pursuant to sections 361 and 363(e) of the Bankruptcy Code, adequate protection of their interests in collateral under the Prepetition Credit Agreement to the extent that there is a diminution in the value of such collateral from and after the Petition Date. In addition to Prepetition Replacement Liens, the Debtors propose to grant and/or pay the Prepetition Lenders other forms of adequate protection, as set forth in the proposed DIP Orders.

44. Approval of the DIP Facility will provide the Debtors with immediate and ongoing access to borrowing availability to pay their current and ongoing operating expenses, including post-petition wages and salaries and utility and vendor costs. Unless these expenses are paid, the Debtors will have no access to working capital to fund their operations and shall be forced to cease operations, which would likely: (a) result in irreparable harm to their business; (b) deplete going concern value; and (c) jeopardize the Debtors' ability to restructure their businesses, assets and other financial obligations. The credit provided under the DIP Credit Agreement and the use of Cash Collateral will enable the Debtors to continue to satisfy their vendors, service their customers, pay their employees and operate their business in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of their estates for the benefit of all stakeholders. The availability of credit under the DIP Credit Agreement will provide confidence to the Debtors' creditors that will enable and encourage them to continue their relationships with the Debtors. Finally, the implementation of the DIP Credit Agreement will be viewed favorably by the Debtors' vendors, employees and customers, thereby promoting a successful chapter 11 process. Accordingly, the timely approval of the relief requested herein is imperative.

45. The Debtors' liquidity needs can be satisfied only if the Debtors are immediately authorized to borrow under the DIP Facility and to use such proceeds to fund their operations. The Debtors have been unable to procure sufficient financing in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, as an administrative expense under section 364(a) or (b) of the Bankruptcy Code or in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code. The Debtors have not been able to obtain post-petition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein.

46. Substantially all of the Debtors' assets are encumbered and the Debtors have been unable to procure the required funding absent granting the proposed superpriority claims and liens. The circumstances of the Chapter 11 Cases require the Debtors to obtain financing pursuant to sections 364(c) and 364(d) of the Bankruptcy Code and, accordingly, the DIP Credit Agreement reflects the exercise of their sound business judgment.

47. The terms and conditions of the DIP Credit Agreement are fair and reasonable and were negotiated extensively by well-represented, independent parties in good faith and at arms'-length.

48. The Debtors require the use of Cash Collateral to fund their day-to-day operations. Indeed, absent such relief, the Debtors' business will be brought to an immediate halt, with damaging consequences for the Debtors and their estates and creditors. The Prepetition Lenders have consented to the use of the Cash Collateral on the terms set forth in the Interim DIP Order.

49.     The Debtors have an urgent and immediate need for cash to continue to operate. Currently, the Debtors do not have sufficient unencumbered funds with which to operate their business on an ongoing basis. Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending a final hearing on the Motion, the Debtors will be immediately and irreparably harmed. The availability of interim loans under the DIP Facility will provide necessary assurance to the Debtors' vendors, employees and customers of their ability to meet their near-term obligations. Failure to meet these obligations and to provide these assurances likely would have a long-term negative impact on the value of the Debtors' business, to the detriment of all parties in interest. Furthermore, the lack of an interim facility would result in accelerated cash demands on the Debtors. Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtors and facilitating their reorganization efforts.

**B.      Motion for Entry of an Order (I) Authorizing, but not Directing, the Debtors to (A) Pay Certain Accrued Prepetition Wages, (B) Permit Employees to Use Accrued Prepetition Personal Time Off, (C) Pay Employees' Prepetition Reimbursable Business Expenses, (D) Make Accrued Prepetition Contributions to Employment Benefit Plan and (E) Continue Employee Benefit Plans; (II) Authorizing Related Relief; and (III) Authorizing, but not Directing, the Release of Withheld Taxes and Employee Contributions (the "Wage Motion")**

50.     On the Petition Date, the Debtors employed approximately 742 full-time and part-time (twenty-four (24) hours or less a week) hourly-wage, piece-rate and salaried employees (each, an "Employee" and collectively, the "Employees"). The continued and uninterrupted service of the Employees is essential to maximize the value of the Debtors' estates for the benefit of their creditors.

51.     In the ordinary course of business, the Debtors: (a) issue payroll checks to their salaried, hourly and piece-rate Employees; and (b) pay contract labor pursuant to invoices

received and paid in the ordinary course of business. The Debtors issue payment[6] to their Employees on a biweekly basis, every other Friday, one week in arrears.[7] Certain of the Employees are salespeople who receive commission in addition to their regular salary or wage. In addition, certain of the Employees may be eligible to receive incentive payments in the ordinary course of business.

52.     The Debtors believe that approximately $1,500,000.00 in wages, salaries, commissions, overtime pay, jury pay, personal time off and other compensation (excluding severance pay) has accrued prior to the Petition Date and remains unpaid (collectively, the "Unpaid Compensation"). Items of Unpaid Compensation were due and owing on the Petition Date because, among other things:

a)     these chapter 11 petitions were filed during the Debtors' regular and customary salary and hourly wage payroll periods and temporary and contract worker invoice periods;

b)     some payroll checks issued to the Employees and invoice checks issued to or for the benefit of other Employees prior to the Petition Date may not have been presented for payment or cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date; and

c)     the Employees have not yet been paid all their salaries and wages for services performed prior to the Petition Date on behalf of the Debtors because some of the Debtors' payroll checks are issued in arrears.

53.     The Debtors offer their Employees PTO for each calendar year in lieu of traditional vacation days, sick time, personal days, etc. under one of three PTO policies: one for U.S. Employees, one for Canadian Employees and one for salaried executives (Level C3 and

---

[6]  If any pay day falls on a Saturday, Sunday or holiday, the Debtors generally issue payroll to their Employees on the prior business day.

[7]  Prior to the Petition Date, the Debtors centralized the payroll process so that Employees' checks are now issued from the Debtors' corporate office.

above).  In each case, an Employee's PTO accrual rate is determined by such Employee's length of service with the Debtors.  Eligibility begins on an Employee's first day of employment with the Debtors.

a) **PTO – U.S. Employees.**  The PTO policy applicable to the Debtors' U.S. Employees requires that, to be eligible, U.S. Employees must be regularly scheduled to work twenty-four or more hours per week.  PTO begins accruing from an Employee's first day of eligibility.  Accruals are credited to one's balance on a bi-weekly basis in accordance with the standard payroll cycle.  Under the following schedule, the Debtors' eligible U.S. Employees continue to earn hours until the maximum number of PTO hours are accumulated:

| Years of Service | PTO Accrual Rate | Hours Earned Per Year (Maximum Accrual Level) | Days Earned Per Year |
|---|---|---|---|
| 0-4 | .058 per hour/4.62 per biweekly period | 120 | 15 |
| 5-14 | .077 per hour/6.15 per biweekly period | 160 | 20 |
| 15+ | .096 per hour/7.69 per biweekly period | 200 | 25 |

Employees do not receive cash or any other form of compensation in lieu of PTO balances (with the exception of separations from the Debtors, unless (i) the subject Employee abandoned his or her job, failed to pay corporate credit card balances for which he or she was responsible or failed to give the Debtors two-weeks notification of his or her resignation or (ii) in the event of gross misconduct by the Employee as determined by management and human resources).

b) *PTO – Canadian Employees*.  Under the PTO policy applicable to the Debtors' Canadian Employees, all of the Debtors' Canadian Employees are eligible to earn and accrue PTO from the first date of active employment with the Debtors.  For hourly Canadian Employees, PTO is paid on each hour that work is performed.  For salaried Canadian Employees, PTO is earned on a biweekly basis. Under the following schedule, PTO is paid to the Debtors' eligible Canadian Employees as a percentage of earnings:[8]

---

[8]  For the Debtors' Canadian Employees who work thirty or more hours a week, the percentage of PTO earned on base salary is paid when the Canadian Employee takes PTO.  PTO pay on a bonus, overtime and commissions ("other earnings") will be paid at the applicable percentage listed in the schedule above in the paycheck in which the

| Years of Service | PTO Accrual Rate | Hours Earned Per Year | Days Earned per Year | Vacation Pay Accrual Percentage on Base Salary | Vacation Pay Accrual Percentage on Other Earnings |
|---|---|---|---|---|---|
| 0-4 | .0538 per hour | 112 | 14 | 5.3% | 4.0% |
| 5-14 | .0730 per hour | 152 | 19 | 7.3% | 4.0% |
| 15 + | .0923 per hour | 192 | 24 | 9.2% | 4.0% |

In accordance with the Ontario Employment Standards Act (ESA), each of the Debtors' Canadian Employees must take his or her accrued PTO during the year that such PTO is earned. If PTO cannot be taken during this period, the Canadian Employee has until October 31 of the following year to use accrued PTO time. If the time is not taken by October 31, PTO pay for those unused hours is paid to the Canadian Employee. When the employer – employee relationship is ended, the balance of the Canadian's PTO is paid either with his or her final paycheck or shortly thereafter.

c) ***PTO – Executive Level.*** For the Debtors' Employees with positions classified by the Debtors as level C3 and above (collectively, the "Executives"), a separate PTO policy applies. This policy allows Executives to take between 160 – 200 hours per year of PTO. The requested PTO is tracked internally to monitor the time and attendance of each Executive. Executives who require extended time off for short-term disability, long-term disability or Family Medical Leave Act leaves will have access to the necessary time to cover the waiting period, provided that they have not used more than 160 – 200 hours of PTO in a twelve-month period. Executives' PTO is not earned or banked and is not "paid out" at the time of separation or termination.

