## Exhibit A

Proposed Order

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TLC Vision (USA) Corporation, *et al.*,[1] | ) Case No. 09-14473 (KG) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) **Re: Docket No. ____** |

**ORDER: (A) AUTHORIZING THE SALE OF THE DEBTORS' CANADIAN OPERATIONS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (B) AUTHORIZING AND APPROVING PURCHASE AGREEMENT, (C) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO, AND (D) GRANTING RELATED RELIEF**

This matter coming before the Court on the Debtors' Motion for Entry of an Order (A) Authorizing the Sale of the Debtors' Canadian Operations Free and Clear of Liens, Claims, Encumbrances, and Other Interests and (B) Granting Certain Related Relief [Docket No. __](the "Motion")[2]; due and proper notice of the Motion and the hearing thereon (the "Sale Hearing") having been given to all parties entitled to notice; the Court having reviewed the Motion and its exhibits; the Court having reviewed various objections filed to the Motion; the Court having conducted the Sale Hearing on the Motion on _____ __, 20__ and having heard arguments of counsel, and otherwise being fully advised in the premises;

**THE COURT HEREBY FINDS THAT:**

### JURISDICTION, FINAL ORDER AND STATUTORY PREDICATES

A.      This Court has jurisdiction over the Motion, the transactions contemplated by the Purchase Agreement dated as of December ___, 2009 between 7289499 Canada Inc. (the

---

[1]  The Debtors in the cases, along with the last four digits of each Debtor's federal tax identification number and address, are: TLC Vision (USA) Corporation (6220) 16305 Swingley Ridge Road, Chesterfield, MO 63017; TLC Vision Corporation (1150) 5280 Solar Drive, Suite 300, Mississauga, Ontario, L4W 5M8; and TLC Management Services, Inc. (0374) 1209 Orange Street, Wilmington, DE 19801.

[2]  Each capitalized term used but not defined herein shall have the meaning ascribed thereto in the Motion.

"Purchaser") and TLC Vision Corporation ("TLC Vision" or the "Seller") (as amended from time to time in accordance therewith and the terms of this Order (if necessary), including all exhibits, schedules, ancillary agreements and other attachments thereto, the "Purchase Agreement"), and any other ancillary documents and agreements related thereto pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.       This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and expressly directs entry of judgment as set forth herein.

C.       The statutory and rule-based predicates for the relief sought in the Motion are sections 105, 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004 and 6006, and Local Rule 6004-1.

### SOUND BUSINESS PURPOSE

D.       The Debtors seek to convey the Purchased Assets, all of which are related to the Seller's Canadian Operations.

E.       The Debtors have demonstrated both: (1) good, sufficient, and sound business purposes and justifications for the sale authorized hereby (the "Sale"); and (2) compelling circumstances for the Sale pursuant to section 363(b) of the Bankruptcy Code prior to, and outside of, a plan of reorganization in that, among other things, the value of the Purchased Assets would be harmed by any delay of the Sale. Time is of the essence in consummating the proposed Sale.

CURRENT 15560345v5
RLF1 3518909v.1

## HIGHEST AND BEST OFFERS

F.     The marketing and sale process conducted by the Debtors and their professionals both prior to these chapter 11 cases provided a full, fair and reasonable opportunity for any person to make an offer to purchase the Purchased Assets.

G.     As demonstrated by the testimony and other evidence proffered or adduced at the Sale Hearing: (1) the Debtors have adequately marketed the Purchased Assets; (2) the Purchase Price contained in the Purchase Agreement constitutes the highest and otherwise best offer for the Purchased Assets and provides fair and reasonable consideration therefor; (3) the Sale will provide a greater recovery for the Debtors' creditors from the Purchased Assets than would be provided by any other practical available alternative; (4) no other party has offered to purchase the Purchased Assets for greater economic value to the Debtors or their estates; and (5) the consideration to be paid by the Purchaser under the Purchase Agreement constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory or possession thereof, the District of Columbia and Canada.

## BEST INTEREST OF CREDITORS

H.     Approval of the Purchase Agreement and the consummation of the Sale to the Purchaser at this time are in the best interests of the Debtors, their creditors, their estates and other parties in interest.

## GOOD FAITH

I.     The Purchase Agreement and each of the transactions contemplated therein were negotiated, proposed and entered into by the Seller and the Purchaser in good faith, without collusion or fraud and from arm's-length bargaining positions. The Purchaser is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to all the protections afforded thereby. Neither the Purchaser nor any of its shareholders,

directors, officers or insiders are insiders of the Seller or any of the Debtors herein. Neither the Seller nor the Purchaser have engaged in any conduct that would cause or permit the Purchase Agreement to be avoided or impose costs and damages under section 363(n) of the Bankruptcy Code or any other provision of the Bankruptcy Code, the Bankruptcy Rules, or applicable law. Specifically, the Purchaser's discussions and negotiations with non-Debtor parties to executory contracts and unexpired leases of the Debtors and other creditors of the Debtors were conducted in good faith, without collusion or fraud, and from arm's length bargaining positions.

### NOTICE OF THE MOTION

J.      As evidenced by the certificates of service (including, without limitation, docket numbers ___, ___, ___, ____ and ___) filed with the Court: (1) proper, timely, adequate and sufficient notice of the Motion and the Sale Hearing has been provided by the Debtors; (2) such notice was good, sufficient and appropriate under the particular circumstances; and (3) no other or further notice of the Motion, the proposed Sale, or the Sale Hearing is or shall be required. A reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities, including, but not limited to:

(i)  proposed counsel to the creditors' committee appointed in the Chapter 11 Cases on _____ ___, 20___ (the "Committee");

(ii)  counsel to the DIP Secured Parties (as defined below);

(iii) counsel to the Prepetition Agent (as defined below);

(iv) counsel to the Purchaser;

(v)  any party who recently expressed in writing to the Debtors an interest in the Purchased Assets;

(vi) nondebtor parties to the Purchased Contracts;

(vii)  all parties who are known or reasonably believed to have asserted a lien, encumbrance, claim or other interest in the Purchased Assets;

(viii)  all applicable state and local taxing authorities;

-4-

(ix) the Office of the United States Trustee for the District of Delaware; and

(x) all entities that have requested notice in these chapter 11 cases under Bankruptcy Rule 2002.

K.    Additionally, as evidenced by docket number ____, the Debtors published notice of the Sale in the national edition of the *Wall Street Journal* and the national editions (Canada) of the *Globe and Mail* and *La Presse*.  With regard to parties who have claims against the Debtors, but whose identities are not reasonably ascertainable by the Debtors, the Court finds that such publication notice was sufficient and reasonably calculated under the circumstances to reach such parties.

L.    On _____, 20__, the Debtors have served notice of their intent to assume and assign the Purchased Contracts (the "Contract & Cure Schedule") and of the related proposed costs to cure any outstanding defaults (the "Cure Costs")  upon each non-debtor counterparty to the Purchased Contracts.  The service of such notice was good, sufficient and appropriate under the circumstances and no further notice need be given with respect to the Cure Costs for the Purchased Contracts listed in the Contract & Cure Schedule and the assumption and assignment of the Purchased Contracts.  All nondebtor parties to the Purchased Contracts identified in the Contract & Cure Schedule have had a reasonable opportunity to object to both the Cure Costs listed in the Contract & Cure Schedule and the assumption and assignment of the Purchased Contracts.

M.    The following Assignment Objections (the "Filed Assignment Objections") have been filed with respect to the Motion:

| Docket No. | Objecting Party or Parties |
| --- | --- |
|  |  |
|  |  |
|  |  |

-5-

| | |
|---|---|
| | |
| | |
| | |
| | |
| | |

## SECTION 363(F) REQUIREMENTS MET FOR FREE AND CLEAR SALES

N.     The Debtors may sell the Purchased Assets free and clear of all liens, claims,

interests and encumbrances of any kind or nature whatsoever (collectively, "Claims") (except for

any Assumed Liabilities), because, in each case, one or more of the standards set forth in

section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied.  Those holders of Claims who

did not object, or who withdrew their objections, to the Sale or the Motion are deemed to have

consented pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of Claims who

did object to the Sale of the Purchased Assets free and clear of Claims fall within one or more of

the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by

having their Claims, if any, attach to the proceeds of the Sale ultimately attributable to the

property against which they have a Claim, in the same order of priority and with the same

validity, force and effect that such creditor had prior to the Sale, subject to any defenses of the

Debtors.

O.     The Purchaser would not have entered into the Purchase Agreement and would

not consummate the transactions contemplated thereby, thus adversely affecting the Debtors,

their estates and their creditors, if the sale of the Purchased Assets were not free and clear of all

Claims other than permitted encumbrances and Assumed Liabilities, or if the Purchaser would,

or in the future could, be liable for any such Claims, including, as applicable, certain liabilities

-6-

(collectively, the "Excluded Liabilities") that will not be assumed by the Purchaser, as described in Section 4.2 of the Purchase Agreement.

P.     Without limiting the generality of the foregoing, the Purchase Agreement provides the Seller with reasonably equivalent value and fair consideration (as those terms are defined in the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and the Bankruptcy Code), and was not entered into for the purpose of, nor does it have the effect of, hindering, delaying or defrauding creditors of either of the Debtors under any applicable law. Except for the Assumed Liabilities, and the other obligations of the Purchaser specifically set forth in the Purchase Agreement or in connection with this or other orders of this Court, the Sale and the transactions comprising the Sale shall not impose nor result in the imposition of any liability or responsibility on Purchaser or its affiliates, successors or assigns or any of their respective assets (including the Purchased Assets), and the transfer of the Purchased Assets to the Purchaser does not and will not subject the Purchaser or its affiliates, successors or assigns or any of their respective assets (including the Purchased Assets) to any liability for any Claims, including, without limitation, for any successor liability, other than as expressly identified as an Assumed Liability.

