revoke or limit any Material Authorization. All Material Authorizations (other than Material Authorizations of TLC Moncton) are assignable to the Purchaser.

**Matters Relating to the Purchased Assets**

(q)     **Sufficiency of Assets.** Except as disclosed in Schedule 5.1(q) and subject to the granting of the Court Orders, the Purchased Assets, along with the rights granted under the Ancillary Agreements, include all rights and property reasonably necessary to enable the Purchaser to carry on the Purchased Business after the Closing substantially in the same manner as it was conducted by the Vendor prior to the Closing.

(r)     **Sufficiency of TLC Moncton Assets.** The Atlantic Clinics and the Purchased Business carried on by TLC Moncton (the "**TLC Moncton Business**") is the only business operation carried on by TLC Moncton. The TLC Moncton Assets, along with the rights granted under the Ancillary Agreements, include all rights and property necessary to enable TLC Moncton to conduct the TLC Moncton Business after the Closing substantially in the same manner as it was conducted prior to the Closing.

(s)     **Title to the Purchased Assets.** Except for the Excluded Assets, the property and assets included in the Purchased Assets and the TLC Moncton Assets constitute all of the assets used by the Vendor and TLC Moncton in carrying on the Purchased Business. The Vendor and TLC Moncton, as applicable, have except with respect to the Leased Properties, the personal property leased by the Vendor or TLC Moncton pursuant to the Material Contracts and the Intellectual Property licensed to Vendor or TLC Moncton and disclosed in Schedule 5.1(s), legal and beneficial ownership of the Purchased Assets and the TLC Moncton Assets free and clear of all Liens, except for Permitted Liens. No other Person owns any property and assets which are being used in the Purchased Business except for the Leased Properties, the personal property leased by the Vendor or TLC Moncton pursuant to the Material Contracts and the Intellectual Property licensed to the Vendor or TLC Moncton and disclosed in Schedule 5.1(bb).

(t)     **No Options, etc. to Purchase Assets.** Except for the Purchaser under this Agreement and except as provided in the TLC Moncton Shareholders' Agreement, no Person has any written or oral agreement, option, understanding or commitment, or any right or privilege capable of becoming such for the purchase or other acquisition from the Vendor of any of the Purchased Assets, other than in the Ordinary Course.

(u)     **Condition of Tangible Assets.** The equipment, technology and communications hardware and other tangible personal property which comprise the Purchased Assets and the TLC Moncton Assets, or are leased by the Vendor or TLC Moncton and used by the Purchased Business are structurally sound, in good operating condition and repair having regard to their use and age and are adequate and suitable for the uses to which they are being put. None of such equipment or other property are in need of maintenance or repairs except for

routine maintenance and repairs in the Ordinary Course that are not material in nature or cost.

(v)     **Location of Purchased Assets.** All of the tangible Purchased Assets are situate at the Ontario Clinics and all of the tangible TLC Moncton Assets are situate at the Atlantic Clinics;

(w)     **Leases.** Neither the Vendor nor TLC Moncton is a party to, or under any agreement to become a party to, any leases with respect to real property which is used or to be used in the Purchased Business other than the Leases, copies of which have been provided to the Purchaser. Each Lease is in good standing, creates a good and valid leasehold estate in the Leased Properties thereby demised and is in full force and effect without amendment, except as disclosed in Schedule 5.1(w). With respect to each Lease (i) all rents and additional rents due and payable by the Vendor and/or TLC Moncton have been paid, (ii) to the knowledge of the Vendor no waiver, indulgence or postponement of the lessee's obligations has been granted by the lessor, (iii) there exists no default on the part of the Vendor and/or TLC Moncton or event, occurrence, condition or act which, with the giving of notice, the lapse of time or the happening of any other event or condition, would become a default on the part of the Vendor and/or TLC Moncton under the Leases, and (iv) to the knowledge of the Vendor, all of the material covenants to be performed by any other party under the Lease have been fully performed.

(x)     **Contracts.** Except for the Contracts to which TLC Moncton is a party listed in Schedule 5.1(x) (the **"TLC Moncton Contracts"**) and except for Purchased Contracts, the Employee Plans, the insurance policies, the Employment Contracts listed in Schedule 5.1(ll) and the Contracts listed in Schedule 5.1(bb), neither the Vendor, in connection with the Purchased Business, nor TLC Moncton is a party to or bound by:

(i)     any distributor, sales, advertising, agency or manufacturer's representative Contract;

(ii)    any continuing Contract for the purchase of materials, supplies, equipment or services involving in the case of any such Contract more than $50,000 over the life of the Contract;

(iii)   any Contract that expires or may be renewed at the option of any Person other than the Vendor or TLC Moncton so as to expire more than one year after the date of this Agreement;

(iv)    any trust indenture, mortgage, promissory note, loan agreement or other Contract for the borrowing of money, any currency exchange, interest rate, commodities or other hedging arrangement or any leasing transaction of the type required to be capitalized in accordance with GAAP;

(v)      any Contract for capital expenditures in excess of $10,000;

(vi)      any confidentiality, secrecy or non-disclosure Contract or any Contract limiting the freedom of the Vendor or TLC Moncton to engage in any line of business, compete with any other Person, solicit any Persons for any purpose or otherwise conduct its business;

(vii)      any Contract pursuant to which the Vendor or TLC Moncton is a lessor of any machinery, equipment, motor vehicles, office furniture, fixtures or other personal property;

(viii)      any Contract with any Person with whom the Vendor does not deal at arm's length within the meaning of the Tax Act;

(ix)      any agreement of guarantee, support, indemnification, assumption or endorsement of, or any similar commitment with respect to, the obligations, liabilities (whether accrued, absolute, contingent or otherwise) or indebtedness of any other Person;

(x)      any Contract in respect of the Intellectual Property owned by, licensed to or used by TLC Moncton or the Vendor in connection with the Purchased Business;

(xi)      any Contract made out of the Ordinary Course;

(xii)      any Contract with a physician, optometrist or other provider of professional medical services;

(xiii)      any inter-company Contract between the Vendor (or its predecessors) and TLC Moncton (each an "**Inter-Company Contract**"); or

(xiv)      any Contract that is material to the Purchased Business.

The Vendor and TLC Moncton, as applicable, has performed all of the obligations required to be performed by it and is entitled to all benefits under the Material Contracts (except for the Leases). Except for any breach or default arising from or related to the commencement and/or continuation of the U.S. Bankruptcy Proceeding or the Canadian Insolvency Proceedings, each of the Material Contracts (except for the Leases) is in full force and effect, unamended, and there exists no default or event of default or event, occurrence, condition or act (including the purchase of the Purchased Assets) which, with the giving of notice, the lapse of time or the happening of any other event or condition, would become a default or event of default under any Material Contract (except for the Leases) other than any requirements to obtain the consent to assignment of the other party. True, correct and complete copies of all Material Contracts have been delivered to the Purchaser. With respect to Contracts to which the Vendor or TLC Moncton is a party in connection with the Purchased Business that are not Material Contracts, except for (i) any breach or default arising from or related

to the commencement and/or continuation of the U.S. Bankruptcy Proceeding or the Canadian Insolvency Proceedings, and (ii) certain acts of default or breach which, in the aggregate, are not material, the Vendor has not violated or breached any of the terms or conditions of any such Contract, and to the knowledge of the Vendor, except for certain failures to perform which, in the aggregate, are not material, all the covenants to be performed by any other party to such Contracts have been fully performed.

(y) **[Intentionally Deleted].**

(z) **Purchased Clinic Appointment Information.** The Books and Records contain all information concerning the Purchased Clinics' booked pre-operation, post-operation, upcoming surgeries and all other scheduled appointments, and, subject to applicable Law, the Purchaser has been provided access to such information.

(aa) **Accounts Receivable.** All TLC Moncton Accounts Receivable are bona fide, and, subject to an allowance for doubtful accounts that has been reflected in the Corporate Records in accordance with GAAP and consistent with past practice.

(bb) **Intellectual Property.**

(i) Schedule 5.1(bb) includes complete and accurate particulars of all registrations and applications for registration of the Purchased Intellectual Property and TLC Moncton Intellectual Property owned by the Vendor or TLC Moncton, as applicable (collectively, the "**Owned Intellectual Property**"). All Owned Intellectual Property which has been registered has been properly maintained and renewed by the Vendor or TLC Moncton, as applicable, in accordance with all applicable Laws.

(ii) Except as set forth in Schedule 5.1(bb), the Vendor or TLC Moncton, as applicable, owns all right, title and interest in and to the Owned Intellectual Property, free and clear of all Liens (except Permitted Liens) and the Vendor or TLC Moncton, as applicable, has the right to use all the Intellectual Property used by it in carrying on the Purchased Business. The Vendor and TLC Moncton have taken reasonable steps to protect their respective rights in and to the Owned Intellectual Property.

(iii) Except as set forth in Schedule 5.1(bb), neither the Vendor nor TLC Moncton is a party to or bound by any Contract or other obligation that limits or impairs (i) their ability to use, sell, transfer, assign or convey, or that otherwise affects any of the Owned Intellectual Property or (ii) their ability to use any of the Purchased Intellectual Property or the TLC Moncton Intellectual Property licensed to or used by it, the loss of which would have a material adverse effect on the Purchased Business. Except as set forth in Schedule 5.1(bb), neither the Vendor nor TLC Moncton have granted to any Person any right, license or permission to use all or any portion of, or otherwise encumbered any of its rights in, or to, any of

the Purchased Intellectual Property or the TLC Moncton Intellectual Property owned by, licensed to or used by the Vendor or TLC Moncton, as applicable. Except as set forth in Schedule 5.1(bb), neither the Vendor nor TLC Moncton is obligated to pay any royalties, fees or other compensation to any Person in respect of its ownership, use or license of the Purchased Intellectual Property or the TLC Moncton Intellectual Property, as applicable.

(iv)     The operation of the Purchased Business does not infringe upon the Intellectual Property rights of any Person. Except as set forth in Schedule 5.1(bb), no claims have been asserted or are threatened by any Person against the Vendor or TLC Moncton, alleging that the conduct of the Purchased Business, including the use of the Purchased Intellectual Property or TLC Moncton Intellectual Property, as applicable, infringes upon any of their Intellectual Property rights. To the knowledge of the Vendor (such knowledge, with respect to Intellectual Property that is not owned by the Vendor, being knowledge without any inquiry of third parties), there are no valid grounds for any bona fide claims by any Persons alleging a conflict with or infringement of their Intellectual Property rights arising out of the use of the Purchased Intellectual Property or TLC Moncton Intellectual Property owned by, licensed to or used by or TLC Moncton, as applicable. To the knowledge of the Vendor (such knowledge, with respect to Intellectual Property that is not owned by the Vendor, being knowledge without any inquiry of third parties), there is no state of facts that casts doubt on the validity or enforceability of any of the Purchased Intellectual Property or TLC Moncton Intellectual Property owned by, licensed to or used by it or TLC Moncton, as applicable.

(v)      Subject to the granting of the Court Orders, and except as set forth in Schedule 5.1(bb), the transaction contemplated by this Agreement and the continued operation of the Purchased Business will not violate or breach the terms of any Intellectual Property license, or entitle any other party to any such Intellectual Property license to terminate or modify it, or otherwise adversely affect the Vendor's or TLC Moncton's rights under it.

(vi)     The Purchased Intellectual Property, the Excluded Intellectual Property and the TLC Moncton Intellectual Property constitutes all Intellectual Property necessary for the conduct of the Purchased Business as presently conducted. Except for the Excluded Intellectual Property, the Software set out in Schedule 5.1(cc) and as set forth in Schedule 5.1(bb), following Closing, the Purchaser or TLC Moncton, as applicable, will be entitled to continue to use, practice and exercise rights in, all of the Purchased Intellectual Property and TLC Moncton Intellectual Property, as applicable, to the same extent and in the same manner as used, practiced and exercised by the Vendor or TLC Moncton, as applicable, prior to Closing without financial obligation to any Person.

(vii)    Except as set forth in Schedule 5.1(bb), to the knowledge of the Vendor (such knowledge, with respect to Intellectual Property that is not owned by the Vendor, being knowledge without any inquiry of third parties), no Person is currently infringing any of the Purchased Intellectual Property or TLC Moncton Intellectual Property.

(viii)    Except as set forth in Schedule 5.1(bb), following the Closing, neither the Vendor nor any Affiliate of the Vendor will use in Canada any of the Purchased Intellectual Property or TLC Moncton Intellectual Property.

