# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| TLC Vision (USA) Corporation, *et al.*,[1] ) | Case No. 09-14473 (KG) |
| ) | |
| Debtors. ) | Joint Administration Requested |
| ) | Hearing Date: 1/22/09 at 11:30 a.m. (EST) |
| ) | Obj. Deadline: 1/15/09 at 4:00 p.m. (EST) |
| ) | |

## APPLICATION OF THE DEBTORS FOR ENTRY OF AN ORDER APPROVING THE RETENTION OF CONWAY, DEL GENIO, GRIES & CO., LLC AS CRISIS AND TURNAROUND MANAGER OF THE DEBTORS AND DESIGNATING MICHAEL F. GRIES AS CHIEF RESTRUCTURING OFFICER OF THE DEBTORS, AND RELATED RELIEF

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") hereby apply to the Court (this "Application") pursuant to 11 U.S.C. §§ 105(a) and 363 for entry of an order (the "Order"), in substantially the form attached hereto as **Exhibit A**, (i) authorizing the retention of Conway, Del Genio, Gries & Co., LLC, ("CDG") as crisis and turnaround manager of the Debtors; (ii) designating Michael F. Gries as chief restructuring officer of the Debtors and William McManus as interim chief financial officer of the Debtors; and (iii) granting related relief. In support of the Application, the Debtors rely on the *Declaration of Michael F. Gries, Principal of CDG* (the "Gries Retention Declaration"), a copy of which is attached hereto as **Exhibit B**, and respectfully state as follows:

### Jurisdiction

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

---

[1] The Debtors in the cases, along with the last four digits of each Debtor's federal tax identification number and address, are: TLC Vision (USA) Corporation (6220) 16305 Swingley Ridge Road, Chesterfield, MO 63017; TLC Vision Corporation (1150) 5280 Solar Drive, Suite 300, Mississauga, Ontario, L4W 5M8; and TLC Management Services, Inc. (0374) 1209 Orange Street, Wilmington, DE 19801.

2. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The statutory bases for the relief requested herein are sections 105(a) and 363(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2014-1 and 2016-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## Background

5. On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief with the Court under chapter 11 of the Bankruptcy Code. The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases (the "Chapter 11 Cases") and, as of the date of the filing of this Application, no official committees have been appointed or designated.

6. The factual background relating to the Debtors' commencement of these Chapter 11 cases is set forth in detail in the *Declaration of Michael F. Gries, Chief Restructuring Officer for the Debtors, in Support of First Day Pleadings* (the "Gries Declaration") filed on the Petition Date and incorporated herein by reference.

## Relief Requested

7. Pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, the Debtors request entry of an order authorizing the employment of certain personnel of CDG, effective as of the Petition Date, as crisis management personnel of the Debtors in accordance with the fee structure described below and pursuant to the terms and conditions of the engagement letter

- 2 -

between CDG and the Debtors, dated February 16, 2009, (including the addendum thereto dated April 23, 2009, and as otherwise supplemented, amended or modified, the "Engagement Agreement").[2] A copy of the Engagement Agreement is attached to the Order as **Exhibit 1**. The Debtors selected CDG after considering their needs and alternatives and interviewing other firms. Pursuant to section 363(b)(1) of the Bankruptcy Code, the Debtors also seek the approval of the appointment of Michael F. Gries ("CRO") as chief restructuring officer of the Debtors and William McManus of CDG as interim chief financial officer ("CFO").

## Qualifications Of CDG And Michael F. Gries

8.   In consideration of the size and complexity of their businesses, as well as the exigencies of the circumstances, the Debtors have determined that the services of experienced restructuring advisors will substantially enhance their attempts to maximize the value of their businesses. Specifically, CDG has already been providing restructuring management services to the Debtors under the terms of the Engagement Agreement for approximately ten months. This previous experience has provided CDG with an unmatched familiarity with the Debtors' businesses and operations and makes CDG uniquely qualified to assist the Debtors in their Chapter 11 Cases.

9.   Furthermore, CDG has extensive experience in providing restructuring and financial advisory services in reorganization proceedings, and has an excellent reputation for the services it has rendered in chapter 11 cases on behalf of debtors and creditors throughout the United States. CDG is headed by three founders, each of whom has more than 25 years of financial advisory experience. CDG is a financial advisory firm with a major focus on advising

---

[2] In the event of any inconsistencies between the description of the CDG engagement described in this Application and the terms of the Engagement Agreement, the Engagement Agreement shall control.

clients regarding the management and restructuring of under-performing companies, including in the context of a chapter 11 filing.

