**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TLC Vision (USA) Corporation, *et al.*,[1] | ) Case No. 09-14473 (KG) |
| | ) |
| Debtors. | ) Joint Administration Requested |

**SUPPLEMENTAL DECLARATION OF MICHAEL F. GRIES, CHIEF RESTRUCTURING OFFICER FOR THE DEBTORS, IN FURTHER SUPPORT OF DEBTORS' MOTION FOR ENTRY OF ORDER (A) AUTHORIZING THE SALE OF THE DEBTORS' CANADIAN OPERATIONS FREE AND CLEAR OF ALL LIENS, CLAIMS ENCUMBRANCES AND OTHER INTERESTS AND (B) GRANTING CERTAIN RELATED RELIEF**

I, Michael F. Gries, hereby declare as follows:

1. I am the Chief Restructuring Officer for each of the above-captioned debtors and debtors in possession (collectively, the "Debtors"). I have served in this capacity since April 23, 2009. I am generally familiar with the facts and circumstances relating to the proposed sale and assignment (the "Canada Sale") by Debtor TLC Vision Corporation ("TLC Vision") of its 75% equity interest in its non-debtor affiliate TLC The Laser Centre (Moncton), Inc., a Canadian corporation ("Moncton"), and of certain assets, contracts and other rights and obligations of TLC Vision relating to refractive laser eye surgery centers located in Canada (collectively, with the equity interests in Moncton, the "Canadian Operations") pursuant to the Debtors' Motion for Entry of Order (A) Authorizing the Sale of the Debtors' Canadian Operations Free and Clear of All Liens, Claims Encumbrances and Other Interests and (B) Granting Certain Related Relief (the

---

[1] The Debtors in the cases, along with the last four digits of each Debtor's federal tax identification number and address, are: TLC Vision (USA) Corporation (6220) 16305 Swingley Ridge Road, Chesterfield, MO 63017; TLC Vision Corporation (1150) 5280 Solar Drive, Suite 300, Mississauga, Ontario, L4W 5M8; and TLC Management Services, Inc. (0374) 1209 Orange Street, Wilmington, DE 19801.

"Canadian Sale Motion") [Docket No. 22][2] filed in this case on December 21, 2009 (the "Petition Date").

2.  I submit this Supplemental Declaration in further support of the Debtors' request, as stated on the record at the December 22, 2009 hearing in these chapter 11 cases, for an interim order authorizing TLC Vision to conduct the Canada Sale as a private sale without the need for a public auction. This Supplemental Declaration is a supplement to the Declaration of Michael F. Gries, Chief Restructuring Officer of the Debtors, in Support of First Day Pleadings filed in these cases on the Petition Date (the "First Day Declaration") [Docket No. 11, see ¶¶ 136-45].

3.  As I stated in the First Day Declaration, the Purchaser and its affiliates currently operate a number of laser vision correction clinics across Canada. Collectively, these clinics constitute TLC Vision's largest competitor in Canada. In May 2009, TLC Vision received an unsolicited indication of interest from Purchaser for the acquisition of TLC Vision's Canadian Operations. For several months the Purchaser conducted due diligence on the Canadian Operations. On November 12, 2009, the parties signed a letter of intent (the "LOI") for the sale of the Canadian Operations. The LOI was approved by TLC Vision's prepetition secured lenders, who hold a valid, enforceable and properly perfected senior lien on and security interest in all of the assets constituting the Canadian Operations, subject only to the liens of the debtor-in-possession financing facility approved by this Court on an interim basis.

4.  From and after the execution of the LOI, TLC Vision and the Purchaser engaged in extensive, arms length negotiation of definitive purchase documents. During

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Canadian Sale Motion.

the course of the negotiations, the Purchaser expressed reluctance to proceed with the purchase of the Canadian Operations, at least under the terms set forth in the LOI, in a Court-ordered auction process due to its concern that the related delay and uncertainty in ultimate ownership of the Canadian Operations would result in irreparable harm to the business.

