# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TLC Vision (USA) Corporation, et. al.,[1] | Case No. 09-14473 (KG) |
| Debtors. | Joint Administration Requested |

## DISCLOSURE STATEMENT WITH RESPECT TO THE
## JOINT CHAPTER 11 PLAN OF REORGANIZATION DATED AS OF JANUARY 6, 2010

**PROSKAUER ROSE LLP**
Mark K. Thomas (admitted *pro hac vice*)
Paul V. Possinger (admitted *pro hac vice*)
Jeremy T. Stillings (admitted *pro hac vice*)
Three First National Plaza
70 West Madison, Suite 3800
Chicago, Illinois 60602-4342
Telephone: (312) 962-3550
Facsimile: (312) 962-3551

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (DE Bar No. 2981)
Michael J. Merchant (DE Bar No. 3854)
Chun I. Jang (DE Bar No. 4790)
Andrew C. Irgens (DE Bar No. 5193)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7531
Facsimile: (302) 498-7531

Dated: January 6, 2010

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: TLC Vision (USA) Corporation (6220); TLC Vision Corporation (1150) and TLC Management Services, Inc. (0374).

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE JOINT CHAPTER 11 PLAN OF REORGANIZATION DATED JANUARY 6, 2010 FILED BY TLC VISION CORPORATION, TLC VISION (USA) CORPORATION, AND TLC MANAGEMENT SERVICES INC., DEBTORS AND DEBTORS IN POSSESSION, (AS MAY BE AMENDED IN ACCORDANCE WITH THE TERMS THEREOF AND APPLICABLE LAW, THE "PLAN"). THE INFORMATION CONTAINED HEREIN MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS ANNEXED TO THE PLAN AND THE PLAN SUPPLEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN SHALL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF ANY OF THE DEBTORS AND DEBTORS IN POSSESSION IN THESE CASES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE

CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN ANY OF THE DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CASES.

*[Remainder of Page Intentionally Left Blank.]*

4541/74009-001 Current/15961454v9
RLF1 3523585v.2

# TABLE OF CONTENTS

I.     INTRODUCTION ....................................................................................................1

II.    OVERVIEW OF THE PLAN...................................................................................3

    A.    General Structure of the Plan....................................................................4
    B.    Summary of Treatment of Claims and Interests under the Plan ...............5

III.   PLAN VOTING INSTRUCTIONS AND PROCEDURES .........................................18

    A.    Notice to Holders of Claims and Interests ..............................................18
    B.    Voting Rights.........................................................................................19
    C.    Solicitation Materials.............................................................................19
    D.    Voting Procedures, Ballots and Voting Deadline.....................................20
    E.    Confirmation Hearing and Deadline for Objections to Confirmation .................22

IV.   GENERAL INFORMATION CONCERNING THE DEBTORS....................................22

    A.    Corporate Structure ...............................................................................22
    B.    Overview of Business Operations............................................................22
    C.    Description of the Debtors' Business Operations .....................................23
            1.    Refractive Centers....................................................................23
            2.    Doctors' Services .....................................................................24
            3.    Eye Care..................................................................................24
    D.    Pre-Confirmation Management and Employees........................................24
            1.    Existing Board of Directors ......................................................24
            2.    Existing Executive Officers ......................................................25
            3.    Employees/Labor Relations......................................................26
            4.    Existing Compensation and Benefits........................................26
    E.    Pre-Petition Capital Structure ................................................................27
            1.    Credit Facility .........................................................................27
            2.    Interest Rate Swap Agreement..................................................28
            3.    Equipment and Capital Financing.............................................28
    F.    Summary of Assets ................................................................................28
    G.    Historical Financial Information..............................................................29
    H.    Events Leading to Commencement of the Chapter 11 Cases ...............................29
    I.    The Debtors' Significant Leverage ..........................................................31
    J.    Plan Negotiations; Consensual Plan Efforts ...........................................31

V.    THE CHAPTER 11 CASES ....................................................................................31

    A.    Continuation of Business; Stay of Litigation...........................................31
    B.    First Day Motions .................................................................................32
    C.    Retention of Professionals .....................................................................32
    D.    Debtor in Possession Financing and Authorization to Use Cash Collateral.........32

VI.   SUMMARY OF THE PLAN OF REORGANIZATION.............................................33

    A.    Overall Structure of the Plan..................................................................34

i

|  | B. | Substantive Consolidation .................................................................................34 |
|  | C. | Reorganized Capital Structure Created by Plan.................................................34 |
|  | D. | Classification and Treatment of Claims and Interests ...........................................35 |
|  |  | 1. | Treatment of Unclassified Claims under the Plan ....................................36 |
|  |  | 2. | Treatment of Claims Against and Interests in TLC USA:.........................38 |
|  |  | 3. | Treatment of Claims Against and Interests in TLC Canada:.....................40 |
|  |  | 4. | Treatment of Claims Against and Interests in TLC MSI:..........................41 |
|  | E. | Reservation of Rights Regarding Claims...............................................................42 |
|  | F. | Allowed Claims, Distribution Rights and Objections to Claims ...........................42 |
|  |  | 1. | Allowance Requirement............................................................................42 |
|  |  | 2. | Date of Distribution .................................................................................43 |
|  |  | 3. | Making of Distributions............................................................................43 |
|  |  | 4. | Objection Procedures................................................................................43 |
|  | G. | Disposition of Executory Contracts and Unexpired Leases ...................................44 |
|  |  | 1. | Contracts and Leases Deemed Assumed....................................................44 |
|  |  | 2. | Cure with Respect to Assumed Contracts and Leases ................................45 |
|  |  | 3. | Rejection Damages ....................................................................................45 |
|  |  | 4. | Benefit Programs ......................................................................................46 |
|  | H. | Revesting of Assets; Release of Liens...................................................................46 |
|  | I. | Post-Consummation Corporate Structure, Management and Operation...................46 |
|  |  | 1. | Corporate Action.......................................................................................46 |
|  |  | 2. | Articles of Organization............................................................................47 |
|  |  | 3. | Issuance of New TLC USA Common Stock ...............................................47 |
|  |  | 4. | Officers and Directors of Reorganized Debtors.........................................47 |
|  |  | 5. | New Management Incentive Plan ...............................................................47 |
|  |  | 6. | Funding of Reorganized Debtors ...............................................................47 |
|  |  | 7. | Exemption from Certain Transfer Taxes ...................................................47 |
|  | J. | Confirmation and/or Consummation ......................................................................48 |
|  |  | 1. | Requirements for Confirmation of the Plan...............................................48 |
|  |  | 2. | Conditions to Confirmation Date and Effective Date.................................49 |
|  | K. | Releases, Discharge, Injunctions, Exculpation and Indemnification......................50 |
|  |  | 1. | Releases by Debtors in Favor of Third Parties ..........................................50 |
|  |  | 2. | Releases by Creditors of Claims Against Third Parties..............................51 |
|  |  | 3. | Discharge and Discharge Injunction..........................................................51 |
|  |  | 4. | Exculpation Relating to Chapter 11 Cases.................................................52 |
|  |  | 5. | Post-Effective Date Indemnifications ........................................................53 |
|  | L. | Preservation of Rights of Action...........................................................................53 |
|  | M. | Retention of Jurisdiction .......................................................................................54 |
|  | N. | Amendment, Alteration and Revocation of Plan ....................................................56 |
|  | O. | Plan Implementation Documents ...........................................................................56 |

| VII. | CERTAIN RISK FACTORS TO BE CONSIDERED .......................................................57 |
|  |  |
|  | A. | General Considerations..........................................................................................57 |
|  | B. | Certain Bankruptcy Considerations .......................................................................57 |
|  | C. | Claims Estimations ...............................................................................................58 |
|  | D. | Conditions Precedent to Consummation.................................................................58 |

ii

E.  Inherent Uncertainty of Financial Projections ........................................58
F.  Certain Risk Factors Relating to Securities to be Issued Under the Plan .............59
    1.  No Current Public Market for Securities ...................................59
    2.  Restrictions on Transfer ...................................................60
    3.  Potential Dilution Caused by Additional Grants or Issuances of
        Reorganized TLC USA Common Stock .......................................60
    4.  Dividends ..............................................................60
    5.  Change of Control ......................................................61
G.  Competition .................................................................61
H.  Cyclicality .................................................................61
I.  Reliance on Key Personnel ...................................................61
J.  Debt Service ................................................................61
K.  Litigation ..................................................................61
L.  Certain Tax Considerations ..................................................61
M.  Post-Emergence Leverage .....................................................62

VIII.  APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS ........................62

A.  Offer and Sale of New Securities Pursuant to the Plan:  Bankruptcy Code
    Exemption from Registration Requirements ...................................62
B.  Subsequent Transfers of New Securities .....................................62

IX.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ........................64

A.  U.S. Federal Income Tax Consequences to the Debtors ........................65
    1.  Consolidated Group and Net Operating Losses ..............................65
    2.  Cancellation of Indebtedness Income .....................................66
    3.  Utilization of NOLs and Net Unrealized Built-In Losses ...................67
    4.  U.S. Federal Alternative Minimum Tax .....................................68
    5.  Original Issue Discount; Applicable High Yield Discount
        Obligation Provisions ...................................................69
B.  U.S. Federal Income Tax Consequences to Claim Holders ......................70
    1.  Holders of Prepetition Lender Secured Claims (Classes A4, B3 and
        C5) .....................................................................70
C.  Other Tax Matters ..........................................................74
    1.  Information Reporting and Backup Withholding .............................74
    2.  Importance of Obtaining Professional Tax Assistance .....................74

X.  FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS .....................75

A.  Feasibility of the Plan ....................................................75
B.  Acceptance of the Plan .....................................................76
C.  Best Interests Test ........................................................77
D.  Liquidation Analysis .......................................................78
E.  Application of the "Best Interests" of Creditors Test to the Liquidation
    Analysis and the Valuation .................................................78
F.  Confirmation Without Acceptance of All Impaired Classes: The
    "Cramdown" Alternative .....................................................78

iii

XI.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ...................................................................................................................79

    A.    Alternative Plan(s) of Reorganization ................................................79
    B.    Liquidation under Chapter 7 or Chapter 11 .......................................79

XII.    THE SOLICITATION; VOTING PROCEDURES .......................................80

    A.    Parties in Interest Entitled to Vote....................................................80
    B.    Classes Entitled to Vote to Accept or Reject the Plan .......................81
    C.    Solicitation Order...............................................................................81
    D.    Waivers of Defects, Irregularities, Etc..............................................81
    E.    Withdrawal of Ballots; Revocation....................................................81
    F.    Voting Rights of Disputed Claimants.................................................82
    G.    Further Information; Additional Copies .............................................83

4541/74009-001 Current/15961454v9
RLF1 3523585v.2

# I. INTRODUCTION

The debtors and debtors in possession in the above-referenced chapter 11 cases (these "Chapter 11 Cases") are the following related companies (collectively, the "Debtors" or the "Company"):

TLC Vision Corporation;

TLC Vision (USA) Corporation; and

TLC Management Services Inc.

