Class A9 Old TLC USA Common Stock and Interests are Impaired. Holders of Class A9 Old TLC USA Common Stock and Interests shall not receive or retain any property under the Plan on account of such Old Common Stock and Interests. On the Effective Date, all Old TLC USA Common Stock and Interests shall be cancelled.

3.  Treatment of Claims Against and Interests in TLC Canada:

(a)  Class B1: Other Secured Claims

Class B1 Other Secured Claims are Unimpaired. Each Holder of an Allowed Class B1 Other Secured Claim shall receive, in the sole discretion of the Debtors or the Reorganized Debtors, as the case may be, in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (a) Cash equal to the amount of such Allowed Other Secured Claim on or as soon as practicable after the later of (i) the Effective Date, (ii) the date that such Other Secured Claim becomes Allowed, and (iii) a date agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of such Class B1 Other Secured Claim; (b) treatment such that such Other Secured Claim is Reinstated; (c) the Property securing such Other Secured Claim, with any deficiency to result in a General Unsecured Claim; or (d) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order.

(b)  Class B2: Other Priority Claims

Class B2 Other Priority Claims are Unimpaired. Each Holder of an Allowed Class B2 Other Priority Claim shall be paid in full in cash (a) on or as soon as practicable after the Effective Date or the date such claim is allowed in accordance with section 502 of the Bankruptcy Code, whichever is later, or (b) upon such other terms, less favorable to the Holder of such Claim, as the Reorganized Debtors and the Holder of such Claim may agree.

(c)  Class B3: Prepetition Lender Secured Claims

Class B3 Prepetition Lender Secured Claims are Impaired. Each Holder of an Allowed Class B3 Prepetition Lender Secured Claim shall receive on or as soon as practicable after the Effective Date, its pro rata share of (a) the New TLC USA Common Stock and (b) the TLC Restructured Notes.

(d)  Class B4: General Unsecured Claims.

Class B4 General Unsecured Claims are Impaired. In the event that Class B4 votes to accept the Plan, each Holder of an Allowed Class B4 General Unsecured Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim its pro rata share of a cash pool in the amount of the lesser of (x) $500,000 plus the amount, if any, realized upon liquidation of remaining assets of TLC Canada as provided in section 7.10 of the Plan, or (y) 10% of the aggregate Allowed amount of the Class B4 General Unsecured Claims. In the event that Class B4 votes to reject the Plan, each Holder of an Allowed Class B4 General Unsecured Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim the lesser of its pro rata share of a cash pool in the amount of the lesser of (x) $250,000, plus the amount, if any, realized upon liquidation of remaining assets of TLC Canada as provided in section 7.10 of the Plan, or (y) 5% of the Allowed amount of the Class B4 General Unsecured Claims after payment of costs of liquidation.

40

(e)     Class B5:  Intercompany Claims

Class B5 Intercompany Claims are Impaired.  Holders of Class B5 Intercompany Claims shall not receive or retain any property under the Plan on account of such Intercompany Claims.  On the Effective Date, all Intercompany Claims shall be extinguished, provided that, claims owing by non-debtor subsidiaries and affiliates to TLC Canada shall not be affected by this Plan.

(f)     Class B6:  Old TLC Canada Common Stock and Interests

Class B6 TLC Canada Common Stock and Interests are Impaired.  In the event that Class B4 votes to accept the Plan, each Holder of an Allowed Class B6 TLC Canada Common Stock and Interest shall (a) retain their Interests in the Old TLC Canada Common Stock, and (b) receive in full satisfaction, settlement, release, extinguishment and discharge of such Interest its pro rata share of a cash pool in the amount of $250,000 after payment of costs of liquidation.  In the event that Class B4 votes to reject the Plan, each Holder of an Allowed Class B6 TLC Canada Common Stock and Interest shall retain their Interests in the Old TLC Canada Common Stock, and shall receive no other distribution.

4.     Treatment of Claims Against and Interests in TLC MSI:

(a)     Class C1:  Other Secured Claims

Class C1 Other Secured Claims are Unimpaired.  Each Holder of an Allowed Class C1 Other Secured Claim shall receive, in the sole discretion of the Debtors or the Reorganized Debtors, as the case may be, in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (a) Cash equal to the amount of such Allowed Secured Claim on or as soon as practicable after the later of (i) the Effective Date, (ii) the date that such Secured Claim becomes Allowed, and (iii) a date agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of such Class C1 Other Secured Claim; (b) treatment such that such Secured Claim is Reinstated; (c) the Property securing such Secured Claim, with any deficiency to result in a General Unsecured Claim; or (d) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order.

(b)     Class C2:  Other Priority Claims

Class C2 Other Priority Claims are Unimpaired.  Each Holder of an Allowed Class C2 Other Priority Claim shall be paid in full in cash (a) on or as soon as practicable after the Effective Date or the date such claim is allowed in accordance with section 502 of the Bankruptcy Code, whichever is later, or (b) upon such other terms, less favorable to the Holder of such Claim, as the Reorganized Debtors and the Holder of such Claim may agree.

(c)     Class C3:  General Unsecured Claims

Class C3 General Unsecured Claims are Unimpaired.  Each Holder of an Allowed Class C3 General Unsecured Claim not satisfied as of the Effective Date of the Plan shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (a) the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such General Unsecured Claim becomes Allowed, or (iii) a date agreed to in writing by the Debtors or Reorganized Debtors, as the case may be, and the Holder of such General Unsecured Claim; (b) treatment such that such General

41

Unsecured Claim is Reinstated; or (c) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or the Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order.

        (d)      Class C4:  Old TLC MSI Common Stock and  Interests.

Class C4 TLC MSI Common Stock and Interests is Unimpaired.  Holders of Allowed Class C4 TLC MSI Common Stock and Interests shall retain their Interests.

        (e)      Class C5:  Prepetition Lender Secured Claims.

Class C5 Prepetition Lender Secured Claims are Impaired.  Each Holder of an Allowed Class C5 Prepetition Lender Secured Claim shall receive on or as soon as practicable after the Effective Date, its pro rata share of (a) the New TLC USA Common Stock and (b) the TLC Restructured Notes.

        (f)      Class C6:  Intercompany Claims.

Class C6 Intercompany Claims are Impaired.  Holders of Class C6 Intercompany Claims shall not receive or retain any property under the Plan on account of such Intercompany Claims.  On the Effective Date, all Intercompany Claims shall be extinguished, provided that, claims owing by non-debtor subsidiaries and affiliates to TLC MSI shall not be affected by this Plan.

**E.      Reservation of Rights Regarding Claims**

Except as otherwise explicitly provided in the Plan, nothing will affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.  The Debtors and the Reorganized Debtors specifically reserve all rights, remedies, claims, defenses and Causes of Action.

**F.      Allowed Claims, Distribution Rights and Objections to Claims**

      1.      Allowance Requirement

Only Holders of Allowed Claims are entitled to receive distributions under the Plan.  An Allowed Administrative Claim is a Claim or any portion thereof that has been Allowed, or adjudicated in favor of the Holder by estimation or liquidation, by a Final Order, that was incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases and as to which there is no dispute as to the Debtors' liability, or that has become Allowed by failure to object pursuant to Section 8.05 of the Plan.  An unsatisfied Allowed Claim is such Claim or any portion thereof (other than an Administrative Claim) of (a) any Claim against any of the Debtors that has been listed by the Debtors in the Schedules, as such Schedules may have been amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent, and with respect to which no contrary proof of claim has been filed, (b) any Claim specifically allowed under the Plan, (c) any Claim the amount or existence of which has been determined or allowed by a Final Order, or (d) any Claim as to which a proof of claim has been timely filed before the Bar Date, provided that at the time of the Effective Date the Debtors, Reorganized Debtors or the Prepetition Lenders have not identified such Claim as being objectionable in part or in whole and no objection to the allowance thereof has been filed by the Claims Objection Deadline; provided, however, that the

term Allowed, with reference to any Claim, shall not include (x) any unliquidated claim or (y) interest or attorneys' fees on or related to any Claim that accrues from and after the Petition Date unless otherwise expressly provided for in the Plan.

2.  Date of Distribution

All Distributions to Holders of Allowed Claims as of the Effective Date will be made as and when provided in the Plan.

3.  Making of Distributions

The Reorganized Debtors will designate the Person to serve as the Disbursing Agent under the Plan, and, unless such person is Reorganized TLC USA, will file a written notice of such designation at least five (5) days before the Confirmation Hearing. Distributions to Holders of Allowed Claims will be made by the Disbursing Agent (a) to the last known addresses of such Holders, or (b) to the addresses set forth in any written notices of address changes delivered to the Disbursing Agent. If any Holder's distribution is returned as undeliverable, no further distributions to such Holder shall be made unless and until the Disbursing Agent is notified of such Holder's then current address, at which time all missed distributions shall be made to such Holder without interest. Unless otherwise agreed between the Reorganized Debtors and the Disbursing Agent, amounts in respect of undeliverable distributions made by the Disbursing Agent will be returned to the Reorganized Debtors until such distributions are claimed.

All Property distributed on account of Claims must be claimed within the later of (a) one (1) year after the Effective Date or (b) one (1) year after such distribution is made to such Holder or, in the case of a distribution made in the form of a check, must be negotiated and a request for reissuance be made as provided for in Section 5.05 of the Plan. All Unclaimed Property will be retained by and will revest in the Reorganized Debtors and will no longer be subject to distribution. All full or partial payments made by the Disbursing Agent and received by the Holder of a Claim prior to the Effective Date will be deemed to be payments under the Plan for purposes of satisfying the obligations of Debtors pursuant to the Plan. Nothing contained in the Plan shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim other than by reviewing the records of the Reorganized Debtors and any Claims filed in these cases. Pursuant to section 1143 of the Bankruptcy Code, all claims in respect of Unclaimed Property shall be deemed Disallowed under Section 5.06 of the Plan and the Holder of any Claim Disallowed under Section 5.06 of the Plan will be forever barred, expunged, estopped and enjoined from assertion in any manner against the Debtors or their respective Properties or the Reorganized Debtors or their respective Properties.

4.  Objection Procedures

Unless otherwise ordered by the Court after notice and a hearing, under the Plan, the Reorganized Debtors shall have the exclusive right, on and after the Effective Date, to File objections to Claims (other than Claims specifically Allowed in the Plan) and shall serve a copy of each such objection upon the Holder of the Claim to which the objection is made as soon as practicable, but in no event later than the latest of (a) 75 days after the Effective Date, (b) 75 days after the date on which any Claim is Filed, or (c) such later date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clauses (a) and (b) above. The foregoing deadlines may be extended by order of the Court. An objection to any Claim shall

43

be deemed properly served on the Holder thereof if the Reorganized Debtors effect service in any of the following manners: (i) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Federal Rule of Bankruptcy Procedure 7004, (ii) by first class mail, postage prepaid, on the signatory on the proof of claim or interest or other representative identified in the proof of claim or interest or any attachment thereto, or (iii) by first class mail, postage prepaid, on any counsel that has appeared on the Holder's behalf in the Chapter 11 Cases.

## G.     Disposition of Executory Contracts and Unexpired Leases

### 1.     Contracts and Leases Deemed Assumed

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtors and any person or Entity shall be deemed assumed by the Debtors as of the Effective Date, except for any executory contract or unexpired lease that (a) has expired or terminated pursuant to its own terms, (b) has previously been assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court on or prior to the Confirmation Date, (c) is the subject of a pending motion to assume, assume and assign, or reject as of the Confirmation Date, or (d) is listed on the Schedule of Rejected Contracts which shall be included with the Plan Supplement; provided, however, that the Debtors shall have the right, at any time prior to the Confirmation Date, to amend the Schedule of Rejected Contracts upon notice to the counterparty to such contract or lease (a) to delete any executory contract or unexpired lease listed therein, thus providing for its assumption pursuant to Section 6.01 of the Plan or (b) to add any executory contract or unexpired lease thereto, thus providing for its rejection pursuant to Section 6.01 of the Plan. The Confirmation Order (except as otherwise provided therein) shall constitute an order of the Bankruptcy Court pursuant to section 365 of the Bankruptcy Code, effective as of the Effective Date, approving the assumptions and rejections hereunder. Each contract and lease assumed pursuant to Section 6.01 of the Plan shall be assumed only to the extent that any such contract or lease constitutes an executory contract or unexpired lease.    Assumption of a contract or lease pursuant to Section 6.01 of the Plan shall not constitute an admission by the Debtors or the Reorganized Debtors that such contract or lease is an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors have any liability thereunder. All executory contracts and unexpired leases that are assumed will be assumed under their present terms or upon such terms as are agreed to in writing between the applicable Debtor and the counterparty to the executory contract or unexpired lease; provided, however, that any leases and executory contracts of TLC that are assumed under the Plan shall be deemed to be assigned to Reorganized TLC USA as of the Effective Date. Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire, or occupancy of real property shall include:  (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other interests in real estate or rights *in rem* related to such premises, unless any of the foregoing agreements has been rejected pursuant to an order of the Bankruptcy Court.

