# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TLC Vision (USA) Corporation, *et. al.*,[1] | ) Case No. 09-14473 (KG) |
| | ) |
| Debtors. | ) Jointly Administered |

## FIRST AMENDED DISCLOSURE STATEMENT WITH RESPECT TO THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION DATED AS OF FEBRUARY 3, 2010

**RICHARDS LAYTON & FINGER, P.A.**
Mark D. Collins (DE Bar No. 2981)
Michael J. Merchant (DE Bar No. 3854)
Chun I. Jang (DE Bar No. 4790)
Andrew C. Irgens (DE Bar No. 5193)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
*Counsel for Debtors and Debtors in Possession*

Dated: Wilmington, Delaware
February 3, 2010

**PROSKAUER ROSE LLP**
Mark K. Thomas
Paul V. Possinger
Jeremy T. Stillings
Three First National Plaza
70 West Madison, Suite 3800
Chicago, Illinois 60602
Telephone: (312) 962-3550
Facsimile: (312) 962-3551
*Counsel for Debtors and Debtors in Possession*

---

[1] The Debtors in the cases, along with the last four digits of each Debtor's federal tax identification number and address, are: TLC Vision (USA) Corporation (6220) 16305 Swingley Ridge Road, Chesterfield, MO 63017; TLC Vision Corporation (1150) 5280 Solar Drive, Suite 300, Mississauga, Ontario, L4W 5M8; and TLC Management Services, Inc. (0374) 1209 Orange Street, Wilmington, DE 19801.

**DISCLAIMER**

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THIS FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION DATED FEBRUARY 3, 2010 FILED BY TLC VISION CORPORATION, TLC VISION (USA) CORPORATION, AND TLC MANAGEMENT SERVICES INC., DEBTORS AND DEBTORS IN POSSESSION, (AS MAY BE AMENDED IN ACCORDANCE WITH THE TERMS THEREOF AND APPLICABLE LAW, THE "PLAN").  THE INFORMATION CONTAINED HEREIN MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS ANNEXED TO THE PLAN AND THE PLAN SUPPLEMENT.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN SHALL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.  THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF ANY OF THE DEBTORS AND DEBTORS IN POSSESSION IN THESE CASES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT SHALL NOT BE

ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN ANY OF THE DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CASES.

*[Remainder of Page Intentionally Left Blank.]*

1113/74009-007 Current/17228164v7
RLF1 3534297v.2

**TABLE OF CONTENTS**

I.     INTRODUCTION ..................................................................................................1

II.    OVERVIEW OF THE PLAN ................................................................................3

    A.     General Structure of the Plan.......................................................................4
    B.     Summary of Treatment of Claims and Interests under the Plan .............................4

III.   PLAN VOTING INSTRUCTIONS AND PROCEDURES .............................................19

    A.     Notice to Holders of Claims and Interests ............................................................19
    B.     Voting Rights.........................................................................................................20
    C.     Solicitation Materials............................................................................................21
    D.     Voting Procedures, Ballots and Voting Deadline .................................................21
    E.     Confirmation Hearing and Deadline for Objections to Confirmation ..................23

IV.   GENERAL INFORMATION CONCERNING THE DEBTORS....................................23

    A.     Corporate Structure...............................................................................................23
    B.     Overview of Business Operations.........................................................................24
    C.     Description of the Debtors' Business Operations..................................................24
           1.     Refractive Centers .....................................................................24
           2.     Doctors' Services ......................................................................25
           3.     Eye Care.....................................................................................26
    D.     Pre-Confirmation Management and Employees.....................................................26
           1.     Existing Board of Directors .......................................................26
           2.     Existing Executive Officers:  The following are each of the
                  Debtors' current executive officers:..........................................27
           3.     Employees/Labor Relations .......................................................27
           4.     Existing Compensation and Benefits .........................................28
    E.     Pre-Petition Capital Structure...............................................................................28
           1.     Credit Facility ...........................................................................28
           2.     Interest Rate Swap Agreement...................................................29
           3.     Equipment and Capital Financing..............................................29
    F.     Summary of Assets................................................................................................30
    G.     Historical Financial Information............................................................................30
    H.     Events Leading to Commencement of the Chapter 11 Cases ................................30
    I.     The Debtors' Exercise of Fiduciary Termination Rights and the Plan
          Sponsor  Agreement...............................................................................................32
    J.     The Debtors' Significant Leverage .......................................................................34

V.     THE CHAPTER 11 CASES ..................................................................................34

    A.     Continuation of Business; Stay of Litigation........................................................34
    B.     First Day Motions and Orders...............................................................................34
    C.     Retention of Professionals.....................................................................................35
    D.     Debtor in Possession Financing and Authorization to Use Cash Collateral..........35
    E.     Junior DIP Financing ............................................................................................36

i

VI.     SUMMARY OF THE PLAN OF REORGANIZATION ....................................................36

    A.    Overall Structure of the Plan.................................................................................37
    B.    Substantive Consolidation....................................................................................37
    C.    Reorganized Capital Structure Created by Plan....................................................37
    D.    Classification and Treatment of Claims and Interests ...........................................38
        1.    Treatment of Unclassified Claims under the Plan .....................................39
        2.    Treatment of Claims Against and Interests in TLC USA: ........................41
        3.    Treatment of Claims Against and Interests in TLC Canada:....................42
        4.    Treatment of Claims Against and Interests in TLC MSI:.........................44
    E.    Reservation of Rights Regarding Claims...............................................................45
    F.    Allowed Claims, Distribution Rights and Objections to Claims .............................45
        1.    Allowance Requirement...........................................................................45
        2.    Date of Distribution ................................................................................46
        3.    Making of Distributions...........................................................................46
        4.    Objection Procedures...............................................................................46
    G.    Disposition of Executory Contracts and Unexpired Leases ...................................47
        1.    Contracts and Leases Deemed Assumed ...................................................47
        2.    Cure with Respect to Assumed Contracts and Leases ...............................48
        3.    Rejection Damages ..................................................................................48
        4.    Modification of Change of Control Provisions..........................................48
        5.    Benefit Programs .....................................................................................49
    H.    Revesting of Assets; Release of Liens ...................................................................49
    I.    Post-Consummation Corporate Structure, Management and Operation................50
        1.    Corporate Action.....................................................................................50
        2.    Articles of Organization...........................................................................50
        3.    Officers and Directors of Reorganized Debtors........................................51
        4.    New Management Incentive Plan ..............................................................51
        5.    Exemption from Certain Transfer Taxes ...................................................51
    J.    Confirmation and/or Consummation ....................................................................51
        1.    Requirements for Confirmation of the Plan...............................................51
        2.    Conditions to Confirmation Date and Effective Date................................53
    K.    Releases, Discharge, Injunctions, Exculpation and Indemnification....................53
        1.    Releases by Debtors in Favor of Third Parties .........................................53
        2.    Releases by Creditors of Claims Against Third Parties............................54
        3.    Discharge and Discharge Injunction .......................................................55
        4.    Exculpation Relating to Chapter 11 Cases...............................................56
        5.    Post-Effective Date Indemnifications.......................................................56
    L.    Preservation of Rights of Action...........................................................................57
    M.    Retention of Jurisdiction .......................................................................................57
    N.    Amendment, Alteration and Revocation of Plan ...................................................60
    O.    Plan Implementation Documents............................................................................60

VII.    CERTAIN RISK FACTORS TO BE CONSIDERED .................................................61

    A.    General Considerations..........................................................................................61
    B.    Certain Bankruptcy Considerations ......................................................................61

    C.      Claims Estimations .................................................................62
    D.     Conditions Precedent to Consummation.....................................62
    E.     Inherent Uncertainty of Financial Projections .........................62
    F.     Competition..............................................................................63
    G.     Cyclicality ...............................................................................63
    H.     Reliance on Key Personnel and Medical Care Providers ..........63
    I.      Litigation.................................................................................63
    J.      Certain Tax Considerations.......................................................63

VIII.    APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS.......................63

[TO COME.] .................................................................................................63

IX.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .................63

    A.     U.S. Federal Income Tax Consequences to the Debtors.............65
        1.     Consolidated Group and Net Operating Losses.............65
        2.     Cancellation of Indebtedness Income ...........................65
        3.     Utilization of NOLs and Net Unrealized Built-In Losses......66
        4.     U.S. Federal Alternative Minimum Tax ........................67
    B.     U.S. Federal Income Tax Consequences to Claim Holders........67
        1.     U.S. Holders of Prepetition Lender Secured Claims .................67
    C.     Other Tax Matters ....................................................................68
        1.     Information Reporting and Backup Withholding ...........68
        2.     Importance of Obtaining Professional Tax Assistance ...68

X.    FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS ...............68

    A.     Feasibility of the Plan ..............................................................68
    B.     Acceptance of the Plan.............................................................69
    C.     Best Interests Test ....................................................................69
    D.     Liquidation Analysis ................................................................70
    E.     Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Valuation ..............................................................70
    F.     Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative ...........................................................70

XI.    ALTERNATIVES TO CONFIRMATION AND  CONSUMMATION OF THE PLAN ...............................................................................................71

    A.     Alternative Plan(s) of Reorganization .....................................71
    B.     Liquidation under Chapter 7 or Chapter 11 ..............................72

XII.    THE SOLICITATION; VOTING PROCEDURES.........................................72

    A.     Parties in Interest Entitled to Vote ...........................................72
    B.     Classes Entitled to Vote to Accept or Reject the Plan ...............73
    C.     Solicitation Order.....................................................................73
    D.     Waivers of Defects, Irregularities, Etc.....................................73
    E.     Withdrawal of Ballots; Revocation...........................................73
    F.     Voting Rights of Disputed Claimants ........................................74

G.      Further Information; Additional Copies ................................................................74

iv

# I. INTRODUCTION

The debtors and debtors in possession in the above-referenced chapter 11 cases (these "Chapter 11 Cases") are the following related companies (collectively, the "Debtors" or the "Company"):

TLC Vision Corporation;

TLC Vision (USA) Corporation; and

TLC Management Services Inc.

The Debtors submit this first amended disclosure statement (as may be amended, the "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code") for use in the solicitation of votes on the First Amended Joint Chapter 11 Plan of Reorganization Dated as of February 3, 2010 (as may be amended, the "Plan"). A copy of the Plan is attached hereto as Appendix A. Each capitalized term used in this Disclosure Statement but not otherwise defined herein has the meaning ascribed to such term in the Plan. In addition, all references in this Disclosure Statement to monetary figures refer to United States currency, unless otherwise expressly provided.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, their reasons for seeking protection and reorganization under chapter 11, significant events that have occurred during the Chapter 11 Cases, and the anticipated organization, operations and financing of the Debtors upon successful emergence from chapter 11. This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan and the securities to be issued under the Plan and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims entitled to vote to accept or reject the Plan must follow for their votes to be counted.

By order entered on or about [_____], 2010, the Bankruptcy Court has approved this Disclosure Statement as containing "adequate information," in accordance with section 1125 of the Bankruptcy Code, to enable a hypothetical, reasonable investor typical of Holders of Claims against the Debtors to make an informed judgment as to whether to accept or reject the Plan, and has authorized its use in connection with the solicitation of votes with respect to the Plan. **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.** No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. In voting on the Plan, Holders of Claims entitled to vote should not rely on any information relating to the Debtors and their businesses, other than that contained in this Disclosure Statement, the Plan, the Plan Supplement and all exhibits and appendices hereto and thereto.

Pursuant to the provisions of the Bankruptcy Code, only classes of Claims or Interests that are (a) "impaired" by a plan of reorganization and (b) entitled to receive a distribution under such plan are entitled to vote to accept or reject the Plan. In the Debtors'

cases, only Classes A5, A6, and B4 are Impaired by and entitled to receive a distribution under the Plan; accordingly, only the Holders of Claims or Interests in those Classes are entitled to vote to accept or reject the Plan. Claims and Interests in Classes A1, A2, A3, A4, B1, B2, B3, C1, C2, C3, C4 and C5 are Unimpaired by the Plan; accordingly, the Holders thereof are conclusively presumed to have accepted the Plan. Claims and Interests in Classes A7, A8, A9, B5, B6 and C6, which receive nothing under the Plan, are deemed to have rejected the Plan and the Holders thereof are not entitled to vote.

FOR A DESCRIPTION OF THE PLAN AND VARIOUS RISKS AND OTHER FACTORS PERTAINING TO THE PLAN, PLEASE SEE ARTICLE VI OF THIS DISCLOSURE STATEMENT, ENTITLED "SUMMARY OF THE PLAN OF REORGANIZATION," AND ARTICLE VII OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED."

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATING TO THE PLAN, CERTAIN EVENTS THAT HAVE OCCURRED IN THE CHAPTER 11 CASES AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT THE SUMMARIES OF THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE AS OF THE DATE HEREOF, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS AND TO THE EXTENT THEY MAY CHANGE AS PERMITTED BY THE PLAN AND APPLICABLE LAW. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

NOTHING CONTAINED HEREIN SHALL BE DEEMED TO CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE REORGANIZATION AS TO HOLDERS OF CLAIMS OR INTERESTS. YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES OR OTHER LEGAL CONSEQUENCES OF THE PLAN.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS. EXCEPT WITH RESPECT TO THE *PRO FORMA* FINANCIAL PROJECTIONS SET FORTH IN APPENDIX B ANNEXED HERETO (THE "PROJECTIONS") AND EXCEPT AS OTHERWISE SPECIFICALLY AND EXPRESSLY STATED HEREIN, THIS DISCLOSURE STATEMENT DOES NOT REFLECT ANY

2

EVENTS THAT MAY OCCUR SUBSEQUENT TO THE DATE HEREOF AND THAT MAY HAVE A MATERIAL IMPACT ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS DO NOT UNDERTAKE ANY OBLIGATION TO, AND DO NOT INTEND TO, UPDATE THE PROJECTIONS; THUS, THE PROJECTIONS WILL NOT REFLECT THE IMPACT OF ANY SUBSEQUENT EVENTS NOT ALREADY ACCOUNTED FOR IN THE ASSUMPTIONS UNDERLYING THE PROJECTIONS. FURTHER, THE DEBTORS DO NOT ANTICIPATE THAT ANY AMENDMENTS OR SUPPLEMENTS TO THIS DISCLOSURE STATEMENT WILL BE DISTRIBUTED TO REFLECT SUCH OCCURRENCES. ACCORDINGLY, THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCE IMPLY THAT THE INFORMATION HEREIN IS CORRECT OR COMPLETE AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF. MOREOVER, THE PROJECTIONS ARE BASED ON ASSUMPTIONS THAT, ALTHOUGH BELIEVED TO BE REASONABLE BY THE DEBTORS, MAY DIFFER FROM ACTUAL RESULTS.

THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THE DEBTORS TO SUCCESSFULLY REORGANIZE AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS, THEIR CREDITORS AND THEIR ESTATES. THE PLAN IMPLEMENTS A PLAN SPONSOR AGREEMENT, SUBJECT TO THE APPROVAL OF THIS COURT, PURSUANT TO WHICH THE BUYERS THEREUNDER HAVE AGREED TO PURCHASE SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND TO ASSUME CERTAIN LIABILITIES OF THE DEBTORS. THE PROCEEDS OF THE SALE SHALL BE USED TO FUND PAYMENTS TO THE DEBTORS' SECURED AND UNSECURED CREDITORS UNDER THE PLAN. THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE HIGHEST AND BEST POSSIBLE RECOVERY FOR THE DEBTORS' SECURED AND UNSECURED CREDITORS. THE DEBTORS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT THE PLAN.

## II.    OVERVIEW OF THE PLAN

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan. For a more detailed description of the terms and provisions of the Plan, see <u>Article VI</u> of this Disclosure Statement, entitled "Summary of the Plan of Reorganization."

The Plan provides for the classification and treatment of Claims against and Interests in the Debtors. The Plan designates eighteen Classes of Claims and three Classes of Interests. These Classes take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Interests.

The Plan Sponsor Agreement that forms the basis of the Plan was negotiated among the Debtors and the Buyer Parties. The Debtors believe that the Plan presents the best means currently available for their emergence from Chapter 11.

## A. General Structure of the Plan

The Plan is structured as a joint plan. The Chapter 11 Cases were filed to implement a restructuring which is embodied in the Plan in an efficient, expedient and economical fashion, with minimal disruption to the Debtors' ongoing business operations.

As of the Petition Date, the aggregate amount of Prepetition Lender Secured Claims totaled approximately $107 million, including principal, interest, cost and fees. As of the Petition Date, the Debtors' other liabilities totaled approximately $25 million.

The Plan provides for the distribution of the proceeds derived from the sale of the Debtors' assets, under the Plan Sponsor Agreement to the Debtors' secured and unsecured creditors. Holders of the Allowed Class A4, B3 and C5 Prepetition Lender Secured Claims shall be paid in full. Holders of Allowed Class A5 and B4 General Unsecured Claims shall receive a pro rata distribution from a cash pool established for such Claims. Holders of Allowed Class C3 General Unsecured Claims shall be paid in full or such Claims shall be Reinstated. Class A9 TLC USA Common Stock and Interests shall be transferred to the Buyer Parties pursuant to the Plan Sponsor Agreement. Class B6 TLC Canada Common Stock and Interests shall be retained by Holders thereof, though Reorganized TLC Canada shall no longer have any assets following the Effective Date. Additionally, the Holders thereof shall receive a pro rata distribution of cash in the event that Class B4 General Unsecured Claims accept the Plan. Holders of Class B6 Interests shall nonetheless be deemed to have rejected the Plan. Holders of Class C4 TLC MSI Common Stock and Interests shall retain their Interests.

The following are certain additional material terms of the Plan:

- Following the Effective Date, the Reorganized Debtors shall have the same Corporate Structure as existed prior to the Effective Date, as may be modified in a manner acceptable by the Buyer Parties; provided, however, that Reorganized TLC Canada shall cease all operations and the Information Officer shall be authorized to liquidate the remaining assets of TLC Canada and distribute the net proceeds thereof to Holders of Allowed Claims in Class B4.

- Holders of Allowed Junior DIP Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, Allowed Essential Trade Claims and Allowed Other Priority Claims will be Unimpaired by the Plan or will be paid in full as required by the Bankruptcy Code, unless otherwise agreed by the Holders of such Claims.

## B. Summary of Treatment of Claims and Interests under the Plan

The table below summarizes the classification and treatment of the prepetition Claims against and Interests in the Debtors under the Plan. For certain Classes of Claims, estimated percentage recoveries also are set forth below. Estimated percentage recoveries have been calculated based upon a number of assumptions, including (where not Allowed by the Plan) the amount of Allowed Claims in each Class.

4

For certain Classes of Claims, the actual amounts of Allowed Claims could materially exceed or could be materially less than the estimated amounts shown in the table that follows. Except for Claims Allowed by the Plan, estimated Claim amounts for each Class set forth below are based upon the Debtors' review of their books and records, and include estimates of a number of Claims that are contingent, disputed and/or unliquidated. Accordingly, for these reasons, no representation can be or is being made with respect to whether the estimated percentage recoveries shown in the table below for Classes A5, B4 and C3 will actually be realized by the Holders of Allowed Claims in such Classes.

1113/74009-007 Current/17228164v7
RLF1 3534297v.2

## Treatment of Certain Unclassified Claims Against All Debtors

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| **Unclassified — Administrative Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately [$TBD] | An Administrative Claim is a Claim for (a) any cost or expense of administration (including, without limitation, the fees and expenses of Professionals) of any of the Chapter 11 Cases asserted or arising under sections 503, 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code including, but not limited to (i) any actual and necessary post Petition Date cost or expense of preserving the Debtors' respective Estates or operating the businesses of the Debtors, (ii) any payment to be made under the Plan to cure a default under an assumed executory contract or unexpired lease, (iii) any post Petition Date cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtors in the ordinary course of their respective businesses, (iv) compensation or reimbursement of expenses of Professionals to the extent Allowed by the Bankruptcy Court under sections 330(a) or 331 of the Bankruptcy Code, and (v) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546 of the Bankruptcy Code; (b) any fees or charges assessed against the Debtors' respective Estates under section 1930 of title 28 of the United States Code; and (c) any Allowed administrative claim or superpriority claim granted to the Collateral Trustee pursuant to the Cash Collateral Order.<br><br>Under the Plan, Administrative Claims are Unimpaired. Unless otherwise provided for herein, each Holder of an Allowed Administrative Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (a) the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Administrative Claim becomes Allowed, or (iii) a date agreed to in writing by the Debtors or Reorganized Debtors, as the case may be, and the Holder of such Administrative Claim; or (b) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or the Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order; provided, however, that Allowed Administrative Claims representing (i) liabilities, |

1113/74009-007 Current/17228164v7
RLF1 3534297v.2

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| | accounts payable or other Claims, or obligations incurred in the ordinary course of business of the Debtors consistent with past practices subsequent to the Petition Date, or (ii) contractual liabilities incurred subsequent to the Petition Date, whether or not incurred in the ordinary course of business, shall be paid or performed by the Debtors or the Reorganized Debtors in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto.<br><br>Administrative Claims are not classified and are treated as required by the Bankruptcy Code. The Holders of such Claims are not entitled to vote to accept or reject the Plan.<br><br>Estimated Percentage Recovery: 100% |
| **Unclassified — Priority Tax Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately $0 | The Plan defines Priority Tax Claims as any and all Claims accorded priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code. Such Priority Tax Claims include Claims of governmental units for taxes owed by the Debtors that are entitled to a certain priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code. The taxes entitled to priority are (a) taxes on income or gross receipts that meet the requirements set forth in section 507(a)(8)(A) of the Bankruptcy Code, (b) property taxes meeting the requirements of section 507(a)(8)(B) of the Bankruptcy Code, (c) taxes that were required to be collected or withheld by the Debtors and for which the Debtors are liable in any capacity as described in section 507(a)(8)(C) of the Bankruptcy Code, (d) employment taxes on wages, salaries or commissions that are entitled to priority pursuant to section 507(a)(4) of the Bankruptcy Code, to the extent that such taxes also meet the requirements of section 507(a)(8)(D), (e) excise taxes of the kind specified in section 507(a)(8)(E) of the Bankruptcy Code, (f) customs duties arising out of the importation of merchandise that meet the requirements of section 507(a)(8)(F) of the Bankruptcy Code and (g) prepetition penalties relating to any of the foregoing taxes to the extent such penalties are in compensation for actual pecuniary loss as provided in section 507(a)(8)(G) of the Bankruptcy Code.<br><br>Under the Plan, Priority Tax Claims are Unimpaired. Each Holder of an Allowed Priority Tax Claim shall receive, at the |

7

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| | option of the Debtors or the Reorganized Debtors, as the case may be, in full satisfaction, settlement, release, extinguishment and discharge of such Priority Tax Claim: (a) the amount of such unpaid Allowed Priority Tax Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Priority Tax Claim becomes Allowed and (iii) a date agreed to by the Debtors or Reorganized Debtors, as the case may be, and the Holder of such Priority Tax Claim; (b) equal Cash payments from the Reorganized Debtors made on the last Business Day of every three (3) month period following the Effective Date, over a period not exceeding five (5) years after the assessment of the tax on which such Priority Tax Claim is based, totaling the principal amount of such Priority Tax Claim plus simple interest on any outstanding balance from the Effective Date calculated at the interest rate publicly quoted on the Effective Date for obligations backed by the full faith and credit of the United States of America maturing in ninety (90) days; or (c) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Priority Tax Claim and the Debtors or the Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order. The Debtors or the Reorganized Debtors, as the case may be, shall have the right, in their sole discretion, to prepay at any time, in whole or in part, any Allowed Priority Tax Claim without premium or penalty of any sort or nature. |
| | Priority Tax Claims are not classified and are treated as required by the Bankruptcy Code. The Holders of such Claims are not entitled to vote to accept or reject the Plan. |
| | Estimated Percentage Recovery: 100% |
| **Unclassified – Junior DIP Claims** <br><br> Estimated Aggregate Allowed Amount: Approximately $25,000,000 | The Plan defines Junior DIP Claims as the claims of the Junior DIP Agent and the Junior DIP Lenders based upon, evidenced by, arising under or related to the Junior DIP Loan Agreement, plus all accrued and unpaid interest, fees and costs thereunder. |
| | Under the Plan, Junior DIP Claims and Unimpaired. Each Holder of an Allowed Junior DIP Claim shall be paid in full in cash (a) on or as soon as practicable after the Effective Date or (b) upon such other terms as the Reorganized Debtors |

8

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| | and the holders of such Claim may agree. |

1113/74009-007 Current/17228164v7
RLF1 3534297v.2

## Treatment of Claims Against and Interests In TLC USA

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| **Class A1 – Other Secured Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately $120,000 | Other Secured Claims are Secured Claims other than the Prepetition Lender Secured Claims.<br><br>Class A1 Other Secured Claims are Unimpaired (unless such Claims are treated pursuant to clause (d) in the following sentence, in which case such Claims are Impaired and shall be entitled to vote). Each Holder of an Allowed Class A1 Other Secured Claim shall receive, in the sole discretion of the Debtors or the Reorganized Debtors, as the case may be, in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (a) Cash equal to the amount of such Allowed Other Secured Claim on or as soon as practicable after the later of (i) the Effective Date, (ii) the date that such Other Secured Claim becomes Allowed, and (iii) a date agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of such Class A1 Other Secured Claim; (b) treatment such that such Other Secured Claim is Reinstated; (c) the Property securing such Other Secured Claim, with any deficiency to result in a General Unsecured Claim; (d) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or Reorganized Debtors, as the case may be; (e) or as the Bankruptcy Court may order.<br><br>Estimated Percentage Recovery: 100% |
| **Class A2 – Essential Trade Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately $0 | Essential Trade Claims are those Claims identified by TLC USA as such in the Plan Supplement.<br><br>Class A2 Essential Trade Claims are Unimpaired. Each Holder of an Allowed Class A2 Essential Trade Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Class A2 Claim becomes Allowed, and (iii) a date agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of such Class A2 Essential Trade Claim; or (b) such other |

10

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| | treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or the Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order.<br><br>Estimated Percentage Recovery: 100% |
| **Class A3 – Other Priority Claims**<br><br>Estimated Aggregate Allowed Amount:  Approximately $0 | Other Priority Claims are Claims against the Debtors entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.<br><br>Class A3 Other Priority Claims are Unimpaired.  Each Holder of an Allowed Class A3 Other Priority Claim shall be paid in full in cash (a) on or as soon as practicable after the Effective Date or the date such claim is allowed in accordance with section 502 of the Bankruptcy Code, whichever is later, or (b) upon such other terms, less favorable to the holder of such claim, as the Reorganized Debtors and the holder of such Claim may agree.<br><br>Estimated Percentage Recovery: 100% |
| **Class A4 – Prepetition Lender Secured Claims**<br><br>Estimated Aggregate Allowed Amount:  Approximately $107,500,000 | Prepetition Lender Secured Claims are the claims of the Prepetition Agent and the Prepetition Lenders.<br><br>Class A4 Prepetition Lender Secured Claims are Unimpaired. Each Holder of an Allowed Class A4 Prepetition Lender Secured Claim shall receive on or as soon as practicable after the Effective Date, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, cash in an amount equal to such Allowed Class A4 Prepetition Lender Secured Claim.<br><br>Estimated Percentage Recovery: 100% |
| **Class A5 – General Unsecured Claims**<br><br>Estimated Aggregate Allowed Amount:  Approximately $5,100,000 | General Unsecured Claims are all Allowed Claims, but excluding Administrative Claims, Priority Tax Claims, Junior DIP Claims Professional Fee Claims, Other Secured Claims, Prepetition Lender Secured Claims, Essential Trade Claims, and Other Priority Claims.<br><br>Class A5 General Unsecured Claims are Impaired.  Each Holder of an Allowed Class A5 General Unsecured Claim shall receive, on or as soon as reasonably practicable after the Effective Date, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, its pro rata |

11

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| | share of $862,500. <br><br> Estimated Percentage Recovery: 17% |
| **Class A6 – Medical Pending Litigation Claims** <br><br> Estimated Aggregate Allowed Amount: Approximately $160,000 | Medical Pending Litigation Claims are those claims arising from a medical malpractice or similar action against the Debtors, including the actions listed on <u>Appendix E</u> hereto. <br><br> Class A6 Medical Pending Litigation Claims are Impaired. On the Effective Date, the Holders of Class A6 Medical Pending Litigation Claims shall be entitled to payment exclusively by way of any insurance coverage held by TLC USA covering such Medical Pending Litigation Claims. <br><br> Estimated Percentage Recovery: 100% |
| **Class A7 – Subordinated Claims** <br><br> Estimated Aggregate Allowed Amount: Approximately $[unknown] | Subordinated Claims are any and all claims subordinated pursuant to section 510(b) of the Bankruptcy Code. <br><br> Class A7 Subordinated Claims are Impaired. Holders of Class A7 Subordinated Claims shall not receive or retain any property under the Plan on account of such Subordinated Claims. On the Effective Date, all Subordinated Claims shall be extinguished. <br><br> Percentage Recovery: 0% |
| **Class A8 – Intercompany Claims** <br><br> Estimated Aggregate Allowed Amount: Approximately $33,395,738 | Intercompany Claims means all claims owing by any Debtor to any other Debtor. <br><br> Class A8 Intercompany Claims are Impaired. Holders of Class A8 Intercompany Claims shall not receive or retain any Property under the Plan on account of such Intercompany Claims. On the Effective Date, all Intercompany Claims shall be extinguished, provided that, claims owing by non-debtor subsidiaries and affiliates to TLC USA shall not be affected by this Plan. <br><br> Percentage Recovery: 0% |
| **Class A9 – TLC USA Common Stock and Interests** | TLC USA Common Stock and Interests are all authorized, issued and outstanding shares of common stock of, and Interests in TLC USA, as of the Petition Date, including, without limitation all issued, outstanding and unexpired options, warrants, conversion, privilege or other legal or contractual rights to acquire shares of TLC USA Common Stock or Interests. TLC USA Common Stock and Interests |

1113/74009-007 Current/17228164v7
RLF1 3534297v.2

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| | also includes any contingent, disputed or unliquidated Claims related to or in connection with any of the foregoing. |
| | Class A9 TLC USA Common Stock and Interests are Impaired. Holders of Class A9 TLC USA Common Stock and Interests shall not receive or retain any property under the Plan on account of such Common Stock and Interests. On the Effective Date, all TLC USA Common Stock and Interests shall be transferred to the Buyer pursuant to the Plan Sponsor Agreement. |
| | Percentage Recovery: 0% |

13

## Treatment of Claims Against and Interests In TLC Canada

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| **Class B1 – Other Secured Claims**<br><br>Estimated Aggregate Allowed Amount: $7,200,000 | Other Secured Claims are Secured Claims other than the Prepetition Lender Secured Claims.<br><br>Class B1 Other Secured Claims are Unimpaired (unless such Claims are treated pursuant to clause (d) in the following sentence, in which case such Claims are Impaired and shall be entitled to vote). Each Holder of an Allowed Class B1 Other Secured Claim shall receive, in the sole discretion of the Debtors or the Reorganized Debtors, as the case may be, in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (a) Cash equal to the amount of such Allowed Other Secured Claim on or as soon as practicable after the later of (i) the Effective Date, (ii) the date that such Other Secured Claim becomes Allowed, and (iii) a date agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of such Class B1 Other Secured Claim; (b) treatment such that such Other Secured Claim is Reinstated; (c) the Property securing such Other Secured Claim, with any deficiency to result in a General Unsecured Claim; (d) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or Reorganized Debtors, as the case may be; or (e) as the Bankruptcy Court may order.<br><br>Estimated Percentage Recovery: 100% |
| **Class B2 – Other Priority Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately $0 | Other Priority Claims are Claims against the Debtors entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.<br><br>Class B2 Other Priority Claims are Unimpaired. Each Holder of an Allowed Class B2 Other Priority Claim shall be paid in full in cash (a) on or as soon as practicable after the Effective Date or the date such claim is allowed in accordance with section 502 of the Bankruptcy Code, whichever is later, or (b) upon such other terms, less favorable to the Holder of such Claim, as the Reorganized Debtors and the Holder of such Claim may agree. Notwithstanding the foregoing, each Allowed Canadian Priority Employee Claim shall be paid |

1113/74009-007 Current/17228164v7
RLF1 3534297v.2

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| | immediately after the Canadian Sanction Order, or as the Canadian Court may order.<br><br>Estimated Percentage Recovery: 100% |
| **Class B3 – Prepetition Lender Secured Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately $107,500,000 | Prepetition Lender Secured Claims are the claims of the Prepetition Agent and the Prepetition Lenders.<br><br>Class B3 Prepetition Lender Secured Claims are Unimpaired. Each Holder of an Allowed Class B3 Prepetition Lender Secured Claim shall receive, on or as soon as reasonably practicable after the Effective Date, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, cash in an amount equal to such Allowed Class B3 Prepetition Lender Secured Claim.<br><br>Estimated Percentage Recovery: 100% |
| **Class B4 – General Unsecured Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately $2,300,000 | General Unsecured Claims are all Allowed Claims, but excluding Administrative Claims, Priority Tax Claims, and Junior DIP Claims, Professional Fee Claims, Other Secured Claims, Prepetition Lender Secured Claims, Essential Trade Claims, and Other Priority Claims.<br><br>Class B4 General Unsecured Claims are Impaired.  (i) In the event that Class B4 General Unsecured Claims vote as a class in favor of the Plan, on or as soon as practicable after the Effective Date, each holder of an Allowed Class B4 General Unsecured Claim shall receive, in full satisfaction, settlement, release, extinguishment, and discharge of such Claim, its pro rata share of a cash pool of $575,000.  (ii) In the event that Class B4 General Unsecured Claims vote as a class to reject the Plan, on or as soon as practicable after the Effective Date, each holder of an Allowed Class B4 General Unsecured Claim shall receive, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, its pro rata share of cash pool of $287,500.<br><br>Estimated Percentage Recovery: 25% |
| **Class B5 – Intercompany Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately $[unknown] | Intercompany Claims means all claims owing by any Debtor to any other Debtor.<br><br>Class B5 Intercompany Claims are Impaired.  Holders of Class B5 Intercompany Claims shall not receive or retain any Property under the Plan on account of such Intercompany |

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| | Claims. On the Effective Date, all Intercompany Claims shall be extinguished, provided that, claims owing by non-debtor subsidiaries and affiliates to TLC Canada shall not be affected by this Plan.<br><br>Percentage Recovery: 0% |
| **Class B6 – TLC Canada Common Stock and Interests** | TLC Canada Common Stock and Interests means all authorized, issued and outstanding shares of common stock of, and Interests in TLC Canada, as of the Petition Date, including, without limitation all issued, outstanding and unexpired options, warrants, conversion, privilege or other legal or contractual rights to acquire any of the foregoing. TLC Canada Common Stock and Interests also includes any contingent, disputed or unliquidated Claims related to or in connection with any of the foregoing.<br><br>Class B6 TLC Canada Common Stock and Interests are Impaired and are deemed to have rejected the Plan. On the Effective Date, the Holders of the TLC Canada Common Stock and Interests shall retain such common stock and interests although TLC Canada shall no longer have any assets following the consummation of the Plan and Plan Sponsor Agreement. The Holders of the TLC Canada Common Stock and Interests shall not receive or retain any Property under the Plan on account of such Common Stock and Interests, provided, however, that solely in the event that Holders of Class B4 General Unsecured Claims vote to accept the Plan, each Holder of an Allowed Class B6 TLC Canada Common Stock and Interest shall receive its pro rata share of a cash pool of $287,500.<br><br>Percentage Recovery: N/A |

16

**Treatment of Claims Against and Interests In TLC MSI**

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| **Class C1 – Other Secured Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately $0 | An Other Secured Claim is any Claim arising before the Petition Date that is: (a) secured in whole or part, as of the Petition Date, by a Lien which is valid, perfected and enforceable under applicable law on Property in which the Debtors' respective Estates has an interest and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or (b) subject to setoff under section 553 of the Bankruptcy Code, but, with respect to both case (a) and (b), only to the extent of each such Estate's interest in the value of the assets or Property securing any such Claim or the amount subject to setoff, as the case may be.<br><br>Class C1 Other Secured Claims are Unimpaired (unless such Claims are treated pursuant to clause (d) in the following sentence, in which case such Claims are Impaired and shall be entitled to vote). Each Holder of an Allowed Class C1 Other Secured Claim shall receive, in the sole discretion of the Debtors or the Reorganized Debtors, as the case may be, in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (a) Cash equal to the amount of such Allowed Secured Claim on or as soon as practicable after the later of (i) the Effective Date, (ii) the date that such Secured Claim becomes Allowed, and (iii) a date agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of such Class C1 Other Secured Claim; (b) treatment such that such Secured Claim is Reinstated; (c) the Property securing such Secured Claim, with any deficiency to result in a General Unsecured Claim; (d) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or Reorganized Debtors, as the case may be; or (e) as the Bankruptcy Court may order.<br><br>Estimated Percentage Recovery: 100% |
| **Class C2 – Other Priority Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately $0 | Other Priority Claims are Claims against the Debtors entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.<br><br>Class C2 Other Priority Claims are Unimpaired. Each Holder |

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| | of an Allowed Class C2 Other Priority Claim shall be paid in full in cash (a) on or as soon as practicable after the Effective Date or the date such claim is allowed in accordance with section 502 of the Bankruptcy Code, whichever is later, or (b) upon such other terms, less favorable to the Holder of such Claim, as the Reorganized Debtors and the Holder of such Claim may agree.