54. As of the Petition Date, most of the Employees have accrued unused PTO. The total amount of accrued unused PTO for the Debtors' hourly and salaried Employees was approximately $1.1 million as of December 1, 2009.

---

Canadian Employee receives payment for a bonus, overtime or commission. Canadian Employees working less than thirty hours a week will be paid PTO as a percentage of all earnings when earned, not when they take time off.

55.     The Debtors offer certain Employees the opportunity to participate in a retirement plan qualified under § 401(k) of the Internal Revenue Code (the "401(k) Plan"). The 401(k) Plan is administered by Great-West Retirement Services. Under the terms of the 401(k) Plan, Employees who are at least twenty-one (21) years old and have been employed by the Debtors for at least three (3) months may elect to contribute a portion of their salary or wages to the 401(k) Plan. The 401(k) Plan allows for automatic, pre-tax salary deductions from a participating Employee's eligible compensation in an aggregate amount equal to the annual limit established under the Internal Revenue Code (*i.e.*, $16,500.00 in 2009, plus, when applicable, a $5,500.00 catch-up contribution amount for employees over age 50).

56.     The Debtors, under certain circumstances, may elect to match or otherwise contribute to the 401(k) Plan for the benefit of the Employee participants in the Plan (in addition to the contributions otherwise made by the Employees). Under the 401(k) Plan, the Debtors' matching contribution is discretionary. The Debtors made matching contributions until April 2009. Employer matching contributions were subject to a 3-year vesting schedule (*i.e.*, thirty-three and one-third percent (33.33%) of accrued benefits vest each year of work performed by an eligible participant).

57.     Approximately 1,749 of the Debtors' current and former Employees participate in the Debtors' 401(k) Plan and, of those Employee participants, approximately 538 Employees contribute to the 401(k) Plan each month. The monthly amount withheld from participating Employees' paychecks is approximately $200,000.00.

58.     Certain Employees have elected to receive or are otherwise entitled to group health (including prescription care), dental care and, with respect to certain of the Debtors' branches, vision care (collectively, the "Health Benefits").

59.     The cost of the Health Benefits is shared by the Debtors and their Employees. Employees generally contribute between (a) 9% and 30% of the cost for Employees, and (b) 33% to 54% of the cost for dependents, related to the Health Benefits (depending on the benefits and coverage elected). The Debtors pay the remaining premium costs. Historically, the Debtors have paid approximately $340,000.00 each month in amounts related to Health Benefits.

60.     Approximately 568 of Debtors' Employees are eligible to participate in the Debtors' medical plans. Approximately 500 (*i.e.*, 88%) have elected to participate. The Debtors fund some portion of the cost. Most of Debtors' medical plans have a co-pay and a "traditional" plan design. Very few of the plans feature high deductibles.

61.     Approximately 568 of the Debtors' Employees are eligible to participate in the Debtors' dental plans. Approximately 499 (*i.e.*, 88%) have elected to participate. The Debtors fund some portion of the cost. Most of the dental plans offer a fairly standard plan design and coverage up to an annual cap of $1,000.00 per eligible Employee.

62.     The Debtors offer eligible Employees basic life and accidental death and dismemberment insurance under two plans offered by a variety of carriers. Under their corporate benefit package, the Debtors offer life insurance through Reliance Standard (U.S.) and Great-West Life (Canada) to eligible Employees at no cost to the Employees. The Debtors offer AD&D insurance through Reliance Standard (U.S.) and RBC Insurance (Canada). Under the policies in effect, all provide for the Debtors to fund some portion of the cost of life insurance plans for eligible Employees. In nearly every case, the life insurance plans offer a dollar amount of coverage up to two times (2x) base pay earnings to a maximum of $600,000.00. Approximately one hundred percent (100%) of the Debtors' eligible Employees participate in one of the Debtors' life insurance plans.

63.     Under their corporate benefit package, the Debtors also provide all full-time salaried Employees with long-term disability ("LTD") insurance from Reliance Standard (U.S.) and RBC Insurance (Canada), at no cost to such Employees. Prior to the Petition Date, each month, the Debtors paid approximately $16,800.00 in premiums to Reliance Standard and $5,900.00 to other carriers for the basic life, accidental death and dismemberment and LTD insurance provided to the Debtors' eligible Employees.

64.     Under their corporate benefits package, the Debtors also maintain a short-term disability ("STD") insurance plan for the benefit of their full-time salaried Employees. Under the terms of that STD insurance plan, Employees are eligible to receive up to sixty percent (60%) of their gross weekly pay up to $1,500.00 for each week that they are disabled up to thirteen (13) weeks. The STD insurance program is administered by Reliance Standard. Prior to the Petition Date, each month, the Debtors paid approximately $2.25 per eligible Employee in administrative fees to Reliance Standard, totaling approximately $1,500.00 each month, for the STD insurance provided to their corporate Employees.

65.     The Debtors provide workers' compensation insurance to their Employees at the statutorily-required level required for each state in which they operate (the "Workers' Compensation Program"). These benefits are provided to the Employees through a variety of carriers. The carriers administer and pay the Debtors' workers compensation claims, subject to the Debtors' deductibles.

66.     The Debtors offer their Employees the opportunity to elect to contribute a portion of their pre-tax compensation to flexible spending accounts to pay for various out-of-pocket (a) health care and/or (b) dependent care costs and expenses not otherwise covered or payable under the Debtors' other benefit plans (the "Flexible Benefit Plan"). Approximately 184

Employees participate in the health care portion of the Flexible Benefit Plan, approximately 57 Employees participate in the dependent care portion of the Flexible Benefit Plan, and approximately 5 Employees participate in the transportation portion of the Flexible Benefit Plan. The Flexible Benefit Plan is administered by J.W. Terrill. The Debtors pay J.W. Terrill an administration fee of $5.50 per participant per month, totaling approximately $1,350.00 each month.

67.     The Flexible Benefit Plan is fully funded through contributions by participating Employees. Employee contributions are deducted from the Employees' regular paychecks.

68.     Employees enrolled in the Debtors' High Deductible Health Benefit Plan are eligible to participate in the Health Savings Account ("HSA") to which the Debtors contribute $250.00 annually. Approximately 19 Employees have an HSA.

69.     Approximately 538 Employees participate in the Debtors' Vision Plan, which is administered through Vision Service Plan. Historically, the Debtors have paid approximately $3,100.00 each month in amounts related to vision benefits.

70.     Prior to the Petition Date and in the ordinary course of their business, the Debtors reimbursed (either directly or via payment of credit cards issued to the Employees in the name of the Debtors) Employees and officers for certain expenses incurred in the scope of their employment. As of the Petition Date, the Debtors estimate that they owe approximately $75,00.00 on account of Employee reimbursable expenses relating to, among other things, business-related travel expenses, business meals, car expenses, mileage reimbursement, and miscellaneous business expenses (collectively, the "Reimbursable Expenses"). All of the Reimbursable Expenses were incurred by the Employees on the Debtors' behalf and with the understanding that they would be reimbursed.

71.     The Debtors deduct from their Employees' paychecks, among other items: (a) payroll taxes and the Employees' portions of FICA and statutory unemployment taxes; (b) Employee contributions for insurance plans and the Flexible Benefit Plan; (c) Employee contributions to the 401(k) Plan; and (d) legally-ordered deductions such as wage garnishments, child support, and tax levies (collectively, the "Employee Deductions"). The Debtors forward the amounts equal to the Employee Deductions from their operating accounts to appropriate third-party recipients. Certain of these funds were deducted from Employee paychecks but, due to the commencement of the Chapter 11 Cases, may not have been forwarded to appropriate third-party recipients.

72.     The Debtors' books and records indicate that in no instance should the amount of prepetition wages, salaries, and contractual compensation owing to an Employee as of the Petition Date exceed the sum of $10,950.00, which amount is allowable as a priority claim under section 507(a)(4) of the Bankruptcy Code.

73.     It is essential to the Debtors that they retain Employees to continue operations pending their proposed reorganization. Many Employees live from paycheck to paycheck and rely exclusively on receiving their full compensation or reimbursement of their expenses in order to continue to pay their daily living expenses. These Employees will be exposed to significant financial problems if the Debtors are not permitted to pay certain of the Employee Obligations and Employee Payments. If the Debtors are not granted the relief requested Wage Motion, Employee morale and loyalty will be jeopardized at a time when Employee support is critical. Such uncertainty will cause significant anxiety at precisely the time the Debtors need their Employees to perform their jobs at peak efficiency.

74.     The Employee Deductions principally represent Employee earnings which Employees or, in the case of garnishments, judicial authorities have designated for deduction from Employee paychecks and payment accordingly. The failure to pay these benefits could result in hardship to certain Employees. The Debtors expect inquiries from garnishors regarding the Debtors' failure to submit, among other things, child support and alimony payments, which are not the Debtors' property, but rather have been withheld from Employee paychecks. If the Debtors cannot remit these amounts, Employees may face legal action due to the Debtors' failure to submit these payments.