### ASSUMPTION AND ASSIGNMENT OF THE PURCHASED CONTRACTS

Q.     The assumption and assignment of the Purchased Contracts are integral to the Purchase Agreement, are in the best interests of the Debtors and their estates, and represent the reasonable exercise of the Debtors' sound business judgment.

R.     With respect to each of the Purchased Contracts, the Debtors have met all requirements of section 365(b) of the Bankruptcy Code. Further, the Purchaser has provided all necessary adequate assurance of future performance under the Purchased Contracts in satisfaction of sections 365(b) and 365(f) of the Bankruptcy Code. Accordingly, the Purchased

-7-

Contracts may be assumed by the Debtors and assigned to the Purchaser, as provided for in the Motion and the Purchase Agreement and upon such assumption and assignment, the Debtors can be relieved of liability from any future breach of the Purchased Contracts pursuant to section 365(k) of the Bankruptcy Code.

## VALIDITY OF THE TRANSFER

S.     As of the closing of the Sale (the "Closing"), the transfer of the Purchased Assets to the Purchaser will be a legal, valid and effective transfer of the Purchased Assets, and will vest the Purchaser with all right, title and interest in and to the Purchased Assets, free and clear of (1) all Claims other than permitted encumbrances and Assumed Liabilities and (2) all debts arising under or out of, in connection with, or in any way relating to, any acts of the Debtors, claims (as defined in section 101(5) of the Bankruptcy Code), rights or causes of action (whether in law or in equity, including any rights or causes of action based on theories of transferee or successor liability under any law, statute, rule or regulation of the United States, any state, territory, or possession thereof or the District of Columbia), obligations, demands, guaranties, rights, contractual commitments, restrictions, interests and matters of any kind or nature whatsoever, whether arising prior to or subsequent to the commencement of these cases, and whether imposed by agreement, understanding, law, equity or otherwise.

T.     The Seller: (1) has full corporate power and authority to execute the Purchase Agreement and all other documents contemplated thereby, and the Sale has been duly and validly authorized by all necessary corporate action of the Seller; (2) has all of the corporate power and authority necessary to consummate the transactions contemplated by the Purchase Agreement; (3) has taken all actions necessary to authorize and approve the Purchase Agreement and the consummation by the Debtors of the transactions contemplated thereby; and (4) requires

CURRENT 15560345v5
RLF1 3518909v.1

no consents or approvals, other than those expressly provided for in the Purchase Agreement, to consummate such transactions.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

<u>GENERAL PROVISIONS</u>

1.     The Motion is granted in full and the Sale is approved as set forth in this Sale Order.

2.     The findings of fact set forth above and conclusions of law stated herein shall constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

3.     All objections, if any, to the Motion or the relief requested therein that have not been withdrawn, waived or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are overruled on the merits, except as expressly provided herein.

<u>APPROVAL OF THE PURCHASE AGREEMENT</u>

4.     Subject to the provisions of this Sale Order, the Purchase Agreement, all transactions contemplated therein and all of the terms and conditions thereof are approved.

5.     Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Seller is authorized and directed to perform their obligations under and comply with the terms of the Purchase Agreement and consummate the Sale, pursuant to and in accordance with the terms and conditions of the Purchase Agreement and this Sale Order.

CURRENT 15560345v5
RLF1 3518909v.1

6.    The Seller, as well as its affiliates, officers, employees and agents, is authorized and directed to perform under, consummate and implement, the Purchase Agreement, in substantially the same form as the Purchase Agreement attached hereto as <u>Exhibit 1</u>, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement and to take all further actions as may be: (a) reasonably requested by the Purchaser for the purpose of assigning, transferring, granting, conveying and conferring to the Purchaser, or reducing to possession, the Purchased Assets; or (b) necessary or appropriate to the performance of the obligations contemplated by the Purchase Agreement, all without further order of the Court. The Purchase Agreement may not be amended without the prior consent of the Required DIP Lenders (as defined in the Final DIP Order).

## TRANSFER OF PURCHASED ASSETS

7.    Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Sellers are authorized and directed to transfer the Purchased Assets in accordance with the terms of the Purchase Agreement. The Purchased Assets shall be transferred to the Purchaser, and upon consummation of the Purchase Agreement, such transfer shall: (a) be valid, legal, binding and effective; (b) vest the Purchaser with all right, title and interest in the Purchased Assets; and (c) be free and clear of all Claims except for permitted encumbrances and Assumed Liabilities, with all Claims to attach to the net proceeds of the Sale with the same validity, priority, force and effect which they now have against the Purchased Assets, subject to any claims and defenses the Debtors may possess with respect thereto.

8.    Pursuant to clause 7(3)(c) of the Canada Personal Information Protection and Electronic Documents Act, the Seller is authorized and permitted to disclose and transfer to the Purchaser all human resources and payroll information in the Seller's records pertaining to the Seller's past and current employees, including personal information of those employees

-10-

contained in such records. The Purchaser shall maintain and protect the privacy of such information and shall be entitled to use the personal information provided to it in a manner which is in all material respects identical to the prior use of such information by the Seller.

9.      Pursuant to clause 7(3)(c) of the Canada Personal Information Protection and Electronic Documents Act, the Seller is authorized and permitted to disclose and transfer to the Purchaser all patient information in the Seller's records pertaining to the Seller's past and current patients, including personal information of those patients contained in such records. The Purchaser shall maintain and protect the privacy of such information and shall be entitled to use the personal information provided to it in a manner which is in all material respects identical to the prior use of such information by the Seller.

10.      At the Closing, the Liens in favor of or for the benefit of the Prepetition Lenders, the Prepetition Agent, and the DIP Secured Parties on the Purchased Assets shall attach to the proceeds of the sale of the Purchased Assets in the same relative order of priority; and the proceeds from the sale of the Purchased Assets attributable to the Prepetition Collateral and the DIP Collateral shall be paid in accordance with the provisions of the Court's Final Order Approving Debtor in Possession Credit and Guaranty Agreement (Docket No. ___, the "Final DIP Order"). For purposes of this Order, the terms Prepetition Lenders, Prepetition Agent, DIP Secured Parties, Prepetition Collateral and DIP Collateral shall have the meanings ascribed thereto in the Final DIP Order.

11.      Except as otherwise provided in the Purchase Agreement, all persons and entities (and their respective successors and assigns), including all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, holding claims (as defined in section 101(5) of the Bankruptcy Code), except for permitted encumbrances and Assumed Liabilities, arising under or out of, in connection with, or in any

-11-

way relating to, the Debtors, the Purchased Assets, the operation of the Debtors' businesses prior to Closing, or the transfer of the Purchased Assets to the Purchaser, are hereby forever barred, estopped and permanently enjoined from asserting such claims against the Purchaser, its successors or assigns, its property or the Purchased Assets. No such persons or entities shall assert against the Purchaser or their successors in interest any such claim arising from, related to or in connection with the ownership or operation of the Purchased Assets prior to the Closing, except for permitted encumbrances and Assumed Liabilities.

12. This Sale Order (a) shall be effective as a determination that, as of Closing, all Claims other than permitted encumbrances and Assumed Liabilities relating to the Purchased Assets have been unconditionally released, discharged and terminated as to the Purchased Assets, and that the conveyances described herein have been effected, and (b) is and shall be binding upon and govern the acts of all entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

13. If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Claims against or in the Debtors or the Purchased Assets shall not have delivered to the Debtors prior to the Closing of the Sale, in proper form for filing and executed by the appropriate parties, termination statements,

-12-

instruments of satisfaction, releases of all interests which the person or entity has with respect to the Debtors or the Purchased Assets or otherwise, then only with regard to Purchased Assets that are purchased by the Purchaser pursuant to the Purchase Agreement and this Sale Order (a) the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Purchased Assets and (b) the Purchaser is hereby authorized to file, register or otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims against the Purchased Assets other than the Assumed Liabilities. This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state or local government agency, department or office.

14.     All persons or entities in possession of some or all of the Purchased Assets are directed to surrender possession of such assets to the Purchaser or its designee at the time of Closing of the Sale.

15.     Following the Closing of the Sale, no holder of any Claim shall interfere with the Purchaser's title to or use and enjoyment of the Purchased Assets based on or related to any such Claim or based on any actions the Debtors may take in their chapter 11 cases.

16.     Following the Closing of the Sale, any and all rights, title, interests and obligations of the Seller in and to the Purchase Agreement and all related documents and agreements shall be deemed to be assigned from the Seller to, and assumed by, TLC Vision (USA) Corporation.

17.     All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Purchased Assets to the Purchaser in accordance with the Purchase Agreement and this Sale Order.

-13-

## ASSUMPTION AND ASSIGNMENT OF PURCHASED CONTRACTS

18.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, the Debtors'
assumption and assignment to the Purchaser (or an affiliate of the Purchaser as designated by the
Purchaser) of the Purchased Contracts identified on Exhibit 2 to this Order and is hereby
approved, and all requirements of section 365 of the Bankruptcy Code are hereby determined to
have been satisfied with respect to such Purchased Contracts. Pursuant to section 365(k) of the
Bankruptcy Code, the Debtors and their estates shall not be liable for any breach of the
Purchased Contracts after the date of assignment to the Purchaser or its designated affiliate.

19.     The Debtors are hereby authorized in accordance with sections 105(a) and 365 of
the Bankruptcy Code to assume and assign the Purchased Contracts to the Purchaser or its
designated affiliate free and clear of all Claims, and to execute and deliver to the Purchaser such
documents or other instruments as may be necessary to assign and transfer the Purchased
Contracts to the Purchaser or its designated affiliate.