(ix)    None of the Owned Intellectual Property has been developed with the assistance or use of any funding from third parties or third party agencies, including funding from any Governmental Entity.

(cc)    **Software and Technology.**

(i)    Schedule 5.1(cc) contains a complete list of Software included within the Purchased Intellectual Property or the TLC Moncton Intellectual Property, identifying whether such Software is (i) owned by the Vendor or TLC Moncton, (ii) customised for the Vendor or TLC Moncton, the object code and source code of which are licensed for use by the Vendor or TLC Moncton, (iii) customized for the Vendor or TLC Moncton, only the object code of which is licensed to the Vendor or TLC Moncton, (iv) off-the-shelf Software licensed for use for the Vendor or TLC Moncton, or (v) Software, customized or otherwise, licensed or made available for the Vendor or TLC Moncton through the internet or otherwise from a network location neither owned or controlled by the Vendor or TLC Moncton.

(ii)    Except as disclosed in Schedule 5.1(cc), with respect to any Software included within the Owned Intellectual Property, (i) copies of such Software distributed in connection with the Purchased Business have been distributed solely in object code form; (ii) except as disclosed in Schedule 5.1(cc), there has been no disclosure of such Software in connection with the Purchased Business other than through licensing of object code versions; (iii) each copy of such Software so distributed was distributed pursuant to a valid, existing and enforceable license agreement; and (iv) all such Software so distributed in connection with the Purchased Business operates in all material respects within its specifications material error or defect.

(iii)    Except as set forth in Schedule 5.1(cc), none of the Software included within the Owned Intellectual Property contains any open source, "copyleft" or community source code, including any libraries or code licensed under the **"General Public License"**, **"Lesser General Public License"** or any other license agreement or arrangement obliging the Vendor to make source code publicly available, whether or not approved by the **"Open Source Initiative"**.

(iv)   Schedule 5.1(cc) sets out the physical location of the computer servers that are currently hosting the Vendor's Internet websites that are included within the Purchased Intellectual Property or the TLC Moncton Intellectual Property. Such servers are validly owned or a portion is validly leased by the Vendor. Schedule 5.1(cc) also sets out any domain name included within the Purchased Intellectual Property or the TLC Moncton Intellectual Property, and to each such domain name, the domain name registrar and the expiration date of the registration.

(dd)   **Inventory.** The inventory included in the Purchased Assets and TLC Moncton Assets is good and usable and is capable of being processed and sold in the Ordinary Course, subject to a reasonable allowance for obsolete inventory consistent with the allowances disclosed to the Purchaser. At least 21 days of inventory levels are presently maintained in connection with the Purchased Business, which levels are sufficient for the continuation of the Purchased Business in the Ordinary Course.

(ee)   **Subsidiaries.** TLC Moncton has no subsidiaries and holds no shares or other ownership, equity or proprietary interests in any other Person.

**Financial Matters**

(ff)   **Books and Records.** All accounting and financial Books and Records of the Vendor and TLC Moncton relating to the Purchased Business have been fully, properly and accurately kept and completed in all material respects. The Books and Records necessary for the continued conduct of the Purchased Business are not recorded, stored, maintained, operated or otherwise wholly or partly dependent upon or held by any means (including any electronic, mechanical or photographic process, whether computerized or not) which will not be available to the Purchaser in the Ordinary Course.

(gg)   **TLC Moncton Financial Statements.** The consolidated balance sheets of the Vendor as of December 31, 2008 and 2007, and the related consolidated statements of operations, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2008 have been audited in accordance with the standards of the Public Company Accounting Oversight Board (United States). True, correct and complete copies of the TLC Moncton Financial Statements and the TLC Moncton Interim Financial Statements are attached as Schedule 5.1(gg) and such statements, including:

(i)    the assets, liabilities, (whether accrued, absolute, contingent or otherwise) and the financial position of TLC Moncton as at respective dates of the relevant statements; and

(ii)   the sales and earnings of TLC Moncton during the periods covered by the TLC Moncton Financial Statements and TLC Moncton Interim Statements

have not been separately audited, however they were included in the Vendor's consolidated financial statements referred to above. Although not separately audited, the TLC Moncton balances were subject to audit testing consistent with all other consolidated entities. The Vendor represents and warrants that except for the provision for income taxes and certain center liabilities that have historically been recorded on the Vendor's corporate books, the figures themselves have been prepared in accordance with the same accounting principles and procedures, consistently applied, that have been used, and continue to be used, by the Vendor in the preparation of its annual audited consolidated financial statements. Except for the provision for income taxes and certain center liabilities that have historically been recorded on the Vendor's corporate books, the financial statements, including the interim statements, include all provisions and adjustments generally used in accounting practice, to the extent that the provisions and adjustments are material to the results of TLC Moncton.

(hh)   **Ontario Clinics' Financial Statements.**   The consolidated balance sheets of the Vendor as of December 31, 2008 and 2007, and the related consolidated statements of operations, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2008 have been audited in accordance with the standards of the Public Company Accounting Oversight Board (United States). True, correct and complete copies of the Ontario Clinics' Financial Statements and the Ontario Clinics' Interim Financial Statements are attached as Schedule 5.1(hh) and such statements, including:

   (i)   the assets, liabilities, (whether accrued, absolute, contingent or otherwise) and the financial position the Ontario Clinics as at respective dates of the relevant statements; and

   (ii)   the sales and earnings of the Ontario Clinics during the periods covered by the Ontario Clinics' Financial Statements and the Ontario Clinics' Interim Financial Statements

have not been separately audited, however they were included in the Vendor's consolidated financial statements referred to above. Although not separately audited, the Ontario Clinics' balances were subject to audit testing consistent with all other consolidated entities. The Vendor represents and warrants that except for the provision for income taxes and certain center liabilities that have historically been recorded on the Vendor's corporate books, the figures themselves have been prepared in accordance with the same accounting principles and procedures, consistently applied, that have been used, and continue to be used, by the Vendor in the preparation of its annual audited consolidated financial statements. Except for the provision for income taxes and certain center liabilities that have historically been recorded on the Vendor's corporate books, the financial statements, including the interim statements, include all provisions and adjustments generally used in accounting practice, to

the extent that the provisions and adjustments are material to the results of the Ontario Clinics.

(ii) **Working Capital**. The working capital of TLC Moncton is consistent with amounts held in accordance with TLC Moncton's past practices.

(jj) **No Liabilities.** Except as previously disclosed to the purchaser in writing in the dataroom and except as set forth in Schedule 5.1(jj), TLC Moncton has no liabilities or obligations of any nature whatsoever, whether known, unknown, due, to become due, direct, indirect, absolute, contingent or otherwise that would be required to be accrued on the financial statements of TLC Moncton in accordance with GAAP, except for, in either case, (i) liabilities and obligations reflected or reserved against in the TLC Moncton Financial Statements or the TLC Moncton Interim Financial Statements, (ii) Ordinary Course liabilities incurred after the date of the TLC Moncton Interim Balance Sheet, or (iii) liabilities and obligations disclosed in the Schedules to this Agreement.

(kk) **Bank Accounts and Powers of Attorney.** Schedule 5.1(kk) is a correct and complete list showing (i) the name of each bank in which TLC Moncton has an account or safe deposit box and the names of all Persons authorized to draw on the account or to have access to the safety deposit box, and (ii) the names of all Persons holding powers of attorney from TLC Moncton. Copies of the powers of attorney have been provided to the Purchaser.

**Particular Matters Relating to the Purchased Business**

(ll) **Employees.**

(i) The Vendor and TLC Moncton are in material compliance with all terms and conditions of employment and all Laws respecting employment, including pay equity, wages, hours of work, overtime, human rights and occupational health and safety, and there are no material outstanding claims, complaints, investigations or orders under any such Laws, and to the knowledge of the Vendor there is no basis on which such claim would reasonably be expected to be made.

(ii) Neither the Vendor, in respect of the Employees, nor TLC Moncton is engaged in any unfair labour practice and no unfair labour practice complaint, grievance or arbitration proceeding is pending or, to the knowledge of the Vendor, threatened against the Vendor, in respect of the Employees, or TLC Moncton.

(iii) There is no collective agreement in force with respect to the Purchased Business or the Employees nor is there any Contract with any employee association in respect of the Purchased Business, TLC Moncton or the Employees.

(iv)    No trade union, council of trade unions, employee bargaining agency or affiliated bargaining agent holds bargaining rights with respect to any of the Employees by way of certification, interim certification, voluntary recognition, or succession rights, or has applied or, to the knowledge of the Vendor, threatened to apply to be certified as the bargaining agent of the Employees. To the knowledge of the Vendor, there are no threatened or pending union organizing activities involving any Employees. There is no labour strike, dispute, work slowdown or stoppage pending or involving or, to the knowledge of the Vendor, threatened against the Vendor, in respect of the Employees, or TLC Moncton in respect of the Purchased Business and no such event has occurred within the last three (3) years.

(v)     No trade union has applied to have the Vendor, in respect of the Employees, or TLC Moncton declared a common or related employer pursuant to the *Labour Relations Act* (Ontario) or any similar legislation in any jurisdiction in which the Vendor carries on business.

(vi)    All amounts due or accrued due for all salary, wages, bonuses, commissions, vacation with pay, sick days and benefits under the Employee Plans in respect of the Employees have either been paid or are accurately reflected in the Books and Records. Employees are reimbursed for expenses properly incurred in connection with the Purchased Business on production of receipts.

(vii)   Schedule 5.1(ll) contains a correct and complete list of each Employee and independent contractor/consultant of the Vendor and TLC Moncton employed or retained in connection with the Purchased Business, whether actively at work or not, showing without names or employee numbers their employer, salaries, wage rates, commissions and consulting fees, bonus arrangements, benefits entitlements, positions, status as full-time or part-time employees, location of employment, cumulative length of service with the Purchased Business and whether they are subject to an Employment Contract, their annual vacation entitlement in days, their accrued and unused vacation days as of the thirtieth day prior to the date hereof, any other annual paid time off entitlement in days and their accrued and unused days or such other paid time off as of the date hereof. Schedule 5.1(ll) lists any Employee currently on leave, together with the type of leave and their expected date of return to work, if known.

(viii)  Except as disclosed in Schedule 5.1(ll), no Employee has any agreement as to length of notice or severance payment required to terminate his or her employment, other than such as results by Laws from the employment of an employee without an agreement as to notice or severance.

(ix)    Each independent contractor who is disclosed on Schedule 5.1(ll) has been properly classified by the Vendor or TLC Moncton, as applicable, as

an independent contractor. Neither the Vendor nor TLC Moncton has received any notice from any Governmental Entity disputing such classification.

(x)     The Vendor, in respect of the Employees, and TLC Moncton are in compliance with all applicable laws respecting workers compensation. There are no material outstanding assessments, penalties, fines, liens, charges, surcharges, or other amounts due or owing pursuant to any workplace safety and insurance legislation in respect of the Purchased Business and neither the Vendor, in respect of the Employees, nor TLC Moncton has been reassessed in any material respect under such legislation during the past year and, to the knowledge of the Vendor, no audit of the Purchased Business is currently being performed pursuant to any applicable workplace safety and insurance legislation. There are no claims or, to the knowledge of the Vendor, potential claims which are likely to materially adversely affect the Vendor's or TLC Moncton's accident cost experience in respect of the Purchased Business.

(xi)    The Vendor has provided to the Purchaser all orders and inspection reports under applicable occupational health and safety legislation ("**OHSA**") relating to the Purchased Business together with the minutes of the Vendor's and TLC Moncton's joint health and safety committee meetings for the past year. There are no material charges pending under OHSA in respect of the Purchased Business. The Vendor and TLC Moncton have complied in all material respects with any orders issued under OHSA in respect of the Purchased Business and there are no appeals of any orders under OHSA currently outstanding.

(mm)  **Employee Plans.**

(i)     Schedule 5.1(mm) lists all Employee Plans and identifies which Employee Plans are sponsored by TLC Moncton (the "**TLC Moncton Employee Plan**"). The Vendor has furnished to the Purchaser true, correct and complete copies of all the TLC Moncton Employee Plans as amended, together with all related documentation including funding and investment management agreements, summary plan descriptions, the most recent actuarial reports, financial statements, asset statements, and material correspondence with regulatory authorities. No changes have occurred which would materially affect the information contained in the actuarial reports, financial statements or asset statements required to be provided to the Purchaser.

(ii)    Except for the Pension Plan, no Employee Plan is a "registered pension plan"; no Employee Plan is a "deferred profit sharing plan" or a "retirement compensation arrangement" in each case as such term is defined in the *Income Tax Act* (Canada).