10. The Debtors selected CDG based on its longstanding reputation in assisting companies through complex financial restructurings, including bankruptcy reorganizations, and its high degree of success in a wide range of industries. Since 1998, when CDG was founded, it has advised on over 90 restructuring and interim management transactions with a total deal value in excess of $40 billion. CDG's past and current clients include Adelphia Communications Corporation, Encompass Services, Inc., Linens 'n Things, Mariner Health Group, Inc., Mariner Post-Acute Network, Inc., Montgomery Ward, LLC, Wheeling Pittsburg Steel Group, The Penn Traffic Company, OCA, Inc., Corvest Promotional Products, Inc., Haven Eldercare LLC, and USInternetworking, Inc. Based on the foregoing, the Debtors believe the engagement of CDG to assist the Debtors during these Chapter 11 Cases is essential to their success. CDG currently employs approximately 50 professionals. CDG specializes in, among other things, corporate restructuring, crisis management, and mergers/acquisitions in chapter 11 cases.

11. Michael F. Gries is a principal and founder of CDG and is also well-suited to provide the restructuring services required by the Debtors. Mr. Gries specializes in helping operationally and financially distressed organizations through out-of-court workouts and chapter 11 reorganizations. Mr. Gries is a nationally recognized leader in the restructuring profession with more than 25 years of experience advising companies and creditors on complex corporate reorganizations. Over the course of his career, Mr. Gries has been responsible for restructurings, divestitures and acquisitions representing companies, lenders, and bondholders, which included valuation, strategic assessment, overhead reduction initiatives, business plan development and evaluation, capital raising and negotiation. Mr. Gries has overseen engagements in a broad range

of industries including aerospace, apparel and textile, design and marketing, automotive, construction and engineering, distribution, electrical contracting, energy services, gaming, health care, manufacturing, mechanical contracting, mining, publishing and media, power generation, real estate, retail, shipbuilding, technology, trading and transportation. His past assignments have included representing OCA, Inc., Wellman, Inc., Mariner Health Group, Inc., Mariner Post-Acute Network, Inc., NABI Autobuszipari Rt., Encompass Services Corporation and American Plumbing and Mechanical, Inc. In addition, he has served as the Chief Restructuring Officer or Chief Executive Officer of Linens 'n Things, Mariner, OCA and Encompass Services, Inc. during their chapter 11 cases.

12. Mr. Gries's areas of specialty include crisis management, preparation of business plans including cash flow forecasts, replacement and restructuring of financing, improvements in accuracy and timing of financial reporting, identification and implementation of cost reductions and forensic accounting. Mr. Gries has considerable experience in the health care, retail, distribution, manufacturing and finance industries.

13. Prior to founding CDG, Mr. Gries was a Partner and Director of the Northeast Restructuring and Reorganization practice of Ernst & Young LLP. He received his Bachelor of Science Degree in Business Administration, with a Major in Accounting, from Northeastern University. Mr. Gries is a Certified Public Accountant and a Certified Restructuring and Reorganization Accountant.

## Scope Of Services

14. CDG will manage all aspects of the Debtors' chapter 11 cases leading to a possible refinancing, restructuring, or modification of any or all of the Debtors' existing debt, other obligations, or equity (the "Restructuring"). In addition, CDG will manage the Debtors'

day to day operations including business strategy and all employee related matters. In this regard, Mr. Gries has been appointed CRO of the Debtors and Mr. McManus has been appointed as interim CFO of the Debtors by their Boards of Directors. CDG will provide restructuring management services as requested by the Debtors and described in the Engagement Agreement, including, but not limited to the following:

(i) Perform general due diligence on the Company which will include gathering and analyzing data, evaluating the Company's performance, and reviewing other information with current management in order to determine the extent of the Company's financial challenges and opportunities;

(ii) Perform due diligence on the Company's capital structure, including a review of the applicable legal agreements;

(iii) Evaluate the feasibility of strategic alternatives being considered by the Company given its current operating business, current capital structure and business prospects;

(iv) Review and assess the Company's current liquidity forecast and assist management in modifying and updating such forecast based upon current information, CDG's observations and other information as it becomes available;

(v) Assist the Company in the development of business plan alternatives (including detailed financial projections);

(vi) Assist the Company in presenting its business plan and restructuring plan to its various constituencies;

(vii) Develop valuation and debt capacity analyses for the Company on a consolidated basis;

(viii) Assist the Company in evaluating restructuring alternatives available to the Company;

(ix) Assist the Company in restructuring discussions and negotiations with lenders, creditors, shareholders and other constituencies;

(x) Assist in the development of material financial information (including operating reports, cash flow forecasts, and other financial analyses) important to the restructuring effort; and

(xi) Performing such other services and analyses relating to the restructuring effort as are or become consistent with the foregoing items or as mutually agreed upon.