5.  On December 20, 2009, the day before the Petition Date, the parties executed the Purchase Agreement attached to the Canadian Sale Motion. Pursuant to Section 10.1(f) of the Purchase Agreement, the Purchaser may terminate the Purchase Agreement "no later than the fifth (5th) Business Day (or such other date as otherwise agreed to by [TLC Vision]) of the U.S. Bankruptcy Court issuing an order for an auction to be conducted pursuant to section 363 of the U.S. Bankruptcy Code." The Purchaser insisted on this provision to ensure it could walk away from the transaction if an auction is required.

6.  During the course of negotiations with the Purchaser, TLC Vision received indications of interest from two other potential purchasers of the Canadian Operations, both of whom are operators of laser vision correction clinics in Ontario, but on a smaller scale than the Purchaser. TLC Vision allowed those interested parties to conduct due diligence on the Canadian Operations. One of those parties submitted a proposal with a lower purchase price than that offered by the Purchaser and with numerous conditions to closing. After further negotiations with that party, the party declined to increase its offer. The other party declined to make an offer for the Canadian Operations.

7. TLC Vision has received no other indications of interest for the sale of its Canadian Operations.

8. The Purchase Agreement with the Purchaser contains no financing or due diligence contingencies. It's only material contingency is the approval of the transaction by Moncton's minority shareholder (a contingency that any sale of TLC's equity interests in Moncton would require).

9. The assets constituting the Canadian Operations to be sold pursuant to the Purchase Agreement are located entirely in Canada.

10. The assets constituting the Canadian Operations to be sold pursuant to the Purchase Agreement are encumbered by properly perfected post-petition liens in favor of the Debtors' debtor-in-possession agent and lenders (collectively, the "DIP Lenders") and properly perfected prepetition liens in favor of the Debtors' prepetition senior secured lenders (collectively, the "Prepetition Lenders"). As of the date hereof, the Debtors, including TLC Vision, are indebted to the DIP Lenders in the principal amount of $7,500,000. As of the Petition Date, the Debtors, including TLC Vision, were indebted to the Prepetition Lenders in an amount of not less than $105,000,000. The Canadian Operations are therefore encumbered by debt far in excess of their value. The DIP Lenders and the Prepetition Lenders have consented to and support the Canada Sale.

11. TLC Vision is a publicly traded entity, TLC Vision has been in default to the Prepetition Lenders, and such default has been a matter of public record.

12. Based on the foregoing, I believe that TLC Vision has either approached or been approached by a sufficient number of entities that have a reasonable likelihood of submitting a bid for the Canadian Operations, that the purchase price offered by the

Purchaser represents the best price TLC Vision will obtain under present market conditions, and that a higher or better purchase price for the Canadian Operations will not be obtained by a public auction process. As such, I believe it would be a waste of estate resources to conduct a public auction process because (a) it is highly unlikely that any other bidder would be able to match the value of the proposed transaction without significant contingencies or conditions to closing, and (b) the Purchaser has the right to terminate the Purchase Agreement or attempt to lower its purchase price under the threat of termination..

13. The Purchaser currently operates a business that complements the Canadian Operations and, for that reason, is in a relatively unique position to recognize significant synergistic efficiencies from the sale. TLC Vision has spoken with other similarly-situated entities in Canada regarding the sale of the Canadian Operations, and they have either submitted a materially lesser offer with much less certainty, or declined to bid altogether.

14. The Purchase Agreement provides that the Purchaser has the option to terminate the Purchase Agreement in the event that TLC Vision is required to proceed with a public auction of the Canadian Operations. Therefore, if an auction were ordered, TLC Vision would risk losing this transaction.

15. Finally, the delay inherent in an auction process for the Canadian Operations would create an atmosphere of uncertainty among employees, patients and key contract counterparties of the Canadian Operations regarding the viability and ownership of the Canadian Operations, which could lead to employee attrition, loss of patients, and erosion of the value of the Canadian Operations. Under all of these

circumstances, the Purchaser might seek a reduction in the Purchase Price, if it were still interested in the Canadian Operations at all.

16. Based on the foregoing, I believe that the likelihood and degree of any benefits resulting from a public auction are far outweighed by the potential irreparable harm to the business and transaction value if a public auction were required.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 4, 2010

                        **TLC Vision (USA) Corporation**
                        **TLC Vision Corporation**
                        **TLC Management Services, Inc.**

                        /s/ *Michael F. Gries*
                        Michael F. Gries
                        Chief Restructuring Officer