The Debtors submit this disclosure statement (as may be amended, the "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code") for use in the solicitation of votes on the Joint Chapter 11 Plan of Reorganization Dated as of January 6, 2010 (as may be amended, the "Plan"). A copy of the Plan is attached hereto as Appendix A. Each capitalized term used in this Disclosure Statement but not otherwise defined herein has the meaning ascribed to such term in the Plan. In addition, all references in this Disclosure Statement to monetary figures refer to United States currency, unless otherwise expressly provided.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, their reasons for seeking protection and reorganization under chapter 11, significant events that have occurred during the Chapter 11 Cases, and the anticipated organization, operations and financing of the Debtors upon successful emergence from chapter 11. This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan and the securities to be issued under the Plan and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims entitled to vote to accept or reject the Plan must follow for their votes to be counted.

By order entered on or about February 17, 2010, the Bankruptcy Court has approved this Disclosure Statement as containing "adequate information," in accordance with section 1125 of the Bankruptcy Code, to enable a hypothetical, reasonable investor typical of Holders of Claims against the Debtors to make an informed judgment as to whether to accept or reject the Plan, and has authorized its use in connection with the solicitation of votes with respect to the Plan. **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.** No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. In voting on the Plan, Holders of Claims entitled to vote should not rely on any information relating to the Debtors and their businesses, other than that contained in this Disclosure Statement, the Plan, the Plan Supplement and all exhibits and appendices hereto and thereto.

Pursuant to the provisions of the Bankruptcy Code, only classes of Claims or Interests that are (a) "impaired" by a plan of reorganization and (b) entitled to receive a distribution under such plan are entitled to vote to accept or reject the Plan. In the Debtors' cases, only Classes A4, A5, A6, B3, B4 and C5 are Impaired by and entitled to receive a distribution under the Plan; accordingly, only the Holders of Claims or Interests in those Classes are entitled to vote to accept or reject the Plan. Claims and Interests in Classes A1, A2, A3, B1, B2, C1, C2, C3 and C4 are Unimpaired by the Plan; accordingly, the Holders thereof are conclusively presumed to have accepted the Plan. Claims and Interests in Classes A7, A8, A9, B5, B6 and C6, which receive nothing under the Plan, are deemed to have rejected the Plan and the Holders thereof are not entitled to vote.

FOR A DESCRIPTION OF THE PLAN AND VARIOUS RISKS AND OTHER FACTORS PERTAINING TO THE PLAN, PLEASE SEE <u>ARTICLE VI</u> OF THIS DISCLOSURE STATEMENT, ENTITLED "SUMMARY OF THE PLAN OF REORGANIZATION," AND <u>ARTICLE VII</u> OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED."

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATING TO THE PLAN, CERTAIN EVENTS THAT HAVE OCCURRED IN THE CHAPTER 11 CASES AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT THE SUMMARIES OF THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE AS OF THE DATE HEREOF, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS AND TO THE EXTENT THEY MAY CHANGE AS PERMITTED BY THE PLAN AND APPLICABLE LAW. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

NOTHING CONTAINED HEREIN SHALL BE DEEMED TO CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE REORGANIZATION AS TO HOLDERS OF CLAIMS OR INTERESTS. YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES OR OTHER LEGAL CONSEQUENCES OF THE PLAN.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM

ACTUAL, FUTURE RESULTS. EXCEPT WITH RESPECT TO THE *PRO FORMA* FINANCIAL PROJECTIONS SET FORTH IN <u>APPENDIX B</u> ANNEXED HERETO (THE "<u>PROJECTIONS</u>") AND EXCEPT AS OTHERWISE SPECIFICALLY AND EXPRESSLY STATED HEREIN, THIS DISCLOSURE STATEMENT DOES NOT REFLECT ANY EVENTS THAT MAY OCCUR SUBSEQUENT TO THE DATE HEREOF AND THAT MAY HAVE A MATERIAL IMPACT ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS DO NOT UNDERTAKE ANY OBLIGATION TO, AND DO NOT INTEND TO, UPDATE THE PROJECTIONS; THUS, THE PROJECTIONS WILL NOT REFLECT THE IMPACT OF ANY SUBSEQUENT EVENTS NOT ALREADY ACCOUNTED FOR IN THE ASSUMPTIONS UNDERLYING THE PROJECTIONS. FURTHER, THE DEBTORS DO NOT ANTICIPATE THAT ANY AMENDMENTS OR SUPPLEMENTS TO THIS DISCLOSURE STATEMENT WILL BE DISTRIBUTED TO REFLECT SUCH OCCURRENCES. ACCORDINGLY, THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCE IMPLY THAT THE INFORMATION HEREIN IS CORRECT OR COMPLETE AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF. MOREOVER, THE PROJECTIONS ARE BASED ON ASSUMPTIONS THAT, ALTHOUGH BELIEVED TO BE REASONABLE BY THE DEBTORS, MAY DIFFER FROM ACTUAL RESULTS.

THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THE DEBTORS TO SUCCESSFULLY REORGANIZE AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS, THEIR CREDITORS AND THEIR ESTATES. THE PLAN EMBODIES A COMPROMISE AND SETTLEMENT BETWEEN THE DEBTORS AND THE PREPETITION LENDERS. PURSUANT TO SUCH COMPROMISE AND SETTLEMENT, AND AS SET FORTH IN THE PLAN, IN EXCHANGE FOR AND IN FULL SATISFACTION OF THE PREPETITION LENDER SECURED CLAIMS OF APPROXIMATELY $105 MILLION, THE PREPETITION LENDERS WILL RECEIVE (I) $80 MILLION IN SENIOR SECURED NOTES ISSUED BY TLC USA AND (II) 100% OF THE NEW COMMON EQUITY OF REORGANIZED TLC USA UPON EMERGENCE FROM CHAPTER 11 (SUBJECT TO DILUTION BY MANAGEMENT INTERESTS). THEREFORE, THE PLAN RESULTS IN A SIGNIFICANT DELEVERAGING OF THE DEBTORS' BALANCE SHEET. THE DEBTORS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT THE PLAN.

## II.    OVERVIEW OF THE PLAN

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan. For a more detailed description of the terms and provisions of the Plan, see <u>Article VI</u> of this Disclosure Statement, entitled "Summary of the Plan of Reorganization."

The Plan provides for the classification and treatment of Claims against and Interests in the Debtors. The Plan designates sixteen Classes of Claims and three Classes of

3

Interests. These Classes take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Interests.

The Plan Support Agreement that forms the basis of the Plan was negotiated among the Debtors and certain of the Prepetition Lenders. The Debtors believe that the Plan presents the best means currently available for their emergence from Chapter 11.

## A.    General Structure of the Plan

The Plan is structured as a joint plan. Subject to the terms and conditions specified in the Plan Support Agreement, it is anticipated that certain of the Prepetition Lenders will support the Plan and will vote in favor of the Plan; accordingly, it is anticipated that Classes A4, B3 and C5, each of which is an Impaired Class, will vote to accept the Plan. The Chapter 11 Cases were filed to implement a consensual restructuring which is embodied in the Plan in an efficient, expedient and economical fashion, with minimal disruption to the Debtors' ongoing business operations.

As of the Petition Date, the aggregate principal amount of Prepetition Lender Secured Claims totaled approximately $105 million. As of the Petition Date, the Debtors' other liabilities totaled approximately $25 million.

Under the Plan, Holders of Allowed Class A4, B3 and C5 Claims will receive their pro rata share of $80 million in TLC Restructured Notes and TLC Restructured Equity (which shares issued on the Effective Date are subject to dilution by new equity granted to management).

The following are certain additional material terms of the Plan:

- Following the Effective Date, the Reorganized Debtors shall have the same Corporate Structure as existed prior to the Effective Date, as may be modified in a manner acceptable by the Requisite Prepetition Lenders; provided, however, that Reorganized TLC Canada shall cease all operations and shall thereafter be placed in liquidation proceedings in the Canadian Court under the laws of the Province of New Brunswick, Canada.

- Holders of Allowed DIP Facility Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, Allowed Essential Trade Claims, Allowed Other Priority Claims, Allowed Secured Claims, Allowed General Unsecured Claims (against TLC MSI) and Allowed TLC MSI Common Stock and Interests will be Unimpaired by the Plan or will be paid in full as required by the Bankruptcy Code, unless otherwise agreed by the Holders of such Claims.

- Old TLC USA Common Stock and Interests will be cancelled.

4

**B.     Summary of Treatment of Claims and Interests under the Plan**

The table below summarizes the classification and treatment of the prepetition Claims against and Interests in the Debtors under the Plan. For certain Classes of Claims, estimated percentage recoveries also are set forth below. Estimated percentage recoveries have been calculated based upon a number of assumptions, including (where not Allowed by the Plan) the amount of Allowed Claims in each Class and the estimated value ascribed to the TLC Restructured Notes and TLC Restructured Equity to be issued under the Plan.

For certain Classes of Claims, the actual amounts of Allowed Claims could materially exceed or could be materially less than the estimated amounts shown in the table that follows. Except for Claims Allowed by the Plan, estimated Claim amounts for each Class set forth below are based upon the Debtors' review of their books and records, and include estimates of a number of Claims that are contingent, disputed and/or unliquidated. Accordingly, for these reasons, no representation can be or is being made with respect to whether the estimated percentage recoveries shown in the table below for Classes A5 and B4 will actually be realized by the Holders of Allowed Claims in such Classes.

The Debtors are not able to predict the market value of the TLC Restructured Equity as of or after the Effective Date. The market values of securities issued under a plan of reorganization are subject to many unforeseeable circumstances. Such securities may be valued in the marketplace at various prices because of a number of factors, including, but not limited to, those discussed in Article VII.