44

2. Cure with Respect to Assumed Contracts and Leases

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtors and any person or Entity shall be deemed assumed by the Debtors as of the Effective Date, except for any executory contract or unexpired lease that (a) has expired or terminated pursuant to its own terms, (b) has previously been assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court on or prior to the Confirmation Date, (c) is the subject of a pending motion to assume, assume and assign, or reject as of the Confirmation Date, or (d) is listed on the Schedule of Rejected Contracts which shall be included with the Plan Supplement; provided, however, that the Debtors shall have the right, at any time prior to the Confirmation Date, to amend the Schedule of Rejected Contracts upon notice to the counterparty to such contract or lease (a) to delete any executory contract or unexpired lease listed therein, thus providing for its assumption pursuant to Section 6.01 of the Plan or (b) to add any executory contract or unexpired lease thereto, thus providing for its rejection pursuant to Section 6.01 of the Plan. Within fifteen (15) days of the Effective Date, the Debtors shall pay to the nondebtor parties to such executory contracts and unexpired leases being assumed the cure amounts. The nondebtor parties to such executory contracts and unexpired leases shall have thirty (30) days from receipt of such cure amounts to object thereto. If any objections are filed, and cannot be resolved by agreement, the Bankruptcy Court shall hold a hearing to determine the cure amount with respect to the executory contract or unexpired lease subject to the objection or to otherwise resolve such objection. Any party failing to object (whether to the proposed cure amount or otherwise) within thirty (30) days after receipt of the cure amount by the Reorganized Debtors shall be forever barred from asserting, collecting, or seeking to collect from the Reorganized Debtors any amounts in excess of the cure amount or from otherwise objection to the assumption, by the Debtors, of such executory contract or unexpired lease. Notwithstanding the foregoing, or anything else in Article VI of the Plan, with respect to any executory contract or unexpired lease which is the subject of an objection, the Reorganized Debtors shall retain the right, until five (5) Business Days after any order resolving the objection becomes a Final Order, to reject such executory contract or unexpired lease.

3. Rejection Damages

Rejection Claims arising out of the rejection of any executory contract or unexpired lease pursuant to Section 6.01 of the Plan must be filed with the Bankruptcy Court no later than the later of thirty (30) days after the entry of an order rejecting such executory contract or unexpired lease. Any Claim not filed within such time period shall be forever barred. The Reorganized Debtors shall have the exclusive right to object to any Claim arising out of the rejection of an executory contract or unexpired lease pursuant to the terms of Section 8.05 of the Plan.

The Bankruptcy Court shall determine any objections Filed in accordance with Section 8.05 of the Plan at a hearing to be held on a date to be determined by the Bankruptcy Court. Subject to any statutory limitation, including, but not limited to the limitations contained in sections 502(b)(6) and 502(b)(7) of the Bankruptcy Code, any Claims arising out of the rejection of executory contracts and unexpired leases shall, pursuant to section 502(g) of the Bankruptcy Code, be treated as Class A5, B4, or C3 General Unsecured Claims, as appropriate, in accordance with Sections 3.05, 3.06, or 3.07 of the Plan.

45

4. Benefit Programs

Except and to the extent previously assumed by an order of the Bankruptcy Court on or before the Effective Date, all officer, director or employee compensation and benefit programs of the Debtors entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under Section 6.01 of the Plan, but only to the extent that rights under such programs are held by the Debtors or Persons who are employees of the Debtors as of the Effective Date, and the Debtors' obligations under such programs to Persons who are employees of the Debtors on the Effective Date shall survive Confirmation of the Plan, except for (a) executory contracts or plans specifically rejected pursuant to the Plan, and (b) executory contracts or plans that have previously been rejected, are the subject of a motion to reject, or have been specifically waived by the beneficiaries of any plans or contracts.

## H. Revesting of Assets; Release of Liens

Except as otherwise expressly provided in the Plan, pursuant to sections 1123(a)(5), 1123(b)(3) and 1141(b) of the Bankruptcy Code, all Property comprising the Estates of each Debtor, including, but not limited to, all Avoidance Actions and all Causes of Action shall automatically be retained and revest in the relevant Reorganized Debtor or its respective successor, free and clear of all Claims, Liens, contractually-imposed restrictions, charges, encumbrances and Interests of Creditors and equity security holders on the Effective Date, with all such Claims, Liens, contractually-imposed restrictions, charges, encumbrances and Interests being extinguished except as otherwise provided in the Plan, the TLC Restructured Notes and Exit Financing documents. As of the Effective Date, each Reorganized Debtor may operate its business and use, acquire and dispose of Property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and Confirmation Order. Without limiting the foregoing, each Reorganized Debtor may pay the charges it incurs for professional fees, disbursements, expenses, or related support services after the Effective Date without any application to the Bankruptcy Court.

## I. Post-Consummation Corporate Structure, Management and Operation

1. Corporate Action

The entry of the Confirmation Order shall constitute authorization for the Debtors and the Reorganized Debtors to take or to cause to be taken all corporate actions necessary or appropriate to consummate and implement the provisions of the Plan prior to, on and after the Effective Date, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court, including, without limitation, (a) the cancellation of the Old Common Stock and Interests, (b) the issuance of the New TLC USA Common Stock, (c) the issuance of the TLC Restructured Notes, (d) the election of directors and officers in accordance with Section 10.02 of the Plan, (e) the adoption of the New TLC USA Certificates of Incorporation and By-Laws, (f) the consummation of the Exit Financing, (g) the execution and delivery of the new Senior Management Contracts, (h) the adoption of New Management Incentive Plan, and (i) as needed or desired, the filing of liquidation proceedings in the Canadian Court. All such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of

46

further action by the stockholders or directors of the Debtors or the Reorganized Debtors. On the Effective Date, the appropriate officers and directors of the Debtors and the Reorganized Debtors are authorized and directed to execute and deliver the agreements, documents and instruments contemplated by the Plan and the Plan Supplement in the name and on behalf of the Debtors and the Reorganized Debtors.

2.      Articles of Organization

The New TLC USA Certificates of Incorporation and By-Laws shall contain such provisions as are required to satisfy the provisions of the Plan and the Bankruptcy Code and shall include, among other things, (a) authorization to issue a maximum number of shares of New TLC USA Common Stock, to be determined by the Requisite Prepetition Lenders, (b) a prohibition on the issuance of nonvoting equity securities to the extent, and only to the extent, required by section 1123(a)(6) of the Bankruptcy Code, (c) provisions for a five (5) member Board of Directors of Reorganized TLC USA consisting of the one (1) member appointed by Senior Management and four (4) members appointed by the Prepetition Lenders, (d) such other provisions as required by the New Shareholder Agreement, and (e) other provisions ordinary and customary in such situations so long as they are not inconsistent with any of the provisions to contained in the foregoing (a) and (e).

3.      Issuance of New TLC USA Common Stock

On the Effective Date, all of the issued and outstanding Old Common Stock and Interests shall be canceled and the Reorganized Debtors shall issue the New TLC USA Common Stock to the Holders of Allowed Class A4, B3 and C5 Claims in accordance with Sections 3.05 and 3.06 of the Plan.

4.      Officers and Directors of Reorganized Debtors

Under the Plan, the initial Board of Directors of TLC USA will have five (5) members, one of whom will be appointed by Senior Management and the other four (4) of whom will be appointed by the Prepetition Lenders. The names of the new directors will be set forth in the Plan Supplement.

5.      New Management Incentive Plan

On the Effective Date, the Reorganized Debtors will adopt the New Management Incentive Plan, a copy of which will be included in the Plan Supplement.

6.      Funding of Reorganized Debtors

The Reorganized Debtors expect to be able to fund their operations, pay administrative and priority claims as provided in the Plan, and service the debt instruments contemplated by the Plan, through cash receipts.

7.      Exemption from Certain Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or any other Person pursuant to the Plan, including any Liens granted by the Debtors to secure the TLC Restructured Notes will not be taxed under any law imposing a stamp tax or other similar tax. Such exemption specifically applies, without limitation, to all

47

documents necessary to evidence and implement distributions under the Plan, including the documents contained in the Plan Supplement.

## J. Confirmation and/or Consummation

Described below are certain important considerations under the Bankruptcy Code in connection with confirmation of the Plan.

    1.    Requirements for Confirmation of the Plan

Before the Plan can be confirmed, the Bankruptcy Court must determine at the Confirmation Hearing that the following requirements for confirmation, set forth in section 1129 of the Bankruptcy Code, have been satisfied:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised by the Debtors or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

- The Debtors have disclosed (a) the identity and affiliations of (i) any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of the Reorganized Debtors, (ii) any affiliate of the Debtors participating in a joint plan with the Debtors or (iii) any successor to the Debtors under the Plan (and the appointment to, or continuance in, such office of such individual(s) is consistent with the interests of Claim and Interest Holders and with public policy), and (b) the identity of any insider that will be employed or retained by the Debtors and the nature of any compensation for such insider.

- With respect to each Class of Claims or Interests, each Impaired Claim and Impaired Interest Holder either has accepted the Plan or will receive or retain under the Plan, on account of the Claims or Interests held by such Holder, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code. <u>See</u> <u>Section X.D.</u>

- The Plan provides that Administrative Claims and Priority Claims other than Priority Tax Claims will be paid in full on the Effective Date and that Priority Tax Claims will receive on account of such Claims deferred cash

48

payments, over a period not exceeding five years after the date of assessment of such Claims, of a value, as of the Effective Date, equal to the Allowed Amount of such Claims, except to the extent that the Holder of any such Claim has agreed to a different treatment.

- If a Class of Claims is Impaired under the Plan, at least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by insiders holding Claims in such Class.

- Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. See Section X.A.

- The Plan provides for the continuation after the Effective Date of all retiree benefits, if any, at the level established pursuant to section 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits.

The Debtors believe that, upon receipt of the votes required to confirm the Plan, the Plan will satisfy all the statutory requirements of chapter 11 of the Bankruptcy Code, that the Debtors have complied or will have complied with all of the requirements of chapter 11 and that the Plan has been proposed and submitted to the Bankruptcy Court in good faith.

Further, even if all of the foregoing are satisfied, if any Class of Claims is Impaired and votes to reject the Plan, the Debtors must satisfy the applicable "cramdown" standard with respect to that Class. Section 1129(b) of the Bankruptcy Code requires that the Plan "not discriminate unfairly" and be "fair and equitable" with respect to such Class. The Debtors do not anticipate that any Class of Claims will vote to reject the Plan. However, in the event any Class votes to reject the Plan, the Debtors believe they will satisfy the cramdown standards in section 1129(b) with respect to any such rejecting Class.

2.     Conditions to Confirmation Date and Effective Date

The Plan specifies conditions precedent to the Confirmation Date and the Effective Date. Each of the specified conditions must be satisfied or waived in whole or in part pursuant to Section 9.03 of the Plan by the Debtors, without any notice to parties-in-interest or the Bankruptcy Court and without a hearing.

The conditions precedent to the occurrence of the Confirmation Date, which is the date of entry by the clerk of the Bankruptcy Court of the Confirmation Order, are that: (a) the Confirmation Order shall be in form and substance reasonably acceptable to the Debtors and the Requisite Prepetition Lenders; (b) lease negotiations for the Canadian Lease have been completed on terms reasonably satisfactory to the Requisite Prepetition Lenders; and (c) the sale of Canadian Refractive Center Assets by TLC Canada has been consummated.

The conditions that must be satisfied on or prior to the Effective Date, which is the Business Day upon which all conditions to the consummation of the Plan have been satisfied or waived, and is the date on which the Plan becomes effective, are that: (a) the Bankruptcy Court shall have approved the information contained in the Disclosure Statement as adequate; (b)

49

the Confirmation Order, which order shall be in form and substance reasonably satisfactory to the Debtors and the Requisite Prepetition Lenders, shall have been entered and shall not be stayed by order of a court of competent jurisdiction; (c) all documents and agreements required to be executed or delivered under the Plan on or prior to the Effective Date shall have been executed and delivered by the parties thereto; (d) the Bankruptcy Court shall have entered an order (contemplated to be part of the Confirmation Order) authorizing and directing the Debtors and the Reorganized Debtors to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, indentures and other agreements or documents created, amended, supplemented, modified or adopted in connection with the Plan; (e) the Canadian Court shall have entered the CCAA Recognition Order; (f) the New Debtors Certificates of Incorporation shall have been filed with the applicable authority of each such Debtors' jurisdiction of incorporation or organization in accordance with such jurisdiction's applicable law; (g) all authorizations, consents and regulatory approvals required, if any, in connection with the Plan's effectiveness shall have been obtained; (h) the Debtors shall have received a rating of the TLC Restructured Notes, either in the aggregate or each debt tranche as requested by the Requisite Prepetition Lenders, which rating shall be acceptable to the Requisite Prepetition Lenders; (i) the Debtors shall have satisfied all conditions precedent to the consummation of the Exit Financing; (j) the Senior Management Contracts shall have been entered into by the parties thereto (as applicable); (k) all Plan Documents shall have been adopted and shall be in form and substance reasonably acceptable to the Debtors and the Requisite Prepetition Lenders and (l) TLC Canada's contracts with ETW Corp., James Wachtman, and AMO shall have been amended as acceptable to the Debtors and the Requisite Prepetition Lenders, and assumed and assigned to TLC USA.