Estimated Percentage Recovery: 100% |
| **Class C3 – General Unsecured Claims**

Estimated Aggregate Allowed Amount:  Approximately $0 | General Unsecured Claims are all Allowed Claims, but excluding Administrative Claims, Priority Tax Claims, Junior DIP Claims, Professional Fee Claims, Other Secured Claims, Prepetition Lender Secured Claims, Essential Trade Claims, and Other Priority Claims.

Class C3 General Unsecured Claims are Unimpaired.  Each Holder of an Allowed Class C3 General Unsecured Claim not satisfied as of the Effective Date of the Plan shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (a) the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such General Unsecured Claim becomes Allowed, or (iii) a date agreed to in writing by the Debtors or Reorganized Debtors, as the case may be, and the Holder of such General Unsecured Claim; (b) treatment such that such General Unsecured Claim is Reinstated; or (c) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or the Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order.

Estimated Percentage Recovery: 100% |
| **Class C4 – TLC MSI Common Stock and Interests** | TLC MSI Common Stock and Interests are all authorized, issued and outstanding shares of common stock of, and Interests in TLC MSI, as of the Petition Date, including, without limitation all issued, outstanding and unexpired options, warrants, conversion, privilege or other legal or contractual rights to acquire shares of TLC MSI Common Stock or Interests.  TLC MSI Common Stock and Interests also includes any contingent, disputed or unliquidated Claims related to or in connection with any of the foregoing. |

18

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| | Class C4 TLC MSI Common Stock and Interests is Unimpaired. Holders of Allowed Class C4 TLC MSI Common Stock and Interests shall retain their Interests.<br><br>Estimated Percentage Recovery: 100% |
| **Class C5 – Prepetition Lender Secured Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately $107,500,000 | Prepetition Lender Secured Claims are the claims of the Prepetition Agent and the Prepetition Lenders.<br><br>Class C5 Prepetition Lender Secured Claims are Unimpaired. Each Holder of an Allowed Class C5 Prepetition Lender Secured Claim shall receive, on or as soon as reasonably practicable after the Effective Date, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, cash in an amount equal to such Allowed Class C5 Prepetition Lender Secured Claim.<br><br>Estimated Percentage Recovery: 100% |
| **Class C6 – Intercompany Claims**<br><br>Estimated Aggregate Allowed Amount: Approximately $4,392,385 | Intercompany Claims means all claims owing by any Debtor to any other Debtor.<br><br>Class C6 Intercompany Claims are Impaired. Holders of Class C6 Intercompany Claims shall not receive or retain any Property under the Plan on account of such Intercompany Claims. On the Effective Date, all Intercompany Claims shall be extinguished, provided that, claims owing by non-debtor subsidiaries and affiliates to TLC MSI shall not be affected by this Plan.<br><br>Percentage Recovery: 0% |

THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AGAINST THE DEBTORS AND THUS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN. THE BUYER PARTIES ALSO URGE YOU TO VOTE TO ACCEPT THE PLAN.

## III. PLAN VOTING INSTRUCTIONS AND PROCEDURES

### A. Notice to Holders of Claims and Interests

Approval by the Bankruptcy Court of this Disclosure Statement means that the Bankruptcy Court has found that this Disclosure Statement contains information of a kind and in sufficient and adequate detail to enable Holders of Claims to make an informed judgment whether to accept or reject the Plan.

19

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR THEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

IF THE PLAN IS APPROVED BY THE REQUISITE VOTE OF HOLDERS OF CLAIMS ENTITLED TO VOTE AND IS SUBSEQUENTLY CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS, WHETHER OR NOT THEY WERE ENTITLED TO VOTE OR DID VOTE TO ACCEPT OR REJECT THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN. THUS, ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ENTITLED TO VOTE ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT AND THE PLAN ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN.

No solicitation of votes may be made except after distribution of this Disclosure Statement and no person has been authorized to distribute any information concerning the Debtors other than the information contained herein. No such information will be relied upon in making a determination to vote to accept or reject the Plan.

## B.      Voting Rights

Pursuant to the provisions of the Bankruptcy Code, only holders of claims in classes that are (a) treated as "impaired" by the plan of reorganization and (b) entitled to receive a distribution under such plan are entitled to vote to accept or reject the Plan. In these Chapter 11 Cases, under the Plan, only Holders of Claims in Classes A5, A6 and B4 are entitled to vote to accept or reject the Plan. Claims and Interests in other Classes are either (i) Unimpaired and their Holders are deemed to have accepted the Plan, or (ii) receiving no distributions under the Plan and their Holders are deemed to have rejected the Plan.

Only Holders of Allowed Claims in the voting Classes are entitled to vote to accept or reject the Plan. A Claim that is unliquidated, contingent or disputed is not an Allowed Claim, and is thus not entitled to vote, unless and until the amount is estimated or determined, or the dispute is determined, resolved or adjudicated in the Bankruptcy Court or another court of competent jurisdiction, or pursuant to agreement with the Debtors. However, the Bankruptcy Court may deem a contingent, unliquidated or disputed Claim to be Allowed on a provisional basis, for purposes only of voting on the Plan.

Holders of Allowed Claims in the voting Classes may vote to accept or reject the Plan only if they are Holders as of the Distribution Record Date, which Distribution Record Date is [_____], 2010.

## C. Solicitation Materials

In soliciting votes for the Plan pursuant to this Disclosure Statement, the Debtors, through their voting agent, Epiq Bankruptcy Solutions, LLC (the "Voting Agent"), will send to Holders of Claims who are entitled to vote copies of (a) the Disclosure Statement and Plan, (b) the notice of, among other things, (i) the date, time and place of the hearing to consider confirmation of the Plan and related matters and (ii) the deadline for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice"), (c) one or more ballots (and return envelopes) to be used in voting to accept or to reject the Plan and (d) other materials as authorized by the Bankruptcy Court.

If you are the Holder of a Claim that is entitled to vote, but you did not receive a ballot, or if your ballot is damaged or illegible, or if you have any questions concerning voting procedures, you may contact the following:

**If by regular mail:**

TLC Vision (USA) Corporation Ballot Processing,
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5014
New York, NY 10150-5014
Attn: Janice E. Livingstone

**If by overnight courier or hand delivery:**

TLC Vision (USA) Corporation Ballot Processing,
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017
Attn: Janice E. Livingstone

**If by telephone, for U.S. callers only:**

Epiq Systems, Inc.
Telephone: [_____]

**If by telephone, for international callers:**

Epiq Systems, Inc.
Telephone: [_____]

## D. Voting Procedures, Ballots and Voting Deadline

After reviewing the Plan and this Disclosure Statement, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying ballot. You should complete and sign your original ballot (copies will not be accepted) and return it in the envelope provided.

1113/74009-007 Current/17228164v7
RLF1 3534297v.2

Each ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded ballot or ballots sent to you with this Disclosure Statement.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND <u>RECEIVED</u> NO LATER THAN [_____], 2010, AT 5:00 P.M. EASTERN TIME (THE "<u>VOTING DEADLINE</u>") BY THE FOLLOWING:

**If by regular mail:**

TLC Vision (USA) Corporation Ballot Processing,
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5014
New York, NY 10150-5014
Attn: Janice E. Livingstone

**If by overnight courier or hand delivery:**

TLC Vision (USA) Corporation Ballot Processing,
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017
Attn: Janice E. Livingstone

UNLESS OTHERWISE PROVIDED IN THE INSTRUCTIONS ACCOMPANYING THE BALLOTS, FAXED BALLOTS WILL NOT BE ACCEPTED. BALLOTS THAT ARE RECEIVED BUT NOT SIGNED WILL NOT BE COUNTED. BALLOTS THAT ARE SIGNED BUT DO NOT SPECIFY WHETHER THE HOLDER ACCEPTS OR REJECTS THE PLAN WILL BE NULL AND VOID. DO NOT RETURN ANY STOCK CERTIFICATES, DEBT INSTRUMENTS OR OTHER EVIDENCE OF YOUR CLAIM WITH YOUR BALLOT.

Copies of this Disclosure Statement, the Plan and any appendices and exhibits to such documents are available to be downloaded free of charge on the TLC Vision (USA) Corporation, *et al.* case website: www.epiqbankruptcysolutions.com. If you have any questions about (a) the procedure for voting your Claim, (b) the packet of materials that you have received, or (c) the amount of your Claim, or if you wish to obtain, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), an additional copy of the Plan, this Disclosure Statement or any appendices or exhibits to such documents, please contact:

**If by regular mail:**

TLC Vision (USA) Corporation Ballot Processing,

22

c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5014
New York, NY 10150-5014
Attn: Janice E. Livingstone

**If by overnight courier or hand delivery:**

TLC Vision (USA) Corporation Ballot Processing,
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017
Attn: Janice E. Livingstone

For further information and general instruction on voting to accept or reject the Plan, see <u>Article XII</u> of this Disclosure Statement and the instructions accompanying your ballot.

THE DEBTORS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO EXERCISE THEIR RIGHT BY VOTING IN FAVOR OF THE PLAN AND OTHERWISE COMPLETING THEIR BALLOTS AND RETURNING THEM BY THE VOTING DEADLINE.

**E.     Confirmation Hearing and Deadline for Objections to Confirmation**

Pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), the Bankruptcy Court has scheduled a Confirmation Hearing for [_____], at _____.m. prevailing Eastern time. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing. Objections to confirmation of the Plan or proposed modifications to the Plan, if any, must (i) be in writing, (ii) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, (iii) state the name and address of the objecting party and the amount and nature of the claim or interest of such party, (iv) state with particularity the basis and nature of any objection to the Plan and (v) be filed electronically, together with proof of service, with the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Third Floor, Wilmington, Delaware 19801, www.deb.uscourts.gov, and served on the parties listed in the Confirmation Hearing notice, in each case so as to be actually received on or before **5:00 p.m. (prevailing Eastern time) on [_____]**. Objections to Confirmation of the Plan are governed by Bankruptcy Rule 9014.

## IV.     GENERAL INFORMATION CONCERNING THE DEBTORS

**A.     Corporate Structure**

TLC Vision (USA) Corporation ("<u>TLC USA</u>"), a Delaware corporation, is a wholly-owned subsidiary of TLC Vision Corporation ("<u>TLC Canada</u>"), a Canadian corporation. TLC Canada is traded on the NASDAQ Global Market under the symbol "TLCV" and on the Toronto Stock Exchange under the symbol "TLC." TLC Management Services Inc., ("<u>TLC MSI</u>", and together with TLC USA and TLC Canada, the "<u>Debtors</u>"), a Delaware corporation, is

23

a wholly-owned subsidiary of TLC USA and employs virtually all of the non-executive employees of the Debtors and their non-debtor affiliates.

## B.    Overview of Business Operations

Founded in 1993 by a predecessor of the Debtors and their non-debtor affiliates, (collectively, the "Company"), the Company has grown into one of North America's premier eye care service companies. Despite the current economic climate, the Company maintains a leading position in refractive, cataract and optometric markets. The Company operates distinct lines of business, described in greater detail below, which include: (a) owning and providing management services to 71 refractive laser centers in the United States and Canada, (b) providing doctors and medical facilities with equipment, supplies, and technicians in 40 states, and (c) providing marketing, practice development and purchasing power to independently owned optometric centers under the Vision Source® brand. The Company's U.S. corporate headquarters is located in St. Louis, Missouri. The Debtors, generally speaking, are administrative entities that provide corporate services to a variety of affiliated medical services company.

Debtors TLC USA and TLC MSI provide management and related services to the Company's operations in the United States, which include more than 30 non-debtor affiliates of the Debtors. These entities do not provide health care services and do not have patients. Debtor TLC Canada primarily provides management and related services to the Company's operations in Canada, but directly owns and manages certain refractive centers in Canada. Among other things, the Debtors provide critical cash management, personnel and other administrative services to their numerous non-debtor affiliates. As described below, the Company's cash management system is fully integrated and the Company expects that the flow of funds between and among the Company's Debtor and non-debtor entities will not be adversely affected by the Commencement of the Chapter 11 Cases.

## C.    Description of the Debtors' Business Operations

### 1.    Refractive Centers

The Company, almost exclusively through its non-debtor entities, owns and provides management services to refractive laser centers in the United States and Canada that provide an environment for doctors to treat common refractive vision disorders such as myopia (nearsightedness), hyperopia (farsightedness) and astigmatism. At these refractive centers, optometrists and ophthalmologists affiliated with the Company perform corrective laser surgery using excimer laser technology.

Because most states prohibit the Company from practicing medicine, employing physicians to practice medicine on the Company's behalf, or employing optometrists to render optometric services on the Company's behalf, the Company's activities generally are limited to owning and providing management services to refractive centers and affiliating with other health care providers. The Company, therefore, developed and implemented a comprehensive co-management model under which it not only establishes and provides management services to refractive centers, but also coordinates the activities of the various doctors, including the primary care and surgical doctors, who assess and perform various operative and non-operative medical procedures. In connection with this co-management model, the Company has developed

24

proprietary management and administrative software that is designed to assist eye care professionals in providing high levels of patient care and which they utilize in substantially all of the Company's refractive centers.

Accordingly, the success of the Company's operations depends in large part on the Company's ability to enter into agreements on acceptable terms with a sufficient number of health care providers, including institutions and eye care doctors, to render surgical and or other professional services at the centers.

Laser eye surgery is considered an elective procedure and is therefore not covered by most insurance providers, including the provincial health care plans in Canada and Medicare and Medicaid in the United States. As a result, the primary sources of revenue generated by the refractive center business is derived from: (a) amounts charged to patients for procedures performed at laser centers and collected by the Company on behalf of the medical care professional who performed the procedure; (b) management and facility fees paid by doctors who use the center to perform laser vision correction procedures; and (c) administrative fees for billing and collection services from doctors who co-manage patients treated at the centers.

2.     Doctors' Services

The Company's doctor services business provides a variety of services and products directly to doctors and facilities in which the doctors perform surgeries. Primarily through non-debtor subsidiaries, the Company: (a) furnishes doctors and medical facilities with mobile or fixed site refractive and cataract surgery equipment, supplies, technicians and diagnostic products, and (b) owns and provides management to single-specialty ambulatory surgery centers.

The Company's mobile cataract segment provides mobile and fixed site technology and service to doctors and hospitals to support cataract surgery as well as treatment of other eye diseases in approximately 41 states.

The Company's refractive access segment assists surgeons by providing mobile and fixed site corrective laser surgery refractive technology and value support services such as training, technical support and equipment maintenance. The Company's mobile access systems are provided by means of a proprietary patented Roll-On/Roll-Off laser system which is transported between doctors' offices to provide temporary in-office use of the laser equipment. The Company's fixed site lasers, primarily used by surgeons who perform more than 40 procedures per month, are permanently located at a surgeon's office, or such other location where eye surgeries are performed such as ambulatory surgery centers. Surgeons using mobile or fixed site lasers do not operate under the TLC name and pay a fee to the Company for each procedure performed using the Company's equipment.

The Company also provides doctor services through its surgical and secondary care center segment. This is a minor segment through which the Company maintains ownership interests in several refractive practices and ambulatory surgical centers. These businesses are conducted through non-debtor entities.

1113/74009-007 Current/17228164v7
RLF1 3534297v.2

3.    Eye Care

The Company, through non-debtor entities, provides franchise opportunities to independent optometrists and other qualified care providers. The Company's optometric franchising segment provides marketing, practice development and purchasing power to independently-owned and operated practices in the U.S. and Canada under the Vision Source® brand.

**D.    Pre-Confirmation Management and Employees**

1.    Existing Board of Directors

The Debtors' boards of directors oversee the Debtors' management, review their long-term strategic plans and exercise direct decision making authority in key areas. Information on the post-Effective Date Board of Directors will be submitted with the Plan Supplement prior to the Confirmation Hearing. Set forth below is information with respect to the members of each Debtors' current Board of Directors (each, a "Board" and collectively, the "Boards"):

(a)    TLC Vision Corporation

- *Warren S. Rustand, Chairman*
- *Michael D. DePaolis*
- *Jay T. Holmes*
- *Gary F. Jonas*
- *Olden C. Lee*
- *Richard L. Lindstrom, M.D.*
- *Toby S. Wilt*

(b)    TLC Vision (USA) Corporation

- *James B. Tiffany*
- *Charles H. Judy*
- *Ellen J. Plass*

(c)    TLC Management Services Inc.

- *James B. Tiffany*

The non-employee directors receive compensation in the amount of $25,000 per year for service on the Boards plus applicable meeting and committee fees and expenses.

The Board of Directors of TLC Vision has three standing committees: (a) the audit committee; (b) the compensation committee; and (c) the corporate governance and nominating committee.

26

2. **Existing Executive Officers:** The following are each of the Debtors' current executive officers:

### TLC Vision Corporation

- *James B. Tiffany, President & Chief Operating Officer*
- *William J. McManus, Interim Chief Financial Officer*
- *Charles H. Judy, Senior Vice President, Shared Services and Secretary*
- *Henry W. Lynn, Vice President, Chief Information Officer*
- *James J. Hyland, Vice President, Investor Relations*
- *Patricia S. Larson, Assistant Secretary*
- *Jonathan Compton, Assistant Treasurer*
- *Ellen-Jo Plass, Senior Vice President, Centers Operations*
- *Jim Feinstein, Senior Vice President, Sales*
- *Dan Robins, Vice President, Access Operations*

### TLC Vision (USA) Corporation

- *James B. Tiffany, President & Chief Operating Officer*
- *William J. McManus, Interim Chief Financial Officer*
- *Jonathan Compton, Assistant Treasurer*
- *Charles H. Judy, Secretary*
- *Assistant Secretary, Patricia Larson*

### TLC Management Services Inc.

- *James B. Tiffany, President & Chief Operating Officer*
- *William J. McManus, Interim Chief Financial Officer*
- *Jonathan Compton, Assistant Treasurer*
- *Charles H. Judy, Secretary*
- *Assistant Secretary, Patricia Larson*

3. **Employees/Labor Relations**

As of the Petition Date, the Company employed approximately 742 full-time and part-time (twenty-four (24) hours or less a week) hourly-wage, piece-rate and salaried employees. Certain officers and employees of the Debtors are subject to executive employment agreements (which include severance and separation terms). In addition, the Debtors also use the services of certain temporary and contract workers.

27

4. Existing Compensation and Benefits

The Company has historically provided a competitive compensation and benefit package to its employees, consistent with its belief that the success of its businesses is dependent to a significant extent upon the efforts and abilities of its employees.

(a)     *Retirement Plan*

The Debtors offer certain Employees the opportunity to participate in a retirement plan qualified under section 401(k) of the Internal Revenue Code (the "401(k) Plan"). The 401(k) Plan is administered by Great-West Retirement Services. Under the terms of the 401(k) Plan, Employees who are at least twenty-one (21) years old and have been employed by the Debtors for at least three (3) months may elect to contribute a portion of their salary or wages to the 401(k) Plan. The 401(k) Plan allows for automatic, pre-tax salary deductions from a participating Employee's eligible compensation in an aggregate amount equal to the annual limit established under the Internal Revenue Code (i.e., $16,500 in 2009, plus, when applicable, a $5,500 catch-up contribution amount for employees over age 50).

(b)     *Postconfirmation Compensation and Benefits*

Except and to the extent previously assumed by an order of the Bankruptcy Court on or before the Effective Date, all officer, director or employee compensation and benefit programs of the Debtors entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under Section 6.01 of the Plan, but only to the extent that rights under such programs are held by the Debtors or Persons who are employees of the Debtors as of the Effective Date, and the Debtors' obligations under such programs to Persons who are employees of the Debtors on the Effective Date shall survive Confirmation of the Plan, except for (a) executory contracts or plans specifically rejected pursuant to the Plan, and (b) executory contracts or plans that have previously been rejected, are the subject of a motion to reject, or have been specifically waived by the beneficiaries of any plans or contracts.

## E.     Pre-Petition Capital Structure

1. Credit Facility

On June 21 2007, certain of the Debtors entered into that certain Amended and Restated Credit Agreement (as amended and restated, and modified from time to time, the "Credit Agreement") for a $110.0 million credit facility (the "Credit Facility") among TLC USA, TLC Canada, as guarantor, the additional guarantors, the lenders party thereto (the "Secured Lenders"), and Wells Fargo Bank, National Association (the "Administrative Agent"). The Credit Agreement is secured by a first priority security interest in substantially all the assets of the Debtors, including the Debtors' cash and cash equivalents, and consists of both senior term debt and a revolver as follows:

- Senior term debt, totaling $85.0 million, with a six-year term and required amortization payments of 1% per annum plus a percentage of excess cash flow (as defined in the Credit Agreement) and sales of assets or borrowings outside of the normal course of business.

28

- A revolving credit facility, totaling $25.0 million with a five-year term. As of the Petition Date, $23.4 million was outstanding under this portion of the facility.

- Interest on the facility is calculated based on either prime rate or the London Interbank Offered Rate (LIBOR) plus a margin. Effective June 30, 2009, the Debtors began incurring 2% default rate interest and all LIBOR advances with interest periods ending on or after June 30, 3009 automatically converted to prime rate advances.

The Credit Facility, among other things, requires the Debtors to maintain various financial and non-financial covenants as defined in the Credit Agreement. On multiple occasions prior to the Petition Date, the Debtors executed amendments to the Credit Facility, multiple of which modified the Credit Facility to prevent, cure or waive the Debtors' defaults (past or prospective) under such facility. On September 11, 2009, the Debtors executed that certain Limited Waiver and Amendment No. 5 to the Credit Agreement, dated as of September 8, 2009. The Limited Waiver and Amendment No. 5 (as amended), among other things, provided a limited waiver through November 15, 2009 of certain defaults and provided that the Prepetition Lenders would, until November 15, 2009, forbear from exercising their rights arising out of the non-payment of certain principal, interest and other payments previously due under the Credit Facility. The Limited Waiver and Amendment No. 5 expired on November 15, 2009, and the Debtors have operated without any further waiver or forbearance agreement since that date.

2.      Interest Rate Swap Agreement

As required under the Credit Facility, the Debtors entered into interest rate swap agreements to eliminate the variability of cash required for interest payments for a majority of the total variable rate debt. Under the agreement entered during August 2007, the Debtors receive a floating rate based on the LIBOR interest rate and pay a fixed rate of 5.0% on notional amounts ranging from $20 million to $42 million over the life of the swap agreement, which matures on April 1, 2010. Under the agreement entered during December 2007, with an effective date of January 2, 2008, the Debtors receive a floating rate based on the LIBOR interest rate and pay a fixed rate of 3.9% on notional amounts ranging from $20 million to $32 million over the life of the swap agreement, which matures on April 1, 2010.

On July 10, 2009, based on asserted defaults, Citibank N.A. terminated the swap agreement, effective as of July 9, 2009. As a result of this termination, Citibank asserts it is owed approximately $1,625,000, which amount would be added to the balance of the Debtors' senior secured debt under the Credit Agreement.

3.      Equipment and Capital Financing

Prior to the Petition Date, the Debtors entered into various capital leases, primarily to obtain lasers and other medical equipment. The Debtors primarily utilize VISX lasers manufactured by Abbott Medical Optics, Inc. ("AMO") for refractive surgery. The Debtors do not have an exclusive manufacturing agreement with AMO, as their laser technologies are available on a non-exclusive basis to all LASIK providers. The majority of the Debtors' capital leases are governed by that certain master lease with AMO dated as of May 17,

2006, as amended, which covers 60 Intralase laser machines. The payment obligations arising under this master lease are approximately $7.9 million in the aggregate over the next five years.

**F.      Summary of Assets**

The Debtors filed Schedules with the Bankruptcy Court that detail the assets owned by each of the Debtors. Such assets include cash on hand, bank accounts and investments, security deposits, insurance policies, stock interests, accounts receivable, intellectual property, vehicles, office equipment, furnishings and supplies, machinery, fixtures, equipment and supplies used in business, inventory, and other items of personal property. The Schedules will provide asset values on a net book basis, which are not reflective of actual values. The Schedules may be reviewed on the Bankruptcy Court electronic case filing system, on the Debtors' case website at www.epiqbankruptcysolutions.com or during business hours in the offices of the Clerk of the Bankruptcy Court. Information regarding the Debtors' assets is also available in the Liquidation Analysis attached hereto as Appendix C.

**G.      Historical Financial Information**

Attached as Appendix D is selected financial data for the Debtors. As indicated in Appendix D certain of this financial data has not yet been audited.

**H.      Events Leading to Commencement of the Chapter 11 Cases**

The Debtors experienced financial difficulties for several years prior to the Petition Date, including recurring losses from continuing operations of $98.3 million and $35.3 million for the years ended December 31, 2008 and 2007, respectively. Nonetheless, the Debtors started 2008 with their best quarter in their history. During the quarter ended March 31, 2008, refractive center revenue was up 14% over the prior year, consolidated net income was up 75%, earnings per diluted share were up 142%, operating cash flow was up 49% and total debt was reduced by 6%. The reason for this great quarter was two-fold. First, the Debtors reaped the benefits of successfully transitioning their refractive centers to a new, robust operating model that had been built in 2007. Second, the economy, although challenged, was operating under a consumer confidence index of 95 at the start of the year. Ultimately, however, the unprecedented economic conditions that unfolded over the course of 2008 and 2009 took their toll on the Debtors.

The foundation of the Debtors' primary business, laser vision correction, is generally not reimbursed by health care insurance companies or other third-party payors and is therefore impacted by changes in economic and stock market conditions, unemployment rates, consumer confidence and discretionary spending patterns. The deepening recession in the fourth quarter of 2008 and through much of 2009 had a significant impact on the Debtors' operations, resulting in a sharp decline in their financial performance. As a result, the Debtors' liquidity became progressively constrained. By the end of 2008, the Debtors experienced a more than 20% annual decline in refractive center and shared access procedures. The resulting precipitous decline in operating revenue led the Debtors to fall out of compliance with the primary financial covenants under the Credit Facility.

In response to the deteriorating economic environment, the Debtors implemented a series of initiatives to reduce their costs of operation to levels commensurate with the new lower level of refractive procedures. The Debtors have continued to implement cost reduction

30

and cash generation initiatives, including reductions in headcount, freezing or reducing salaries and benefits, reductions in discretionary spending including direct to consumer marketing, reductions in overhead costs, lower capital spending, the sale of surplus assets, and the closure of underperforming refractive centers/mobile refractive routes. In addition, the Debtors continued the diversification of their business model focusing on the doctor services and eye care businesses where services are reimbursed by third party insurance or Medicare, which is critical in an economy where discretionary spending slowed dramatically.

In addition, the Debtors engaged advisors to help them explore various alternatives to restructure their balance sheet, including selling the entire business or significant assets, seeking capital infusions, or restructuring their current debt. The freezing of the financial markets that began in the late summer and fall of 2008, however, limited the ability of companies such as the Debtors to access the capital markets and ultimately prevented the Debtors from completing any of the alternatives they were exploring.

Therefore, the Debtors focused their attention on working with the Prepetition Lenders to create a more flexible capital structure reflective of the challenges within the economy. The Debtors began active discussions with the Prepetition Lenders to ensure that they had sufficient liquidity in excess of what is available under the Credit Facility. These discussions resulted in a series of waivers and amendments to the Credit Facility. Nonetheless, the Debtors were unable to make interest and principal payments under the Credit Facility and, when it became apparent that they could not service the debt arising under the Prepetition Facility, the Debtors entered into discussions with the Prepetition Lenders to secure both a short-term financial debt covenant compliance waiver to cure existing defaults and to execute a plan support agreement to be implemented though the filing of the Chapter 11 Cases.

These negotiations resulted in the execution of a Plan Support Agreement with certain of the Prepetition Lenders (the "Plan Support Agreement" or the "Prepetition Lender PSA"), which outlined the terms of a plan of reorganization supportable at that time by both the Debtors and a majority of the Prepetition Lenders. The Plan Support Agreement provided for a mechanism to satisfy all of the Debtors' essential creditors, doctors, employees, customers and patients, and to de-leverage their balance sheet to enable them to emerge with a more manageable debt load.

On January 6, 2010, the Debtors filed a plan of reorganization (the "Lender Plan") and related disclosure statement consistent with the Prepetition Lender PSA. Since the Petition Date, in furtherance of their fiduciary duties, and in accordance with the terms of the Prepetition Lender PSA and this Court's interim order entered on December 22, 2009 [Docket No. 40] approving the DIP Agreement (the "Interim DIP Order"), the Debtors continued to explore possible restructuring transactions, as an alternative to the restructuring outlined in the Prepetition Lender PSA under certain terms and conditions. The Prepetition Lender PSA and paragraph 39 of the Interim DIP Order provided that the Debtors could exercise a "fiduciary out" and terminate the Prepetition Lender PSA. To exercise the fiduciary out, the Debtors must do the following: (i) provide the Prepetition Lenders with written notice of the board of directors' decision to exercise the fiduciary out concurrently with such decision being made; (ii) file a motion, concurrently with delivering the notice described in (i) above, seeking authority to pay all amounts owing under the DIP Agreement in full in cash (which motion may seek approval for debtor-in-possession financing secured by liens that are junior to, but not senior to or *pari passu*

1113/74009-007 Current/17228164v7
RLF1 3534297v.2

with the liens of the Prepetition Lenders); (iii) file a plan of reorganization, concurrently with delivering the notice described in (i) above, that provides (A) for payment in full in cash of the Prepetition Lender Secured Claims, (B) an effective date of no later than May 20, 2010, (C) reasonable evidence of committed financing, and (D) that it is not contingent on further due diligence or obtaining financing; and (iv) obtain a Bankruptcy Court order approving the Junior DIP financing and pay the Prepetition Lender DIP financing in cash in full, within 15 days of delivering the notice described in (i) above. The Debtors have determined to exercise their fiduciary out and terminate the Prepetition Lender PSA, conditioned upon this Court's approval of the Plan Sponsor Agreement and the Junior DIP Loan Agreement.

## I.     The Debtors' Exercise of Fiduciary Termination Rights and the Plan Sponsor Agreement

After lengthy and arm's-length negotiations, the Debtors and the Buyers, which are affiliates of Charlesbank, entered into the Plan Sponsor Agreement dated February 3, 2010, subject to the approval of this Court. Pursuant to and subject to the conditions set forth in the Plan Sponsor Agreement, the Buyers, among other things, have agreed to purchase and assume from the Debtors all right, title, interest and obligation of the Debtors in and to substantially all of the assets and liabilities of the Debtors' business pursuant to the Sponsored Plan. Charlesbank has committed to provide equity financing to the Buyers sufficient to satisfy their obligations under the Plan Sponsor Agreement and the Plan. The Debtors believe that this Plan to be implemented by the Plan Sponsor Agreement will yield greater results to their estates than the Lender Plan and will permit the Debtors to emerge from chapter 11 with a significantly more deleveraged balance sheet. Additionally, the Plan provides the Debtors' Prepetition Lenders with payment in full on account of the Prepetition Lender Secured Claims on the Effective Date and a greater cash distribution to the Debtors' unsecured creditors than they would have received under the Lender Plan.

The salient terms of the Plan Sponsor Agreement are:[2]

- **Purchased Assets:** Substantially all of Debtor TLC Vision Corporation, including, without limitation, the Business as a going concern, furniture and equipment, inventories, merchandise, Cash, accounts receivable, books and records, Intellectual Property, certain claims and causes of action, Assumed Contracts, Permits, leasehold interests, and the stock of TLC Vision (USA) Corporation, The Laser Center (Moncton), Inc. and OccuLogix Inc., as specifically set forth in Section **[2.1]** of the Plan Sponsor Agreement;

---

[2]   The summary of the Plan Sponsor Agreement which follows is subject to the full terms of the Plan Sponsor Agreement which is annexed hereto as Exhibit B to the Motion to Approve the Plan Sponsor Agreement being filed concurrently herewith.

1113/74009-007 Current/17228164v7
RLF1 3534297v.2

- **Consideration:** In accordance with Sections 2.3, and 2.4 of the Plan Sponsor Agreement and subject to the terms thereof, the Buyers will provide the following consideration:

    a.  Payment of an amount sufficient to pay the General Unsecured Claims of the TLC Vision Corporation and any amount payable in respect to TLC Vision Corporation's equity, up to a maximum of $862,500;

    b.  An amount sufficient to repay the Debtors' existing indebtedness under the Prepetition Credit Agreement up to a maximum of $107,677,000;

    c.  An amount sufficient to repay the Junior DIP Loan up to a maximum of $25,000,000.

    d.  An amount sufficient to pay the General Unsecured Claims of TLC Vision (USA) Corporation and TLC Management Services Inc., up to a maximum of $862,500;

    e.  An amount sufficient to fund a reserve account for any amounts payable in respect of the TLC Vision Corporation's Allowed Priority Tax Claims and Allowed Administrative Claims to the extent provided in the Plan Sponsor Agreement;

    f.  An amount sufficient to pay the Restructuring Expenses in the manner provided in the Plan Sponsor Agreement and subject to the Restructuring Expenses Cap as defined in the Plan Sponsor Agreement (less restructuring expenses paid by the Debtors before Closing and less the reserve amount for Allowed Priority Tax Claims and Allowed Administrative Claims); and

    g.  Assumption of capital lease obligations of TLC Vision Corporation up to a maximum amount of $7,172,000.