75.     The Employees are valuable assets. Deterioration in Employee morale and welfare at this critical time undoubtedly would adversely impact the Debtors, the value of their assets and businesses, their proposed reorganization and, ultimately, the Debtors' ability to maximize value for creditors.

76.     Each of the checks or transfers for which payment is requested in the Wage Motion can be identified as relating directly to payment of the Employee Payments. Accordingly, the Debtors believe that prepetition checks and transfers other than those for Employee Payments will not be honored inadvertently.

**C.     Motion of the Debtors for an Order Authorizing, but not Directing, the Debtors to Enter Into Trade Agreements with Critical Vendors and to Pay Prepetition Obligations in Connection Therewith (the "Critical Vendor Motion")**

77.     The Debtors seek the entry of an Order authorizing the Debtors to enter into trade agreements (the "Trade Agreements") with and to pay prepetition amounts owed to vendors critical to the Debtors' operations (as described below, the "Critical Vendors") because such payments are necessary to prevent the disruption to the Debtors' operations.

78.     The Critical Vendors primarily consist of: (a) surgeons and other Medical Providers with whom the Debtors contract to perform and administer the Debtors' surgical and

other medical procedures, and (b) Providers of medical equipment, supplies, and business services (including independent auditors) critical to the continued operation of patient care facilities of the Debtors and their affiliates.

79.     The Debtors were careful to limit the list of Critical Vendors to those suppliers of goods and services who meet each of the following criteria: (a) an ongoing relationship with the vendor is critical to the success of the Debtors' reorganization efforts and the long-term success of their operations and those of their non-debtor affiliates; (b) the loss of the vendor would create a risk of harm or loss of economic advantage to the Debtors' estates that is disproportionate to the vendor's pre-petition claim; and (c) there is no practical or legal alternative by which the Debtors can cause the vendor to deal with it other than by payment of the pre-petition claim.

80.     The individuals most critical to the Debtors' continued success are the numerous surgeons and medical directors (collectively, the "Medical Providers") that contract directly with the Debtors (as opposed to their non-debtor affiliates) to perform and administer laser correction, refractive and other medical services. The Medical Providers are highly qualified and sought after individuals who might be able to transfer their practice away from the Debtors. Generally, the Medical Providers are independent contractors of the Debtors. As of the Petition Date, the Debtors owed approximately $70,000.00 to Medical Providers.

81.     The Debtors provide medical supplies and equipment and management, operational and other business services for themselves and their non-debtor affiliates (the "Affiliated Businesses") that provide services directly to patients. This business model allows the Affiliated Businesses, and the medical and other personnel who work there, to focus on delivering quality patient care while secure in the knowledge that the operations and

management of their practice is sound and that they will have the necessary medical equipment and supplies necessary to provide top quality patient care.

82.    The Debtors rely on third party providers (the "Providers")[9] to provide the majority of the medical equipment, supplies and business services ultimately provided to themselves and the Affiliated Businesses. While many suppliers have contracts directly with Affiliated Businesses, Providers to the Debtors will typically have a contract with one of the Debtors to supply most or all of the Affiliated Businesses with a particular good or service. By arranging for goods and services to be provided by these parties on behalf of all of the Affiliated Businesses, the Debtors are able to tightly manage quality control and take advantage of economies of scale to secure goods and services at costs much lower than any Affiliated Business would be able to secure on its own. Additionally, in some cases where a surgeon seeks to maintain a certain quality of service and superior end-customer experience, such surgeon often prefers or mandates that certain providers of goods or services be used at his or her respective Affiliated Businesses, making it difficult for the Debtors to change Providers without surgeon consent.

83.    By far the most significant Critical Vendor is Abbott Medical Optics Inc. ("AMO"), which provides all of the lasers to the Debtors and their affiliates under lease arrangements with the Debtors, plus most of the related software and individual cards used in the laser equipment to program them for each individual refractive procedure. As of the Petition Date, the Debtors owed AMO in excess of $7 million. AMO's good and services are at the core of the Debtors' operations and those of the Affiliated Business. Without AMO's continued support, the Debtors' reorganization efforts would be severely prejudiced.

---

[9] A non-exhaustive list of Providers is attached to the Critical Vendor Motion as **Exhibit B**.

84.     As of the Petition Date, the Debtors estimate that they owe approximately $8.7 million to Providers.

85.     Authority to pay Critical Vendors in the aggregate up to the amount of the Critical Vendor Cap would allow them continued access to the goods and services that are absolutely necessary to the Debtors' and their affiliates post-petition operations and otherwise may be withheld from the Debtors and their affiliates.

86.     The Debtors have carefully examined proposed payments to Critical Vendors and request authority to make only those payments essential to their continued operations. In determining the amount of Critical Vendor Claims for which they seek this Court's authority to pay pursuant to this Motion, the Debtors consulted with their management and department heads to identify those vendors that are most essential to the Debtors' operations, using criteria developed by the Debtors. These criteria included: (a) whether the vendor in question was a "sole-source" vendor; (b) whether preferences or requirements of the Debtors' patients or other stakeholders would prevent the Debtors from looking to alternative sources for a vendor's products or services; (c) whether the Debtors receive advantageous pricing or other terms from a vendor such that replacing such vendor post-petition would result in significantly higher costs to the Debtors; (d) whether the loss of the vendor would create a risk of harm or loss of economic advantage to the Debtors' estates that is disproportionate to the vendor's pre-petition claim; and (e) whether the Debtor have any practical or legal alternative by which they can cause the vendor to deal with it other than by payment of the pre-petition claim.

87.     After evaluating the information received in response to these inquiries, the Debtors estimated the payment amount necessary to ensure the continued supply of goods and services from each Critical Vendor, taking into account: (a) whether failure to pay a Critical

Vendor's claims would result in the Critical Vendor terminating its provision of goods and/or services to the Debtors, and (b) what percentage of the Critical Vendor's claims would need to be paid to induce it to continue providing goods and/or services to the Debtors. The Critical Vendor Cap represents the aggregate of these estimated amounts.

88.     Payment to Critical Vendors is key to a successful reorganization of the Debtors. If the Critical Vendor Motion is not granted, it is likely that Critical Vendors will stop providing essential goods and services to the Debtors on Customary Trade Terms, effectively reducing the amount of credit available to the Debtors. Moreover, certain of the Critical Vendors could stop doing business with the Debtors altogether, leaving the Debtors unable to obtain the essential goods and services for their business and patient needs, forcing the Debtors to incur higher costs to obtain replacement goods and services (if such goods and services are even available) and, in any event, causing such substantial delays in the Debtors' operations that the Debtors may never fully recover from the harm resulting from such a delay. Such actions would be extremely damaging to the Debtors, their estates and their creditors.

89.     In particular, continued availability of trade credit in amounts and on terms consistent with those the Debtors enjoyed prepetition is vital to the Debtors' businesses because it allows the Debtors to maintain liquidity for operations and to abide by the budget governing their use of cash collateral and debtor-in-possession financing. Preserving working capital through the retention or reinstatement of traditional trade credit terms will enable the Debtors to maintain their competitiveness and to maximize the value of their businesses. Conversely, a deterioration of trade credit and a disruption or cancellation of deliveries of goods or provision of services – many of which may not readily be replaceable – would cripple the Debtors' business operations, increase the amount of funding needed by the Debtors post-petition (which funding

may not be available), and ultimately impede the Debtors' ability to service their patients, thereby placing the successful reorganization of their businesses at risk.

90.     The relief requested in the Critical Vendor Motion is essential to preserving good relationships with those vendors that are essential to the continued operations of the Debtors' business. The Debtors, their creditors, and their estates would suffer immediate harm if the Debtors were unable to secure the continued cooperation of their Critical Vendors.

91.     Maintaining favorable trade terms and credit is critical to the Debtors' reorganization and in the best interests of all the Debtors' creditors. The payment of the prepetition Critical Vendor Claims is essential to assure such terms and credit.

92.     Each of the Checks and Electronic Transfers that the Debtors seek to honor under the Critical Vendor Motion can be readily identified as relating directly to the authorized payment of amounts owed on account of the Critical Vendor Claims.

**D.     Motion of the Debtors for an Order Authorizing Maintenance of Existing Bank Accounts, Continued Use of Existing Business Forms, Continued Use of Existing Cash Management System, and Granting Other Relief (the "Cash Management Motion")**

93.     Prior to the Petition Date, the Debtors, in the ordinary course of their business, maintained several Bank Accounts.

94.     Closing the Bank Accounts would cause undue disruption to the Debtors' continued operations and would impair their efforts to maximize value through this chapter 11 process. Dismantling the Debtors' cash management system would likely disrupt the Debtors' relationships with their key stakeholders and may hinder their ability to maintain operations pending their reorganization.

95.     Maintenance of the Bank Accounts would greatly facilitate the Debtors' transition to post-petition operations and preserve the value of the Debtors. Closing the Bank Accounts

and transferring the funds in those accounts to newly created post-petition accounts would be disruptive and time consuming. Moreover, requiring the Debtors to close or alter the Bank Accounts would greatly complicate and disrupt the cash management system currently in place, likely to the detriment of the Debtors' estates and creditors.