20.     The Purchased Contracts transferred in accordance with this Order shall be
transferred to, and remain in full force and effect for the benefit of, the Purchaser or its
designated affiliate in accordance with their respective terms, notwithstanding any provision in
any such Assumed Contract (including those of the type described in sections 365(e)(1) and (f)
of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer. There
shall be no rent accelerations, assignment fees, increases or any other fees charged to the
Purchaser, its designated affiliate, or the Debtors as a result of the assumption or assignment of
the Purchased Contracts. No Assumed Contract may be terminated, or the rights of any party
modified in any respect, including pursuant to any "change of control" clause, by any other party
thereto as a result of the transactions contemplated by the Purchase Agreement.

CURRENT 15560345v5
RLF1 3518909v.1

21.     The Cure Costs identified on <u>Exhibit 2</u> hereto arising under the Purchased Contracts identified on <u>Exhibit 2</u> hereto shall be paid by the Seller at the Closing of the Sale, subject to the terms of the Purchase Agreement.

22.     Payment of the Cure Costs shall be a full satisfaction of any and all defaults under the Purchased Contracts, whether monetary or non-monetary. Each pre-Closing, non-debtor party to an Assumed Contract hereby is forever barred, estopped and permanently enjoined from asserting against the Debtors or the Purchaser, their successors or assigns or the property of any of them, any default existing as of the date of the Sale Hearing if such default was not raised or asserted prior to or at the Sale Hearing.

23.     The failure of the Debtors or the Purchaser or its designated affiliate to enforce at any time one or more terms or conditions of any Assumed Contract shall not be a waiver of such terms or conditions, or of the rights of the Debtors, the Purchaser or its designated affiliate to enforce every term and condition of the Purchased Contracts.

24.     Upon the Closing of the Sale, the Purchaser or its designated affiliate shall be fully and irrevocably vested with all right, title and interest of the Debtors under the Purchased Contracts.

<u>ADDITIONAL PROVISIONS</u>

25.     Except as expressly set forth in the Purchase Agreement, the Purchaser and its successors or assigns shall have no liability for any liability, Claim, claim (as that term is defined in section 101(5) of the Bankruptcy Code), damages or other obligation of or against the Debtors related to the Purchased Assets by reason of the transfer of the Purchased Assets to the Purchaser. The Purchaser shall not be deemed, as a result of any action taken in connection with the purchase of the Purchased Assets, to: (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than with respect to any obligations arising under the Purchased

-15-

Contracts from and after the Closing); (b) have, *de facto* or otherwise, merged with or into the Debtors; or (c) be a mere continuation or substantial continuation of the Debtors or the enterprise of the Debtors.

26.     While the Debtors' bankruptcy cases are pending, this Court shall retain jurisdiction to, among other things, interpret, enforce and implement the terms and provisions of this Sale Order and the Purchase Agreement, all amendments thereto, any waivers and consents thereunder (and of each of the agreements executed in connection therewith in all respects) and to adjudicate disputes arising under or related to this Sale Order or the Purchase Agreement.

27.     Nothing in this Sale Order or the Purchase Agreement releases, nullifies or enjoins the enforcement of any liability to a governmental unit under environmental statutes or regulations (or any associated liabilities for penalties, damages, cost recovery or injunctive relief) that any entity would be subject to as the owner or operator of property after the date of entry of this Sale Order. Notwithstanding the foregoing sentence, nothing in this Sale Order shall be interpreted to deem the Purchaser as the successor to the Debtors under any state law successor liability doctrine with respect to any liabilities under environmental statutes or regulations for penalties for days of violation prior to entry of this Sale Order or for liabilities relating to off-site disposal of wastes by the Debtors prior to entry of this Sale Order.

28.     No bulk sales law, or similar law of any state or other jurisdiction shall apply in any way to the transactions contemplated by the Purchase Agreement, the Motion and this Sale Order.

29.     The transactions contemplated by the Purchase Agreement are undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein of the

-16-

Sale shall not affect the validity of the Sale to the Purchaser, unless such authorization is duly stayed pending such appeal.

30.     The terms and provisions of the Purchase Agreement and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates and their creditors, the Purchaser, and their respective affiliates, successors and assigns, and any affected third parties including all persons asserting Claims in the Purchased Assets to be sold to the Purchaser pursuant to the Purchase Agreement, notwithstanding any subsequent appointment of any trustee, examiner or receiver under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee, examiner or receiver and shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors, their shareholders or any trustee, examiner or receiver.

31.     The failure specifically to include any particular provisions of the Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement be authorized and approved in its entirety.

32.     The Purchase Agreement, and any related agreements, documents or other instruments, may be modified, amended or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not materially change the terms of the Purchase Agreement.

33.     In the event that there is a direct conflict between the terms of this Sale Order and the Purchase Agreement, the terms of this Sale Order shall control.

-17-

34.     Each and every federal, state and local governmental agency, department or official is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

35.     As provided by Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure, this Sale Order shall not be stayed for 14 days after the entry of the Sale Order and shall be effective immediately upon entry, and the Debtors and the Purchaser are authorized to close the Sale immediately upon entry of this Sale Order.

36.     This Court requests the aid and assistance of any court, tribunal, regulatory or administrative body having jurisdiction in the United States or Canada (including the Ontario Superior Court of Justice (Commercial List), the Court of Queen's Bench of New Brunswick and the Supreme Court of Nova Scotia) to give effect to and recognize this Order and to assist the Seller, which has by Order of this Court dated December _ , 2009 been appointed as foreign representative in respect of this chapter 11 case, and its agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies (including the Ontario Superior Court of Justice (Commercial List), the Court of Queen's Bench of New Brunswick and the Supreme Court of Nova Scotia) are hereby respectfully requested to make such orders and to provide such assistance to the Seller as may be necessary or desirable to give effect to this Order or to assist the Seller and its agents in carrying out the terms of this Order.

Dated: _____, 2010
       Wilmington, Delaware

                              _____
                              THE HONORABLE KEVIN GROSS
                              UNITED STATES BANKRUPTCY JUDGE

-18-

# EXHIBIT 1

## PURCHASE AGREEMENT

### [attached hereto]

**TLC VISION CORPORATION**

as Vendor

and

**7289499 CANADA INC.**

as Purchaser

---

**PURCHASE AGREEMENT**

December 20, 2009

---

# TABLE OF CONTENTS

## ARTICLE 1
## INTERPRETATION

Section 1.1    Defined Terms. ................................................................................................ 1
Section 1.2    Gender and Number. ................................................................................... 10
Section 1.3    Headings, etc. ................................................................................................ 10
Section 1.4    Currency. ........................................................................................................ 10
Section 1.5    Certain Phrases, etc. ..................................................................................... 10
Section 1.6    Knowledge. ..................................................................................................... 10
Section 1.7    Accounting Terms. ....................................................................................... 10
Section 1.8    Schedules. ....................................................................................................... 10
Section 1.9    References to Persons and Agreements. ................................................. 10
Section 1.10   Statutes. ........................................................................................................... 11
Section 1.11   Non-Business Days. ...................................................................................... 11

## ARTICLE 2
## PURCHASED ASSETS

Section 2.1    Purchased Assets. .......................................................................................... 11
Section 2.2    Excluded Assets. ............................................................................................ 12

## ARTICLE 3
## PURCHASE PRICE

Section 3.1    Purchase Price. ............................................................................................... 13
Section 3.2    Allocation. ....................................................................................................... 13
Section 3.3    Payment of the Purchase Price. ................................................................ 13
Section 3.4    Payment of Sales Tax and Registration Charges on Transfer. ........... 13
Section 3.5    Adjustment for rent and lease payments. ............................................... 14

## ARTICLE 4
## ASSUMED LIABILITIES

Section 4.1    Assumed Liabilities. ..................................................................................... 14
Section 4.2    Excluded Liabilities. ..................................................................................... 14
Section 4.3    Assumption of Contractual Liabilities. ................................................... 15

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF THE VENDOR

Section 5.1    Representations and Warranties. ............................................................... 15

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

Section 6.1    Representations and Warranties of the Purchaser. ............................... 36

**(i)**

## ARTICLE 7
## PRE-CLOSING COVENANTS OF THE PARTIES

Section 7.1    Conduct of Business Prior to Closing.................................................. 37
Section 7.2    Access for Due Diligence............................................................... 39
Section 7.3    Actions to Satisfy Closing Conditions.................................................. 39
Section 7.4    Transfer of the Purchased Assets....................................................... 40
Section 7.5    Request for Consents. .................................................................. 40
Section 7.6    Filings and Authorizations............................................................. 40
Section 7.7    Supplemental Disclosure. ............................................................... 40
Section 7.8    TLC Moncton Pre-Closing Taxes. ......................................................... 41
Section 7.9    TLC Moncton Accounts Payable........................................................... 41
Section 7.10   Purchase Price Funds................................................................... 41
Section 7.11   Limited Pre-Closing License............................................................ 41

## ARTICLE 8
## CONDITIONS OF CLOSING

Section 8.1    Conditions for the Benefit of the Purchaser. .......................................... 42
Section 8.2    Conditions for the Benefit of the Vendor............................................... 46

## ARTICLE 9
## CLOSING

Section 9.1    Date, Time and Place of Closing. ...................................................... 47
Section 9.2    Closing Procedures. ................................................................... 47
Section 9.3    Non-Assigned Contracts. ............................................................... 47

## ARTICLE 10
## TERMINATION

Section 10.1   Termination Rights. ................................................................... 48
Section 10.2   Effect of Termination. ................................................................ 49