(iii)    All TLC Moncton Employee Plans have been established, registered, administered, communicated and invested in accordance with all Laws. No fact or circumstance exists which could reasonably be expected to adversely affect the registered status of any such TLC Moncton Employee Plan. Neither TLC Moncton nor any of their agents or delegates has breached any fiduciary obligation with respect to the administration or investment of any TLC Moncton Employee Plan.

(iv)    TLC Moncton has made all contributions and paid all premiums in respect of each TLC Moncton Employee Plan in a timely fashion in accordance with the terms of each TLC Moncton Employee Plan and applicable Laws. TLC Moncton has paid in full all contributions and premiums for the period up to the Closing Date even though not otherwise required to be paid until a later date or has made full and adequate disclosure of and provision for such contributions and premiums in the Books and Records.

(v)    Other than routine claims for benefits, no TLC Moncton Employee Plan is subject to any pending action, investigation, examination, claim (including claims for Taxes) or any other proceeding initiated by any Person and, to the knowledge of the Vendor, there exists no state of facts which could reasonably be expected to give rise to any such action, investigation, examination, claim or other proceeding.

(vi)    No insurance policy or any other agreement affecting any TLC Moncton Employee Plan requires or permits a retroactive increase in contributions, premiums or other payments due under such insurance policy or agreement.

(vii)    None of the TLC Moncton Employee Plans provide for retiree benefits or for benefits to retired employees or to the beneficiaries or dependants of retired employees and no such retiree benefits are provided to the Employees.

(viii)    Subject to the requirements of applicable Laws, no provision of any TLC Moncton Employee Plan or of any agreement, and no act or omission of TLC Moncton, in any way limits, impairs, modifies or otherwise affects the right of TLC Moncton to unilaterally amend or terminate any TLC Moncton Employee Plan, and no commitments to improve or otherwise amend any TLC Moncton Employee Plan have been made.

(ix)    Any the TLC Moncton Employee Plans which enjoy any special tax status under any Laws meet the requirements for such special tax status.

(x)    All employee data necessary to administer each TLC Moncton Employee Plan in accordance with its terms and conditions and all Laws is in possession of TLC Moncton and such data is complete, correct, in all

material respects and is in a form which is sufficient for the proper administration of each TLC Moncton Employee Plan.

(nn) **Insurance.** TLC Moncton maintains insurance policies with recognized insurers as are appropriate to the Purchased Business in such amounts and against such risks as are customarily carried and insured against by prudent owners of comparable businesses. All such policies of insurance coverage are in full force and effect. TLC Moncton is not in default with respect to any of the provisions contained in any such insurance policy and has not failed to give any notice or present any claim under any such insurance policy in due and timely fashion. Except as discussed in Schedule Schedule 5.1(nn), to the knowledge of the Vendor, there are no circumstances in respect of which any Person could make a claim under any insurance policy. True, correct and complete copies of all insurance policies have been delivered to the Purchaser.

(oo) **Litigation.** Except as described in Schedule 5.1(oo), there are no (i) actions, suits or proceedings, at law or in equity, by any Person, (ii) grievance, arbitration or alternative dispute resolution process, or (iii) administrative or other proceeding by or before (or to the knowledge of the Vendor any investigation by) any Governmental Entity, pending, or, to the knowledge of the Vendor, threatened against or affecting the Purchased Business, the Vendor in respect of the Purchased Business, TLC Moncton or any of the Purchased Assets, and, to the knowledge of the Vendor, there is no valid basis for any such action, complaint, grievance, suit, proceeding, arbitration or investigation. Neither the Vendor nor TLC Moncton is subject to any judgment, order or decree entered in any lawsuit or proceeding nor has the Vendor or TLC Moncton, since January 1, 2008, settled any claim prior to being prosecuted in respect of the Purchased Business. Except as disclosed in Schedule 5.1(oo), neither the Vendor nor TLC Moncton is not the plaintiff or complainant in any act, suit, proceeding, grievance, arbitration or alternative dispute resolution process arising out of or connected with the Purchased Business;

(pp) **Suppliers.** Schedule 5.1(pp) is a true and correct list setting forth the ten largest suppliers of the Purchased Business since January 1, 2009 by dollar amount as at the date of this Agreement;

(qq) **Taxes.**

(i) The Vendor has, in accordance with applicable Law, invoiced, collected, withheld, reported and remitted to the appropriate taxing authority (within the time prescribed) all: (i) sales, transfer, use customs, goods and services and other Taxes which are due and payable by the Vendor with respect to the Purchased Business; (ii) withholding, payroll or employment Taxes, employment insurance, Canada Pension Plan and provincial pension plan contributions and other deductions at source as required by applicable law in connection with the Purchased Business; and (iii) all non-resident withholding Taxes as required by applicable law

in respect of the Purchased Business. The Vendor is a registrant for the purposes of the tax imposed under Part IX of the *Excise Tax Act* (Canada).

(ii) As of the date hereof and as of the Closing Date, the Vendor has and will have acquired, imported, manufactured or produced all personal property that forms part of the Purchased Assets exclusively for consumption or use in the course of activities of the Vendor which are not commercial activities (as such term is defined in the *Excise Tax Act* (Canada)).

(rr) **TLC Moncton Taxes.**

(i) Except as previously disclosed to the purchaser in writing in the dataroom and except as set forth in Schedule 5.1(rr), TLC Moncton has paid all Taxes which are due and payable within the time required by applicable Law, and has paid all assessments and reassessments it has received in respect of Taxes. TLC Moncton has made full and adequate provision in the Books and Records and TLC Moncton Interim Financial Statements for all Taxes which are not yet due and payable but which relate to periods ending on or before the Closing Date. TLC Moncton has not received any refund of Taxes to which it not entitled.

(ii) The liability for Taxes of TLC Moncton has been assessed by all relevant Governmental Entities for all periods up to and including December 31, 2008. There are no outstanding agreements, arrangements, waivers or objections extending the statutory period or providing for an extension of time with respect to the assessment or reassessment of Taxes or the filing of any Tax Return by, or any payment of Taxes by, TLC Moncton. TLC Moncton has not received a ruling from any Governmental Entity in respect of Taxes or signed an agreement in respect of Taxes with any Governmental Entity and, without limiting the generality of the foregoing, TLC Moncton is not a party to or bound by any obligation under any Tax sharing or allocation agreement or similar contract or arrangement (whether or not written) nor does TLC Moncton owe any amount under any such agreement.

(iii) There are no claims, actions, suits, audits, proceedings, investigations or other action pending or threatened against TLC Moncton in respect of Taxes and, to the knowledge of the Vendor, there is no reason to expect that any such claim, action, suit, audit, proceeding, investigation or other action may be asserted against TLC Moncton by a Governmental Entity for any period ending on or prior to the Closing Date. TLC Moncton is not negotiating any final or draft assessment or reassessment in respect of Taxes with any Governmental Entity and TLC Moncton has not received any indication from any Governmental Entity that an assessment or reassessment is proposed or may be proposed in respect of any Taxes for any period ending on or prior to the Closing Date. There are no facts of which TLC Moncton or the Vendor is aware which would constitute

grounds for the assessment or reassessment of Taxes payable by TLC Moncton for any period ending on or prior to the Closing Date, except in respect of Taxes that are provided for in the Books and Records and TLC Moncton Interim Financial Statements.

(iv)   Except as set forth in Schedule 5.1(rr), TLC Moncton has withheld and collected all amounts required by applicable Law to be withheld or collected by it on account of Taxes and has remitted all such amounts to the appropriate Governmental Entity within the time prescribed under any applicable Law.

(v)    There are no circumstances existing which could result in the application of section 17, section 78, section 79, or sections 80 to 80.04 of the *Tax Act*, or any equivalent provision under applicable provincial law, to TLC Moncton. TLC Moncton has not claimed nor will it claim any reserve under any provision of the *Tax Act* or any equivalent provincial provision, if any amount could be included in the income of TLC Moncton for any period ending after the Closing Date.

(vi)   TLC Moncton has not acquired property or services from, or disposed of property or provided services to, a person with whom it does not deal at arm's length (within the meaning of the *Tax Act*) for an amount that is other than the fair market value of such property or services, nor has TLC Moncton been deemed to have done so for purposes of the *Tax Act*.

(vii)  TLC Moncton has filed or caused to be filed with the appropriate Governmental Entity, within the times and in the manner prescribed by applicable Law, all federal, provincial, local and foreign Tax Returns which are required to be filed by or with respect to it. The information contained in such Tax Returns is correct and complete and such Tax Returns reflect accurately all liability for Taxes of TLC Moncton for the periods covered thereby.

(viii) TLC Moncton is not subject to any joint venture, partnership or other arrangement or contract that is treated as a partnership for income tax purposes in any jurisdiction.

(ix)   To the knowledge of the Vendor, no claim has ever been made by a Governmental Entity in respect of Taxes in a jurisdiction where TLC Moncton does not file Tax Returns that TLC Moncton is or may be subject to Tax by that jurisdiction.

(ss)   **Privacy.** The Vendor and TLC Moncton are, and have at all times been, conducting the Purchased Business in compliance with all applicable Laws governing privacy and the protection of personal information, including the *Personal Information Protection and Electronic Documents Act* ("**PIPEDA**"), other than acts of non-compliance which individually or in the aggregate are not material. The Vendor and TLC Moncton each have a written privacy policy

which governs the collection, use and disclosure of personal information and the Vendor and TLC Moncton are in compliance in all material respects with their respective policy. There is no requirement to obtain any consent, approval or waiver of any Person under applicable Laws governing privacy and the protection of personal information, including PIPEDA, in connection with the execution and performance of this Agreement and the transactions contemplated by it except for the consents, approvals and waivers obtained prior to the date of this Agreement or disclosed in Schedule 5.1(ss).

(tt)     **Brokers.** The Vendor has not taken any action in connection with this Agreement or the transactions contemplated hereby so as to give rise to any valid claim against the Purchaser or TLC Moncton for any brokerage or finder's commissions, fees or similar compensation.

EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN ARTICLE 5 OF THIS AGREEMENT, NONE OF THE VENDOR, TLC MONCTON NOR ANY OTHER PERSON ACTING ON BEHALF OF THE VENDOR OR TLC MONCTON (INCLUDING ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES OR REPRESENTATIVES) MAKES OR HAS MADE ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED AT LAW OR IN EQUITY, INCLUDING IN RESPECT OF (I) THE PURCHASED ASSETS, (II) THE TLC MONCTON ASSETS, (III) THE PURCHASED BUSINESS, (IV) MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, (V) THE OPERATION OF THE PURCHASED BUSINESS BY THE PURCHASER AFTER THE CLOSING IN ANY MANNER EXCEPT THE MANNER IN WHICH THE BUSINESS HAS BEEN USED AND OPERATED PRIOR TO THE DATE HEREOF, OR (VI) THE PROBABLE SUCCESS OR PROFITABILITY OF THE PURCHASED BUSINESS AFTER THE CLOSING AND (B) SUBJECT TO ANY FRAUDULENT ACT OR FRAUDULENT MISREPRESENTATION, NONE OF THE VENDOR, TLC MONCTON, NOR ANY OTHER PERSON ACTING ON BEHALF OF THE VENDOR OR TLC MONCTON (INCLUDING ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES OR REPRESENTATIVES) WILL HAVE OR BE SUBJECT TO ANY LIABILITY OR INDEMNIFICATION OBLIGATION TO THE PURCHASER OR TO ANY OTHER PERSON RESULTING FROM THE DISTRIBUTION TO THE PURCHASER, ITS AFFILIATES OR REPRESENTATIVES OF, OR PURCHASER'S USE OF, ANY INFORMATION RELATING TO THE PURCHASED BUSINESS, AND ANY INFORMATION, DOCUMENTS OR MATERIAL MADE AVAILABLE TO THE PURCHASER, WHETHER ORALLY OR IN WRITING, IN CERTAIN "DATA ROOMS", RESPONSES TO QUESTIONS SUBMITTED ON BEHALF OF THE PURCHASER OR IN ANY OTHER FORM IN EXPECTATION OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. ANY OTHER REPRESENTATION OR WARRANTY NOT MADE IN THIS AGREEMENT IS HEREBY EXPRESSLY DISCLAIMED.