15. As interim CFO, Mr. McManus will assist other members of management with:

(i) addressing any and all operational issues as they arise;

(ii) managing all business relationships; and

(iii) implementing operational changes.

16. To address and handle the above responsibilities on behalf of the Debtors, Messrs. Gries and McManus will be assisted by certain professionals from CDG pursuant to the terms of the Engagement Agreement.

## CDG's Disinterestedness

17. The Debtors do not believe that CDG is a "professional" whose retention is subject to approval under section 327 of the Bankruptcy Code. Nonetheless, to the best of the Debtors' knowledge, information and belief, and as disclosed in the Gries Retention Declaration and exhibits thereto, neither CDG nor any professional employee or independent contractor of CDG has any connection with or any interest adverse to the Debtors, their creditors, or any other party in interest, or their respective attorneys and accountants, except as set forth in the Gries Retention Declaration.

18. In addition, as set forth in the Gries Retention Declaration, if any new material facts or relationships are discovered or arise, CDG will provide the Court with a supplemental declaration.

## Compensation

19. As set forth in the Engagement Agreement, CDG will bill the Debtors for its services and those of Mr. Gries at the rate of $175,000 per month, plus out-of-pocket expenses

incurred in connection with these cases including, but not limited to, travel, lodging, meals, postage, long-distance telephone, facsimile charges, rental cars, photocopying, as well as other attendant costs that CDG may reasonably incur in connection with these Chapter 11 cases. Also, CDG is entitled to indemnity to the extent set forth in the Engagement Agreement, as modified by the proposed order approving this Application in the form attached hereto as **Exhibit A**.

20. The Debtors shall pay to CDG the compensation set forth above based upon the submission of monthly invoices to the Debtors by CDG. Additionally, CDG shall file with the Court, and provide notice to the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") and all official committees appointed in these chapter 11 cases, reports (the "Monthly Reports" and each a "Monthly Report") of compensation earned and expenses incurred on a monthly basis. The Monthly Reports shall contain summary charts which (a) summarize the service provided to the Debtors, (b) note the compensation earned by CDG, (c) identify the CDG employees providing services to the Debtors and (d) itemize the expenses incurred. The U.S. Trustee and all official committees appointed in these chapter 11 cases shall have twenty (20) days from the date that a Monthly Report is served (the "Objection Deadline") to file an objection thereto; provided, however, that CDG's compensation shall be subject only to the standard of review set forth in section 328(a) of the Bankruptcy Code and not subject to any other standard of review, including the standard of review under section 330 of the Bankruptcy Code.

21. In the event that an objection to a Monthly Report is filed by the Objection Deadline, the Court shall schedule a hearing thereon. If no objection to a Monthly Report is filed by the Objection Deadline, CDG shall be entitled to immediate payment on account of the fees and expenses set forth in the Monthly Report without further action being required. The

- 8 -

1076/74009-001 Current/15084663v4
RLF1 3518759v.4

compensation provided for in the Engagement Agreement shall constitute full payment for the services to be rendered by CDG, the CRO and the interim CFO to the Debtors hereunder. Because CDG, the CRO and the interim CFO are not being employed as professionals under section 327 of the Bankruptcy Code, neither CDG, the CRO nor the interim CFO shall be required to submit fee applications pursuant to sections 330 and 331 of the Bankruptcy Code.

22. The Fee Structure provided for in the Engagement Agreement is consistent with and typical of arrangements entered into by CDG and other comparable firms in connection with the rendering of similar services under similar circumstances. The fee amount has been set at a level designed to fairly compensate CDG for its work and to cover fixed and routine overhead expenses.

23. Given the numerous issues which the CDG personnel may be required to address in the performance of their services, CDG's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for such services for engagements of this nature in an out-of-court context, as well as in chapter 11, the Debtors submit that the Fee Structure in the Engagement Agreement is reasonable under the standards set forth in section 328 of the Bankruptcy Code.