5

## Treatment of Certain Unclassified Claims Against All Debtors

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| **Unclassified — Administrative Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately [$TBD] | An Administrative Claim is a Claim for (a) any cost or expense of administration (including, without limitation, the fees and expenses of Professionals) of any of the Chapter 11 Cases asserted or arising under sections 503, 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code including, but not limited to (i) any actual and necessary post Petition Date cost or expense of preserving the Debtors' respective Estates or operating the businesses of the Debtors, (ii) any payment to be made under the Plan to cure a default under an assumed executory contract or unexpired lease, (iii) any post Petition Date cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtors in the ordinary course of their respective businesses, (iv) compensation or reimbursement of expenses of Professionals to the extent Allowed by the Bankruptcy Court under sections 330(a) or 331 of the Bankruptcy Code, and (v) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546 of the Bankruptcy Code; (b) any fees or charges assessed against the Debtors' respective Estates under section 1930 of title 28 of the United States Code; and (c) any Allowed administrative claim or superpriority claim granted to the Collateral Trustee pursuant to the Cash Collateral Order.<br><br>Under the Plan, Administrative Claims are Unimpaired. Unless otherwise provided for herein, each Holder of an Allowed Administrative Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (a) the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Administrative Claim becomes Allowed, or (iii) a date agreed to in writing by the Debtors or Reorganized Debtors, as the case may be, and the Holder of such Administrative Claim; or (b) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or the Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order; provided, however, that Allowed Administrative Claims representing (i) liabilities, accounts payable or other Claims, or obligations incurred in |

4541/74009-001 Current/15961454v9
RLF1 3523585v.2

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| | the ordinary course of business of the Debtors consistent with past practices subsequent to the Petition Date, or (ii) contractual liabilities incurred subsequent to the Petition Date, whether or not incurred in the ordinary course of business, shall be paid or performed by the Debtors or the Reorganized Debtors in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto.<br><br>Administrative Claims are not classified and are treated as required by the Bankruptcy Code. The Holders of such Claims are not entitled to vote to accept or reject the Plan.<br><br>Estimated Percentage Recovery: 100% |
| **Unclassified — Priority Tax Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately $0 | The Plan defines Priority Tax Claims as any and all Claims accorded priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code. Such Priority Tax Claims include Claims of governmental units for taxes owed by the Debtors that are entitled to a certain priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code. The taxes entitled to priority are (a) taxes on income or gross receipts that meet the requirements set forth in section 507(a)(8)(A) of the Bankruptcy Code, (b) property taxes meeting the requirements of section 507(a)(8)(B) of the Bankruptcy Code, (c) taxes that were required to be collected or withheld by the Debtors and for which the Debtors are liable in any capacity as described in section 507(a)(8)(C) of the Bankruptcy Code, (d) employment taxes on wages, salaries or commissions that are entitled to priority pursuant to section 507(a)(4) of the Bankruptcy Code, to the extent that such taxes also meet the requirements of section 507(a)(8)(D), (e) excise taxes of the kind specified in section 507(a)(8)(E) of the Bankruptcy Code, (f) customs duties arising out of the importation of merchandise that meet the requirements of section 507(a)(8)(F) of the Bankruptcy Code and (g) prepetition penalties relating to any of the foregoing taxes to the extent such penalties are in compensation for actual pecuniary loss as provided in section 507(a)(8)(G) of the Bankruptcy Code.<br><br>Under the Plan, Priority Tax Claims are Unimpaired. Each Holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors or the Reorganized Debtors, as the case may be, in full satisfaction, settlement, release, |

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| | extinguishment and discharge of such Priority Tax Claim: (a) the amount of such unpaid Allowed Priority Tax Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Priority Tax Claim becomes Allowed and (iii) a date agreed to by the Debtors or Reorganized Debtors, as the case may be, and the Holder of such Priority Tax Claim; (b) equal Cash payments from the Reorganized Debtors made on the last Business Day of every three (3) month period following the Effective Date, over a period not exceeding five (5) years after the assessment of the tax on which such Priority Tax Claim is based, totaling the principal amount of such Priority Tax Claim plus simple interest on any outstanding balance from the Effective Date calculated at the interest rate publicly quoted on the Effective Date for obligations backed by the full faith and credit of the United States of America maturing in ninety (90) days; or (c) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Priority Tax Claim and the Debtors or the Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order. The Debtors or the Reorganized Debtors, as the case may be, shall have the right, in their sole discretion, to prepay at any time, in whole or in part, any Allowed Priority Tax Claim without premium or penalty of any sort or nature.

Priority Tax Claims are not classified and are treated as required by the Bankruptcy Code. The Holders of such Claims are not entitled to vote to accept or reject the Plan.

Estimated Percentage Recovery: 100% |

4541/74009-001 Current/15961454v9
RLF1 3523585v.2

01/06/2010 12:02 pm

## Treatment of Claims Against and Interests In TLC USA

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| **Class A1 – Other Secured Claims**<br><br>Estimated Aggregate Allowed Amount: Unknown at present time | Other Secured Claims are Secured Claims other than the Prepetition Lender Secured Claims.<br><br>Class A1 Other Secured Claims are Unimpaired. Each Holder of an Allowed Class A1 Other Secured Claim shall receive, in the sole discretion of the Debtors or the Reorganized Debtors, as the case may be, in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (a) Cash equal to the amount of such Allowed Other Secured Claim on or as soon as practicable after the later of (i) the Effective Date, (ii) the date that such Other Secured Claim becomes Allowed, and (iii) a date agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of such Class A1 Other Secured Claim; (b) treatment such that such Other Secured Claim is Reinstated; (c) the Property securing such Other Secured Claim, with any deficiency to result in a General Unsecured Claim; or (d) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order.<br><br>Estimated Percentage Recovery: 100% |
| **Class A2 – Essential Trade Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately $0 | Essential Trade Claims are those Claims identified by TLC USA as such in the Plan Supplement.<br><br>Class A2 Essential Trade Claims are Unimpaired. Each Holder of an Allowed Class A2 Essential Trade Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Class A2 Claim becomes Allowed, and (iii) a date agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of such Class A2 Essential Trade Claim; or (b) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or the Reorganized Debtors, as the case may be, or |

9

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| | as the Bankruptcy Court may order.<br><br>Estimated Percentage Recovery: 100% |
| **Class A3 – Other Priority Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately $0 | Other Priority Claims are Claims against the Debtors entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.<br><br>Class A3 Other Priority Claims are Unimpaired. Each Holder of an Allowed Class A3 Other Priority Claim shall be paid in full in cash (a) on or as soon as practicable after the Effective Date or the date such claim is allowed in accordance with section 502 of the Bankruptcy Code, whichever is later, or (b) upon such other terms, less favorable to the holder of such claim, as the Reorganized Debtors and the holder of such Claim may agree.<br><br>Estimated Percentage Recovery: 100% |
| **Class A4 – Prepetition Lender Secured Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately $105,000,000 | Prepetition Lender Secured Claims are the claims of the Prepetition Agent and the Prepetition Lenders.<br><br>Class A4 Prepetition Lender Secured Claims are Impaired. Each Holder of an Allowed Class A4 Prepetition Lender Secured Claim shall receive on or as soon as practicable after the Effective Date, its pro rata share of (a) the New TLC USA Common Stock and (b) the TLC Restructured Notes.<br><br>Estimated Percentage Recovery: 100% |
| **Class A5 – General Unsecured Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately $6,500,000 | General Unsecured Claims are all Allowed Claims, but excluding Administrative Claims, Priority Tax Claims, Professional Fee Claims, Other Secured Claims, Prepetition Lender Secured Claims, Essential Trade Claims, and Other Priority Claims.<br><br>Class A5 General Unsecured Claims are Impaired. Each Holder of an Allowed Class A5 General Unsecured Claim shall receive on or as soon as reasonably practicable after the Effective Date, from the assets of TLC USA, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, the lesser of its pro rata share of a cash pool in the amount of $750,000 or 10% of the Allowed amount of the Class A5 General Unsecured Claims, or (b) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or Reorganized Debtors, as the case may be, |

4541/74009-001 Current/15961454v9<br>RLF1 3523585v.2

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| | or as the Bankruptcy Court may order. |
| | Estimated Percentage Recovery: 10% |
| **Class A6 – Medical Pending Litigation Claims**<br>Estimated Aggregate Allowed Amount: Approximately $160,000 | Medical Pending Litigation Claims are those claims arising from a medical malpractice or similar action against the Debtors, including the actions listed on <u>Appendix E</u> hereto. |
| | Class A6 Medical Pending Litigation Claims are Impaired. On the Effective Date, the Holders of Class A6 Medical Pending Litigation Claims shall be entitled to payment exclusively by way of any insurance coverage held by TLC USA covering such Medical Pending Litigation Claims. |
| | Estimated Percentage Recovery: 100% |
| **Class A7 – Subordinated Claims**<br>Estimated Aggregate Allowed Amount: Approximately $[unknown] | Subordinated Claims are any and all claims subordinated pursuant to section 510(b) of the Bankruptcy Code including, (a) in the absence of an agreement to assume the relevant contracts, the Kremer Parties Claims and (b) the TruVision Earn Out Claims. |
| | Class A7 Subordinated Claims are Impaired.  Holders of Class A7 Subordinated Claims shall not receive or retain any property under the Plan on account of such Subordinated Claims.  On the Effective Date, all Subordinated Claims shall be extinguished. |
| | Percentage Recovery: 0% |
| **Class A8 – Intercompany Claims**<br>Estimated Aggregate Allowed Amount: Approximately $33,395,738 | Intercompany Claims means all claims owing by any Debtor to any other Debtor. |
| | Class A8 Intercompany Claims are Impaired.  Holders of Class A8 Intercompany Claims shall not receive or retain any property under the Plan on account of such Intercompany Claims.  On the Effective Date, all Intercompany Claims shall be extinguished, provided that, claims owing by non-debtor subsidiaries and affiliates to TLC USA shall not be affected by this Plan. |
| | Percentage Recovery: 0% |
| **Class A9 – Old TLC USA Common Stock and Interests** | Old TLC USA Common Stock and Interests are all authorized, issued and outstanding shares of common stock of, and Interests in TLC USA, as of the Petition Date, including, without limitation all issued, outstanding and |

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| | unexpired options, warrants, conversion, privilege or other legal or contractual rights to acquire shares of Old TLC USA Common Stock or Interests. Old TLC USA Common Stock and Interests also includes any contingent, disputed or unliquidated Claims related to or in connection with any of the foregoing. |
| | Class A9 Old TLC USA Common Stock and Interests are Impaired. Holders of Class A9 Old TLC USA Common Stock and Interests shall not receive or retain any property under the Plan on account of such Old Common Stock and Interests. On the Effective Date, all Old TLC USA Common Stock and Interests shall be cancelled. |
| | Percentage Recovery: 0% |

12

## Treatment of Claims Against and Interests In TLC Canada

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| **Class B1 – Other Secured Claims**<br><br>Estimated Aggregate Allowed Amount: Unknown at present time | Other Secured Claims are Secured Claims other than the Prepetition Lender Secured Claims.<br><br>Class B1 Other Secured Claims are Unimpaired. Each Holder of an Allowed Class B1 Other Secured Claim shall receive, in the sole discretion of the Debtors or the Reorganized Debtors, as the case may be, in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (a) Cash equal to the amount of such Allowed Other Secured Claim on or as soon as practicable after the later of (i) the Effective Date, (ii) the date that such Other Secured Claim becomes Allowed, and (iii) a date agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of such Class B1 Other Secured Claim; (b) treatment such that such Other Secured Claim is Reinstated; (c) the Property securing such Other Secured Claim, with any deficiency to result in a General Unsecured Claim; or (d) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order.<br><br>Estimated Percentage Recovery: 100% |
| **Class B2 – Other Priority Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately $0 | Other Priority Claims are Claims against the Debtors entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.<br><br>Class B2 Other Priority Claims are Unimpaired. Each Holder of an Allowed Class B2 Other Priority Claim shall be paid in full in cash (a) on or as soon as practicable after the Effective Date or the date such claim is allowed in accordance with section 502 of the Bankruptcy Code, whichever is later, or (b) upon such other terms, less favorable to the Holder of such Claim, as the Reorganized Debtors and the Holder of such Claim may agree.<br><br>Estimated Percentage Recovery: 100% |
| **Class B3 – Prepetition Lender Secured Claims** | Prepetition Lender Secured Claims are the claims of the Prepetition Agent and the Prepetition Lenders. |