**K.  Releases, Discharge, Injunctions, Exculpation and Indemnification**

1.  Releases by Debtors in Favor of Third Parties

Effective as of the Effective Date, and except as otherwise provided in the Plan or the Confirmation Order, for good and valuable consideration, the adequacy of which is confirmed by the Plan, the Debtors and the Reorganized Debtors, in their individual capacities and as debtors in possession, will be deemed to have forever released, waived and discharged the Releasees from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities (other than the rights of the Debtors or Reorganized Debtors to enforce the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered thereunder), whether for tort, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence, including actions in connection with indebtedness for money borrowed by the Debtors, taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, or the Plan; provided, however, that no Releasee shall be released or discharged from any Claims, obligations, suits, judgments, debts or Causes of Action arising out of or in connection with indebtedness for money borrowed by any such person from any of the Debtors.

As to the Debtors' directors, officers and employees, the consideration for such release is the service rendered by such individuals during the pendency of the Chapter 11 Cases

50

and the need for their continued dedication after the Effective Date to fully consummate a successful reorganization. The Debtors will be hampered in their reorganization efforts if their directors, officers and employees are subject to claims and potential litigation that will distract their attention from operational and other business matters. None of such individuals are currently the target of any claim or litigation, and the Debtors are not aware of any credible theory on which an entity might pursue claims and litigation against such individuals.

As to the Prepetition Lenders, the consideration for such release is, among other things, their agreement to compromise their Claims, support the Plan and accept the treatment provided for their Claims under the Plan.

2. Releases by Creditors of Claims Against Third Parties

Effective as of the Effective Date, and except as otherwise provided in the Plan or the Confirmation Order, to the fullest extent permitted under applicable law, in consideration for the obligations of the Persons set forth below under the Plan and, if applicable, the Cash, securities, contracts, releases and other agreements or documents to be delivered in connection with the Plan, each Holder of a Claim or Interest and any Affiliate of any such Holder (as well as any trustee or agent on behalf of each such Holder) that either affirmatively votes in favor of the Plan or is deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, shall be deemed to have forever waived, released and discharged (i) the Debtors, (ii) the Reorganized Debtors, and (iii) the Releasees from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities (other than the rights of the Debtors or Reorganized Debtors to enforce the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered thereunder), whether for tort, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence, including actions in connection with indebtedness for money borrowed by the Debtors, taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, or the Plan.

3. Discharge and Discharge Injunction

To the fullest extent permitted by applicable law (including, without limitation, section 105 of the Bankruptcy Code), and except as otherwise provided in the Plan or in the Confirmation Order, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims of any nature whatsoever against the Debtors or any of their assets or properties, regardless of whether any Property shall have been distributed or retained pursuant to the Plan on account of such Claims. Upon the Effective Date, and except as expressly contemplated in the Plan, the Debtors, and each of them, shall: (a) be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, debts (as such term is defined in section 101(12) of the Bankruptcy Code), Liens, security interests, and encumbrances of and against all Property of the respective Estates, the Debtors, or the Reorganized Debtors that arose prior to the Effective Date, including without limitation, all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) such Claim has been Allowed pursuant to section 502 of the

51

Bankruptcy Code, or (ii) the Holder of such Claim has voted to accept the Plan; and, (b) terminate all Interests of the Holders of Old Common Stock and Interests. Further, as of the Effective Date, all entities, including, without limitation, all Holders of Claims or Interests, shall be barred and enjoined from asserting against the Debtors or the Reorganized Debtors, their successors or their Property any other or further Claims, debts, rights, Causes of Action, liabilities or Interests relating to the Debtors based upon any act, omission, transaction or other activity of any nature that occurred prior to the Effective Date, except for those obligations expressly created by, or reserved in, the Plan. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtors and termination of all Interests of the Holders of Old Common Stock and Interests, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge and termination shall void any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

Except as otherwise expressly provided for in the Plan or the Confirmation Order and to the fullest extent authorized or provided by the Bankruptcy Code, including sections 524 and 1141 thereof, the entry of the Confirmation Order shall, provided that the Effective Date occurs, permanently enjoin all Persons that have held, currently hold or may hold a Claim or other debt or liability that is discharged or an Interest or other right of an equity security holder that is Impaired or terminated pursuant to the terms of the Plan from taking any of the following actions against the Debtors, the Reorganized Debtors or their Property on account of any such discharged Claims, debts or liabilities or such terminated Interests or rights: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind; (iv) asserting any setoff, offset, right of subrogation or recoupment of any kind, directly or indirectly, against any debt, liability or obligation due to the Debtors or the Reorganized Debtors; and (v) proceeding in any manner in any place whatsoever, including employing any process, that does not conform to or comply with or is inconsistent with the provisions of the Plan.

4.      Exculpation Relating to Chapter 11 Cases

None of the Debtors, Reorganized Debtors or Exculpated Persons shall have or incur any liability to any Person, including, without limitation, any Holder of a Claim or Interest or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or affiliates or any of their successors or assigns, for any act taken or omission made in connection with, relating to, or arising out of, the Chapter 11 Cases, Filing, negotiating, prosecuting, administering, formulating, implementing, confirming or consummating the Plan, or the Property to be distributed under the Plan, including all activities leading to the promulgation and confirmation of the Plan, the Disclosure Statement (including any information provided or statement made in the Disclosure Statement or omitted therefrom), or any contract, instrument, release or other agreement or document created in connection with or related to the Plan or the administration of the Debtors or these Chapter 11 Cases; provided, however, that the foregoing exculpation shall not apply to any act of gross negligence or willful misconduct.

4541/74009-001 Current/15961454v9
RLF1 3523585v.2

5.  Post-Effective Date Indemnifications

To the extent not inconsistent with the Plan or the Confirmation Order and to the fullest extent permitted by applicable law, including, but not limited to the extent provided in their constituent documents, contracts (including, but not limited to, employment agreement or indemnification agreement), statutory law or common law, the Reorganized Debtors will indemnify, hold harmless and reimburse the Exculpated Persons from and against any and all losses, claims, Causes of Action, damages, fees, expenses, liabilities and actions:  (a) for any act taken or omission made in good faith in connection with or in any way related to negotiating, formulating, implementing, confirming or consummating the Plan, the Disclosure Statement, or any contract, instrument, release or other agreement or document created in connection with the Plan or the administration of the Chapter 11 Cases; or (b) for any act or omission in connection with or arising out of the administration of the Plan or the Property to be distributed under the Plan or the operations or activities of the Reorganized Debtors, and any Claims of any such Exculpated Person against the Debtors or the Reorganized Debtors on account of such indemnification obligations shall be unaltered and Unimpaired within the meaning of section 1124(1) of the Bankruptcy Code, except that none of the Debtors or the Reorganized Debtors shall have any obligation to indemnify any Exculpated Person for any acts or omissions that constitute gross negligence or willful misconduct as such is finally determined by a court of competent jurisdiction.  Such indemnification obligations shall survive unaffected by entry of the Confirmation Order, irrespective of whether such indemnification is owed for an act or event occurring before or after the Petition Date.

## L.  Preservation of Rights of Action

Except to the extent that any Claim is Allowed during the Chapter 11 Cases or expressly by the Plan, nothing, including, but not limited to, the failure of the Debtors or the Reorganized Debtors to object to a Claim or Interest for any reason during the pendency of the Chapter 11 Cases, shall affect, prejudice, diminish or impair the rights and legal and equitable defenses of the Debtors or the Reorganized Debtors with respect to any Claim or Interest, including, but not limited to, all rights of the Debtors or Reorganized Debtors to contest or defend themselves against such Claims or Interests in any lawful manner or forum when and if such Claim or Interest is sought to be enforced by the Holder thereof.

Further, Except as otherwise provided in the Plan, all Causes of Action, including Avoidance Actions, shall automatically be retained and preserved and will revest in the Reorganized Debtors.  Pursuant to section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors (as representatives of the Debtors' Estates) will retain and have the exclusive right to enforce and prosecute such Causes of Action against any Entity, that arose before the Effective Date, other than those expressly released or compromised as part of or pursuant to the Plan.

In addition, except to the extent that any Claim is Allowed, the Debtors or the Reorganized Debtors, as applicable, may, but shall not be required to, set off against any Claims and the payments or distributions to be made pursuant to the Plan in respect of such Claims, any and all debts, liabilities, Causes of Action and claims of every type and nature whatsoever which the Estates, the Debtors or the Reorganized Debtors may have against their Creditors, but neither the failure to do so nor the allowance of any such Claims, whether pursuant to the Plan or otherwise, shall constitute a waiver or release by the Debtors of any such claims or Causes of Action the Debtors may have against such Creditors, and all such claims and Causes of Action

53

which are not expressly released pursuant to the Plan shall be reserved to and retained by the Reorganized Debtors.

All references to Claims and amounts of Claims refer to the amount of the Claim Allowed by agreement of the Debtors or Reorganized Debtors and the Holder of such Claim, by operation of law, by Final Order, or by the Plan. Notwithstanding any other provision in the Plan, no payment or distribution shall be made on account of or with respect to any Claim to the extent it is a Disputed Claim unless and until the Disputed Claim becomes an Allowed Claim.

## M. Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain after the Effective Date exclusive jurisdiction of all matters arising out of, arising in or related to the Chapter 11 Cases to the fullest extent permitted by applicable law, including, without limitation, jurisdiction to:

1. classify or establish the priority or secured or unsecured status of any Claim (whether Filed before or after the Effective Date and whether or not contingent, Disputed or unliquidated) or resolve any dispute as to the treatment of any Claim pursuant to the Plan;

2. grant or deny any applications for allowance of compensation or reimbursement of expenses pursuant to sections 330, 331 or 503(b) of the Bankruptcy Code or otherwise provided for in the Plan, for periods ending on or before the Effective Date;

3. determine and resolve any matters related to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which any Debtor is a party or with respect to which any Debtor may be liable, and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

4. ensure that all payments due under the Plan and performance of the provisions of the Plan are accomplished as provided herein and resolve any issues relating to distributions to Holders of Allowed Claims pursuant to the provisions of the Plan;

5. construe, take any action and issue such orders, prior to and following the Confirmation Date and consistent with section 1142 of the Bankruptcy Code, as may be necessary for the enforcement, implementation, execution and consummation of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, including, without limitation, the Disclosure Statement and the Confirmation Order, for the maintenance of the integrity of the Plan and protection of the Reorganized Debtors in accordance with sections 524 and 1141 of the Bankruptcy Code following consummation;

6. determine and resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation, implementation or enforcement of the Plan (and all Exhibits to the Plan and the Plan Supplement) or the Confirmation Order, including the indemnification and injunction provisions set forth in and contemplated by the Plan or the Confirmation Order, or any Entity's rights arising under or obligations incurred in connection therewith;

54

7. hear any application of the Debtors or Reorganized Debtors to modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code and Section 13.04 hereof or modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code and the Plan;

8. issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

9. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

10. determine any other matters that may arise in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, except as otherwise provided in the Plan;

11. determine such other matters and for such other purposes as may be provided in the Confirmation Order;

12. hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code;

13. hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan;

14. enter a final decree closing the Chapter 11 Cases;

15. determine and resolve any and all controversies relating to the rights and obligations of the Disbursing Agent in connection with the Chapter 11 Cases;

16. allow, disallow, determine, liquidate or estimate any Claim, including the compromise, settlement and resolution of any request for payment of any Claim, the resolution of any Objections to the allowance of Claims and to hear and determine any other issue presented hereby or arising hereunder, including during the pendency of any appeal relating to any Objection to such Claim (to the extent permitted under applicable law);

17. permit the Debtors to recover all assets of the Reorganized Debtors and Property of their respective Estates, wherever located;

18.     hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes and tax benefits and similar or related matters with respect to the Debtors or the Debtors' respective Estates arising prior to the Effective Date or relating to the period of administration of the Chapter 11 Cases, including, without limitation, matters concerning federal, state and local taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

19.     hear and determine any motions, applications, adversary proceedings, contested matters and other litigated matters pending on, Filed or commenced after the Effective Date that may be commenced by the Reorganized Debtors thereafter, including Avoidance Actions, proceedings with respect to the rights of the Reorganized Debtors to recover Property under sections 542, 543 or 553 of the Bankruptcy Code, or proceedings to otherwise collect to recover on account of any claim or Cause of Action that the Reorganized Debtors may have; and

20.     hear any other matter not inconsistent with the Bankruptcy Code.