- **Representations and Warranties:** Representations and warranties of the Debtors, as specifically set forth in Article 3 of the Plan Sponsor Agreement, and representations and warranties of the Buyer Parties, as specifically set forth in Article 4 of the Plan Sponsor Agreement.

Pursuant to an equity commitment letter dated February 3, 2010 (the "Equity Commitment Letter"), the Plan Sponsor has committed, subject to the approval of the Plan Sponsor Agreement by this Court and conditions contained in Section 2 of the Equity Commitment Letter, to provide equity financing to the Buyer Parties or their affiliates in an aggregate amount up to a maximum of $134,402,000 in cash in exchange for the equity securities of the Buyer Parties, which have been formed for the purpose of acquiring the

33

Purchased Assets pursuant to the Plan Sponsor Agreement. The proceeds from the purchase of the securities pursuant to the Equity Commitment Letter shall be used by the Buyer Parties to fund the Purchase Price under the Plan Sponsor Agreement and thereafter for other purposes relating to the purchase and sale of the Purchased Assets.

## J. The Debtors' Significant Leverage

As the Debtors experienced decreasing revenues, they continued to maintain significant leverage and, as such, attendant high debt costs. As of the Petition Date, the Debtors' books reflected approximately [$_____ million] of debt obligations and assets of approximately [$_____ million].

# V. THE CHAPTER 11 CASES

## A. Continuation of Business; Stay of Litigation

As described above, on December 21, 2009, the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have continued to operate as debtors in possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. The Debtors are authorized to operate their businesses and manage their properties in the ordinary course, with transactions outside of the ordinary course of business requiring Bankruptcy Court approval.

An immediate effect of the filing of the Debtors' bankruptcy petitions was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by creditors, the enforcement of liens against property of the Debtors and the continuation of litigation against the Debtors. The relief provides the Debtors with the "breathing room" necessary to assess and reorganize their businesses and prevents creditors from obtaining an unfair recovery advantage while the reorganization is ongoing.

On December 23, 2009, TLC Canada, as foreign representative, brought an application to the Canadian Court under the CCAA. The Canadian Court entered an order pursuant to Section 47 of the CCAA that, among other things: (a) recognized the Chapter 11 Cases as a "foreign main proceeding" in Canada; (b) determined that TLC Canada was entitled to relief under the CCAA; (c) appointed the Information Officer; and (d) stayed proceedings against TLC Canada in Canada.

## B. First Day Motions and Orders

On the first day of the Chapter 11 Cases, the Debtors filed several applications and motions seeking certain relief by virtue of so-called "first day orders." First day motions and orders are intended to facilitate the transition between a debtor's prepetition and postpetition business operations by approving certain regular business practices that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the Bankruptcy Court. The first day motions filed in the Chapter 11 Cases are

typical of motions filed in large Chapter 11 cases across the country. Such motions sought, among other things, the following relief:

- establishment of procedures for interim compensation of professionals;

- authorization to pay employees' prepetition compensation, benefits and expense reimbursement amounts;

- authorization to pay prepetition taxes and fee amounts;

- authorization to pay prepetition claims of certain creditors, including creditors with claims related to insurance premium financing arrangements, in the ordinary course of business;

- joint administration of the Debtors' bankruptcy cases;

- authorization for debtor-in-possession financing (as further discussed below);

- maintenance of the Debtors' bank accounts and operation of their cash management systems substantially as such systems existed prior to the Petition Date;

- rejection of an unexpired lease of nonresidential real property; and

- establishment of adequate assurance of payment to utilities as a condition of receiving services and prohibiting utilities from altering, refusing or discontinuing services.

Where necessary or appropriate, the Debtors have obtained orders of the Canadian Court recognizing certain orders entered in the Chapter 11 Cases.

## C.    Retention of Professionals

The Debtors are represented in the Chapter 11 Cases by Proskauer Rose LLP ("Proskauer") and Richards, Layton & Finger LLP ("Richards Layton"). The Debtors also retained crisis management personnel of Conway Del Genio & Gries & Co., LLC ("CDG"). CDG was originally retained by TLC Vision Corporation prepetition. Epiq Bankruptcy Solutions, LLC was authorized to provide claims, noticing and balloting services to the Debtors.

## D.    Debtor in Possession Financing and Authorization to Use Cash Collateral

Cash collateral is defined in section 363 of the Bankruptcy Code and includes, but is not limited to, "cash, negotiable instruments, documents of title, securities, deposit accounts, . . . other cash equivalents. . . and . . . proceeds, products, offspring, rents or profits of property subject to a security interest. . ." 11 U.S.C. § 363(a). Under the Bankruptcy Code, the Debtors are prohibited from using, selling or leasing cash collateral unless either the appropriate creditors consent or the Bankruptcy Court, after notice and a hearing, authorizes such action.

1113/74009-007 Current/17228164v7
RLF1 3534297v.2

On the Petition Date, the Debtors filed the *Motion of Debtors for Entry of Interim and Final Orders: (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Superpriority Financing Pursuant to 11 U.S.C. §§ 361, 362, 363(c), 363(e), 364(c), 364(d) and 364(e) and (B) Utilize Cash Collateral of Prepetition Secured Parties, (II) Granting Adequate Protection to the Prepetition Senior Secured Lenders and (III) Granting Related Relief* [*Docket No. 10*] (the "DIP Motion"). The terms of the DIP Motion were agreed upon by the Prepetition Lenders.

By the DIP Motion, the Debtors sought (a) authority to obtain postpetition financing, on an interim basis and on a final basis, in the aggregate committed amount of up to $15 million (the "DIP Facility") (b) authority to use cash collateral pursuant to section 363 of the Bankruptcy Code and (c) authority to grant adequate protection to Wells Fargo Bank, National Association (the "Prepetition Agent"), as agent for the Prepetition Lenders. In addition, the Debtors sought to secure the DIP Facility by post-petition liens that are senior to all prepetition liens and obligations other than valid and enforceable prepetition liens permitted under the Prepetition Credit Agreement to be senior in priority.

## E.    Junior DIP Financing

Concurrently with the filing of this Disclosure Statement, the Debtors are seeking approval of a junior debtor-in-possession financing facility (the "Junior DIP") from Charlesbank of up to $25 million. The Junior DIP will provide the Debtors with sufficient funds to (i) payoff the Debtors' existing debtor-in-possession facility provided by Prepetition Lenders and (ii) provide sufficient working capital to fund the Debtors' operations through the Effective Date of the Plan. The amounts to be paid by the Buyer Parties under the Plan Sponsor Agreement will be used by the Debtors to, among other things, repay the Junior DIP.

## VI.    SUMMARY OF THE PLAN OF REORGANIZATION

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS, THE REORGANIZED DEBTORS AND OTHER PARTIES IN INTEREST. IN THE EVENT OF

ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

## A.     Overall Structure of the Plan

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors and other stakeholders.  Upon the filing of a petition for relief under chapter 11, section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the chapter 11 case.

The consummation of a plan of reorganization is the principal objective of a chapter 11 case.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (a) is impaired under or has accepted the plan or (b) receives or retains any property under the plan.  Subject to certain limited exceptions, and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes for such debt the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

If the Plan is confirmed by the Bankruptcy Court and consummated, (a) the Claims in certain Classes will be Reinstated or modified and receive distributions equal to the full amount of such Claims, (b) the Claims of certain other Classes will be modified and receive distributions constituting a partial recovery on such Claims and (c) the Claims and Interests in certain other Classes will receive no recovery on such Claims or Interests.  On the Effective Date and at certain times thereafter, the Reorganized Debtors will distribute Cash and other property in respect of certain Classes of Claims as provided in the Plan.  Under the Plan, Claims against and Interests in the Debtors are divided into Classes according to their relative seniority and other criteria.  The Classes of Claims against and Interests in the Debtors created under the Plan, the treatment of those Classes under the Plan and other property to be distributed under the Plan are described below.

## B.     Substantive Consolidation

The Plan does not provide for the substantive consolidation of the Debtors' assets and liabilities.  The Debtors, however, reserve the right to seek substantive consolidation by motion if they conclude that substantive consolidation is necessary or appropriate for effectuation of the Plan.

## C.     Reorganized Capital Structure Created by Plan

The Plan sets forth the following capital structure for the Reorganized Debtors upon their emergence from chapter 11: [**TBD**].

**D.      Classification and Treatment of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan of reorganization must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with section 1122 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims, Priority Tax Claims and Junior DIP Claims which, pursuant to section 1123(a)(1), do not need to be classified).  The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtors into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law, but it is possible that a Holder of a Claim or Interest may challenge the Debtors' classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  In that event, the Debtors intend, to the extent permitted by the Bankruptcy Code, the Plan and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting Holder ultimately is deemed to be a member.  Any such reclassification could adversely affect the Class in which such Holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

Except as to Claims specifically Allowed in the Plan, the amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and accordingly the total Claims ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class.  Thus, the value of the property that ultimately will be received by a particular Holder of an Allowed Claim under the Plan may be adversely or favorably affected by the aggregate amount of Claims ultimately Allowed in the applicable Class.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below.  The Debtors believe that the consideration, if any, provided under the Plan to Holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual and statutory subordination) of such Claims and Interests and the fair value of the Debtors' assets.  With respect to any Class deemed to reject the Plan and any Class that rejects the Plan, the Debtors will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code as to any dissenting Class.  Section 1129(b) of the Bankruptcy Code permits confirmation of a chapter 11 plan in certain circumstances even if the plan has not been accepted by all Impaired classes of Claims and Interests.  See Section X.F herein.  Although the Debtors believe that the Plan can be confirmed under section 1129(b) of the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will find that the requirements to do so have been satisfied.

1113/74009-007 Current/17228164v7
RLF1 3534297v.2

1.      Treatment of Unclassified Claims under the Plan

        (a)        Administrative Claims

An Administrative Claim is defined in the Plan as a Claim for (a) any cost or expense of administration (including, without limitation, the fees and expenses of Professionals) of any of the Chapter 11 Cases asserted or arising under sections 503, 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code including, but not limited to (i) any actual and necessary postpetition cost or expense of preserving the Debtors' respective Estates or operating the businesses of the Debtors, (ii) any payment to be made under the Plan to cure a default on an assumed executory contract or unexpired lease, (iii) any postpetition cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtors in the ordinary course of their respective businesses, (iv) compensation or reimbursement of expenses of Professionals to the extent Allowed by the Bankruptcy Court under section 330(a) or section 331 of the Bankruptcy Code, and (v) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546(c)(1)(B) of the Bankruptcy Code; (b) any fees or charges assessed against the Debtors' respective Estates under section 1930 of title 28 of the United States Code; and (c) any Allowed administrative claim or superpriority claim granted to the Collateral Trustee pursuant to the Cash Collateral Order.

Administrative Claims are Unimpaired. Unless otherwise provided for herein, each Holder of an Allowed Administrative Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (a) the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Administrative Claim becomes Allowed, or (iii) a date agreed to in writing by the Debtors or Reorganized Debtors, as the case may be, and the Holder of such Administrative Claim; or (b) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or the Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order; provided, however, that Allowed Administrative Claims representing (i) liabilities, accounts payable or other Claims, or obligations incurred in the ordinary course of business of the Debtors consistent with past practices subsequent to the Petition Date, or (ii) contractual liabilities incurred subsequent to the Petition Date, whether or not incurred in the ordinary course of business, shall be paid or performed by the Debtors or the Reorganized Debtors in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto.

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, will be paid on or before the Effective Date. All such fees that arise after the Effective Date but before the closing of the Chapter 11 Cases will be paid by the Reorganized Debtors.

Under the Plan, applications for compensation for services rendered and reimbursement of expenses incurred by Professionals (a) from the Petition Date through the Effective Date or (b) at any time during the Chapter 11 Cases when such compensation is sought pursuant to sections 503(b)(2) through (b)(5) of the Bankruptcy Code, must be Filed no later than forty-five (45) days after the Effective Date or such later date as the Bankruptcy Court approves, and must be served on (a) the Reorganized Debtors, TLC Vision (USA) Corporation, 16305

39

Swingley Ridge Road, Chesterfield, MO 63017 (Attn: William McManus), (b) counsel to the Debtors, Proskauer Rose LLP, 70 West Madison Street, Suite 3800, Chicago, Illinois 60602 (Attn: Mark K. Thomas), (c) the Office of the United States Trustee, 844 King Street, Suite 2207, Wilmington, Delaware 19801 and (d) any other party designated by the Bankruptcy Rules or any order of the Court to receive notice. Applications that are not timely Filed will be barred and will not be considered by the Court. The Reorganized Debtors will pay any valid claims for Professional fees and expenses incurred after the Effective Date without any application to the Bankruptcy Court.

(b)     Priority Tax Claims

The Plan defines Priority Tax Claims as any and all Claims accorded priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code. Such Priority Tax Claims include Claims of governmental units for taxes owed by the Debtors that are entitled to a certain priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code. The taxes entitled to priority are (a) taxes on income or gross receipts that meet the requirements set forth in section 507(a)(8)(A) of the Bankruptcy Code, (b) property taxes meeting the requirements of section 507(a)(8)(B) of the Bankruptcy Code, (c) taxes that were required to be collected or withheld by the Debtors and for which the Debtors are liable in any capacity as described in section 507(a)(8)(C) of the Bankruptcy Code, (d) employment taxes on wages, salaries or commissions that are entitled to priority pursuant to section 507(a)(4) of the Bankruptcy Code, to the extent that such taxes also meet the requirements of section 507(a)(8)(D), (e) excise taxes of the kind specified in section 507(a)(8)(E) of the Bankruptcy Code, (f) customs duties arising out of the importation of merchandise that meet the requirements of section 507(a)(8)(F) of the Bankruptcy Code and (g) prepetition penalties relating to any of the foregoing taxes to the extent such penalties are in compensation for actual pecuniary loss as provided in section 507(a)(8)(G) of the Bankruptcy Code. The Debtors have estimated that there will be no unpaid prepetition Priority Tax Claims as of the Effective Date.

Priority Tax Claims are Unimpaired. Each Holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors or the Reorganized Debtors, as the case may be, in full satisfaction, settlement, release, extinguishment and discharge of such Priority Tax Claim: (a) the amount of such unpaid Allowed Priority Tax Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Priority Tax Claim becomes Allowed and (iii) a date agreed to by the Debtors or Reorganized Debtors, as the case may be, and the Holder of such Priority Tax Claim; (b) equal Cash payments from the Reorganized Debtors made on the last Business Day of every three (3) month period following the Effective Date, over a period not exceeding five (5) years after the assessment of the tax on which such Priority Tax Claim is based, totaling the principal amount of such Priority Tax Claim plus simple interest on any outstanding balance from the Effective Date calculated at the interest rate publicly quoted on the Effective Date for obligations backed by the full faith and credit of the United States of America maturing in ninety (90) days; or (c) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Priority Tax Claim and the Debtors or the Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order. The Debtors or the Reorganized Debtors, as the case may be, shall have the right, in their sole discretion, to prepay at any time, in whole or in part, any Allowed Priority Tax Claim without premium or penalty of any sort or nature. Notwithstanding any provision to the

40

contrary in the Plan, the implementing Plan documents or the Order confirming the Plan: (1) nothing shall affect the rights of the United States Internal Revenue Service (the "<u>IRS</u>") to assert setoff and recoupment; and (2) the Priority Tax Claims of the IRS shall be paid on a no less than quarterly basis within five (5) years of the Petition Date and interest shall accrue on such claims from the Effective Date at the rate and method set forth in 26 U.S.C. Sections 6621 and 6622. Notwithstanding the foregoing, unless Her Majesty in Right of Canada agrees otherwise, each Allowed Canadian Priority Tax Claim shall be paid within six (6) months of the Canadian Sanction Order, or as the Canadian Court may order.

(c)     Junior DIP Claims

Junior DIP Claims are Unimpaired. The Junior DIP Claims shall be paid in full in cash (i) on or as soon as practicable after the Effective Date or (ii) upon such other terms as the Reorganized Debtors and the Holders of such Claims may agree.

2.     Treatment of Claims Against and Interests in TLC USA:

(a)     Class A1: Other Secured Claims

Class A1 Other Secured Claims are Unimpaired (unless such Claims are treated pursuant to clause (d) in the following sentence, in which case such Claims are Impaired and shall be entitled to vote). Each Holder of an Allowed Class A1 Other Secured Claim shall receive, in the sole discretion of the Debtors or the Reorganized Debtors, as the case may be, in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (a) Cash equal to the amount of such Allowed Other Secured Claim on or as soon as practicable after the later of (i) the Effective Date, (ii) the date that such Other Secured Claim becomes Allowed, and (iii) a date agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of such Class A1 Other Secured Claim; (b) treatment such that such Other Secured Claim is Reinstated; (c) the Property securing such Other Secured Claim, with any deficiency to result in a General Unsecured Claim; (d) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or Reorganized Debtors, as the case may be; or (e) as the Bankruptcy Court may order.

(b)     Class A2: Essential Trade Claims

Class A2 Essential Trade Claims are Unimpaired. Each Holder of an Allowed Class A2 Essential Trade Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Class A2 Claim becomes Allowed, and (iii) a date agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of such Class A2 Essential Trade Claim; or (b) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or the Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order.

(c)     Class A3: Other Priority Claims

Class A3 Other Priority Claims are Unimpaired. Each Holder of an Allowed Class A3 Other Priority Claim shall be paid in full in cash (a) on or as soon as practicable after the Effective Date or the date such claim is allowed in accordance with section 502 of the

41

Bankruptcy Code, whichever is later, or (b) upon such other terms, less favorable to the holder of such claim, as the Reorganized Debtors and the holder of such Claim may agree.

(d)      Class A4:  Prepetition Lender Secured Claims.

Class A4 Prepetition Lender Secured Claims are Impaired.  Each Holder of an Allowed Class A4 Prepetition Lender Secured Claim shall receive, on or as soon as reasonably practicable after the Effective Date, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, cash in an amount equal to such Allowed Class A4 Prepetition Lender Secured Claim.

(e)      Class A5:  General Unsecured Claims

Class A5 General Unsecured Claims are Impaired.  Each Holder of an Allowed Class A5 General Unsecured Claim shall receive, on or as soon as reasonably practicable after the Effective Date, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, its pro rata share of $862,500.

(f)      Class A6:  Medical Pending Litigation Claims

Class A6 Medical Pending Litigation Claims are Impaired.  On the Effective Date, the Holders of Class A6 Medical Pending Litigation Claims shall be entitled to payment exclusively by way of any insurance coverage held by TLC USA covering such Medical Pending Litigation Claims.

(g)      Class A7:  Subordinated Claims

Class A7 Subordinated Claims are Impaired.  Holders of Class A7 Subordinated Claims shall not receive or retain any property under the Plan on account of such Subordinated Claims.  On the Effective Date, all Subordinated Claims shall be extinguished.

(h)      Class A8:  Intercompany Claims

Class A8 Intercompany Claims are Impaired.  Holders of Class A8 Intercompany Claims shall not receive or retain any property under the Plan on account of such Intercompany Claims.  On the Effective Date, all Intercompany Claims shall be extinguished, provided that, claims owing by non-debtor subsidiaries and affiliates to TLC USA shall not be affected by this Plan.

(i)      Class A9:  TLC USA Common Stock and  Interests

Class A9 TLC USA Common Stock and  Interests are Impaired.  Holders of Class A9 TLC USA Common Stock and Interests shall not receive or retain any Property under the Plan on account of such Common Stock and Interests.  All TLC USA Common Stock and Interests shall be transferred to the Buyer Parties pursuant to the Plan Sponsor Agreement.

3.      Treatment of Claims Against and Interests in TLC Canada:

(a)      Class B1:  Other Secured Claims

Class B1 Other Secured Claims are Unimpaired (unless such Claims are treated pursuant to clause (d) in the following sentence, in which case such Claims are Impaired and shall be entitled to vote).  Each Holder of an Allowed Class B1 Other Secured Claim shall receive, in the sole discretion of the Debtors or the Reorganized Debtors, as the case may be, in

42

full satisfaction, settlement, release, extinguishment and discharge of such Claim: (a) Cash equal to the amount of such Allowed Other Secured Claim on or as soon as practicable after the later of (i) the Effective Date, (ii) the date that such Other Secured Claim becomes Allowed, and (iii) a date agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of such Class B1 Other Secured Claim; (b) treatment such that such Other Secured Claim is Reinstated; (c) the Property securing such Other Secured Claim, with any deficiency to result in a General Unsecured Claim; (d) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or Reorganized Debtors, as the case may be; or (e) as the Bankruptcy Court may order.

(b)     Class B2:  Other Priority Claims

Class B2 Other Priority Claims are Unimpaired.  Each Holder of an Allowed Class B2 Other Priority Claim shall be paid in full in cash (a) on or as soon as practicable after the Effective Date or the date such claim is allowed in accordance with section 502 of the Bankruptcy Code, whichever is later, or (b) upon such other terms, less favorable to the Holder of such Claim, as the Reorganized Debtors and the Holder of such Claim may agree. Notwithstanding the foregoing, each Allowed Canadian Priority Employee Claim shall be paid immediately after the Canadian Sanction Order, or as the Canadian Court may order.

(c)     Class B3:  Prepetition Lender Secured Claims

Class B3 Prepetition Lender Secured Claims are Impaired.  Each Holder of an Allowed Class B3 Prepetition Lender Secured Claim shall receive, on or as soon as reasonably practicable after the Effective Date, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, cash in an amount equal to such Allowed Class B3 Prepetition Lender Secured Claim.

(d)     Class B4:  General Unsecured Claims.

Class B4 General Unsecured Claims are Impaired.  (i) In the event that Class B4 General Unsecured Claims vote as a class in favor of the Plan, on or as soon as practicable after the Effective Date, each holder of an Allowed Class B4 General Unsecured Claim shall receive, in full satisfaction, settlement, release, extinguishment, and discharge of such Claim, its pro rata share of $575,000.  (ii) In the event that Class B4 General Unsecured Claims vote as a class to reject the Plan, on or as soon as practicable after the Effective Date, each holder of an Allowed Class B4 General Unsecured Claim shall receive, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, its pro rata share of $287,500.

(e)     Class B5:  Intercompany Claims

Class B5 Intercompany Claims are Impaired.  Holders of Class B5 Intercompany Claims shall not receive or retain any property under the Plan on account of such Intercompany Claims.  On the Effective Date, all Intercompany Claims shall be extinguished, provided that, claims owing by non-debtor subsidiaries and affiliates to TLC Canada shall not be affected by this Plan.

(f)     Class B6:  TLC Canada Common Stock and  Interests

Class B6 TLC Canada Common Stock and Interests are Impaired.  On the Effective Date, the Holders of the TLC Canada Common Stock and Interests shall retain such

43

common stock and interests although TLC Canada shall no longer have any assets following the consummation of the Plan and Plan Sponsor Agreement. The Holders of the TLC Canada Common Stock and Interests shall not receive or retain any Property under the Plan on account of such Common Stock and Interests, provided, however, that solely in the event that Holders of Class B4 General Unsecured Claims vote to accept the Plan, each Holder of an Allowed Class B6 TLC Canada Common Stock and Interest shall receive its pro rata share of a cash pool of $287,500.

        4.       Treatment of Claims Against and Interests in TLC MSI:

        (a)       Class C1:  Other Secured Claims

Class C1 Other Secured Claims are Unimpaired (unless such Claims are treated pursuant to clause (d) in the following sentence, in which case such Claims are Impaired and shall be entitled to vote). Each Holder of an Allowed Class C1 Other Secured Claim shall receive, in the sole discretion of the Debtors or the Reorganized Debtors, as the case may be, in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (a) Cash equal to the amount of such Allowed Secured Claim on or as soon as practicable after the later of (i) the Effective Date, (ii) the date that such Secured Claim becomes Allowed, and (iii) a date agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of such Class C1 Other Secured Claim; (b) treatment such that such Secured Claim is Reinstated; (c) the Property securing such Secured Claim, with any deficiency to result in a General Unsecured Claim; (d) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or Reorganized Debtors, as the case may be; or (e) as the Bankruptcy Court may order.

        (b)       Class C2:  Other Priority Claims

Class C2 Other Priority Claims are Unimpaired. Each Holder of an Allowed Class C2 Other Priority Claim shall be paid in full in cash (a) on or as soon as practicable after the Effective Date or the date such claim is allowed in accordance with section 502 of the Bankruptcy Code, whichever is later, or (b) upon such other terms, less favorable to the Holder of such Claim, as the Reorganized Debtors and the Holder of such Claim may agree.

        (c)       Class C3:  General Unsecured Claims

Class C3 General Unsecured Claims are Unimpaired. Each Holder of an Allowed Class C3 General Unsecured Claim not satisfied as of the Effective Date of the Plan shall receive, in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (i) the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (x) the Effective Date, (y) the date on which such General Unsecured Claim becomes Allowed, or (z) a date agreed to in writing by the Debtors or Reorganized Debtors, as the case may be, and the Holder of such General Unsecured Claim; (ii) treatment such that such General Unsecured Claim is Reinstated; or (iii) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or the Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order.

        (d)       Class C4:  TLC MSI Common Stock and  Interests.

Class C4 TLC MSI Common Stock and Interests is Unimpaired. Holders of Allowed Class C4 TLC MSI Common Stock and Interests shall retain their Interests.

(e)     Class C5:  Prepetition Lender Secured Claims.

Class C5 Prepetition Lender Secured Claims are Unimpaired. Each Holder of an Allowed Class C5 Prepetition Lender Secured Claim shall receive, on or as soon as reasonably practicable after the Effective Date, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, cash in an amount equal to such Allowed Class C5 Prepetition Lender Secured Claim.

(f)     Class C6:  Intercompany Claims.

Class C6 Intercompany Claims are Impaired. Holders of Class C6 Intercompany Claims shall not receive or retain any Property under the Plan on account of such Intercompany Claims. On the Effective Date, all Intercompany Claims shall be extinguished, provided that claims owing by non-debtor subsidiaries and affiliates to TLC MSI shall not be affected by this Plan.

## E.     Reservation of Rights Regarding Claims

Except as otherwise explicitly provided in the Plan, nothing will affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment. The Debtors and the Reorganized Debtors specifically reserve all rights, remedies, claims, defenses and Causes of Action.

## F.     Allowed Claims, Distribution Rights and Objections to Claims

### 1.     Allowance Requirement

Only Holders of Allowed Claims are entitled to receive distributions under the Plan. An Allowed Administrative Claim is a Claim or any portion thereof that has been Allowed, or adjudicated in favor of the Holder by estimation or liquidation, by a Final Order, that was incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases and as to which there is no dispute as to the Debtors' liability, or that has become Allowed by failure to object pursuant to Section 8.05 of the Plan. An unsatisfied Allowed Claim is such Claim or any portion thereof (other than an Administrative Claim) of (a) any Claim against any of the Debtors that has been listed by the Debtors in the Schedules, as such Schedules may have been amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent, and with respect to which no contrary proof of claim has been filed, (b) any Claim specifically allowed under the Plan, (c) any Claim the amount or existence of which has been determined or allowed by a Final Order, or (d) any Claim as to which a proof of claim has been timely filed before the Bar Date, provided that at the time of the Effective Date the Debtors, Reorganized Debtors or the Prepetition Lenders have not identified such Claim as being objectionable in part or in whole and no objection to the allowance thereof has been filed by the Claims Objection Deadline; provided, however, that the term Allowed, with reference to any Claim, shall not include (x) any unliquidated claim or (y) interest or attorneys' fees on or related to any Claim that accrues from and after the Petition Date unless otherwise expressly provided for in the Plan.

45

2. Date of Distribution

All Distributions to Holders of Allowed Claims as of the Effective Date will be made as and when provided in the Plan.

3. Making of Distributions

The Reorganized Debtors will designate the Person to serve as the Disbursing Agent under the Plan, and, unless such person is Reorganized TLC USA, will file a written notice of such designation at least five (5) days before the Confirmation Hearing. Distributions to Holders of Allowed Claims will be made by the Disbursing Agent (a) to the last known addresses of such Holders, or (b) to the addresses set forth in any written notices of address changes delivered to the Disbursing Agent. If any Holder's distribution is returned as undeliverable, no further distributions to such Holder shall be made unless and until the Disbursing Agent is notified of such Holder's then current address, at which time all missed distributions shall be made to such Holder without interest. Unless otherwise agreed between the Reorganized Debtors and the Disbursing Agent, amounts in respect of undeliverable distributions made by the Disbursing Agent will be returned to the Reorganized Debtors until such distributions are claimed.

All Property distributed on account of Claims must be claimed within the later of (a) one (1) year after the Effective Date or (b) one (1) year after such distribution is made to such Holder or, in the case of a distribution made in the form of a check, must be negotiated and a request for reissuance be made as provided for in Section 5.06 of the Plan. All Unclaimed Property will be retained by and will revest in the Reorganized Debtors and will no longer be subject to distribution. All full or partial payments made by the Disbursing Agent and received by the Holder of a Claim prior to the Effective Date will be deemed to be payments under the Plan for purposes of satisfying the obligations of Debtors pursuant to the Plan. Nothing contained in the Plan shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim other than by reviewing the records of the Reorganized Debtors and any Claims filed in these cases. Pursuant to section 1143 of the Bankruptcy Code, all claims in respect of Unclaimed Property shall be deemed Disallowed under Section 5.07 of the Plan and the Holder of any Claim Disallowed under Section 5.07 of the Plan will be forever barred, expunged, estopped and enjoined from assertion in any manner against the Debtors or their respective Properties or the Reorganized Debtors or their respective Properties.

4. Objection Procedures

Unless otherwise ordered by the Court after notice and a hearing, under the Plan, the Reorganized Debtors shall have the exclusive right, on and after the Effective Date, to File objections to Claims (other than Claims specifically Allowed in the Plan) and shall serve a copy of each such objection upon the Holder of the Claim to which the objection is made as soon as practicable, but in no event later than the latest of (a) 75 days after the Effective Date, (b) 75 days after the date on which any Claim is Filed, or (c) such later date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clauses (a) and (b) above. The foregoing deadlines may be extended by order of the Court. An objection to any Claim shall be deemed properly served on the Holder thereof if the Reorganized Debtors effect service in any of the following manners: (i) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Federal Rule of Bankruptcy Procedure 7004,

46

(ii) by first class mail, postage prepaid, on the signatory on the proof of claim or interest or other representative identified in the proof of claim or interest or any attachment thereto, or (iii) by first class mail, postage prepaid, on any counsel that has appeared on the Holder's behalf in the Chapter 11 Cases.

## G. Disposition of Executory Contracts and Unexpired Leases

### 1. Contracts and Leases Deemed Assumed

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtors and any person or Entity shall be deemed assumed by the Debtors as of the Effective Date, except for any executory contract or unexpired lease that (a) has expired or terminated pursuant to its own terms, (b) has previously been assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court on or prior to the Confirmation Date, and, if necessary, by order of the Canadian Court, (c) is the subject of a pending motion to assume, assume and assign, or reject as of the Confirmation Date, or (d) is listed on the Schedule of Rejected Contracts which shall be included with the Plan Supplement; provided, however, that the Debtors shall have the right, with the consent of the Buyer Parties, at any time prior to the Confirmation Date, to amend the Schedule of Rejected Contracts upon notice to the counterparty to such contract or lease (a) to delete any executory contract or unexpired lease listed therein, thus providing for its assumption pursuant to Section 6.01 of the Plan or (b) to add any executory contract or unexpired lease thereto, thus providing for its rejection pursuant to Section 6.01 of the Plan. The Confirmation Order (except as otherwise provided therein) shall constitute an order of the Bankruptcy Court pursuant to section 365 of the Bankruptcy Code, effective as of the Effective Date, approving the assumptions and rejections hereunder. Each contract and lease assumed pursuant to Section 6.01 of the Plan shall be assumed only to the extent that any such contract or lease constitutes an executory contract or unexpired lease. Assumption of a contract or lease pursuant to Section 6.01 of the Plan shall not constitute an admission by the Debtors or the Reorganized Debtors that such contract or lease is an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors have any liability thereunder. All executory contracts and unexpired leases that are assumed will be assumed under their present terms or upon such terms as are agreed to in writing between the applicable Debtor and the counterparty to the executory contract or unexpired lease; provided, however, that any leases and executory contracts of TLC that are assumed under the Plan shall be deemed to be assigned to the Buyer Parties. Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire, or occupancy of real property shall include: (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other interests in real estate or rights *in rem* related to such premises, unless any of the foregoing agreements has been rejected pursuant to an order of the Bankruptcy Court.

1113/74009-007 Current/17228164v7
RLF1 3534297v.2

2.      Cure with Respect to Assumed Contracts and Leases

Within fifteen (15) days after the Effective Date, the Reorganized Debtors shall pay to the nondebtor parties to such executory contracts and unexpired leases being assumed the cure amounts.  The nondebtor parties to such executory contracts and unexpired leases shall have thirty (30) days from receipt of such cure amounts to object thereto.  If any objections are filed, and cannot be resolved by agreement, the Bankruptcy Court shall hold a hearing to determine the cure amount with respect to the executory contract or unexpired lease subject to the objection or to otherwise resolve such objection.  Any party failing to object (whether to the proposed cure amount or otherwise) within thirty (30) days after receipt of the cure amount by the Reorganized Debtors shall be forever barred from asserting, collecting, or seeking to collect from the Reorganized Debtors any amounts in excess of the cure amount or from otherwise objection to the assumption, by the Debtors, of such executory contract or unexpired lease.  Notwithstanding the foregoing, or anything else in Article VI of the Plan, with respect to any executory contract or unexpired lease which is the subject of an objection, the Reorganized Debtors shall retain the right, until five (5) Business Days after any order resolving the objection becomes a Final Order, to reject such executory contract or unexpired lease.

3.      Rejection Damages

Rejection Claims arising out of the rejection of any executory contract or unexpired lease pursuant to Section 6.01 of the Plan must be filed with the Bankruptcy Court no later than the later of thirty (30) days after the entry of an order rejecting such executory contract or unexpired lease.  Any Claim not filed within such time period shall be forever barred.  The Reorganized Debtors shall have the exclusive right to object to any Claim arising out of the rejection of an executory contract or unexpired lease pursuant to the terms of Section 8.05 of the Plan.

The Bankruptcy Court shall determine any objections Filed in accordance with Section 8.05 of the Plan at a hearing to be held on a date to be determined by the Bankruptcy Court.  Subject to any statutory limitation, including, but not limited to the limitations contained in sections 502(b)(6) and 502(b)(7) of the Bankruptcy Code, any Claims arising out of the rejection of executory contracts and unexpired leases shall, pursuant to section 502(g) of the Bankruptcy Code, be treated as Class A5, B4, or C3 General Unsecured Claims, as appropriate, in accordance with Sections 3.05, 3.06, or 3.07 of the Plan.