96. Because of the nature of the Debtors' businesses, the status of TLC Vision Corporation as a public company, and the notice of consummation of cases that will be sent to all of the Debtors' stakeholders and creditors, parties doing business with the Debtors likely will be made aware of the Debtors' status as chapter 11 debtors in possession. Changing correspondence and business forms would be unnecessary and burdensome to the estates, as well as expensive and disruptive to the Debtors' business operations.

97. The Debtors' primary transactional bank in the U.S. is Harris Bank ("Harris") and in Canada is Bank of Montreal ("BMO"). In U.S. locations where the Debtors or their non-debtor affiliates have operating centers with other banks nearby, and in locations which have adopted a remote deposit capture process, the Debtors and their non-debtor subsidiaries use Fifth Third Bank, Bank of America, Chase Bank, First Interstate Bank, Huntington Bank, Key Bank, Nextier Bank, Park Bank, Peoples Community Bank, Regions Bank, and Wachovia Bank (collectively, with Harris and BMO, the "Banks").

98. The Debtors maintain current and accurate accounting records of daily cash transactions and submit that maintenance of this cash management system will prevent undue disruption to their businesses and operations, while protecting their cash for the benefit of their estates.

99. A large proportion of the cash management for the Debtors and their non-debtor operating affiliates and subsidiaries is run through a single primary account held by the Debtor

TLC Management Services, Inc. ("MSI") at Harris Bank. MSI is responsible for collecting and receiving substantially all of the revenue of TLC's refractive division, which includes both Debtor and non-debtor receipts. MSI also employs substantially all of the non-executive employees of TLC's U.S. operations. In addition to concentrating their receipts, MSI is responsible for paying a large proportion of U.S. accounts payable and debt service of the Debtors and their non-debtor affiliates.

100. The Debtors' senior lenders, who have valid security interests in all cash proceeds of the operations of the Debtors and most of their non-debtor affiliates, consent to and support the relief requested in the Cash Management Motion.

101. The principal components of the Debtors' cash management system and the flow of funds among the various Bank Accounts are as follows:

**Harris Accounts**

- ***Main Harris U.S. Concentration Account -- TLC Management Services Inc. (US$ Acct. no. ending 0042).*** The Debtors utilize a centralized Harris Bank cash management system in the U.S., which provides for weekly concentration of excess cash balances in each of the Debtors' depository accounts, as well as weekly cash concentration from approximately 38 non-debtor depository accounts, into the Debtors' main concentration account. Debtor and non-debtor receipts from a patient-financing vendor also are received daily into this account. In addition, this account is the recipient of daily receipts from a non-debtor lockbox (also initiated through the Harris system), as well as receipts from entities that are wholly or partially owned by the Debtors, consisting of, among other things, distributions, reimbursements, and intercompany loan payments. Outbound wire transfers and other electronic payments made on behalf of the Debtors and non-debtors are paid from this account including credit facility interest and principal payments, sales and use tax payments, and payments to the Debtors' employee expense reimbursement third party administrator. Funds for U.S. payroll and payroll taxes and fees are debited from the account by the Debtors' third party payroll administrator, which further processes the employee payroll from its own accounts. At times, funds are transferred to accounts of non-debtors to fund obligations, such as transfers to a non-debtor account from which the Debtors' third party administrator debits payment for Debtor employee healthcare claims. Funds are also transferred automatically to the Debtors' Harris controlled disbursement accounts ending in 3074 and 2746 daily as items clear,

and on an as-needed basis to the Debtors' Canadian US$ disbursement account at BMO ending in 1063. The balance in excess of $100,000 in this account is automatically swept daily to an overnight investment to earn interest income, then swept back the following morning.

- *Harris Bank -- TLC Management Services Inc. -- A/P Controlled Disbursement Account (US$ Acct. no. ending 3074)*. All U.S. disbursements via checks for U.S. accounts payable vendors are made by MSI from this controlled disbursement account, and include some payments made on behalf of related entities that are non-debtors. Daily funding comes automatically from the Harris concentration account for items clearing the account. All disbursements are generated and controlled by the corporate accounting staff at the U.S. corporate headquarters.

- *Harris Bank -- TLC Management Services Inc. -- Doctors Payable Controlled Disbursement Account (US$ Acct. no. ending 2746)*. All U.S. disbursements via checks for U.S. doctors for payments owed by Debtors and non-debtor affiliates are made by MSI from this controlled disbursement account, and include some payments made on behalf of related entities that are non-debtors. Daily funding comes automatically from the Harris concentration account for items clearing the account. All disbursements are generated and controlled by the corporate accounting staff at the U.S. corporate headquarters.

- *Harris Bank -- TLC Management Services Inc. -- Capital One Patient Financing Receipts Account (US$ Acct. no. ending 0997)*. Debtor and non-debtor receipts from a former patient-financing vendor had been received daily into this account and automatically swept daily into the Harris concentration account; however, since both Debtors and non-debtors recently transitioned to a new patient financing vendor, this account is currently not active. Receipts from the new vendor are to be redirected from the Harris concentration account to this account to facilitate reconciliation of the funds.

## BMO Accounts

- *BMO -- TLC Vision Corporation -- Canadian Center Depository Account (C$ Acct. no. ending 5549)*. Deposits from the Debtors' centers located in Canada are made to this account, and the funds are periodically moved to the Debtor accounts ending in 7557 and 2374 (discussed below) to fund disbursements made from those accounts.

- *BMO -- TLC Vision Corporation -- Canadian Center Depository and Corporate A/P Disbursement Account (C$ Acct. no. ending 7557)*. All Canadian dollar disbursements via checks and electronic payments for Canadian accounts payable vendors are made by the Debtors from this disbursement account, and include some payments made on behalf of related entities that are non-debtors. Funds for Canadian payroll and payroll taxes and fees are wired from the account to the Debtors' third party payroll administrator, which further processes the employee

payroll from its own accounts. Funding for these disbursements comes from the BMO account ending in 5549. All disbursements are generated and controlled by the corporate accounting staff at the U.S. corporate headquarters.

- ***BMO -- TLC Management Services Inc. -- Canadian Doctors Payable Disbursement Account (C$ Acct. no. ending 2374).*** All Canadian dollar disbursements via checks for Canadian doctors are made by the Debtors from this controlled disbursement account, and include some payments made on behalf of related entities that are non-debtors. Funding for these disbursements comes from the BMO account ending in 5549. All disbursements are generated and controlled by the corporate accounting staff at the U.S. corporate headquarters.

- ***BMO -- TLC Vision Corporation -- US$ Disbursement Account for Canadian Vendors (US$ Acct. no. ending 1063).*** All U.S. dollar disbursements via checks for Canadian accounts payable vendors are made by the Debtors from this disbursement account, and include some payments made on behalf of related entities that are non-debtors. Funding for these disbursements comes from the Harris concentration account ending in 0042. All disbursements are generated and controlled by the corporate accounting staff at the U.S. corporate headquarters.

## Fifth Third Bank Accounts

- ***Fifth Third Bank Consolidation Account -- TLC Vision (USA) Corporation (US$ Acct. no. ending 2005).*** The Debtors utilize depository accounts with remote deposit capture services with Fifth Third Bank for several center locations, each of which has its own account. The Fifth Third center depository accounts are all zero-balance accounts ("ZBAs"), providing for an end-of-day transfer of all cash balances into the Debtors' consolidation account at Fifth Third. Funds are concentrated weekly from the Fifth Third Bank consolidation account into MSI's Harris Bank concentration account.

- ***Fifth Third Bank --TLC Vision (USA) Corporation Depository Account (US$ Acct. no. ending 3656).*** This Little Rock, AR center account is used for depository purposes and is a ZBA, providing for an end-of-day transfer of all cash balances into the Debtors' consolidation account at Fifth Third.

- ***Fifth Third Bank -- TLC Vision (USA) Corporation Depository Account (US$ Acct. no. ending 4951).*** This Columbia, SC center account is used for depository purposes and is a ZBA, providing for an end-of-day transfer of all cash balances into the Debtors' consolidation account at Fifth Third.

- ***Fifth Third Bank -- TLC Vision (USA) Corporation Depository Account (US$ Acct. no. ending 5231).*** This Greater Seattle, WA center account is used for depository purposes and is a ZBA, providing for an end-of-day transfer of all cash balances into the Debtors' consolidation account at Fifth Third.

- ***Fifth Third Bank -- TLC Vision (USA) Corporation Depository Account (US$ Acct. no. ending 0926)***. This Arlington Heights, IL center account is used for depository purposes and is a ZBA, providing for an end-of-day transfer of all cash balances into the Debtors' consolidation account at Fifth Third.

- ***Fifth Third Bank -- TLC Vision (USA) Corporation Depository Account (US$ Acct. no. ending 0934)***. This Portland, OR center account is used for depository purposes and is a ZBA, providing for an end-of-day transfer of all cash balances into the Debtors' consolidation account at Fifth Third.

- ***Fifth Third Bank -- TLC Vision (USA) Corporation Depository Account (US$ Acct. no. ending 1486)***. This Kennesaw, GA center account is used for depository purposes and is a ZBA, providing for an end-of-day transfer of all cash balances into the Debtors' consolidation account at Fifth Third.