## ARTICLE 11
## INDEMNIFICATION

Section 11.1   Liability for Representations and Warranties. ......................................... 49
Section 11.2   Indemnification in Favour of the Purchaser............................................. 50
Section 11.3   Indemnification in Favour of the Vendor. .............................................. 50
Section 11.4   Limitations on Indemnification........................................................ 50
Section 11.5   Notification. ......................................................................... 51
Section 11.6   Direct Claims. ........................................................................ 51
Section 11.7   Procedure for Third Party Claims...................................................... 52
Section 11.8   Exclusion of Other Remedies. ......................................................... 54

## ARTICLE 12
## POST-CLOSING COVENANTS

Section 12.1   Access to Books and Records. ......................................................... 54

| | | |
|---|---|---|
| Section 12.2 | Full Benefit of Contracts. | 54 |
| Section 12.3 | Full Benefit of Deliverables | 55 |
| Section 12.4 | Confidentiality. | 55 |
| Section 12.5 | Further Assurances. | 55 |
| Section 12.6 | Pre-Closing TLC Moncton Tax. | 55 |
| Section 12.7 | Inter-Company Contract Release. | 55 |

## ARTICLE 13
## EMPLOYEES

| | | |
|---|---|---|
| Section 13.1 | Employees. | 56 |
| Section 13.2 | Employee Liability. | 56 |
| Section 13.3 | Pension Plan. | 56 |
| Section 13.4 | Employee Liability. | 57 |

## ARTICLE 14
## MISCELLANEOUS

| | | |
|---|---|---|
| Section 14.1 | Notices. | 58 |
| Section 14.2 | Time of the Essence. | 59 |
| Section 14.3 | Announcements. | 60 |
| Section 14.4 | Third Party Beneficiaries. | 60 |
| Section 14.5 | Expenses. | 60 |
| Section 14.6 | Amendments. | 60 |
| Section 14.7 | Waiver, Required Lender Approvals. | 60 |
| Section 14.8 | Non-Merger. | 61 |
| Section 14.9 | Entire Agreement. | 61 |
| Section 14.10 | Successors and Assigns. | 61 |
| Section 14.11 | Severability. | 62 |
| Section 14.12 | Governing Law. | 62 |
| Section 14.13 | Counterparts. | 63 |

## ADDENDA

| | |
|---|---|
| SCHEDULE 1.1 | EMPLOYEES |
| SCHEDULE 2.1(b) | MACHINERY, EQUIPMENT AND SUPPLIES |
| SCHEDULE 2.1(e) | PURCHASED CONTRACTS |
| SCHEDULE 3.2 | ALLOCATION OF PURCHASE PRICE |
| SCHEDULE 5.1(a) | JURISDICTIONS IN WHICH VENDOR CARRIES ON BUSINESS, ETC. |
| SCHEDULE 5.1(c) | NO CONFLICT |
| SCHEDULE 5.1(d) | REQUESTED AUTHORIZATIONS |
| SCHEDULE 5.1(e) | REQUESTED CONSENTS |
| SCHEDULE 5.1(j) | TITLE TO PURCHASED SHARES |
| SCHEDULE 5.1(m) | ORDINARY COURSE EXCEPTION |
| SCHEDULE 5.1(p) | MATERIAL AUTHORIZATIONS |
| SCHEDULE 5.1(q) | SUFFICIENCY OF ASSETS |

**( iii )**

SCHEDULE 5.1(s)      PERMITTED LIENS
SCHEDULE 5.1(w)      LEASES AND LEASED PROPERTIES
SCHEDULE 5.1(x)      TLC MONCTON MATERIAL CONTRACTS
SCHEDULE 5.1(bb)     INTELLECTUAL PROPERTY
SCHEDULE 5.1(cc)     SOFTWARE AND TECHNOLOGY
SCHEDULE 5.1(gg)     FINANCIAL STATEMENTS AND INTERIM FINANCIAL
STATEMENTS
SCHEDULE 5.1(hh)     ONTARIO CLINICS' FINANCIAL STATEMENTS
SCHEDULE 5.1(jj)     LIABILITIES
SCHEDULE 5.1(kk)     BANK ACCOUNTS AND POWERS OF ATTORNEY
SCHEDULE 5.1(ll)     EMPLOYMENT MATTERS
SCHEDULE 5.1(mm)     EMPLOYEE PLANS
SCHEDULE 5.1(nn)     INSURANCE
SCHEDULE 5.1(oo)     LITIGATION
SCHEDULE 5.1(pp)     SUPPLIERS
SCHEDULE 5.1(rr)     TLC MONCTON TAXES
SCHEDULE 5.1(ss)     PRIVACY
SCHEDULE 8.1(e)      FORM OF COURT ORDERS
SCHEDULE 8.1(h)      DESIGNATED CONTRACTS
SCHEDULE 8.1(l)      FORM OF TRANSITIONAL SERVICES AGREEMENT
SCHEDULE 8.1(m)      FORM OF LICENCE AGREEMENT
SCHEDULE 8.1(n)      FORM OF PHAROS LICENCE AGREEMENT
SCHEDULE 8.1(o)      FORM OF NON-COMPETITION AND NON-SOLICITATION
AGREEMENT

5576783 v16

# PURCHASE AGREEMENT

Purchase Agreement dated December 20, 2009 between TLC Vision Corporation (the "**Vendor**") and 7289499 Canada Inc. (the "**Purchaser**").

## ARTICLE 1
## INTERPRETATION

**Section 1.1    Defined Terms.**

As used in this Agreement, the following terms have the following meanings:

"**Accrued Vacation Amount**" has the meaning specified in Section 4.1(b).

"**Affiliate**" has the meaning specified in National Instrument 45-106 - *Prospectus and Registration Exemptions*.

"**Agreement**" means this asset and share purchase agreement, as amended or modified from time to time.

"**Ancillary Agreements**" means the Transitional Services Agreement, the License Agreement, the Non-Competition and Non-Solicitation Agreement, the PHAROS License Agreement and the Shared IP License Agreement.

"**Assumed Liabilities**" has the meaning specified in Section 4.1.

"**Atlantic Clinics**" means the laser eye surgery clinics of TLC Moncton located in Halifax (Nova Scotia) and Moncton (New Brunswick);

"**Authorization**" means, with respect to any Person, any order, permit, approval, consent, waiver, licence or similar authorization of any Governmental Entity having jurisdiction over the Person.

"**Books and Records**" means all information in any form relating to the Purchased Business, including patient records, books of account, financial and accounting information and records, personnel records, tax records, sales and purchase records, customer and supplier lists, lists of potential customers, referral sources, research and development reports and records, production reports and records, equipment logs, operating guides and manuals, business reports, plans and projections, marketing and advertising materials and all other documents, files, correspondence and other information (whether in written, printed, electronic or computer printout form, or stored on computer discs or other data and software storage and media devices).

"**Business Day**" means any day of the year, other than a Saturday, Sunday or any day on which major banks are closed for business in Toronto, Ontario.

"**Call Center**" means the Vendor's call center located in Ontario.

"**Canadian Court**" means the *Ontario Superior Court of Justice* (Commercial List).

"**Canadian Head Office**" means the Vendor's head office located at 5280 Solar Drive, Suite 300, Mississauga, Ontario.

"**Canadian Insolvency Proceedings**" means the recognition proceedings commenced by the Vendor under Part IV of the CCAA in the Canadian Court.

"**Canadian Orders**" mean the Canadian Recognition Order and any other order of the Canadian Court issued and entered in the CCAA Proceedings in respect of the purchase transaction contemplated in this Agreement.

"**Canadian Recognition Order**" has the meaning specified in Section 8.1(d).

"**CCAA**" means the *Companies' Creditors Arrangement Act* (Canada), R.S.C. 1985, c.C-36, as amended.

"**Closing**" means the completion of the transaction of purchase and sale contemplated in this Agreement.

"**Closing Date**" means the earlier of (i) three Business Days following satisfaction or waiver of the closing conditions set forth in Section 8.1 and Section 8.2 and (ii) February 16, 2010, or such earlier or later date as the Parties may agree in writing.

"**Contract**" means any agreement, contract, licence, undertaking, engagement or commitment of any nature, written or oral, including any: (i) lease of personal property; (ii) forward commitment for supplies or materials entered into in the Ordinary Course; or (iii) restrictive agreement or negative covenant agreement.

"**Corporate Records**" means the corporate records of TLC Moncton, including (i) all constating documents and by-laws, (ii) all minutes of meetings and resolutions of shareholders and directors (and any committees), and (iii) the share certificate books, securities register, register of transfers and register of directors.

"**Court Orders**" mean the Canadian Orders and the U.S. Orders.

"**Damages**" means any losses, liabilities, damages or expenses (including legal fees and expenses without reduction for tariff rates or similar reductions) whether resulting from an action, suit, proceeding, arbitration, claim or demand that is instituted or asserted by a third party, including a Governmental Entity, or a cause, matter, thing, act, omission or state of facts not involving a third party.

"**Designated Contracts**" means the Purchased Contracts which are required to be assigned to the Purchaser pursuant to Section 8.1(h) and listed in Schedule 8.1 (h).

"**DIP Credit Agreement**" shall mean the senior secured super priority debtor in possession credit agreement among, *inter alia,* the Vendor, as a borrower, Cantor Fitzgerald Securities, as collateral agent and administrative agent, and the lenders party thereto from time to time, as amended, restated, or otherwise modified from time to time.

"**Direct Claim**" means any cause, matter, thing, act, omission or state of facts not involving a Third Party Claim which entitles an Indemnified Person to make a claim for indemnification under this Agreement against the Indemnified Party.