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

**Section 6.1**     **Representations and Warranties of the Purchaser.**

The Purchaser represents and warrants as follows to the Vendor and acknowledges and agrees that the Vendor is relying on such representations and warranties in connection with its sale of the Purchased Assets:

(a)     **Due Incorporation and Corporate Power.**  The Purchaser is a corporation incorporated and existing under the federal laws of Canada and has the corporate power and authority to enter into and perform its obligations under this Agreement and each of the Ancillary Agreements to which it is a party.

(b)     **Corporate Authorization.**  The execution and delivery of and performance by the Purchaser of this Agreement and each of the Ancillary Agreements to which it is a party and the consummation of the transactions contemplated by them have been duly authorized by all necessary corporate action on the part of the Purchaser.

(c)     **No Conflict.** The execution and delivery of and performance by the Purchaser of this Agreement and each of the Ancillary Agreements to which it is a party:

(i)     do not and will not (or would not with the giving of notice, the lapse of time or the happening of any other event or condition) constitute or result in a violation or breach of, or conflict with, or allow any other Person to exercise any rights under, any of the terms or provisions of its constating documents or by-laws;

(ii)     do not and will not (or would not with the giving of notice, the lapse of time or the happening or any other event or condition) constitute or result in a breach or violation of, or conflict with or allow any other Person to exercise any rights under, any of the terms or provisions of any Contracts or instruments to which it is a party; and

(iii)     do not and will not result in the violation of any Law.

(d)     **Execution and Binding Obligation.**  This Agreement and each of the Ancillary Agreements to which the Purchaser is a party have been duly executed and delivered by the Purchaser and constitute legal, valid and binding agreements of the Purchaser, enforceable against it in accordance with their respective terms.

(e)     **Brokers.** The Purchaser has not taken any action in connection with this Agreement or the transactions contemplated hereby so as to give rise to any valid claim against the Vendor for any brokerage or finder's commissions, fees or similar compensation.

(f)     **Financing.** The Purchaser has sufficient funds available to enable the Purchaser (a) to pay the Purchase Price and all fees and expenses related to the transactions

contemplated hereby, to the extent that this Agreement or any of the Ancillary Agreements requires it to pay such fees and expenses, and (b) to pay and discharge all of its other liabilities and obligations when due. The funds available as described in clause (a) of the preceding sentence are not committed or reserved for any other purpose and are not necessary, and are not planned or expected to be used, for any purpose described in clause (b) of the preceding sentence. Any indebtedness of the Purchaser is subordinated in right of payment to the Purchaser's obligations under this Agreement. The use of the funds described in clause (a) of the preceding sentence for the purpose described in such clause (a) is not subject to any condition or contingency. The Purchaser has provided evidence to the Vendor as of the date hereof that sufficient funds for the payment of the Purchase Price have been deposited with counsel to the Purchaser and such funds have been invested in Canadian chartered bank term deposits, treasury bills or guaranteed investment certificates.

(g) **Investment Canada Act.** The Purchaser is a "Canadian" as such term is defined in the *Investment Canada Act*.

## ARTICLE 7
## PRE-CLOSING COVENANTS OF THE PARTIES

**Section 7.1     Conduct of Business Prior to Closing.**

(1) During the Interim Period, the Vendor will conduct the Purchased Business and will cause TLC Moncton to conduct the TLC Moncton Business in the Ordinary Course.

(2) Without limiting the generality of Section 7.1(1) and without derogating from the obligation of the Vendor in Section 8.1(a), during the Interim Period and subject to any Court Orders, the Vendor in respect of the Purchased Business shall not and shall cause TLC Moncton not:

(a) to sell, transfer or otherwise dispose of any of the Purchased Assets or the TLC Moncton Assets except for in the Ordinary Course;

(b) to, without the prior written consent of the Purchaser (i) make any payment to any of TLC Moncton's officers, directors or employees except in accordance with its customary practices; (ii) make any expenditure or incur any liability other than in the Ordinary Course and in any event not to exceed $10,000; (iii) become bound to any agreement resulting in obligations of the Purchased Business and TLC Moncton exceeding $10,000; (iv) renew Material Contracts of any kind, except as provided herein; and/or (v) otherwise encumber the Purchased Assets or TLC Moncton Assets;

(c) except in the Ordinary Course, to promise any change in the compensation, commissions or bonuses payable by it, pay any bonus, profit-sharing or other extraordinary compensation of any kind or adopt or enter into any new, or modify any existing, employee benefit plan or arrangement; hire any additional employees, surgeons or agents, without the prior written consent of the Purchaser;

(d) to take any actions that are inconsistent with the successful completion of the transactions contemplated by this Agreement and the Ancillary Agreements;

(e) to discharge any secured or unsecured obligation or liability (whether accrued, absolute, contingent or otherwise) of TLC Moncton which individually or in the aggregate exceeds $10,000;

(f) except for the DIP Credit Agreement, to increase its indebtedness for borrowed money or make any loan or advance or assume, guarantee or otherwise become liable with respect to the liabilities or obligations of any Person in connection with the Purchased Business;

(g) to exercise any termination rights it may have under the U.S. Bankruptcy Proceeding;

(h) to compromise or settle any litigation, proceeding or governmental investigation relating to the Purchased Assets or the Purchased Business;

(i) to cancel or reduce any of its insurance coverage; or

(j) to authorize, agree or otherwise commit, whether or not in writing, to do any of the foregoing.

(3) Without limiting the generality of Section 7.1(1) and without derogating from the obligation of the Vendor in Section 8.1(a), during the Interim Period and subject to any Court Orders, the Vendor shall and shall cause TLC Moncton to:

(a) maintain the Purchased Assets and the TLC Moncton Assets in a good state of repair and condition;

(b) comply, in all material respects, with all Authorizations and contractual obligations under the Material Contracts;

(c) maintain all Books and Records in the usual, regular and ordinary manner;

(d) use its commercially reasonable efforts to preserve intact the current business organization, keep available the services of the Employees of the Purchased Business and preserve the Purchased Business and goodwill, maintain its relationships with suppliers, customers, consultants and others having business relations with it and retain in its employ all of the employees of the Purchased Business

(e) use its commercially reasonable efforts to retain possession and control of the Purchased Assets and TLC Moncton Assets and preserve the confidentiality of any confidential or proprietary information of the Purchased Business; and

(f) otherwise periodically respond to the reasonable inquiries of the Purchaser concerning the state of the Purchased Business and the Purchased Assets.

(4)     For greater certainty, neither the U.S. Bankruptcy Proceeding nor the Canadian Insolvency Proceedings shall constitute a breach of any provision of this Section 7.1, provided the foregoing shall not be construed so as to permit the Vendor to take an action authorized by the Canadian Court or the U.S. Bankruptcy Court if such action would constitute a direct breach of any covenant of this Section 7.1.

(5)     For greater certainty, nothing in this Section 7.1 shall prohibit the TLC Moncton Pre-Closing Transaction, provided such transaction would not cause the Vendor to breach its covenant in Section 7.9.

**Section 7.2      Access for Due Diligence.**

(1)     Subject to applicable Law, during the Interim Period, the Vendor will (i) upon reasonable notice, permit the Purchaser and its employees, agents, counsel, accountants or other representatives, to have reasonable access during normal business hours to (A) the premises relating to the Purchased Business, (B) the Purchased Assets, including all Books and Records, the Corporate Records whether retained by the Vendor or otherwise, (C) copies of all Contracts and Leases, and (D) the senior personnel of the Purchased Business, so long as the access does not unduly interfere with the ordinary conduct of the Purchased Business; and (ii) furnish to the Purchaser or its employees, agents, counsel, accountants or other such representatives such financial and operating data and other information with respect to the Purchased Assets and the Purchased Business as the Purchaser from time to time reasonably requests; provided that any such access shall be conducted at the Purchaser's expense, in accordance with Laws, at a reasonable time, under the supervision of the Vendor's personnel and in such a manner as to maintain confidentiality and not to unreasonably interfere with the normal operations of the Purchased Business. Furthermore, such access shall be subject to any confidentiality and non-solicitation agreements entered into between the Purchaser and the Vendor in connection with the proposed transaction set out herein.

(2)     No investigations made by or on behalf of the Purchaser, whether under Section 7.2 or any other provision of this Agreement or any Ancillary Agreement, shall have the effect of waiving, diminishing the scope of, or otherwise affecting, any representation or warranty made in this Agreement or any Ancillary Agreement.

**Section 7.3      Actions to Satisfy Closing Conditions.**

(1)     During the Interim Period and subject to the Court Orders, the Vendor agrees to take all such actions as are within its power to control and use its commercially reasonable efforts to cause other actions to be taken which are not within their power to control, so as to ensure compliance with all of the conditions set forth in Section 8.1.

(2)     The Purchaser agrees to take all such actions as are within its power to control and use its commercially reasonable efforts to cause other actions to be taken which are not within its power to control, so as to ensure compliance with all of the conditions set forth in Section 8.2.

**Section 7.4     Transfer of the Purchased Assets.**

Subject to the Court Orders, the Vendor shall take all necessary steps and proceedings to permit good title to the Purchased Assets to be duly and validly transferred and assigned to the Purchaser at the Closing, free of all Liens other than Permitted Liens.

**Section 7.5     Request for Consents.**

(1)     The Vendor will use its commercially reasonable efforts to obtain, prior to Closing, all consents, approvals and waivers that are required by the terms of the Material Contracts in order to assign any Purchased Contract or to complete any of the other transactions contemplated by this Agreement, including the consents, approvals and waivers described in Schedule 5.1(e). The Vendor agrees to pay the reasonable fees of counsel to Atlantic Laser Investments Ltd. in connection with the transactions contemplated by this Agreement.

(2)     The Vendor will use its commercially reasonable efforts to obtain, prior to Closing, all consents, approvals and waivers that are required by applicable Laws governing privacy and the protection of personal information, including PIPEDA and PHIPA, in connection with this Agreement and the transactions contemplated by it.

(3)     The consents, approvals and waivers in (1) and (2) above, will be upon such terms as are acceptable to the Purchaser, acting reasonably.   The Purchaser will co-operate in obtaining such consents, approvals and waivers.

**Section 7.6     Filings and Authorizations.**

Each of the Parties, as promptly as practicable after the execution of this Agreement, will (i) make, or cause to be made, all filings and submissions under all Laws applicable to it, that are required for it to consummate the purchase and sale of the Purchased Assets in accordance with the terms of this Agreement, (ii) use its commercially reasonable efforts to obtain, or cause to be obtained, all Authorizations necessary to be obtained by it in order to consummate such transfer, and (iii) use its commercially reasonable efforts to take, or cause to be taken, all other actions which are necessary in order for it to fulfil its obligations under this Agreement.   The Parties will coordinate and cooperate in exchanging information and supplying assistance that is reasonably requested in connection with this Section including providing each other with all notices and information supplied to or filed with any Governmental Entity (including notices and information which the Vendor or the Purchaser, in each case acting reasonably, considers highly confidential and sensitive which may be provided on a confidential and privileged basis to outside counsel of the other Party), and all notices and correspondence received from any Governmental Entity.  Despite the above, the Purchaser is under no obligation to take any steps or action that would, materially and adversely, affect the Purchaser's right to own, use or exploit either the Purchased Assets or any of the Purchaser's assets.

**Section 7.7     Supplemental Disclosure.**

The Vendor shall from time to time prior to the Closing, by written notice in accordance with the terms of this Agreement, provide supplements to the Vendor's disclosure schedules hereto in order to provide notice of all facts, matters and/or circumstances of which the Vendor comes to have knowledge that constitute a breach or inaccuracy of any representation or

warranty contained in Section 5.1. Such notice of such facts, matters and/or circumstances shall be provided promptly upon the knowledge thereof by the Vendor. No such supplement shall be deemed to cure any breach of any representation or warranty contained herein for any purpose and the Purchaser shall have all of its rights and remedies contained in Article 11.

**Section 7.8    TLC Moncton Pre-Closing Taxes.**

The Vendor shall provide an estimate of the Taxes payable by TLC Moncton for the taxation periods ending on (i) December 31, 2009 and (ii) the Closing Date or as a result of the Closing ((i) and (ii) collectively, the "**TLC Moncton Pre-Closing Tax Liability Amounts**") and shall provide the Purchaser with such estimate of the TLC Moncton Pre-Closing Tax Liability Amounts at least 10 days prior to Closing for the Purchaser's approval, not to be unreasonably withheld. Subject to the Purchaser's approval, the Vendor shall cause TLC Moncton to remit the TLC Moncton Pre-Closing Tax Liability Amounts to the appropriate Governmental Entity prior to Closing.