### Indemnification

24. Subject to the approval of the Court and as more fully described in the Engagement Agreement and modified in accordance with the proposed order attached hereto as **Exhibit A**, the Debtors will indemnify hold harmless, and defend CDG and its affiliates and their respective shareholders, members, managers, employees, agents, representatives, and subcontractors (collectively, the "Indemnified Parties") under certain circumstances.[3]

---

[3] The indemnification provision in the Engagement Agreement provides that the Debtors will indemnify and hold harmless CDG its affiliates, consultants, and independent contractors and each of their respective members, officers,

25. The Debtors and CDG believe that the indemnification is customary and reasonable for restructuring and financial advisory services, both out-of-court and in chapter 11 cases, and reflects the qualifications and limitations on indemnification provisions that are customary in this district and other jurisdictions. *See, e.g.,*: *In re Tribune Company*, Case No. 08-13141 (KJC); *In re Washington Mutual, Inc.*, Case No. 08-12229 (MFW); *In re PPI Holdings, Inc.*, Case No. 08-13289 (KG); *In re Lehman Brothers Holdings, Inc.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. December 17, 2008); *In re Ziff Davis Media Inc.*, Case No. 08-10768 (BRL) (Bankr. S.D.N.Y. March 31, 2008), *In re DJK Residential LLC*, Case No. 08-10375 (JMP) (Bankr. S.D.N.Y. February 25, 2008), *In re Dunmore Homes, Inc.*, Case No. 07-13533 (Bankr. S.D.N.Y. December 20, 2007).

26. The terms and conditions of the Engagement Agreement were negotiated by the Debtors and CDG at arm's-length and in good faith. The Debtors respectfully submit that the indemnification provisions contained in the Engagement Agreement, as modified by the proposed order, viewed in conjunction with the other terms of CDG's proposed retention, are reasonable and in the best interests of the Debtors, their estates, and creditors in light of the fact

---

directors employees, agents, controlling parties and representatives (each, an "Indemnified Party" and collectively the "Indemnified Parties") against any and all Losses (as defined in the Engagement Agreement) caused by, relating to, based upon, or arising out of (directly or indirectly):
  i. the Engagement Agreement;
  ii. the Indemnified Parties' acceptance of or the performance or non-performance of the services that are the subject of the Engagement Agreement and related activities prior to the date of the Engagement Agreement;
  iii. any document or information, whether oral or written, provided to CDG by the Company or any of its representatives;
  iv. the breach of any representations, warranties or covenants by the Company given pursuant to the Engagement Agreement or in connection therewith;
  v. CDG's involvement in any Restructuring or any part thereof;
  vi. any filings made by or on behalf of any party with any governmental agency in connection with any Restructuring; or
  vii. any Restructuring (items (i) through (vii) collectively, the "Indemnified Events").

Provided, however, that the Company will not be liable to indemnify any Indemnified Party to the extent that any Loss is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) on the merits to have resulted primarily and directly from such Indemnified Party's gross negligence or willful misconduct.

- 10 -

that the Debtors require CDG's services to successfully reorganize. Accordingly, as part of this Application, the Debtors request that the Court approve the indemnification provisions of the Engagement Agreement as modified.

### Legal Basis For Relief

A. **The Court May Authorize the Employment and Retention of CDG Pursuant to Section 363 of the Bankruptcy Code.**

27. Section 363 of the Bankruptcy Code provides, in relevant part, that a debtor in possession "after notice and hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Under applicable case law in this and other circuits, courts will approve a debtor's proposed use of their assets under section 363(b) if it represents a sound business purpose on the part of the debtor. *See, e.g., In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (Bankr. D. Del. 1999) ("In evaluating whether a sound business purpose justifies the use, sale or lease of property under Section 363(b), courts consider a variety of factors, which essentially represent a business judgment test."); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (courts defer to a trustee's judgment concerning use of property under § 363 (b) when there is a legitimate business justification); *In re Delaware & Hudson R.R. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (courts have applied the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)). Under the business judgment rule, a court will not interfere with the judgment of a board of directors unless there is a showing of "gross and palpable overreaching." *In re Marvel Entm't Group, Inc.*, 273 B.R. 58, 78 (Bankr. D. Del. 2002) ("under the business judgment rule, a board's 'decisions will not be disturbed if they can be attributed to any rational purpose' and a court 'will not substitute its own notions of what is or is not sound business judgment'") (citing *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 719-20 (Del. 1971)).

28. The Debtors believe that their estates will benefit from having a seasoned reorganization professional services firm which is not affiliated with the Debtors to evaluate the Debtors' options for maximizing the value of their assets and recovery for creditors.