13

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| Estimated Aggregate Allowed Amount: Approximately $105,000,000 | Class B3 Prepetition Lender Secured Claims are Impaired. Each Holder of an Allowed Class B3 Prepetition Lender Secured Claim shall receive on or as soon as practicable after the Effective Date, its pro rata share of (a) the New TLC USA Common Stock and (b) the TLC Restructured Notes.<br><br>Estimated Percentage Recovery: 100% |
| **Class B4 – General Unsecured Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately $2,000,000-5,000,000 | General Unsecured Claims are all Allowed Claims, but excluding Administrative Claims, Priority Tax Claims, Professional Fee Claims, Other Secured Claims, Prepetition Lender Secured Claims, Essential Trade Claims, and Other Priority Claims.<br><br>Class B4 General Unsecured Claims are Impaired. In the event that Class B4 votes to accept the Plan, each Holder of an Allowed Class B4 General Unsecured Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim the lesser of its pro rata share of a cash pool in the amount of $500,000 or 10% of the Allowed amount of the Class B4 General Unsecured Claims. In the event that Class B4 votes to reject the Plan, each Holder of an Allowed Class B4 General Unsecured Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim the lesser of its pro rata share of a cash pool in the amount of $250,000 or 5% of the Allowed amount of the Class B4 General Unsecured Claims after payment of costs of liquidation.<br><br>Estimated Percentage Recovery: 10% |
| **Class B5 – Intercompany Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately $[_____] | Intercompany Claims means all claims owing by any Debtor to any other Debtor.<br><br>Class B5 Intercompany Claims are Impaired. Holders of Class B5 Intercompany Claims shall not receive or retain any property under the Plan on account of such Intercompany Claims. On the Effective Date, all Intercompany Claims shall be extinguished, provided that, claims owing by non-debtor subsidiaries and affiliates to TLC Canada shall not be affected by this Plan.<br><br>Percentage Recovery: 0% |
| **Class B6 – TLC Canada Common Stock and Interests** | TLC Canada Common Stock and Interests means all authorized, issued and outstanding shares of common stock |

14

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| | of, and Interests in TLC Canada, as of the Petition Date, including, without limitation all issued, outstanding and unexpired options, warrants, conversion, privilege or other legal or contractual rights to acquire shares of TLC Canada Common Stock or Interests. TLC Canada Common Stock and Interests also includes any contingent, disputed or unliquidated Claims related to or in connection with any of the foregoing.<br><br>Class B6 TLC Canada Common Stock and Interests is Impaired. In the event that Class B4 votes to accept the Plan, each Holder of an Allowed Class B6 TLC Canada Common Stock and Interest shall (a) retain their Interests in the Old TLC Canada Common Stock, and (b) receive in full satisfaction, settlement, release, extinguishment and discharge of such Interest its pro rata share of a cash pool in the amount of $250,000 after payment of costs of liquidation. In the event that Class B4 votes to reject the Plan, each Holder of an Allowed Class B6 TLC Canada Common Stock and Interest shall retain their Interests in the Old TLC Canada Common Stock, and shall receive no other distribution.<br><br>Percentage Recovery: N/A |

4541/74009-001 Current/15961454v9
RLF1 3523585v.2

01/06/2010 12:02 pm

## Treatment of Claims Against and Interests In TLC MSI

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| **Class C1 – Other Secured Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately $0 | An Other Secured Claim is any Claim arising before the Petition Date that is: (a) secured in whole or part, as of the Petition Date, by a Lien which is valid, perfected and enforceable under applicable law on Property in which the Debtors' respective Estates has an interest and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or (b) subject to setoff under section 553 of the Bankruptcy Code, but, with respect to both case (a) and (b), only to the extent of each such Estate's interest in the value of the assets or Property securing any such Claim or the amount subject to setoff, as the case may be.<br><br>Class C1 Other Secured Claims are Unimpaired. Each Holder of an Allowed Class C1 Other Secured Claim shall receive, in the sole discretion of the Debtors or the Reorganized Debtors, as the case may be, in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (a) Cash equal to the amount of such Allowed Secured Claim on or as soon as practicable after the later of (i) the Effective Date, (ii) the date that such Secured Claim becomes Allowed, and (iii) a date agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of such Class C1 Other Secured Claim; (b) treatment such that such Secured Claim is Reinstated; (c) the Property securing such Secured Claim, with any deficiency to result in a General Unsecured Claim; or (d) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order.<br><br>Estimated Percentage Recovery: 100% |
| **Class C2 – Other Priority Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately $0 | Other Priority Claims are Claims against the Debtors entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.<br><br>Class C2 Other Priority Claims are Unimpaired. Each Holder of an Allowed Class C2 Other Priority Claim shall be paid in full in cash (a) on or as soon as practicable after the Effective |

16

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| | Date or the date such claim is allowed in accordance with section 502 of the Bankruptcy Code, whichever is later, or (b) upon such other terms, less favorable to the Holder of such Claim, as the Reorganized Debtors and the Holder of such Claim may agree.<br><br>Estimated Percentage Recovery: 100% |
| **Class C3 – General Unsecured Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately $0 | General Unsecured Claims are all Allowed Claims, but excluding Administrative Claims, Priority Tax Claims, Professional Fee Claims, Other Secured Claims, Prepetition Lender Secured Claims, Essential Trade Claims, and Other Priority Claims.<br><br>Class C3 General Unsecured Claims are Unimpaired. Each Holder of an Allowed Class C3 General Unsecured Claim not satisfied as of the Effective Date of the Plan shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (a) the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such General Unsecured Claim becomes Allowed, or (iii) a date agreed to in writing by the Debtors or Reorganized Debtors, as the case may be, and the Holder of such General Unsecured Claim; (b) treatment such that such General Unsecured Claim is Reinstated; or (c) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or the Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order.<br><br>Estimated Percentage Recovery: 100% |
| **Class C4 – TLC MSI Common Stock and Interests** | TLC MSI Common Stock and Interests are all authorized, issued and outstanding shares of common stock of, and Interests in TLC MSI, as of the Petition Date, including, without limitation all issued, outstanding and unexpired options, warrants, conversion, privilege or other legal or contractual rights to acquire shares of Old TLC MSI Common Stock or Interests. TLC MSI Common Stock and Interests also includes any contingent, disputed or unliquidated Claims related to or in connection with any of the foregoing.<br><br>Class C4 TLC MSI Common Stock and Interests is Unimpaired. Holders of Allowed Class C4 TLC MSI |

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| | Common Stock and Interests shall retain their Interests. |
| | Estimated Percentage Recovery: 100% |
| **Class C5 – Prepetition Lender Secured Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately $105,000,000 | Prepetition Lender Secured Claims are the claims of the Prepetition Agent and the Prepetition Lenders.<br><br>Class C5 Prepetition Lender Secured Claims are Impaired. Each Holder of an Allowed Class C5 Prepetition Lender Secured Claim shall receive on or as soon as practicable after the Effective Date, its pro rata share of (a) the New TLC USA Common Stock and (b) the TLC Restructured Notes.<br><br>Estimated Percentage Recovery: 100% |
| **Class C6 – Intercompany Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately $4,392,385 | Intercompany Claims means all claims owing by any Debtor to any other Debtor.<br><br>Class C6 Intercompany Claims are Impaired. Holders of Class C6 Intercompany Claims shall not receive or retain any property under the Plan on account of such Intercompany Claims. On the Effective Date, all Intercompany Claims shall be extinguished, provided that, claims owing by non-debtor subsidiaries and affiliates to TLC MSI shall not be affected by this Plan.<br><br>Percentage Recovery: 0% |

THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AGAINST THE DEBTORS AND THUS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN. THE PREPETITION AGENT, ON BEHALF OF THE CONSENTING PREPETITION LENDERS, ALSO URGES YOU TO VOTE TO ACCEPT THE PLAN.

### III. PLAN VOTING INSTRUCTIONS AND PROCEDURES

#### A. Notice to Holders of Claims and Interests

Approval by the Bankruptcy Court of this Disclosure Statement means that the Bankruptcy Court has found that this Disclosure Statement contains information of a kind and in sufficient and adequate detail to enable Holders of Claims to make an informed judgment whether to accept or reject the Plan.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR THEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

18

IF THE PLAN IS APPROVED BY THE REQUISITE VOTE OF HOLDERS OF CLAIMS ENTITLED TO VOTE AND IS SUBSEQUENTLY CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS, WHETHER OR NOT THEY WERE ENTITLED TO VOTE OR DID VOTE TO ACCEPT OR REJECT THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN. THUS, ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ENTITLED TO VOTE ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT AND THE PLAN ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN.

No solicitation of votes may be made except after distribution of this Disclosure Statement and no person has been authorized to distribute any information concerning the Debtors other than the information contained herein. No such information will be relied upon in making a determination to vote to accept or reject the Plan.

## B.      Voting Rights

Pursuant to the provisions of the Bankruptcy Code, only holders of claims in classes that are (a) treated as "impaired" by the plan of reorganization and (b) entitled to receive a distribution under such plan are entitled to vote to accept or reject the Plan.  In these Chapter 11 Cases, under the Plan, only Holders of Claims in Classes A4, A5, A6, B3, B4 and C5 are entitled to vote to accept or reject the Plan.  Claims and Interests in other Classes are either (i) Unimpaired and their Holders are deemed to have accepted the Plan, or (ii) receiving no distributions under the Plan and their Holders are deemed to have rejected the Plan.

Only Holders of Allowed Claims in the voting Classes are entitled to vote to accept or reject the Plan. A Claim that is unliquidated, contingent or disputed is not an Allowed Claim, and is thus not entitled to vote, unless and until the amount is estimated or determined, or the dispute is determined, resolved or adjudicated in the Bankruptcy Court or another court of competent jurisdiction, or pursuant to agreement with the Debtors.  However, the Bankruptcy Court may deem a contingent, unliquidated or disputed Claim to be Allowed on a provisional basis, for purposes only of voting on the Plan.

Holders of Allowed Claims in the voting Classes may vote to accept or reject the Plan only if they are Holders as of the Distribution Record Date, which Distribution Record Date is February 17, 2010.