If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction over any matter arising under, arising in or related to the Debtors, including with respect to the matters set forth above in Section 12.01 hereof, this Article XII shall not prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such subject matter.

## N.     Amendment, Alteration and Revocation of Plan

The Debtors may alter, amend or modify the Plan (with the consent of the Requisite Prepetition Lenders) in accordance with section 1127 of the Bankruptcy Code or as otherwise permitted at any time prior to the Confirmation Date. After the Confirmation Date and prior to the substantial consummation of the Plan, and in accordance with the provisions of section 1127(b) of the Bankruptcy Code and the Bankruptcy Rules, the Debtors may (with the consent of the Requisite Prepetition Lenders), so long as the treatment of Holders of Claims or Interests under the Plan is not adversely affected, institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order and any other matters as may be necessary to carry out the purposes and effects of the Plan; provided, however, prior notice of such proceedings shall be served in accordance with Bankruptcy Rules 2002 and 9014.

The Debtors reserve the right, at any time prior to Confirmation of the Plan, to withdraw the Plan. If the Plan is withdrawn, the Plan shall be null and void and have no force and effect. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

## O.     Plan Implementation Documents

The documents necessary to implement the Plan include the following:

- the New TLC USA Certificates of Incorporation and By-laws;

- the New TLC USA Common Stock;

- the New Shareholder Agreement;

56

- the New Management Incentive Plan;
- documents relating to the Exit Financing;
- the New Tranche A Senior Secured Notes;
- the New Tranche B Junior Secured Notes;
- the Schedule of Rejected Contracts; and
- the Senior Management Contracts.

Such documents will be submitted in substantially the form to be implemented on the Effective Date as part of the Plan Supplement. All documents in the Plan Supplement shall be in form, scope, and substance satisfactory to the Debtors and the Requisite Prepetition Lenders. The New Shareholder Agreement, the form of which will be included in the Plan Supplement, shall be in form, scope and substance reasonably satisfactory to the Debtors and the Prepetition Agent. Upon such filing, all documents included in the Plan Supplement may be viewed and downloaded free of charge from the Debtors' case website at www.epiqbankruptcysolutions.com, viewed and downloaded from the Bankruptcy Court electronic case filing system or inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. Holders of Claims or Interests may obtain a copy of any document included in the Plan Supplement upon written request to the Debtors' Voting Agent at the address set forth above, or to the Debtors' counsel, Proskauer Rose LLP, 70 West Madison Street, Suite 3800, Chicago, Illinois 60602 (Attn: Mark K. Thomas).

## VII.   CERTAIN RISK FACTORS TO BE CONSIDERED

The Holders of Claims in Classes A4, A5, A6, B3, B4 and C5 should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

## A.      General Considerations

The Plan sets forth the means for satisfying the Claims against each of the Debtors. Certain Claims and Interests receive no distributions pursuant to the Plan. Nevertheless, reorganization of certain of the Debtors' businesses and operations under the proposed Plan avoids the potentially adverse impact of a liquidation on the Debtors' customers, suppliers, employees, communities and other stakeholders.

## B.      Certain Bankruptcy Considerations

Even if all voting Impaired Classes vote in favor of the Plan, and if with respect to any Impaired Class deemed to have rejected the Plan the requirements for "cramdown" are met, the Bankruptcy Court may choose not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtors, (see Section X.A), and that the value of distributions to dissenting Holders of Claims and Interests will not be less than the value such Holders would receive if the Debtors were liquidated under chapter 7 of the

57

Bankruptcy Code. See Section X.D. Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion. See Appendix C for a liquidation analysis of the Debtors.

If a liquidation or protracted reorganization were to occur, there is a significant risk that the value of the Debtors' enterprise would be substantially eroded to the detriment of all stakeholders.

The Debtors' future results are dependent upon the successful confirmation and implementation of a plan of reorganization. Failure to obtain this approval in a timely manner could adversely affect the Debtors' operating results, as the Debtors' relations with their customers and suppliers may be harmed by protracted bankruptcy proceedings. Furthermore, the Debtors cannot predict the ultimate amount of all their liabilities that will be subject to a plan of reorganization. Once a plan of reorganization is approved and implemented, the Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders, customers and suppliers to do business with a company that recently emerged from bankruptcy proceedings.

C.      **Claims Estimations**

There can be no assurance that any estimated Claim amounts set forth in this Disclosure Statement are correct. The actual Allowed amount of Claims likely will differ in some respect from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should any underlying assumptions prove incorrect, the actual Allowed amount of Claims may vary from those estimated herein.

D.      **Conditions Precedent to Consummation**

The Plan provides for certain conditions that must be satisfied (or waived) prior to confirmation of the Plan and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

E.      **Inherent Uncertainty of Financial Projections**

The Projections set forth in Appendix B hereto have been prepared by management of the Debtors in consultation with their financial advisors and cover the projected operations of the Reorganized Debtors through fiscal year 2014. These Projections are based on numerous assumptions that are an integral part of the Projections, including confirmation and consummation of the Plan in accordance with its terms, realization of the operating strategy of the Debtors, industry performance, no material adverse changes in applicable legislation or regulations, or the administration thereof, or regulations, exchange rates or generally accepted accounting principles, general business and economic conditions, competition, retention of key management and other key employees, absence of material contingent or unliquidated litigation, indemnity or other claims, and other matters. Certain additional material assumptions are disclosed on Appendix B, and the projections should be read in conjunction with these assumptions.

58

To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and are based on assumptions considered reasonable by the Debtors, the assumptions and estimates underlying the Projections are subject to business, economic and competitive uncertainties and contingencies. Accordingly, the Projections are only the Debtors' educated, good faith estimates and are necessarily contingent in nature. It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and may increase over time. The projected financial information contained herein should not be regarded as a guaranty by the Debtors, the Debtors' advisors or any other Person that the Projections can or will be achieved. However, the Debtors believe that the Projections are credible and that there is a reasonable likelihood that the results set forth in the Projections can be achieved.

**F.     Certain Risk Factors Relating to Securities to be Issued Under the Plan**

1.     No Current Public Market for Securities

The TLC Restructured Notes and the New TLC USA Common Stock that will be issued pursuant to the Plan are securities for which there may be no market.

There is no present intention to register the New TLC USA Common Stock. So long as the New TLC USA Common Stock is not registered under the Exchange Act, the New TLC USA Common Stock will not be listed on a securities exchange or quoted on an interdealer quotation system. Even if the New TLC USA Common Stock were to be registered under the Exchange Act, no assurance can be made that the New TLC USA Common Stock will be listed on a securities exchange or included in an interdealer quotation system. As a result, such securities may be traded only infrequently in transactions arranged through brokers or otherwise, and reliable market quotations for the New TLC USA Common Stock may not be available.

The TLC Restructured Notes will not be listed on any national or regional securities exchange and may be traded only infrequently in transactions arranged through brokers or otherwise, and reliable market quotations for any of the TLC Restructured Notes may not available. A debt security with a small outstanding principal amount available for trading (a small "float"), such as the TLC Restructured Notes, may command a lower price than would a comparable debt security with a greater float. Following consummation of the Plan, Holders of the TLC Restructured Notes may attempt to obtain offers for the TLC Restructured Notes; however, there can be no assurance that any trading market will exist for the TLC Restructured Notes following the consummation of the Plan. The extent of the market for the TLC Restructured Notes following consummation of the Plan will depend upon the number of Holders of the TLC Restructured Notes at such time, the interest in maintaining a market in the TLC Restructured Notes on the part of securities firms, banks, and other lending institutions, and other factors. There can be no assurance that any market in the TLC Restructured Notes will exist and no assurance as to the prices at which the TLC Restructured Notes may trade after the consummation of the Plan.

Accordingly, there can be no assurance as to the development or liquidity of any market for the TLC Restructured Notes or the New TLC USA Common Stock. If a trading market does not develop or is not maintained, Holders of the TLC Restructured Notes and the New TLC USA Common Stock may experience difficulty in reselling such securities or may be

unable to sell them at all. Even if such market were to exist, such securities could trade at prices higher or lower than the value attributed to such securities in connection with their distribution under the Plan, depending upon many factors, including, without limitation, prevailing interest rates, markets for similar securities, industry conditions and the performance of, and investor expectations for, the Reorganized Debtors.

Persons to whom the TLC Restructured Notes and/or the New TLC USA Common Stock are issued pursuant to the Plan may prefer to liquidate their investments rather than hold such securities on a long-term basis. Accordingly, any market that does develop for any of such securities may be volatile. Other factors, such as the restrictions on transferability discussed below and the likelihood that Reorganized TLC USA will not declare dividends for the foreseeable future, may further depress any market for the New TLC USA Common Stock.

    2.      Restrictions on Transfer

If the parties receiving New TLC USA Common Stock enter into a "lock-up" in order to protect certain tax attributes of the Reorganized Debtors, any attempted sale, purchase, transfer, assignment, conveyance, pledge, disposition or other transaction ("Transfer"), without the prior written consent of Reorganized TLC USA's Board of Directors, of any shares of New TLC USA Common Stock to any Person (including a group of Persons making a coordinated acquisition) may be restricted. Further the New Shareholder Agreement may restrict or condition the ability to Transfer shares of New TLC USA Common Stock.

Resales by certain persons who are deemed to be "underwriters" pursuant to section 1145(b) of the Bankruptcy Code will be restricted. For further discussion, see Section VIII.B below.

    3.      Potential Dilution Caused by Additional Grants or Issuances of Reorganized TLC USA Common Stock

If equity interests are granted under the New Management Incentive Plan or the Board of Reorganized TLC USA issues equity securities in the future, such equity interests will dilute the ownership percentage represented by the New TLC USA Common Stock distributed on the Effective Date under the Plan.

In the future, additional equity financings or other share issuances by Reorganized TLC USA could adversely affect the market price of New TLC USA Common Stock. Sales by existing Holders of a large number of shares of New TLC USA Common Stock in the public market or the perception that additional sales could occur could cause the market price of New TLC USA Common Stock to decline. If additional shares of New TLC USA Common Stock are issued, as will be permitted by Reorganized TLC USA's charter, such equity interests will dilute the ownership percentage represented by the New TLC USA Common Stock distributed on the Effective Date under the Plan.

    4.      Dividends

The Reorganized Debtors do not anticipate that cash dividends or other distributions will be paid with respect to the New TLC USA Common Stock in the foreseeable future. In addition, restrictive covenants in certain debt instruments to which Reorganized TLC USA may become a party may limit the ability of Reorganized TLC USA to pay dividends.

4541/74009-001 Current/15961454v9
RLF1 3523585v.2

5.     Change of Control

The Debtors' Articles of Incorporation and Bylaws, the New Debtors Certificates of Incorporation and By-laws, as well as the Delaware General Corporation Law, contain provisions that may have the effect of delaying, deterring or preventing a change in control of the Debtors.

## G.     Competition

The high degree of competition in the Debtors' businesses and the potential for new competitors to enter into those businesses could cause actual results to differ from those expected by the Debtors.

## H.     Cyclicality

There have been occasional general downward trends in the Debtors' industry. While no such general downward trend is anticipated during the period of the Debtors' projections, there can be no assurance that general market conditions relating to the Debtors' services will not impair the Debtors' future financial performance.

## I.     Reliance on Key Personnel

The Debtors operate a business that is highly dependent on skilled employees. A loss of a significant number of key management or sales employees could have a material adverse effect on the Reorganized Debtors.

The Debtors' successful transition through the restructuring process is dependent in part on their ability to retain and motivate their officers and key employees. There can be no assurance that the Reorganized Debtors will be able to retain and employ qualified management and sales personnel.

## J.     Debt Service

The Debtors' business plan projects that the Reorganized Debtors should be able to meet their obligations under the TLC Restructured Notes while growing their businesses and enhancing their cash position. No guaranty can be made, however, that the performance in the business plan will be achieved. Further, if the Reorganized Debtors fall materially short of their business plan, there is no guaranty that they will be able to meet the debt service obligations under the TLC Restructured Notes.

## K.     Litigation

The Reorganized Debtors will be subject to various claims and legal actions arising in the ordinary course of their businesses. The Debtors are not able to predict the nature and extent of any such claims and actions and cannot guarantee that the ultimate resolution of such claims and actions will not have a material adverse effect on the Reorganized Debtors.

## L.     Certain Tax Considerations

There are a number of income tax considerations, risks and uncertainties associated with consummation of the Plan. Interested parties should read carefully the discussions set forth in Article IX regarding certain U.S. federal income tax consequences of the transactions proposed by the Plan to the Debtors and the Reorganized Debtors and to Holders of Claims who are entitled to vote to accept or reject the Plan.

4541/74009-001 Current/15961454v9
RLF1 3523585v.2                                          01/06/2010 12:02 pm

**M.  Post-Emergence Leverage**

While the Debtors believe that they are currently well positioned competitively, and that the Projections contemplate adequate ongoing capital investment to maintain and improve the Reorganized Debtors' competitive position, there can be no assurance that if the Reorganized Debtors materially under-perform their Projections, the leverage represented by any Exit Facility and the TLC Restructured Notes will not have an adverse effect on their businesses.