4.      Modification of Change of Control Provisions

To the extent any contracts of the Debtors contain provisions modifying their rights or the rights of the subject counterparties, or give rise to rights or obligations of the Debtors or such counter-parties, as a result of a change in control of any of the Debtors, such contracts are hereby deemed to be modified such that the consummation of the transactions contemplated hereby, including the Plan Sponsor Agreement, shall not modify or give rise to any such rights or obligations.

48

5. Benefit Programs

Employees of TLC Canada to be transferred to the Buyers will be given full credit for their years of service with the TLC Canada before the Effective Date for purposes of vesting and eligibility to participate (but not accrual of benefits for any purpose) in benefit plans, vacation and leave, severance and other programs of Buyer and its Affiliates that are made available to such employees after the Effective Date. Such employees shall cease to participate in TLC Canada's benefit plans (other than any Assumed Benefit Plans as defined in the Plan Sponsor Agreement) as at the Effective Date and shall commence participation in the Buyer's benefit plans as at the Effective Date. In respect of any Assumed Benefit Plan, effective as of the Effective Date, TLC Canada shall assign to the subject new employer the Assumed Benefit Plans and all of its rights, duties, obligations and liabilities under and in relation to the Assumed Benefit Plans and all related agreements. Buyer shall cause the employer to accept such assignment and become the sponsor and administrator (where applicable) of the Assumed Benefit Plans as of the Effective Date. Except and to the extent previously assumed by an order of the Bankruptcy Court on or before the Effective Date, all officer, director or employee compensation and benefit programs of Debtors TLC USA and TLC MSI entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under Section 6.01 of the Plan, but only to the extent that rights under such programs are held by such Debtors or Persons who are employees of the Debtors as of the Effective Date, and the Debtors' obligations under such programs to Persons who are employees of the Debtors on the Effective Date shall survive Confirmation of the Plan, except for (a) executory contracts or plans specifically rejected pursuant to the Plan, and (b) executory contracts or plans that have previously been rejected, are the subject of a motion to reject, or have been specifically waived by the beneficiaries of any plans or contracts.

## H. Revesting of Assets; Release of Liens

Except as otherwise expressly provided in the Plan, pursuant to sections 1123(a)(5), 1123(b)(3) and 1141(b) of the Bankruptcy Code, all Property comprising the Estates of each Debtor, including, but not limited to, all Avoidance Actions and all Causes of Action shall automatically be retained and revest in the relevant Reorganized Debtor or its respective successor, free and clear of all Claims, Liens, contractually-imposed restrictions, charges, encumbrances and Interests of Creditors and equity security holders on the Effective Date, with all such Claims, Liens, contractually-imposed restrictions, charges, encumbrances and Interests being extinguished except as otherwise provided in the Plan and Plan Sponsor Agreement. As of the Effective Date, each Reorganized Debtor may operate its business and use, acquire and dispose of Property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and Confirmation Order. Without limiting the foregoing, each Reorganized Debtor may pay the charges it incurs for professional fees, disbursements, expenses, or related support services after the Effective Date without any application to the Bankruptcy Court.

1113/74009-007 Current/17228164v7
RLF1 3534297v.2

## I.     Post-Consummation Corporate Structure, Management and Operation

1.     Corporate Action

The entry of the Confirmation Order shall constitute authorization for the Debtors and the Reorganized Debtors to take or to cause to be taken all corporate actions necessary or appropriate to consummate and implement the provisions of the Plan prior to, on and after the Effective Date, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court, including, without limitation, (a) the consummation of the transactions contemplated by the Plan Sponsor Agreement, (b) the election of directors and officers in accordance with Section 10.02 of the Plan, (c) the adoption of the New TLC USA Certificates of Incorporation and By-Laws, (d) the execution and delivery of the new Senior Management Contracts, (e) the adoption of New Management Incentive Plan, and (f) as needed or desired, the filing of liquidation proceedings in the Canadian Court.  All such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action by the stockholders or directors of the Debtors or the Reorganized Debtors.  On the Effective Date, the appropriate officers and directors of the Debtors and the Reorganized Debtors are authorized and directed to execute and deliver the agreements, documents and instruments contemplated by the Plan and the Plan Supplement in the name and on behalf of the Debtors and the Reorganized Debtors.

2.     Plan Funding

The funds to be utilized to make Cash payments under this Plan have been and/or will be generated from, among other things, payments made, funds available, or obligations assumed under the Plan Sponsor Agreement, the Cash of the Debtors as of the Effective Date, and Cash generated from operations of the Debtors or the Reorganized Debtors.

3.     Plan Sponsor Agreement

On the Effective Date, the transactions contemplated by the Plan Sponsor Agreement shall be consummated.

2.     Articles of Organization

The New TLC USA Certificates of Incorporation and By-Laws shall contain such provisions as are required to satisfy the provisions of the Plan and the Bankruptcy Code and shall include, among other things, (a) a prohibition on the issuance of nonvoting equity securities to the extent, and only to the extent, required by section 1123(a)(6) of the Bankruptcy Code, (b) provisions for a five (5) member Board of Directors of Reorganized TLC USA consisting of initial members who will be identified in the Plan Supplement, and (c) other provisions ordinary and customary in such situations so long as they are not inconsistent with any of the provisions to contained in the foregoing (a) and (c).

1113/74009-007 Current/17228164v7
RLF1 3534297v.2

3. Officers and Directors of Reorganized Debtors

Under the Plan, the names of the new directors on the initial Board of Directors of TLC USA will be set forth in the Plan Supplement.

4. New Management Incentive Plan

On the Effective Date, the Reorganized Debtors will adopt the New Management Incentive Plan, a copy of which will be included in the Plan Supplement.

5. Exemption from Certain Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or any other Person pursuant to the Plan will not be taxed under any law imposing a stamp tax or other similar tax. Such exemption specifically applies, without limitation, to all documents necessary to evidence and implement distributions under the Plan, including the documents contained in the Plan Supplement.

**J. Confirmation and/or Consummation**

Described below are certain important considerations under the Bankruptcy Code in connection with confirmation of the Plan.

1. Requirements for Confirmation of the Plan

Before the Plan can be confirmed, the Bankruptcy Court must determine at the Confirmation Hearing that the following requirements for confirmation, set forth in section 1129 of the Bankruptcy Code, have been satisfied:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised by the Debtors or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

- The Debtors have disclosed (a) the identity and affiliations of (i) any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of the Reorganized Debtors, (ii) any affiliate of the Debtors participating in a joint plan with the Debtors or (iii) any successor to the Debtors under the Plan (and the appointment to, or continuance in, such office of such individual(s) is consistent with the interests of Claim and Interest Holders and with public policy), and (b) the

51

identity of any insider that will be employed or retained by the Debtors and the nature of any compensation for such insider.

- With respect to each Class of Claims or Interests, each Impaired Claim and Impaired Interest Holder either has accepted the Plan or will receive or retain under the Plan, on account of the Claims or Interests held by such Holder, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code. <u>See Section X.D</u>.

- The Plan provides that Administrative Claims, Junior DIP Claims, and Priority Claims other than Priority Tax Claims will be paid in full on the Effective Date and that Priority Tax Claims will receive on account of such Claims deferred cash payments, over a period not exceeding five years after the date of assessment of such Claims, of a value, as of the Effective Date, equal to the Allowed Amount of such Claims, except to the extent that the Holder of any such Claim has agreed to a different treatment.

- If a Class of Claims is Impaired under the Plan, at least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by insiders holding Claims in such Class.

- Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. <u>See Section X.A</u>.

- The Plan provides for the continuation after the Effective Date of all retiree benefits, if any, at the level established pursuant to section 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits.

The Debtors believe that, upon receipt of the votes required to confirm the Plan, the Plan will satisfy all the statutory requirements of chapter 11 of the Bankruptcy Code, that the Debtors have complied or will have complied with all of the requirements of chapter 11 and that the Plan has been proposed and submitted to the Bankruptcy Court in good faith.

Further, even if all of the foregoing are satisfied, if any Class of Claims is Impaired and votes to reject the Plan, the Debtors must satisfy the applicable "cramdown" standard with respect to that Class. Section 1129(b) of the Bankruptcy Code requires that the Plan "not discriminate unfairly" and be "fair and equitable" with respect to such Class. The Debtors do not anticipate that any Class of Claims will vote to reject the Plan. However, in the event any Class votes to reject the Plan, the Debtors believe they will satisfy the cramdown standards in section 1129(b) with respect to any such rejecting Class.

1113/74009-007 Current/17228164v7
RLF1 3534297v.2

2.      Conditions to Confirmation Date and Effective Date

The Plan specifies conditions precedent to the Confirmation Date and the Effective Date. Each of the specified conditions must be satisfied or waived in whole or in part pursuant to Section 9.03 of the Plan by the Debtors, without any notice to parties-in-interest or the Bankruptcy Court and without a hearing.

The conditions precedent to the occurrence of the Confirmation Date, which is the date of entry by the clerk of the Bankruptcy Court of the Confirmation Order, are that: (a) the Confirmation Order shall be in form and substance reasonably acceptable to the Debtors and the Buyer Parties; (b) the Plan, including any amendments, modifications, or supplements thereto, and all documentation contemplated by the Plan, shall be satisfactory to the Buyer Parties; (c) the Debtors shall not be in breach of the Plan Sponsor Agreement; (d) no default or event of default has occurred under the Junior DIP Loan Agreement; and (e) all material third party consents and waivers shall have been obtained, reasonably satisfactory to the Buyer Parties.

The conditions that must be satisfied on or prior to the Effective Date, which is the Business Day upon which all conditions to the consummation of the Plan have been satisfied or waived, and is the date on which the Plan becomes effective, are that: (a) the Bankruptcy Court shall have approved the information contained in the Disclosure Statement as adequate; (b) the Confirmation Order, which order shall be in form and substance satisfactory to the Debtors and the Buyer Parties, shall have been entered and shall not be stayed by order of a court of competent jurisdiction; (c) all documents and agreements required to be executed or delivered under the Plan on or prior to the Effective Date shall have been executed and delivered by the parties thereto; (d) the Bankruptcy Court shall have entered an order (contemplated to be part of the Confirmation Order) authorizing and directing the Debtors and the Reorganized Debtors to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, and other agreements or documents created, amended, supplemented, modified or adopted in connection with the Plan; (e) the Canadian Court shall have entered the Canadian Sanction Order; (f) the New Debtors Certificates of Incorporation shall have been filed with the applicable authority of each such Debtors' jurisdiction of incorporation or organization in accordance with such jurisdiction's applicable law; (g) all authorizations, consents and regulatory approvals required, if any, in connection with the Plan's effectiveness shall have been obtained; (h) the conditions to closing under the Plan Sponsor Agreement shall have been satisfied; (i) the Senior Management Contracts shall have been entered into by the parties thereto (as applicable); and (j) all Plan Documents shall have been adopted, shall be in full force and effect, and shall be in form and substance acceptable to the Debtors and the Buyer Parties.

## K.      Releases, Discharge, Injunctions, Exculpation and Indemnification

1.      Releases by Debtors in Favor of Third Parties

Effective as of the Effective Date, and except as otherwise provided in the Plan or the Confirmation Order, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their individual capacities and as debtors in possession, will be deemed to have forever released, waived and discharged the Releasees from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities (other than the rights of the Debtors or Reorganized Debtors to enforce the Plan and the contracts, instruments, releases, and other agreements or documents delivered

53

thereunder), whether for tort, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event or other occurrence, including actions in connection with indebtedness for money borrowed by the Debtors, taking place on or prior to the Effective Date in any way relating to any of the Debtors, the Reorganized Debtors, the Chapter 11 Cases, or the Plan, and the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan (other than claims based on gross negligence or willful misconduct) arising on or prior to the Effective Date, that the Debtors or the Reorganized Debtors have, had or may have, provided, however, that no Releasee shall be released or discharged from any Claims, obligations, suits, judgments, debts or Causes of Action arising out of or in connection with indebtedness for money borrowed by any such person from any of the Debtors, provided, however, that such release provisions will not impact, modify or limit the ability of the Debtors or the Reorganized Debtors to take any defensive measure, including, without limitation, as to impleading any party into such matter, necessary to respond to any litigation, adversary proceeding or other proceeding that may be brought by any other party in interest to the bankruptcy proceeding or in relation thereto, as necessary to fully and properly protect their interests. Notwithstanding anything to the contrary contained herein, the Plan shall not release former officers of the Debtors from any continuing obligations the former officers owe to the Debtors under employment, separation, severance, non-competition, non-disclosure or proprietary rights agreements existing between the Debtors and the former officers.

As to the Debtors' directors, officers and employees, the consideration for such release is the service rendered by such individuals during the pendency of the Chapter 11 Cases and the need for their continued dedication after the Effective Date to fully consummate a successful reorganization. The Debtors will be hampered in their reorganization efforts if their directors, officers and employees are subject to claims and potential litigation that will distract their attention from operational and other business matters. None of such individuals are currently the target of any claim or litigation, and the Debtors are not aware of any credible theory on which an entity might pursue claims and litigation against such individuals.

2.      Releases by Creditors of Claims Against Third Parties

Effective as of the Effective Date, and except as otherwise provided in the Plan or the Confirmation Order, in consideration for the obligations of the Debtors under the Plan and the payments, contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each Holder of a Claim or Interest and any Affiliate of any such Holder (as well as any trustee or agent on behalf of each such Holder) that either affirmatively votes in favor of the Plan or is deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, shall be deemed to have forever waived, released and discharged (i) the Debtors, (ii) the Reorganized Debtors, and (iii) the Releasees from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities, whether for tort, contract, violations of federal or state securities laws or otherwise, or whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to any of the Debtors or the

54

Plan that such person or entity has, had or may have against the Debtors, the Releasees, the Junior DIP Lenders and the Junior DIP Agent, and each of their respective present or former directors, affiliates, officers, employees, attorneys, accountants, underwriters, investment bankers, professionals, financial advisors and agents (acting in such capacity and excluding claims based on gross negligence or willful misconduct); provided however that, the foregoing provision will not impact, modify or limit the ability of any such party to take any defensive measure, including, without limitation, as to impleading any party into such matter, necessary to respond to any litigation, adversary proceeding or other proceeding that may be brought by any other party in interest to the bankruptcy proceeding or in relation thereto, as necessary to fully and properly protect its interests.

3. Discharge and Discharge Injunction

To the fullest extent permitted by applicable law (including, without limitation, section 105 of the Bankruptcy Code), and except as otherwise provided in the Plan or in the Confirmation Order, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims of any nature whatsoever against the Debtors or any of their assets or properties, regardless of whether any Property shall have been distributed or retained pursuant to the Plan on account of such Claims. Upon the Effective Date, and except as expressly contemplated in the Plan, the Debtors, and each of them, shall: (a) be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, debts (as such term is defined in section 101(12) of the Bankruptcy Code), Liens, security interests, and encumbrances of and against all Property of the respective Estates, the Debtors, or the Reorganized Debtors that arose prior to the Effective Date, including without limitation, all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) such Claim has been Allowed pursuant to section 502 of the Bankruptcy Code, or (ii) the Holder of such Claim has voted to accept the Plan; and, (b) transferred to the Buyer Parties. Further, as of the Effective Date, all entities, including, without limitation, all Holders of Claims or Interests, shall be barred and enjoined from asserting against the Debtors or the Reorganized Debtors, their successors or their Property any other or further Claims, debts, rights, Causes of Action, liabilities or Interests relating to the Debtors based upon any act, omission, transaction or other activity of any nature that occurred prior to the Effective Date, except for those obligations expressly created by, or reserved in, the Plan. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtors and transferred to the Buyer Parties, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge and termination shall void any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

Except as otherwise expressly provided for in the Plan or the Confirmation Order and to the fullest extent authorized or provided by the Bankruptcy Code, including sections 524 and 1141 thereof, the entry of the Confirmation Order shall, provided that the Effective Date occurs, permanently enjoin all Persons that have held, currently hold or may hold a Claim or other debt or liability that is discharged or an Interest or other right of an equity security holder that is Impaired or terminated pursuant to the terms of the Plan from taking any of the following

55

actions against the Debtors, the Reorganized Debtors or their Property on account of any such discharged Claims, debts or liabilities or such terminated Interests or rights: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind; (iv) asserting any setoff, offset, right of subrogation or recoupment of any kind, directly or indirectly, against any debt, liability or obligation due to the Debtors or the Reorganized Debtors; and (v) proceeding in any manner in any place whatsoever, including employing any process, that does not conform to or comply with or is inconsistent with the provisions of the Plan.

4.      Exculpation Relating to Chapter 11 Cases

None of the Debtors, Reorganized Debtors or Exculpated Persons shall have or incur any liability to any Person, including, without limitation, any Holder of a Claim or Interest or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or affiliates or any of their successors or assigns, for any act taken or omission made in connection with, relating to, or arising out of, the Chapter 11 Cases, Filing, negotiating, prosecuting, administering, formulating, implementing, confirming or consummating the Plan, or the Property to be distributed under the Plan, including all activities leading to the promulgation and confirmation of the Plan, the Disclosure Statement (including any information provided or statement made in the Disclosure Statement or omitted therefrom), or any contract, instrument, release or other agreement or document created in connection with or related to the Plan or the administration of the Debtors or these Chapter 11 Cases; provided, however, that the foregoing exculpation shall not apply to any act of gross negligence or willful misconduct.

5.      Post-Effective Date Indemnifications

To the extent not inconsistent with the Plan or the Confirmation Order and to the fullest extent permitted by applicable law, including, but not limited to the extent provided in their constituent documents, contracts (including, but not limited to, employment agreement or indemnification agreement), statutory law or common law, the Reorganized Debtors will indemnify, hold harmless and reimburse the Exculpated Persons from and against any and all losses, claims, Causes of Action, damages, fees, expenses, liabilities and actions: (a) for any act taken or omission made in good faith in connection with or in any way related to negotiating, formulating, implementing, confirming or consummating the Plan, the Disclosure Statement, or any contract, instrument, release or other agreement or document created in connection with the Plan or the administration of the Chapter 11 Cases; or (b) for any act or omission in connection with or arising out of the administration of the Plan or the Property to be distributed under the Plan or the operations or activities of the Reorganized Debtors, and any Claims of any such Exculpated Person against the Debtors or the Reorganized Debtors on account of such indemnification obligations shall be unaltered and Unimpaired within the meaning of section 1124(1) of the Bankruptcy Code, except that none of the Debtors or the Reorganized Debtors shall have any obligation to indemnify any Exculpated Person for any acts or omissions that constitute gross negligence or willful misconduct as such is finally determined by a court of competent jurisdiction. Such indemnification obligations shall survive unaffected by entry of the

56

Confirmation Order, irrespective of whether such indemnification is owed for an act or event occurring before or after the Petition Date. The Debtors will purchase "tail" coverage to their existing D&O insurance policies. The term and cost of the "tail" coverage shall be reasonably satisfactory to the Buyer Parties.

## L.    Preservation of Rights of Action

Except to the extent that any Claim is Allowed during the Chapter 11 Cases or expressly by the Plan, nothing, including, but not limited to, the failure of the Debtors or the Reorganized Debtors to object to a Claim or Interest for any reason during the pendency of the Chapter 11 Cases, shall affect, prejudice, diminish or impair the rights and legal and equitable defenses of the Debtors or the Reorganized Debtors with respect to any Claim or Interest, including, but not limited to, all rights of the Debtors or Reorganized Debtors to contest or defend themselves against such Claims or Interests in any lawful manner or forum when and if such Claim or Interest is sought to be enforced by the Holder thereof.

Further, Except as otherwise provided in the Plan, all Causes of Action, including Avoidance Actions, shall automatically be retained and preserved and will revest in the Reorganized Debtors. Pursuant to section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors (as representatives of the Debtors' Estates) will retain and have the exclusive right to enforce and prosecute such Causes of Action against any Entity, that arose before the Effective Date, other than those expressly released or compromised as part of or pursuant to the Plan.

In addition, except to the extent that any Claim is Allowed, the Debtors or the Reorganized Debtors, as applicable, may, but shall not be required to, set off against any Claims and the payments or distributions to be made pursuant to the Plan in respect of such Claims, any and all debts, liabilities, Causes of Action and claims of every type and nature whatsoever which the Estates, the Debtors or the Reorganized Debtors may have against their Creditors, but neither the failure to do so nor the allowance of any such Claims, whether pursuant to the Plan or otherwise, shall constitute a waiver or release by the Debtors of any such claims or Causes of Action the Debtors may have against such Creditors, and all such claims and Causes of Action which are not expressly released pursuant to the Plan shall be reserved to and retained by the Reorganized Debtors.

All references to Claims and amounts of Claims refer to the amount of the Claim Allowed by agreement of the Debtors or Reorganized Debtors and the Holder of such Claim, by operation of law, by Final Order, or by the Plan. Notwithstanding any other provision in the Plan, no payment or distribution shall be made on account of or with respect to any Claim to the extent it is a Disputed Claim unless and until the Disputed Claim becomes an Allowed Claim.

## M.    Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain after the Effective Date exclusive jurisdiction of all matters arising out of, arising in or related to the Chapter 11 Cases to the fullest extent permitted by applicable law, including, without limitation, jurisdiction to:

1.    classify or establish the priority or secured or unsecured status of any Claim (whether Filed before or after the Effective Date and whether or not contingent,

Disputed or unliquidated) or resolve any dispute as to the treatment of any Claim pursuant to the Plan;

2.  grant or deny any applications for allowance of compensation or reimbursement of expenses pursuant to sections 330, 331 or 503(b) of the Bankruptcy Code or otherwise provided for in the Plan, for periods ending on or before the Effective Date;

3.  determine and resolve any matters related to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which any Debtor is a party or with respect to which any Debtor may be liable, and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

4.  ensure that all payments due under the Plan and performance of the provisions of the Plan are accomplished as provided herein and resolve any issues relating to distributions to Holders of Allowed Claims pursuant to the provisions of the Plan;

5.  construe, take any action and issue such orders, prior to and following the Confirmation Date and consistent with section 1142 of the Bankruptcy Code, as may be necessary for the enforcement, implementation, execution and consummation of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, including, without limitation, the Disclosure Statement and the Confirmation Order, for the maintenance of the integrity of the Plan and protection of the Reorganized Debtors in accordance with sections 524 and 1141 of the Bankruptcy Code following consummation;

6.  determine and resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation, implementation or enforcement of the Plan Sponsor Agreement, the Plan (and all Exhibits to the Plan and the Plan Supplement) or the Confirmation Order, including the indemnification and injunction provisions set forth in and contemplated by the Plan Sponsor Agreement, the Plan or the Confirmation Order, or any Entity's rights arising under or obligations incurred in connection therewith;

7.  hear any application of the Debtors or Reorganized Debtors to modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code and Section 13.04 hereof or modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code and the Plan;

1113/74009-007 Current/17228164v7
RLF1 3534297v.2

8.     issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

9.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

10.     determine any other matters that may arise in connection with or relating to the Plan Sponsor Agreement, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan Sponsor Agreement, the Plan, the Disclosure Statement or the Confirmation Order, except as otherwise provided in the Plan;

11.     determine such other matters and for such other purposes as may be provided in the Confirmation Order;

12.     hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code;

13.     hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan;

14.     enter a final decree closing the Chapter 11 Cases;

15.     determine and resolve any and all controversies relating to the rights and obligations of the Disbursing Agent in connection with the Chapter 11 Cases;

16.     allow, disallow, determine, liquidate or estimate any Claim, including the compromise, settlement and resolution of any request for payment of any Claim, the resolution of any Objections to the allowance of Claims and to hear and determine any other issue presented hereby or arising hereunder, including during the pendency of any appeal relating to any Objection to such Claim (to the extent permitted under applicable law);

17.     permit the Debtors to recover all assets of the Reorganized Debtors and Property of their respective Estates, wherever located;

18.     hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes and tax benefits and similar or related matters with respect to the Debtors or the Debtors' respective Estates arising prior to the Effective Date or relating to the period of administration of the Chapter 11 Cases, including, without limitation, matters concerning federal, state and local taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

19.     hear and determine any motions, applications, adversary proceedings, contested matters and other litigated matters pending on, Filed or commenced after the Effective Date that may be commenced by the Reorganized Debtors thereafter, including Avoidance Actions, proceedings with respect to the rights of the Reorganized Debtors to recover Property under sections 542, 543 or 553 of the

Bankruptcy Code, or proceedings to otherwise collect to recover on account of any claim or Cause of Action that the Reorganized Debtors may have; and

20. hear any other matter not inconsistent with the Bankruptcy Code.

If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction over any matter arising under, arising in or related to the Debtors, including with respect to the matters set forth above in Section 12.01 hereof, this Article XII shall not prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such subject matter.

## N.      Amendment, Alteration and Revocation of Plan

The Debtors may alter, amend or modify the Plan (with the consent of the Buyer Parties) in accordance with section 1127 of the Bankruptcy Code or as otherwise permitted at any time prior to the Confirmation Date. After the Confirmation Date and prior to the substantial consummation of the Plan, and in accordance with the provisions of section 1127(b) of the Bankruptcy Code and the Bankruptcy Rules, the Debtors may (with the consent of the Buyer Parties), so long as the treatment of Holders of Claims or Interests under the Plan is not adversely affected, institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order and any other matters as may be necessary to carry out the purposes and effects of the Plan; provided, however, prior notice of such proceedings shall be served in accordance with Bankruptcy Rules 2002 and 9014.

The Debtors reserve the right, at any time prior to Confirmation of the Plan, to withdraw the Plan. If the Plan is withdrawn, the Plan shall be null and void and have no force and effect. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

## O.      Plan Implementation Documents

The documents necessary to implement the Plan include the following:

- the New TLC USA Certificates of Incorporation and By-laws;
- Plan Sponsor Agreement
- the New Management Incentive Plan;
- the Schedule of Rejected Contracts; and
- the Senior Management Contracts.

Such documents will be submitted in substantially the form to be implemented on the Effective Date as part of the Plan Supplement. All documents in the Plan Supplement shall be in form, scope, and substance satisfactory to the Debtors and the Buyer Parties. Upon such filing, all documents included in the Plan Supplement may be viewed and downloaded free of charge from the Debtors' case website at www.epiqbankruptcysolutions.com, viewed and downloaded from the Bankruptcy Court electronic case filing system or inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. Holders of Claims or Interests

60

may obtain a copy of any document included in the Plan Supplement upon written request to the Debtors' Voting Agent at the address set forth above, or to the Debtors' counsel, Proskauer Rose LLP, 70 West Madison Street, Suite 3800, Chicago, Illinois 60602 (Attn: Mark K. Thomas).

## VII.    CERTAIN RISK FACTORS TO BE CONSIDERED

The Holders of Claims in Classes A5, A6, and B4 should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

## A.    General Considerations

The Plan sets forth the means for satisfying the Claims against each of the Debtors. Certain Claims and Interests receive no distributions pursuant to the Plan. Nevertheless, reorganization of certain of the Debtors' businesses and operations under the proposed Plan avoids the potentially adverse impact of a liquidation on the Debtors' customers, suppliers, employees, communities and other stakeholders.

## B.    Certain Bankruptcy Considerations

Even if all voting Impaired Classes vote in favor of the Plan, and if with respect to any Impaired Class deemed to have rejected the Plan the requirements for "cramdown" are met, the Bankruptcy Court may choose not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtors, (see Section X.A), and that the value of distributions to dissenting Holders of Claims and Interests will not be less than the value such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. See Section X.D. Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion. See Appendix C for a liquidation analysis of the Debtors.

If a liquidation or protracted reorganization were to occur, there is a significant risk that the value of the Debtors' enterprise would be substantially eroded to the detriment of all stakeholders.

The Debtors' future results are dependent upon the successful confirmation and implementation of a plan of reorganization. Failure to obtain this approval in a timely manner could adversely affect the Debtors' operating results, as the Debtors' relations with their customers and suppliers may be harmed by protracted bankruptcy proceedings. Furthermore, the Debtors cannot predict the ultimate amount of all their liabilities that will be subject to a plan of reorganization. Once a plan of reorganization is approved and implemented, the Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders, customers and suppliers to do business with a company that recently emerged from bankruptcy proceedings.

61

C.        **Claims Estimations**

There can be no assurance that any estimated Claim amounts set forth in this Disclosure Statement are correct. The actual Allowed amount of Claims likely will differ in some respect from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should any underlying assumptions prove incorrect, the actual Allowed amount of Claims may vary from those estimated herein.

D.        **Conditions Precedent to Consummation**

The Plan provides for certain conditions that must be satisfied (or waived) prior to confirmation of the Plan and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

E.        **Inherent Uncertainty of Financial Projections**

The Projections set forth in <u>Appendix B</u> hereto have been prepared by management of the Debtors in consultation with their financial advisors and cover the projected operations of the Reorganized Debtors through fiscal year 2014. These Projections are based on numerous assumptions that are an integral part of the Projections, including confirmation and consummation of the Plan in accordance with its terms, realization of the operating strategy of the Debtors, industry performance, no material adverse changes in applicable legislation or regulations, or the administration thereof, or regulations, exchange rates or generally accepted accounting principles, general business and economic conditions, competition, retention of key management and other key employees, absence of material contingent or unliquidated litigation, indemnity or other claims, and other matters. Certain additional material assumptions are disclosed on <u>Appendix B</u>, and the projections should be read in conjunction with these assumptions.

To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and are based on assumptions considered reasonable by the Debtors, the assumptions and estimates underlying the Projections are subject to business, economic and competitive uncertainties and contingencies. Accordingly, the Projections are only the Debtors' educated, good faith estimates and are necessarily contingent in nature. It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and may increase over time. The projected financial information contained herein should not be regarded as a guaranty by the Debtors, the Debtors' advisors or any other Person that the Projections can or will be achieved. However, the Debtors believe that the Projections are credible and that there is a reasonable likelihood that the results set forth in the Projections can be achieved.

1113/74009-007 Current/17228164v7
RLF1 3534297v.2

**F.     Competition**

The high degree of competition in the Debtors' businesses and the potential for new competitors to enter into those businesses could cause actual results to differ from those expected by the Debtors.

**G.     Cyclicality**

There have been occasional general downward trends in the Debtors' industry. While no such general downward trend is anticipated during the period of the Debtors' projections, there can be no assurance that general market conditions relating to the Debtors' services will not impair the Debtors' future financial performance.

**H.     Reliance on Key Personnel and Medical Care Providers**

The Debtors operate a business that is highly dependent on skilled employees, , as well as optometrists and ophthalmologists who have relationships with the refractive laser centers operated by the Debtors' non-debtor subsidiaries and independently owned optometric centers under the Vision Source® brand.  A loss of a significant number of key management or sales employees or relationships with medical care providers could have a material adverse effect on the Reorganized Debtors.

The Debtors' successful transition through the restructuring process is dependent in part on their ability to retain relationships with ophthalmologists and optometrists and motivate their officers and key employees.  There can be no assurance that the Reorganized Debtors will be able to retain and employ qualified management and sales personnel or continue its key medical care relationships through its non-debtor subsidiaries.

**I.     Litigation**

The Reorganized Debtors will be subject to various claims and legal actions arising in the ordinary course of their businesses.  The Debtors are not able to predict the nature and extent of any such claims and actions and cannot guarantee that the ultimate resolution of such claims and actions will not have a material adverse effect on the Reorganized Debtors.

**J.     Certain Tax Considerations**

There are a number of income tax considerations, risks and uncertainties associated with consummation of the Plan.  Interested parties should read carefully the discussions set forth in Article IX regarding certain U.S. federal income tax consequences of the transactions proposed by the Plan to the Debtors and the Reorganized Debtors and to Holders of Claims who are entitled to vote to accept or reject the Plan.

## VIII.     APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS

[To Come.]

## IX.     CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

THE FOLLOWING DISCUSSION SUMMARIZES CERTAIN ANTICIPATED U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE TRANSACTIONS PROPOSED BY THE PLAN TO THE DEBTORS AND U.S. HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.  THIS SUMMARY IS

63

PROVIDED FOR INFORMATION PURPOSES ONLY AND IS BASED ON THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "<u>CODE</u>"), TREASURY REGULATIONS PROMULGATED THEREUNDER, JUDICIAL AUTHORITIES, AND CURRENT ADMINISTRATIVE RULINGS AND PRACTICE, ALL AS IN EFFECT AS OF THE DATE HEREOF AND ALL OF WHICH ARE SUBJECT TO CHANGE OR DIFFERING INTERPRETATION, POSSIBLY WITH RETROACTIVE EFFECTS THAT COULD ADVERSELY AFFECT THE U.S. FEDERAL INCOME TAX CONSEQUENCES DESCRIBED BELOW.

THIS SUMMARY DOES NOT ADDRESS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR U.S HOLDER OF A CLAIM IN LIGHT OF ITS PARTICULAR FACTS AND CIRCUMSTANCES OR TO CERTAIN TYPES OF HOLDERS OF CLAIMS SUBJECT TO SPECIAL TREATMENT UNDER THE CODE (FOR EXAMPLE, NON-U.S. TAXPAYERS, FINANCIAL INSTITUTIONS, BROKER-DEALERS, INSURANCE COMPANIES, TAX-EXEMPT ORGANIZATIONS, AND THOSE HOLDING CLAIMS THROUGH A PARTNERSHIP OR OTHER PASS-THROUGH ENTITY). IN ADDITION, THIS SUMMARY DOES NOT DISCUSS ANY ASPECTS OF STATE, LOCAL, OR NON-U.S. TAXATION AND DOES NOT ADDRESS THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO U.S. HOLDERS OF CLAIMS THAT ARE UNIMPAIRED UNDER THE PLAN, U.S. HOLDERS OF CLAIMS THAT ARE NOT ENTITLED TO VOTE UNDER THE PLAN, AND U.S. HOLDERS OF CLAIMS THAT ARE NOT ENTITLED TO RECEIVE OR RETAIN ANY PROPERTY UNDER THE PLAN.

THE TAX RULES DESCRIBED HEREIN ARE COMPLEX AND THEIR APPLICATION IS UNCERTAIN IN CERTAIN RESPECTS. EACH U.S. HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE TAX CONSEQUENCES (INCLUDING STATE, LOCAL AND NON-U.S.) OF THE PLAN TO SUCH U.S. HOLDER.

A SUBSTANTIAL AMOUNT OF TIME MAY ELAPSE BETWEEN THE DATE OF THIS DISCLOSURE STATEMENT AND THE RECEIPT OF A FINAL DISTRIBUTION UNDER THE PLAN. EVENTS SUBSEQUENT TO THE DATE OF THIS DISCLOSURE STATEMENT, SUCH AS ADDITIONAL TAX LEGISLATION, COURT DECISIONS, OR ADMINISTRATIVE CHANGES, COULD AFFECT THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREUNDER. NO RULING HAS BEEN OR IS EXPECTED TO BE SOUGHT FROM THE INTERNAL REVENUE SERVICE (THE "<u>IRS</u>") WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN OR IS EXPECTED TO BE OBTAINED BY THE DEBTORS WITH RESPECT THERETO.