## Bank of America Account

- ***Bank of America -- TLC Management Services Inc. Account (US$ Acct. no. ending 7292)***. This Massachusetts center account is used for depository purposes, and funds are concentrated weekly from this account into the Harris Bank concentration account.

## Chase Bank Account

- ***Chase Bank -- TLC Management Services Inc. Account (US$ Acct. no. ending 7049)***. This Tulsa, OK center account is used for depository purposes, and funds are concentrated weekly from this account into the Harris Bank concentration account.

## First Interstate Bank Account

- ***First Interstate Bank -- TLC Management Services Inc. Account (US$ Acct. no. ending 1605)***. This Big Sky/Billings, MT center account is used for depository purposes, and funds are concentrated weekly from this account into the Harris Bank concentration account.

## Huntington Bank Account

- ***Huntington Bank -- TLC Management Services Inc. Account (US$ Acct. no. ending 7440)***. This Columbus, OH center account is used for depository purposes, and funds are concentrated weekly from this account into the Harris Bank concentration account.

## Key Bank Account

- ***Key Bank -- TLC Management Services Inc. Account (US$ Acct. no. ending 2581)***. This Cleveland, OH center account is used for depository purposes, and

funds are concentrated weekly from this account into the Harris Bank concentration account.

## NexTier Bank Account

- ***NexTier Bank -- TLC Management Services Inc. Account (US$ Acct. no. ending 0834)***. This Pittsburgh, PA center account is used for depository purposes, and funds are concentrated weekly from this account into the Harris Bank concentration account.

## Park Bank Account

- ***Park Bank -- TLC Management Services Inc. Account (US$ Acct. no. ending 1926)***. This Madison, WI center account is used for depository purposes, and funds are concentrated weekly from this account into the Harris Bank concentration account.

## Peoples Community Bank Account

- ***Peoples Community Bank -- TLC Management Services Inc. Account (US$ Acct. no. ending 6906)***. This Tri-Cities, TN center account is used for depository purposes, and funds are concentrated weekly from this account into the Harris Bank concentration account.

## Regions Bank Account

- ***Regions Bank -- TLC Management Services Inc. Account (US$ Acct. no. ending 5904)***. This Indiana center account is used for depository purposes, and funds are concentrated weekly from this account into the Harris Bank concentration account.

## Wachovia Bank Account

- ***Wachovia Bank -- TLC Management Services Inc. Account (US$ Acct. no. ending 7764)***. This Piedmont, SC center account is used for depository purposes, and funds are concentrated weekly from this account into the Harris Bank concentration account.

102. Given the dispersion of the Debtors' operations, the continued operation and the preservation and enhancement of their going concern value, which inherently includes the value of their non-debtor affiliates, will be inhibited if there is substantial disruption in the Debtors'

cash management system. It is essential, therefore, that the Debtors be permitted to continue to consolidate the management of their cash and the cash of their non-debtor affiliates as needed and in the amounts necessary to continue the operation of their businesses.

103. The basic structure of the Debtors' cash management system constitutes the Debtors' ordinary, usual and essential business practice. The cash management system is similar to those commonly employed by enterprises comparable in size and complexity to the Debtors. The widespread use of such systems is attributable to the numerous benefits they provide, including the ability: (a) to tightly control corporate funds; (b) to ensure cash availability; and (c) to reduce administrative expenses by facilitating the movement and concentration of funds and the development of timely and accurate account balance and presentment information.

104. In addition, given the corporate and financial structure of the Debtors, it would be difficult, if not impossible, for them to establish an entirely new system of accounts and a new cash management system, as of the Petition Date. For example, if the Debtors were required to open separate accounts as debtors in possession and rearrange their cash management system, there would be delays in the Debtors' ability to accept payments from their patients. Thus, under the circumstances, maintenance of the Debtors' cash management system is not only desirable, it is also in the best interests of the Debtors' estates and creditors. Furthermore, preserving the usual business atmosphere (to the greatest extent possible) for employees within the Debtors' operating centers and avoiding the distractions that would inevitably be attendant with any disruption in the cash management system will facilitate the Debtors' reorganization.

105. If the Debtors are not permitted to continue to use their cash management system as described herein, their operations likely will not only be impaired, but critical funds may not

be collected timely and valuable resources will be expended unnecessarily in implementing a new cash management system.

106.     It is critical to the continued operation of the Debtors' businesses and to the preservation of the value of those businesses that the Debtors continue to utilize their existing cash management system without disruption.

**E.     Motion of the Debtors Pursuant to Section 366 of the Bankruptcy Code for Entry of Interim and Final Orders: (I) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Services to, or Discriminating Against, the Debtors on Account of Prepetition Amounts Due; (II) Determining that Utility Companies Are Adequately Assured of Future Payment; (III) Authorizing the Debtors to Establish the Utility Deposit Account and Pay the Adequate Assurance Deposit; (IV) Establishing Procedures to Object to the Motion; and (V) Granting Certain Related Relief (the "Utilities Motion")**

107.     The Debtors currently use electric, cable, internet, telephone and other similar services provided by the Utility Companies. The Utility Companies provide traditional utility services related to the day-to-day operation of the Debtors' various offices and branches. The Debtors estimate that their aggregate average monthly obligations to the Utility Companies on account of services rendered is approximately $37,000.00. The Debtors believe that they are generally current on all prepetition obligations due to the Utility Companies, other than (a) accrued, but unbilled, costs and (b) billed, but not yet due, prepetition obligations for utility services.

108.     Uninterrupted service from the Utility Companies is essential to the Debtors' continued operation and successful restructuring. The Debtors could not maintain their facilities in the absence of continuous service. It is therefore critical that the Utility Companies continue to provide uninterrupted services to the Debtors.

109.     The Debtors intend to pay timely their post-petition obligations to the Utility Companies. The Debtors will make these payments with cash on hand, cash generated during

the Chapter 11 Cases and pursuant to orders of this Court authorizing use of cash collateral and/or debtor-in-possession financing.

110. The Debtors have a powerful incentive to stay current on their utility obligations because of their reliance on utility services for the operation of their business.

111. Discontinuation of utility service could essentially shut down the Debtors' operations, and any significant disruption of operations is likely to jeopardize the Debtors' reorganization efforts.

**F. Motion of the Debtors for an Order (A) Authorizing, but not Directing, Debtors to Pay Prepetition Taxes and Fees and (B) Directing Financial Institutions to Honor and Process Checks Related to Prepetition Taxes and Regulatory Fees (the "Tax Motion")**

112. In the ordinary course of their business, the Debtors are continuously required to collect and pay Taxes and Fees with respect to sales of goods and services performed for patients, as well as their general business activities. The Debtors must remit these Taxes and Fees to the various governmental entities of the jurisdictions in which the Debtors conduct business.

113. As of the Petition Date, the Debtors estimate a prepetition outstanding balance of approximately $101,259.00 related to Taxes, Regulatory Fees and Licensing Fees. Prior to the Petition Date, the Debtors paid, on an estimated basis, some but not all of the prepetition accrued and unpaid amounts outstanding on account of the Taxes and Fees. The Debtors' failure to pay the prepetition Taxes, Regulatory Fees and Licensing Fees could have a material adverse impact on their ability to operate in the ordinary course of business.

114. Prior to the Petition Date, certain Taxing Authorities were sent Checks or Electronic Transfers in respect of such obligations that may not have cleared the Debtors' banks or other financial institutions (together, the "Banks") as of the Petition Date.

115.     The Debtors have significant personal property located throughout the United States and in parts of Canada that are subject to state and local property taxes (collectively, the "Property Taxes"). Property Taxes are normally determined on an annual basis. Depending on the jurisdiction in which the property is located, the Debtors pay and remit Property Taxes in arrears on a monthly, quarterly, semi-annual or annual basis. Generally, significant lag time exists between the date on which the Property Taxes accrue and the date on which the Debtors' obligation to pay the Property Taxes arises. The Debtors believe that as of the Petition Date, approximately $24,481.00 of Property Taxes are accrued and unpaid. State and local laws in the jurisdictions in which the Debtors operate generally grant Taxing Authorities the power to levy property taxes against the Debtors' property subject to taxation. If the Debtors fail to pay these taxes, it is possible that statutory liens may be imposed on this property.

116.     The Debtors pay certain franchise, income and gross receipts taxes to Taxing Authorities as a condition to being able to operate their businesses in the applicable taxing jurisdiction. Some jurisdictions assess a flat franchise tax on all businesses, while other jurisdictions asses a tax based on income, gross receipts, net worth or some other measure of value. In some jurisdictions, the Debtors are liable for a combination of these taxes. Certain states, in addition, impose personal liability on directors and officers of a corporation for a corporation's failure to pay these taxes. The Debtors' failure to pay these taxes could constitute grounds for a given governmental authority to challenge the Debtors' right to operate within their jurisdiction. The Debtors estimate that they owe approximately $26,593.00 in franchise, income and gross receipts taxes as of the Petition Date.