"**Effective Time**" means 12:01 am (Toronto time) on the Closing Date.

"**Employees**" means those individuals listed on Schedule 5.1(ll) who are employed in the Purchased Business.

"**Employee Plans**" means all the employee benefit, fringe benefit, supplemental unemployment benefit, bonus, incentive, profit sharing, termination, change of control, pension, retirement, stock option, stock purchase, stock appreciation, health, welfare, medical, dental, disability, life insurance and similar plans, programmes, arrangements or practices relating to the Employees or the current or former directors, officers or employees of the Vendor or TLC Moncton maintained, sponsored or funded by the Vendor or TLC Moncton, whether written or oral, funded or unfunded, insured or self-insured, registered or unregistered under which the Vendor or TLC Moncton may have any liability, contingent or otherwise.

"**Employee Start Date**" has the meaning specified in Section 13.1(3).

"**Employment Contracts**" means each written employment contract and retention agreement, between the Vendor and an Employee or TLC Moncton and a TLC Moncton Employee.

"**Excluded Assets**" has the meaning specified in Section 2.2.

"**Excluded Contracts**" has the meaning specified in Section 2.2(d).

"**Excluded Liabilities**" has the meaning specified in Section 4.2.

"**Excluded Intellectual Property**" means the Intellectual Property licensed to the Purchaser pursuant to the License Agreement and the PHAROS License Agreement, Intellectual Property that is owned by or licensed to the Vendor and is not used exclusively by the Vendor in connection with the Purchased Business, and Software set out in Schedule 5.1(cc).

"**GAAP**" means accounting principles generally accepted in the United States at the relevant time applied on a consistent basis.

"**Governmental Entity**" means (i) any international, multinational, national, federal, provincial, state, municipal, local or other governmental or public department, central bank, court, commission, board, bureau, agency or instrumentality, domestic or foreign, (ii) any subdivision or authority of any of the above, (iii) any stock exchange and (iv) any quasi-governmental or private body exercising any regulatory, expropriation or taxing authority under or for the account of any of the above.

**"Indemnified Person"** means a Person with indemnification rights or benefits under Section 11.2 or Section 11.3, or otherwise under this Agreement.

**"Indemnifying Party"** means a Party against which a claim may be made for indemnification under this Agreement, including pursuant to Article 11.

**"Intellectual Property"** means domestic and foreign: (i) patents, applications for patents and reissues, divisions, continuations, renewals, extensions and continuations-in-part of patents or patent applications; (ii) proprietary and non-public business information, including inventions (whether patentable or not), invention disclosures, improvements, discoveries, trade secrets, confidential information, know-how, methods, processes, designs, technology, technical data, schematics, formulae and customer lists, and documentation relating to any of the foregoing; (iii) copyrights, copyright registrations and applications for copyright registration; (iv) mask works, mask work registrations and applications for mask work registrations; (v) designs, design registrations, design registration applications and integrated circuit topographies; (vi) trade names, business names, corporate names, domain names, website names and world wide web addresses, common law trade-marks, trade-mark registrations, trade mark applications, trade dress and logos, and the goodwill associated with any of the foregoing; (vii) Software; and (viii) any other intellectual property and industrial property.

**"Inter-Company Contract"** has the meaning in Section 5.1(x)(xiii).

**"Inter-Company Contract Claim"** has the meaning in Section 12.7.

**"Interim Period"** means the period between the close of business on the date hereof and the Closing.

**"Inventories"** has the meaning specified in Section 2.1(c).

**"Laws"** means any and all applicable (i) laws, constitutions, treaties, statutes, codes, ordinances, orders, decrees, rules, regulations and by-laws (ii) judgments, orders, writs, injunctions, decisions, awards and directives of any Governmental Entity and (iii) policies, guidelines, notices and protocols of any Governmental Entity.

**"Leased Properties"** means the lands and premises described in Schedule 5.1(w).

**"Leases"** means the leases described in Schedule 5.1(w).

**"Letter of Intent"** means the letter of intent between the Purchaser and the Vendor, dated November 10, 2009 and accepted by the Vendor on November 12, 2009.

**"License Agreement"** has the meaning specified in Section 8.1(m).

**"Lien"** means any mortgage, charge, pledge, hypothec, security interest, assignment, lien (statutory or otherwise), easement, title retention agreement or arrangement, conditional sale, deemed or statutory trust, restrictive covenant or other encumbrance of any nature which, in substance, secures payment or performance of an obligation.

**"Machat Agreement"** means the professional services agreement dated January 31, 2003 between TLC Vision Corporation and Jeffrey Machat M.D., including all amendments and renewals thereto.

**"material adverse effect"** and **"material adverse change"** shall not include the announcement or pendency of the U.S. Bankruptcy Proceeding or the Canadian Insolvency Proceedings, including the impact thereof on relationships, contractual or otherwise, with employees, customers, suppliers, distributors or partners.

**"Material Authorizations"** has the meaning specified in Section 5.1(p).

**"Material Contracts"** means, collectively, the Purchased Contracts and the TLC Moncton Contracts.

**"New TLC Moncton Shareholders' Agreement"** has the meaning specified in Section 8.1(i).

**"Non-assigned Contracts"** has the meaning specified in Section 9.3.

**"Notice"** has the meaning specified in Section 14.1.

**"Offered Employees"** has the meaning specified in Section 13.1(1).

**"Ontario Clinics"** means the Vendor's laser eye surgery clinics located in North York (Ontario), London (Ontario), Mississauga (Ontario) and Waterloo (Ontario).

**"Ontario Clinics' Accounts Payable"** means, in respect of the Ontario Clinics, trade payables, accrued payroll (excluding accrued vacation), surgeon fees relating to surgeries prior to Closing, co-management fees relating to surgeries prior to Closing, accrued employer portions of employment insurance, Canada Pension Plan, provincial health tax, workers' compensation and accrued employer contributions to the Employee Plans as described in Schedule 5.1 (mm) with respect to the Employees of the Vendor.

**"Ontario Clinics' Financial Statements"** means the unaudited financial statements of each of the Ontario Clinics for the fiscal years ending December 31, 2008, 2007 and 2006, respectively, consisting in each case of a balance sheet and accompanying statement of income.

**"Ontario Clinics' Interim Balance Sheet"** means the unaudited balance sheet of the Vendor's Ontario Clinics as at the Interim Balance Sheet Date.

**"Ontario Clinics' Interim Balance Sheet Date"** means October 31, 2009.

**"Ontario Clinics' Interim Financial Statements"** means the Ontario Clinics' Interim Balance Sheet and the accompanying statement of income for the Ontario Clinics for the 10 month period then ended.

**"Ordinary Course"** means, with respect to an action taken by a Person, that such action is consistent with the past practices of the Person and is taken in the ordinary course of the normal day-to-day operations of the Person.

**"Owned Intellectual Property"** has the meaning specified in Section 5.1(bb)(i).

**"Parties"** means the Vendor, the Purchaser and any other Person who may become a party to this Agreement.

**"Pension Plan"** means the "Pension Plan for the Employees of TLC Vision Corporation.", Ontario registration number 1143056.

**"Permitted Liens"** means any one or more of the following:

(a)    Liens for Taxes of TLC Moncton which are not delinquent or the validity of which is being contested at the time by the Vendor in good faith by proper legal proceedings if, in the Purchaser's opinion, adequate provision has been made for their payment; and

(b)    Liens listed and described in Schedule 5.1(s) but only to the extent such Liens conform to their description in Schedule 5.1(s).

**"Person"** means a natural person, partnership, limited partnership, limited liability partnership, corporation, limited liability company, unlimited liability company, joint stock company, trust, unincorporated association, joint venture or other entity or Governmental Entity, and pronouns have a similarly extended meaning.

**"Pharos License Agreement"** has the meaning specified in Section 8.1(n).

**"Public Statement"** has the meaning specified in Section 14.3.

**"Purchase Price"** has the meaning specified in Section 3.1.

**"Purchased Assets"** has the meaning specified in Section 2.1.

**"Purchased Business"** means laser eye surgery centres situated in Canada operated directly or indirectly by the Vendor through the Purchased Clinics.

**"Purchased Clinics"** means the laser eye surgery clinics located in North York (Ontario), London (Ontario), Mississauga (Ontario), Waterloo (Ontario), Moncton (New Brunswick) and Halifax (Nova Scotia) owned and operated directly by the Vendor, or in the case of the clinics located in Moncton (New Brunswick) and Halifax (Nova Scotia), indirectly through the Vendor's majority shareholding in TLC Moncton.

**"Purchased Contracts"** has the meaning specified in Section 2.1(e).

**"Purchased Intellectual Property"** has the meaning specified in Section 2.1(g).

**"Purchased Shares"** has the meaning specified in Section 2.1(a).

**"Purchaser"** means 7289499 Canada Inc., a corporation incorporated under the federal laws of Canada.

**"Required Lenders"** means the "Required Lenders" under the DIP Credit Agreement, provided that if the DIP Credit Agreement has been terminated and the obligations thereunder have been satisfied in full the term "Required Lenders" hereunder shall mean the "Required Lenders" under that certain Amended and Restated Credit Agreement dated as of June 21, 2007 (as amended and in effect from time to time) among the Vendor, its subsidiaries, the lenders party thereto, and Wells Fargo Bank, National Association, as administrative agent and collateral agent.

**"Shared Intellectual Property"** means Intellectual Property owned by the Vendor or any of its Affiliates or permitted to be sublicensed by the Vendor, as of the date of this Agreement, and used by the Vendor in connection with the Purchased Business as of the Closing Date, except for: (i) Intellectual Property licensed pursuant to the License Agreement, (ii) Intellectual Property licensed pursuant to the PHAROS License Agreement, (iii) Intellectual Property used by the Vendor exclusively in connection with the Purchased Business, (iv) the Software set out in Schedule 5.1(bb) of the Purchase Agreement, (v) domain names other than the domain names set out in Schedule 5.1 (cc), and (vi) any rights to use the image or likeness of, or make reference to, Tiger Woods.