**Section 7.9    TLC Moncton Accounts Payable.**

The Vendor shall, prior to Closing, cause TLC Moncton to pay all surgeon fees, co-management fees and optometrist fees relating to surgeries prior to Closing and, as of the date of Closing, the Vendor shall ensure that no such fees are outstanding obligations of TLC Moncton. The Vendor shall ensure that on Closing all TLC Moncton Accounts Payables incurred more than 21 days prior to the Closing Date have been paid.

**Section 7.10    Purchase Price Funds.**

The Purchaser shall maintain sufficient funds for the payment of the Purchase Price in trust with counsel to the Purchaser and such funds shall be (i) invested in Canadian chartered bank term deposits, treasury bills or guaranteed investment certificates, and (ii) available at all times to pay the Purchase Price on Closing or any Damages owing to the Vendor as a result of a breach by the Purchaser of this Agreement. Such funds shall not be removed from trust with the Purchaser's counsel or disbursed for any purpose not contemplated by clause (ii) above without the prior written consent of the Vendor or until termination of this Agreement in accordance with Section 10.1 (unless such termination arises from or relates to a breach by the Purchaser of this Agreement). The Purchaser shall provide, at the reasonable request of the Vendor, confirmation by the Purchaser's counsel from time to time of the amount of funds held in trust pursuant to this Section 7.10. At the request of the Vendor, the Purchaser shall make the representations set forth in Section 6.1(f) to the U.S. Bankruptcy Court or the Canadian Court.

**Section 7.11    Limited Pre-Closing License.**

The Vendor hereby grants to the Purchaser, and the Purchaser hereby accepts, a limited non-exclusive license to use the trade-marks used in the Purchased Business in Canada for the purposes of facilitating the transition and marketing of the Purchased Business to the Purchaser during the Interim Period. The Purchaser agrees to consult with the Vendor in connection with the use of such trade-marks during such period and the Vendor will have the right to approve any such use by the Vendor, such approval not to be unreasonably withheld. The Purchaser shall, in all materials in or on which the such licensed trade-marks are displayed, include a notice indicated that such licensed trade-marks are owned by the Vendor and used by the Purchaser under license.

## ARTICLE 8
## CONDITIONS OF CLOSING

**Section 8.1**     **Conditions for the Benefit of the Purchaser.**

The purchase and sale of the Purchased Assets is subject to the following conditions being satisfied at or prior to Closing, which conditions are for the exclusive benefit of the Purchaser and may be waived, in whole or in part, by the Purchaser in its sole discretion:

(a)     The representations and warranties of the Vendor contained in this Agreement (other that the representation and warranty in Section 5.1(qq)(ii)) or in any Ancillary Agreement shall be true and correct as of the Closing Date (provided that if a representation and warranty speaks only as of a specific date it only needs to be true and correct as of that date) with the same force and effect as if such representations and warranties had been made on and as of such date except where the failure to be true and correct would not have a material adverse effect on the Purchased Business. The Purchaser must receive a certificate of a senior officer of the Vendor as to the matters in this paragraph.

(b)     The Vendor shall have fulfilled or complied with all covenants, except where the failure to comply would not, in the aggregate, be material, contained in this Agreement to be fulfilled or complied with by it at or prior to the Closing, and the Vendor shall have executed and delivered a certificate of a senior officer to that effect.

(c)     Approval of the transactions contemplated by this Agreement, and any Ancillary Agreement contemplated by this Agreement as may require court approval, by an order of the U.S. Bankruptcy Court which shall provide for, among other things, the approval of the transactions contemplated by this Agreement and any Ancillary Agreement on a standalone basis, without requiring the Vendor to conduct an auction process pursuant to section 363 of the U.S. Bankruptcy Code (the "**U.S. Approval Order**").

(d)     A recognition of the U.S. Approval Order by the Canadian Court (the "**Canadian Recognition Order**", and together with the U.S. Approval Order, the "**Court Orders**").

(e)     The Court Orders shall be substantially in the form attached as Schedule 8.1(e).

(f)     The Court Orders shall not have been varied in any material respect, stayed, appealed or leave to appeal sought as of the Closing Date.

(g)     The transfer by the Vendor to the Purchaser pursuant to the Court Orders of all of its title to the Purchased Assets, including the Purchased Shares, free and clear of all Liens or other encumbrances (other than Permitted Liens) whatsoever, such vesting order being in a form and substance satisfactory to the Purchaser and the Vendor.

(h)      The assignment to the Purchaser of all Designated Contracts (except in the case of the Leases, to an Affiliate of the Purchaser), other than Non-assigned Contracts, in form and substance satisfactory to the Purchaser, acting reasonably.

(i)      The Purchaser entering into of a new unanimous shareholders agreement with Atlantic Laser Investments Ltd. and TLC Moncton on substantially similar terms as the TLC Moncton Shareholders' Agreement (with the exception of the non-competition covenant contained therein, the inclusion of a management fee reflecting historical practice) (the **"New TLC Moncton Shareholders' Agreement"**);

(j)      The entering into by the Purchaser of employment arrangements with Michele McLaughlin and Daniel DeGrace and with at least three the following individuals: Rhonda Kirzner, Chris Surdykowski, Bonnie Hoffman and Kelly Addeman on substantially similar terms to their existing arrangements;

(k)      The entering into by the Purchaser of arrangements with each of Hugh Jellie, Nick Nianiaris, Dean Smith, Dan Belliveau, Vicki Taylor and Bruce Nichols (collectively, the **"Surgeons"**) on substantially similar terms to their existing arrangements, or, in the Purchaser's discretion, an assignment of the existing surgeon agreements (and associated consents by the Surgeons) (collectively the **"Surgeon Arrangements"**);

(l)      The entering into of a transitional services agreement (the **"Transitional Services Agreement"**) with the Vendor or one of its Affiliates, substantially in the form of the draft agreement attached as Schedule 8.1(l) or as otherwise satisfactory to the Purchaser;

(m)      The entering into of an exclusive licence (the **"Licence Agreement"**) with the Vendor or one of its Affiliates, substantially in the form of the draft agreement attached as Schedule 8.1(m) or as otherwise acceptable to the Vendor and Purchaser, both acting reasonably.

(n)      The entering into of an exclusive license (the **"PHAROS License Agreement"**) with the Vendor or one of its Affiliates, substantially in the form of the draft agreement attached as Schedule 8.1(n) or as otherwise acceptable to the Vendor and Purchaser, both acting reasonably.

(o)      The entering into of a non-competition and non-solicitation agreement duly executed by the Vendor, substantially in the form of the draft agreement attached as Schedule 8.1(o) or as otherwise acceptable to the Vendor and Purchaser, both acting reasonably (collectively the **"Non-Competition and Non-Solicitation Agreement"**).

(p)      The entering into by the Purchaser of a license agreement with the Vendor or one of its Affiliates in respect of the Shared Intellectual Property in connection with the Purchased Business as it may be operated by the Purchaser after Closing, on mutually satisfactory terms (the **"Shared IP License Agreement"**).

(q)     Receipt by the Purchaser (for greater certainty, receipt by the Purchaser includes such Books and Records being located at the Purchased Clinics as of the Closing Date) of, all of the Books and Records (including editable electronic copies of such Books and Records, if available, including Excel spreadsheets for financial output, source graphic files for marketing and patient collateral, original Word and PowerPoint documents for training materials), Corporate Records, plans, cost sheets (as such term is used generally in the trade), lists of business contacts and contact information, referrals, including lists of customers, patients (past, present and prospective, and in respect of past patients, past invoices and whether or not they are covered by some type of warranty plan) and suppliers, sales records, customer and current and historical patient records and files (including, upcoming patient appointment schedules (including pre-operative, post-operative surgery appointments) along with the names of the optometrists who are co-managing the pre-operative and surgery of such patients), account and patient histories any and all other books, documents, records and data relating to the Purchased Business, whether in written, printed or electronic form.

(r)     Absence of a material adverse change in the Purchased Business during the Interim Period.

(s)     The Vendor shall have paid all amounts due and payable, as of the Closing Date, to any surgeon, physician, optometrist (including referral and co-management fees) and Transferred Employee (other than the Accrued Vacation Amount) in connection with the Purchased Business, and shall have provided the Purchaser of evidence of such payments.

(t)     The Vendor shall deliver or cause to be delivered to the Purchaser the following in form and substance satisfactory to the Purchaser:

        (i)     certified copies of (i) the charter documents and by-laws of each of the Vendor and TLC Moncton, (ii) all resolutions of the shareholders and the board of directors of each of the Vendor and TLC Moncton and shareholders of TLC Moncton approving the entering into and completion of the transactions contemplated by this Agreement and the Ancillary Agreements, and (iii) a list of the directors and officers of the Vendor and TLC Moncton authorized to sign agreements together with their specimen signatures;

        (ii)    share certificates representing the Purchased Shares duly endorsed in blank for transfer, or accompanied by irrevocable security transfer powers of attorney duly executed in blank, in either case by the Vendor, together with evidence satisfactory to the Purchaser that the Purchaser or its nominee(s) have been entered upon the books of TLC Moncton as the holder of the Purchased Shares.

        (iii)   a certificate of status, compliance, good standing or like certificate with respect to the Vendor and TLC Moncton issued by appropriate

government officials of their respective jurisdictions of incorporation and, in the case of TLC Moncton, of each jurisdiction in which TLC Moncton carries on business as listed in Schedule 5.1(a);

(iv) the certificates referred to in Section 8.1(a) and Section 8.1(b);

(v) originals of all of the Material Contracts or, if originals are not available, copies thereof;

(vi) evidence that the TLC Moncton Pre-Closing Tax Liability Amounts has been paid to the Canada Revenue Agency on behalf of TLC Moncton;

(vii) the Non-Competition and Non-Solicitation Agreement;

(viii) the Licence Agreement;

(ix) the PHAROS License Agreement;

(x) the Transitional Services Agreement;

(xi) the New TLC Moncton Shareholders' Agreement executed by TLC Moncton;

(xii) the Shared IP License Agreement;

(xiii) an executed form of assignment of the Machat Agreement to TLC Moncton in form and substance satisfactory to the Purchaser, acting reasonably;

(xiv) necessary deeds, conveyances, assurances, transfers and assignments and any other instruments necessary or reasonably required to transfer the Purchased Assets (including the Purchased Shares) to the Purchaser free and clear of all Liens other than Permitted Liens;

(xv) a duly executed resignation effective as at the Closing of each current director and current officer of TLC Moncton nominated by the Vendor pursuant to the TLC Moncton Shareholders' Agreement as the Purchaser may specify in writing at least 3 Business Days prior to Closing; and

(xvi) a release in favour of TLC Moncton from the Vendor.

(u) No action or proceeding shall be pending or threatened by any Person (other than the Purchaser) in any jurisdiction, to enjoin, restrict or prohibit any of the transactions contemplated by this Agreement or the right of the Purchaser to conduct the Purchased Business after Closing on substantially the same basis as heretofore operated.

**Section 8.2    Conditions for the Benefit of the Vendor.**

The purchase and sale of the Purchased Assets is subject to the following conditions being satisfied at or prior to Closing, which conditions are for the exclusive benefit of the Vendor and may be waived, in whole or in part, by the Vendor in its sole discretion:

(a)    The representations and warranties of the Purchaser contained in this Agreement or in any Ancillary Agreement shall be true and correct in all material respects as of the Closing Date with the same force and effect as if such representations and warranties had been made on and as of such date. However, (i) if a representation and warranty is qualified by materiality or Material Adverse Effect, it must be true and correct in all respects and (ii) if a representation and warranty speaks only as of a specific date it only needs to be true and correct in all material respects as of that date. The Vendor must receive a certificate of a senior officer of the Purchaser as to the matters in this paragraph.

(b)    The Purchaser shall have fulfilled or complied with all covenants contained in this Agreement and in any Ancillary Agreement to be fulfilled or complied with by it at or prior to Closing and the Purchaser shall have executed and delivered a certificate of a senior officer to that effect.

(c)    All actions, proceedings, instruments and documents required to complete the transactions contemplated by this Agreement and Ancillary Agreements shall have been made, given or obtained on terms acceptable to the Vendor, acting reasonably.

(d)    Receipt of the U.S. Approval Order.

(e)    Receipt of the Canadian Recognition Order.

(f)    The Court Orders shall be substantially in the form attached as Schedule 8.1 (e).

(g)    The assumption by the Purchaser of all Purchased Contracts and the Assumed Liabilities, in form and substance satisfactory to the Vendor.