29. Bankruptcy courts have analyzed the propriety of a debtor's employment of corporate restructuring officers, advisors and professionals under section 363 on numerous occasions and have determined it is an appropriate exercise of the debtor's business judgment to employ a restructuring professional in this manner. *See, e.g., In re Hoop Holdings, LLC*, No. 08-10544 (BLS) (Bankr. D. Del. Apr. 22, 2008); *In re Leiner Health Products, Inc.*, No. 08-10446 (KJC) (Bankr. D. Del. Apr. 8, 2008); *In re TOUSA, Inc.*, No. 08-10928 (Bankr. S.D. Fla. Feb. 1, 2008) (interim approval); *In re American Home Mortgage Holdings, Inc.*, No. 07-11047 (Bankr. D. Del. Sept. 5, 2007); *In re Calpine Corp.*, No. 05-60200 (Bankr. S.D.N.Y. Jan. 17, 2007); *In re ACR Mgmt., LLC*, No. 04-27848 (Bankr. W.D. Pa. June 16, 2004); *In re Mirant Corp.*, No. 03-46590 (Bankr. N.D. Tex. Sept. 29, 2003); *In re Fleming Cos., Inc.*, No. 03-10945 (Bankr. D. Del. June 25, 2003); *In re Exide Techs., Inc.*, No. 02-11125 (Bankr. D. Del. May 10, 2002).

30. A debtor, pursuant to section 363(b), may employ one or more professionals to act as their restructuring officers or managers or crisis officers or managers. *See In re Tokheim Corp.*, No. 02-13437 (RJN) (Bankr. D. Del. February 25, 2003). The retention of interim corporate officers and other temporary employees is proper under section 363 of the Bankruptcy Code. Numerous courts in this district have authorized retention of officers utilizing this provision of the Bankruptcy Code. *See In re Adva-Lite, Inc.*, No. 07-10264 (KJC) (Bankr. D. Del. Mar. 16, 2007); *In re Global Home Products LLC*, No. 06-10340 (KG) (Bankr. D. Del. May 4, 2006); *In re The Holliston Mill, Inc.*, No. 07-10687 (MFW) (Bankr. D. Del. June 6,

2007); *In re World Health Alternatives, Inc.*, No. 06-1066 (PJW) (Bankr. D. Del. Mar. 15, 2006); *In re Sea Containers Ltd.*, No. 06-11156 (KJC) (Bankr. D. Del. May 8, 2007).

31. The terms and conditions of the Engagement Agreement were negotiated by the Debtors and CDG at arm's-length and in good faith. The Debtors submit that the employment of CDG is a sound exercise of their business judgment and satisfies section 363 of the Bankruptcy Code as CDG's services are necessary and essential to the Debtors' restructuring efforts. In addition to the specific knowledge they have acquired about the Debtors' business, Mr. Gries and CDG have extensive experience providing management services to distressed companies. Since their engagement, CDG, Mr. Gries and Mr. McManus, working in conjunction with the Debtors' senior management, have provided invaluable assistance in, among other things, (a) analyzing the Debtors' overall operations and financial condition, (b) developing reliable short-term cash flow forecasts, (c) implementing certain cash conservation and cash management techniques, (d) implementing cost cutting measures and operational changes to reduce cash spend, and (e) coordinating the Debtors' preparation for filing these chapter 11 cases.

### B. Retention of CDG Is Critical to the Debtors' Success.

32. Denying the relief requested herein would deprive the Debtors of the assistance of a highly qualified CRO and interim CFO and disadvantage the Debtors and all parties in interest. Indeed, the Debtors would be forced to engage a new CRO who lacks an equivalently thorough understanding of the Debtors' business and restructuring initiatives—both already in progress and soon to be implemented. Further, hiring a new CRO would involve a steep learning curve, significant time and additional resources—all of which are in short supply in a chapter 11 case. Accordingly, the Debtors respectfully submit that the services provided by CDG are critical to the success of these chapter 11 cases and request that the Court approve the Engagement Agreement in substantially the form attached hereto.

33.  The Debtors submit that the employment of CDG and Mr. Gries under the terms of the Engagement Agreement would greatly benefit the Debtors' estate and creditors. The absence of executives capable of achieving a successful reorganization would severely hinder the Debtors' ability to reorganize in an efficient and effective manner.