## C.      Solicitation Materials

In soliciting votes for the Plan pursuant to this Disclosure Statement, the Debtors, through their voting agent, Epiq Bankruptcy Solutions, LLC (the "Voting Agent"), will send to Holders of Claims who are entitled to vote copies of (a) the Disclosure Statement and Plan, (b) the notice of, among other things, (i) the date, time and place of the hearing to consider confirmation of the Plan and related matters and (ii) the deadline for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice"), (c) one or more ballots (and

19

return envelopes) to be used in voting to accept or to reject the Plan and (d) other materials as authorized by the Bankruptcy Court.

If you are the Holder of a Claim that is entitled to vote, but you did not receive a ballot, or if your ballot is damaged or illegible, or if you have any questions concerning voting procedures, you may contact the following:

**If by regular mail:**

TLC Vision (USA) Corporation Ballot Processing,
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5014
New York, NY 10150-5014
Attn: Janice E. Livingstone

**If by overnight courier or hand delivery:**

TLC Vision (USA) Corporation Ballot Processing,
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017
Attn: Janice E. Livingstone

**If by telephone, for U.S. callers only:**

Epiq Systems, Inc.
Telephone: [_____]

**If by telephone, for international callers:**

Epiq Systems, Inc.
Telephone: [_____]

D.      **Voting Procedures, Ballots and Voting Deadline**

After reviewing the Plan and this Disclosure Statement, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying ballot. You should complete and sign your original ballot (copies will not be accepted) and return it in the envelope provided.

Each ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded ballot or ballots sent to you with this Disclosure Statement.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND <u>RECEIVED</u> NO LATER THAN MARCH 26, 2010, AT 5:00 P.M. EASTERN TIME (THE "<u>VOTING DEADLINE</u>") BY THE FOLLOWING:

20

**If by regular mail:**

TLC Vision (USA) Corporation Ballot Processing,
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5014
New York, NY 10150-5014
Attn: Janice E. Livingstone

**If by overnight courier or hand delivery:**

TLC Vision (USA) Corporation Ballot Processing,
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017
Attn: Janice E. Livingstone

UNLESS OTHERWISE PROVIDED IN THE INSTRUCTIONS ACCOMPANYING THE BALLOTS, FAXED BALLOTS WILL NOT BE ACCEPTED. BALLOTS THAT ARE RECEIVED BUT NOT SIGNED WILL NOT BE COUNTED. BALLOTS THAT ARE SIGNED BUT DO NOT SPECIFY WHETHER THE HOLDER ACCEPTS OR REJECTS THE PLAN WILL BE NULL AND VOID. DO NOT RETURN ANY STOCK CERTIFICATES, DEBT INSTRUMENTS OR OTHER EVIDENCE OF YOUR CLAIM WITH YOUR BALLOT.

Copies of this Disclosure Statement, the Plan and any appendices and exhibits to such documents are available to be downloaded free of charge on the TLC Vision (USA) Corporation, *et al.* case website: www.epiqbankruptcysolutions.com. If you have any questions about (a) the procedure for voting your Claim, (b) the packet of materials that you have received, or (c) the amount of your Claim, or if you wish to obtain, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), an additional copy of the Plan, this Disclosure Statement or any appendices or exhibits to such documents, please contact:

**If by regular mail:**

TLC Vision (USA) Corporation Ballot Processing,
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5014
New York, NY 10150-5014
Attn: Janice E. Livingstone

**If by overnight courier or hand delivery:**

TLC Vision (USA) Corporation Ballot Processing,
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor

21

New York, NY 10017
Attn: Janice E. Livingstone

For further information and general instruction on voting to accept or reject the Plan, see Article XII of this Disclosure Statement and the instructions accompanying your ballot.

THE DEBTORS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO EXERCISE THEIR RIGHT BY VOTING IN FAVOR OF THE PLAN AND OTHERWISE COMPLETING THEIR BALLOTS AND RETURNING THEM BY THE VOTING DEADLINE.

### E. Confirmation Hearing and Deadline for Objections to Confirmation

Pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), the Bankruptcy Court has scheduled a Confirmation Hearing for [_____], at _____.m. prevailing Eastern time. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing. Objections to confirmation of the Plan or proposed modifications to the Plan, if any, must (i) be in writing, (ii) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, (iii) state the name and address of the objecting party and the amount and nature of the claim or interest of such party, (iv) state with particularity the basis and nature of any objection to the Plan and (v) be filed electronically, together with proof of service, with the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Third Floor, Wilmington, Delaware 19801, www.deb.uscourts.gov, and served on the parties listed in the Confirmation Hearing notice, in each case so as to be actually received on or before **5:00 p.m. (prevailing Eastern time) on [_____]**. Objections to Confirmation of the Plan are governed by Bankruptcy Rule 9014.

## IV. GENERAL INFORMATION CONCERNING THE DEBTORS

### A. Corporate Structure

TLC Vision (USA) Corporation ("TLC USA"), a Delaware corporation, is a wholly-owned subsidiary of TLC Vision Corporation ("TLC Canada"), a Canadian corporation. TLC Canada is traded on the NASDAQ Global Market under the symbol "TLCV" and on the Toronto Stock Exchange under the symbol "TLC." TLC Management Services Inc., ("TLC MSI", and together with TLC USA and TLC Canada, the "Debtors"), a Delaware corporation, is a wholly-owned subsidiary of TLC USA and employs virtually all of the non-executive employees of the Debtors and their non-debtor affiliates.

### B. Overview of Business Operations

Founded in 1993 by a predecessor of the Debtors and their non-debtor affiliates, (collectively, the "Company"), the Company has grown into one of North America's premier eye care service companies. Despite the current economic climate, the Company maintains a leading position in refractive, cataract and optometric markets. The Company operates distinct lines of business, described in greater detail below, which include: (a) owning and providing management services to 71 refractive laser centers in the United States and Canada, (b) providing doctors and medical facilities with equipment, supplies, and technicians in 40 states,

22

and (c) providing marketing, practice development and purchasing power to independently owned optometric centers under the Vision Source® brand. The Company's U.S. corporate headquarters is located in St. Louis, Missouri. The Debtors, generally speaking, are administrative entities that provide corporate services to a variety of affiliated medical services company.

Debtors TLC USA and TLC MSI provide management and related services to the Company's operations in the United States, which include more than 30 non-debtor affiliates of the Debtors. These entities do not provide health care services and do not have patients. Debtor TLC Canada primarily provides management and related services to the Company's operations in Canada, but directly owns and manages certain refractive centers in Canada. Among other things, the Debtors provide critical cash management, personnel and other administrative services to their numerous non-debtor affiliates. As described below, the Company's cash management system is fully integrated and the Company expects that the flow of funds between and among the Company's Debtor and non-debtor entities will not be adversely affected by the Commencement of the Chapter 11 Cases.

## C.    Description of the Debtors' Business Operations

### 1.    Refractive Centers

The Company, almost exclusively through its non-debtor entities, owns and provides management services to refractive laser centers in the United States and Canada that provide an environment for doctors to treat common refractive vision disorders such as myopia (nearsightedness), hyperopia (farsightedness) and astigmatism. At these refractive centers, optometrists and ophthalmologists affiliated with the Company perform corrective laser surgery using excimer laser technology.

Because most states prohibit the Company from practicing medicine, employing physicians to practice medicine on the Company's behalf, or employing optometrists to render optometric services on the Company's behalf, the Company's activities generally are limited to owning and providing management services to refractive centers and affiliating with other health care providers. The Company, therefore, developed and implemented a comprehensive co-management model under which it not only establishes and provides management services to refractive centers, but also coordinates the activities of the various doctors, including the primary care and surgical doctors, who assess and perform various operative and non-operative medical procedures. In connection with this co-management model, the Company has developed proprietary management and administrative software that is designed to assist eye care professionals in providing high levels of patient care and which they utilize in substantially all of the Company's refractive centers.

Accordingly, the success of the Company's operations depends in large part on the Company's ability to enter into agreements on acceptable terms with a sufficient number of health care providers, including institutions and eye care doctors, to render surgical and or other professional services at the centers.

Laser eye surgery is considered an elective procedure and is therefore not covered by most insurance providers, including the provincial health care plans in Canada and Medicare and Medicaid in the United States. As a result, the primary sources of revenue generated by the refractive center business is derived from: (a) amounts charged to patients for procedures

23

performed at laser centers and collected by the Company on behalf of the medical care professional who performed the procedure; (b) management and facility fees paid by doctors who use the center to perform laser vision correction procedures; and (c) administrative fees for billing and collection services from doctors who co-manage patients treated at the centers.

2.    Doctors' Services

The Company's doctor services business provides a variety of services and products directly to doctors and facilities in which the doctors perform surgeries. Primarily through non-debtor subsidiaries, the Company: (a) furnishes doctors and medical facilities with mobile or fixed site refractive and cataract surgery equipment, supplies, technicians and diagnostic products, and (b) owns and provides management to single-specialty ambulatory surgery centers.

The Company's mobile cataract segment provides mobile and fixed site technology and service to doctors and hospitals to support cataract surgery as well as treatment of other eye diseases in approximately 41 states.

The Company's refractive access segment assists surgeons by providing mobile and fixed site corrective laser surgery refractive technology and value support services such as training, technical support and equipment maintenance. The Company's mobile access systems are provided by means of a proprietary patented Roll-On/Roll-Off laser system which is transported between doctors' offices to provide temporary in-office use of the laser equipment. The Company's fixed site lasers, primarily used by surgeons who perform more than 40 procedures per month, are permanently located at a surgeon's office, or such other location where eye surgeries are performed such as ambulatory surgery centers. Surgeons using mobile or fixed site lasers do not operate under the TLC name and pay a fee to the Company for each procedure performed using the Company's equipment.

The Company also provides doctor services through its surgical and secondary care center segment. This is a minor segment through which the Company maintains ownership interests in several refractive practices and ambulatory surgical centers. These businesses are conducted through non-debtor entities.

3.    Eye Care

The Company, through non-debtor entities, provides franchise opportunities to independent optometrists and other qualified care providers. The Company's optometric franchising segment provides marketing, practice development and purchasing power to independently-owned and operated practices in the U.S. and Canada under the Vision Source® brand.

**D.    Pre-Confirmation Management and Employees**

1.    Existing Board of Directors

The Debtors' boards of directors oversee the Debtors' management, review their long-term strategic plans and exercise direct decision making authority in key areas. Information on the post-Effective Date Board of Directors will be submitted with the Plan Supplement prior

24

to the Confirmation Hearing. Set forth below is information with respect to the members of each Debtors' current Board of Directors (each, a "Board" and collectively, the "Boards"):

    (a)    TLC Vision Corporation

- *Warren S. Rustand, Chairman*
- *Michael D. DePaolis*
- *Jay T. Holmes*
- *Gary F. Jonas*
- *Olden C. Lee*
- *Richard L. Lindstrom, M.D.*
- *Toby S. Wilt*

    (b)    TLC Vision (USA) Corporation

- *James B. Tiffany*
- *Charles H. Judy*
- *Ellen J. Plass*

    (c)    TLC Management Services Inc.