## VIII.  APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS

It is not currently expected that any registration statement will be filed under the Securities Act or any state securities laws with respect to the issuance or distribution of the TLC Restructured Notes or the New TLC USA Common Stock under the Plan or their subsequent transfer or resale. The Debtors believe that, subject to certain exceptions described below, various provisions of the Securities Act, the Bankruptcy Code and state securities laws exempt from federal and state securities registration requirements with respect to (a) the offer and the sale of such securities pursuant to the Plan and (b) subsequent transfers of such securities.

**A.  Offer and Sale of New Securities Pursuant to the Plan:  Bankruptcy Code Exemption from Registration Requirements**

Holders of certain Allowed Claims will receive certain TLC Restructured Notes and TLC USA Common Stock pursuant to the Plan. Section 1145(a)(1) of the Bankruptcy Code exempts the offer or sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws if three principal requirements are satisfied: (a) the securities must be issued "under a plan" of reorganization by the debtor or its successor under a plan or by an affiliate participating in a joint plan of reorganization with the debtor; (b) the recipients of the securities must hold a pre-petition or administrative expense claim against the debtor or an interest in the debtor; and (c) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or "principally" in such exchange and "partly" for cash or property. In reliance upon this exemption, the Debtors believe that the offer and sale of the TLC Restructured Notes and New TLC USA Common Stock under the Plan will be exempt from registration under the Securities Act and state securities laws.

In addition, the Debtors will seek to obtain, as part of the Confirmation Order, a provision confirming such exemption. Accordingly, such securities may be resold without registration under the Securities Act or other federal securities laws pursuant to an exemption provided by Section 4(1) of the Securities Act, unless the Holder is an "underwriter" (see discussion below) with respect to such securities, as that term is defined under the Bankruptcy Code. In addition, such securities generally may be resold without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the several states. However, recipients of securities issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

**B.  Subsequent Transfers of New Securities**

Section 1145(b) of the Bankruptcy Code defines the term "underwriter" for purposes of the Securities Act as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (a) purchases a claim against, interest in, or claim for an

62

administrative expense in the case concerning, the debtor, if such purchase is with a view to distributing any security received in exchange for such a claim or interest; (b) offers to sell securities offered or sold under a plan for the Holders of such securities; (c) offers to buy securities offered or sold under the plan from the Holders of such securities, if the offer to buy is: (i) with a view to distribution of such securities; and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer" with respect to the securities, as the term "issuer" is defined in Section 2(11) of the Securities Act.

The term "issuer" is defined in Section 2(4) of the Securities Act; however, the reference contained in section 1145(b)(1)(D) of the Bankruptcy Code to Section 2(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. "Control" (as such term is defined in Rule 405 of Regulation C under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor (or its successor) under a plan of reorganization may be deemed to be a "control person," particularly if such management position is coupled with the ownership of a significant percentage of the debtor's (or successor's) voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns at least 10% of the securities of a reorganized debtor may be presumed to be a "control person."

To the extent that persons deemed to be "underwriters" receive TLC Restructured Notes or New TLC USA Common Stock pursuant to the Plan, resales by such persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Such persons would not be permitted to resell such TLC Restructured Notes or New TLC USA Common Stock unless such securities were registered under the Securities Act or an exemption from such registration requirements were available. Entities deemed to be statutory underwriters for purposes of section 1145 of the Bankruptcy Code may, however, be able, at a future time and under certain conditions, to sell securities without registration pursuant to the resale provisions of Rule 144 and Rule 144A under the Securities Act.

Pursuant to the Plan, certificates evidencing TLC Restructured Notes or New TLC USA Common Stock received by a Holder of ten percent (10%) of any class of such securities will bear a legend substantially in the form below:

THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE, OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

Whether or not any particular person would be deemed to be an "underwriter," or an "affiliate" of the Reorganized Debtors, would depend upon various facts and circumstances

4541/74009-001 Current/15961454v9
RLF1 3523585v.2

applicable to that person. Accordingly, the Debtors express no view as to whether any such person would be such an "underwriter" or "affiliate." **Persons who receive securities under the Plan are urged to consult their own legal advisor with respect to the restrictions applicable under Rule 144 and the circumstances under which such securities may be sold in reliance upon such Rule.**

**In each of the provinces of Canada either a resale exemption is available or application may be made for an exemption from the relevant first trade restrictions in order for the securities issued under the Plan to be freely tradable by Canadian Holders through an exchange or a market outside of Canada or to a person or company outside of Canada.**

THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT HEREBY PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE TLC RESTRUCTURED NOTES OR THE NEW TLC USA COMMON STOCK, OR THE BANKRUPTCY MATTERS DESCRIBED HEREIN. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, THE DEBTORS ENCOURAGE EACH CREDITOR AND PARTY-IN-INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, THE DEBTORS MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE TLC RESTRUCTURED NOTES OR THE NEW TLC USA COMMON STOCK.

## IX.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

THE FOLLOWING DISCUSSION SUMMARIZES CERTAIN ANTICIPATED U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE TRANSACTIONS PROPOSED BY THE PLAN TO THE DEBTORS AND HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN. THIS SUMMARY IS PROVIDED FOR INFORMATION PURPOSES ONLY AND IS BASED ON THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), TREASURY REGULATIONS PROMULGATED THEREUNDER, JUDICIAL AUTHORITIES, AND CURRENT ADMINISTRATIVE RULINGS AND PRACTICE, ALL AS IN EFFECT AS OF THE DATE HEREOF AND ALL OF WHICH ARE SUBJECT TO CHANGE OR DIFFERING INTERPRETATION, POSSIBLY WITH RETROACTIVE EFFECTS THAT COULD ADVERSELY AFFECT THE U.S. FEDERAL INCOME TAX CONSEQUENCES DESCRIBED BELOW.

THIS SUMMARY DOES NOT ADDRESS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF ITS PARTICULAR FACTS AND CIRCUMSTANCES OR TO CERTAIN TYPES OF HOLDERS OF CLAIMS SUBJECT TO SPECIAL TREATMENT UNDER THE CODE (FOR EXAMPLE, NON-U.S. TAXPAYERS, FINANCIAL INSTITUTIONS, BROKER-DEALERS, INSURANCE COMPANIES, TAX-EXEMPT

64

ORGANIZATIONS, AND THOSE HOLDING CLAIMS THROUGH A PARTNERSHIP OR OTHER PASS-THROUGH ENTITY). IN ADDITION, THIS SUMMARY DOES NOT DISCUSS ANY ASPECTS OF STATE, LOCAL, OR NON-U.S. TAXATION AND DOES NOT ADDRESS THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS THAT ARE UNIMPAIRED UNDER THE PLAN, HOLDERS OF CLAIMS THAT ARE NOT ENTITLED TO VOTE UNDER THE PLAN, AND HOLDERS OF CLAIMS THAT ARE NOT ENTITLED TO RECEIVE OR RETAIN ANY PROPERTY UNDER THE PLAN.

THE TAX RULES DESCRIBED HEREIN ARE COMPLEX AND THEIR APPLICATION IS UNCERTAIN IN CERTAIN RESPECTS. EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE TAX CONSEQUENCES (INCLUDING STATE, LOCAL AND NON-U.S.) OF THE PLAN TO SUCH HOLDER.

A SUBSTANTIAL AMOUNT OF TIME MAY ELAPSE BETWEEN THE DATE OF THIS DISCLOSURE STATEMENT AND THE RECEIPT OF A FINAL DISTRIBUTION UNDER THE PLAN. EVENTS SUBSEQUENT TO THE DATE OF THIS DISCLOSURE STATEMENT, SUCH AS ADDITIONAL TAX LEGISLATION, COURT DECISIONS, OR ADMINISTRATIVE CHANGES, COULD AFFECT THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREUNDER. NO RULING HAS BEEN OR IS EXPECTED TO BE SOUGHT FROM THE INTERNAL REVENUE SERVICE (THE "IRS") WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN OR IS EXPECTED TO BE OBTAINED BY THE DEBTORS WITH RESPECT THERETO.

**To ensure compliance with United States Internal Revenue Service Circular 230, (a) any discussion of U.S. federal tax issues in this Disclosure Statement is not intended or written to be relied upon, and cannot be relied upon by Holders, for purposes of avoiding penalties that may be imposed on such Holders under the Code; (b) such discussion is written to support the promotion of the Plan; and (c) each Holder of a claim should seek advice based on such Holder's particular circumstances from an independent tax advisor.**

A.    **U.S. Federal Income Tax Consequences to the Debtors**

1.    Consolidated Group and Net Operating Losses

TLC USA is the common parent corporation of an affiliated group of corporations that files a consolidated tax return for U.S. federal income tax purposes (the "TLC USA Consolidated Group"). TLC USA is the borrower under the Credit Agreement. TLC Canada, a Canadian corporation which currently owns all of the stock of TLC USA, and the subsidiaries of TLC USA are guarantors under this agreement. The TLC USA Consolidated Group has net operating losses ("NOLs") of $206 million through December 31, 2008 that were incurred by the group. Of this amount, the utilization of approximately $14 million of the NOLs is not subject to any limitation under Section 382 of the Code ("Section 382"), the utilization of approximately $124 million of the NOLs is subject to limitations under Section 382 that permit approximately $8 million of NOLs to be utilized per year for the five-year period following the ownership change in February 2008 and approximately $5.5 million of NOLs to be utilized per year

65

thereafter, and the utilization of approximately $68 million of the NOLs is severely limited. (See "Utilization of NOLs and Net Unrealized Built-In Losses" below.)

2.     Cancellation of Indebtedness Income

Under the Code, a taxpayer generally recognizes cancellation of indebtedness ("COD") income in an amount equal to the difference between the "adjusted issue price" of the indebtedness discharged and the sum of (i) the amount of any cash, (ii) the "issue price" of any new debt instruments, and (iii) the fair market value of any stock or other property, transferred in satisfaction of the discharged indebtedness. COD income also includes any interest payable on the debt exchanged that the taxpayer deducted on the accrual method of accounting but remains unpaid at the time the indebtedness is discharged. COD income generally does not include the discharge of indebtedness to the extent payment of the liability would give rise to a deduction.

TLC USA will realize COD income upon the issuance of the TLC Restructured Notes and New TLC USA Common Stock in satisfaction of the Prepetition Lender Secured Claims to the extent the issue price of the Prepetition Lender Secured Claims (plus any accrued but unpaid interest that has been deducted for tax purposes) exceeds the sum of the issue price of the TLC Restructured Notes (as discussed under "Original Issue Discount; Applicable High Yield Discount Obligation Provisions" below) and the fair market value of the New TLC USA Common Stock issued therefor. If the issue price of the TLC Restructured Notes equals their principal amount, TLC USA estimates that it will realize COD income of approximately $25 million from the satisfaction of the Prepetition Lender Secured Claims, before taking into account the fair market value of the New TLC USA Common Stock as a result of the restructuring. If the issue price of the TLC Restructured Notes is less than their principal amount, TLC USA will realized additional COD income.

TLC USA may also realize COD income upon the satisfaction of General Unsecured Claims in an amount equal to the excess of the amount of the claims over the cash paid, to the extent that payment of the unpaid claims would not give rise to a deduction.

Taxpayers that realize COD income generally are required to include such amounts in gross income for purposes of determining their U.S. federal income tax for the year of debt discharge. However, because TLC USA is under the jurisdiction of a bankruptcy court in a title 11 case, it will not be required to include the COD income in its gross income. Instead, TLC USA will be required to reduce certain tax attributes (e.g., NOLs, general business credit carryovers and tax basis in property (collectively with NOLs, "Tax Attributes")) by the amount of the COD income excluded from gross income. The reduction in Tax Attributes occurs as of the first day of the taxable year following the taxable year in which such COD income is realized. While the issue is not free from doubt, TLC USA believes that its COD income will reduce NOLs the utilization of which is currently subject to significant limitation under Section 382 .

An election is available to defer the recognition of COD income for exchanges occurring in 2009 or 2010. Pursuant to the election, for exchanges occurring in 2009, COD income is deferred until the fifth taxable year following the taxable year in which the exchange creating the COD income occurs. Beginning in that fifth taxable year, the deferred COD income would be includable in the debtor's gross income ratably over a five year period. Once made, this election is irrevocable and the exclusion of COD income from gross income for companies

66

under the jurisdiction of the Bankruptcy Court in title 11 cases described above would not be available (and the reduction in Tax Attributes would not apply). TLC USA does not expect to make this election.

3.    Utilization of NOLs and Net Unrealized Built-In Losses

In general, when a corporation undergoes an "ownership change," generally a more than 50 percent increase in the ownership of stock of the common parent by five-percent shareholders at any time during a rolling three year testing period, Section 382 limits the corporation's ability to utilize its NOLs and if, at the time of the ownership change, the corporation has a net unrealized built-in loss in its assets (i.e., where the tax basis in its assets exceeds their fair market value by more than the lesser of $10 million or 15 percent of the fair market value of its assets), to deduct its built-in losses upon the sale or depreciation of those assets during the five-year period following the ownership change.