**To ensure compliance with United States Internal Revenue Service Circular 230, (a) any discussion of U.S. federal tax issues in this Disclosure Statement is not intended or written to be relied upon, and cannot be relied upon by U.S. Holders, for purposes of avoiding penalties that may be imposed on such U.S. Holders under the Code; (b) such discussion is written to support the promotion of the Plan; and (c) each U.S. Holder of a**

64

**claim should seek advice based on such U.S. Holder's particular circumstances from an independent tax advisor.**

**A.      U.S. Federal Income Tax Consequences to the Debtors**

        **1.      Consolidated Group and Net Operating Losses**

        TLC USA is the common parent corporation of an affiliated group of corporations that files a consolidated tax return for U.S. federal income tax purposes (the "TLC USA Consolidated Group"). TLC USA is the borrower under the Credit Agreement. TLC Canada, a Canadian corporation which currently owns all of the stock of TLC USA, and the subsidiaries of TLC USA are guarantors under this agreement. The TLC USA Consolidated Group has net operating losses ("NOLs") of $206 million for U.S. federal income tax purposes through December 31, 2008 that were incurred by the group. Of this amount, the utilization of approximately $14 million of the NOLs is not subject to any limitation under Section 382 of the Code ("Section 382"), the utilization of approximately $124 million of the NOLs is subject to limitations under Section 382 that permit approximately $8 million of NOLs to be utilized per year for the five-year period following the ownership change in February 2008 and approximately $5.5 million of NOLs to be utilized per year thereafter, and the utilization of approximately $68 million of the NOLs is severely limited. (See "Utilization of NOLs and Net Unrealized Built-In Losses" below.)

        **2.      Cancellation of Indebtedness Income**

        Under the Code, a taxpayer generally recognizes cancellation of indebtedness ("COD") income in an amount equal to the difference between the "adjusted issue price" of the indebtedness discharged and the sum of (i) the amount of any cash, (ii) the "issue price" of any new debt instruments, and (iii) the fair market value of any stock or other property, transferred in satisfaction of the discharged indebtedness. COD income also includes any interest payable on the debt exchanged that the taxpayer deducted on the accrual method of accounting but remains unpaid at the time the indebtedness is discharged. COD income generally does not include the discharge of indebtedness to the extent payment of the liability would give rise to a deduction.

        TLC USA will realize COD income upon the repayment of the Prepetition Lender Secured Claims to the extent the adjusted issue price of the Prepetition Lender Secured Claims (plus any accrued but unpaid interest that has been deducted for tax purposes) exceeds the cash received in respect of such Prepetition Lender Secured Claims.

        TLC USA may also realize COD income upon the satisfaction of General Unsecured Claims, Subordinated Claims, or Intercompany Claims in an amount equal to the excess of the amount of the claims over the cash paid, to the extent that payment of the unpaid claims would not give rise to a deduction.

        Taxpayers that realize COD income generally are required to include such amounts in gross income for purposes of determining their U.S. federal income tax for the year of debt discharge. However, because TLC USA is under the jurisdiction of a bankruptcy court in a title 11 case, it will not be required to include the COD income in its gross income. Instead, TLC USA will be required to reduce certain tax attributes (e.g., NOLs, general business credit carryovers and tax basis in property (collectively with NOLs, "Tax Attributes")) by the amount of the COD income excluded from gross income. The reduction in Tax Attributes occurs as of the first day of the taxable year following the taxable year in which such COD income is

65

realized.  While the issue is not free from doubt, TLC USA believes that its COD income will reduce NOLs the utilization of which is currently subject to significant limitation under Section 382 .

An election is available to defer the recognition of COD income for exchanges occurring in 2010.  Pursuant to the election, for exchanges occurring in 2010, COD income is deferred until the fourth taxable year following the taxable year in which the exchange creating the COD income occurs.  Beginning in that fourth taxable year, the deferred COD income would be includable in the debtor's gross income ratably over a five year period.  Once made, this election is irrevocable and the exclusion of COD income from gross income for companies under the jurisdiction of the Bankruptcy Court in title 11 cases described above would not be available (and the reduction in Tax Attributes would not apply).  TLC USA does not expect to make this election.

3.      Utilization of NOLs and Net Unrealized Built-In Losses

In general, when a corporation undergoes an "ownership change," generally a more than 50 percent increase in the ownership of stock of the common parent by five-percent shareholders at any time during a rolling three year testing period, Section 382 limits the corporation's ability to utilize its pre-change NOLs against its post-change income and if, at the time of the ownership change, the corporation has a net unrealized built-in loss in its assets (i.e., where the aggregate tax basis in its assets exceeds their fair market value by more than the lesser of $10 million or 15 percent of the fair market value of its assets), to deduct its built-in losses as of the time of the ownership change upon the sale or depreciation of those assets during the five-year period following the ownership change.

Due to heavy trading in TLC Vision's common stock leading up to the commencement of these cases, it is possible that TLC USA has already undergone an ownership change.  If it has not already done so, TLC USA will undergo an ownership change as a result of the consummation of the Plan.  In addition to the TLC USA Consolidated Group's NOLs, it anticipates that the TLC USA Consolidated Group will have a net unrealized built-in loss in its assets at that time.  The annual limitation on a corporation's use of its NOLs and the deduction of its recognized built-in losses (as discussed above) following an "ownership change" is generally equal to the product of the value of the stock of the corporation (with certain adjustments) immediately before the ownership change and the applicable "long-term tax-exempt rate" (currently 4.14 percent for ownership changes occurring in January 2010).  For these purposes, the annual Section 382 limitation and built-in losses generally are determined on a consolidated group basis as though the consolidated group were one entity.

Section 382 provides an exception from the application of the annual Section 382 limitation for a corporation under the jurisdiction of a court in a title 11 case if shareholders and certain eligible creditors immediately prior to the ownership change own 50 percent or more of the stock of the corporation (as a result of being shareholders or creditors prior to the ownership change) immediately thereafter, provided the corporation does not elect out of this exception (the "Bankruptcy Exception").  Because 100% of TLC USA's stock will be held by the Buyer after the effective time, we do not expect that the Bankruptcy Exception will be available.  As a result, we expect that Section 382 will apply.

66

4.    U.S. Federal Alternative Minimum Tax

The TLC USA Consolidated Group may be subject to the alternative minimum tax (the "AMT") which imposes a tax equal to the amount by which 20 percent of the group's alternative minimum taxable income ("AMTI") exceeds the group's regular tax liability. AMTI is calculated pursuant to specific rules in the Code which eliminate or limit the availability of certain tax deductions and which include as income certain amounts not generally included in computing the corporation's regular tax liability. However any COD income excluded from regular taxable income, as described above, will also be excluded from AMTI.

Additionally, a consolidated group with a net unrealized built-in loss in its assets that undergoes an ownership change, within the meaning of Section 382, must adjust the tax basis of its assets for AMT purposes to their fair market values immediately before the ownership change. As stated above, TLC USA expects that its consolidated group will have a net unrealized built-in loss in its assets on the Effective Date of the Plan, and therefore basis reduction, for AMT purposes, with respect to built-in loss assets will be required.

AMT paid by a corporation will generally be allowed as a nonrefundable credit against its regular federal income tax liability in future tax years when the corporation is subject to regular federal income tax.

**B.    U.S. Federal Income Tax Consequences to Claim Holders**

The following discussion only applies to U.S. Holders of Prepetition Lender Secured Claims and/or General Unsecured Claims. The term "U.S. Holder" means any beneficial owner of a Prepetition Lender Secured Claim, other than an entity treated as a partnership for U.S. federal income tax purposes, that for United States federal income tax purposes, is: (i) a citizen or resident of the United States, (ii) a corporation (including an entity treated as a corporation for United States federal income tax purposes) created or organized under the laws of the United States or of a political subdivision of the United States, (iii) an estate, the income of which is subject to United States federal income taxation regardless of its source, or (iv) any trust if (1) a United States court is able to exercise primary supervision over the administration of such trust and one or more United States persons have the authority to control all substantial decisions of the trust or (2) it has a valid election in place to be treated as a United States person.

1.    U.S. Holders of Prepetition Lender Secured Claims

A U.S. Holder will recognize gain or loss equal to the difference between the amount realized on the exchange and the U.S. Holder's tax basis in the property exchanged. In the case of property held as a capital asset, gain or loss recognized on the exchange will be treated as capital gain or loss, and will be long-term capital gain or loss if the property has been held for more than one year at the time of the exchange, except to the extent any gain is treated as ordinary income under the market discount rules discussed below. In addition, ordinary interest income may be recognized to the extent of accrued interest not previously included in income. The deductibility of capital loss is subject to limitations.

Accrued Interest. The manner in which the cash consideration paid to the U.S. Holders is allocated between accrued but unpaid interest and principal for U.S. federal income tax purposes in connection with a debt restructuring under which the full amount of the principal

67

of the debt is not repaid is unclear under present law. If any consideration were attributed to accrued but unpaid interest, a U.S. Holder of Prepetition Lender Secured Claims would be required to recognize such consideration as ordinary income if such interest income had not already been included in income by the U.S. Holder.

Market Discount. A U.S. holder having accrued market discount (as defined below) with respect to a debt instrument is generally required to include such market discount as ordinary income upon the disposition of such debt instrument. "Market discount" is defined as the amount by which a U.S. holder's tax basis in a debt instrument immediately after its acquisition (other than on original issuance) is exceeded by the adjusted issue price of the debt instrument at such time (subject to a de minimis exception).

## C. Other Tax Matters

### 1. Information Reporting and Backup Withholding

Certain payments pursuant to the Plan, may be subject to information reporting to the IRS. Moreover, such reportable payments may be subject to backup withholding (at the then applicable rate (currently 28 percent)) unless the taxpayer: (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (ii) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.

### 2. Importance of Obtaining Professional Tax Assistance

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A U.S. HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, U.S. HOLDERS SHOULD CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## X. FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS

## A. Feasibility of the Plan

In connection with confirmation of the Plan, the Bankruptcy Court will be required to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the

68

liquidation or the need for further financial reorganization of the Debtors. Because the consummation of the transaction embodied by the Plan Sponsor Agreement will generate sufficient funds to satisfy the Debtors' obligations under the Plan, the Debtors believe that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code.

## B.      Acceptance of the Plan

As a condition to Confirmation, the Bankruptcy Code requires that each Class of Impaired Claims vote to accept the Plan, except under certain circumstances.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the Plan. Thus, Holders of Claims in each of Classes A5, A6, B4 and B6 will have voted to accept the Plan only if two-thirds (⅔) in amount and a majority in number of the Claims actually voting in each Class cast their ballots in favor of acceptance. Holders of Claims who fail to vote are not counted as either accepting or rejecting the Plan.

## C.      Best Interests Test

As noted above even if a plan is accepted by each class of claims and interests, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the best interests of all holders of claims or interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor were liquidated under chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its chapter 11 case were converted to a chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 cases and the chapter 11 cases. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid administrative expenses incurred by the debtors in their chapter 11 cases that are allowed in the chapter 7 cases, litigation costs and claims arising from the operations of the debtor during the pendency of the chapter 11 case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity security interests. The

liquidation would also prompt the rejection of a large number of executory contracts and unexpired leases and thereby significantly enlarge the total pool of unsecured claims by reason of resulting rejection damages claims.

Once the bankruptcy court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the plan, then the plan is not in the best interests of creditors and equity security holders.

**D.      Liquidation Analysis**

For purposes of the best interests test, in order to determine the amount of liquidation value available to Creditors, the Debtors, with the assistance of their financial advisors, prepared a liquidation analysis, annexed hereto as <u>Appendix C</u> (the "<u>Liquidation Analysis</u>"), which concludes that in a chapter 7 liquidation **[summary of liquidation analysis to come]**. The Plan thus proposes to distribute more to Impaired Classes than the Debtors believe they would receive in a chapter 7 liquidation. These conclusions are premised upon the assumptions set forth in <u>Appendix C</u>, which the Debtors believe are reasonable.

The Debtors believe that any liquidation analysis with respect to the Debtors is inherently speculative. The Liquidation Analysis for the Debtors necessarily contains estimates of the net proceeds that would be received from a forced sale of assets and/or business units, as well as the amount of Claims that would ultimately become Allowed Claims. Claims estimates are based solely upon the Debtors' books and records. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis. In preparing the Liquidation Analysis, the Debtors have projected an amount of Allowed Claims that represents their best estimate of the chapter 7 liquidation dividend to Holders of Allowed Claims. The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan.

**E.      Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Valuation**

[**To come**].

Notwithstanding the difficulty in quantifying recoveries with precision, the Debtors believe that the financial disclosures and projections contained herein imply a greater recovery to Holders of Claims in Impaired Classes than the recovery available in a chapter 7 liquidation. Accordingly, the Debtors believe that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied.

**F.      Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative**

In the event any Class of Impaired Claims rejects the Plan, the Debtors may seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code.

70

Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. The Bankruptcy Court may confirm a plan at the request of a debtor if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the plan. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank. The Debtors believe the Plan does not discriminate unfairly with respect to the Claims and Interests in Classes.

A plan is "fair and equitable" as to holders of unsecured claims that reject the plan if the plan provides either that: (a) each holder of a claim of such class receives or retains on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (a) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest or (b) that the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property at all.

The Debtors believe that they could, if necessary, meet the "fair and equitable" requirements of section 1129(b) of the Bankruptcy Code with respect to Holders of Claims and Interests in Impaired Classes.

## XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords all Holders of Claims and Interests the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such Holders. If, however, the requisite acceptances are not received, or the Plan is not confirmed and consummated, the theoretical alternatives include (a) formulation of an alternative plan or plans of reorganization or (b) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

### A. Alternative Plan(s) of Reorganization

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtors (or, if the Debtors' exclusive periods in which to file and solicit acceptances of a plan of reorganization have expired, any other party in interest) could attempt to formulate and propose a different plan or plans of reorganization. Such a plan or plans might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of assets.

The Debtors believe that the Plan enables Creditors to realize the greatest possible value under the circumstances and has the greatest chance to be confirmed and consummated.

1113/74009-007 Current/17228164v7
RLF1 3534297v.2

**B.     Liquidation under Chapter 7 or Chapter 11**

If no plan is confirmed, the Debtors' cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. It is impossible to predict with certainty how the proceeds of the liquidation would be distributed to the respective Holders of Claims against or Interests in the Debtors. It is, however, possible to predict that the Prepetition Lenders would assert that they held security interests in substantially all assets to be liquidated, likely resulting in nothing to distribute to any other Class of Claims or Interests.

The Debtors believe that a liquidation under chapter 7 would cause a substantial diminution in the Debtors' Estates given the substantial premium in the enterprise value of their businesses over the liquidation value of their assets, and the additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees. The assets available for distribution to Creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, arising by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtors' assets. More importantly, conversion to a chapter 7 liquidation would likely result in the immediate cessation of the Debtors' businesses, as most chapter 7 trustees are disinclined to continue operations.

## XII.     THE SOLICITATION; VOTING PROCEDURES

**A.     Parties in Interest Entitled to Vote**

In general, a holder of a claim or interest may vote to accept or to reject a plan if (a) the claim or interest is "allowed," which means generally that no party in interest has objected to such claim or interest, and (b) the claim or interest is "impaired" by the plan but entitled to receive or retain property under the plan.

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan and, accordingly, holders of such claims and interests do not actually vote to accept or reject the Plan. If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote to accept or reject the Plan.

1113/74009-007 Current/17228164v7
RLF1 3534297v.2

**B.      Classes Entitled to Vote to Accept or Reject the Plan**

Holders of Claims in Classes A5, A6, and B4 are entitled to vote to accept or reject the Plan.  By operation of law, each Unimpaired Class of Claims is deemed to have accepted the Plan and each Impaired Class of Claims or Interests that will receive nothing under the Plan is deemed to have rejected the Plan and, therefore, the Holders of Claims or Interests in such Classes are not entitled to vote to accept or reject the Plan.  Consequently, Classes A1, A2, A3, A4, B1, B2, B3, C1, C2, C3, C4 and C5 are deemed to have accepted the Plan and Classes A7, A8, A9, B5, B6 and C6 are deemed to have rejected the Plan and, therefore, none of the Holders of Claims or Interests in such Classes are entitled to vote to accept or reject the Plan.

**C.      Solicitation Order**

Upon approval of this Disclosure Statement, the Bankruptcy Court entered an order that, among other things, determines the dates, procedures and forms applicable to the process of soliciting votes on the Plan and establishes certain procedures with respect to the tabulation of such votes (the "Solicitation Order").  Parties in interest may obtain a copy of the Solicitation Order through the Bankruptcy Court's electronic case filing system, by downloading the Solicitation Order from the Debtors' case website at www.epiqbankruptcysolutions.com, or by making written request upon the Debtors' counsel or Voting Agent.

**D.      Waivers of Defects, Irregularities, Etc.**

All questions with respect to the validity, form, eligibility (including time of receipt), acceptance and revocation or withdrawal of ballots will be determined by the Bankruptcy Court.  As indicated below under "Withdrawal of Ballots; Revocation," effective withdrawals of ballots must be delivered to the Voting Agent prior to the Voting Deadline.  The Debtors reserve the absolute right to contest the validity of any such withdrawal.  The Debtors also reserve the right to seek rejection of any and all ballots not in proper form.  The Debtors further reserve the right to seek waiver of any defects or irregularities or conditions of delivery as to any particular ballot.  Neither the Debtors nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of ballots nor will any of them incur any liabilities for failure to provide such notification.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) may be invalidated by the Bankruptcy Court.

**E.      Withdrawal of Ballots; Revocation**

Any party who has delivered a valid ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting Agent at any time prior to the Voting Deadline.  A notice of withdrawal, to be valid, must (a) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s), (b) be signed by the withdrawing party in the same manner as the ballot being withdrawn, (c) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn and (d) be received by the Voting Agent in a timely manner via regular mail at TLC Vision (USA) Corporation Ballot Processing, c/o Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, FDR Station, P.O. Box 5014, New York, NY 10150-5014, Attn:  Janice E. Livingstone, or via hand delivery or overnight courier at TLC Vision (USA) Corporation Ballot Processing, c/o Epiq

Bankruptcy Solutions, LLC, 757 Third Avenue, 3rd Floor, New York, NY 10017, Attn: Janice E. Livingstone. The Debtors intend to consult with the Voting Agent to determine whether any withdrawals of ballots were received and whether the requisite acceptances of the Plan have been received. As stated above, the Debtors expressly reserve the absolute right to contest the validity of any such withdrawals of ballots.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of ballots which is not received in a timely manner by the Voting Agent will not be effective to withdraw a previously cast ballot.

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed ballot may revoke such ballot and change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed ballot is received, only the ballot which bears the latest date will be counted for purposes of determining whether the requisite acceptances have been received.

## F. Voting Rights of Disputed Claimants

Holders of Disputed Claims or Interests in Classes A5, A6, and B4 whose Claims or Interests are (a) asserted as wholly unliquidated or wholly contingent in Proofs of Claim or Interest filed prior to the Distribution Record Date or (b) whose Claims or Interests are asserted in Proofs of Claim as to which an objection to the entirety of the Claim or Interest is pending as of the Distribution Record Date (collectively, the "Disputed Claimants") are not permitted to vote to accept or reject the Plan except as provided in the Solicitation Order. Pursuant to the procedures outlined in the Solicitation Order, Disputed Claimants may obtain a ballot for voting on the Plan only by filing a motion under Bankruptcy Rule 3018(a) seeking to have their Claims temporarily Allowed for voting purposes (a "Rule 3018 Motion"). Any such Rule 3018 Motion must be filed and served upon the Debtors' counsel and the Voting Agent no later than 5:00 p.m. (Eastern time) on the fourteenth (14th) day after the later of (i) the Solicitation Date and (ii) the date of service of an objection, if any, to such claim. The ballot of any creditor filing such a motion, will not be counted unless temporarily allowed by the Bankruptcy Court for voting purposes, after notice and a hearing. Any party timely filing and serving a Rule 3018 Motion will be provided a ballot and be permitted to cast a provisional vote to accept or reject the Plan. If and to the extent that the Debtors and such party are unable to resolve the issues raised by the Rule 3018 Motion prior to the Voting Deadline established by the Bankruptcy Court, then at the Confirmation Hearing the Bankruptcy Court will determine whether the provisional ballot should be counted as a vote to accept or reject the Plan. Nothing herein affects the Debtors' right to object to any Proof of Claim after the Distribution Record Date. With respect to any such objection, the Debtors may request that any vote cast by the Holder of the Claim subject to the objection be disallowed and not counted in determining whether the requirements of section 1126(c) of the Bankruptcy Code have been met.

## G. Further Information; Additional Copies

If you have any questions or require further information about the voting procedures for voting your Claim or about the package of materials you received, or if you wish to obtain an additional copy of the Plan or this Disclosure Statement, or any exhibits or

1113/74009-007 Current/17228164v7
RLF1 3534297v.2

appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d) or the Solicitation Order), please contact the Voting Agent at:

**If by regular mail:**

TLC Vision (USA) Corporation Ballot Processing,
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5014
New York, NY 10150-5014
Attn:  Janice E. Livingstone

**If by overnight courier or hand delivery:**

TLC Vision (USA) Corporation Ballot Processing,
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017
Attn:  Janice E. Livingstone

**If by telephone, for U.S. callers only:**

Epiq Systems, Inc.
Telephone:  646 282-2400

**If by telephone, for international callers:**

Epiq Systems, Inc.
Telephone:  [_____]

## RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Debtors urge all Holders of Claims in Classes A5, A6 and B4 to vote to ACCEPT the Plan, and to complete and return their ballots so that they will be RECEIVED on or before [_____], 2010, at 5:00 p.m. prevailing Eastern time.

Dated: February 3, 2010

TLC VISION CORPORATION; TLC VISION (USA) CORPORATION; AND TLC MANAGEMENT SERVICES INC.

By: /s/ Michael F. Gries
Title: Chief Restructuring Officer

**<u>Appendix A</u>**

**Joint Chapter 11 Plan of Reorganization**

**ATTACHED**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| TLC Vision (USA) Corporation , *et al.*,[1] | ) | Case No. 09-14473 (KG) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

## FIRST AMENDED JOINT CHAPTER 11 PLAN OF
## REORGANIZATION DATED AS OF FEBRUARY 3, 2010

The above-captioned debtors and debtors in possession hereby submit their First Amended Joint Chapter 11 Plan of Reorganization Dated as of February 3, 2010.

**RICHARDS LAYTON & FINGER, P.A.**
Mark D. Collins (DE Bar No. 2981)
Michael J. Merchant (DE Bar No. 3854)
Chun I. Jang (DE Bar No. 4790)
Andrew C. Irgens (DE Bar No. 5193)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
*Counsel for Debtors and Debtors in Possession*

Dated: Wilmington, Delaware
          February 3, 2010

**PROSKAUER ROSE LLP**
Mark K. Thomas
Paul V. Possinger
Jeremy T. Stillings
Three First National Plaza
70 West Madison, Suite 3800
Chicago, Illinois 60602
Telephone: (312) 962-3550
Facsimile: (312) 962-3551
*Counsel for Debtors and Debtors in Possession*

---

[1]  The Debtors in the cases, along with the last four digits of each Debtor's federal tax identification number and address, are: TLC Vision (USA) Corporation (6220) 16305 Swingley Ridge Road, Chesterfield, MO 63017; TLC Vision Corporation (1150) 5280 Solar Drive, Suite 300, Mississauga, Ontario, L4W 5M8; and TLC Management Services, Inc. (0374) 1209 Orange Street, Wilmington, DE 19801.

Table of Contents

## ARTICLE I.

### DEFINITIONS, INTERPRETATION AND EXHIBITS.

Section 1.01.    Definitions ..................................................................................................1

Section 1.02.    Rules of Interpretation ..................................................................................14

Section 1.03.    Exhibits ........................................................................................................14

## ARTICLE II.

### CLASSIFICATION OF CLAIMS AND INTERESTS

Section 2.01.    Generally......................................................................................................14

Section 2.02.    Unclassified Claims .....................................................................................15

Section 2.03.    Classification of Claims Against and Interests in TLC USA. .........................15

Section 2.04.    Classification of Claims Against and Interests in TLC Canada. .....................16

Section 2.05.    Classification of Claims Against and Interests in TLC MSI. .........................17

## ARTICLE III.

### PROVISIONS FOR TREATMENT OF CLASSES OF  CLAIMS AND INTERESTS

Section 3.01.    Satisfaction of Claims and Interests...............................................................18

Section 3.02.    Unclassified Claims, Classified Unimpaired and Impaired Claims and Classified Interests .............................................................................................18

Section 3.03.    Administrative Claims ..................................................................................18

Section 3.04.    Priority Tax Claims.......................................................................................19

Section 3.05.    Junior DIP Claims.........................................................................................19

Section 3.06.    Treatment of Claims Against and Interests in TLC USA:...............................19

Section 3.07.    Treatment of Claims Against and Interests in TLC Canada:..........................21

Section 3.08.    Treatment of Claims Against and Interests in TLC MSI:...............................22

i

## ARTICLE IV.

### ACCEPTANCE OR REJECTION OF THE PLAN; CRAMDOWN

Section 4.01.     Acceptance by Impaired Classes of Claims and Interests ...............................23

Section 4.02.     Voting Classes ..................................................................................................24

Section 4.03.     Ballot Instructions............................................................................................24

Section 4.04.     Cramdown..........................................................................................................24

## ARTICLE V.

### PROVISIONS GOVERNING DISTRIBUTIONS  UNDER THE PLAN

Section 5.01.     Timing of Distributions......................................................................................24

Section 5.02.     Distributions to Holders of Allowed Claims ....................................................24

Section 5.03.     Delivery of Distributions ..................................................................................25

Section 5.04.     Method of Cash Distributions............................................................................25

Section 5.05.     Fractional Dollars..............................................................................................25

Section 5.06.     Failure to Negotiate Checks..............................................................................25

Section 5.07.     Unclaimed Distributions ...................................................................................25

Section 5.08.     Limitation on Distribution Rights......................................................................26

Section 5.09.     Compliance With Tax Requirements..................................................................26

Section 5.10.     Documentation Necessary to Release Liens ....................................................26

## ARTICLE VI.

### EXECUTORY CONTRACTS AND UNEXPIRED LEASES; INDEMNIFICATION OBLIGATIONS; BENEFIT PROGRAMS

Section 6.01.     Treatment of Executory Contracts and Unexpired Leases ...............................26

Section 6.02.     Cure of Defaults for Assumed Contracts and Leases ......................................27

Section 6.03.     Resolution of Objections to Assumption of Executory Contracts and Unexpired Leases...............................................................................................28

ii

Section 6.04.    Bar Date for Rejection Claims ..............................................................28

Section 6.05.    Treatment of Rejection Claims ..............................................................28

Section 6.06.    Executory Contracts and Unexpired Leases Entered Into and Other
Obligations Incurred After the Petition Date .......................................29

Section 6.07.    Modification of Change of Control Provisions.....................................29

Section 6.08.    Reorganized Debtors' Indemnification Obligations .............................29

Section 6.09.    Benefit Programs ..................................................................................29

ARTICLE VII.

MEANS FOR IMPLEMENTATION OF THE PLAN

Section 7.01.    Corporate Action...................................................................................30

Section 7.02.    Plan Funding ........................................................................................30

Section 7.03.    Plan Sponsor Agreement......................................................................30

Section 7.04.    Articles of Organization.......................................................................30

Section 7.05.    Operations Between the Confirmation Date and the Effective Date .............31

Section 7.06.    Revesting of Assets..............................................................................31

Section 7.07.    Approval of Agreements.......................................................................31

Section 7.08.    Adoption or Assumption of Senior Management Contracts...........................31

Section 7.09.    Adoption of New Management Incentive Plan.................................31

Section 7.10.    Corporate Structure Changes ..............................................................31

ARTICLE VIII.

PRESERVATION OF CAUSES OF ACTION AND RIGHT TO DEFEND AND CONTEST

Section 8.01.    Preservation of Rights...........................................................................32

Section 8.02.    Rights of Action....................................................................................32

Section 8.03.    Setoffs ...................................................................................................32

Section 8.04.    No Payment or Distribution Pending Allowance...............................32

1076/74009-007 Current/17494726v4
RLF1 3534300v.1

Section 8.05.      Resolution of Disputed Claims .......................................................32

ARTICLE IX.

CONDITIONS TO CONFIRMATION and CONSUMMATION OF THE PLAN

Section 9.01.      Conditions to Confirmation .............................................................33

Section 9.02.      Conditions to Effective Date............................................................33

Section 9.03.      Waiver of Conditions to Confirmation and Consummation ............................34

Section 9.04.      Effect of Failure or Absence of Waiver of Conditions Precedent to the
Effective Date of the Plan ................................................................34

ARTICLE X.

OPERATION AND MANAGEMENT OF THE REORGANIZED DEBTORS

Section 10.01.     Post-Effective Date Operation of Business.......................................35

Section 10.02.     Post Effective Date Officers and Directors......................................35

ARTICLE XI.

EFFECTS OF CONFIRMATION

Section 11.01.     Discharge .......................................................................................35

Section 11.02.     Injunction. .....................................................................................36

Section 11.03.     Exculpation ....................................................................................36

Section 11.04.     Releases..........................................................................................37

Section 11.05.     Indemnification ..............................................................................38

Section 11.06.     Other Documents and Actions .......................................................38

Section 11.07.     Term of Injunctions or Stays..........................................................39

Section 11.08.     Preservation of Insurance...............................................................39

Section 11.09.     Guaranties .....................................................................................39

Section 11.10.     Subordination Rights .....................................................................39

Section 11.11.     No Successor Liability ...................................................................39

1076/74009-007 Current/17494726v4
RLF1 3534300v.1

ARTICLE XII.

RETENTION OF JURISDICTION

Section 12.01.     Exclusive Jurisdiction of Bankruptcy Court ....................................................39

Section 12.02.     Failure of Bankruptcy Court to Exercise Jurisdiction.....................................42

ARTICLE XIII.

MISCELLANEOUS PROVISIONS

Section 13.01.     Binding Effect of Plan ......................................................................42

Section 13.02.     Withdrawal of the Plan .....................................................................42

Section 13.03.     Final Order........................................................................................42

Section 13.04.     Modification of the Plan ...................................................................42

Section 13.05.     Business Days ...................................................................................42

Section 13.06.     Severability ......................................................................................43

Section 13.07.     Governing Law .................................................................................43

Section 13.08.     Dissolution of Committee .................................................................43

Section 13.09.     Payment of Fees and Expenses of the Junior DIP Agent and Junior DIP
                   Lenders..............................................................................................43

Section 13.10.     Payment of Statutory Fees ................................................................43

Section 13.11.     Post-Confirmation Operating Reports ..............................................43

Section 13.12.     Notices ..............................................................................................43

Section 13.13.     Filing of Additional Documents .......................................................44

Section 13.14.     Section 1125 of the Bankruptcy Code ..............................................44

Section 13.15.     Section 1146 Exemption ...................................................................44

Section 13.16.     Release of Liens................................................................................45

Section 13.17.     Time ..................................................................................................45

Section 13.18.     No Attorneys' Fees ...........................................................................45

v

Section 13.19.    No Injunctive Relief..............................................................................45

Section 13.20.    Non-Voting Equity Securities................................................................45

Section 13.21.    Continued Confidentiality Obligations................................................45

Section 13.22.    No Admissions or Waivers....................................................................45

Section 13.23.    Entire Agreement..................................................................................45

Section 13.24.    Waiver....................................................................................................45

Section 13.25.    Bar Date for Professionals...................................................................46

1076/74009-007 Current/17494726v4
RLF1 3534300v.1

# INTRODUCTION

This first amended joint plan of reorganization under chapter 11 of the Bankruptcy Code (as amended or modified hereafter in accordance with its terms, the "Plan"), dated as of February 3, 2010, is proposed by TLC Vision Corporation, TLC Vision (USA) Corporation, and TLC Management Services Inc. (collectively, the "Debtors"). Reference is made to the Disclosure Statement accompanying the Plan for a discussion of the Debtors' history, business, results of operations, historical financial information, properties, projections for future operations and risk factors, a summary and analysis of the Plan, and certain related matters. The Debtors are proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL CREDITORS OF THE DEBTORS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3019 AND THE PLAN, THE DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THE PLAN PRIOR TO ITS SUBSTANTIAL CONSUMMATION.

The Debtors have obtained Bankruptcy Court authority to have the Chapter 11 Cases jointly administered for administrative and procedural purposes only. Accordingly, the Plan is being proposed as a joint plan of reorganization of the Debtors for administrative and procedural purposes only. The Plan is not premised upon the substantive consolidation of the Debtors or the Chapter 11 Cases and nothing herein shall be otherwise construed. The Debtors, however, reserve the right to seek substantive consolidation by motion or amendment to the Plan if they conclude that substantive consolidation is necessary or appropriate for effectuation of the Plan. Claims against, and Interests in, the Debtors (other than Administrative Claims, Priority Tax Claims, and Junior DIP Claims) are classified in Article II hereof and treated in Article III hereof.

## ARTICLE I.
## DEFINITIONS, INTERPRETATION AND EXHIBITS.

Section 1.01. <u>Definitions</u>. Unless the context requires otherwise, the following terms shall have the following meanings whether presented in the Plan or the Disclosure Statement with initial capital letters or otherwise. As used herein:

"Administrative Claim" means a Claim for: (a) any cost or expense of administration (including, without limitation, Professional Fee Claims) of any of the Chapter 11 Cases asserted or arising under sections 503, 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code including, but not limited to (i) any actual and necessary post Petition Date cost or expense of preserving the Debtors' respective Estates or operating the businesses of the Debtors, (ii) any payment to be made under the Plan to cure a default under an assumed executory contract or unexpired lease, (iii) any post-Petition Date cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtors in the ordinary course of their respective businesses, (iv) compensation or reimbursement of expenses of Professionals to the extent Allowed by the

1

Bankruptcy Court under sections 330(a) or 331 of the Bankruptcy Code, and (v) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under Section 546 of the Bankruptcy Code; (b) any fees or charges assessed against the Debtors' respective Estates under section 1930 of title 28 of the United States Code; and (c) any Allowed administrative claim or superpriority claim granted pursuant to the Junior DIP Order.

"Affiliate" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

"Allowed" means: (i) with reference to any unsatisfied Claim, (a) any Claim against any of the Debtors that has been listed by the Debtors in the Schedules, as such Schedules may have been amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent, and with respect to which no proof of claim has been filed, (b) any Claim specifically allowed under the Plan, (c) any Claim the amount or existence of which has been determined or allowed by a Final Order (including the Junior DIP Order), or (d) any Claim as to which a proof of claim has been timely filed before the Bar Date and to which no objection to the allowance thereof has been filed by the Claims Objection Deadline; provided, however, that the term "Allowed", with reference to any Claim, shall not include (x) any unliquidated claim or (y) interest or attorneys' fees on or related to any Claim that accrues from and after the Petition Date unless otherwise expressly provided for in the Plan; and (ii) with reference to any Interests, an Interest which is registered as of the Record Date in such stock register as may be maintained on behalf of the Debtors.

"Allowed Claim" means a Claim that is Allowed.

"Allowed Interest" means an Interest that is Allowed.