117.     Many local governments require the Debtors to obtain business licenses and pay corresponding Licensing Fees, and/or (b) pay an annual tax based on gross receipts or other

bases determined by the taxing jurisdiction. If the Debtors do not pay such Taxes or Fees, the respective Authorities may take actions that could have wide-ranging and adverse effect on the Debtors' operations including: (a) initiating audits of the Debtors, which would divert unnecessarily their attention away from the reorganization process; (b) suspending the Debtors' operations; (c) filing liens or seeking to lift the automatic stay; or (d) pursue other remedies that would harm the estates. Moreover, officers and directors may be subject to personal liability for some or all of these taxes and fees, which would distract those key individuals from their duties related to the Debtors' restructuring.

118. The Debtors estimate that the total amount of prepetition Licensing Fees and annual report Taxes and Fees owing to the various Authorities does not exceed approximately $50,000.00. The Debtors believe that payment of such Taxes and Fees is appropriate in the Chapter 11 Cases.

119. The Debtors represent that each of the Checks or Electronic Transfers can be readily identified as relating directly to the authorized payment of prepetition Taxes and Fees. Accordingly, the Debtors believe that Checks and Electronic Transfers other than those relating to authorized payments will not be inadvertently honored.

120. Any delay in paying the obligations relating to the Taxes and Fees could be detrimental to the Debtors, their creditors and their estates. Indeed, the Debtors' ability to manage and run their business operations with as little disruption as possible requires, in part, that they remain in good standing with the relevant Taxing Authorities.

**G.    Debtors' Motion for an Order Pursuant to Sections 105(a), 363, and 364 of the Bankruptcy Code for (I) Authority to Honor Prepetition Insurance Premium Financing Agreements and Renew Such Agreements in the Ordinary Course of Business and (II) Related Relief (the "Insurance Premium Financing Motion")**

121.    In addition, the Debtors request that the Court authorize the Debtors' banks and financial institutions to honor and process checks and transfers related to funding their obligations under the Policies (the "Premium Financing Obligations"). Finally, the Debtors seek authority to use cash collateral to make payments due under the Agreement.

122.    In the ordinary course of the Debtors' business, the Debtors maintain numerous insurance policies providing coverage for, among other things, general liability (property and casualty), workers' compensation and employer's liability, commercial property, fiduciary/ pension trust liability, umbrella liability and automotive liability (collectively, the "Insurance Policies"). The Insurance Policies are essential to the preservation of the Debtors' business, property and assets and, in many cases, required by various regulations, laws and contracts that govern the Debtors' commercial activity.

123.    The total annual premiums for the Insurance Policies amount to $1,367,166.00. It is not always economically advantageous for the Debtors to pay the premiums on the Insurance Policies on a lump-sum basis. Accordingly, in the ordinary course of the Debtors' business, the Debtors finance the premiums on their Insurance Policies pursuant to two Agreements with First Insurance Funding Corp. ("First Insurance") both dated as of May 29, 2009. In exchange for the financing, the Debtors agreed to pay monthly installments in accordance with a payment schedule and grant First Insurance a security interest in return premiums, dividend payments and certain loss payments.

124. Prior to the Petition Date, the Debtors made two cash down payment totaling $341,791.50, and financed the remaining $1,025,374.50 of premiums pursuant to the Agreements. The Agreements require monthly installments that total $115,933.57 each month.

125. If the Debtors are not able to meet the Premium Financing Obligations, First Insurance may seek relief from the automatic stay to terminate the Insurance Policies and recover unearned premiums to recoup its losses. The Debtors would then be required to obtain replacement insurance on an expedited basis and at tremendous cost to the Debtors' estates. If the Debtors were required to obtain replacement insurance and pay a lump-sum premium for the insurance policy in advance, this payment would likely be greater than what the Debtors currently pay. Even if First Insurance were not permitted to terminate the Insurance Policies, any interruption of payment would have a severe, adverse effect on the Debtors' ability to finance premiums for future policies.

126. In view of the importance of maintaining insurance coverage with respect to their business activities and preserving the Debtors' cash flow by financing the insurance premiums, the Debtors believe it is in the best interests of their estates to satisfy their Premium Financing Obligations under the Agreement. Any alternative would likely require considerable additional cash expenditures and be detrimental to the Debtors' reorganization efforts.

127. The Debtors will need to continue their insurance coverage throughout the entire the Chapter 11 Cases and respectfully submit that (a) renewal of the Agreements fall squarely within their ordinary course of business, and (b) but for the constraints of section 364 of the Bankruptcy Code, the Debtors would not need the Court's prior approval to renew the Agreements.

128.    In light of the importance of maintaining insurance coverage and preserving the Debtors' liquidity by financing related premiums, the Debtors believe it is in the best interests of their estates to honor the Premium Financing Obligations and renew the Agreements, as necessary.

**H.    Motion of the Debtors for an Order Pursuant to Sections 105(a) and 365(a) of the Bankruptcy Code Authorizing Debtors to Reject Unexpired Nonresidential Real Property Lease (the "Canadian Lease Rejection Motion")**

129.    Prior to the Petition Date, TLCV used the Leased Premises primarily for general office purposes, including an ambulatory surgical center, an eye clinic and a call center. As part of the Debtors' ordinary business operations prior to the Vacate Date, the Debtors had commenced the process of relocating their call center operations to a smaller, temporary alternative workspace pursuant to a prepetition managed services agreement by and between IT Weapons, Inc. ("ITW") and TLCV. This temporary alternate workspace is intended to provide a temporary space for call center operations while the Debtors prepare to relocate to a new permanent, and less expensive, call center location. The Debtors intend to cease operations at the Leased Premises prior to the Vacate Date. Accordingly, the Leased Premises will no longer serve any benefit to the Debtors as of the Vacate Date.

130.    In order to reduce post-petition administrative costs and in the exercises of the Debtors' sound business judgment, the Debtors have determined that rejecting the Lease as of the Vacate Date is in the best interests of the Debtors' estates, creditors, and other parties in interest.

131.    Furthermore, the Lease may obligate the Debtors to pay for real estate taxes, insurance, utilities, property damage charges and other additional obligations under the Lease for which the Debtor will no longer receive any benefit.

132.    The Debtors have examined the costs associated with the rental obligations and other additional obligations under the Lease and have determined in their business judgment that such costs are substantial and constitute an unnecessary drain on the Debtors resources.

133.    By rejecting the Lease as of the Vacate Date, the Debtors avoid the unnecessary administrative charges for rent and additional charges of the premises that provide no tangible benefit to the Debtors' estates and will play no part in the Debtors' future operations.

134.    Therefore, the Debtors believe that the rejection of the Lease is in the best interest of their estates, creditors and other parties in interest.

135.    Maximization of the value of the Debtors' estates depends in large measure on their ability to relieve themselves from unnecessary and burdensome contracts and to keep their post-petition costs of administration to a minimum. For these reasons, TLCV has determined, in the exercise of sound business judgment, that rejecting the Lease as of the Vacate Date is in the best interests of TLCV's creditors and estate. TLCV has determined that the Lease is unnecessarily expensive for its current purpose (*i.e.* the operation of a call center). The Debtors will ultimately relocate to less expensive permanent space for the call center, and in the meantime have found much more affordable temporary space through ITW. TLCV's estate will receive no benefit from the Lease after the Vacate Date. Moreover, the cost of remaining at the Leased Premises is not sufficiently offset by any rental payments from any related subleases. Thus, it would be in the best interests of TLCV's estate to avoid incurring additional unsecured or administrative claims relating to the Lease. There is no reason for TLCV to maintain any interest in the Leased Premises. Rejection of the Lease, and the attendant reduction in the estates' administrative costs, thus reflects TLCV's exercise of sound business judgment.

**I.** **Debtors' Motion for Entry of Order (A) Authorizing the Sale of the Debtors' Canadian Operations Free and Clear of All Liens, Claims Encumbrances and Other Interests and (B) Granting Certain Related Relief (the "<u>Canadian Sale Motion</u>")**

136.    TLC Vision holds 75% of the outstanding equity securities of TLC The Laser Centre (Moncton) Inc. ("<u>Moncton</u>"), which is organized under the laws of Canada. Moncton is not a debtor in the Chapter 11 Cases. Together, TLC Vision and Moncton own all of the assets necessary to operate all of the refractive laser eye surgery centers that are affiliated with the Debtors and located in Canada (collectively, the "<u>Canadian Operations</u>"), including facilities in Moncton, New Brunswick and Halifax, Nova Scotia.

137.    The Purchaser and its affiliates currently operate a number of laser vision correction clinics across Canada. The Seller received an expression of interest from the Purchaser in May 2009. Over the course of the next several months the Purchaser conducted due diligence on the Canadian Operations. The parties negotiated a letter of intent which was signed on November 12, 2009. During the course of negotiations with the Purchaser, the Seller received interest from two other potential purchasers of the business, both of whom were operators of laser vision correction clinics in Ontario, but on a smaller scale than the Purchaser. The Seller allowed those interested parties to conduct due diligence on the Canadian operations. One of those parties submitted a proposal that would have resulted in a much lower purchase price than that offered by the Purchaser and would have been subject to a financing contingency. After further negotiations with that party, the party refused to increase its offer. The other declined to make an offer for the Canadian Operations. The Seller has received no other indication of interest for the sale of its Canadian Operations.