**"Shared IP License Agreement"** has the meaning specified in Section 8.1(p).

**"Software"** means computer software and programs (both source code and object code form), all proprietary rights in the computer software and programs and all documentation and other materials related to the computer software and programs.

**"Surgeons"** has the meaning specified in Section 8.1(k).

**"Surgeon Arrangements"** has the meaning specified in Section 8.1(k).

**"Tax Act"** means the *Income Tax Act*, R.S.C. 1985 (5th Supp.) c.1, as amended.

**"Tax Returns"** means any and all returns, reports, declarations, elections, notices, forms, designations, filings, and statements (including estimated tax returns and reports, withholding tax returns and reports, and information returns and reports) filed or required to be filed in respect of Taxes.

**"Taxes"** means (i) any and all taxes, duties, fees, excises, premiums, assessments, imposts, levies and other charges or assessments of any kind whatsoever imposed by any Governmental Entity, whether computed on a separate, consolidated, unitary, combined or other basis, including those levied on, or measured by, or described with respect to, income, gross receipts, profits, gains, windfalls, capital, capital stock, production, recapture, transfer, land transfer, license, gift, occupation, wealth, environment, net worth, indebtedness, surplus, sales, goods and services, harmonized sales, use, value-added, excise, special assessment, stamp, withholding, business, franchising, real or personal property, health, employee health, payroll, workers' compensation, employment or unemployment, severance, social services, social security,

education, utility, surtaxes, customs, import or export, and including all license and registration fees and all employment insurance, health insurance and government pension plan premiums or contributions; (ii) all interest, penalties, fines, additions to tax or other additional amounts imposed by any Governmental Entity on or in respect of amounts of the type described in clause (i) above or this clause (ii); (iii) any liability for the payment of any amounts of the type described in clauses (i) or (ii) as a result of being a member of an affiliated, consolidated, combined or unitary group for any period; and (iv) any liability for the payment of any amounts of the type described in clauses (i) or (ii) as a result of any express or implied obligation to indemnify any other Person or as a result of being a transferee or successor in interest to any party.

"**Third Party Claim**" means any action, suit, proceeding, arbitration, claim or demand that is instituted or asserted by a third party, including a Governmental Entity, against an Indemnified Person which entitles the Indemnified Person to make a claim for indemnification under this Agreement against an Indemnifying Party.

"**TLC Moncton**" means TLC The Laser Center (Moncton) Inc., a corporation incorporated under the laws of Ontario.

"**TLC Moncton Accounts Receivable**" means all accounts receivable, notes receivable and other debts due or accruing due to TLC Moncton.

"**TLC Moncton Accounts Payable**" means trade payables, accrued payroll (excluding accrued vacation), surgeon fees relating to surgeries prior to Closing, co-management fees relating to surgeries prior to Closing, accrued employer portions of employment insurance, Canada Pension Plan, provincial health tax, workers' compensation and accrued employer contributions to the Employee Plans as described in Schedule 5.1 (mm) with respect to the Employees of the Vendor.

"**TLC Moncton Assets**" means all property and assets of TLC Moncton of every nature and kind and wheresoever situate including (i) all machinery, equipment, technology and communications hardware and infrastructure, furniture, accessories and supplies of all kinds, (ii) all inventories, (iii) all TLC Moncton Accounts Receivable and the full benefit of all security for those accounts receivable, (iv) all of TLC Moncton's prepaid expenses, (v) the leasehold interest of TLC Moncton in and to its leased properties, (vi) all right, title and interest of TLC Moncton in and to the Intellectual Property owned by, licensed to or used by TLC Moncton, (vii) the full benefit of all Contracts to which TLC Moncton is a party, and (viii) the Books and Records and the Corporate Records.

"**TLC Moncton Business**" has the meaning specified in Section 5.1(r).

"**TLC Moncton Contracts**" has the meaning specified in Section 5.1(x).

"**TLC Moncton Employee Plan**" has the meaning specified in Section 5.1(mm)(i).

"**TLC Moncton Employees**" means Employees listed on Schedule 1.1 who are employed by TLC Moncton in connection with the laser eye surgery centres located in Moncton (New Brunswick) and Halifax (Nova Scotia).

**"TLC Moncton Financial Statements"** means the unaudited financial statements of TLC Moncton for the fiscal years ending December 31, 2006, 2007 and 2008, respectively, consisting in each case of a balance sheet and the accompanying statement of income.

**"TLC Moncton Intellectual Property"** means all Intellectual Property owned by or licensed to or used by TLC Moncton in connection with the Purchased Business, except for the Excluded Intellectual Property.

**"TLC Moncton Interim Balance Sheet"** means the unaudited balance sheet of TLC Moncton as at the TLC Moncton Interim Balance Sheet Date.

**"TLC Moncton Interim Balance Sheet Date"** means October 31, 2009.

**"TLC Moncton Interim Financial Statements"** means the TLC Moncton Interim Balance Sheet and the accompanying statement of income for TLC Moncton for the 10 month period then ended.

**"TLC Moncton Pre-Closing Tax Liability Amounts"** has the meaning specified in Section 7.8.

**"TLC Moncton Pre-Closing Transaction"** means the declaration and payment by TLC Moncton of a cash dividend prior to Closing, including to reduce or eliminate the intercompany receivable of TLC Moncton.

**"TLC Moncton Shareholders' Agreement"** means the unanimous shareholders' agreement between the Vendor, formerly TLC The Laser Center Inc., Atlantic Laser Investments Ltd. and TLC Moncton dated October 1, 1997.

**"Transferred Employees"** has the meaning specified in Section 13.1(3).

**"Transitional Services Agreement"** has the meaning specified in Section 8.1(l).

**"U.S. Approval Order"** has the meaning specified in Section 8.1(c).

**"U.S. Bankruptcy Code"** means Title 11 of the United States Code.

**"U.S. Bankruptcy Court"** means the United States Bankruptcy Court for the District of the State of Delaware.

**"U.S. Bankruptcy Proceeding"** means the proceedings commenced by the Vendor, together with certain of its Affiliates and subsidiaries under chapter 11 of the U.S. Bankruptcy Code in the U.S. Bankruptcy Court.

**"U.S. Orders"** mean the U.S. Approval Order and any other order of the U.S. Bankruptcy Court issued and entered in the U.S. Bankruptcy Proceeding in respect of the purchase transaction contemplated in this Agreement.

**"Vendor"** means TLC Vision Corporation.

### Section 1.2    Gender and Number.

Any reference in this Agreement or any Ancillary Agreement to gender includes all genders. Words importing the singular number only shall include the plural and vice versa.

### Section 1.3    Headings, etc.

The provision of a Table of Contents, the division of this Agreement into Articles and Sections and the insertion of headings are for convenient reference only and are not to affect its interpretation.

### Section 1.4    Currency.

All references in this Agreement or any Ancillary Agreement to dollars or to $ are expressed in Canadian currency unless otherwise specifically indicated.

### Section 1.5    Certain Phrases, etc.

In this Agreement and any Ancillary Agreement (i) the words "**including**", "**includes**" and "**include**" mean "**including (or includes or include) without limitation**", and (ii) the phrase "**the aggregate of**", "**the total of**", "**the sum of**", or a phrase of similar meaning means "the aggregate (or total or sum), without duplication, of". Unless otherwise specified, the words "Article" and "Section" followed by a number mean and refer to the specified Article or Section of this Agreement. In the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word "**from**" means "**from and including**" and the words "**to**" and "**until**" each mean "**to but excluding**".

### Section 1.6    Knowledge.

Where any representation or warranty contained in this Agreement or any Ancillary Agreement is expressly qualified by reference to the knowledge of the Vendor, it shall, except as otherwise specified, be deemed to refer to the knowledge of Charles Judy, Henry Lynn, Ellen Jo Plass, Warren Rustand, Steve Tucker and Drue Hood after reasonable and prudent inquiry.

### Section 1.7    Accounting Terms.

All accounting terms not specifically defined in this Agreement are to be interpreted in accordance with GAAP.

### Section 1.8    Schedules.

The schedules attached to this Agreement form an integral part of this Agreement for all purposes of it.

### Section 1.9    References to Persons and Agreements.

Any reference in this Agreement or any Ancillary Agreement to a Person includes its heirs, administrators, executors, legal personal representatives, successors and permitted assigns. Except as otherwise provided in this Agreement or any Ancillary Agreement, the term "Agreement" and any reference in this Agreement to this Agreement, any Ancillary Agreement or any other agreement or document includes, and is a reference to, this Agreement, such Ancillary Agreement or such other agreement or document as it may have been, or may from time to time be amended, restated, replaced, supplemented or novated and shall include all schedules to it.

**Section 1.10    Statutes.**

Except as otherwise provided in this Agreement or any Ancillary Agreement, any reference in this Agreement to a statute refers to such statute and all rules and regulations made under it, as it or they may have been or may from time to time be amended or re-enacted.

**Section 1.11    Non-Business Days.**

Whenever payments are to be made or an action is to be taken on a day which is not a Business Day, such payment shall be made or such action shall be taken on or not later than the next succeeding Business Day.