(h)    The receipt by the Vendor of the Purchase Price, less the Assumed Liabilities.

(i)    The payment by the Purchaser of any and all Taxes payable by the Purchaser.

(j)    The Purchaser shall deliver or cause to be delivered to the Vendor the following in form and substance satisfactory to the Vendor:

(i)    certified copies of (i) the charter documents and extracts from the by-laws of the Purchaser relating to the execution of documents, (ii) all resolutions of the shareholders and the board of directors of the Purchaser approving the entering into and completion of the transactions contemplated by this Agreement and the Ancillary Agreements, and (iii) a list of its officers and directors authorized to sign agreements together with their specimen signatures;

    (ii)     a certificate of status, compliance, good standing or like certificate with respect to the Purchaser issued by appropriate government official of the jurisdiction of its incorporation;

    (iii)    the certificates referred to in Section 8.2(a) and Section 8.2(b);

    (iv)    the Transitional Services Agreement;

    (v)     the License Agreement;

    (vi)    the PHAROS License Agreement;

    (vii)   the Non-Competition and Non-Solicitation Agreement; and

    (viii)   delivery of legal opinions on matters to be agreed upon, satisfactory to the Vendor, acting reasonably.

    (k)    No action or proceeding shall be pending or threatened by any Person (other than the Vendor) in any jurisdiction, to enjoin, restrict or prohibit any of the transactions contemplated by this Agreement or the right of the Purchaser to conduct the Purchased Business after Closing on substantially the same basis as heretofore operated.

<center>

**ARTICLE 9**
**CLOSING**

</center>

**Section 9.1    Date, Time and Place of Closing.**

The completion of the transaction of purchase and sale contemplated by this Agreement shall take place at the offices of Torys LLP, Suite 3000, TD Centre, 79 Wellington Street West, Toronto, Ontario, at 10:00 a.m. (Toronto time) on the Closing Date or at such other place, on such other date and at such other time as may be agreed upon in writing between the Vendor and the Purchaser. The Closing shall be deemed to have been consummated and become effective for all purposes as of the Effective Time.

**Section 9.2    Closing Procedures.**

(1)    Subject to satisfaction or waiver by the relevant Party of the conditions of closing and subject to Section 9.3, at the Closing, the Vendor shall deliver possession of the Purchased Assets and the instruments of conveyance described in Section 8.1 and upon such deliveries the Purchaser shall pay or satisfy the Purchase Price in accordance with Section 3.3.

**Section 9.3    Non-Assigned Contracts.**

In the event that (A) (i) there are any Purchased Contracts which are not assignable in whole or in part without the consent, approval or waiver of another party or parties to them, (ii) such consents, approvals or waivers have not yet been obtained as of the Closing Date on terms satisfactory to the Purchaser, acting reasonably and (iii) such Purchased Contracts are not Designated Contracts or the Purchaser has waived the closing condition relating to such consents, approvals and waivers or (B) the Machat Agreement is not assignable in whole or in

part to TLC Moncton without the consent, approval or waiver of another party or parties to it, then:

(a) nothing in this Agreement nor any Ancillary Agreement will be construed as an assignment of any such Purchased Contracts or Machat Agreement (the "Non-assigned Contracts");

(b) the Parties will take all actions described in Section 12.2; and

(c) once the consent, approval or waiver to the assignment of a Non-assigned Contract is obtained, such Non-assigned Contract is deemed to be assigned to the Purchaser and the Purchaser is deemed to assume the obligations under such Non-assigned Contract.

## ARTICLE 10
## TERMINATION

**Section 10.1     Termination Rights.**

This Agreement may, by notice in writing given prior to or on the Closing Date, be terminated:

(a) by mutual consent of the Vendor and the Purchaser;

(b) by the Purchaser if any of the conditions in Section 8.1 have not been satisfied as of the Closing Date and the Purchaser has not waived such condition at or prior to Closing;

(c) by the Vendor if any of the conditions in Section 8.2 have not been satisfied as of the Closing Date and the Vendor has not waived such condition at or prior to Closing;

(d) by either Party if the Closing has not occurred on or before February 16, 2010 or on or before such later date as the Parties agree to in writing, provided that a Party may not terminate this Agreement under this Section 10.1(d) if it has failed to perform any one or more of its material obligations or covenants under this Agreement to be performed at or prior to Closing and the Closing has not occurred because of such failure;

(e) by either Party if there has been a material breach of this Agreement by the other Party and such breach has not been waived by the non-breaching Party or cured by the breaching party within ten (10) days of such breach;

(f) by the Purchaser by no later than the fifth (5th) Business Day (or such other date as otherwise agreed to by the Vendor) of the U.S. Bankruptcy Court issuing an order for an auction to be conducted pursuant to section 363 of the U.S. Bankruptcy Code;

(g)      by the Vendor if the U.S. Bankruptcy Court orders an auction pursuant to section 363 of the U.S. Bankruptcy Code, and the Vendor subsequently receives an offer to purchase the Purchased Assets that is a higher and better offer, as determined by the Vendor, in accordance with any bidding procedures set by the U.S. Court.

**Section 10.2      Effect of Termination.**

(1)      Each Party's right of termination under this Article 10 is in addition to any other rights it may have under this Agreement, and the exercise of a right of termination will not be an election of remedies. Nothing in this Article 10 limits or affects any other rights or causes of action any Party may have with respect to the representations, warranties, covenants and indemnities in its favour contained in this Agreement. If a Party waives compliance with any of the conditions, obligations or covenants contained in this Agreement, the waiver will be without prejudice to any of its rights of termination in the event of non-fulfilment, non-observance or non-performance of any other condition, obligation or covenant in whole or in part.

(2)      If this Agreement is terminated pursuant to Section 10.1, all obligations of the Parties under this Agreement will terminate, except that:

(a)      each Party's obligations under Section 14.3 and Section 14.5 will survive; and

(b)      if this Agreement is terminated by a Party because of a breach of this Agreement by the other Party which breach is not cured within the applicable cure period or because a condition for the benefit of the terminating Party has not been satisfied because the other Party has failed to perform any of its obligations or covenants under this Agreement, the terminating Party's right to pursue all legal remedies will survive such termination unimpaired.

## ARTICLE 11
## INDEMNIFICATION

**Section 11.1      Liability for Representations and Warranties.**

The representations and warranties of the Vendor contained in this Agreement and the certificate to be delivered pursuant to Section 8.1(a) shall terminate at the Closing and the Vendor shall have no obligation or liability with respect to any such representation or warranty after the Closing Date, except as a result of any fraudulent act or fraudulent misrepresentation (in which event the Vendor's liability for such fraudulent act or fraudulent misrepresentation shall only survive for twelve months after the Closing Date). The representations and warranties of the Purchaser contained in this Agreement and the certificate to be delivered pursuant to Section 8.2(a) shall survive the Closing Date and shall continue in full force and effect for a period of twelve (12) months after the Closing Date. The pre-closing covenants of the Parties contained in this Agreement shall terminate at Closing and the Vendor shall have no obligation or liability with respect to any such pre-closing covenant or any breach or alleged breach thereof, except as a result of any fraudulent act or fraudulent misrepresentation (in which event such Party's liability for such fraudulent act or fraudulent misrepresentation shall only survive for twelve months after the Closing Date). The post closing covenants of the

Parties contained in this Agreement continue in full force and effect for a period of twelve months (12) after the Closing Date unless expressly provided otherwise herein.

**Section 11.2    Indemnification in Favour of the Purchaser.**

Subject to Section 11.4, the Vendor will indemnify and save the Purchaser harmless of and from, and will pay for, any Damages suffered by, imposed upon or asserted against it as a result of, in respect of, connected with, or arising out of, under, or pursuant to:

(a)    any breach or inaccuracy of any representation or warranty given by the Vendor contained in this Agreement or the certificate to be delivered pursuant to Section 8.1(a) or Section 8.1(b) (other than with respect to the representation contained in Section 5.1(qq)(ii) that is a result of a fraudulent act or fraudulent misrepresentation; and

(b)    any failure of the Vendor to perform or fulfill any of its post-closing covenants or obligations under this Agreement.

**Section 11.3    Indemnification in Favour of the Vendor.**

Subject to Section 11.4, the Purchaser will indemnify and save the Vendor harmless of and from, and will pay for, any Damages suffered by, imposed upon or asserted against it or any of them as a result of, in respect of, connected with, or arising out of, under or pursuant to:

(a)    any breach or inaccuracy of any representation or warranty given by the Purchaser contained in this Agreement or the certificate to be delivered pursuant to Section 8.2(a);

(b)    any failure of the Purchaser to perform or fulfil any of its covenants or obligations under this Agreement; and

(c)    any failure of the Purchaser to pay or discharge or perform any of the Assumed Liabilities at any time following closing.

**Section 11.4    Limitations on Indemnification.**

(1)    In respect of any single breach giving rise to indemnification under this Article 11, the Indemnifying Party shall only be responsible to indemnify actual Damages incurred or suffered by an Indemnified Party. For greater certainty, Damages to be indemnified hereunder shall (i) be net of (A) any insurance or other recoveries actually received by the Indemnified Party or any of its Affiliates in connection with the facts giving rise to the right of indemnification (it being understood and agreed that the Purchaser shall use commercially reasonable efforts to pursue such insurance or other third party recoveries), (B) any net tax benefit actually realized (net of any realized tax cost actually incurred) by (in each case calculated on a with and without basis)) the Indemnified Party or any of its Affiliates arising in connection with the accrual, incurrence or payment of any such Damages or resulting from the receipt of any indemnification payment under this Article 11, and (ii) in respect of any fraudulent misrepresentation concerning TLC Moncton, be pro-rated to reflect the Purchaser's 75% interest in TLC Moncton.

(2)     Each of the Parties agrees to take all commercially reasonable steps to mitigate their respective Damages upon and after becoming aware of any event or condition which would reasonably be expected to give rise to any Damages that are indemnifiable hereunder.

**Section 11.5     Notification.**

(1)     If a Third Party Claim is instituted or asserted against an Indemnified Person, the Indemnified Person will promptly notify the Indemnifying Party in writing of the Third Party Claim. The notice must specify in reasonable detail, the identity of the Person making the Third Party Claim and, to the extent known, the nature of the Damages and the estimated amount needed to investigate, defend, remedy or address the Third Party Claim.

(2)     If an Indemnified Person becomes aware of a Direct Claim, the Indemnified Person will promptly notify the Indemnifying Party in writing of the Direct Claim. The notice must specify in reasonable detail the nature of the Direct Claim.

(3)     Notice to an Indemnifying Party under this Section of a Direct Claim or a Third Party Claim is assertion of a claim for indemnification against the Indemnifying Party under this Agreement. Upon receipt of such notice, the provisions of Section 11.7 will apply to any Third Party Claim and the provisions of Section 11.6 will apply to any Direct Claim.

(4)     The omission to notify the Indemnifying Party will not relieve the Indemnifying Party from any obligation to indemnify the Indemnified Person, unless such notification is provided after the expiration of the period during which the Indemnified Party is entitled to indemnification under this Agreement or (and only to that extent that) the omission to notify prejudices the ability of the Indemnifying Party to exercise its right to defend provided in Section 11.7.

**Section 11.6     Direct Claims.**

(1)     Following receipt of notice of a Direct Claim, the Indemnifying Party has 60 days to investigate the Direct Claim and respond in writing. For purposes of the investigation, the Indemnified Person shall make available to the Indemnifying Party the information relied upon by the Indemnified Person to substantiate the Direct Claim, together with such other information as the Indemnifying Party may reasonably request.

(2)     If the Indemnifying Party disputes the validity or amount of the Direct Claim, the Indemnifying Party shall provide written notice of the dispute to the Indemnified Person within the 60 day period specified in Section 11.6(1). The dispute notice must describe in reasonable detail the nature of the Indemnifying Party's dispute. During the 30 day period immediately following receipt of a dispute notice by the Indemnified Person, the Indemnifying Party and the Indemnified Person shall attempt in good faith to resolve the dispute. If the Indemnifying Party and the Indemnified Person fail to resolve the dispute within that 30 day time period, the Indemnified Person is free to pursue all rights and remedies available to it, subject only to this Agreement. If the Indemnifying Party fails to respond in writing to the Direct Claim within the 60 day period specified in Section 11.6(1), the Indemnifying Party is deemed to have agreed to

the validity and amount of the Direct Claim and shall promptly pay in full the amount of the Direct Claim to the Indemnified Person.