34.  Moreover, Mr. Gries is clearly qualified for the position for which he is being employed. The Debtors have determined that the terms of the Engagement Agreement are within the range of those for senior executive officers employed with companies of comparable size, value, and reputation. Accordingly, the Debtors' decision to enter into the Engagement Agreement reflects an exercise of the Debtors' sound business judgment.

C.  **Approval of the Fee Structure Under Section 328 is Appropriate.**

35.  The Debtors also seek approval of the Fee Structure and indemnification provisions set forth in the Engagement Agreement, as modified, pursuant to section 328(a) of the Bankruptcy Code, which provides, in relevant part, that the Debtors "with the court's approval, may employ or authorize the employment of a professional person under section 327 ... on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis ...." 11 U.S.C. § 328(a). Accordingly, section 328 permits the compensation of professionals, including restructuring advisors and financial advisors, on more flexible terms that reflect the nature of their services and market conditions, which is a significant departure from prior bankruptcy practice relating to the compensation of professionals. As the United States Court of Appeals for the Fifth Circuit recognized in *In re National Gypsum Co.*, 123 F.3d 861 (5th Cir. 1997):

> Prior to 1978 the most able professionals were often unwilling to work for bankruptcy estates where their compensation would be subject to the uncertainties of what a judge thought the work was worth after it had been done. That uncertainty continues under the present § 330 of the Bankruptcy Code, which provides that the

> court award to professional consultants "reasonable compensation" based on relevant factors of time and comparable costs, etc. Under present § 328 the professional may avoid that uncertainty by obtaining court approval of compensation agreed to with the trustee (or debtor or committee).

*Id.* at 862 (citations omitted). Owing to this inherent uncertainty, courts in this circuit and other jurisdictions have approved similar arrangements that contain reasonable terms and conditions under section 328. *See Artists Theatre Co. v. Walton*, 315 F.3d 217, 228-234 (3d Cir. 2003) (applying "market driven" approach and holding retention application of financial advisor, including indemnification provisions, was reasonable); *In re Insilco Techs., Inc.*, 291 B.R. 628, 633 (Bankr. D. Del. 2003) ("Section 328 authorizes the employment of professional persons on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis or on a contingent fee basis. Section 328 applies to all professionals, including financial advisors, that a debtor seeks to retain … [T]he Court is guided by a standard of reasonableness when analyzing the terms and conditions of engagement of professionals, including retainers held by professionals."); *see also In re Tribune Company*, Case No. 08-13141 (KJC); *In re Washington Mutual, Inc.*, Case No. 08-12229 (MFW); and *In re PPI Holdings, Inc.*, Case No. 08-13289 (KG); *In re Ziff Davis Media*, Case No. 08-10768 (BRL) (Bankr. S.D.N.Y. March 31, 2008); *In re Dunmore Homes, Inc.*, Case No. 07-13533 (Bankr. S.D.N.Y. December 20, 2007); *In re Smart World Technologies, LLC*, 552 F.3d 228 (2d. Cir. 2009).

36. The Fee Structure appropriately reflects the nature and scope of services to be provided by CDG and is appropriate in light of CDG's substantial experience with respect to restructuring and financial advisory services and the fee structures typically utilized by CDG and other leading restructuring advisors and financial advisors.

1076/74009-001 Current/15084663v4
RLF1 3518759v.4

## Notice

37.     Notice of this Application shall be provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) the Steering Committee of Lenders; (d) counsel to the Steering Committee of Lenders; (e) the Securities and Exchange Commission; (f) the Internal Revenue Service; (g) the Toronto Stock Exchange and each Canadian provincial and territorial securities commission; (h) the Office of the United States Attorney for District of Delaware; (i) the agent to the proposed debtor-in-possession lender; and (j) Harris Bank, as the Debtors' primary bank deposit. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

## No Prior Request

38.     No prior application for the relief requested herein has been made to this or any other court.

1076/74009-001 Current/15084663v4
RLF1 3518759v.4

WHEREFORE the Debtors respectfully request the entry of an order in substantially the form attached hereto as **Exhibit A**: (a) authorizing and approving the retention and employment by the Debtors of CDG as crisis and turnaround manager of the Debtors, effective as of the Petition Date; (b) designating Michael F. Gries as chief restructuring officer and William McManus as interim CFO of the Debtors and (c) granting such other and further relief as the Court deems just and proper

Dated: December 21, 2009
Wilmington, Delaware

**TLC VISION (USA) CORPORATION,**
**TLC VISION CORPORATION**
**TLC MANAGEMENT SERVICES, INC.**

By: _____
    James Tiffany, President