- *James B. Tiffany*

The non-employee directors receive compensation in the amount of $25,000 per year for service on the Boards plus applicable meeting and committee fees and expenses.

The Board of Directors of TLC Vision has three standing committees: (a) the audit committee; (b) the compensation committee; and (c) the corporate governance and nominating committee.

    2.    Existing Executive Officers: The following are each of the Debtors' current executive officers:

<u>TLC Vision Corporation</u>

- *James B. Tiffany, President & Chief Operating Officer*
- *William J. McManus, Interim Chief Financial Officer*
- *Charles H. Judy, Senior Vice President, Shared Services and Secretary*
- *Henry W. Lynn, Vice President, Chief Information Officer*
- *James J. Hyland, Vice President, Investor Relations*
- *Patricia S. Larson, Assistant Secretary*
- *Jonathan Compton, Assistant Treasurer*
- *Ellen-Jo Plass, Senior Vice President, Centers Operations*

- *Jim Feinstein, Senior Vice President, Sales*
- *Dan Robins, Vice President, Access Operations*

TLC Vision (USA) Corporation

- *James B. Tiffany, President & Chief Operating Officer*
- *William J. McManus, Interim Chief Financial Officer*
- *Jonathan Compton, Assistant Treasurer*
- *Charles H. Judy, Secretary*
- *Assistant Secretary, Patricia Larson*

TLC Management Services Inc.

- *James B. Tiffany, President & Chief Operating Officer*
- *William J. McManus, Interim Chief Financial Officer*
- *Jonathan Compton, Assistant Treasurer*
- *Charles H. Judy, Secretary*
- *Assistant Secretary, Patricia Larson*

3.    Employees/Labor Relations

As of the Petition Date, the Company employed approximately 742 full-time and part-time (twenty-four (24) hours or less a week) hourly-wage, piece-rate and salaried employees. Certain officers and employees of the Debtors are subject to executive employment agreements (which include severance and separation terms). In addition, the Debtors also use the services of certain temporary and contract workers.

4.    Existing Compensation and Benefits

The Company has historically provided a competitive compensation and benefit package to its employees, consistent with its belief that the success of its businesses is dependent to a significant extent upon the efforts and abilities of its employees.

26

(a)    *Retirement Plan*

The Debtors offer certain Employees the opportunity to participate in a retirement plan qualified under section 401(k) of the Internal Revenue Code (the "401(k) Plan"). The 401(k) Plan is administered by Great-West Retirement Services. Under the terms of the 401(k) Plan, Employees who are at least twenty-one (21) years old and have been employed by the Debtors for at least three (3) months may elect to contribute a portion of their salary or wages to the 401(k) Plan. The 401(k) Plan allows for automatic, pre-tax salary deductions from a participating Employee's eligible compensation in an aggregate amount equal to the annual limit established under the Internal Revenue Code (i.e., $16,500 in 2009, plus, when applicable, a $5,500 catch-up contribution amount for employees over age 50).

(b)    *Postconfirmation Compensation and Benefits*

Except and to the extent previously assumed by an order of the Bankruptcy Court on or before the Effective Date, all officer, director or employee compensation and benefit programs of the Debtors entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under Section 6.01 of the Plan, but only to the extent that rights under such programs are held by the Debtors or Persons who are employees of the Debtors as of the Effective Date, and the Debtors' obligations under such programs to Persons who are employees of the Debtors on the Effective Date shall survive Confirmation of the Plan, except for (a) executory contracts or plans specifically rejected pursuant to the Plan, and (b) executory contracts or plans that have previously been rejected, are the subject of a motion to reject, or have been specifically waived by the beneficiaries of any plans or contracts.

## E.    Pre-Petition Capital Structure

1.    Credit Facility

On June 21 2007, certain of the Debtors entered into that certain Amended and Restated Credit Agreement (as amended and restated, and modified from time to time, the "Credit Agreement") for a $110.0 million credit facility (the "Credit Facility") among TLC USA, TLC Canada, as guarantor, the additional guarantors, the lenders party thereto (the "Secured Lenders"), and Wells Fargo Bank, National Association (the "Administrative Agent"). The Credit Agreement is secured by a first priority security interest in substantially all the assets of the Debtors, including the Debtors' cash and cash equivalents, and consists of both senior term debt and a revolver as follows:

- Senior term debt, totaling $85.0 million, with a six-year term and required amortization payments of 1% per annum plus a percentage of excess cash flow (as defined in the Credit Agreement) and sales of assets or borrowings outside of the normal course of business.

- A revolving credit facility, totaling $25.0 million with a five-year term. As of the Petition Date, $23.4 million was outstanding under this portion of the facility.

- Interest on the facility is calculated based on either prime rate or the London Interbank Offered Rate (LIBOR) plus a margin. Effective June 30, 2009, the Debtors began incurring 2% default rate interest and all

27

LIBOR advances with interest periods ending on or after June 30, 3009 automatically converted to prime rate advances.

The Credit Facility, among other things, requires the Debtors to maintain various financial and non-financial covenants as defined in the Credit Agreement. On multiple occasions prior to the Petition Date, the Debtors executed amendments to the Credit Facility, multiple of which modified the Credit Facility to prevent, cure or waive the Debtors' defaults (past or prospective) under such facility. On September 11, 2009, the Debtors executed that certain Limited Waiver and Amendment No. 5 to the Credit Agreement, dated as of September 8, 2009. The Limited Waiver and Amendment No. 5 (as amended), among other things, provided a limited waiver through November 15, 2009 of certain defaults and provided that the Prepetition Lenders would, until November 15, 2009, forbear from exercising their rights arising out of the non-payment of certain principal, interest and other payments previously due under the Credit Facility. The Limited Waiver and Amendment No. 5 expired on November 15, 2009, and the Debtors have operated without any further waiver or forbearance agreement since that date.

    2.     Interest Rate Swap Agreement

As required under the Credit Facility, the Debtors entered into interest rate swap agreements to eliminate the variability of cash required for interest payments for a majority of the total variable rate debt. Under the agreement entered during August 2007, the Debtors receive a floating rate based on the LIBOR interest rate and pay a fixed rate of 5.0% on notional amounts ranging from $20 million to $42 million over the life of the swap agreement, which matures on April 1, 2010. Under the agreement entered during December 2007, with an effective date of January 2, 2008, the Debtors receive a floating rate based on the LIBOR interest rate and pay a fixed rate of 3.9% on notional amounts ranging from $20 million to $32 million over the life of the swap agreement, which matures on April 1, 2010.

On July 10, 2009, based on asserted defaults, Citibank N.A. terminated the swap agreement, effective as of July 9, 2009. As a result of this termination, Citibank asserts it is owed approximately $1,625,000, which amount would be added to the balance of the Debtors' senior secured debt under the Credit Agreement.

    3.     Equipment and Capital Financing

Prior to the Petition Date, the Debtors entered into various capital leases, primarily to obtain lasers and other medical equipment. The Debtors primarily utilize VISX lasers manufactured by Abbott Medical Optics, Inc. ("AMO") for refractive surgery. The Debtors do not have an exclusive manufacturing agreement with AMO, as their laser technologies are available on a non-exclusive basis to all LASIK providers. The majority of the Debtors' capital leases are governed by that certain master lease with AMO dated as of May 17, 2006, as amended, which covers 60 Intralase laser machines. The payment obligations arising under this master lease are approximately $7.9 million in the aggregate over the next five years.

**F.**      **Summary of Assets**

The Debtors filed Schedules with the Bankruptcy Court that detail the assets owned by each of the Debtors. Such assets include cash on hand, bank accounts and investments, security deposits, insurance policies, stock interests, accounts receivable, intellectual property, vehicles, office equipment, furnishings and supplies, machinery, fixtures, equipment and supplies used in business, inventory, and other items of personal property. The

Schedules will provide asset values on a net book basis, which are not reflective of actual values. The Schedules may be reviewed on the Bankruptcy Court electronic case filing system, on the Debtors' case website at www.epiqbankruptcysolutions.com or during business hours in the offices of the Clerk of the Bankruptcy Court. Information regarding the Debtors' assets is also available in the Liquidation Analysis attached hereto as <u>Appendix C</u>.

## G. Historical Financial Information

Attached as <u>Appendix D</u> is selected financial data for the Debtors. As indicated in Appendix D certain of this financial data has not yet been audited.

## H. Events Leading to Commencement of the Chapter 11 Cases

The Debtors experienced financial difficulties for several years prior to the Petition Date, including recurring losses from continuing operations of $98.3 million and $35.3 million for the years ended December 31, 2008 and 2007, respectively. Nonetheless, the Debtors started 2008 with their best quarter in their history. During the quarter ended March 31, 2008, refractive center revenue was up 14% over the prior year, consolidated net income was up 75%, earnings per diluted share were up 142%, operating cash flow was up 49% and total debt was reduced by 6%. The reason for this great quarter was two-fold. First, the Debtors reaped the benefits of successfully transitioning their refractive centers to a new, robust operating model that had been built in 2007. Second, the economy, although challenged, was operating under a consumer confidence index of 95 at the start of the year. Ultimately, however, the unprecedented economic conditions that unfolded over the course of 2008 and 2009 took their toll on the Debtors.

The foundation of the Debtors' primary business, laser vision correction, is generally not reimbursed by health care insurance companies or other third-party payors and is therefore impacted by changes in economic and stock market conditions, unemployment rates, consumer confidence and discretionary spending patterns. The deepening recession in the fourth quarter of 2008 and through much of 2009 had a significant impact on the Debtors' operations, resulting in a sharp decline in their financial performance. As a result, the Debtors' liquidity became progressively constrained. By the end of 2008, the Debtors experienced a more than 20% annual decline in refractive center and shared access procedures. The resulting precipitous decline in operating revenue led the Debtors to fall out of compliance with the primary financial covenants under the Credit Facility.

In response to the deteriorating economic environment, the Debtors implemented a series of initiatives to reduce their costs of operation to levels commensurate with the new lower level of refractive procedures. The Debtors have continued to implement cost reduction and cash generation initiatives, including reductions in headcount, freezing or reducing salaries and benefits, reductions in discretionary spending including direct to consumer marketing, reductions in overhead costs, lower capital spending, the sale of surplus assets, and the closure of underperforming refractive centers/mobile refractive routes. In addition, the Debtors continued the diversification of their business model focusing on the doctor services and eye care businesses where services are reimbursed by third party insurance or Medicare, which is critical in an economy where discretionary spending slowed dramatically.

In addition, the Debtors engaged advisors to help them explore various alternatives to restructure their balance sheet, including selling the entire business or significant

29

assets, seeking capital infusions, or restructuring their current debt. The freezing of the financial markets that began in the late summer and fall of 2008, however, limited the ability of companies such as the Debtors to access the capital markets and ultimately prevented the Debtors from completing any of the alternatives they were exploring.