Due to heavy trading in TLC Vision's common stock leading up to the commencement of these cases, it is possible that TLC USA has already undergone an ownership change. If it has not already done so, TLC USA will undergo an ownership change as a result of the consummation of the Plan. In addition to the TLC USA Consolidated Group's NOLs, it anticipates that the TLC USA Consolidated Group will have a net unrealized built-in loss in its assets at that time. The annual limitation on a corporation's use of its NOLs and the deduction of its recognized built-in losses (as discussed above) following an "ownership change" is generally equal to the product of the value of the stock of the corporation (with certain adjustments) immediately before the ownership change and the applicable "long-term tax-exempt rate" (currently 4.14 percent for ownership changes occurring in January 2010). For these purposes, the annual Section 382 limitation and built-in losses generally are determined on a consolidated group basis as though the consolidated group were one entity.

Section 382 provides an exception from the application of the annual Section 382 limitation for a corporation under the jurisdiction of a court in a title 11 case if shareholders and certain eligible creditors immediately prior to the ownership change own 50 percent or more of the stock of the corporation (as a result of being shareholders or creditors prior to the ownership change) immediately thereafter, provided the corporation does not elect out of this exception (the "Bankruptcy Exception"). For purposes of determining whether the Bankruptcy Exception is available, options held by persons who are not pre-change shareholders and eligible creditors (e.g., options held by management) at the time of the ownership change are deemed exercised, if as a result of such exercise the Bankruptcy Exception would not be satisfied. To be an eligible creditor, in general, the claim held by such creditor must have arisen in the ordinary course of business (e.g., a trade creditor) or the claim must be owned by the same beneficial owner since the date that is 18 months before the date of the filing of the title 11 case. Under a special rule, a corporation may treat a claim as always having been owned by the beneficial owner of the claim immediately before the ownership change if the beneficial owner is not, immediately after the ownership change, a five-percent shareholder (or an entity through which a five-percent shareholder holds an ownership interest) and the beneficial owner is not a person whose participation in formulating a plan of reorganization makes evident to the corporation (whether or not the corporation has previous knowledge) that the person has not owned the indebtedness for the requisite period.

67

If TLC USA is able to apply the Bankruptcy Exception, there will be no annual limitation on the use of pre-change NOLs or built-in losses to offset post-change income on account of consummation of the Plan; however, the amount of pre-change NOLs available to be carried over to a post-Effective Date year will be reduced by the amount of interest that had been deducted on the debt exchanged for New TLC USA Common Stock during the taxable year of the Effective Date of the Plan and during the three preceding taxable years. If the Bankruptcy Exception applies and TLC USA experiences a second ownership change within two years, the Section 382 limitation will be zero.

If the Bankruptcy Exception does not apply or is not applied, a special rule under Section 382 applicable to corporations under the jurisdiction of a court in a title 11 case will apply in calculating the appropriate annual Section 382 limitation. Under this special rule, the annual Section 382 limitation will be calculated by reference to the value of New TLC USA Common Stock (with certain adjustments) immediately after the Effective Date, i.e., taking into account the exchange of debt for new debt and common stock (as opposed to immediately before the Effective Date).

TLC USA is analyzing whether it will be eligible for the Bankruptcy Exception. Because TLC USA's current shareholder will not retain any stock in the corporation under the Plan, whether TLC USA is eligible for this exception will likely depend on the percentage of Prepetition Lender Secured Claims that are held by beneficial owners that have held, or are deemed under the applicable Treasury Regulations to have held, such claims for at least 18 months prior to the date of the bankruptcy filing. If TLC USA is eligible for the Bankruptcy Exception, it expects to utilize it, because otherwise the utilization of the NOLs of its consolidated group and the deduction of built-in losses of its consolidated group, such as depreciation, realized during the five year period following the Effective Date of the Plan will be effectively eliminated due to the Section 382 limitation.

4. U.S. Federal Alternative Minimum Tax

The TLC USA Consolidated Group may be subject to the alternative minimum tax (the "AMT") which imposes a tax equal to the amount by which 20 percent of the group's alternative minimum taxable income ("AMTI") exceeds the group's regular tax liability. AMTI is calculated pursuant to specific rules in the Code which eliminate or limit the availability of certain tax deductions and which include as income certain amounts not generally included in computing the corporation's regular tax liability. However any COD income excluded from regular taxable income, as described above, will also be excluded from AMTI.

Additionally, a consolidated group with a net unrealized built-in loss in its assets that undergoes an ownership change, within the meaning of Section 382, must adjust the tax basis of its assets for AMT purposes to their fair market values. It appears that this basis adjustment is required for AMT purposes even if the Bankruptcy Exception is utilized. As stated above, TLC USA expects that its consolidated group will have a net unrealized built-in loss in its assets on the Effective Date of the Plan, and therefore basis reduction, for AMT purposes, with respect to built-in loss assets will be required.

AMT paid by a corporation will generally be allowed as a nonrefundable credit against its regular federal income tax liability in future tax years when the corporation is subject to regular federal income tax.

68

5.    Original Issue Discount; Applicable High Yield Discount Obligation Provisions.

An obligation generally is treated as issued with OID if its "stated redemption price at maturity" exceeds its issue price by more than a *de minimis* amount. "Stated redemption price at maturity" is the total of all payments provided for by the obligation that are not payments of "qualified stated interest." "Qualified stated interest" only includes stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually at a specified rate, which may include a specified variable rate such as LIBOR.

Therefore, in the absence of the application of the "publicly traded debt instrument" rules (discussed below), the New Tranche A Senior Secured Notes should not be treated as issued with OID because their issue price will not be less than their stated redemption price at maturity. However, the New Tranche B Junior Secured Notes should be treated as issued with OID, even in the absence of the application of the "publicly traded debt instrument" rules, because TLC USA may satisfy, at its option, the obligation to pay a portion of the interest due through issuing additional notes for up to eight quarterly interest payments. As a result, the portion of the interest subject to this option (4 percent) on the New Tranche B Junior Secured Notes will not be treated as qualified stated interest and the stated redemption price will therefore include these amounts. Since the New Tranche B Junior Secured Notes will be treated as having OID, OID will accrue daily, on a constant yield basis, and TLC USA generally will be entitled to a deduction for amounts of OID accrued on the New Tranche B Junior Secured Notes.

The issue price of the TLC Restructured Notes may depend upon whether, during the 60-day period ending 30 days after the TLC Restructured Notes are issued, either such notes or the debt underlying the Prepetition Lender Secured Claims is "publicly traded" as defined by the applicable Treasury Regulations. A debt instrument will be considered "publicly traded" if (i) it is listed on a securities exchange or similar market, (ii) it is traded on either a board of trade designated as a contract market by the Commodities Futures Trading Commission or on an interbank market, (iii) it appears on a system of general circulation that provides a reasonable basis to determine fair market value by disseminating either recent price quotations (including rates, yields, or other pricing information) of one or more identified brokers, dealers, or traders or actual prices (including rates, yields, or other pricing information) of recent sales transactions or (iv) price quotations are readily available from dealers, brokers or traders unless no other outstanding debt of the issuer or any guarantor is described in clause (i), (ii) or (iii). There is very little authority interpreting the application of these rules.

If the TLC Restructured Notes are considered publicly traded, the issue price of such notes will be based on their fair market value on the first date a substantial amount of the notes is issued. On the other hand, if the TLC Restructured Notes are not treated as publicly traded, but the Prepetition Lender Secured Claims are considered publicly traded, the issue price of the TLC Restructured Notes will be based on the fair market value of the Prepetition Lender Secured Claims on the first date a substantial amount of the TLC Restructured Notes is issued for such claims. If the application of these rules causes the issue price of the New Tranche A Senior Secured Notes to be less than their principal amount, the notes will be treated as issued with OID (unless the notes are treated as issued with a de minimis amount of OID) or causes the issue price of the New Tranche B Junior Secured Notes to be less than their principal amount, the notes will be treated as issued with additional OID.

69

Section 163(e)(5) of the Code defers the deduction of OID until it is paid by a corporate issuer of a certain type of debt instrument referred to as an applicable high yield discount obligation (an "AHYDO"). In addition, if the yield to maturity on an AHYDO is above the "applicable federal rate" plus six percentage points, the AHYDO rules also permanently disallow the deduction by the issuer of the portion of the OID above this yield. A debt instrument is an AHYDO if its maturity date is more than five years from the date of issue, its yield to maturity exceeds the sum of the applicable federal rate for debt instruments with its term for the month of issue and five percentage points, and it has "significant OID". Significant OID will exist if, before the close of any accrual period more than five years from the date of issue, the amount of income includable with respect to the debt instrument exceeds the sum of the interest to be paid under the debt instrument and the product of the issue price and the yield to maturity of such debt instrument. The American Recovery and Reinvestment Act of 2009 amended Section 163(e)(5) to suspend temporarily the application of the AHYDO rules to any debt obligation issued in a debt-for-debt exchange before January 1, 2010, as long as the new debt instrument is not issued in exchange for an AHYDO and is not issued to a related party within the meaning of Section 108(e)(4) of the Code. TLC USA believes that the Prepetition Lender Secured Claims are not subject to the AHYDO rules.

In no event will the New Tranche A Senior Secured Notes be an AHYDO because their term will not be more than five years. If the Effective Date of the Plan is before January 1, 2010, the New Tranche B Junior Secured Notes will not be subject to the AHYDO provisions (provided that no Holder of this debt is a related party). However, if the Effective Date of the Plan is on or after January 1, 2010, the application of the AHYDO provisions to the New Tranche B Junior Secured Notes will depend upon the applicable federal rate at the time this debt is issued and its issue price (as discussed above).

**B.    U.S. Federal Income Tax Consequences to Claim Holders**

1.    Holders of Prepetition Lender Secured Claims (Classes A4, B3 and C5)

General. The exchange of the Prepetition Lender Secured Claims for TLC Restructured Notes and New TLC USA Common Stock should be treated as a significant modification of the existing debt under applicable Treasury Regulations because of the delayed date of maturity of, and modified interest rate on, the TLC Restructured Notes as compared to the term and revolver loan portions of the existing debt. Therefore, unless the exchange is a recapitalization qualifying as a reorganization under Section 368(a)(1)(E) of the Code as discussed below, the exchange will be a fully taxable transaction.

Under the rules applicable to recapitalizations qualifying as reorganizations, holders will not recognize any gain or loss on the exchange, except holders may recognize gain, but not loss, where consideration other than securities is also received. In the case of securities held as capital assets, gain recognized in connection with such a recapitalization generally will be treated as capital gain, and will be long-term capital gain if the securities were held for more than one year at the time of the exchange, except to the extent that any gain is treated as ordinary income under the "market discount" rules discussed below. In addition, ordinary interest income may be recognized to the extent of accrued interest not previously included in income. No loss may be recognized as a result of such a recapitalization.

70

On the other hand, if the exchange is a fully taxable transaction, rather than a recapitalization qualifying as a reorganization, a Holder will recognize gain or loss equal to the difference between the amount realized on the exchange and the Holder's tax basis in the property exchanged. In the case of property held as a capital asset, gain or loss recognized on the exchange will be treated as capital gain or loss, and will be long-term capital gain or loss if the property has been held for more than one year at the time of the exchange, except to the extent any gain is treated as ordinary income under the market discount rules discussed below. In addition, ordinary interest income may be recognized to the extent of accrued interest not previously included in income. The deductibility of capital loss is subject to limitations.

Whether the exchange of the term loan portion of the Prepetition Lender Secured Claims or the exchange of the revolving loan portion of the Prepetition Lender Secured Claims for the TLC Restructured Notes and the New TLC USA Common Stock will be a recapitalization qualifying as a reorganization will depend upon whether the term loans or revolver loans, respectively, constitute "securities" for tax purposes. Because the New TLC USA Common Stock will constitute a security, if the term loans or the revolver loans are securities, as the case may be, the exchange will be a recapitalization qualifying as a reorganization even if the TLC Restructured Notes are not treated as securities. It is not likely that the transaction will be bifurcated and treated as separate exchanges of Prepetition Lender Secured Claims for New TLC USA Common Stock and Prepetition Lender Secured Claims for TLC Restructured Notes.

A debt instrument constitutes a security if, based on all the facts and circumstances, the instrument represents a meaningful investment in the issuer of the instrument. Although there are a number of factors that may affect the determination of whether a debt instrument is a security, one of the most important factors is the original term of the instrument, or the length of time between the issuance of the instrument and its maturity. Generally, corporate debt instruments with an original term of less than five years are not considered securities, while corporate debt instruments with an original term of ten years or more are considered securities. Whether a debt instrument with a term of five years or more, but less than ten years, is a security is unclear.