"Avoidance Actions" means any and all Causes of Action which a trustee, debtor-in-possession, the estate or other appropriate party in interest may assert under sections 502, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code (other than those which are released or dismissed as part of and pursuant to the Plan) or under other similar or related state or federal statutes or common law, including fraudulent conveyance laws.

"Ballot" means the forms of ballots accompanying the Disclosure Statement upon which Holders of Impaired Claims entitled to vote on the Plan shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the instructions regarding voting.

"Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as codified in title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as in effect on the Petition Date, together with all amendments and modifications thereto that subsequently may be made applicable to the Chapter 11 Cases.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or, if such court ceases to exercise jurisdiction over these proceedings, the court or adjunct thereof that exercises jurisdiction over the Chapter 11 Cases.

2

"Bankruptcy Rules" means: (a) the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended and promulgated under section 2075 of title 28 of the United States Code; (b) the Federal Rules of Civil Procedure, as amended and promulgated under section 2072 of title 28 of the United States Code; (c) the Local Rules of the Bankruptcy Court; and (d) any standing orders governing practice and procedure issued by the Bankruptcy Court, each as in effect on the Petition Date, together with all amendments and modifications thereto that subsequently may be applicable to the Chapter 11 Cases or proceedings therein, as the case may be.

"Bar Date" means the applicable bar date by which a proof of Claim must be, or must have been, Filed, as established by an order of the Bankruptcy Court, in accordance with the Bankruptcy Code, or as set forth in Section 6.04 hereof.

"BIA" means the Bankruptcy and Insolvency Act (Canada), R.S.C. 1985, c B-3, as amended from time to time.

"Business Day" means any day which is not a Saturday, a Sunday, a "legal holiday" as defined in Bankruptcy Rule 9006(a), or a day on which banking institutions in the State of New York are authorized or obligated by law, executive order or governmental decree to be closed.

"Buyer" means Thriller Acquisition Corp., a Delaware corporation.

"Buyer Parties" mean Buyer and Canadian Buyer.

"Canadian Buyer" means Thriller Canada Acquisition Corp., a New Brunswick corporation.

"Canadian Court" means the Ontario Superior Court of Justice (Commercial List).

"Canadian Priority Employee Claims" means the claims of the employees and former employees of TLC Canada pursuant to section 6(5) of the CCAA, and the claims of the employees and former employees of TLC Canada and other Persons pursuant to section 6(6) of the CCAA.

"Canadian Priority Tax Claim" means the claims of Her Majesty in Right of Canada pursuant to section 6(3) of the CCAA.

"Canadian Recognition Order" means an order of the Canadian Court issued in respect of the CCAA Case recognizing the Plan Sponsor Order and the Junior DIP Order.

"Canadian Sanction Order" means an order of the Canadian Court recognizing the Plan and the Confirmation Order in their entirety and declaring the Plan and the Confirmation Order to be effective in Canada.

"Cash" means money, currency and coins, negotiable checks, balances in bank accounts and other lawful currency of the United States of America and its equivalents.

3

"Causes of Action" means any and all actions, claims, rights, defenses, third-party claims, damages, executions, demands, crossclaims, counterclaims, suits, choses in action, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims whatsoever, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly, indirectly or derivatively, at law, in equity or otherwise, accruing to the Debtors or the Reorganized Debtors, including, but not limited to, the Avoidance Actions.

"CCAA" shall mean the Companies' Creditors Arrangement Act (Canada), R.S.C. 1985, c. C-36, as amended from time to time.

"CCAA Case" means the proceeding commenced under Part IV of the CCAA by TLC Canada in the Canadian Court.

"Chapter 11 Cases" means the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors in the Bankruptcy Court on the Petition Date.

"Charlesbank" means Charlesbank Equity Fund VII, Limited Partnership, its direct and indirect affiliates, and any fund and any accounts managed by Charlesbank Equity Fund VII or a direct or indirect affiliate thereof.

"Claim" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

"Claims Objection Deadline" means the latest of (a) 75 days after the Effective Date, (b) 75 days after the date on which any Claim is Filed, or (c) such later date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clauses (a) and (b) above.  The filing of a motion to extend the Claims Objection Deadline shall automatically extend the Claims Objection Deadline until a Final Order is entered on such motion.  In the event that such motion to extend the Claims Objection Deadline is denied by the Bankruptcy Court, the Claims Objection Deadline shall be the later of the current Claims Objection Deadline (as previously extended, if applicable) or 30 days after the Bankruptcy Court's entry of an order denying the motion to extend the Claims Objection Deadline.

"Class" means each class, subclass or category of Claims or Interests as classified in Article II of the Plan.

"Committee" means the committee appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code by the United States Trustee on January 5, 2010, as the membership of such committee is from time to time constituted and reconstituted.

"Committee Members" means the members of any Committee.

"Confirmation" means the entry by the Bankruptcy Court of the Confirmation Order.

"Confirmation Date" means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court with respect to the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

"Confirmation Hearing" means the hearing held before the Bankruptcy Court to consider Confirmation of the Plan pursuant to sections 1128 and 1129 of the Bankruptcy Code.

"Confirmation Order" means the order entered by the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"Creditor" means any Person that is the Holder of any Claim against any of the Debtors.

"Day(s)" means, unless expressly otherwise provided, calendar day(s).

"Debtors" shall have the meaning set forth in the Introduction of this Plan.

"Disallowed" means, with respect to any Claim or Interest or portion thereof, any Claim against or Interest in the Debtors which: (a) has been withdrawn, in whole or in part, by agreement of the Debtors or Reorganized Debtors and the Holder thereof; (b) has been withdrawn, in whole or in part, by the Holder thereof; or (c) has been disallowed, in whole or part, by Final Order of a court of competent jurisdiction. In each case, a Disallowed Claim or a Disallowed Interest is disallowed only to the extent of disallowance or withdrawal.

"Disallowed Claim" means a Claim, or any portion thereof, that is Disallowed.

"Disallowed Interest" means an Interest, or any portion thereof, that is Disallowed.

"Disbursing Agent" means Reorganized TLC USA or such other Entity that is designated by Reorganized TLC USA to disburse Property pursuant to the Plan.

"Disclosure Statement" means the Debtors' Disclosure Statement With Respect to the First Amended Joint Chapter 11 Plan of Reorganization Dated as of February 3, 2010, including all exhibits, appendices, schedules and annexes, if any, attached thereto, as submitted by the Debtors, as the same may be altered, amended, supplemented or modified from time to time, and which was prepared and distributed in accordance with sections 1125 and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018.

"Disputed" means any Claim or Interest that has been neither Allowed nor Disallowed.

"Disputed Claim" means a Claim, or any portion thereof, that is Disputed. For purposes of the Plan, a Claim that has been neither Allowed nor Disallowed shall be considered a Disputed Claim.

5

"Disputed Interest" means an Interest, or any portion thereof, that is Disputed. For purposes of the Plan, an Interest that has been neither Allowed nor Disallowed shall be considered a Disputed Interest.

"Effective Date" means the date on which all conditions to consummation set forth in Article IX of the Plan have been satisfied or waived (if capable of being duly and expressly waived), provided that no stay of the Confirmation Order is then in effect, as evidenced by the filing and service of a notice thereof with the Bankruptcy Court.

"Entity" means any individual, corporation, limited or general partnership, joint venture, association, joint stock company, limited liability company, estate, trustee, United States Trustee, unincorporated organization, government, governmental unit (as defined in the Bankruptcy Code), agency or political subdivision thereof.

"Essential Trade Claims" shall mean those Claims identified by TLC USA as such in the Plan Supplement.

"Estates" means the estates created in these Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code upon commencement of the Chapter 11 Cases.

"Exculpated Persons" means: (a) each of the Debtors, (b) directors, officers and employees of the Debtors, as of the Petition Date but prior to the Effective Date, (c) Charlesbank, (d) the Buyer Parties, and (e) the respective current and former officers, directors, employees, agents, stockholders, managers, members, affiliates, partners, advisors, attorneys and professionals of the parties identified in subclauses (a) through (d).

"Excluded Assets" shall have the same meaning set forth in the Plan Sponsor Agreement.

"File, Filed or Filing" means file, filed or filing with the Bankruptcy Court in the Chapter 11 Cases.

"Final Decree" means the final decree entered by the Bankruptcy Court after the Effective Date and pursuant to section 350(a) of the Bankruptcy Code and Bankruptcy Rule 3022.

"Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket of such court, the operation or effect of which has not been stayed, reversed, vacated, modified or amended, and as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal, petition for certiorari, or seek review or rehearing has expired and as to which no appeal, petition for certiorari, or petition for review or rehearing was filed or, if filed, remains pending; provided, however, that the possibility that a motion may be filed pursuant to Rules 9023 or 9024 of the Bankruptcy Rules or Rules 59 or 60(b) of the Federal Rules of Civil Procedure shall not mean that an order or judgment is not a Final Order.

6

"General Unsecured Claims" means all Allowed Claims, but excluding Administrative Claims, Priority Tax Claims, Professional Fee Claims, Other Secured Claims, Prepetition Lender Secured Claims, Essential Trade Claims, and Other Priority Claims.

"Holder" means an Entity holding a beneficial interest in a Claim or Interest and, when used in conjunction with a Class or type of Claim or Interest, means a holder of a beneficial interest in a Claim or Interest in such Class or of such type.

"Impaired" means, when used with reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"Impaired Claim" means a Claim which is Impaired.

"Impaired Interest" means an Interest which is Impaired.

"Information Officer" means Alvaraz & Marsal Canada Inc., the information officer appointed by the Canadian Court in connection with the CCAA Case.

"Intercompany Claims" means all claims owing to any Debtor by any other Debtor.

"Interests" means any and all equity interests, ownership interests or shares in the Debtors issued by the Debtors prior to the Petition Date (including, without limitation, all capital stock, stock certificates, common stock, preferred stock, partnership interests, rights, options, warrants, contingent warrants, convertible or exchangeable securities, investment securities, subscriptions or other agreements and contractual rights to acquire or obtain such an interest or share in the Debtors, partnership interests in the Debtors' stock appreciation rights, conversion rights, repurchase rights, redemption rights, dividend rights, preemptive rights and liquidation preferences, puts, calls or commitments of any character whatsoever relating to any such equity, ownership interests or shares of capital stock of the Debtors or obligating the Debtors to issue, transfer or sell any shares of capital stock) whether or not certificated, transferable, voting or denominated "stock" or a similar security, and any Claim or Cause of Action related to or arising from any of the foregoing.

"Junior DIP Agent" means Charlesbank as collateral agent and administrative agent under the Junior DIP Loan Agreement.

"Junior DIP Claims" means the claims of the Junior DIP Agent and the Junior DIP Lenders based upon, evidenced by, arising under or related to the Junior DIP Loan Agreement, plus all accrued and unpaid interest, fees and costs thereunder.

"Junior DIP Financing" means the post-petition loan facility provided to the Debtors by the Junior DIP Lenders pursuant to the Junior DIP Loan Agreement.

"Junior DIP Lenders" means the lender parties to the Junior DIP Loan Agreement.

"Junior DIP Loan Agreement" means that certain Junior Secured Super Priority Debtor in Possession Credit Agreement dated as of February 3, 2010 by and among the Debtors, the Junior DIP Agent and the Junior DIP Lenders.

"Junior DIP Order" means the interim or final order, as in effect from time-to-time, entered by the Bankruptcy Court authorizing and approving the Junior DIP Financing and the Debtors' use of cash collateral pursuant to section 363 of the Bankruptcy Code, and any extensions or amendments thereof.

"Liens" means, with respect to any asset or Property (or the rents, revenues, income, profits or proceeds therefrom), and in each case, whether the same is consensual or nonconsensual or arises by contract, operation of law, legal process or otherwise: (a) any and all mortgages, liens, pledges, attachments, charges, leases evidencing a capitalizable lease obligation, conditional sale or other title retention agreement, or other security interest or encumbrance or other legally cognizable security devices of any kind in respect of any asset or Property, or upon the rents, revenues, income, profits or proceeds therefrom; or (b) any arrangement, express or implied, under which any Property is transferred, sequestered or otherwise identified for the purpose of subjecting or making available the same for the payment of debt or performance of any other obligation in priority to the payment of general unsecured Creditors.

"Management Interests" means equity interests in the Buyer Parties to be issued to each member of the Senior Management team pursuant to the New Management Incentive Plan.

"Medical Pending Litigation Claims" means all Claims relating to pending litigation against any of the Debtors for medical malpractice or similar liability, as further disclosed in the Disclosure Statement.

"New Management Incentive Plan" means, collectively, the equity incentive and bonus plans and other terms of employment of Senior Management to be adopted by the Buyer Parties on the Effective Date which provide for the issuance of equity awards to officers and key employees of the Debtors. The Plan Supplement will include the forms of the New Management Incentive Plan in substantially the form to be implemented on the Effective Date.

"New TLC USA Certificates of Incorporation and By-Laws" means the amended and restated certificates of incorporation, articles of organization, by-laws or other governing charter documents, as appropriate, of TLC USA which will be included in the Plan Supplement. The Plan Supplement will include the forms of the New TLC USA Certificates of Incorporation and By-Laws in substantially the form to be implemented on the Effective Date.

"Objection" means any objection, application, motion, complaint or any other legal proceeding seeking, in whole or in part, to Disallow, determine, liquidate, classify, reclassify or establish the priority, expunge, subordinate or estimate any Claim (including the resolution of any request for payment of any Administrative Claim) or Interest other than a Claim or an Interest that is Allowed.

1076/74009-007 Current/17494726v4
RLF1 3534300v.1

"Other Priority Claims" means any Claim against the Debtors entitled to priority pursuant to section 507(a) of the Bankruptcy Code, including the Canadian Priority Employee Claims other than a Priority Tax Claim or an Administrative Claim.

"Other Secured Claims" means any Secured Claim (other than the Prepetition Lender Secured Claims).

"Person" means and includes a natural person, individual, partnership, corporation (as defined in section 101(9) of the Bankruptcy Code), or organization including, without limitation, officers and directors of the Debtors, corporations, limited partnerships, limited liability companies, general partnerships, joint ventures, joint stock companies, trusts, land trusts, business trusts, unincorporated organizations or associations, or other organizations, irrespective of whether they are legal entities, governmental bodies (or any agency, instrumentality or political subdivision thereof), or any other form of legal entities; provided, however, "Person" does not include governmental units, except that a governmental unit that (a) acquires an asset from a Person (i) as a result of the operation of a loan guarantee agreement or (ii) as receiver or liquidating agent of a Person; (b) is a guarantor of a pension benefit payable by or on behalf of a Debtor or an Affiliate of a Debtor; or (c) is the legal or beneficial owner of an asset of (i) an employee pension benefit plan that is a governmental plan, as defined in section 414(d) of the Internal Revenue Code of 1986 or (ii) an eligible deferred compensation plan, as defined in section 457(b) of the Internal Revenue Code of 1986, shall be considered for purposes of section 1102 of the Bankruptcy Code to be a Person with respect to such asset or such benefit.

"Petition Date" means December 21, 2009, the date on which the Debtors Filed their respective petitions for relief commencing the Chapter 11 Cases.

"Plan" means this First Amended Joint Chapter 11 Plan of Reorganization Dated as of February 3, 2010, including all exhibits, appendices, schedules and annexes, if any, attached hereto, as submitted by the Debtors, including the Plan Supplement, as such Plan may be altered, amended, supplemented or modified from time to time in accordance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Confirmation Order and the terms and conditions of Section 13.04 of the Plan.

"Plan Documents" means the form of the Plan Sponsor Agreement, the New Management Incentive Plan, the Senior Management Contracts, a schedule of the identities of the members of the Boards of Directors of the Reorganized Debtors, and such other definitive documents as may be necessary to implement the Plan.

"Plan Sponsor" means Charlesbank.

"Plan Sponsor Agreement" means that certain Plan Sponsor Agreement dated February 3, 2010 among the Buyer Parties and the Debtors.

"Plan Sponsor Order" means an order of the Bankruptcy Court, substantially in the form attached to the Plan Sponsor Agreement, approving the assumption of the Plan Sponsor Agreement by the Debtors and the Break-Up Fee, Expense Reimbursement and other amounts

paid or payable thereunder, and approving and directing the execution, delivery and performance of the Plan Sponsor Agreement and the applicable ancillary agreements.

"Plan Supplement" means the supplement to this Plan containing the Plan Documents which shall be filed with the Bankruptcy Court. The Plan Supplement, which shall be reasonably satisfactory to the Debtors and Charlesbank, is incorporated into, and is a part of, this Plan as if set forth in full herein, and all references to this Plan shall refer to this Plan together with all documents contained in the Plan Supplement. The Plan Supplement (containing drafts or final versions of the Plan Documents) shall be filed with the Bankruptcy Court on or before the date that is ten (10) days prior to the Confirmation Hearing, or on such other date as the Bankruptcy Court may establish.

"Prepetition Agent" means Wells Fargo Bank, N.A., as collateral agent and administrative agent under the Prepetition Credit Agreement, and any predecessor agent thereunder.

"Prepetition Credit Agreement" means the Amended and Restated Credit Agreement dated as of June 21, 2007 (as amended from time to time), by and among TLC USA, TLC Canada, the guarantors party thereto, the Prepetition Lenders, and the Prepetition Agent pursuant to which the Prepetition Lenders agreed to provide loans and other financial accommodations to TLC USA secured by first priority liens and security interests on substantially all of the Debtors' assets.

"Prepetition Lenders" shall mean the lenders party to the Prepetition Credit Agreement.

"Prepetition Lender Secured Claims" means the claims of the Prepetition Agent and the Prepetition Lenders based upon, evidenced by, arising under or related to the Prepetition Credit Agreement estimated to include, without limitation, (i) outstanding principal amount of term loans of US $76,659,696.92, (ii) outstanding principal amount of revolving loans of US $23,400,000, (iii) the outstanding letter of credit exposure of US $50,000 and CAD $1,000,000, (iv) the outstanding amount under hedge agreements of $1,605,478.79, plus (v) all interest, fees and costs thereunder, all as may be Allowed by the Bankruptcy Court.

"Prepetition Loan Documents" shall mean the Prepetition Credit Agreement and the other Loan Documents (as defined in the Prepetition Credit Agreement).

"Priority Tax Claim" means any and all Claims accorded priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code and the Canadian Priority Tax Claim.

"Professional Fee Claim" means a claim for compensation for services rendered and for reimbursement of expenses incurred pursuant to sections 327, 328, 330, 331 or 503(b) of the Bankruptcy Code, relating to services incurred on and after the Petition Date and prior to and including the Effective Date in connection with an application made to the Bankruptcy Court by Professionals in the Chapter 11 Cases or Professionals retained by or on behalf of the Debtors or their estates in connection with parallel restructuring proceedings in the Canadian Court.

10

"Professionals" means any professional employed in these Chapter 11 Cases pursuant to sections 327 or 1103 of the Bankruptcy Code or any Professional entitled to compensation pursuant to sections 327, 328, 330, 331, 503(b)(2) or (4), or 1103 of the Bankruptcy Code or retained by or on behalf of the Debtors or their estates in connection with parallel restructuring proceedings in the Canadian Court.

"Property" means all assets or property of the Debtors' respective Estates or the Reorganized Debtors, as applicable, of any nature whatsoever, real or personal, tangible or intangible, including contract rights, accounts and Causes of Action, previously or now owned by the Debtors, or acquired by the Debtors' respective Estates, or by the Reorganized Debtors, as applicable, as defined in section 541 of the Bankruptcy Code.

"Purchased Assets" has the meaning ascribed thereto in the Plan Sponsor Agreement.

"Record Date" means (a) for the purpose of voting on the Plan, the date of entry of the order approving the Disclosure Statement respecting the Plan and (b) for the purposes of any distribution to Holders of Claims and Interests and for the determination of which Interests and Claims are Allowed, the Confirmation Date.

"Reinstated or Reinstatement" means: (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim so as to leave such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; and (iv) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitled the Holder of such Claim; provided, however, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, and affirmative covenants regarding corporate existence or which prohibit certain transactions or actions contemplated by the Plan, or conditioning such transactions or action on certain factors, shall not be required to be reinstated in order to accomplish Reinstatement.

"Rejection Claims" means claims of any non-Debtor counterparty to any unexpired leased of nonresidential real property or executory contract arising on account of the rejection of such lease or contract either during the administration of these Chapter 11 Cases under section 365 of the Bankruptcy Code or as a result of the occurrence of the Effective Date of this Plan.

"Releasees" means: (a) the directors, officers and employees of the Debtors, in each case as of the Petition Date or that have become directors, officers, or employees thereafter but prior to the Effective Date, and the Debtors' agents and Professionals, (b) the Junior DIP

11

Agent and each of the Junior DIP Lenders, (c) Charlesbank and (d) the respective current and former officers, directors, employees, agents, stockholders, managers, members, affiliates, partners, attorneys, advisors, investment bankers, consultants and professionals of the parties identified in subclauses (a) through (c); provided, however, that the foregoing released parties identified in subclauses (a) through (c) above shall be released only from liabilities arising out of actions taken in such capacity.

"Reorganized Debtors" means Reorganized TLC Canada, Reorganized TLC USA, and Reorganized TLC MSI on and after the Effective Date.

"Reorganized TLC Canada" means TLC Canada on and after the Effective Date.

"Reorganized TLC USA" means TLC USA on and after the Effective Date.

"Reorganized TLC MSI" means TLC MSI on and after the Effective Date.

"Schedule of Rejected Contracts" means the schedule listing certain executory contracts and unexpired leases to be rejected by the Debtors as of the Effective Date, which schedule shall be included in the Plan Supplement.

"Schedules" means the schedules of assets and liabilities and statements of financial affairs Filed on January 5, 2010 by any of the Debtors in the Chapter 11 Cases, as required by section 521 of the Bankruptcy Code, as the same may have been or may be amended, modified or supplemented.

"Secured Claim" means any Claim arising before the Petition Date that is: (a) secured in whole or part, as of the Petition Date, by a Lien which is valid, perfected and enforceable under applicable law on Property in which the Debtors' respective Estates has an interest and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or (b) subject to setoff under section 553 of the Bankruptcy Code, but, with respect to both case (a) and (b), only to the extent of each such Estate's interest in the value of the assets or Property securing any such Claim or the amount subject to setoff, as the case may be.

"Securities Act" means the Securities Act of 1933, as amended.

"Senior Management" means the Chief Executive Officer, Chief Financial Officer, and the Chief Operating Officer, and such other executives and employees designated by the Buyer Parties. The Reorganized Debtors' senior management shall be substantially the same as the Debtors' senior management on the date immediately prior to the Effective Date.

"Senior Management Contracts" means: (a) certain of the existing employment and severance agreements with Senior Management which shall be assumed by the Debtors as of the Effective Date (each as they may be amended with the approval of the Buyer Parties); and (b) any new employment agreements with Senior Management which shall be subject to the approval of the Debtors and the Buyer Parties and which shall become effective as of the Effective Date. The form of the Senior Management Contracts will be Filed under seal with the Bankruptcy Court in connection with the Filing of the Plan Supplement.

"Subordinated Claims" means any and all claims subordinated pursuant to section 510 of the Bankruptcy Code or pursuant to an order of the Bankruptcy Court.

"Tax" means any tax, charge, fee, levy, impost or other assessment by any federal, state, local or foreign governmental authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, *ad valorem*, estimated, severance, stamp, occupation and withholding tax, together with any interest, penalties, fines or additions attributable to, imposed on, or collected by any such federal, state, local or foreign governmental authority.

"TLC Canada" means TLC Vision Corporation, a New Brunswick Corporation.

"TLC USA" means TLC Vision (USA) Corporation, a Delaware Corporation.

"TLC MSI" means TLC Management Services Inc., a Delaware Corporation.

"TLC Canada Common Stock and Interests" means all authorized, issued and outstanding shares of common stock of, and Interests in, TLC Canada, as of the Petition Date, including, without limitation, all issued, outstanding and unexpired options, warrants, conversion, privilege or other legal or contractual rights to acquire shares of TLC Canada Common Stock or Interests. TLC Canada Common Stock and Interests also includes any contingent, disputed or unliquidated Claims related to or in connection with any of the foregoing.

"TLC MSI Common Stock and Interests" means all authorized, issued and outstanding shares of common stock of, and Interests in, TLC MSI, as of the Petition Date, including, without limitation, all issued, outstanding and unexpired options, warrants, conversion, privilege or other legal or contractual rights to acquire shares of TLC MSI Common Stock or Interests. TLC MSI Common Stock and Interests also includes any contingent, disputed or unliquidated Claims related to or in connection with any of the foregoing.

"TLC USA Common Stock and Interests" means all authorized, issued and outstanding shares of common stock of, and Interests in, TLC USA, as of the Petition Date, including, without limitation, all issued, outstanding and unexpired options, warrants, conversion, privilege or other legal or contractual rights to acquire shares of TLC USA Common Stock or Interests. TLC USA Common Stock and Interests also includes any contingent, disputed or unliquidated Claims related to or in connection with any of the foregoing.

"Unclaimed Property" means any distribution of Cash or any other Property made to the Holder of an Allowed Claim pursuant to the Plan that: (a) is returned to the Reorganized Debtors as undeliverable and no appropriate forwarding address is received within the later of (a) one (1) year after the Effective Date and (b) one (1) year after such distribution is made to such Holder, or (b) in the case of a distribution made in the form of a check, is not negotiated and no request for reissuance is made as provided for in Section 5.06 of the Plan.

"Unimpaired" means any Claim that is not Impaired within the meaning of section 1124 of the Bankruptcy Code.

1076/74009-007 Current/17494726v4
RLF1 3534300v.1

"United States Trustee" means the United States Trustee appointed under section 581(a)(3) of title 28 of the United States Code to serve in the District of Delaware.

"U.S. Trustee's Fee Claims" means any fees assessed against the Debtors' Estates pursuant to section 1930(a)(6) of title 28 of the United States Code.

"Vision Source, L.P." means the Debtors' optometric franchising segment that provides marketing, practice development and purchasing power to independently owned and operated practices in the U.S. and Canada.

"Voting Agent" means Epiq Bankruptcy Solutions, LLC.

Section 1.02.  Rules of Interpretation.  All references to "the Plan" herein shall be construed, where applicable, to include references to this document and all its exhibits, appendices, schedules and annexes, if any (and any amendments thereto made in accordance with the Bankruptcy Code), including the Plan Supplement.  Whenever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular paragraph, subparagraph, or clause contained in the Plan.  The words "includes" and "including" are not limiting and mean that the things specifically identified are set forth for purposes of illustration, clarity or specificity and do not in any respect qualify, characterize or limit the generality of the class within which such things are included.  The captions and headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  Any term used in the Plan that is not defined in the Plan, either in Article I hereof or elsewhere, but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in (and shall be construed in accordance with the rules of construction under) the Bankruptcy Code or the Bankruptcy Rules (with the Bankruptcy Code controlling in the case of a conflict or ambiguity).  Without limiting the preceding sentence, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the Plan, unless superseded herein.  In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) and Section 13.17 hereof shall apply, but Bankruptcy Rule 9006(a) shall govern.

Section 1.03.  Exhibits.  All Exhibits to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein, regardless of when Filed.

## ARTICLE II.
## CLASSIFICATION OF CLAIMS AND INTERESTS

Section 2.01.  Generally.  Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of the Class and is classified in a different Class to the extent the Claim or Interest qualifies within the description of that different Class.  A Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent

that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released, settled or otherwise satisfied prior to the Effective Date.

Section 2.02. <u>Unclassified Claims</u>. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified and are excluded from the Classes designated in this Article II of the Plan. The Junior DIP Claims likewise are not classified and are excluded from the Classes designated in this Article II of the Plan. The treatment accorded Administrative Claims, Priority Tax Claims and Junior DIP Claims is set forth in Article III of the Plan.

Section 2.03. <u>Classification of Claims Against and Interests in TLC USA</u>.

(a) <u>Unimpaired Classes</u>. The Plan classifies the following Unimpaired Claims that are not entitled to vote to accept or reject the Plan. Pursuant to section 1126(f) of the Bankruptcy Code, each Holder of a Claim in the following Classes is conclusively presumed to have accepted the Plan on account of such Claims and is not entitled to vote to accept or reject the Plan:

(i) Class A1 shall consist of all Other Secured Claims (subject to Section 3.02).

(ii) Class A2 shall consist of all Essential Trade Claims.

(iii) Class A3 shall consist of Other Priority Claims.

(iv) Class A4 shall consist of all Prepetition Lender Secured Claims.

(b) <u>Impaired Classes Entitled to Vote</u>. The Plan classifies the following Classes as Impaired Classes that may receive a distribution under the Plan and that are entitled to vote to accept or reject the Plan:

(i) Class A5 shall consist of the General Unsecured Claims.

(ii) Class A6 shall consist of Medical Pending Litigation Claims.

(c) <u>Impaired Classes Deemed to Reject</u>. The Plan classifies the following Impaired Classes of Interests and Claims as Impaired Classes that are not entitled to vote to accept or reject the Plan. Pursuant to section 1126(g) of the Bankruptcy Code, each Holder of an Interest or Claim in these Classes is conclusively presumed to have rejected the Plan on account of such Interests or Claims, because the Plan does not entitle the Holders of such

15

Interests and Claims to receive or retain any property under the Plan on account of such Interests or Claims. Accordingly, Holders of such Interests and Claims are not entitled to vote to accept or reject the Plan:

> (i)    Class A7 shall consist of all Subordinated Claims.
>
> (ii)   Class A8 shall consist of all Intercompany Claims.
>
> (iii)  Class A9 shall consist of all TLC USA Common Stock and Interests.

Section 2.04.    <u>Classification of Claims Against and Interests in TLC Canada</u>.

(a)    <u>Unimpaired Classes</u>.  The Plan classifies the following Unimpaired Claims that are not entitled to vote to accept or reject the Plan.  Pursuant to section 1126(f) of the Bankruptcy Code, each Holder of a Claim in the following Classes is conclusively presumed to have accepted the Plan on account of such Claims and is not entitled to vote to accept or reject the Plan:

> (i)    Class B1 shall consist of all Other Secured Claims (subject to Section 3.02).
>
> (ii)   Class B2 shall consist of all Other Priority Claims.
>
> (iii)  Class B3 shall consist of all Prepetition Lender Secured Claims.

(b)    <u>Impaired Classes Entitled to Vote</u>.    The Plan classifies the following Classes as Impaired Classes that may receive a distribution under the Plan and that are entitled to vote to accept or reject the Plan:

> (i)    Class B4 shall consist of the General Unsecured Claims.

(c)    <u>Impaired Classes Deemed to Reject</u>.    The Plan classifies the following Impaired Classes of Interests and Claims as Impaired Classes that are not entitled to vote to accept or reject the Plan.  Pursuant to section 1126(g) of the Bankruptcy Code, each Holder of an Interest or Claim in this Classes is conclusively presumed to have rejected the Plan on account of such Interests or Claims, because the Plan does not entitle the Holders of such Interests and Claims to receive or retain any property under the Plan on account of such Interests or Claims (unless, with respect to Class B6, Class B4 votes in favor of the Plan, in which case it

16

will be entitled to the treatment set forth in Section 3.07(f). Accordingly, Holders of such Interests and Claims are not entitled to vote to accept or reject the Plan:

> (i)     Class B5 shall consist of all Intercompany Claims.
>
> (ii)    Class B6 shall consist of all TLC Canada Common Stock

and Interests.

Section 2.05.    Classification of Claims Against and Interests in TLC MSI.

(a)    Unimpaired Classes.  The Plan classifies the following Unimpaired Claims and Unimpaired Interests that are not entitled to vote to accept or reject the Plan. Pursuant to section 1126(f) of the Bankruptcy Code, each Holder of a Claim or Interest in the following Classes is conclusively presumed to have accepted the Plan on account of such Claims or Interests and is not entitled to vote to accept or reject the Plan:

> (i)     Class C1 shall consist of all Other Secured Claims (subject

to Section 3.02).

> (ii)    Class C2 shall consist of all Other Priority Claims.
>
> (iii)   Class C3 shall consist of the General Unsecured Claims.
>
> (iv)    Class C4 shall consist of all TLC MSI Common Stock and

Interests.

> (v)     Class C5 shall consist of Prepetition Lender Secured

Claims.

(b)    Impaired Classes Deemed to Reject.  The Plan classifies the following Impaired Class of Claims as an Impaired Class that is not entitled to vote on the Plan. Pursuant to section 1126(g) of the Bankruptcy Code, each Holder of an Interest in this Class is conclusively presumed to have rejected the Plan on account of such Claims, because the Plan does not entitle the Holders of such Claims to receive or retain any property under the Plan on account of such Claims.  Accordingly, Holders of such Claims are not entitled to vote to accept or reject the Plan:

> (i)     Class C6 shall consist of all Intercompany Claims.

1076/74009-007 Current/17494726v4
RLF1 3534300v.1

## ARTICLE III.
## PROVISIONS FOR TREATMENT OF CLASSES OF
## CLAIMS AND INTERESTS

Section 3.01.  <u>Satisfaction of Claims and Interests</u>.  The treatment of and consideration to be received by Holders of Allowed Claims or Allowed Interests pursuant to this Article III and the Plan shall be in full satisfaction, settlement, release, extinguishment and discharge of their respective Claims against or Interests in the Debtors and the Debtors' respective Estates, except as otherwise provided in the Plan or the Confirmation Order.

Section 3.02.  <u>Unclassified Claims, Classified Unimpaired and Impaired Claims and Classified Interests</u>.  Administrative Claims and Priority Tax Claims are treated in accordance with section 1129(a)(9)(A) and section 1129(a)(9)(C) of the Bankruptcy Code, respectively.  Such Claims are Unimpaired under the Plan and, in accordance with section 1123(a)(1) of the Bankruptcy Code, are not designated as Classes of Claims for purposes of this Plan and for purposes of sections 1123, 1124, 1126 and 1129 of the Bankruptcy Code. The Junior DIP Claims likewise are Unimpaired under the Plan and are not designated as a Class of Claims for purposes of this Plan.  In addition, Claims and Interests in Classes A1, A2, A3, A4, B1, B2, B3, C1, C2, C3, C4 and C5 are classified as Classes of Claims and Interests that are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the Holders of Claims or Interests in such Classes are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.  However, in the event that holders of Claims in Classes A1, B1 and C1 are treated as set forth in Sections 3.06(a)(iv), 3.07(a)(iv) or 3.08(a)(iv), they shall be entitled to vote on the Plan.  Claims and Interests in Classes A5, A6 and B4 are Impaired, and the Holders thereof are entitled to vote to accept or reject the Plan.  Claims in Classes A7, A8, A9, B5, B6 and C6 are Impaired under the Plan, and the Holders thereof will receive no distribution on account of their respective Claims and, pursuant to section 1126(g) of the Bankruptcy Code, such Holders are conclusively presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

Section 3.03.  <u>Administrative Claims</u>.  Administrative Claims are Unimpaired. Unless otherwise provided for herein, each Holder of an Allowed Administrative Claim, including Professional Fee Claims, shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (a) the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Administrative Claim becomes Allowed, or (iii) a date agreed to in writing by the Debtors or Reorganized Debtors, as the case may be, and the Holder of such Administrative Claim; or (b) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or the Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order; provided, however, that Allowed Administrative Claims representing (i) liabilities, accounts payable or other Claims, or obligations incurred in the ordinary course of business of the Debtors consistent with past practices subsequent to the Petition Date, or (ii) contractual liabilities incurred subsequent to the Petition Date, whether or not incurred in the ordinary course of business, shall be paid or performed by the Debtors or the Reorganized Debtors in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto.