138.    The sale of the Canadian Operations is a critical component of the Debtors' restructuring strategy. The Debtors intend to cease eye care operations in Canada and wind down the Seller as part of its restructuring. Central to this strategy is the divestiture of the

Seller's remaining Canadian surgical centers and their equity interests in Moncton. As a result of the sale, the Debtors, among other things, will be able to consolidate their supply base for and streamline their U.S. operations, thus realizing significant operational efficiencies for their remaining businesses. This sale will also allow the Debtors to monetize the Canadian Operations at a very advantageous purchase price and provide the Debtors with significant liquidity to be used to reduce their outstanding debt. The Purchaser will also be assuming significant contracts and liabilities associated with the Canadian Operations, minimizing any remaining claims against TLC Vision Corporation in its Chapter 11 Case.

139. The Debtors decided to sell the Canadian Operations, including their equity interests in Moncton, after thorough consideration of the terms of the Purchase Agreement and all other viable alternatives. The Debtors will be able to reduce their overall cost structure and increase their operational efficiency by closing the Canadian Operations (which generate a net loss). The Debtors will strengthen their U.S. operations by consolidating their remaining Canadian assets into their U.S. operations, which will enable the Debtors to maintain and enhance critical patient, doctor and supplier relationships. Finally, the Debtors will obtain the benefit of significant cash generated by the sale, which cash will significantly reduce the Debtors' debt load.

140. The Debtors have worked with their advisors to determine an appropriate price range for the Canadian Operations and believe that the Purchase Price is fair and reasonable. The Debtors' management and financial advisors will be able to provide evidence of the appropriateness of the Purchase Price at any hearing on the Sale Motion.

141. The assumption and assignment of the Purchased Contracts to the Purchaser is in the best interests of the Debtors' estates and a proper exercise of the Debtors' business judgment.

In addition to maximizing the consideration received in exchange for the Sale, it also allows the Debtors to avoid rejection damages that otherwise would accrue if those contracts or leases were to be rejected.

142.    There is no fraud or collusion between the Purchaser and the Debtors.   the Purchaser conducted extensive due diligence.  The Debtors and the Purchaser were represented by separate counsel, engaged in extensive arms' length negotiations, and negotiated a letter of intent prior to negotiating and executing and the definitive Purchase Agreement for which approval is sought in the Canadian Sale Motion.  The business terms of the proposed transaction are fair and equitable to both Purchaser and Seller.

143.    The Debtors propose to sell the Purchased Assets to the Purchaser by way of a private sale to avoid the cost and delay associated with conducting a public auction and because the Debtors believe a higher and better bid will not be obtained by an auction.  Based on this factor alone, any consideration received from a purchaser other than the Purchaser likely would be significantly lower than the current Purchase Price.  The Debtors believe it would be a waste of estate resources to conduct an auction process knowing that no other purchaser would be able to match the value of the proposed transaction.  Moreover, the Purchase Agreement provides that the Purchaser has the option to terminate the Purchase Agreement in the event that the Debtors proceed with an auction of the Purchased Assets, and so in the event that an auction is ordered the Debtors would risk losing this transaction.

144.    The alternative to the proposed private sale is to market publicly the Canadian Operations and to conduct an auction sale process, which would subject the Debtors' estates to significant market risk.  The Purchase Price reflects not only the certainty of private sale, but synergistic benefits from the sale that the Purchaser, and no other bidder, will enjoy.  Moreover,

the Debtors sought competing offers for the Canadian Operations prior to the commencement of these cases. The only other interested party made a non-binding proposal for far less consideration that would have required significantly more time to close. Accordingly, there is a very low probability that a public sale process would yield an offer that would approach the Purchase Agreement. The amount and certainty of the Purchase Price clearly outweigh any potential value that such a public process would offer.

145. The Debtors believe that further delays in completing the sale will result in continued loss of cash, further deterioration of the Debtors' financial performance and permanent erosion of the Debtors' aggregate intrinsic value. Moreover, patients and employees of the Canadian Operations would face uncertainty regarding the future of the Canadian Operations, which could lead to employee attrition and a negative market response that would jeopardize the Purchase Agreement and permanently erode the value of the Canadian Operations. Under these circumstances, the Purchaser might seek a reduction in the Purchase Price, if it were still interested in the Canadian Operations at all.

## III. PROFESSIONAL RETENTION AND RELATED APPLICATIONS AND MOTIONS

### A. Application of the Debtors for an Order Authorizing the Employment and Retention of Proskauer Rose LLP *Nunc Pro Tunc* to the Petition Date (the "Proskauer Retention Application")

146. The Debtors selected Proskauer as their restructuring counsel because Proskauer's attorneys have extensive experience, knowledge and resources in the area of debtors' and creditors' rights, and, in addition to a national bankruptcy practice, have extensive experience with the bankruptcy courts in various jurisdictions. Proskauer has the ability to commit substantial resources to legal problems on an urgent basis and is well qualified to represent the Debtors in the Chapter 11 Cases.

147. In assisting the Debtors with the preparation and filing of the Chapter 11 Cases and as a result of Proskauer's prepetition representation of the Debtors, Proskauer's attorneys have become familiar with the complex factual and legal issues that will have to be addressed in the Chapter 11 Cases. The retention of Proskauer, with its knowledge of and experience with the Debtors and the industry in which they operate, will assist in the efficient administration of the estates, thereby minimizing the expense to the estates.

148. The Debtors believe that, except as set forth in the Thomas Declaration, Proskauer's partners and associates do not hold or represent any interest adverse to the Debtors and that Proskauer and each of its partners and associates is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code.

149. Based upon the Thomas Declaration, the Debtors believe that Proskauer's partners and associates have no connection with the Debtors, the Debtors' directors and executive management, the Debtors' other professionals, the Debtors' equity holders, the Debtors' primary secured creditors, the Debtors' largest unsecured creditors, the Judges of the United States Bankruptcy Court for the District of Delaware, the United States Trustee (Region 3) and the Assistant Trustee and Trial Attorneys for the office of the United States Trustee, except as set forth in the Thomas Declaration.

150. The Debtors believe that the employment of Proskauer would be in the best interests of the Debtors and their estates and desire to employ Proskauer, effective as of the Petition Date. Were the Debtors required to engage counsel other than Proskauer in connection with these proceedings, the Debtors, their estates and all parties in interest would be unduly prejudiced by the time and expense necessarily attendant to such counsel's familiarization with the intricacies of the Debtors' businesses and financial affairs.

**B. Application of the Debtors for an Order Authorizing the Employment and Retention of Richards, Layton & Finger, P.A. *Nunc Pro Tunc* to the Petition Date ("Richards Layton Retention Application")**

151. Contemporaneously herewith, the Debtors have filed an application seeking to retain Richards, Layton, & Finger, P.A. ("Richards Layton"), as their local counsel, in the Chapter 11 Cases. Proskauer does not maintain an office in the State of Delaware and, therefore, the Debtors are required to retain local counsel. The services of Richards, Layton, & Finger, P.A. will complement, and not duplicate, the services rendered by Proskauer.

152. The Debtors believe that, except as set forth in the declaration attached to the Richards Layton Retention Application, Richards Layton's partners and associates do not hold or represent any interest adverse to the Debtors and that Richards Layton and each of its partners and associates is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code.

153. Based upon the declaration attached to the Richards Layton Retention Application, the Debtors believe that Richards Layton's partners and associates have no connection with the Debtors, the Debtors' directors and executive management, the Debtors' other professionals, the Debtors' equity holders, the Debtors' primary secured creditors, the Debtors' largest unsecured creditors, the Judges of the United States Bankruptcy Court for the District of Delaware, the United States Trustee (Region 3) and the Assistant Trustee and Trial Attorneys for the office of the United States Trustee, except as set forth in such declaration.

154. The Debtors believe that the employment of Richards Layton would be in the best interests of the Debtors and their estates and desire to employ Richards Layton, effective as of the Petition Date.

**C. Application of the Debtors for Entry of an Order Approving the Retention of Conway Del Genio, Gries & Co., LLC as Crisis and Turnaround Manager of the Debtors and Designated Michael F. Gries as Chief Restructuring Officer of the Debtors, and Related Relief (the "CDG Retention Application")**

155.    The Debtors seek to employ certain personnel of CDG, effective as of the Petition Date, as crisis management personnel of the Debtors pursuant to the terms and conditions of the of the engagement letter between CDG and the Debtors, dated February 16, 2009, (including the addendum thereto dated April 23, 2009, and as otherwise supplemented, amended or modified, the "Engagement Letter").    The Debtors selected CDG after considering their needs and alternatives and interviewing other firms. The Debtors also seek the approval of the appointment of Michael F. Gries ("CRO") as chief restructuring officer of the Debtors and William McManus of CDG as interim chief financial officer ("CFO").

156.    In consideration of the size and complexity of their businesses, as well as the exigencies of the circumstances, the Debtors have determined that the services of experienced restructuring advisors will substantially enhance their attempts to maximize the value of their businesses.

157.    The Debtors selected CDG to provide critical management services based on its longstanding reputation in assisting companies through complex financial restructurings, including bankruptcy reorganizations, and its degree of success in a wide range of industries. As such, the Debtors believe that CDG is well-qualified and able to serve on behalf of the Debtors in a cost-effective, efficient, and timely manner. The Debtors believe the engagement of CDG to assist the Debtors during the Chapter 11 Cases is essential to their success.