**ARTICLE 2**
**PURCHASED ASSETS**

**Section 2.1    Purchased Assets.**

The Vendor, as debtor and debtor in possession, and subject to and pursuant to the terms and conditions of this Agreement and the Court Orders, agrees to sell, assign and transfer to the Purchaser and the Purchaser agrees to purchase from the Vendor on the Closing Date, effective as of the Effective Time, the following property and assets of the Vendor in respect of the Purchased Business, other than the Excluded Assets (collectively, the "**Purchased Assets**"):

(a)    **TLC Moncton.** All of the Vendor's right, title and interest in 75 common shares of TLC Moncton (the "**Purchased Shares**");

(b)    **Machinery, Equipment and Supplies.** The machinery, equipment, technology and communications hardware and infrastructure, furniture, furnishings and accessories, listed and described in Schedule 2.1(b) and all parts and supplies of all kinds, including office supplies, owned by the Vendor and located at the Ontario Clinics;

(c)    **Inventories.** All inventories of the Vendor in respect of the Ontario Clinics (the "**Inventories**"), including all materials and supplies on hand to be used or consumed in connection with the operation of the Ontario Clinics;

(d)    **Prepaid Expenses.** All prepaid expenses of the Vendor in respect of the Ontario Clinics;

(e)    **Contracts.** The full benefit of the Contracts listed in Schedule 2.1(e) and Leases (collectively, the "**Purchased Contracts**");

(f)    **Authorizations.** All Authorizations owned, held or used by the Vendor in connection with the Ontario Clinics to the extent that they are transferable;

(g)    **Intellectual Property.** All right, title and interest of the Vendor in and to the Intellectual Property owned by and licensed to the Vendor and used by the Vendor in connection with the Purchased Business, including all local phone numbers in area codes in Canada used in connection with the Purchased Business and all domains names used in connection with the Purchased Business

containing the word "Canada" or ending in ".ca" except for the Excluded Intellectual Property (collectively, the **"Purchased Intellectual Property"**);

(h) **Books and Records.** Subject to Section 2.2(e) (in which case copies of such Books and Records), originals of all of the Books and Records (provided that the Vendor may retain copies of such original Books and Records), excluding all Tax Returns pertaining to corporate income taxes of the Vendor and minute books of the Vendor; and

(i) **Goodwill.** The goodwill of the Vendor in respect of the Purchased Business, including the exclusive right of the Purchaser to (i) represent itself as carrying on the Purchased Business in continuation of and in succession to the Vendor, and (ii) use any words indicating that the Purchased Business is so carried on, including the rights, if any, to telephone and facsimile numbers used in connection with the Purchased Business.

**Section 2.2     Excluded Assets.**

The Purchased Assets shall not include any of the following assets (collectively, the **"Excluded Assets"**):

(a) all cash and cash equivalents on hand or on deposit with banks or other depositories and all securities and short term investments of the Vendor;

(b) accounts receivable of the Vendor;

(c) the minute books and corporate records of the Vendor;

(d) the full benefit of all Contracts to which the Vendor is a party other than the Purchased Contracts (the **"Excluded Contracts"**);

(e) the property and assets of the Vendor located at the Call Center and at the Canadian Head Office, and the original Books and Records not used primarily in connection with the Purchased Business, in which case the Purchased Assets shall include copies of such Books and Records;

(f) income tax refunds and other Tax refunds receivable by the Vendor and all Tax Returns pertaining to corporate income taxes of the Vendor;

(g) all assets related to the Pension Plan;

(h) any shares, partnership interests or any other equity interests in any Person owned by the Vendor other than the Purchased Shares;

(i) all rights of the Vendor under this Agreement and the Ancillary Agreements;

(j) the Excluded Intellectual Property; and

(k) insurance policies of the Vendor.

## ARTICLE 3
## PURCHASE PRICE

**Section 3.1      Purchase Price.**

The consideration (the **"Purchase Price"**) payable by the Purchaser to the Vendor for the Purchased Assets is Nine Million, Seven Hundred Thousand Dollars ($9,700,000.00), plus the dollar value of the Assumed Liabilities.

**Section 3.2      Allocation.**

The Vendor and the Purchaser agree to allocate the Purchase Price in accordance with the provisions of Schedule 3.2. Except to the extent otherwise required by applicable Law, the Parties agree to execute and file all of their own Tax Returns and prepare all of their own financial statements and other instruments on the basis of this allocation.

**Section 3.3      Payment of the Purchase Price.**

At the Closing, the Purchase Price shall be paid and satisfied as follows:

(a)      as to the dollar value of the Assumed Liabilities, by the Purchaser assuming the Assumed Liabilities; and

(b)      as to the balance, by the Purchaser paying to or to the order of the Vendor $9,700,000 by wire transfer of immediately available funds.

**Section 3.4      Payment of Sales Tax and Registration Charges on Transfer.**

(1)      The Purchaser shall be liable for and shall pay all sales taxes and all other similar taxes, duties, registration fees or other like charges properly payable by the Purchaser upon and in connection with the sale, assignment and transfer of the Purchased Assets from the Vendor to the Purchaser, other than any Taxes payable on the Vendor's net income, profits or gains. On Closing, the Purchaser will either pay such Taxes to the Vendor or deliver to the Vendor evidence confirming the Purchaser's payment of or exemption from payment of such Taxes in form and substance acceptable to Vendor, acting reasonably. To the extent any such Taxes are required to be paid by or imposed upon the Vendor, the Purchaser will reimburse the Vendor for such Taxes within five (5) Business Days of payment by the Vendor. For greater certainty, and notwithstanding Section 5.1(qq)(ii), the Purchaser shall pay to the Vendor on Closing the goods and services tax applicable to the sale of the Purchased Assets that are subject to goods and services tax, including, without limitation, any property forming part of the Purchased Assets other than personal property (as defined in the *Excise Tax Act* (Canada)) and any property supplied hereunder by the Vendor to the Purchaser by way of lease, license or similar arrangement.

(2)      The Parties will use their commercially reasonable efforts in good faith to minimize (or eliminate) any taxes payable under the *Excise Tax Act* (Canada) in respect of the Closing by, among other things taking such steps as may be provided for under that Act as may reasonably be requested by the Purchaser in connection with the Closing. Notwithstanding anything to the contrary in this Agreement (including without limitation Section 5.1(qq)(ii)), the Purchaser shall indemnify and hold the Vendor

harmless in respect of any goods and services tax, sales tax, penalties, interest and other amounts or Taxes which may be assessed against the Vendor as a result of the transactions under this Agreement and such obligations shall survive the Closing indefinitely.

**Section 3.5    Adjustment for rent and lease payments**

Rent and other charges paid or payable under the Leases and any amounts owing under equipment leases shall be prorated between the Vendor and the Purchaser in accordance with the principle that the Vendor shall be responsible for such expenses allocable to the period prior to the close of business on the day prior to the Closing Date and the Purchaser shall be responsible for all such expenses allocable to the period after such date, and such proration shall be reflected in an appropriate adjustment to the Purchase Price on the Closing Date.

**ARTICLE 4**
**ASSUMED LIABILITIES**

**Section 4.1    Assumed Liabilities.**

Subject to Closing, the Purchaser agrees to discharge, perform and fulfil the following obligations and liabilities of the Vendor with respect to the Purchased Business and the Purchased Assets as and from the Effective Time (collectively, the "**Assumed Liabilities**"):

(a)    all obligations and liabilities under the Purchased Contracts arising in respect of the period after the Effective Time and not related to any default existing at, prior to or as a consequence of Closing;

(b)    all compensation with respect to accrued and unused vacation days that is due and owing to the Transferred Employees by the Vendor as of the Closing Date (the "**Accrued Vacation Amount**");

(c)    all other obligations and liabilities expressly assumed under this Agreement, including under Section 13.2; and

(d)    all liabilities and obligations arising from ownership of the Purchased Assets from and after the Effective Time.

**Section 4.2    Excluded Liabilities**

The Purchaser shall not assume and shall have no obligation to discharge, perform or fulfil, any and all Excluded Liabilities. "**Excluded Liabilities**" means any and all liabilities and obligations of the Vendor or with respect to the Purchased Business or the Purchased Assets, whether known, unknown, direct, indirect, absolute, contingent or otherwise or arising out of facts, circumstances or events, in existence on or prior to the Closing Date, other than the Assumed Liabilities, including:

(a)    liabilities accrued and due prior to the Effective Time under the Purchased Contracts;

(b)    all liabilities and obligations under all Contracts to which the Vendor is a party other than the Purchased Contracts;

(c)    subject to Section 3.4, any assessment or reassessment for income, corporate, capital, sales, excise or other Taxes, duties or imposts of any kind whatsoever of the Vendor or, if incurred or accruing due prior to the Effective Time, relating to the Purchased Business or Purchased Assets;

(d)    all liabilities and obligations of the Vendor described in Section 13.2, Section 13.3 and Section 13.4(1);

(e)    all liabilities and obligations arising out of the Employment Contracts to which the Vendor is a party, with the exception of any liability expressly assumed by the Purchaser under this Agreement in respect of any Transferred Employee, including under Section 13.4(2);

(f)    all liabilities relating to the Employee Plans other than the TLC Moncton Employee Plans;

(g)    all liabilities relating to the Pension Plan; and

(h)    the Ontario Clinics' Accounts Payable.

**Section 4.3      Assumption of Contractual Liabilities.**

Notwithstanding anything in this Agreement, the Purchaser does not assume and has no obligation to discharge any liability or obligation under or in respect of any Purchased Contract which, subject to the Court Orders, (i) is not assignable in whole or in part without the consent, approval or waiver of the other party or parties to it or (ii) which cannot be performed by the Purchaser without the consent of the other party or parties to it, unless, in either case, (x) such consent, approval or waiver has been obtained on terms satisfactory to the Purchaser, acting reasonably, (y) the Vendor has performed its obligations under Section 12.2 and the value of such Purchased Contract has enured to the Purchaser or (z) pursuant to the Court Orders such consent, approval or waiver is not necessary for the assignment of such Purchased Contract to the Purchaser.