**Section 11.7    Procedure for Third Party Claims.**

(1)    Subject to the terms of this Section 11.7, upon receiving notice of a Third Party Claim, the Indemnifying Party may participate in the investigation and defence of the Third Party Claim and may also elect to assume the investigation and defence of the Third Party Claim.

(2)    The Indemnifying Party may not assume the investigation and defence of a Third Party Claim if:

    (a)    the Indemnifying Party is also a party to the Third Party Claim and the Indemnified Person determines in good faith that joint representation would be inappropriate;

    (b)    the Indemnifying Party fails to provide reasonable assurance to the Indemnified Person of its financial capacity to defend the Third Party Claim;

    (c)    the Indemnifying Party does not unconditionally acknowledge in writing its obligation to indemnify and hold the Indemnified Person harmless with respect to the Third Party Claim pursuant to the terms of this Agreement.

    (d)    the Third Party Claim seeks relief against the Indemnified Person other than monetary damages or the Indemnified Person determines in good faith that there is a reasonable probability that the Third Party Claim may adversely affect it or its Affiliates, and the Indemnified Person has notified the Indemnifying Party that it will exercise its exclusive right to defend, compromise or settle the Third Party Claim.

(3)    In order to assume the investigation and defence of a Third Party Claim other than the Third Party Claims set out in Section 11.7(2), the Indemnifying Party must give the Indemnified Person written notice of its election within 15 days of Indemnifying Party's receipt of notice of the Third Party Claim.

(4)    If the Indemnifying Party assumes the investigation and defence of a Third Party Claim:

    (a)    the Indemnifying Party will pay for all costs and expenses of the investigation and defence of the Third Party Claim except that the Indemnifying Party will not, so long as it diligently conducts such defence, be liable to the Indemnified Person for any fees of other counsel or any other expenses with respect to the defence of the Third Party Claim, incurred by the Indemnified Person after the date the Indemnifying Party validly exercised its right to assume the investigation and defence of the Third Party Claim;

    (b)    the Indemnifying Party will reimburse the Indemnified Person for all costs and expenses incurred by the Indemnified Person in connection with the investigation and defence of the Third Party Claim prior to the date the

Indemnifying Party validly exercised its right to assume the investigation and defence of the Third Party Claim;

(c)     the Indemnified Person will not contact or communicate with the Person making the Third Party Claim without the prior written consent of the Indemnifying Party, unless required by applicable Law;

(d)     legal counsel chosen by the Indemnifying Party to defend the Third Party Claim must be satisfactory to the Indemnified Person, acting reasonably; and

(e)     the Indemnifying Party may not compromise and settle or remedy, or cause a compromise and settlement or remedy, of a Third Party Claim without the prior written consent of the Indemnified Person, which consent may not be unreasonably withheld or delayed.

(5)     If the Indemnifying Party (i) is not entitled to assume the investigation and defence of a Third Party Claim under Section 11.7(2), (ii) does not elect to assume the investigation and defence of a Third Party Claim or (iii) assumes the investigation and defence of a Third Party Claim but fails to diligently pursue such defence, or the Indemnified Person concludes that the Third Party Claim is not being defended to its satisfaction, acting reasonably, the Indemnified Person has the right (but not the obligation) to undertake the defence of the Third Party Claim. In the case where the Indemnifying Party fails to diligently pursue the defence of the Third Party Claim or the Indemnified Person concludes that the Third Party Claim is not being defended to its satisfaction, acting reasonably, the Indemnified Person may not assume the defence of the Third Party Claim unless the Indemnified Person gives the Indemnifying Party written demand to diligently pursue the defence and the Indemnifying Party fails to do so within 14 days after receipt of the demand, or such shorter period as may be required to respond to any deadline imposed by a court, arbitrator or other tribunal.

(6)     If, under Section 11.7(5), the Indemnified Party undertakes the investigation and defence of a Third Party Claim, the Indemnified Party may compromise and settle the Third Party Claim but the Indemnifying Party will not be bound by any compromise or settlement of the Third Party Claim effected without its consent (which consent may not be unreasonably withheld or delayed).

(7)     The Indemnified Person and the Indemnifying Party agree to keep each other fully informed of the status of any Third Party Claim and any related proceedings. If the Indemnifying Party assumes the investigation and defence of a Third Party Claim, the Indemnified Person will, at the request and expense of the Indemnifying Party, use its reasonable efforts to make available to the Indemnifying Party, on a timely basis, those employees whose assistance, testimony or presence is necessary to assist the Indemnifying Party in investigating and defending the Third Party Claim. The Indemnified Person shall, at the request and expense of the Indemnifying Party, make available to the Indemnifying Party, or its representatives, on a timely basis all documents, records and other materials in the possession, control or power of the Indemnified Person, reasonably required by the Indemnifying Party for its use solely in defending any Third Party Claim which it has elected to assume the investigation and

defence of. The Indemnified Person shall cooperate on a timely basis with the Indemnifying Party in the defence of any Third Party Claim.

**Section 11.8    Exclusion of Other Remedies.**

Except as provided in this Section 11.8, if the Closing occurs, the indemnities provided in Section 11.2 and Section 11.3 shall constitute the only remedy of the Purchaser or the Vendor, respectively, against another Party in the event of any breach of a representation, warranty, covenant or agreement of such Party contained in this Agreement. The Parties acknowledge that the failure to comply with a covenant or obligation contained in this Agreement may give rise to irreparable injury to a Party inadequately compensable in damages. Accordingly, a Party may seek to enforce the performance of this Agreement by injunction or specific performance upon application to a court of competent jurisdiction without proof of actual damage (and without the requirement of posting a bond or other security). Except as contemplated hereby, each of the Purchaser and the Vendor expressly waives and renounces any other remedies whatsoever, whether at law or in equity, which it would otherwise be entitled to as against a Party.

## ARTICLE 12
## POST-CLOSING COVENANTS

**Section 12.1    Access to Books and Records.**

For a period of six years from the Closing Date or for such longer period as may be required by Law, the Purchaser will retain all original books and records relating to the Purchased Business that are transferred to the Purchaser under this Agreement. So long as any such books and records are retained by the Purchaser pursuant to this Agreement, the Vendor and its Affiliates have the right to inspect and to make copies (at its own expense) of them at any time upon reasonable request during normal business hours and upon reasonable notice for any proper purpose and without undue interference to the business operations of the Purchaser. The Purchaser has the right to have its representatives present during any such inspection.

**Section 12.2    Full Benefit of Contracts.**

(1)    In order that the Purchaser may realize the full benefit of the Non-assigned Contracts:

(a)    the Vendor will continue to use commercially reasonable efforts to obtain the consents, approvals and waivers that are required to assign the Non-assigned Contracts to the Purchaser, on terms satisfactory to the Purchaser, acting reasonably and the Purchaser will co-operate in obtaining such consents, approvals and waivers;

(b)    the Vendor will hold the Non-assigned Contracts in trust for the benefit of the Purchaser;

(c)    the Vendor will, at the request, expense and direction of the Purchaser and in the name of the Vendor or otherwise as the Purchaser may specify, take all action and do or cause to be done all things that are, in the reasonable opinion of the Purchaser, necessary or proper in order that the obligations of the Vendor may

be performed in such a manner that the value of the Non-assigned Contracts is preserved and enures to the benefit of the Purchaser, and that the collection of moneys due and payable to the Purchaser in and under the Non-assigned Contracts are received by the Purchaser; and

(d) the Vendor will promptly pay over to the Purchaser all moneys collected by or paid to the Vendor in respect of any Non-assigned Contract.

(2) In the event any moneys are collected by or paid to the Purchaser in respect of any Contract to which the Vendor or one of its Affiliates is a party that is not a Purchased Contract, the Purchaser will promptly pay over such moneys to the Vendor.

(3) Each of the Purchaser's and the Vendor's obligations pursuant to this Section 12.2 shall survive for a period of one year following the Closing Date.

## Section 12.3    Full Benefit of Deliverables

The Vendor will ensure that any deliverables under this Agreement, including the Licence Agreement, the PHAROS License Agreement, the Transitional Services Agreement, the Non-Competition and Non-Solicitation Agreement and the Shared IP License Agreement, shall not be terminated, compromised or subject to the U.S. Bankruptcy Proceeding or any plan of arrangement.

## Section 12.4    Confidentiality.

After the Closing, the Vendor will keep confidential all information in its possession or under its control relating to the Purchased Business and the Purchased Assets, unless such information is or becomes generally available to the public other than as a result of a disclosure by the Vendor in violation of this Agreement.

## Section 12.5    Further Assurances.

From time to time after the Closing Date, each Party shall at the request of the other Party execute and deliver such additional conveyances, transfers and other assurances as may be reasonably required to effectively transfer the Purchased Assets to the Purchaser and carry out the intent of this Agreement and any Ancillary Agreement.

## Section 12.6    Pre-Closing TLC Moncton Tax.

The Vendor shall use commercially reasonable efforts to cooperate with the Purchaser for purposes of preparing the financial statements and tax returns of TLC Moncton in respect of the taxation periods ending on (i) December 31, 2009 and (ii) the Closing Date or as a result of the Closing, and any audits or assessments with respect to a taxation period of TLC Moncton ending prior to the Closing.

## Section 12.7    Inter-Company Contract Release.

Upon the Closing, the Vendor and its Affiliates shall release and forever discharge TLC Moncton and the Purchaser from any and all claims which the Vendor or its Affiliates have now, or may have in the future, against TLC Moncton or the Purchaser relating to or arising out of any Inter-Company Contract ("**Inter-Company Contract Claims**"). The Vendor represents,

warrants and covenants that it has not assigned and will not assign to any other person or entity any of the Inter-Company Contract Claims.

### ARTICLE 13
### EMPLOYEES

**Section 13.1     Employees.**

(1)     Not less than ten (10) days prior to the Closing Date, the Purchaser shall offer employment to the Employees, other than the TLC Moncton Employees (the "**Offered Employees**") effective as of the Closing Date on terms and conditions of employment substantially similar to such Offered Employees' current terms and conditions of employment (except (i) with respect to termination of employment and (ii) that the Purchaser is not required to provide benefits under the Pension Plan or any equity participation or stock option plan, provided in the case of (ii) that other terms and conditions of employment are enhanced to compensate Employees for the lack of such benefits), and will recognize the service of the Offered Employees with the Vendor for all purposes and will provide the Offered Employees with all vacation time and vacation pay which comprises the Accrued Vacation Amount. The Purchaser shall indemnify and save harmless the Vendor from any claims for severance, termination pay, pay in lieu of notice or similar claim by an Offered Employee resulting from the Purchaser's failure to offer substantially similar termination of employment to terms to the Offered Employees. The Purchaser will not be obligated to offer employment to any Offered Employee who is absent from work on the Closing Date as a result of illness or disability unless he or she is able to resume active employment within twelve (12) months of the Closing Date, in which case the Purchaser shall make an offer of employment in accordance with this Section 13.1(1) effective as of the date on which such Offered Employee is medically authorized to return to active employment.

(2)     The Vendor shall not attempt in any way to discourage Offered Employees from accepting the offer of employment made by the Purchaser.

(3)     In this Agreement, "**Transferred Employees**" means (i) the TLC Moncton Employees and (ii) those Offered Employees who have accepted the Purchaser's offer of employment made pursuant to this Section 13.1. "**Employee Start Date**" means the Closing Date or such later date on which a Transferred Employee commences active employment with the Purchaser.

**Section 13.2     Employee Liability.**

The Purchaser shall not assume any of the Employee Plans other than the TLC Moncton Employee Plans or liability for accrued benefits or any other liability under or in respect of any of the Employee Plans other than the TLC Moncton Employee Plans.

**Section 13.3     Pension Plan.**

(1)     Immediately prior to the Closing Date, each Employee who participates in the Pension Plan shall cease to participate actively in, and accrue benefits under, the Pension Plan.

(2)     The Vendor shall retain all liability, and shall indemnify and hold harmless the Purchaser with respect to all claims and liabilities arising from the Pension Plan.

**Section 13.4     Employee Liability.**

(1)     Without limiting the Vendor's obligations in respect of Persons employed in the Purchased Business prior to the Closing Date, the Vendor shall be responsible for:

(a)     all liabilities for salary, wages, bonuses, commissions and other compensation relating to employment of all Persons in the Purchased Business accrued prior to the Closing Date and all liabilities under or in respect of the Employee Plans;

(b)     all severance payments, damages for wrongful dismissal and all related costs in respect of the termination by the Vendor of the employment of any Employee who does not become a Transferred Employee;

(c)     all liabilities for claims for benefits, injury, disability, death or workers' compensation arising from or related to employment in the Purchased Business and incurred prior to the Closing Date; and

(d)     all employment-related claims, penalties and assessments in respect of the Purchased Business arising out of matters which occurred prior to the Closing Date.