Therefore, the Debtors focused their attention on working with the Prepetition Lenders to create a more flexible capital structure reflective of the challenges within the economy. The Debtors began active discussions with the Prepetition Lenders to ensure that they had sufficient liquidity in excess of what is available under the Credit Facility. These discussions resulted in a series of waivers and amendments to the Credit Facility. Nonetheless, the Debtors were unable to make interest and principal payments under the Credit Facility and, when it became apparent that they could not service the debt arising under the Prepetition Facility, the Debtors entered into discussions with the Prepetition Lenders to secure both a short-term financial debt covenant compliance waiver to cure existing defaults and to execute a plan support agreement to be implemented though the filing of the Chapter 11 Cases.

These negotiations resulted in the execution of a Plan Support Agreement with certain of the Prepetition Lenders (the "Plan Support Agreement"), which outlines the terms of a plan of reorganization supportable by both the Debtors and a majority of the Prepetition Lenders.[2] The Plan Support Agreement provides for a mechanism to satisfy all of the Debtors' essential creditors, doctors, employees, customers and patients, and to de-leverage their balance sheet to enable them to emerge with a more manageable debt load.

Specifically, the Plan Support Agreement provides that, in exchange for and in full satisfaction of the secured obligations under the Prepetition Facility of approximately $101 million (consisting of the outstanding $76,667,280.72 principal amount of the term loans and the outstanding $23.4 million principal amount of the revolving loans), the Prepetition Lenders would receive, upon the Debtors' emergence from chapter 11: (a) newly-issued senior secured notes in the amounts of $50 million and $30 million, respectively, and (b) substantially all of the newly-issued common stock of reorganized TLC Canada. In addition, the Debtors intend to sell substantially all of their interests in the Canadian refractive centers in the Chapter 11 Cases, the proceeds of which will be used to pay in part the debtor-in-possession financing facility for which the Debtors seek authority to consummate concurrently herewith. Accordingly, the Plan Support Agreement contemplates the filing of a plan of reorganization converting over $100 million of secured claims and funded indebtedness into approximately $80 million of secured notes and substantially all of the equity in the reorganized Debtors. The new secured notes would have flexible terms that the Debtors believe can be serviced.

---

[2] As of the Petition Date, Prepetition Lenders holding approximately 55% of the debt under the Prepetition Facility had executed the Plan Support Agreement. The Debtors and these consenting Prepetition Lenders believe that they will be able to obtain acceptance of a plan of reorganization by requisite holders of the debt under the Prepetition Facility.

4541/74009-001 Current/15961454v9
RLF1 3523585v.2

## I.     The Debtors' Significant Leverage

As the Debtors experienced decreasing revenues, they continued to maintain significant leverage and, as such, attendant high debt costs. As of the Petition Date, the Debtors' books reflected approximately [$____ million] of debt obligations and assets of only approximately [$_____ million].

## J.     Plan Negotiations; Consensual Plan Efforts

As described above, prior to the Petition Date, the Debtors and the Consenting Prepetition Lenders reached an agreement on the terms of a plan of reorganization. That agreement was incorporated into the Plan Support Agreement dated December 20, 2009. The Plan Support Agreement incorporated a term sheet that set forth the principal terms of the reorganization plan (the "Term Sheet"). The terms of the Plan Support Agreement and Term Sheet, embodied in the Joint Chapter 11 Plan of Reorganization Dated as of January 6, 2010, include the following:

- the treatment of various Classes as set forth above;

- payment in full of critical trade vendors;

- the scope of releases to be issued in connection with the Plan;

- a timeline for Plan confirmation and a list of conditions precedent thereto; and

- a summary of terms and conditions to be included in the TLC Restructured Notes.

Pursuant to the terms of the Plan, the Debtors propose to de-leverage their balance sheet, address operational issues as necessary and work with their principal stakeholders to return to profitability and to place themselves in a position for future growth.

# V.     THE CHAPTER 11 CASES

## A.     Continuation of Business; Stay of Litigation

As described above, on December 21, 2009, the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have continued to operate as debtors in possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. The Debtors are authorized to operate their businesses and manage their properties in the ordinary course, with transactions outside of the ordinary course of business requiring Bankruptcy Court approval.

An immediate effect of the filing of the Debtors' bankruptcy petitions was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by creditors, the enforcement of liens against property of the Debtors and the continuation of litigation against the Debtors. The relief provides the Debtors with the "breathing room" necessary to assess and reorganize their businesses and prevents creditors from obtaining an unfair recovery advantage while the reorganization is ongoing.

31

## B. First Day Motions and Orders

On the first day of the Chapter 11 Cases, the Debtors filed several applications and motions seeking certain relief by virtue of so-called "first day orders." First day motions and orders are intended to facilitate the transition between a debtor's prepetition and postpetition business operations by approving certain regular business practices that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the Bankruptcy Court. The first day motions filed in the Chapter 11 Cases are typical of motions filed in large Chapter 11 cases across the country. Such motions sought, among other things, the following relief:

- establishment of procedures for interim compensation of professionals;

- authorization to pay employees' prepetition compensation, benefits and expense reimbursement amounts;

- authorization to pay prepetition taxes and fee amounts;

- authorization to pay prepetition claims of certain creditors, including creditors with claims related to insurance premium financing arrangements, in the ordinary course of business;

- joint administration of the Debtors' bankruptcy cases;

- authorization for debtor-in-possession financing (as further discussed below);

- maintenance of the Debtors' bank accounts and operation of their cash management systems substantially as such systems existed prior to the Petition Date;

- rejection of an unexpired lease of nonresidential real property; and

- establishment of adequate assurance of payment to utilities as a condition of receiving services and prohibiting utilities from altering, refusing or discontinuing services.

## C. Retention of Professionals

The Debtors are represented in the Chapter 11 Cases by Proskauer Rose LLP ("Proskauer") and Richards, Layton & Finger LLP ("Richards Layton"). The Debtors also retained crisis management personnel of Conway, Del Genio & Gries & Co., LLC ("CDG"). CDG was originally retained by TLC Vision Corporation prepetition. Epiq Bankruptcy Solutions, LLC was authorized to provide claims, noticing and balloting services to the Debtors.

## D. Debtor in Possession Financing and Authorization to Use Cash Collateral

Cash collateral is defined in section 363 of the Bankruptcy Code and includes, but is not limited to, "cash, negotiable instruments, documents of title, securities, deposit accounts, . . .

32

. other cash equivalents. . . and . . . proceeds, products, offspring, rents or profits of property subject to a security interest. . ." 11 U.S.C. § 363(a). Under the Bankruptcy Code, the Debtors are prohibited from using, selling or leasing cash collateral unless either the appropriate creditors consent or the Bankruptcy Court, after notice and a hearing, authorizes such action.

On the Petition Date, the Debtors filed the *Motion of Debtors for Entry of Interim and Final Orders: (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Superpriority Financing Pursuant to 11 U.S.C. §§ 361, 362, 363(c), 363(e), 364(c), 364(d) and 364(e) and (B) Utilize Cash Collateral of Prepetition Secured Parties, (II) Granting Adequate Protection to the Prepetition Senior Secured Lenders and (III) Granting Related Relief* [*Docket No. 10*] (the "DIP Motion"). The terms of the DIP Motion were agreed upon by the Prepetition Lenders.

By the DIP Motion, the Debtors sought (a) authority to obtain postpetition financing, on an interim basis and on a final basis, in the aggregate committed amount of up to $15 million (the "DIP Facility") (b) authority to use cash collateral pursuant to section 363 of the Bankruptcy Code and (c) authority to grant adequate protection to Wells Fargo Bank, National Association (the "Prepetition Agent"), as agent for the Prepetition Lenders. In addition, the Debtors sought to secure the DIP Facility by post-petition liens that are senior to all prepetition liens and obligations other than valid and enforceable prepetition liens permitted under the Prepetition Credit Agreement to be senior in priority.

## VI.    SUMMARY OF THE PLAN OF REORGANIZATION

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS, THE REORGANIZED DEBTORS AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

4541/74009-001 Current/15961454v9
RLF1 3523585v.2

## A.    Overall Structure of the Plan

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors and other stakeholders. Upon the filing of a petition for relief under chapter 11, section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the chapter 11 case.

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (a) is impaired under or has accepted the plan or (b) receives or retains any property under the plan. Subject to certain limited exceptions, and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes for such debt the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

The terms of the Plan are based upon, among other things, the Debtors' assessment of their ability to achieve the goals of their business plan, make the distributions contemplated under the Plan and pay their continuing obligations in the ordinary course of their businesses. Under the Plan, Claims against and Interests in the Debtors are divided into Classes according to their relative seniority and other criteria.

If the Plan is confirmed by the Bankruptcy Court and consummated, (a) the Claims in certain Classes will be Reinstated or modified and receive distributions equal to the full amount of such Claims, (b) the Claims of certain other Classes will be modified and receive distributions constituting a partial recovery on such Claims and (c) the Claims and Interests in certain other Classes will receive no recovery on such Claims or Interests. On the Effective Date and at certain times thereafter, the Reorganized Debtors will distribute Cash, securities and other property in respect of certain Classes of Claims as provided in the Plan. The Classes of Claims against and Interests in the Debtors created under the Plan, the treatment of those Classes under the Plan and the securities and other property to be distributed under the Plan are described below.

## B.    Substantive Consolidation

The Plan does not provide for the substantive consolidation of the Debtors' assets and liabilities. The Debtors, however, reserve the right to seek substantive consolidation by motion if they conclude that substantive consolidation is necessary or appropriate for effectuation of the Plan.

## C.    Reorganized Capital Structure Created by Plan

The Plan sets forth the following capital structure for the Reorganized Debtors upon their emergence from chapter 11:

4541/74009-001 Current/15961454v9
RLF1 3523585v.2

- **The TLC Restructured Notes.** The TLC Restructured Notes will be distributed to the Prepetition Lenders on the Effective Date. They are comprised of the New Tranche A Senior Secured Notes in the aggregate original principal amount of $50 million and the New Tranche B Junior Secured Notes in the aggregate original principal amount of $30 million. The Tranche A Senior Secured Notes will mature five years after the Effective Date, and the Tranche B Junior Secured Notes will mature seven years after such date, at which time all remaining outstanding principal will be due and payable. Interest will be payable quarterly. The Tranche A Senior Secured Notes will be secured by first priority liens on substantially all of the Reorganized Debtors' assets, and the Tranche B Junior Secured Notes will be secured by second priority liens on substantially all of the Reorganized Debtors' assets.

- **The Form of the TLC Restructured Notes.** These forms will be included in the Plan Supplement.

- **The New TLC USA Common Stock.** The New TLC USA Common Stock will be distributed to the Holders of Allowed Class A4, B3 and C5 Claims on the Effective Date, as provided in the Plan (which shares issued on the Effective Date are subject to dilution by Management Interests).