The Prepetition Lender Secured Claims had an original weighted average term to maturity of over five years, but less than six years, with respect to the term loan portion of the debt and five years with respect to the revolver loan portion of the debt. If a significant modification of the loans occurred upon Amendment No. 1 to the Credit Agreement on February 28, 2008, the term of the revolver loan portion decreased to less than five years. The Internal Revenue Service has published a revenue ruling, involving a situation where a significant modification occurred in a merger on the exchange of target securities (with two years remaining to maturity) for equivalent acquiring corporation securities with a modified interest rate, concluding that the "new" debt resulting from a deemed exchange retained its status as a security, despite there being only two years remaining until maturity at the time of the exchange. While the scope of this revenue ruling is uncertain, it supports the view that the 2008 modification should not affect the treatment of the Prepetition Lender Secured Claims as securities if they would otherwise be treated as securities. The TLC Restructured Notes have original terms of five years for the New Tranche A Senior Secured Notes and seven years for the New Tranche B Junior Secured Notes.

71

If the term loan portion of the Prepetition Lender Secured Claims is treated as a security, a Holder should not recognize gain or loss on the exchange except that a Holder may recognize gain (but not loss) with respect to the receipt of New Tranche A Senior Secured Notes or New Tranche B Junior Secured Notes to the extent that either or both notes are not treated as securities. The amount of gain recognized will not exceed the lesser of (i) the gain realized on the exchange or (ii) the fair market value of the TLC Restructured Note not treated as a security. For this purpose, the Internal Revenue Service may assert that the fair market value equals the note's issue price. If the revolver loan portion of the Prepetition Lender Secured Claims is treated as a security, the tax consequences will be the same as those described with respect to the term loan portion of the Prepetition Lender Secured Claims.

Where both the Prepetition Lender Secured Claims and the TLC Restructured Notes are treated as securities, a Holder of a Prepetition Lender Secured Claim will have an initial tax basis in the TLC Restructured Notes and New TLC USA Common Stock equal to such Holder's adjusted tax basis in the Prepetition Lender Secured Claims surrendered, and will have a holding period in the TLC Restructured Notes and New TLC USA Common Stock that includes such Holder's holding period in the securities. Basis will be apportioned among the notes and the common stock based on their relative fair market values. For this purpose, the Internal Revenue Service may assert that the fair market value of the notes equals their issue price. If the New Tranche A Senior Secured Notes and/or the New Tranche B Junior Secured Notes are not treated as securities, a Holder will take an initial tax basis in such notes equal to their fair market value, although the Internal Revenue Service may assert that fair market value equals the notes' issue price for this purpose, and a Holder's holding period in such notes will begin the day after they are received. In the event that a New Tranche B Junior Secured Note is treated as a security, but the New Tranche A Senior Secured Note is not, the tax basis of the New Tranche B Junior Secured Note and the New TLC USA common stock (apportioned among them as discussed above) will be equal to the adjusted tax basis in the Prepetition Secured Claims surrendered, increased by any gain recognized on the exchange and decreased by the basis of the New Tranche A Senior Secured Note.

On the other hand, if the term loan portion of the Prepetition Lender Secured Claims is not treated as a security, a Holder will recognize gain or loss equal to the difference between the amount realized on the exchange and the Holder's tax basis in the term loan portion of the Prepetition Lender Secured Claims. The amount realized will be equal to the sum of the issue price of the TLC Restructured Notes and the fair market values of the New TLC USA Common Stock received on the exchange. If the revolver loan portion of the Prepetition Lender Secured Claims is not treated as a security, the tax consequences will be the same as those described with respect to the term loan portion of the Prepetition Lender Secured Claims.

Where the exchange is a fully taxable transaction, a Holder's tax basis in the TLC Restructured Notes will be equal to their issue price and the Holder's tax basis in the New TLC USA Common Stock will be equal to its fair market value. The holding period for such notes and stock will begin the day after such property is received.

While the issue is not free from doubt, TLC USA believes that the Prepetition Lender Secured Claims and the TLC Restructured Notes should be treated as securities and the exchange of Prepetition Lender Secured Claims for TLC Restructured Notes and New TLC USA Common Stock should be treated as a recapitalization qualifying as a reorganization and it

72

intends to report the transaction in this manner on its tax return for the year in which the Plan becomes effective. See "Information Reporting and Backup Withholding" below.

Accrued Interest. The Plan provides that the consideration distributed to Holders of the Prepetition Lender Secured Claims is entirely attributed to unpaid principal and no consideration is attributed to accrued but unpaid interest. However, the manner in which consideration is allocated between accrued but unpaid interest and principal for U.S. federal income tax purposes in connection with a debt restructuring under which the full amount of the principal of the debt is not repaid is unclear under present law. If any consideration were attributed to accrued but unpaid interest, a Holder of Prepetition Lender Secured Claims would be required to recognize such consideration as ordinary income if such interest income had not already been included in income by the Holder.

Market Discount. A holder having accrued market discount (as defined below) with respect to a debt instrument is generally required to include such market discount as ordinary income upon the disposition of such debt instrument. However, if the exchange of the Prepetition Lender Secured Claims for the TLC Restructured Notes and New TLC USA Common Stock is treated as a recapitalization qualifying as a reorganization and the TLC Restructured Notes are treated as securities, as discussed above, a Holder that acquired a Prepetition Lender Secured Claim at a market discount generally will carry forward the market discount accrued during the Holder's period of ownership of such claim to the TLC Restructured Notes and New TLC USA Common Stock (unless such Holder elected to include the market discount in income as it accrued). "Market discount" is defined as the amount by which a holder's tax basis in a debt instrument immediately after its acquisition (other than on original issuance) is exceeded by the adjusted issue price of the debt instrument at such time (subject to a de minimis exception).

Such accrued market discount carried forward will be recognized in accordance with the market discount rules as payments are received on a later payment of principal or disposition of the TLC Restructured Notes or on a disposition of the New TLC USA Common Stock. If the Prepetition Lender Secured Claims or the TLC Restructured Notes are treated as "publicly traded" with the result that the issue price of the TLC Restructured Notes is less than the stated principal amount of the notes (see "Original Issue Discount; Applicable High Yield Discount Obligation Provisions" above), any accrued market discount on the Prepetition Lender Secured Claims that is carried forward onto the TLC Restructured Notes is limited to the difference between the issue price and the Holder's tax basis in the TLC Restructured Notes.

OID With Respect to the TLC Restructured Notes. As discussed above (under "Original Issue Discount; Applicable High Yield Discount Obligation Provisions), the New Tranche B Junior Secured Notes should be treated as issued with OID in an amount equal to the excess of its "stated redemption price at maturity" over its issue price. OID accrues daily, on a constant yield basis. The amount of OID includable in income by a Holder of the New Tranche B Junior Secured Notes is the sum of the daily portions of OID that have accrued with respect to each day during the taxable year on which the Holder held such note. Accordingly, Holders may have to include OID in income before the receipt of cash attributable to such income. As discussed above, the "public trading" of the Prepetition Lender Secured Claims or the TLC Restructured Notes may result in the creation of OID for the New Tranche A Senior Secured Notes and additional OID for the New Tranche B Junior Secured Notes.

73

## C.    Other Tax Matters

### 1.    Information Reporting and Backup Withholding

Certain payments, including certain distributions pursuant to the Plan, payments of interest on the TLC Restructured Notes, payments of dividends, if any, on the New TLC USA Common Stock and the proceeds from the sale or other taxable disposition of the TLC Restructured Notes or the New TLC USA Common Stock, may be subject to information reporting to the IRS. Moreover, such reportable payments may be subject to backup withholding (at the then applicable rate (currently 28 percent)) unless the taxpayer: (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (ii) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income. TLC USA and any "significant holder" of Prepetition Lender Secured Claims, defined as a holder of securities in TLC USA with a tax basis of $1 million or more, that believes the exchange is a recapitalization qualifying as a reorganization are required, pursuant to Treasury Regulations, to include a statement with their tax returns for the taxable year of the exchange setting forth information, as specified in the Treasury Regulations, pertaining to the reorganization. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.

### 2.    Importance of Obtaining Professional Tax Assistance

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS SHOULD CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

4541/74009-001 Current/15961454v9
RLF1 3523585v.2

01/06/2010 12:02 pm

# X.    FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS

## A.    Feasibility of the Plan

In connection with confirmation of the Plan, the Bankruptcy Court will be required to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors.

To support their belief in the feasibility of the Plan, the Debtors have prepared and relied upon the Projections, which are annexed to this Disclosure Statement as <u>Appendix B</u>.

The Projections indicate that the Reorganized Debtors should have sufficient cash flow to pay and service their debt obligations and to fund their operations. Accordingly, the Debtors believe that the Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

The Projections were developed by Senior Management in consultation with the Debtors' financial advisor. Collectively, Senior Management possesses decades of experience in the Debtors' industry, and the Projections rely, in part, on the judgment developed through that experience. In addition, they are based on Senior Management's knowledge of the Debtors' businesses and customers, and by reference to publicly available projections for industry revenue growth.

The Projections, however, are based upon numerous assumptions that are an integral part of the Projections, including, without limitation, confirmation and consummation of the Plan in accordance with its terms, realization of the Debtors' operating strategy for the Reorganized Debtors, industry performance, no material adverse changes in applicable legislation or regulations, or the administration thereof, exchange rates or generally accepted accounting principles, general business and economic conditions, competition, absence of material contingent or unliquidated litigation, indemnity or other claims, and other matters. To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and the assumptions on which they are based are considered reasonable by the Debtors, the assumptions and estimates underlying the Projections are subject to business, economic and competitive uncertainties and contingencies. Accordingly, the Projections are only an educated, good faith estimate and are necessarily contingent in nature. It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and may be adverse. The Projections should therefore not be regarded as a guaranty by the Debtors or any other Person that the results set forth in the Projections will be achieved. The Projections were prepared by the Debtors, and not by any of their creditors, and the Debtors' creditors make no representations concerning the reasonableness of the Projections. In light of the foregoing, readers are cautioned not to place undue reliance on the Projections. The projected financial information contained herein and in the Projections should not be regarded as a representation or warranty by the Debtors, the Debtors' advisors or any other Person that the Projections can or will be achieved. The Projections should be read together with the assumptions set forth in the Projections and information in <u>Article VII</u> of this Disclosure Statement entitled "Certain Risk Factors to be Considered," which sets forth important factors that could cause actual results to

75

differ from those in the Projections. The Debtors, however, believe that the Projections are credible and that there is a reasonable likelihood that the results set forth in the Projections can be achieved.

The Debtors do not intend to update or otherwise revise the Projections, including any revisions to reflect events or circumstances existing or arising after the date of the Projections or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition. Furthermore, the Debtors do not intend to update or revise the Projections to reflect changes in general economic or industry conditions.

SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995: This Disclosure Statement and the financial projections contained herein and in the Projections include "forward-looking statements" within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act. All statements other than statements of historical fact included in this Disclosure Statement are forward-looking statements, including, without limitation, financial projections, the statements, and the underlying assumptions, regarding the timing of, completion of and scope of the current restructuring, the Plan, debt and equity market conditions, the cyclicality of the Debtors' industry, current and future industry conditions, the potential effects of such matters on the Debtors' business strategy, results of operations or financial position, the adequacy of the Debtors' liquidity and the market sensitivity of the Debtors' financial instruments. The forward-looking statements are based upon current information and expectations. Estimates, forecasts and other statements contained in or implied by the forward-looking statements speak only as of the date on which they are made, are not guarantees of future performance and involve certain risks, uncertainties and assumptions that are difficult to evaluate and predict. Although the Debtors believe that the expectations reflected in the forward-looking statements are reasonable, parties are cautioned that any such forward-looking statements are not guarantees of future performance, and involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements. Certain important factors that could cause actual results to differ materially from the Debtors' expectations or what is expressed, implied or forecasted by or in the forward-looking statements include developments in the Chapter 11 Cases, adverse developments in the timing or results of the Debtors' business plan (including the time line to emerge from chapter 11), the timing and extent of changes in economic conditions, industry capacity and operating rates, the supply-demand balance for the Debtors' services, competitive products and pricing pressures, federal and state regulatory developments, the Debtors' financial leverage, motions filed or actions taken in connection with the bankruptcy proceedings, the availability of skilled personnel, the Debtors' ability to attract or retain high quality employees and operating hazards attendant to the industry. Additional factors that could cause actual results to differ materially from the Projections or what is expressed, implied or forecasted by or in the forward-looking statements are stated herein in cautionary statements made in conjunction with the forward-looking statements or are included elsewhere in this Disclosure Statement.

**B.     Acceptance of the Plan**

As a condition to Confirmation, the Bankruptcy Code requires that each Class of Impaired Claims vote to accept the Plan, except under certain circumstances.