18

Section 3.04.  Priority Tax Claims.  Priority Tax Claims are Unimpaired.  Each Holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors or the Reorganized Debtors, as the case may be, in full satisfaction, settlement, release, extinguishment and discharge of such Priority Tax Claim: (a) the amount of such unpaid Allowed Priority Tax Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Priority Tax Claim becomes Allowed and (iii) a date agreed to by the Debtors or Reorganized Debtors, as the case may be, and the Holder of such Priority Tax Claim; (b) equal Cash payments from the Reorganized Debtors made on the last Business Day of every three (3) month period following the Effective Date, over a period not exceeding five (5) years after the assessment of the tax on which such Priority Tax Claim is based, totaling the principal amount of such Priority Tax Claim plus simple interest on any outstanding balance from the Effective Date calculated at the interest rate publicly quoted on the Effective Date for obligations backed by the full faith and credit of the United States of America maturing in ninety (90) days; or (c) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Priority Tax Claim and the Debtors or the Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order.  The Debtors or the Reorganized Debtors, as the case may be, shall have the right, in their sole discretion, to prepay at any time, in whole or in part, any Allowed Priority Tax Claim without premium or penalty of any sort or nature.  Notwithstanding any provision to the contrary in the Plan, the implementing Plan documents or the Order confirming the Plan:  (1) nothing shall affect the rights of the United States Internal Revenue Service (the "IRS") to assert setoff and recoupment; and (2) the Priority Tax Claims of the IRS shall be paid on a no less than quarterly basis within five (5) years of the Petition Date and interest shall accrue on such claims from the Effective Date at the rate and method set forth in 26 U.S.C. Sections 6621 and 6622.  Notwithstanding the foregoing, unless Her Majesty in Right of Canada agrees otherwise, each Allowed Canadian Priority Tax Claim shall be paid within six (6) months of the Canadian Sanction Order, or as the Canadian Court may order.

Section 3.05.  Junior DIP Claims.  The Junior DIP Claims are Unimpaired.  The Junior DIP Claims shall be paid in full in cash (a) on or as soon as practicable after the Effective Date or (b) upon such other terms as the Reorganized Debtors and the Holders of such Claims may agree.

Section 3.06.  Treatment of Claims Against and Interests in TLC USA:

(a)     Class A1:  Other Secured Claims.  Class A1 Other Secured Claims are Unimpaired (unless such Claims are treated pursuant to clause (iv) in the following sentence, in which case such Claims are Impaired and shall be entitled to vote).  Each Holder of an Allowed Class A1 Other Secured Claim shall receive, in the sole discretion of the Debtors or the Reorganized Debtors, as the case may be, in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (i) Cash equal to the amount of such Allowed Other Secured Claim on or as soon as practicable after the later of (x) the Effective Date, (y) the date that such Other Secured Claim becomes Allowed, and (z) a date agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of such Class A1 Other Secured Claim; (ii) treatment such that such Other Secured Claim is Reinstated; (iii) the Property securing such Other Secured Claim, with any deficiency to result in a General Unsecured Claim; (iv) such other treatment on such other terms and conditions as may be agreed upon in writing by the

1076/74009-007 Current/17494726v4
RLF1 3534300v.1

Holder of such Claim and the Debtors or Reorganized Debtors, as the case may be; or (v) as the Bankruptcy Court may order.

          (b)    <u>Class A2:  Essential Trade Claims</u>.  Class A2 Essential Trade Claims are Unimpaired.  Each Holder of an Allowed Class A2 Essential Trade Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (i) the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (x) the Effective Date, (y) the date on which such Class A2 Claim becomes Allowed, and (z) a date agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of such Class A2 Essential Trade Claim; or (ii) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or the Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order.

          (c)    <u>Class A3:  Other Priority Claims</u>.  Class A3 Other Priority Claims are Unimpaired.  Each Holder of an Allowed Class A3 Other Priority Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim:  (i) the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (x) the Effective Date, (y) the date on which such Class A3 Claim becomes Allowed, and (z) a date agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of such Class A3 Claim; or (ii) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or the Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order.

          (d)    <u>Class A4:  Prepetition Lender Secured Claims</u>.  Class A4 Prepetition Lender Secured Claims are Unimpaired.  Each Holder of an Allowed Class A4 Prepetition Lender Secured Claim shall receive, on or as soon as reasonably practicable after the Effective Date, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, cash in an amount equal to such Allowed Class A4 Prepetition Lender Secured Claim.

          (e)    <u>Class A5:  General Unsecured Claims</u>.  Class A5 General Unsecured Claims are Impaired.  Each Holder of an Allowed Class A5 General Unsecured Claim shall receive, on or as soon as reasonably practicable after the Effective Date, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, its <u>pro</u> <u>rata</u> share of $862,500.

          (f)    <u>Class A6:  Medical Pending Litigation Claims</u>.  Class A6 Medical Pending Litigation Claims are Impaired.  On the Effective Date, the Holders of Class A6 Medical Pending Litigation Claims shall be entitled to payment exclusively by way of any insurance coverage held by TLC USA or its affiliates covering such Medical Pending Litigation Claims.

          (g)    <u>Class A7:  Subordinated Claims</u>.  Class A7 Subordinated Claims are Impaired.  Holders of Class A7 Subordinated Claims shall not receive or retain any Property under the Plan on account of such Subordinated Claims.  On the Effective Date, all Subordinated Claims shall be extinguished.

          (h)    <u>Class A8:  Intercompany Claims</u>.  Class A8 Intercompany Claims are Impaired.  Holders of Class A8 Intercompany Claims shall not receive or retain any Property

under the Plan on account of such Intercompany Claims. On the Effective Date, all Intercompany Claims shall be extinguished, provided that claims owing by non-debtor subsidiaries and affiliates to TLC USA shall not be affected by this Plan.

(i)     Class A9:  TLC USA Common Stock and Interests.  Class A9 TLC USA Common Stock and Interests are Impaired.  Holders of Class A9 TLC USA Common Stock and Interests shall not receive or retain any Property under the Plan on account of such Common Stock and Interests.  All TLC USA Common Stock and Interests shall be transferred to the Buyer Parties pursuant to the Plan Sponsor Agreement.

Section 3.07.   Treatment of Claims Against and Interests in TLC Canada:

(a)     Class B1:  Other Secured Claims.  Class B1 Other Secured Claims are Unimpaired (unless such Claims are treated pursuant to clause (iv) in the following sentence, in which case such Claims are Impaired and shall be entitled to vote).  Each Holder of an Allowed Class B1 Other Secured Claim shall receive, in the sole discretion of the Debtors or the Reorganized Debtors, as the case may be, in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (i) Cash equal to the amount of such Allowed Other Secured Claim on or as soon as practicable after the later of (x) the Effective Date, (y) the date that such Other Secured Claim becomes Allowed, and (z) a date agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of such Class B1 Other Secured Claim; (ii) treatment such that such Other Secured Claim is Reinstated; (iii) the Property securing such Other Secured Claim, with any deficiency to result in a General Unsecured Claim; (iv) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or Reorganized Debtors, as the case may be; or (v) as the Bankruptcy Court may order.

(b)     Class B2:  Other Priority Claims.  Class B2 Other Priority Claims are Unimpaired.  Each Holder of an Allowed Class B2 Other Priority Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim:  (i) the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (x) the Effective Date, (y) the date on which such Class B2 Claim becomes Allowed, and (z) a date agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of such Class B2 Claim; or (ii) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or the Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order.  Notwithstanding the foregoing, each Allowed Canadian Priority Employee Claim shall be paid immediately after the Canadian Sanction Order, or as the Canadian Court may order.

(c)     Class B3:  Prepetition Lender Secured Claims.  Class B3 Prepetition Lender Secured Claims are Unimpaired.  Each Holder of an Allowed Class B3 Prepetition Lender Secured Claim shall receive, on or as soon as reasonably practicable after the Effective Date, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, cash in an amount equal to such Allowed Class B3 Prepetition Lender Secured Claim.

(d)     Class B4:  General Unsecured Claims.  Class B4 General Unsecured Claims are Impaired.

21

(i)      In the event that Class B4 General Unsecured Claims vote as a class in favor of the Plan, on or as soon as practicable after the Effective Date, each holder of an Allowed Class B4 General Unsecured Claim shall receive, in full satisfaction, settlement, release, extinguishment, and discharge of such Claim, its pro rata share of a cash pool of $575,000.

(ii)     In the event that Class B4 General Unsecured Claims vote as a class to reject the Plan, on or as soon as practicable after the Effective Date, each holder of an Allowed Class B4 General Unsecured Claim shall receive, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, its pro rata share of a cash pool of $287,500.

(e)      Class B5: Intercompany Claims.  Class B5 Intercompany Claims are Impaired.  Holders of Class B5 Intercompany Claims shall not receive or retain any Property under the Plan on account of such Intercompany Claims.  On the Effective Date, all Intercompany Claims shall be extinguished, provided that claims owing by non-debtor subsidiaries and affiliates to TLC Canada shall not be affected by this Plan.

(f)      Class B6: TLC Canada Common Stock and Interests.  Class B6 TLC Canada Common Stock and Interests are Impaired and deemed to have rejected the Plan.  The Holders of the TLC Canada Common Stock and Interests shall retain such Common Stock and Interests although TLC Canada shall no longer have any assets following the consummation of the Plan and Plan Sponsor Agreement.  The Holders of the TLC Canada Common Stock and Interests shall not receive or retain any Property under the Plan on account of such Common Stock and Interests, provided, however, that solely in the event that Holders of Class B4 General Unsecured Claims vote to accept the Plan, each Holder of an Allowed Class B6 TLC Canada Common Stock and Interest shall receive its pro rata share of a cash pool of $287,500.

Section 3.08.   Treatment of Claims Against and Interests in TLC MSI:

(a)      Class C1: Other Secured Claims.  Class C1 Other Secured Claims are Unimpaired (unless such Claims are treated pursuant to clause (iv) in the following sentence, in which case such Claims are Impaired and shall be entitled to vote).  Each Holder of an Allowed Class C1 Other Secured Claim shall receive, in the sole discretion of the Debtors or the Reorganized Debtors, as the case may be, in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (i) Cash equal to the amount of such Allowed Other Secured Claim on or as soon as practicable after the later of (x) the Effective Date, (y) the date that such Other Secured Claim becomes Allowed, and (z) a date agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of such Class C1 Other Secured Claim; (ii) treatment such that such Other Secured Claim is Reinstated; (iii) the Property securing such Other Secured Claim, with any deficiency to result in a General Unsecured Claim; (iv) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or Reorganized Debtors, as the case may be; or (v) as the Bankruptcy Court may order.

(b)      Class C2: Other Priority Claims.  Class C2 Other Priority Claims are Unimpaired.  Each Holder of an Allowed Class C2 Other Priority Claim shall receive in full

22

satisfaction, settlement, release, extinguishment and discharge of such Claim: (i) the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (x) the Effective Date, (y) the date on which such Class C2 Claim becomes Allowed, and (z) a date agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of such Class C2 Claim; or (ii) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or the Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order.

(c)     Class C3:   General Unsecured Claims.    Class C3 General Unsecured Claims are Unimpaired.  Each Holder of an Allowed Class C3 General Unsecured Claim not satisfied as of the Effective Date of the Plan shall receive, in full satisfaction, settlement, release, extinguishment and discharge of such Claim: (i) the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (x) the Effective Date, (y) the date on which such General Unsecured Claim becomes Allowed, or (z) a date agreed to in writing by the Debtors or Reorganized Debtors, as the case may be, and the Holder of such General Unsecured Claim; (ii) treatment such that such General Unsecured Claim is Reinstated; or (iii) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtors or the Reorganized Debtors, as the case may be, or as the Bankruptcy Court may order.

(d)     Class C4:  TLC MSI Common Stock and  Interests.  Class C4 TLC MSI Common Stock and Interests is Unimpaired.  Holders of Allowed Class C4 TLC MSI Common Stock and Interests shall retain their Interests.

(e)     Class C5:   Prepetition Lender Secured Claims.    Class C5 Prepetition Lender Secured Claims are Unimpaired.  Each Holder of an Allowed Class C5 Prepetition Lender Secured Claim shall receive, on or as soon as reasonably practicable after the Effective Date, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, cash in an amount equal to such Allowed Class C5 Prepetition Lender Secured Claim.

(f)     Class C6:  Intercompany Claims.  Class C6 Intercompany Claims are Impaired.  Holders of Class C6 Intercompany Claims shall not receive or retain any Property under the Plan on account of such Intercompany Claims.    On the Effective Date, all Intercompany Claims shall be extinguished, provided that claims owing by non-debtor subsidiaries and affiliates to TLC MSI shall not be affected by this Plan.

## ARTICLE IV.
## ACCEPTANCE OR REJECTION OF THE PLAN; CRAMDOWN

Section 4.01.   Acceptance by Impaired Classes of Claims and Interests.  Pursuant to section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if: (a) the Holders of at least two-thirds (2/3) in dollar amount of the Allowed Claims actually voting in such Class (other than Claims held by any Holder designated pursuant to section 1126(e) of the Bankruptcy Code) have timely and properly voted to accept the Plan, and (b) more than one-half (1/2) in number of the Holders of such Allowed Claims actually voting in such Class (other than Claims held by any Holder designated pursuant to section 1126(e) of the

23

Bankruptcy Code) have timely and properly voted to accept the Plan. No Class of Interests is entitled to vote on the Plan pursuant to section 1126 of the Bankruptcy Code.

Section 4.02. <u>Voting Classes</u>. Except as otherwise required by the Bankruptcy Code or the Bankruptcy Rules or as otherwise provided in this Section 4.02, the Holders of Claims against TLC USA in Classes A5 and A6 and Holders of Claims or Interests against TLC Canada in Class B4 shall be entitled to vote to accept or reject the Plan in accordance with Section 4.01 of the Plan. Classes of Claims and Interests Unimpaired under the Plan (Classes A1, A2, A3, A4, B1, B2, B3, C1, C2, C3, C4 and C5) shall not be entitled to vote to accept or reject the Plan, and shall be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. The Classes of Claims and Interests that are Impaired that are receiving no distribution under the Plan (Classes A7, A8, A9, B5, B6 and C6) shall not be entitled to vote to accept or reject the Plan and shall be conclusively presumed to have rejected the Plan. Administrative Claims, Priority Tax Claims and the Junior DIP Claims are Unimpaired and not classified under the Plan and hence are not entitled to vote to accept or reject the Plan.

Section 4.03. <u>Ballot Instructions</u>. Each Holder of a Claim entitled to vote on the Plan will be asked to complete and return a Ballot to the Voting Agent, which will compile the votes so received. Any questions as to the validity, form, and eligibility (including time of receipt) of Ballots will be resolved by the Bankruptcy Court upon application or at the Confirmation Hearing.

Section 4.04. <u>Cramdown</u>. If all applicable requirements for Confirmation of the Plan are met as set forth in section 1129(a)(1) through (13) of the Bankruptcy Code except subsection (8) thereof, the Debtors intend to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code, notwithstanding the requirements of section 1129(a)(8) thereof, on the bases that the Plan is fair and equitable, and does not discriminate unfairly, with respect to each Class of Claims or Interests that is Impaired under, and has not accepted or is deemed to have rejected, the Plan.

## ARTICLE V.
## PROVISIONS GOVERNING DISTRIBUTIONS
## UNDER THE PLAN

Section 5.01. <u>Timing of Distributions</u>. Except as set forth in Section 5.03 below, distributions of Property will be made to Holders of Allowed Claims and Allowed Interests in accordance with Article III of the Plan. If a Claim or Interest is not an Allowed Claim or an Allowed Interest as of the applicable distribution date, distributions will be made only if and when the Claim or Interest is Allowed, and then in accordance with Article III of the Plan and, with respect to the cure of defaults for assumed executory contracts and unexpired leases, Section 6.02 of the Plan, and in each case, subject to Article VIII of the Plan.

Section 5.02. <u>Distributions to Holders of Allowed Claims</u>. The Reorganized Debtors shall deliver to the Disbursing Agent sufficient Cash to make the distributions to be made on the Effective Date to the Holders of Allowed Claims entitled to receive Cash in accordance with Article III of the Plan. Payments and other distributions to be made pursuant to

the Plan will be available from the funds held by the Reorganized Debtors as of the Effective Date. If any dispute arises as to the identity of a Holder of an Allowed Claim who is to receive any distribution, the Reorganized Debtors shall, in lieu of making such distribution to such Holder, delay such distribution until the disposition thereof shall be determined by Final Order of the Bankruptcy Court or by written agreement among the interested parties to such dispute.

Section 5.03. <u>Delivery of Distributions</u>. Distributions to Holders of Allowed Claims shall be made by the Disbursing Agent: (a) at the last known addresses of such Holders or (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent. If any Holder's distribution is returned as undeliverable, no further distributions to such Holder shall be made unless and until the Disbursing Agent is notified of such Holder's then current address, at which time all missed distributions shall be made to such Holder without interest; provided, however, that such notice be received by the Disbursing Agent prior to such distribution becoming Unclaimed Property. All distributions pursuant to the Plan shall be at the Reorganized Debtors' expense.

Section 5.04. <u>Method of Cash Distributions</u>. Any Cash payment to be made pursuant to the Plan may be made by Cash, draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or applicable law at the option of the Reorganized Debtors.

Section 5.05. <u>Fractional Dollars</u>. Whenever any payment of a fraction of a dollar would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollars (rounding down in the case of $0.50 or less and rounding up in the case of more than $0.50).

Section 5.06. <u>Failure to Negotiate Checks</u>. Checks issued in respect of distributions under the Plan shall be null and void if not negotiated within sixty (60) days after the date of issuance. Any amounts returned to the Reorganized Debtors in respect of such non-negotiated checks shall be held by the Reorganized Debtors, as appropriate. Requests for reissuance for any such check shall be made directly to the Reorganized Debtors by the Holder of the Allowed Claim with respect to which such check originally was issued. All amounts represented by any voided check will be held until the later of one (1) year after (a) the Effective Date or (b) the date that a particular Claim is Allowed, and all requests for reissuance by the Holder of the Allowed Claim in respect of a voided check are required to be made prior to such date. Thereafter, all such amounts shall be deemed to be Unclaimed Property, in accordance with Section 5.07 of the Plan, and all Holders of Claims in respect of void checks shall be forever barred, estopped and enjoined from asserting a claim to such funds in any manner against the Debtors or their respective assets or the Reorganized Debtors or their respective assets.

Section 5.07. <u>Unclaimed Distributions</u>. All Property distributed on account of Claims must be claimed within the later of (a) one (1) year after the Effective Date or (b) one (1) year after such distribution is made to such Holder or, in the case of a distribution made in the form of a check, must be negotiated and a request for reissuance be made as provided for in Section 5.06 of the Plan. All Unclaimed Property will be retained by and will revest in the Reorganized Debtors and will no longer be subject to distribution. All full or partial payments made by the Disbursing Agent and received by the Holder of a Claim prior to the Effective Date

will be deemed to be payments under the Plan for purposes of satisfying the obligations of the Debtors pursuant to the Plan. Nothing contained in the Plan shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim other than by reviewing the records of the Debtors or the Reorganized Debtors, as applicable, and any Claims filed in these Cases. Pursuant to section 1143 of the Bankruptcy Code, all Claims in respect of Unclaimed Property shall be deemed Disallowed and the Holder of any Claim Disallowed in accordance with this Section 5.07 will be forever barred, expunged, estopped and enjoined from asserting such Claim in any manner against the Debtors or their respective assets or the Reorganized Debtors or their respective assets.

          Section 5.08.  <u>Limitation on Distribution Rights</u>.  If a claimant holds more than one Claim in any one Class, all Claims of the claimant in that Class will be aggregated into one Claim and one distribution will be made with respect to the aggregated Claim.

          Section 5.09.  <u>Compliance With Tax Requirements</u>.  In connection with each distribution with respect to which the filing of an information return (such as an Internal Revenue Service Form 1099 or 1042) or withholding is required, the Reorganized Debtors shall file such information return with the Internal Revenue Service and provide any required statements in connection therewith to the recipients of such distribution or effect any such withholding and deposit all moneys so withheld as required by law. With respect to any Person from whom a tax identification number, certified tax identification number or other tax information required by law to avoid withholding has not been received by the Reorganized Debtors within thirty (30) days from the date of such request, the Reorganized Debtors may, at their option, withhold the amount required and distribute the balance to such Person or decline to make such distribution until the information is received.

          Section 5.10.  <u>Documentation Necessary to Release Liens</u>.  Each Creditor which is to receive a Cash distribution under the Plan in full satisfaction of a Secured Claim shall not receive such distribution until such Creditor executes and delivers any documents necessary to release all Liens arising under any applicable security agreement or non-bankruptcy law (in recordable form if appropriate) in connection with such Secured Claim and such other documents as the Debtors or the Reorganized Debtors, as applicable, may reasonably request or otherwise turns over and releases any and all Property of the Debtors that secures or purportedly secures such Claim. Any such Holder that fails to execute and deliver such release of liens within 120 days of the Effective Date shall be deemed to have no further Claim against the Debtors, the Reorganized Debtors or their assets or Property in respect of such Claim and shall not participate in any distribution hereunder on account of such Claim. Notwithstanding the immediately preceding sentence, any such Holder of a Disputed Claim shall not be required to execute and deliver such release until at least the date that is 30 days after the date on which such Claim is Allowed or Disallowed.

## ARTICLE VI.
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES; INDEMNIFICATION OBLIGATIONS; BENEFIT PROGRAMS

          Section 6.01.  <u>Treatment of Executory Contracts and Unexpired Leases</u>. Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and

unexpired leases that exist between the Debtors and any Person or Entity shall be deemed assumed by the Debtors as of the Effective Date, except for any executory contract or unexpired lease that (a) has expired or terminated pursuant to its own terms, (b) has previously been assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court on or prior to the Confirmation Date, and, if necessary, by order of the Canadian Court, (c) is the subject of a pending motion to assume, assume and assign, or reject as of the Confirmation Date, or (d) is listed on the Schedule of Rejected Contracts which shall be included with the Plan Supplement; provided, however, that the Debtors shall have the right, with the consent of the Buyer Parties, at any time prior to the Confirmation Date, to amend the Schedule of Rejected Contracts upon notice to the counterparty to such contract or lease (a) to delete any executory contract or unexpired lease listed therein, thus providing for its assumption pursuant to this Section 6.01 or (b) to add any executory contract or unexpired lease thereto, thus providing for its rejection pursuant to this Section 6.01. The Confirmation Order (except as otherwise provided therein) shall constitute an order of the Bankruptcy Court pursuant to section 365 of the Bankruptcy Code, effective as of the Effective Date, approving the assumptions and rejections hereunder. Each contract and lease assumed pursuant to this Section 6.01 shall be assumed only to the extent that any such contract or lease constitutes an executory contract or unexpired lease. Assumption of a contract or lease pursuant to this Section 6.01 shall not constitute an admission by the Debtors or the Reorganized Debtors that such contract or lease is an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors have any liability thereunder. All executory contracts and unexpired leases that are assumed will be assumed under their present terms or upon such terms as are agreed to in writing between the applicable Debtor and the counterparty to the executory contract or unexpired lease; provided, however, that any leases and executory contracts of TLC Canada that are assumed under this Plan shall be deemed to be assigned to the Canadian Buyer. Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire, or occupancy of real property shall include: (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other interests in real estate or rights *in rem* related to such premises, unless any of the foregoing agreements has been rejected pursuant to an order of the Bankruptcy Court.

Section 6.02. <u>Cure of Defaults for Assumed Contracts and Leases</u>. Within fifteen (15) days after the Effective Date, the Reorganized Debtors shall pay to the nondebtor parties to such executory contracts and unexpired leases being assumed the cure amounts. The nondebtor parties to such executory contracts and unexpired leases shall have thirty (30) days from receipt of such cure amounts to object thereto. If any objections are filed, and cannot be resolved by agreement, the Bankruptcy Court shall hold a hearing to determine the cure amount with respect to the executory contract or unexpired lease subject to the objection or to otherwise resolve such objection. Any party failing to object (whether to the proposed cure amount or otherwise) within thirty (30) days after receipt of the cure amount by the Reorganized Debtors shall be forever barred from asserting, collecting, or seeking to collect from the Reorganized Debtors any amounts in excess of the cure amount or from otherwise objecting to the

27

assumption, by the Debtors, of such executory contract or unexpired lease. Notwithstanding the foregoing, or anything else in this Article VI, with respect to any executory contract or unexpired lease which is the subject of an objection, the Reorganized Debtors shall retain the right, until five (5) Business Days after any order resolving the objection becomes a Final Order, to reject such executory contract or unexpired lease.

Section 6.03. <u>Resolution of Objections to Assumption of Executory Contracts and Unexpired Leases</u>. Any party objecting to the Debtors' proposed assumption of an executory contract or unexpired lease on any grounds other than the proposed cure amount, including, without limitation, the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed shall File and serve on counsel for the Debtors a written objection to the assumption of such contract or lease not later than thirty (30) days from service of notice of the Debtors' intent to assume such executory contract or unexpired lease. Service of such notice shall be sufficient if served on the other party to the executory contract or unexpired lease at the address indicated on (a) the contract or lease, (b) any proof of Claim filed by such other party in respect of such contract or lease, or (c) the Reorganized Debtors' books and records; provided, however, that if such a notice is served by the Reorganized Debtors to one of the foregoing addresses and is promptly returned as undeliverable, the Reorganized Debtors shall attempt reservice of the notice on an alternative address, if any, from the above listed sources. Failure to File an objection within the time period set forth above shall constitute an acknowledgement of the assumption and revestment of such contract or lease, subject to payment of the cure amount, if any, including an acknowledgment that the proposed assumption provided adequate assurance of future performance. To the extent that any objections to the assumption of a contract or lease are timely Filed and served and such objections are not resolved between the Debtors and the objecting parties, the Bankruptcy Court shall resolve such disputes at the Confirmation Hearing or as soon as reasonable practicable thereafter. Notwithstanding the foregoing, or anything else in this Article VI, with respect to any executory contract or unexpired lease which is subject to an objection, the Reorganized Debtors shall retain the right, until five (5) Business Days after any order resolving the objection becomes a Final Order, to reject such executory contract or unexpired lease.

Section 6.04. <u>Bar Date for Rejection Claims</u>. Rejection Claims arising out of the rejection of any executory contract or unexpired lease pursuant to Section 6.01 hereof must be filed with the Bankruptcy Court no later than the later of thirty (30) days after the entry of an order rejecting such executory contract or unexpired lease or the Bar Date. Any Claim not filed within such time period shall be forever barred. The Reorganized Debtors shall have the exclusive right to object to any Claim arising out of the rejection of an executory contract or unexpired lease pursuant to the terms of Section 8.05 of this Plan.

Section 6.05. <u>Treatment of Rejection Claims</u>. The Bankruptcy Court shall determine any Objections Filed in accordance with Section 8.05 hereof at a hearing to be held on a date to be determined by the Bankruptcy Court. Subject to any statutory limitation, including, but not limited to, the limitations contained in sections 502(b)(6) and 502(b)(7) of the Bankruptcy Code, any Claims arising out of the rejection of executory contracts and unexpired leases shall, pursuant to section 502(g) of the Bankruptcy Code, be treated as Class A5, B4, or

28

C3 General Unsecured Claims, as appropriate, in accordance with Sections 3.05, 3.06, or 3.07 of the Plan.

Section 6.06. <u>Executory Contracts and Unexpired Leases Entered Into and Other Obligations Incurred After the Petition Date</u>. On the Effective Date, all contracts, leases, and other agreements entered into by any or all of the Debtors on or after the Petition Date, which agreements have not been terminated in accordance with their terms on or before the Effective Date, shall revest in and remain in full force and effect as against the Reorganized Debtors and the other parties to such contracts, leases and other agreements.

Section 6.07. <u>Modification of Change of Control Provisions</u>. To the extent any contracts of the Debtors contain provisions modifying their rights or the rights of the subject counterparties, or give rise to rights or obligations of the Debtors or such counterparties, as a result of a change in control of any of the Debtors, such contracts are hereby deemed to be modified such that the consummation of the transactions contemplated hereby, including the Plan Sponsor Agreement, shall not modify or give rise to any such rights or obligations.

Section 6.08. <u>Reorganized Debtors' Indemnification Obligations</u>. To the extent not inconsistent with the Plan, any obligations of the Debtors, pursuant to their respective articles of incorporation or by-laws, applicable state law or their specific agreement, to indemnify a Person with respect to all present and future actions, suits and proceedings against the Debtors, the Reorganized Debtors or such indemnified Person, based upon any act or omission related to service with, or for or on behalf of, the Debtors or the Reorganized Debtors, shall survive Confirmation of the Plan and shall not be impaired by Confirmation of the Plan, but shall be deemed and treated as executory contracts that are assumed and, as applicable, amended by the Debtors pursuant to the Plan and section 365 of the Bankruptcy Code, except to the extent any such obligation has been released, discharged or modified pursuant to the Plan. Such indemnification obligations shall survive unaffected by the Plan and shall be performed and honored by the Reorganized Debtors. The Debtors will purchase "tail" coverage to their existing D&O insurance policies pursuant to Section 6.12 of the Plan Sponsor Agreement.

Section 6.09. <u>Benefit Programs</u>. Employees of TLC Canada to be transferred to the Buyers will be given full credit for their years of service with TLC Canada before the Effective Date for purposes of vesting and eligibility to participate (but not accrual of benefits for any purpose) in benefit plans, vacation and leave, severance and other programs of Buyer and its Affiliates that are made available to such employees after the Effective Date. Such employees shall cease to participate in TLC Canada's benefit plans (other than any Assumed Benefit Plans as defined in the Plan Sponsor Agreement) as at the Effective Date and shall commence participation in the Buyers' benefit plans as at the Effective Date. In respect of any Assumed Benefit Plan, effective as of the Effective Date, TLC Canada shall assign to the subject new employer the Assumed Benefit Plans and all of its rights, duties, obligations and liabilities under and in relation to the Assumed Benefit Plans and all related agreements. Buyer shall cause the employer to accept such assignment and become the sponsor and administrator (where applicable) of the Assumed Benefit Plans as of the Effective Date. Except and to the extent previously assumed by an order of the Bankruptcy Court on or before the Effective Date, all officer, director or employee compensation and benefit programs of Debtors TLC USA and TLC MSI entered into before or after the Petition Date and not since terminated, shall be deemed to

be, and shall be treated as though they are, executory contracts that are assumed under Section 6.01 of the Plan, but only to the extent that rights under such programs are held by such Debtors or Persons who are employees of the Debtors as of the Effective Date, and the Debtors' obligations under such programs to Persons who are employees of the Debtors on the Effective Date shall survive Confirmation of the Plan, except for (a) executory contracts or plans specifically rejected pursuant to the Plan, and (b) executory contracts or plans that have previously been rejected, are the subject of a motion to reject, or have been specifically waived by the beneficiaries of any plans or contracts.

## ARTICLE VII.
## MEANS FOR IMPLEMENTATION OF THE PLAN

Section 7.01.  <u>Corporate Action</u>.  The entry of the Confirmation Order shall constitute authorization for the Debtors and the Reorganized Debtors to take or to cause to be taken all corporate actions necessary or appropriate to consummate and implement the provisions of the Plan prior to, on and after the Effective Date, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court, including, without limitation, (a) the consummation of the transactions contemplated by the Plan Sponsor Agreement; (b) the election of directors and officers in accordance with Section 10.02 of the Plan; (c) the adoption of the New TLC USA Certificates of Incorporation and By-Laws; (d) the execution and delivery of the new Senior Management Contracts; (e) the adoption of the New Management Incentive Plan; and (f) the filing of liquidation proceedings in the Canadian Court. All such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action by the stockholders or directors of the Debtors or the Reorganized Debtors.  On the Effective Date, the appropriate officers and directors of the Debtors and the Reorganized Debtors are authorized and directed to execute and deliver the agreements, documents and instruments contemplated by the Plan and the Plan Supplement in the name and on behalf of the Debtors and the Reorganized Debtors to effect the actions detailed herein.

Section 7.02.  <u>Plan Funding</u>.  The funds to be utilized to make Cash payments under this Plan have been and/or will be generated from, among other things, payments made, funds available, or obligations assumed under the Plan Sponsor Agreement, the Cash of the Debtors as of the Effective Date, and Cash generated from operations of the Debtors or Reorganized Debtors.

Section 7.03.  <u>Plan Sponsor Agreement</u>.  On the Effective Date, the transactions contemplated by the Plan Sponsor Agreement shall be consummated.

Section 7.04.  <u>Articles of Organization</u>.  The New TLC USA Certificates of Incorporation and By-Laws shall contain such provisions as are required to satisfy the provisions of the Plan and the Bankruptcy Code and shall include, among other things, (a) a prohibition on the issuance of nonvoting equity securities to the extent, and only to the extent, required by section 1123(a)(6) of the Bankruptcy Code, (b) provisions for a five (5) member Board of Directors of Reorganized TLC USA consisting of initial members who will be identified in the Plan Supplement, and (c) other provisions ordinary and customary in such situations so long as they are not inconsistent with any of the provisions contained in the foregoing (a) and (b).

30

Section 7.05. <u>Operations Between the Confirmation Date and the Effective Date</u>. The Debtors shall continue to operate as debtors-in-possession, subject to the supervision of the Bankruptcy Court and in accordance with the provisions of the Bankruptcy Code, during the period from the Confirmation Date through and until the Effective Date.

Section 7.06. <u>Revesting of Assets</u>. Except as otherwise expressly provided in the Plan, pursuant to sections 1123(a)(5), 1123(b)(3) and 1141(b) of the Bankruptcy Code, all Property comprising the Estates of each Debtor, including, but not limited to, all Avoidance Actions and all Causes of Action shall automatically be retained and revest in the relevant Reorganized Debtor or its respective successor, free and clear of all Claims, Liens, contractually-imposed restrictions, charges, encumbrances and Interests of Creditors and equity security holders on the Effective Date, with all such Claims, Liens, contractually-imposed restrictions, charges, encumbrances and Interests being extinguished except as otherwise provided in the Plan and Plan Sponsor Agreement. As of the Effective Date, each Reorganized Debtor may operate its business and use, acquire and dispose of Property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and Confirmation Order. Without limiting the foregoing, each Reorganized Debtor may pay the charges it incurs for professional fees, disbursements, expenses, or related support services after the Effective Date without any application to the Bankruptcy Court.

Section 7.07. <u>Approval of Agreements</u>. The solicitation of votes on the Plan shall be deemed a solicitation of the Holders of Claims for the approval of all other agreements and transactions contemplated by the Plan and the Plan Supplement. Entry of the Confirmation Order shall constitute approval of such agreements and transactions and the Confirmation Order shall so provide.