158.    The Debtors do not believe that CDG is a "professional" whose retention is subject to approval under section 327 of the Bankruptcy Code. Nonetheless, to the best of the Debtors' knowledge, information and belief, and as disclosed in the Gries Retention Declaration

and exhibits thereto, neither CDG nor any professional employee or independent contractor of CDG has any connection with or any interest adverse to the Debtors, their creditors, or any other party in interest, or their respective attorneys and accountants, except as set forth in the Gries Retention Declaration.

159. The terms and conditions of the Engagement Letter were negotiated by the Debtors and CDG at arm's-length and in good faith.

160. The Debtors submit that the employment of CDG is a sound exercise of their business judgment and satisfies section 363 of the Bankruptcy Code as CDG's services are necessary and essential to the Debtors' restructuring efforts. Since their engagement, CDG, Mr. Gries and Mr. McManus, working in conjunction with the Debtors' senior management, have provided invaluable assistance in, among other things, (a) analyzing the Debtors' overall operations and financial condition, (b) developing reliable short-term cash flow forecasts, (c) implementing certain cash conservation and cash management techniques, (d) implementing cost cutting measures and operational changes to reduce cash spend, and (e) coordinating the Debtors' preparation for filing the Chapter 11 Cases.

**D.    Application of Debtors for an Order Approving Agreement with Epiq Bankruptcy Solutions, LLC as Notice and Claims Agent (the "Epiq Retention Application")**

161. The Debtors have more than 200 potential creditors.

162. Epiq will provide such noticing, claims processing, balloting, and related administrative services as are necessary and appropriate for the prosecution of the Chapter 11 Cases and as are requested by the Debtors or the Clerk's Office from time to time.

163. The Debtors believe that the compensation to be paid to Epiq pursuant to the Services Agreement is fair and reasonable. The Debtors have provided Epiq with a retainer in

the amount of $100,000.00 which they request be held by Epiq during the Chapter 11 Cases solely for the payment of expenses incurred under the Services Agreement.

164.    As an administrative agent and adjunct to the Court, the Debtors do not believe that Epiq is a "professional" whose retention is subject to approval under section 327 of the Bankruptcy Code or whose compensation is subject to approval of the Court under sections 330 and 331 of the Bankruptcy Code.  Furthermore, the Debtors respectfully submit that the fees and expenses incurred by Epiq are administrative in nature and, therefore, should not be subject to the standard fee application procedures for professionals.

165.    In reliance on the McElhinney Declaration, the Debtors believe that Epiq does not hold or represent an interest materially adverse to the Debtors' estates.  Further, in reliance on the McElhinney Declaration, the Debtors also believe that Epiq is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code.

166.    The Debtors believe that the retention of Epiq as the Notice and Claims agent in the Chapter 11 Cases is in the best interests of the Debtors, their estates and creditors.

E.      **Application of the Debtors for Entry of an Order Approving the Retention of Morris Anderson & Associates, LTD. as Restructuring Monitor for the Debtors (the "Restructuring Monitor Application")**

167.    The Debtors request entry of an order authorizing the retention of MAA and Robert E. Troisio as the Debtors' restructuring monitor as required by and pursuant to the proposed Senior Secured Super Priority Debtor in Possession Credit Agreement (the "DIP Credit Agreement") and related documents.  The Debtors selected MAA and Mr. Troisio after considering the requirements for the debtor in possession credit facility and available alternatives, and interviewing other firms.

168.    As a condition precedent to (a) providing the debtor in possession credit facility pursuant to the DIP Credit Agreement and related documents, and (b) providing their support for

the restructuring and plan of reorganization (the "Restructuring"), the Debtors are required to retain MAA and MR. Troisio.

169. Based on the foregoing, the Debtors believe the engagement of MAA will assist the Debtors during the Chapter 11 Cases, and is essential as a condition to the debtor in possession financing the Debtors require immediately.

**F.     Motion of the Debtors for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals in the Ordinary Course of Business (the "OCP Motion")**

170. The Debtors retain various attorneys, accountants and other professionals in the ordinary course of their business (each, an "OCP" and, collectively, the "OCPs"). The OCPs provide services for the Debtors in a variety of matters unrelated to the Chapter 11 Cases, including legal services with regard to specialized areas of the law, accounting services, auditing and tax services and certain consulting services.

171. The Debtors propose to retain each OCP (subject to such OCP filing and serving a declaration of disinterestedness) and pay each OCP, without formal application to the Court by any OCP, 100% of fees and disbursements to each of the OCPs retained by the Debtors after such OCP: (a) files with the Court and serves upon the Notice Parties (as defined in the OCP Procedures) a declaration of disinterestedness in accordance with the OCP Procedures; and (b) submits to the Debtors an appropriate invoice setting forth in reasonable detail the nature of the services rendered after the Petition Date; provided that, other than with respect to Ernst & Young LLP ("E & Y"), while the Chapter 11 Cases are pending, the fees of each OCP, excluding costs and disbursements, do not exceed the proposed OCP Cap of $25,000 each month.

172. If an OCP's fees, excluding costs and disbursements, exceed the OCP Cap applicable to it for any given month, on or before the final day of the month following the month for which compensation is sought, such OCP shall submit a Monthly Statement to the Notice

Parties. The Debtors submit that this process is necessary to avoid any disruption in the professional services that are required for the day-to-day operation of the Debtors' business while ensuring that the fees and expenses for the OCPs are monitored effectively.

173. E & Y is the auditor for Debtor TLC Vision Corporation, a Canadian company whose equity is publicly traded on the Toronto Stock Exchange. E & Y typically incurs monthly fees that exceed the proposed OCP Cap because, among other things: (a) TLC Vision Corporation is a public company with significant reporting and disclosure requirements, (b) TLC Vision Corporation and its affiliates have a complex business structure, and (c) due to their business of providing management and other services to medical professionals, TLC Vision Corporation and the other Debtors face complicated issues regarding restrictions on the practice of medicine by corporate entities that must be carefully audited and adequately disclosed. For these reasons, the Debtors propose to treat E & Y as an OCP, but request that the OCP Cap with respect to E & Y be $125,000.00.

174. The Debtors respectfully submit that the continued retention and compensation of the OCPs is in the best interests of their estates, creditors and other parties in interest. While some OCPs may wish to continue to represent the Debtors on an ongoing basis, others may be unwilling to do so if the Debtors cannot pay them on a regular basis. Without the background knowledge, expertise and familiarity that the OCPs have relative to the Debtors and their operations, the Debtors undoubtedly would incur additional and unnecessary expenses in educating replacement professionals about the Debtors' business and financial operations. In light of the significant costs associated with the preparation of retention applications for professionals who will receive relatively modest fees, it would be impractical, inefficient and

extremely costly for the Debtors and their legal advisors to prepare and submit individual applications and proposed retention orders for each OCP.

175.    The Debtors represent that: (a) the retention of the OCPs is necessary for the day-to-day operations of the Debtors' business; (b) expenses for the OCPs will be monitored; and (c) except as may be disclosed otherwise, the OCPs will not perform substantial bankruptcy-related services without filing an application with this Court for separate retention as a non-ordinary course professional.

176.    Although some of the OCPs may hold minor unsecured claims against the Debtors in connection with services rendered to the Debtors prepetition, the Debtors do not believe that any of the OCPs have an interest materially adverse to the Debtors, their creditors, or other parties in interest.  In any event, the OCP Procedures include a requirement that OCPs file declarations of disinterestedness before an OCP may be compensated.  By the OCP Motion, the Debtors are not requesting authority to pay prepetition amounts owed to OCPs.

**G.      Motion of the Debtors for an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses For Professionals and Members of Official Committees (the "Interim Compensation Motion")**

177.    The Debtors seek entry of an order, among other things: (a) establishing an orderly process for the allowance and payment of compensation for professional services rendered and reimbursement of expenses incurred by professionals whose retentions are approved by this Court and who will be required to file applications for allowance of compensation and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code; (b) establishing a procedure for reimbursement of reasonable out-of-pocket expenses incurred by members of any statutory committees appointed in the Chapter 11 Cases; and (c) limiting service of interim fee applications and final fee applications to identified Notice Parties.

178.    The Compensation Procedures will enable the Debtors to closely monitor costs of administration, maintain appropriate cash flow, and implement efficient cash management procedures. Moreover, the Compensation Procedures will allow the Court and key parties in interest to insure the reasonableness and necessity of the compensation and reimbursement sought pursuant to such procedures.

179.    The efficient administration of the Chapter 11 Cases will be significantly aided by establishing the requested interim compensation and expense reimbursement procedures. The relief requested is in the best interests of the Debtors, their estates, and creditors. The proposed Compensation Procedures and other procedures proposed in the motion are designed to promote the efficient administration of the Chapter 11 Cases, while at the same time allowing for appropriate monitoring of the Professionals' fees.

180.    The size of these cases and the amount of time and effort that will be required from the Professionals to appropriately address the Debtors' business concerns justifies the Compensation Procedures requested herein.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 21, 2009

**TLC Vision (USA) Corporation**
**TLC Vision Corporation**
**TLC Management Services, Inc.**

/s/ Michael F. Gries
Michael F. Gries
Chief Restructuring Officer