**ARTICLE 5**
**REPRESENTATIONS AND WARRANTIES OF THE VENDOR**

**Section 5.1      Representations and Warranties.**

Except as set forth in the Schedules (with specific reference to the section of this Agreement to which the information stated in such disclosure relates; provided that information contained in any Schedule shall be deemed to be disclosed with respect to any other Schedule to the extent that it is reasonably apparent from the face of such disclosure that such information is applicable to such other Schedule), the Vendor represents and warrants as follows to the Purchaser and acknowledges and agrees that the Purchaser is relying upon the representations and warranties in connection with its purchase of the Purchased Assets and its assumption of the Assumed Liabilities.

**Corporate Matters**

(a) **Incorporation and Qualification.** The Vendor and TLC Moncton are corporations incorporated and existing under the laws of New Brunswick and Ontario, respectively, and each has the corporate power to own and operate its property, carry on its business and enter into and perform its obligations under this Agreement and each of the Ancillary Agreements to which it is a party. Each of the Vendor (in respect of the Purchased Business) and TLC Moncton is qualified, licensed or registered to carry on business in the jurisdictions listed in Schedule 5.1(a). The jurisdictions listed in Schedule 5.1(a) include all jurisdictions in which the nature of the Purchased Assets or the Purchased Business makes such qualification necessary or where the Vendor owns or leases any material properties or assets or conducts any material business relating to the Purchased Business.

(b) **Corporate Authorization.** Subject to the granting of the Court Orders, the execution and delivery of and performance by the Vendor, of this Agreement and each of the Ancillary Agreements to which it is a party and the consummation of the transactions contemplated by it have been duly authorized by all necessary corporate action on the part of the Vendor.

(c) **No Conflict.** Except as disclosed in Schedule 5.1(c) and except for the consents, approvals and waivers described in Schedule 5.1(e), and subject to the granting of the Court Orders, the execution and delivery of and performance by the Vendor, of this Agreement and each of the Ancillary Agreements to which it is a party:

　(i) do not and will not (or would not with the giving of notice, the lapse of time or the happening of any other event or condition) constitute or result in a violation or breach of, or conflict with, or allow any Person to exercise any rights under, any of the terms or provisions of its or TLC Moncton's constating documents or by-laws;

　(ii) do not and will not (or would not with the giving of notice, the lapse of time or the happening or any other event or condition) constitute or result in a breach or violation of, or conflict with or allow any Person to exercise any rights under, any of the terms or provisions of any Material Contracts or instruments to which it or TLC Moncton is a party or pursuant to which any of its or TLC Moncton's assets or property may be affected;

　(iii) do not and will not result in a breach of, or cause the termination or revocation of, any Authorization held by the Vendor or TLC Moncton or necessary to the ownership of the Purchased Assets or the operation of the Purchased Business; and

　(iv) do not and will not result in the violation of any Law.

(d) **Required Authorizations.** There is no requirement to make any filing with, give any notice to, or obtain any Authorization of, any Governmental Entity as a condition to the lawful completion of the transactions contemplated by this Agreement, except for the filings, notifications and Authorizations described in Schedule 5.1(d).

(e) **Required Consents.** There is no requirement to obtain any consent, approval or waiver of a party under any Material Contract to which the Vendor or TLC Moncton is a party in connection with the Purchased Business, to the assignment of any Purchased Contract or to any of the other transactions contemplated by this Agreement, except for the consents, approvals and waivers described in Schedule 5.1(e). The Purchased Contracts are assignable to the Purchaser without payment of penalties or impositions of restrictions or other material adverse effect on the Purchased Business.

(f) **Execution and Binding Obligation.** Subject to the granting of the Court Orders, this Agreement and each of the Ancillary Agreements to which the Vendor is a party have been duly executed and delivered by the Vendor and constitute legal, valid and binding agreements of it, enforceable against it in accordance with their respective terms.

(g) **Residence of the Vendor.** The Vendor is not a non-resident of Canada within the meaning of the Tax Act.

(h) **Authorized and Issued Capital.** The authorized capital of TLC Moncton consists of an unlimited number of common shares, of which (i) at this date, 100 common shares (and no more) have been duly issued and are outstanding as fully paid and non assessable, and (ii) at the Closing Date, 100 common shares (and no more) shall have been duly issued and shall be outstanding as fully paid and non assessable. All of the Purchased Shares have been issued in compliance with all applicable Laws including applicable securities Laws. TLC Moncton is not a reporting issuer (as such term is defined in the *Securities Act* (Ontario) and there is no published market for the Purchased Shares. TLC Moncton is a "private issuer" as defined in s.2.4 of National Instrument 45-106.

(i) **No Other Agreements to Purchase.** Except for the Purchaser's right under this Agreement or pursuant to the TLC Moncton Shareholders' Agreement, no Person has any written or oral agreement, option or warrant or any right or privilege (whether by Law, pre emptive or contractual) capable of becoming such for (i) the purchase or acquisition from the Vendor of any of the Purchased Shares, or (ii) the purchase, subscription, allotment or issuance of any of the unissued shares or other securities of TLC Moncton.

(j) **Title to Purchased Shares.** Subject to the granting of the Court Orders, the Purchased Shares are owned by the Vendor as the registered and beneficial owner with good title, free and clear of all Liens other than those restrictions on transfer, if any, contained in the articles of TLC Moncton and the TLC Moncton Shareholders' Agreement and those Liens set forth in Schedule 5.1(j). Upon

completion of the transaction contemplated by this Agreement, the Purchaser will have good and valid title to Purchased Shares, free and clear of all Liens other than (i) those restrictions on transfer, if any, contained in the articles of TLC Moncton, and the New TLC Moncton Shareholders' Agreement and (ii) Liens granted by the Purchaser.

(k)     **Dividends and Distributions.** Since August 28, 2009, TLC Moncton has not, directly or indirectly, declared or paid any dividends or declared or made any other distribution on any of its shares of any class and has not, directly or indirectly, redeemed, purchased or otherwise acquired any of its shares of any class or agreed to do so.

(l)     **Corporate Records.** The Corporate Records are complete and accurate in all material respects and all corporate proceedings and actions reflected in the Corporate Records have been conducted or taken in all material respects in compliance with all applicable Laws and with the articles and by-laws of TLC Moncton.

**General Matters Relating to the Purchased Business**

(m)     **Conduct of Business in Ordinary Course.** Except as disclosed in Schedule 5.1(m), since August 28, 2009, the Purchased Business has been carried on in the Ordinary Course. Without limiting the generality of the foregoing, the Vendor has not and TLC Moncton has not:

(i)     sold, transferred or otherwise disposed of any assets used in the Purchased Business except for (A) assets which are obsolete and which individually or in the aggregate do not exceed $10,000; or (B) inventory sold in the Ordinary Course;

(ii)    made any capital expenditure or commitment to do so in respect of the Purchased Business which individually or in the aggregate exceeded $10,000;

(iii)   discharged any secured or unsecured obligation or liability (whether accrued, absolute, contingent or otherwise) relating to the Purchased Business which individually or in the aggregate exceeded $10,000;

(iv)    increased its indebtedness for borrowed money or made any loan or advance, or assumed, guaranteed or otherwise became liable with respect to the liabilities or obligation of any Person in connection with the Purchased Business;

(v)     made any bonus or profit sharing distribution or similar payment of any kind to any Person in connection with the Purchased Business, except as may be required by the terms of a Contract, an Employee Plan or a written Employment Contract;

(vi)    granted any general increase in the rate of wages, salaries, bonuses or other remuneration of any Employees except as may be required by the terms of a Contract, an Employee Plan or a written Employment Contract;

(vii)    increased the benefits to which Employees are entitled under any Employee Plan or created any new Employee Plan for any Employee;

(viii)    suffered any extraordinary loss in respect of the Purchased Business or any of the Purchased Assets, whether or not covered by insurance;

(ix)    suffered any material shortage or any material cessation or interruption of inventory shipments, supplies or ordinary services in connection with the Purchased Business;

(x)    cancelled or waived any material claims or rights in connection with the Purchased Business;

(xi)    compromised or settled any material litigation, proceeding or other governmental action relating to the Purchased Assets or the Purchased Business;

(xii)    cancelled or reduced any of its insurance coverage on the Purchased Business or any of the Purchased Assets; or

(xiii)    authorized, agreed or otherwise committed, whether or not in writing, to do any of the foregoing.

(n)    **No Material Adverse Change.** Since August 28, 2009, there has not been any material adverse change in the Purchased Business and, to the knowledge of the Vendor, no event has occurred or circumstance exists which would reasonably be expected to have material adverse effect on the Purchased Business.

(o)    **Compliance with Laws.** The Vendor and TLC Moncton, as applicable, are conducting the Purchased Business in compliance with all applicable Laws of each jurisdiction in which the Purchased Business is carried on, other than acts of non-compliance which, individually or in the aggregate, are not material.

(p)    **Authorizations.** The Vendor or TLC Moncton, as applicable, owns, holds, possesses or lawfully uses in the operation of the Purchased Business, all Authorizations which are necessary for it to conduct the Purchased Business as presently conducted or for the ownership and use of the Purchased Assets in compliance with all applicable Laws. All Authorizations material to the Purchased Business are listed in Schedule 5.1(p) (the "**Material Authorizations**"). Each Material Authorization is valid, subsisting and in good standing, the Vendor is not in default or breach of any Material Authorization and, to the knowledge of the Vendor, no proceeding is pending or threatened to