(2)     Without limiting the Purchaser's obligations in respect of the Transferred Employees on and after the Closing Date the Purchaser shall be responsible for:

(a)     all liabilities for salary, wages, bonuses, commissions, vacation pay, and other compensation relating to employment of all Transferred Employees accrued after the applicable Employee Start Date;

(b)     the Accrued Vacation Amount;

(c)     all severance payments, damages for wrongful dismissal and all related costs in respect of the termination by the Purchaser of the employment of any Transferred Employee;

(d)     all liabilities for claims for benefits, injury, disability, death or workers' compensation arising from or related to employment of the Transferred Employees in the Purchased Business and incurred on or after the Closing Date;

(e)     all employment-related claims, penalties and assessments in respect of the Purchased Business arising out of matters which occur on or subsequent to the Closing Date.

(3)     For purposes of Section 13.4(1)(c) and Section 13.4(2)(d), the date on which a benefit claim is incurred will be:

(a)     in the case of a death claim, the date of death;

(b) in the case of a short term disability claim, long term disability claim or a life insurance premium waiver claim, the date of the first incidence of disability, illness, injury or disease that first qualifies an individual for benefits or to commence a qualifying period for benefits;

(c) in the case of extended health care benefits, including, without limitation, dental and medical treatments, the date of treatment or the date of purchase of eligible medical or dental supplies; and

(d) in the case of a claim for drug or vision benefits, the date the prescription was filled.

## ARTICLE 14
## MISCELLANEOUS

**Section 14.1    Notices.**

Any notice, direction or other communication given regarding the matters contemplated by this Agreement (each a "**Notice**") must be in writing, sent by personal delivery, courier or facsimile (but not by electronic mail) and addressed:

(a) to the Purchaser at:

4700 Bonavista Ave., Suite 305
Montreal, Quebec
H3W 2C5

Attention:    President
Telephone:    514-484-5349
Facsimile:    514-481-8127

with a copy to:

Stikeman Elliott LLP
5300 Commerce Court West
199 Bay Street
Toronto, ON  M5L 1B9

Attention:    David Weinberger
Telephone:    416-869-5515
Facsimile:    416-947-0866

(b) to the Vendor at:

TLC Vision Corporation
16305 Swingley Ridge Road
Suite 300
St. Louis, MO

63017

| Attention: | Chief Financial Officer |
| Telephone: | 636-534-2300 |
| Facsimile: | 636-534-2301 |

with a copy to:

Torys
79 Wellington Street West, Suite 3000
Box 270, TD Centre
Toronto, Ontario, M5K 1N2 Canada

| Attention: | David Chaikof |
| Telephone: | 416-865-8125 |
| Facsimile: | 416-865-7380 |

With a copy to:

Bingham McCutchen LLP
399 Park Avenue
New York, NY 10022

| Attention: | Jeffrey S. Sabin (on behalf of the Required Lenders) |
| Telephone: | 212-705-7747 |
| Facsimile: | 212-752-5378 |

A Notice is deemed to be given and received (i) if sent by personal delivery or same day courier, on the date of delivery if it is a Business Day and the delivery was made prior to 4:00 p.m. (local time in place of receipt) and otherwise on the next Business Day, (ii) if sent by overnight courier, on the next Business Day, or (iii) if sent by facsimile, on the Business Day following the date of confirmation of transmission by the originating facsimile. A Party may change its address for service from time to time by providing a Notice in accordance with the foregoing. Any subsequent Notice must be sent to the Party at its changed address. Any element of a Party's address that is not specifically changed in a Notice will be assumed not to be changed. Sending a copy of a Notice to a Party's legal counsel as contemplated above is for information purposes only and does not constitute delivery of the Notice to that Party. The failure to send a copy of a Notice to legal counsel does not invalidate delivery of that Notice to a Party.

## Section 14.2    Time of the Essence.

Time is of the essence in this Agreement.

**Section 14.3     Announcements.**

No press release, public statement or announcement or other public disclosure (a "**Public Statement**") with respect to this Agreement or the transactions contemplated in this Agreement may be made prior to Closing except with the prior written consent and joint approval of the Vendor and the Purchaser or if required by Law (including the U.S. Bankruptcy Code and the CCAA) or required by a Governmental Entity (including the U.S. Bankruptcy Court and the Canadian Court). Where the Public Statement is required by Law or a Governmental Entity, the Party required to make the Public Statement will use its commercially reasonable efforts to obtain the approval of the other Party as to the form, nature and extent of the disclosure. After the Closing, any Public Statement by the Vendor may be made only with the prior written consent and approval of the Purchaser unless the Public Statement is required by Law or a Governmental Entity, in which case the Vendor shall use its commercially reasonable efforts to obtain the approval of the Purchaser as to the form, nature and extent of the disclosure.

**Section 14.4     Third Party Beneficiaries.**

The Vendor and the Purchaser intend that this Agreement will not benefit or create any right or cause of action in favour of any Person, other than the Parties. No Person, other than the Parties, shall be entitled to rely on the provisions of this Agreement in any action, suit, proceeding, hearing or other forum. Despite the foregoing, the Vendor acknowledges to each of the Purchaser's Indemnified Persons their direct rights against it under Section 11.2 of this Agreement and the Purchaser acknowledges (i) to each of the Vendor's Indemnified Persons their direct rights against it under Section 11.3 of this Agreement and (ii) to the Required Lenders, their consent rights specified in Section 14.7. To the extent required by Law to give full effect to these direct rights, the Vendor and the Purchaser agree and acknowledge that they are acting as agent and/or as trustee of their respective Indemnified Persons. The Parties reserve their right to vary or rescind the rights at any time and in any way whatsoever, if any, granted by or under this Agreement to any Person who is not a Party, without notice to or consent of that Person, including any Indemnified Person.

**Section 14.5     Expenses.**

Except as otherwise expressly provided in this Agreement, each Party will pay for its own costs and expenses incurred in connection with this Agreement, the Ancillary Agreements and the transactions contemplated herein. The costs and expenses referred to in this Section are those which are incurred in connection with the negotiation, preparation, execution and performance of this Agreement, and the transactions contemplated by this Agreement, including the fees and expenses of legal counsel, investment advisers and accountants.

**Section 14.6     Amendments.**

This Agreement may only be amended, supplemented or otherwise modified by written agreement signed by the Vendor (with the prior written consent of the Required Lenders) and the Purchaser.

**Section 14.7     Waiver, Required Lender Approvals.**

No waiver of any of the provisions of this Agreement or any Ancillary Agreement will constitute a waiver of any other provision (whether or not similar). No waiver will be binding

unless executed in writing by the Party to be bound by the waiver and, in the case of the Vendor, with the prior written consent of the Required Lenders. A Party's failure or delay in exercising any right under this Agreement will not operate as a waiver of that right. A single or partial exercise of any right will not preclude a Party from any other or further exercise of that right or the exercise of any other right.

Anything in this Agreement to the contrary notwithstanding, it is understood and agreed that, with out the prior written consent of the Required Lenders, the Vendor may not (i) amend, modify or supplement the terms of this Agreement, (ii) waive any of its rights, or the performance of any of the Purchaser's obligations, under this Agreement, (iii) grant any consent under this Agreement or (iv) exercise any remedies under this Agreement (including, without limitation, any right to terminate this Agreement pursuant to Section 10.1).

### Section 14.8    Non-Merger.

Except as otherwise expressly provided in this Agreement, the covenants, representations and warranties shall not merge on and shall survive the Closing. Notwithstanding the Closing and any investigation made by or on behalf of any Party, the covenants, representations and warranties shall continue in full force and effect subject to the terms hereof. Closing shall not prejudice any right of one Party against any other Party in respect of anything done or omitted under this Agreement or in respect of any right to damages or other remedies.

### Section 14.9    Entire Agreement.

This Agreement, and the Ancillary Agreements, constitute the entire agreement between the Parties with respect to the transactions contemplated by this Agreement and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties, including the Letter of Intent. There are no representations, warranties, covenants, conditions or other agreements, express or implied, collateral, statutory or otherwise, including implied warranties or conditions of merchantability or fitness for a particular purpose, between the Parties in connection with the subject matter of this Agreement or concerning any of the Purchased Assets or the Purchased Business, except as specifically set forth in this Agreement or any Ancillary Agreement. The Parties have not relied and are not relying on any other information, discussion or understanding in entering into and completing the transactions contemplated by this Agreement and the Ancillary Agreements. If there is any conflict or inconsistency between the provisions of this Agreement and the provisions of any Ancillary Agreement, the provisions of this Agreement shall govern.

### Section 14.10    Successors and Assigns.

(1)    This Agreement becomes effective only when executed by the Vendor and the Purchaser. After that time, it will be binding upon and enure to the benefit of the Vendor, the Purchaser and their respective successors and permitted assigns.

(2)    Except as provided in this Section 14.10, neither this Agreement nor any of the rights or obligations under this Agreement are assignable or transferable by any Party without the prior written consent of the other Party. Upon giving notice to the Vendor at any time on or prior to the Closing Date, the Purchaser is entitled to assign this Agreement

or any of its rights or obligations under this Agreement to any of its Affiliates, subject to the following four conditions:

(a) If the assignment occurs prior to Closing, the assignee must execute and deliver a confidentiality agreement to the Vendor in substantially the same form as the confidentiality agreement executed by the Purchaser;

(b) Such assignment shall not relieve the assignor of its obligations under this Agreement;

(c) The assignee will become jointly and severally liable with the Purchaser, as a principal and not as a surety, with respect to all of the obligations of the Purchaser, including the representations, warranties, covenants, indemnities and agreements of the Purchaser; and

(d) The assignee must execute an agreement confirming the assignment and the assumption by the assignee of all obligations of the Purchaser under this Agreement.

(3) The Purchaser may assign its rights and obligations under this Agreement after Closing Date, in whole or in part, to any Person that acquires all or substantially all of the assets of the Purchaser or acquires a majority of the Purchaser's issued and outstanding voting securities, whether by way of take-over bid, amalgamation, arrangement, merger or otherwise.

(4) (4) Upon giving notice to the Purchaser at any time after the Closing Date and subject to the Purchaser's written consent, not to be unreasonably withheld, the Vendor is entitled to assign this Agreement or any of its rights or obligations under this Agreement to any of its Affiliates except that the Purchaser's written consent shall not be required in connection with any such assignment to TLC Vision (USA) Corporation.

## Section 14.11    Severability.

If any provision of this Agreement is determined to be illegal, invalid or unenforceable by an arbitrator or any court of competent jurisdiction, that provision will be severed from this Agreement and the remaining provisions shall remain in full force and effect.

## Section 14.12    Governing Law.

(1) This Agreement will be governed by and interpreted and enforced in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein.

(2) Each Party irrevocably attorns and submits to the exclusive jurisdiction of the Canadian Court and the U.S. Bankruptcy Court after the commencement of the Canadian Insolvency Proceedings and the U.S. Bankruptcy Proceeding, respectively, and waives objection to the venue of any proceeding in such court or that such court provides an inconvenient forum.

**Section 14.13    Counterparts.**

This Agreement may be executed in any number of counterparts (including counterparts by facsimile or other means of electronic communication) and all such counterparts taken together shall be deemed to constitute one and the same instrument.

**[Remainder of page intentionally left blank.  Signature pages follow.]**

IN WITNESS WHEREOF the Parties have executed this Purchase Agreement.

**7289499 CANADA INC.**

By: _____

Authorized Signing Officer

**TLC VISION CORPORATION**

By: _____

Authorized Signing Officer

IN WITNESS WHEREOF the Parties have executed this Asset Purchase Agreement.

**7289499 CANADA INC.**

By: _____

Authorized Signing Officer

By: _____

Authorized Signing Officer

**TLC VISION CORPORATION**

By: _____

Authorized Signing Officer

By: _____

Authorized Signing Officer

IN WITNESS WHEREOF the Parties have executed this Asset Purchase Agreement.

**7289499 CANADA INC.**

By: _____

  Authorized Signing Officer

By: _____

  Authorized Signing Officer

**TLC VISION CORPORATION**

By: _____

  Authorized Signing Officer

By: _____

  Authorized Signing Officer

# EXHIBIT 2

## LIST OF ASSUMED AND ASSIGNED PURCHASED CONTRACTS