- **Issuance and Distribution of New Securities.** The new securities to be issued and distributed pursuant to the Plan to Holders of Allowed Class A4, B3 and C5 Claims will be issued in exchange for Allowed Claims in such Classes and will be exempt from registration under applicable securities laws pursuant to section 1145 of the Bankruptcy Code.

## D.    Classification and Treatment of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan of reorganization must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1122 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims and Priority Tax Claims which, pursuant to section 1123(a)(1), do not need to be classified). The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtors into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law, but it is possible that a Holder of a Claim or Interest may challenge the Debtors' classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In that event, the Debtors intend, to the extent permitted by the Bankruptcy Code, the Plan and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting Holder ultimately is deemed to be a member. Any such reclassification could adversely affect the Class in which such Holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

Except as to Claims specifically Allowed in the Plan, the amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed

35

amount of such Claim and accordingly the total Claims ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the value of the property that ultimately will be received by a particular Holder of an Allowed Claim under the Plan may be adversely or favorably affected by the aggregate amount of Claims ultimately Allowed in the applicable Class.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below. The Debtors believe that the consideration, if any, provided under the Plan to Holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual and statutory subordination) of such Claims and Interests and the fair value of the Debtors' assets. With respect to any Class deemed to reject the Plan and any Class that rejects the Plan, the Debtors will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code as to any dissenting Class. Section 1129(b) of the Bankruptcy Code permits confirmation of a chapter 11 plan in certain circumstances even if the plan has not been accepted by all Impaired classes of Claims and Interests. See Section X.F herein. Although the Debtors believe that the Plan can be confirmed under section 1129(b) of the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will find that the requirements to do so have been satisfied.

1.  Treatment of Unclassified Claims under the Plan

   (a)  Administrative Claims

An Administrative Claim is defined in the Plan as a Claim for (a) any cost or expense of administration (including, without limitation, the fees and expenses of Professionals) of any of the Chapter 11 Cases asserted or arising under sections 503, 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code including, but not limited to (i) any actual and necessary postpetition cost or expense of preserving the Debtors' respective Estates or operating the businesses of the Debtors, (ii) any payment to be made under the Plan to cure a default on an assumed executory contract or unexpired lease, (iii) any postpetition cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtors in the ordinary course of their respective businesses, (iv) compensation or reimbursement of expenses of Professionals to the extent Allowed by the Bankruptcy Court under section 330(a) or section 331 of the Bankruptcy Code, and (v) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546(c)(1)(B) of the Bankruptcy Code; (b) any fees or charges assessed against the Debtors' respective Estates under section 1930 of title 28 of the United States Code; and (c) any Allowed administrative claim or superpriority claim granted to the Collateral Trustee pursuant to the Cash Collateral Order.

Administrative Claims are Unimpaired. Unless otherwise provided for herein, each Holder of an Allowed Administrative Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (a) the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Administrative Claim becomes Allowed, or (iii) a date agreed to in writing by the Debtors or Reorganized Debtors, as the case may be, and the Holder of such Administrative Claim; or (b) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or the Reorganized Debtors,

36

as the case may be, or as the Bankruptcy Court may order; provided, however, that Allowed Administrative Claims representing (i) liabilities, accounts payable or other Claims, or obligations incurred in the ordinary course of business of the Debtors consistent with past practices subsequent to the Petition Date, or (ii) contractual liabilities incurred subsequent to the Petition Date, whether or not incurred in the ordinary course of business, shall be paid or performed by the Debtors or the Reorganized Debtors in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto.

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, will be paid on or before the Effective Date. All such fees that arise after the Effective Date but before the closing of the Chapter 11 Cases will be paid by the Reorganized Debtors.

Under the Plan, applications for compensation for services rendered and reimbursement of expenses incurred by Professionals (a) from the Petition Date through the Effective Date or (b) at any time during the Chapter 11 Cases when such compensation is sought pursuant to sections 503(b)(2) through (b)(5) of the Bankruptcy Code, must be Filed no later than forty-five (45) days after the Effective Date or such later date as the Bankruptcy Court approves, and must be served on (a) the Reorganized Debtors, TLC Vision (USA) Corporation, 16305 Swingley Ridge Road, Chesterfield, MO 63017 (Attn: William McManus), (b) counsel to the Debtors, Proskauer Rose LLP, 70 West Madison Street, Suite 3800, Chicago, Illinois 60602 (Attn: Mark K. Thomas), (c) the Office of the United States Trustee, 833 Chestnut Street, Suite 500, Philadelphia, Pennsylvania 19107 and (d) any other party designated by the Bankruptcy Rules or any order of the Court to receive notice. Applications that are not timely Filed will be barred and will not be considered by the Court. The Reorganized Debtors will pay any valid claims for Professional fees and expenses incurred after the Effective Date without any application to the Bankruptcy Court.

      (b)        Priority Tax Claims

The Plan defines Priority Tax Claims as any and all Claims accorded priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code. Such Priority Tax Claims include Claims of governmental units for taxes owed by the Debtors that are entitled to a certain priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code. The taxes entitled to priority are (a) taxes on income or gross receipts that meet the requirements set forth in section 507(a)(8)(A) of the Bankruptcy Code, (b) property taxes meeting the requirements of section 507(a)(8)(B) of the Bankruptcy Code, (c) taxes that were required to be collected or withheld by the Debtors and for which the Debtors are liable in any capacity as described in section 507(a)(8)(C) of the Bankruptcy Code, (d) employment taxes on wages, salaries or commissions that are entitled to priority pursuant to section 507(a)(4) of the Bankruptcy Code, to the extent that such taxes also meet the requirements of section 507(a)(8)(D), (e) excise taxes of the kind specified in section 507(a)(8)(E) of the Bankruptcy Code, (f) customs duties arising out of the importation of merchandise that meet the requirements of section 507(a)(8)(F) of the Bankruptcy Code and (g) prepetition penalties relating to any of the foregoing taxes to the extent such penalties are in compensation for actual pecuniary loss as provided in section 507(a)(8)(G) of the Bankruptcy Code. The Debtors have estimated that there will be no unpaid prepetition Priority Tax Claims as of the Effective Date.

4541/74009-001 Current/15961454v9
RLF1 3523585v.2

Priority Tax Claims are Unimpaired. Each Holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors or the Reorganized Debtors, as the case may be, in full satisfaction, settlement, release, extinguishment and discharge of such Priority Tax Claim: (a) the amount of such unpaid Allowed Priority Tax Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Priority Tax Claim becomes Allowed and (iii) a date agreed to by the Debtors or Reorganized Debtors, as the case may be, and the Holder of such Priority Tax Claim; (b) equal Cash payments from the Reorganized Debtors made on the last Business Day of every three (3) month period following the Effective Date, over a period not exceeding five (5) years after the assessment of the tax on which such Priority Tax Claim is based, totaling the principal amount of such Priority Tax Claim plus simple interest on any outstanding balance from the Effective Date calculated at the interest rate publicly quoted on the Effective Date for obligations backed by the full faith and credit of the United States of America maturing in ninety (90) days; or (c) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Priority Tax Claim and the Debtors or the Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order. The Debtors or the Reorganized Debtors, as the case may be, shall have the right, in their sole discretion, to prepay at any time, in whole or in part, any Allowed Priority Tax Claim without premium or penalty of any sort or nature. Notwithstanding any provision to the contrary in the Plan, the implementing Plan documents or the Order confirming the Plan: (1) nothing shall affect the rights of the United States Internal Revenue Service (the "IRS") to assert setoff and recoupment; and (2) the Priority Tax Claims of the IRS shall be paid on a no less than quarterly basis within five (5) years of the Petition Date and interest shall accrue on such claims from the Effective Date at the rate and method set forth in 26 U.S.C. Sections 6621 and 6622.

2.    Treatment of Claims Against and Interests in TLC USA:

(a)    Class A1: Other Secured Claims

Class A1 Other Secured Claims are Unimpaired. Each Holder of an Allowed Class A1 Other Secured Claim shall receive, in the sole discretion of the Debtors or the Reorganized Debtors, as the case may be, in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (a) Cash equal to the amount of such Allowed Other Secured Claim on or as soon as practicable after the later of (i) the Effective Date, (ii) the date that such Other Secured Claim becomes Allowed, and (iii) a date agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of such Class A1 Other Secured Claim; (b) treatment such that such Other Secured Claim is Reinstated; (c) the Property securing such Other Secured Claim, with any deficiency to result in a General Unsecured Claim; or (d) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order.

(b)    Class A2: Essential Trade Claims

Class A2 Essential Trade Claims are Unimpaired. Each Holder of an Allowed Class A2 Essential Trade Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Class A2 Claim becomes Allowed, and (iii) a date agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of such Class A2 Essential Trade

38

Claim; or (b) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or the Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order.

(c)    Class A3:  Other Priority Claims

Class A3 Other Priority Claims are Unimpaired.  Each Holder of an Allowed Class A3 Other Priority Claim shall be paid in full in cash (a) on or as soon as practicable after the Effective Date or the date such claim is allowed in accordance with section 502 of the Bankruptcy Code, whichever is later, or (b) upon such other terms, less favorable to the holder of such claim, as the Reorganized Debtors and the holder of such Claim may agree.

(d)    Class A4:  Prepetition Lender Secured Claims.

Class A4 Prepetition Lender Secured Claims are Impaired.  Each Holder of an Allowed Class A4 Prepetition Lender Secured Claim shall receive on or as soon as practicable after the Effective Date, its pro rata share of (a) the New TLC USA Common Stock and (b) the TLC Restructured Notes.

(e)    Class A5:  General Unsecured Claims

Class A5 General Unsecured Claims are Impaired.  Each Holder of an Allowed Class A5 General Unsecured Claim shall receive on or as soon as reasonably practicable after the Effective Date, from the assets of TLC USA, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, its pro rata share of a cash pool in the amount of the lesser of (x) $750,000 or (y) 10% of the aggregate Allowed amount of the Class A5 General Unsecured Claims, or (b) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order.

(f)    Class A6:  Medical Pending Litigation Claims

Class A6 Medical Pending Litigation Claims are Impaired.  On the Effective Date, the Holders of Class A6 Medical Pending Litigation Claims shall be entitled to payment exclusively by way of any insurance coverage held by TLC USA covering such Medical Pending Litigation Claims.

(g)    Class A7:  Subordinated Claims

Class A7 Subordinated Claims are Impaired.  Holders of Class A7 Subordinated Claims shall not receive or retain any property under the Plan on account of such Subordinated Claims.  On the Effective Date, all Subordinated Claims shall be extinguished.

(h)    Class A8:  Intercompany Claims

Class A8 Intercompany Claims are Impaired.  Holders of Class A8 Intercompany Claims shall not receive or retain any property under the Plan on account of such Intercompany Claims.  On the Effective Date, all Intercompany Claims shall be extinguished, provided that, claims owing by non-debtor subsidiaries and affiliates to TLC USA shall not be affected by this Plan.

(i)    Class A9:  Old TLC USA Common Stock and Interests