4541/74009-001 Current/15961454v9
RLF1 3523585v.2

01/06/2010 12:02 pm

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the Plan. Thus, Holders of Claims in each of Classes A4, A5, A6, B3, B4 and C5 will have voted to accept the Plan only if two-thirds (⅔) in amount and a majority in number of the Claims actually voting in each Class cast their ballots in favor of acceptance. Holders of Claims who fail to vote are not counted as either accepting or rejecting the Plan.

## C.    Best Interests Test

As noted above even if a plan is accepted by each class of claims and interests, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the best interests of all holders of claims or interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor were liquidated under chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its chapter 11 case were converted to a chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 cases and the chapter 11 cases. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid administrative expenses incurred by the debtors in their chapter 11 cases that are allowed in the chapter 7 cases, litigation costs and claims arising from the operations of the debtor during the pendency of the chapter 11 case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity security interests. The liquidation would also prompt the rejection of a large number of executory contracts and unexpired leases and thereby significantly enlarge the total pool of unsecured claims by reason of resulting rejection damages claims.

Once the bankruptcy court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such

77

creditors and equity security holders under the plan, then the plan is not in the best interests of creditors and equity security holders.

**D.      Liquidation Analysis**

For purposes of the best interests test, in order to determine the amount of liquidation value available to Creditors, the Debtors, with the assistance of their financial advisors, prepared a liquidation analysis, annexed hereto as <u>Appendix C</u> (the "<u>Liquidation Analysis</u>"), which concludes that in a chapter 7 liquidation, [____] would receive [____]. The Plan, which proposes to distribute [____] to [____], thus proposes to distribute more to these classes than the Debtors believe they would receive in a chapter 7 liquidation. These conclusions are premised upon the assumptions set forth in <u>Appendix C</u>, which the Debtors believe are reasonable.

The Debtors believe that any liquidation analysis with respect to the Debtors is inherently speculative. The Liquidation Analysis for the Debtors necessarily contains estimates of the net proceeds that would be received from a forced sale of assets and/or business units, as well as the amount of Claims that would ultimately become Allowed Claims. Claims estimates are based solely upon the Debtors' books and records. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis. In preparing the Liquidation Analysis, the Debtors have projected an amount of Allowed Claims that represents their best estimate of the chapter 7 liquidation dividend to Holders of Allowed Claims. The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan.

**E.      Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Valuation**

It is impossible to determine with certainty the value each Holder of a Prepetition Lender Secured Claim will receive under the Plan as a percentage of any Allowed Claim. This difficulty in estimating the value of recoveries for such Holders is primarily due to the difficulty in assessing the market for the New TLC USA Common Stock and predicting whether and for how long the Holders will hold the New TLC USA Common Stock.

Notwithstanding the difficulty in quantifying recoveries with precision, the Debtors believe that the financial disclosures and projections contained herein imply a greater recovery to Holders of Claims in Impaired Classes than the recovery available in a chapter 7 liquidation. Accordingly, the Debtors believe that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied.

**F.      Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative**

In the event any Class of Impaired Claims rejects the Plan, the Debtors may seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code.

Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. The Bankruptcy Court may confirm a plan at the request of a debtor if

the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the plan. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank. The Debtors believe the Plan does not discriminate unfairly with respect to the Claims and Interests in Classes .

A plan is "fair and equitable" as to holders of unsecured claims that reject the plan if the plan provides either that: (a) each holder of a claim of such class receives or retains on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (a) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest or (b) that the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property at all.

The Debtors believe that they could, if necessary, meet the "fair and equitable" requirements of section 1129(b) of the Bankruptcy Code with respect to Holders of Claims in Impaired Classes.

## XI.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords all Holders of Claims and Interests the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such Holders. If, however, the requisite acceptances are not received, or the Plan is not confirmed and consummated, the theoretical alternatives include (a) formulation of an alternative plan or plans of reorganization or (b) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

### A.   Alternative Plan(s) of Reorganization

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtors (or, if the Debtors' exclusive periods in which to file and solicit acceptances of a plan of reorganization have expired, any other party in interest) could attempt to formulate and propose a different plan or plans of reorganization. Such a plan or plans might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of assets.

The Debtors believe that the Plan enables Creditors to realize the greatest possible value under the circumstances and has the greatest chance to be confirmed and consummated.

### B.   Liquidation under Chapter 7 or Chapter 11

If no plan is confirmed, the Debtors' cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. It is impossible to predict with certainty how the proceeds of the liquidation

79

would be distributed to the respective Holders of Claims against or Interests in the Debtors. It is, however, possible to predict that the First Lien Lenders and Second Lien Lenders would assert that they held security interests in all assets to be liquidated, likely resulting in nothing to distribute to any other Class of Claims or Interests.

The Debtors believe that a liquidation under chapter 7 would cause a substantial diminution in the Debtors' Estates given the substantial premium in the enterprise value of their businesses over the liquidation value of their assets, and the additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees. The assets available for distribution to Creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, arising by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtors' assets. More importantly, conversion to a chapter 7 liquidation would likely result in the immediate cessation of the Debtors' businesses, as most chapter 7 trustees are disinclined to continue operations.

The Debtors could also be liquidated pursuant to the provisions of a chapter 11 plan of reorganization. In a liquidation under chapter 11, the Debtors' assets could theoretically be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, thus resulting in a potentially greater recovery. Conversely, to the extent the commencement of a liquidation resulted in the Debtors' businesses incurring operating losses, the Debtors efforts to liquidate their assets over a longer period of time could theoretically result in a lower net distribution to Creditors than they would receive through a chapter 7 liquidation. Nevertheless, because there would be no need to appoint a chapter 7 trustee and hire new professionals, a chapter 11 liquidation might be less costly than a chapter 7 liquidation and thus provide larger net distributions to Creditors than in a chapter 7 liquidation. Any recovery in a chapter 11 liquidation, while potentially greater than in a chapter 7 liquidation, would also be highly uncertain.

The Debtors believe that any liquidation under chapter 11 is a much less attractive alternative to Creditors than the Plan because of the greater return anticipated under the Plan.

## XII. THE SOLICITATION; VOTING PROCEDURES

### A. Parties in Interest Entitled to Vote

In general, a holder of a claim or interest may vote to accept or to reject a plan if (a) the claim or interest is "allowed," which means generally that no party in interest has objected to such claim or interest, and (b) the claim or interest is "impaired" by the plan but entitled to receive or retain property under the plan.

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems

80

such holder to have rejected the plan and, accordingly, holders of such claims and interests do not actually vote to accept or reject the Plan. If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote to accept or reject the Plan.

## B.     Classes Entitled to Vote to Accept or Reject the Plan

Holders of Claims in Classes A4, A5, A6, B3, B4 and C5 are entitled to vote to accept or reject the Plan. By operation of law, each Unimpaired Class of Claims is deemed to have accepted the Plan and each Impaired Class of Claims or Interests that will receive nothing under the Plan is deemed to have rejected the Plan and, therefore, the Holders of Claims or Interests in such Classes are not entitled to vote to accept or reject the Plan. Consequently, Classes A1, A2, A3, B1, B2, C1, C2, C3, and C4 are deemed to have accepted the Plan and Classes A7, A8, A9, B5, B6 and C6 are deemed to have rejected the Plan and, therefore, none of the Holders of Claims or Interests in such Classes are entitled to vote to accept or reject the Plan.

## C.     Solicitation Order

Upon approval of this Disclosure Statement, the Bankruptcy Court entered an order that, among other things, determines the dates, procedures and forms applicable to the process of soliciting votes on the Plan and establishes certain procedures with respect to the tabulation of such votes (the "Solicitation Order"). Parties in interest may obtain a copy of the Solicitation Order through the Bankruptcy Court's electronic case filing system, by downloading the Solicitation Order from the Debtors' case website at www.epiqbankruptcysolutions.com, or by making written request upon the Debtors' counsel or Voting Agent.

## D.     Waivers of Defects, Irregularities, Etc.

All questions with respect to the validity, form, eligibility (including time of receipt), acceptance and revocation or withdrawal of ballots will be determined by the Bankruptcy Court. As indicated below under "Withdrawal of Ballots; Revocation," effective withdrawals of ballots must be delivered to the Voting Agent prior to the Voting Deadline. The Debtors reserve the absolute right to contest the validity of any such withdrawal. The Debtors also reserve the right to seek rejection of any and all ballots not in proper form. The Debtors further reserve the right to seek waiver of any defects or irregularities or conditions of delivery as to any particular ballot. Neither the Debtors nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of ballots nor will any of them incur any liabilities for failure to provide such notification. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) may be invalidated by the Bankruptcy Court.

## E.     Withdrawal of Ballots; Revocation

Any party who has delivered a valid ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting Agent at any time prior to the Voting Deadline. A notice of withdrawal, to be valid, must (a) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s), (b) be signed by the withdrawing party in the same manner as the ballot being withdrawn, (c) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn and (d) be

81

received by the Voting Agent in a timely manner via regular mail at TLC Vision (USA) Corporation Ballot Processing, c/o Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, FDR Station, P.O. Box 5014, New York, NY 10150-5014, Attn: Janice E. Livingstone, or via hand delivery or overnight courier at TLC Vision (USA) Corporation Ballot Processing, c/o Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, 3rd Floor, New York, NY 10017, Attn: Janice E. Livingstone. The Debtors intend to consult with the Voting Agent to determine whether any withdrawals of ballots were received and whether the requisite acceptances of the Plan have been received. As stated above, the Debtors expressly reserve the absolute right to contest the validity of any such withdrawals of ballots.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of ballots which is not received in a timely manner by the Voting Agent will not be effective to withdraw a previously cast ballot.

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed ballot may revoke such ballot and change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed ballot is received, only the ballot which bears the latest date will be counted for purposes of determining whether the requisite acceptances have been received.

## F.  Voting Rights of Disputed Claimants

Holders of Disputed Claims in Classes A4, A5, A6, B3, B4 and C5 whose Claims are (a) asserted as wholly unliquidated or wholly contingent in Proofs of Claim filed prior to the Distribution Record Date or (b) whose Claims are asserted in Proofs of Claim as to which an objection to the entirety of the Claim is pending as of the Distribution Record Date (collectively, the "Disputed Claimants") are not permitted to vote to accept or reject the Plan except as provided in the Solicitation Order. Pursuant to the procedures outlined in the Solicitation Order, Disputed Claimants may obtain a ballot for voting on the Plan only by filing a motion under Bankruptcy Rule 3018(a) seeking to have their Claims temporarily Allowed for voting purposes (a "Rule 3018 Motion"). Any such Rule 3018 Motion must be filed and served upon the Debtors' counsel and the Voting Agent no later than 5:00 p.m. (Eastern time) on the fourteenth (14th) day after the later of (i) the Solicitation Date and (ii) the date of service of an objection, if any, to such claim. The ballot of any creditor filing such a motion, will not be counted unless temporarily allowed by the Bankruptcy Court for voting purposes, after notice and a hearing. Any party timely filing and serving a Rule 3018 Motion will be provided a ballot and be permitted to cast a provisional vote to accept or reject the Plan. If and to the extent that the Debtors and such party are unable to resolve the issues raised by the Rule 3018 Motion prior to the Voting Deadline established by the Bankruptcy Court, then at the Confirmation Hearing the Bankruptcy Court will determine whether the provisional ballot should be counted as a vote to accept or reject the Plan. Nothing herein affects the Debtors' right to object to any Proof of Claim after the Distribution Record Date. With respect to any such objection, the Debtors may request that any vote cast by the Holder of the Claim subject to the objection be disallowed and not counted in determining whether the requirements of section 1126(c) of the Bankruptcy Code have been met.

4541/74009-001 Current/15961454v9
RLF1 3523585v.2

## G. Further Information; Additional Copies

If you have any questions or require further information about the voting procedures for voting your Claim or about the package of materials you received, or if you wish to obtain an additional copy of the Plan or this Disclosure Statement, or any exhibits or appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d) or the Solicitation Order), please contact the Voting Agent at:

**If by regular mail:**

TLC Vision (USA) Corporation Ballot Processing,
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5014
New York, NY 10150-5014
Attn: Janice E. Livingstone

**If by overnight courier or hand delivery:**

TLC Vision (USA) Corporation Ballot Processing,
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017
Attn: Janice E. Livingstone

**If by telephone, for U.S. callers only:**

Epiq Systems, Inc.
Telephone: 646 282-2400

**If by telephone, for international callers:**

Epiq Systems, Inc.
Telephone: [_____]

4541/74009-001 Current/15961454v9
RLF1 3523585v.2

01/06/2010 12:02 pm

## RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Debtors urge all Holders of Claims in Classes A4, A5, A6, B3, B4 and C5 to vote to ACCEPT the Plan, and to complete and return their ballots so that they will be RECEIVED on or before March 26, 2010, at 5:00 p.m. prevailing Eastern time.

Dated: January 6, 2010

TLC VISION CORPORATION; TLC VISION
(USA) CORPORATION; AND TLC
MANAGEMENT SERVICES INC.

By: /s/ Michael F. Gries
Title: Chief Restructuring Officer