Section 7.08. <u>Adoption or Assumption of Senior Management Contracts</u>. On the Effective Date, the Reorganized Debtors shall (i) assume existing Senior Management Contracts (each as they may be amended with the approval of the Buyer Parties), and (ii) shall enter into an employment agreement with Jim Tiffany, current President and Chief Operating Officer, and Ellen Jo Plass (on terms and conditions acceptable to the Buyer Parties).

Section 7.09. <u>Adoption of New Management Incentive Plan</u>. On the Effective Date, the Buyer Parties will adopt the New Management Incentive Plan.

Section 7.10. <u>Corporate Structure Changes</u>. Following the Effective Date, the Reorganized Debtors shall have the same corporate structure as existed prior to the Effective Date, as may be modified in a manner acceptable by the Buyer Parties; provided, however, that Reorganized TLC Canada shall cease all operations and the Information Officer of TLC Canada appointed by the Canadian Court shall be authorized, pursuant to powers set out in the Confirmation Order and Canadian Sanction Order, to liquidate any remaining assets of TLC Canada and distribute the net proceeds of such assets to Holders of Allowed Class B4 Claims.

1076/74009-007 Current/17494726v4
RLF1 3534300v.1

# ARTICLE VIII.
## PRESERVATION OF CAUSES OF ACTION AND
## RIGHT TO DEFEND AND CONTEST

Section 8.01.  <u>Preservation of Rights</u>.  Except to the extent that any Claim is Allowed during the Chapter 11 Cases or expressly by this Plan, nothing, including, but not limited to, the failure of the Debtors or the Reorganized Debtors to object to a Claim or Interest for any reason during the pendency of the Chapter 11 Cases, shall affect, prejudice, diminish or impair the rights and legal and equitable defenses of the Debtors or the Reorganized Debtors with respect to any Claim or Interest, including, but not limited to, all rights of the Debtors or Reorganized Debtors to contest or defend themselves against such Claims or Interests in any lawful manner or forum when and if such Claim or Interest is sought to be enforced by the Holder thereof.

Section 8.02.  <u>Rights of Action</u>.  Except as otherwise provided in the Plan, all Causes of Action, including Avoidance Actions, shall automatically be retained and preserved and will revest in the Reorganized Debtors.  Pursuant to section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors (as representatives of the Debtors' Estates) will retain and have the exclusive right to enforce and prosecute such Causes of Action against any Entity, that arose before the Effective Date, other than those expressly released or compromised as part of or pursuant to the Plan.

Section 8.03.  <u>Setoffs</u>.  Except to the extent that any Claim is Allowed, the Debtors or the Reorganized Debtors, as applicable, may, but shall not be required to, set off against any Claims and the payments or distributions to be made pursuant to the Plan in respect of such Claims, any and all debts, liabilities, Causes of Action and claims of every type and nature whatsoever which the Estates, the Debtors or the Reorganized Debtors may have against their Creditors, but neither the failure to do so nor the allowance of any such Claims, whether pursuant to the Plan or otherwise, shall constitute a waiver or release by the Debtors of any such claims or Causes of Action the Debtors may have against such Creditors, and all such claims and Causes of Action which are not expressly released pursuant to the Plan shall be reserved to and retained by the Reorganized Debtors.

Section 8.04.  <u>No Payment or Distribution Pending Allowance</u>.  All references to Claims and amounts of Claims refer to the amount of the Claim Allowed by agreement of the Debtors or Reorganized Debtors and the Holder of such Claim, by operation of law, by Final Order, or by this Plan.  Notwithstanding any other provision in the Plan, no payment or distribution shall be made on account of or with respect to any Claim to the extent it is a Disputed Claim unless and until the Disputed Claim becomes an Allowed Claim.

Section 8.05.  <u>Resolution of Disputed Claims</u>.  Unless otherwise ordered by the Court after notice and a hearing, the Reorganized Debtors shall have the exclusive right, on and after the Effective Date, to File Objections to Claims (except those specifically Allowed by this Plan) and shall serve a copy of each such objection upon the holder of the Claim to which the objection is made as soon as practicable, but in no event later than the Claims Objection Deadline.  The foregoing deadlines may be extended by order of the Court.  An Objection to any Claim shall be deemed properly served on the Holder thereof if the Reorganized Debtors effect

32

service in any of the following manners: (a) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Federal Rule of Bankruptcy Procedure 7004; (b) by first class mail, postage prepaid, on the signatory on the proof of claim or other representative identified in the proof of Claim or any attachment thereto; or (c) by first class mail, postage prepaid, on any counsel that has appeared on the Holder's behalf in the Chapter 11 Cases.

## ARTICLE IX.
## CONDITIONS TO CONFIRMATION AND CONSUMMATION OF THE PLAN

Section 9.01.  <u>Conditions to Confirmation</u>.  The Confirmation Order shall not be entered unless and until the following conditions have occurred or have been duly waived (if waivable) pursuant to Section 9.03 below:

(a)    the Plan, including any amendments, modifications, or supplements thereto, and all documentation contemplated by the Plan, shall be in form and substance reasonably satisfactory to the Buyer Parties;

(b)    no default or event of default shall have occurred under the Junior DIP Loan Agreement;

(c)    the Bankruptcy Court shall have entered the Plan Sponsor Order;

(d)    the Canadian Court shall have entered the Canadian Recognition Order;

(e)    all material third party consents and waivers shall have been obtained, reasonably satisfactory to the Buyer Parties;

(f)    the Debtors shall not be in breach of the Plan Sponsor Agreement.

Section 9.02.  <u>Conditions to Effective Date</u>.  The Plan shall not be consummated, and the Effective Date shall not occur, unless and until the following conditions have occurred or have been duly waived (if waivable) pursuant to Section 9.03 below:

(a)    the Bankruptcy Court shall have approved the information contained in the Disclosure Statement as adequate;

(b)    the Confirmation Order, which order shall be in form and substance satisfactory to the Debtors and Buyer Parties, shall have been entered and shall not be stayed by order of a court of competent jurisdiction;

(c)    the Bankruptcy Court shall have entered an order confirming the Plan, which order shall be in form and substance satisfactory to the Debtors and Buyer Parties

(d)    all documents and agreements required to be executed or delivered under the Plan on or prior to the Effective Date shall have been executed and delivered by the parties thereto;

(e)     the Bankruptcy Court shall have entered an order (contemplated to be part of the Confirmation Order) authorizing and directing the Debtors and the Reorganized Debtors to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, indentures and other agreements or documents created, amended, supplemented, modified or adopted in connection with the Plan;

(f)     the Canadian Court shall have entered the Canadian Sanction Order;

(g)     the Debtors' obligations under the Junior DIP Financing shall have been paid in full;

(h)     the New Debtors Certificates of Incorporation shall have been filed with the applicable authority of each Reorganized Debtors' jurisdiction of incorporation or organization in accordance with such jurisdiction's applicable law;

(i)     all authorizations, consents and regulatory approvals required, if any, in connection with the Plan's effectiveness shall have been obtained;

(j)     the conditions to closing under the Plan Sponsor Agreement shall have been satisfied;

(k)     the Senior Management Contracts shall have been entered into by the parties thereto (as applicable); and

(l)     all Plan Documents shall have been adopted, shall be in full force and effect and shall be in form and substance acceptable to the Debtors and the Buyer Parties.

Section 9.03.   Waiver of Conditions to Confirmation and Consummation.   The conditions to confirmation in Section 9.01 and to consummation in Section 9.02 (other than 9.02(a) and (b)) may be waived at any time by a writing signed by an authorized representative of each of the Debtors and the Buyer Parties without notice or order of the Bankruptcy Court or any further action other than proceeding to consummation of the Plan.

Section 9.04.   Effect of Failure or Absence of Waiver of Conditions Precedent to the Effective Date of the Plan.   In the event that one or more of the conditions specified in Section 9.02 of the Plan have not occurred (or been waived) within ninety (90) days after entry of the Confirmation Order, upon notification submitted by the Debtors to the Bankruptcy Court, (a) the Confirmation Order, automatically and without further order of the Bankruptcy Court, shall be deemed, vacated, null and void, with no force or legal effect whatsoever, (b) no distributions under the Plan shall be made, (c) all Property of the Estates shall revest in the Debtors' Estates, (d) the Debtors and all Holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (e) the Debtors' obligations with respect to the Claims and Interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Interests by or against the Debtors or any other Person or

34

Entity or to prejudice in any manner the rights of the Debtors or any Person or Entity in any further proceedings involving the Debtors.

## ARTICLE X.
## OPERATION AND MANAGEMENT OF THE REORGANIZED DEBTORS

Section 10.01. <u>Post-Effective Date Operation of Business</u>. From and after the Effective Date, the Reorganized Debtors will continue to exist as separate corporate entities, in accordance with the applicable law in the respective jurisdictions in which they are incorporated and pursuant to the New TLC USA Certificates of Incorporation and By-Laws and the existing Certificates of Incorporation and By-Laws of TLC Canada and TLC MSI.

Section 10.02. <u>Post Effective Date Officers and Directors</u>. On the Effective Date, the officers of the Reorganized Debtors (a) shall be the individuals with such titles as set forth in the Plan Supplement, and (b) will be reimbursed for all reasonable costs and expenses, and will receive compensation, as set forth in the Senior Management Contracts or such other employment arrangements, with all such payments to be made by the respective Reorganized Debtors. The members of each of the Boards of Directors of the Reorganized Debtors, which shall serve starting on the Effective Date, will be identified in the Plan Supplement.

## ARTICLE XI.
## EFFECTS OF CONFIRMATION

Section 11.01. <u>Discharge</u>. To the fullest extent permitted by applicable law (including, without limitation, section 105 of the Bankruptcy Code), and except as otherwise provided in the Plan or in the Confirmation Order, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims of any nature whatsoever against the Debtors or any of their assets or Properties, regardless of whether any Property shall have been distributed or retained pursuant to the Plan on account of such Claims. Upon the Effective Date, and except as expressly contemplated in this Plan, the Debtors, and each of them, shall: be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, debts (as such term is defined in section 101(12) of the Bankruptcy Code), Liens, security interests, and encumbrances of and against all Property of the respective Estates, the Debtors, or the Reorganized Debtors that arose prior to the Effective Date, including, without limitation, all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) such Claim has been Allowed pursuant to section 502 of the Bankruptcy Code, or (ii) the Holder of such Claim has voted to accept the Plan. Further, as of the Effective Date, all entities, including, without limitation, all Holders of Claims or Interests, shall be barred and enjoined from asserting against the Debtors or the Reorganized Debtors, their successors or their Property any other or further Claims, debts, rights, Causes of Action, liabilities or Interests relating to the Debtors based upon any act, omission, transaction or other activity of any nature that occurred prior to the Effective Date, except for those obligations expressly created by, or reserved in, this Plan. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and

35

such discharge and termination shall void any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

Section 11.02. <u>Injunction</u>.

(a)     <u>Discharged Claims and Terminated Interests</u>.  Except as otherwise expressly provided for in the Plan or the Confirmation Order and to the fullest extent authorized or provided by the Bankruptcy Code, including sections 524 and 1141 thereof, the entry of the Confirmation Order shall, provided that the Effective Date occurs, permanently enjoin all Persons that have held, currently hold or may hold a Claim or other debt or liability that is discharged or an Interest or other right of an equity security holder that is Impaired or terminated pursuant to the terms of the Plan from taking any of the following actions against the Debtors, the Reorganized Debtors or their Property on account of any such discharged Claims, debts or liabilities or such terminated Interests or rights:  (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind; (iv) asserting any setoff, offset, right of subrogation or recoupment of any kind, directly or indirectly, against any debt, liability or obligation due to the Debtors or the Reorganized Debtors; and (v) proceeding in any manner in any place whatsoever, including employing any process, that does not conform to or comply with or is inconsistent with the provisions of the Plan.

(b)     <u>Released Claims</u>.  As of the Effective Date, the Confirmation Order shall constitute an injunction permanently enjoining any Person that has held, currently holds or may hold a Claim, demand, debt, right, Cause of Action or liability that is released pursuant to Section 11.04 of the Plan from enforcing or attempting to enforce any such Claim, demand, debt, right, Cause of Action or liability against any (i) Debtor, (ii) Reorganized Debtor, (iii) Releasee, or (iv) Exculpated Person, or any of their respective Property, based on, arising from or relating to, in whole or in part, any act, omission, or other occurrence taking place on or prior to the Effective Date with respect to or in any way relating to the Chapter 11 Cases, all of which claims, demands, debts, rights, Causes of Action or liabilities shall be deemed released on and as of the Effective Date; provided, however, this injunction shall not apply to (a) any claims Creditors may assert under the Plan to enforce their rights thereunder to the extent permitted by the Bankruptcy Code or (b) any claims Creditors or other third parties may have against each other, which claims are not related to the Debtors and the Reorganized Debtors, it being understood, however, that any defenses, offsets or counterclaims of any kind or nature whatsoever which the Debtors may have or assert in respect of any of the claims of the type described in (a) or (b) of this proviso are fully preserved.

Section 11.03. <u>Exculpation</u>.  None of the Debtors, Reorganized Debtors or Exculpated Persons shall have or incur any liability to any Person, including, without limitation, any Holder of a Claim or Interest or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or affiliates or any of their successors or assigns, for:  (i) any act taken or omission made in connection with, relating to, or arising out of, the Chapter 11 Cases; (ii) Filing, negotiating, prosecuting, administering, formulating,

36

implementing, confirming or consummating this Plan; or (iii) the Property to be distributed under this Plan, including all activities leading to the promulgation and confirmation of the Plan, the Disclosure Statement (including any information provided or statement made in the Disclosure Statement or omitted therefrom), or any contract, instrument, release or other agreement or document created in connection with or related to the Plan or the administration of the Debtors or these Chapter 11 Cases; provided, however, that the foregoing exculpation shall not apply to any act of gross negligence or willful misconduct.

Section 11.04. <u>Releases</u>.

(a) <u>Releases by Debtors</u>. Effective as of the Effective Date, and except as otherwise provided in the Plan or the Confirmation Order, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their individual capacities as debtors in possession, will be deemed to have forever released, waived and discharged the Releasees from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities (other than the rights of the Debtors or Reorganized Debtors to enforce the Plan and the contracts, instruments, releases, and other agreements or documents delivered thereunder), whether for tort, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event or other occurrence, including actions in connection with indebtedness for money borrowed by the Debtors, taking place on or prior to the Effective Date in any way relating to any of the Debtors, the Reorganized Debtors, the Chapter 11 Cases, or the Plan, and the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan (other than claims based on gross negligence or willful misconduct) arising on or prior to the Effective Date, that the Debtors or the Reorganized Debtors have, had or may have, <u>provided</u>, <u>however</u>, that no Releasee shall be released or discharged from any Claims, obligations, suits, judgments, debts or Causes of Action arising out of or in connection with indebtedness for money borrowed by any such person from any of the Debtors, <u>provided</u>, <u>however</u>, that such release provisions will not impact, modify or limit the ability of the Debtors or the Reorganized Debtors to take any defensive measure, including, without limitation, as to impleading any party into such matter, necessary to respond to any litigation, adversary proceeding or other proceeding that may be brought by any other party in interest to the bankruptcy proceeding or in relation thereto, as necessary to fully and properly protect their interests. Notwithstanding anything to the contrary contained herein, the Plan shall not release former officers of the Debtors from any continuing obligations the former officers owe to the Debtors under employment, separation, severance, non-competition, non-disclosure or proprietary rights agreements existing between the Debtors and the former officers.

(b) <u>Releases by Holders of Claims and Interests</u>. Effective as of the Effective Date, and except as otherwise provided in the Plan or the Confirmation Order, in consideration for the obligations of the Debtors under the Plan and the payments, contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each Holder of a Claim or Interest and any Affiliate of any such Holder (as well as any trustee or agent on behalf of each such Holder) that either affirmatively votes in favor of the

37

Plan or is deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, shall be deemed to have forever waived, released and discharged (i) the Debtors, (ii) the Reorganized Debtors, and (iii) the Releasees from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities, whether for tort, contract, violations of federal or state securities laws or otherwise, or whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to any of the Debtors or the Plan that such person or entity has, had or may have against the Debtors, the Releasees, the Junior DIP Lenders and the Junior DIP Agent, and each of their respective present or former directors, affiliates, officers, employees, attorneys, accountants, underwriters, investment bankers, professionals, financial advisors and agents (acting in such capacity and excluding claims based on gross negligence or willful misconduct); provided however that, the foregoing provision will not impact, modify or limit the ability of any such party to take any defensive measure, including, without limitation, as to impleading any party into such matter, necessary to respond to any litigation, adversary proceeding or other proceeding that may be brought by any other party in interest to the bankruptcy proceeding or in relation thereto, as necessary to fully and properly protect its interests.

Section 11.05. Indemnification.  To the extent not inconsistent with the Plan or the Confirmation Order and to the fullest extent permitted by applicable law, including, but not limited to, the extent provided in their constituent documents, contracts (including, but not limited to, employment agreement or indemnification agreement), statutory law or common law, the Reorganized Debtors will indemnify, hold harmless and reimburse the Exculpated Persons from and against any and all losses, claims, Causes of Action, damages, fees, expenses, liabilities and actions:  (a) for any act taken or omission made in good faith in connection with or in any way related to negotiating, formulating, implementing, confirming or consummating the Plan, the Disclosure Statement, or any contract, instrument, release or other agreement or document created in connection with the Plan or the administration of the Chapter 11 Cases; or (b) for any act or omission in connection with or arising out of the administration of the Plan or the Property to be distributed under the Plan or the operations or activities of the Reorganized Debtors, and any Claims of any such Exculpated Person against the Debtors or the Reorganized Debtors on account of such indemnification obligations shall be unaltered and Unimpaired within the meaning of section 1124(1) of the Bankruptcy Code, except that none of the Debtors or the Reorganized Debtors shall have any obligation to indemnify any Exculpated Person for any acts or omissions that constitute gross negligence or willful misconduct as such is finally determined by a court of competent jurisdiction.  Such indemnification obligations shall survive unaffected by entry of the Confirmation Order, irrespective of whether such indemnification is owed for an act or event occurring before or after the Petition Date.

Section 11.06. Other Documents and Actions.  The Debtors and the Reorganized Debtors are authorized to execute such documents and take such other action as is necessary to effectuate the transactions provided for in the Plan.

Section 11.07. <u>Term of Injunctions or Stays</u>.  Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under sections 105(a) or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

Section 11.08. <u>Preservation of Insurance</u>.  Except as necessary to be consistent with the Plan, the Plan and the discharge provided herein shall not diminish or impair:  (a) the enforceability of insurance policies that may cover Claims against the Debtors or any other Person or Entity; or (b) the continuation of workers' compensation programs in effect, including self-insurance programs.

Section 11.09. <u>Guaranties</u>.  Notwithstanding the existence of guaranties by the Debtors of obligations of any Entity or Entities, and the Debtors' joint obligations with another Entity or Entities with respect to the same obligations, all Claims against the Debtors based upon any such guaranties shall be satisfied, discharged and released in the manner provided in this Plan and the Holders of Claims shall be entitled to only one distribution with respect to any given obligation of the Debtors.

Section 11.10. <u>Subordination Rights</u>.  Any distributions under the Plan shall be received and retained free of and from any obligations to hold or transfer the same to any other Creditor, and shall not be subject to levy, garnishment, attachment or other legal process by any Holder by reason of claimed contractual subordination rights and such subordination rights shall be waived and the Confirmation Order shall constitute an injunction enjoining any Person from enforcing or attempting to enforce any contractual, legal or equitable subordination rights to Property distributed under the Plan, in each case other than as provided in the Plan.

Section 11.11. <u>No Successor Liability</u>.  Except as otherwise expressly provided in the Plan, the Debtors and the Reorganized Debtors do not, pursuant to the Plan or otherwise, assume, agree to perform, pay, or indemnify or otherwise have any responsibilities for any liabilities or obligations of the Debtors relating to or arising out of the operations of or assets of the Debtors, whether arising prior to, on, or after the Effective Date.  The Reorganized Debtors are not, and shall not be, successors to the Debtors by reason of any theory of law or equity, and none shall have any successor or transferee liability of any kind or character, except that the Reorganized Debtors shall assume the obligations specified in the Plan and the Confirmation Order.

# ARTICLE XII.
# RETENTION OF JURISDICTION

Section 12.01. <u>Exclusive Jurisdiction of Bankruptcy Court</u>.  Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain after the Effective Date exclusive jurisdiction of all matters arising out of, arising in or related to the Chapter 11 Cases to the fullest extent permitted by applicable law, including, without limitation, jurisdiction to:

(a)      classify or establish the priority or secured or unsecured status of any Claim (whether Filed before or after the Effective Date and whether or not contingent,

Disputed or unliquidated) or resolve any dispute as to the treatment of any Claim pursuant to the Plan;

(b)     grant or deny any applications for allowance of compensation or reimbursement of expenses pursuant to sections 330, 331 or 503(b) of the Bankruptcy Code or otherwise provided for in the Plan, for periods ending on or before the Effective Date;

(c)     determine and resolve any matters related to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which any Debtor is a party or with respect to which any Debtor may be liable, and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

(d)     ensure that all payments due under the Plan, including, without limitation, payments of Allowed Administrative Claims, and performance of the provisions of the Plan are accomplished as provided herein and resolve any issues relating to distributions to Holders of Allowed Claims pursuant to the provisions of the Plan;

(e)     construe, take any action and issue such orders, prior to and following the Confirmation Date and consistent with section 1142 of the Bankruptcy Code, as may be necessary for the enforcement, implementation, execution and consummation of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, including, without limitation, the Disclosure Statement and the Confirmation Order, for the maintenance of the integrity of the Plan and protection of the Reorganized Debtors in accordance with sections 524 and 1141 of the Bankruptcy Code following consummation;

(f)     determine and resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation, implementation or enforcement of the Plan Sponsor Agreement, the Plan (and all Exhibits to the Plan and the Plan Supplement) or the Confirmation Order, including the indemnification and injunction provisions set forth in and contemplated by the Plan Sponsor Agreement, the Plan or the Confirmation Order, or any Entity's rights arising under or obligations incurred in connection therewith;

(g)     hear any application of the Debtors or Reorganized Debtors to modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code and Section 13.04 hereof or modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code and the Plan;

(h)     issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

(i) enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(j) determine any other matters that may arise in connection with or relating to the Plan Sponsor Agreement, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan Sponsor Agreement, the Plan, the Disclosure Statement or the Confirmation Order, except as otherwise provided in the Plan;

(k) determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(l) hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code;

(m) hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan;

(n) enter a final decree closing the Chapter 11 Cases;

(o) determine and resolve any and all controversies relating to the rights and obligations of the Disbursing Agent in connection with the Chapter 11 Cases;

(p) allow, disallow, determine, liquidate or estimate any Claim, including the compromise, settlement and resolution of any request for payment of any Claim, the resolution of any Objections to the allowance of Claims and to hear and determine any other issue presented hereby or arising hereunder, including during the pendency of any appeal relating to any Objection to such Claim (to the extent permitted under applicable law);

(q) permit the Debtors and the Reorganized Debtors to recover all assets of the Debtors and Property of their respective Estates, wherever located;

(r) hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes and tax benefits and similar or related matters with respect to the Debtors or the Debtors' respective Estates arising prior to the Effective Date or relating to the period of administration of the Chapter 11 Cases, including, without limitation, matters concerning federal, state and local taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(s) hear and determine any motions, applications, adversary proceedings, contested matters and other litigated matters pending on, Filed or commenced after the Effective Date that may be commenced by the Debtors or the Reorganized Debtors thereafter, including Avoidance Actions, proceedings with respect to the rights of the Debtors or their Estates to recover Property under sections 542, 543 or 553 of the Bankruptcy Code, or proceedings to otherwise collect to recover on account of any claim or Cause of Action that the Debtors may have; and

(t)      hear any other matter not inconsistent with the Bankruptcy Code.

Section 12.02. <u>Failure of Bankruptcy Court to Exercise Jurisdiction</u>.    If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction over any matter arising under, arising in or related to the Debtors, including with respect to the matters set forth above in Section 12.01 hereof, this Article XII shall not prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such subject matter.

## ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

Section 13.01. <u>Binding Effect of Plan</u>.  The provisions of the Plan shall be binding upon and inure to the benefit of the Debtors, the Estates, the Reorganized Debtors, any Holder of any Claim or Interest treated herein or any Person named or referred to in the Plan, and each of their respective heirs, executors, administrators, representatives, predecessors, successors, assigns, agents, officers and directors, and, to the fullest extent permitted under the Bankruptcy Code and other applicable law, each other Person affected by the Plan.

Section 13.02. <u>Withdrawal of the Plan</u>.  The Debtors reserve the right, at any time prior to Confirmation of the Plan, though subject to the terms of the Plan Sponsor Agreement, to withdraw the Plan.  If the Plan is withdrawn, the Plan shall be null and void and have no force and effect.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

Section 13.03. <u>Final Order</u>.  Except as otherwise expressly provided in the Plan, any requirement in the Plan for a Final Order may be waived by the Debtors (with the consent of the Buyer Parties) or, after the Effective Date, the Reorganized Debtors upon written notice to the Bankruptcy Court.  No such waiver shall prejudice the right of any party in interest to seek a stay pending appeal of any order that is not a Final Order.

Section 13.04. <u>Modification of the Plan</u>.  The Debtors may alter, amend or modify the Plan (with the consent of the Buyer Parties) in accordance with section 1127 of the Bankruptcy Code or as otherwise permitted at any time prior to the Confirmation Date.  After the Confirmation Date and prior to the substantial consummation of the Plan, and in accordance with the provisions of section 1127(b) of the Bankruptcy Code and the Bankruptcy Rules, the Debtors may (with the consent of the Buyer Parties), so long as the treatment of Holders of Claims or Interests under the Plan is not adversely affected, institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order and any other matters as may be necessary to carry out the purposes and effects of the Plan; provided, however, prior notice of such proceedings shall be served in accordance with Bankruptcy Rules 2002 and 9014.

Section 13.05. <u>Business Days</u>.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

1076/74009-007 Current/17494726v4
RLF1 3534300v.1

Section 13.06. <u>Severability</u>.  Should the Bankruptcy Court determine, prior to the Confirmation Date, that any provision of the Plan is either illegal on its face or illegal as applied to any Claim or Interest, such provision shall be unenforceable as to all Holders of Claims or Interests or to the specific Holder of such Claim or Interest, as the case may be, as to which such provision is illegal.  Unless otherwise determined by the Bankruptcy Court, such a determination of unenforceability shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan.  The Debtors reserve the right not to proceed with Confirmation or consummation of the Plan if any such ruling occurs.  In the event that the Canadian Court does not enter an accompanying order that includes the approval of Sections 3.07(d)(2) and 3.07(f) of this Plan, such provisions are expressly severed from this Plan.

Section 13.07. <u>Governing Law</u>.    EXCEPT TO THE EXTENT THAT THE BANKRUPTCY CODE OR BANKRUPTCY RULES OR OTHER FEDERAL LAWS ARE APPLICABLE, AND SUBJECT TO THE PROVISIONS OF ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT ENTERED INTO IN CONNECTION WITH THE PLAN, THE CONSTRUCTION, IMPLEMENTATION AND ENFORCEMENT OF THE PLAN AND ALL RIGHTS AND OBLIGATIONS ARISING UNDER THE PLAN SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO CONFLICTS-OF-LAW PRINCIPLES WHICH WOULD APPLY THE LAW OF A JURISDICTION OTHER THAN THE STATE OF DELAWARE.

Section 13.08. <u>Dissolution of Committee</u>.  On the Effective Date, any Committee shall be automatically dissolved and all of its members, Professionals and agents shall be deemed released of their duties, responsibilities and obligations, and shall be without further duties, responsibilities and authority in connection with the Debtors, the Chapter 11 Cases, the Plan or its implementation.

Section 13.09. <u>Payment of Fees and Expenses of the Junior DIP Agent and Junior DIP Lenders</u>.  The Debtors or the Reorganized Debtors (as applicable) shall pay the reasonable fees and expenses incurred by the Junior DIP Agent and the Junior DIP Lenders in connection with the Chapter 11 Cases and the performance of their duties pursuant to the terms of the Plan Sponsor Agreement (as long as such duties are performed prior to the Effective Date) in accordance with the provisions of the Junior DIP Order and without further Order of the Bankruptcy Court.

Section 13.10. <u>Payment of Statutory Fees</u>.  All U.S. Trustee's Fee Claims, as determined, if necessary, by the Bankruptcy Court at the hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid on or before the Effective Date.

Section 13.11. <u>Post-Confirmation Operating Reports</u>.    The Debtors or the Reorganized Debtors, as applicable, shall continue to file quarterly operating reports as required by the United States Trustee until such time as an order is entered under section 350(a) of the Bankruptcy Code closing the Bankruptcy Cases.

Section 13.12. <u>Notices</u>.  Any notice required or permitted to be provided under this Plan to the Debtors or the Reorganized Debtors, or any request for information with respect

to the Plan, shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery or (c) reputable overnight delivery service, freight prepaid, to be addressed as follows:

TLC Vision (USA) Corporation
16305 Swingley Ridge Road
Chesterfield, MO 63017
Attn:   William McManus
Email:  wmcmanus@cdgco.com

With a copy to:

Proskauer Rose LLP
70 West Madison Street
Chicago, Illinois 60602
Attn:  Mark K. Thomas
Email:  mthomas@proskauer.com

Section 13.13. <u>Filing of Additional Documents</u>.  On or before substantial consummation of the Plan, the Debtors shall issue, execute, deliver, and File with the Bankruptcy Court or record any agreements and other documents, and take any action as may be necessary or appropriate to effectuate, consummate and further evidence the terms and conditions of the Plan.

Section 13.14. <u>Section 1125 of the Bankruptcy Code</u>.  The Debtors have, and upon Confirmation of the Plan shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and the Debtors (and each of their respective Affiliates, officers, directors, employees, consultants, agents, advisors, members, attorneys, accountants, financial advisors, other representatives and Professionals), have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, and purchase of the securities offered and sold under the Plan, and are not, and on account of such offer, issuance, sale, solicitation, and/or purchase will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of the securities offered and sold under the Plan.

Section 13.15. <u>Section 1146 Exemption</u>.  To the fullest extent permitted under section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of any security under the Plan, if any, or the execution, delivery or recording of an instrument of transfer under the Plan, or the revesting, transfer or sale of any real or other Property of or to the Debtors or the Reorganized Debtors, shall not be taxed under any state or local law imposing a stamp tax, transfer tax or similar tax or fee.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, mortgage recording tax, intangible tax or similar tax.

1076/74009-007 Current/17494726v4
RLF1 3534300v.1

Section 13.16. <u>Release of Liens</u>.  Upon entry of the Confirmation Order, all Liens of the Prepetition Lenders against all non-debtor guarantors under the Prepetition Credit Agreement and the related Prepetition Loan Documents shall be released.  Furthermore, the Debtors are permitted to file termination statements to effectuate such releases of those Liens.

Section 13.17. <u>Time</u>.  Unless otherwise specified herein, in computing any period of time prescribed or allowed by the Plan, the day of the act or event from which the designated period begins to run shall not be included.  The last day of the period so computed shall be included, unless it is not a Business Day, in which event the period runs until the end of next succeeding day that is a Business Day.  Otherwise, the provisions of Bankruptcy Rule 9006 shall apply.

Section 13.18. <u>No Attorneys' Fees</u>.  No attorneys' fees will be paid by the Debtors with respect to any Claim or Interest except as expressly specified herein or by order of the Bankruptcy Court (including the Junior DIP Order).

Section 13.19. <u>No Injunctive Relief</u>.  No Claim or Interest shall under any circumstances be entitled to specific performance or other injunctive, equitable or other prospective relief.

Section 13.20. <u>Non-Voting Equity Securities</u>.  The Debtors shall comply with the provisions of section 1123(a)(6) of the Bankruptcy Code.

Section 13.21. <u>Continued Confidentiality Obligations</u>.  Pursuant to the terms thereof, members of and advisors to the Committee, any other Holder of a Claim or Interest and their respective predecessors, successors and assigns shall continue to be obligated and bound by the terms of any confidentiality agreement executed by them in connection with these Chapter 11 Cases or the Debtors, to the extent that such agreement, by its terms, may continue in effect after the Confirmation Date.

Section 13.22. <u>No Admissions or Waivers</u>.  Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed an admission or waiver by the Debtors with respect to any matter set forth herein, including, without limitation, liability on any Claim or Interest or the propriety of any classification of any Claim or Interest.

Section 13.23. <u>Entire Agreement</u>.  The Plan (and all Exhibits to the Plan and the Plan Supplement) sets forth the entire agreement and undertakings relating to the subject matter hereof and supersedes all prior discussions and documents.  The Debtors shall not be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for herein or as may hereafter be agreed to by the parties in writing.

Section 13.24. <u>Waiver</u>.  The Debtors or the Reorganized Debtors, as applicable, reserve the right to waive (with the consent of the Buyer Parties) any provision of this Plan to the extent such provision is for the sole benefit of the Debtors and/or their officers or directors.

1076/74009-007 Current/17494726v4
RLF1 3534300v.1

Section 13.25. <u>Bar Date for Professionals</u>. Applications for compensation for services rendered and reimbursement of expenses incurred by Professionals (a) from the Petition Date through the Effective Date or (b) at any time during the Chapter 11 Cases when such compensation is sought pursuant to sections 503(b)(2) through (b)(5) of the Bankruptcy Code, shall be Filed no later than forty-five (45) days after the Effective Date or such later date as the Bankruptcy Court approves. Such applications shall be served on (a) the Reorganized Debtors at the address set forth in Section 13.12 of the Plan, (b) counsel to the Debtors at the address set forth in Section 13.12 of the Plan, (c) the Office of the United States Trustee, 844 King Street, Room 2202, Wilmington, DE 19801, Attn: Mark Kenney, (d) counsel for Charlesbank, Goodwin Procter, LLP, The New York Times Building, 620 Eighth Avenue, New York, NY 10018-1405, Attn: Brian W. Harvey, and (e) counsel to the Committee, Winston & Strawn, 200 Park Avenue, New York, NY 10166-4193, Attn: David Neier. Applications that are not timely Filed will not be considered by the Court. The Reorganized Debtors may pay any Professional fees and expenses incurred after the Effective Date without any application to the Bankruptcy Court.

## CONFIRMATION REQUEST

The Debtors hereby request confirmation of the Plan pursuant to section 1129(a) or section 1129(b) of the Bankruptcy Code.

Dated: February 3, 2010

TLC VISION CORPORATION; TLC VISION (USA) CORPORATION; AND TLC MANAGEMENT SERVICES INC.

By: <u>/s/ Michael F. Gries</u>
Title: Chief Restructuring Officer

1076/74009-007 Current/17494726v4
RLF1 3534300v.1

**<u>Appendix B</u>**

**Financial Projections**

**TO COME**

**<u>Appendix C</u>**

**Liquidation Analysis**

**TO COME**

## Appendix D

**Selected Financial Data for the Periods from [_____]**

**TO COME**

**<u>Appendix E</u>**

**Identified Medical Claims**

**TO COME**