# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TLC Vision (USA) Corporation, *et al.*,[1] | ) Case No. 09-14473 (KG) |
| | ) |
| Debtors. | ) Jointly Administered |

## DECLARATION OF MICHAEL F. GRIES, CHIEF RESTRUCTURING OFFICER FOR THE DEBTORS, IN SUPPORT OF DEBTORS' MOTIONS FOR ORDERS (1) GRANTING AUTHORITY TO OBTAIN JUNIOR SECURED POSTPETITION FINANCING AND (2) APPROVING PLAN SPONSOR AGREEMENT, BREAK-UP FEE AND EXPENSE REIMBURSEMENT

I, Michael F. Gries, hereby declare under penalty of perjury under the laws of the United States pursuant to 28 U.S.C. §1746 that the following is true and correct (the "Declaration"):

1. I am the Chief Restructuring Officer for each of the above-captioned debtors and debtors in possession (collectively, the "Debtors"). As such, I am generally familiar with the day-to-day operation and business and financial affairs of the Debtors and certain of their affiliates.

2. This Declaration is submitted on behalf of the Debtors in support of the *Motion of the Debtors for Entry of a Second Interim and Final Order: (I) Authorizing the Debtors to (A) Obtain Junior Secured Postpetition Financing Pursuant to 11 U.S.C. §§ 361, 362, 363(c), 363(e), 364(c) and 364(e) and (B) Utilize Cash Collateral of Prepetition Secured Lenders, (II) Granting Adequate Protection to the Prepetition Senior Secured Lenders and (III) Granting Related Relief* [Docket No. 200] (the "DIP Motion") and the *Debtors' Motion Pursuant to*

---

[1] The Debtors in the cases, along with the last four digits of each Debtor's federal tax identification number and address, are: TLC Vision (USA) Corporation (6220) 16305 Swingley Ridge Road, Chesterfield, MO 63017; TLC Vision Corporation (1150) 5280 Solar Drive, Suite 300, Mississauga, Ontario, L4W 5M8; and TLC Management Services, Inc. (0374) 1209 Orange Street, Wilmington, DE 19801.

*Sections 105(a), 363 and 503(b) of the Bankruptcy Code and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure for Order Approving Plan Sponsor Agreement and Break-Up Fee and Expense Reimbursement in Connection Therewith* [Docket No. 197] (the "Plan Sponsor Motion") (each capitalized term used, but not defined, shall have the meaning ascribed thereto in the Plan Sponsor Motion and the DIP Motion, respectively).

**The Commencement of the Chapter 11 Cases**

3. On December 21, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases"). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

4. On January 5, 2010, the Office of the United States Trustee appointed an official committee of unsecured creditors in the Chapter 11 Cases. No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases.[2]

5. Debtor TLC Vision (USA) Corporation ("TLC USA"), a Delaware corporation, is a wholly-owned subsidiary of TLC Canada.

6. Debtor TLC Management Services Inc., a Delaware corporation, is a wholly-owned subsidiary of TLC USA and employs virtually all of the non-executive employees of the Debtors and their affiliates, including the affiliates that are guarantors under the Prepetition

---

[2] On December 23, 2009, TLC Vision Corporation ("TLC Canada"), as foreign representative, brought an application to the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"). The Canadian Court entered an order pursuant to Section 47 of the CCAA that, among other things, recognized the Chapter 11 Cases as a "foreign proceeding" in Canada and stayed proceedings against TLC Canada in Canada (in a manner similar to the stay arising under Section 362 of the Bankruptcy Code).

2

Facility (as defined below) that have pledged stock, cash and other assets to secure such obligations.

**The Company Consists of the Debtor and its Non-Debtor Affiliates**

7. The Debtors and their affiliates (collectively, the "Company"), provide refractive, cataract and related eye care services throughout North America. The Debtors, among other things: (a) contract directly with vendors who supply the Company with office and medical supplies; (b) have entered into leases and service agreements to procure and maintain the lasers and other equipment necessary for surgeons and other care providers to perform surgeries and other medical procedures; and (c) have entered into agreements with the surgeons who actually perform procedures for the Debtors' affiliates. The Debtors also provide cash management and other administrative services to their affiliates.

8. The Debtors' affiliates generate revenue by collecting service and facility fees from doctors and surgeons who use their space and equipment to perform eye care procedures. The majority of the Company's revenue is generated not by the Debtors, but by their non-debtor affiliates. The Debtors' non-debtor affiliates provide a large portion of the tangible and intangible value of the Company. For these reasons, the Debtors and its affiliates comprise a highly integrated business enterprise. The Debtors' cash flow and going concern value would be seriously impaired by any action that threatens this cohesive and voluntary structure.

9. The Debtors' affiliates would not be able to provide services to and for the ultimate benefit of the Debtors without their relationships with doctors and surgeons. The doctors and surgeons with whom the Company works operate under personal service agreements that, I have been advised, cannot be assumed and assigned under section 365 of the Bankruptcy Code.

**The Prepetition Credit Agreement**

10. The Debtors are parties to the Amended and Restated Credit Agreement, dated as of June 21, 2007 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Prepetition Credit Agreement") and a Security Agreement, dated as of June 21, 2007 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Prepetition Security Agreement"), by and among TLC USA, TLC Canada (as guarantor), the other additional guarantors party thereto (the "Guarantors"), the lenders from time to time party thereto (the "Prepetition Lenders"), and Wells Fargo Bank, N.A. as agent[3] (in such capacity, the "Prepetition Agent" and, together with the Prepetition Lenders, the "Prepetition Lender Parties"). Under the Prepetition Credit Agreement, the Prepetition Lenders provided revolving and term loans and a letter of credit facility to TLC USA and provided other financial accommodations to or for the benefit of the other Debtors and the Guarantors (the "Prepetition Facility"). The obligations of the Debtors and the Guarantors (including the Non-Debtor Guarantors) were secured by interests in and liens on substantially all of their assets, whether then or thereafter acquired, wherever located, and whether then or thereafter existing or arising, granted to the Prepetition Agent, for the benefit of itself and the Prepetition Lenders (collectively, the "Prepetition Collateral"). The Debtors believe that they were indebted under the Prepetition Credit Agreement by approximately $105 million (the "Prepetition Lender Claims") as of the Petition Date.

**The Lender Plan Support Agreement, the Interim DIP Order and the "Fiduciary Out"**

11. On December 20, 2009, one day before the Petition Date, the Debtors and holders of approximately 56% in amount of the Prepetition Lender Claims (the "Consenting Prepetition

---
[3] Prior to the Petition Date, Wells Fargo Bank, N.A had been substituted for CIT Healthcare LLC, as agent

Lenders") executed a plan support agreement (the "Lender Plan Support Agreement") that established a process whereby the Debtors would commence the Chapter 11 Cases and subsequently seek confirmation of the Lender Plan (as defined below), all on terms acceptable to the Consenting Prepetition Lenders. Specifically, the Lender Plan Support Agreement required the Debtors to take certain actions in furtherance of confirmation of the Lender Plan, including conditions which became binding upon the Debtors after commencement of the Chapter 11 Cases by their inclusion as events of default under the Lender DIP Credit Agreement and the Lender Interim DIP Order. In exchange, the Consenting Prepetition Lenders agreed to provide debtor-in-possession financing sufficient to fund the Chapter 11 Cases.

12. The Debtors commenced the Chapter 11 Cases on the Petition Date, in accordance with the terms and conditions of the Lender Plan Support Agreement. Also on the Petition Date, also in accordance with the Plan Support Agreement, the Debtors filed a motion requesting authority to use prepetition cash collateral and to enter into a debtor-in-possession credit agreement (the "Lender DIP Credit Agreement") with the lenders under the Lender DIP Credit Agreement (the "DIP Lender Parties" or "DIP Lenders") and Cantor Fitzgerald Securities, as agent for the DIP Lender Parties (the "Lender DIP Agent") and lender, which facility was to be immediately assigned and/or participated out in large part to certain of the Prepetition Lenders (the "Lender DIP Facility"). The Lender DIP Facility was designed to facilitate the filing, pursuit and ultimate consummation of the Lender Plan in accordance with the Lender Plan Support Agreement. Accordingly, certain events of default under the Lender DIP Credit Agreement were related to events necessary to confirm the Lender Plan in accordance with the Plan Support Agreement.

13. On December 22, 2009, the Bankruptcy Court entered an order approving the Lender DIP Facility on an interim basis and granted related relief (the "Lender Interim DIP

5

Order"). The terms of the Lender Interim DIP Order prevent the Debtors from, among other things, seeking any use of the Prepetition Lenders' cash collateral, other than as provided for under the Interim DIP Order, without the prior written consent of certain of the DIP Lender Parties.

14. The Debtors' pursuit of the Charlesbank Plan (as hereinafter defined) will necessarily result in a default under the Lender DIP Credit Agreement and the Lender Interim DIP Order because, for example, there will not be a final order from the Bankruptcy Court approving the Lender DIP Facility before the deadline provided in the Lender DIP Credit Agreement.

15. Because the Debtors believed that the value of the Prepetition Collateral and the going-concern value of the Company might well exceed the amount of the Prepetition Lender Claims, and that there might be alternative restructuring opportunities, the Debtors negotiated a provision of the Lender Interim DIP Order (which the Debtors refer to as the "fiduciary out") that permits them to obtain alternate debtor-in-possession financing, and pursue a restructuring alternative to the Lender Plan, under certain circumstances. (*See* Lender Interim DIP Order at ¶39.) Specifically, to obtain use of alternate financing in accordance with paragraph 39 of the Lender Interim DIP Order and pursue a restructuring other than the Lender Plan, the Debtors must: (a) provide the Prepetition Lenders with written notice of the alternate financing concurrently with the decision of their board of directors to do so; (b) file a motion seeking authority to pay all amounts owing under the Lender DIP Facility in full in cash (which motion may seek approval for debtor-in-possession financing secured by liens that are junior to, but not senior to or *pari passu* with, the liens of the Prepetition Lenders); (c) file a plan of reorganization that provides for payment in full in cash of the Prepetition Lender Claims and (i) will become effective no later than May 20, 2010, and (ii) that is not contingent on further due diligence or

6

obtaining financing; (d) provide reasonable evidence of committed financing in support of the proposed alternate plan; and (e) obtain a Bankruptcy Court order approving junior debtor-in-possession financing and pay the Lender DIP Facility financing, in cash and in full, within 15 days of delivering the notice described in (a) above.

**The Lender Plan**

16. On January 6, 2010, in accordance with the terms and conditions of the Lender DIP Facility and the Lender Plan Support Agreement, the Debtors filed a plan of reorganization satisfactory to the Consenting Prepetition Lenders [Docket No. 94] (as amended, the "Lender Plan") and related disclosure statement [Docket No. 95] (as amended, the "Lender Disclosure Statement"). Among other things, the Lender Plan provides for:

(a) the Prepetition Lenders to receive $80 million in secured notes payable by the restructured TLC (Lender Disclosure Statement at p. 4);

(b) the transfer of the vast majority of the going-concern value of the Company to the Prepetition Lenders through the issuance of 100% of the equity of the restructured TLC (subject to dilution by equity granted to management of the reorganized Debtors) (Lender Disclosure Statement at p. 4); and

(c) the general unsecured creditors of the Debtors to receive the lesser of their pro-rata share of a set pool of cash (the "Unsecured Cash Pool") or 10% of the amount of their Allowed Claims (as defined in the Lender Plan) (Lender Disclosure Statement at pp. 10 and 14).

Thus, in an a nutshell, the Lender Plan provides for the Prepetition Lenders to receive, on account the Prepetition Lender Claims: (a) all or substantially all of the equity of the Company; and (b) $80 million in notes secured by the assets of the Company. Current equity holders of the Debtors will essentially be wiped out and the Debtors' general unsecured creditors will not receive more than a 10% recovery.

17. As described below, the DIP Motion, the Charlesbank DIP Facility, the Charlesbank Plan, the Charlesbank Plan Sponsor Agreement, and the Debtors' actions taken in

7

connection with negotiating, agreeing to (subject to approval of the Court), documenting, filing and delivering the foregoing satisfy the terms of the Debtors' fiduciary out and will facilitate the confirmation of the superior Charlesbank Plan or a Superior Proposal (as defined below).

**The Charlesbank DIP Credit Agreement**

18. The Debtors filed the DIP Motion to secure financing that would allow them to immediately pay off in cash the Lender DIP Facility and to continue to operate while they pursue confirmation of the Charlesbank Plan. The DIP Motion seeks interim and final orders approving junior debtor-in-possession financing in an amount up to $25 million, subject to the terms of a Junior Secured Super Priority Debtor in Possession Credit Agreement dated as of February 3, 2010 (the "Charlesbank DIP Credit Agreement" or "Charlesbank DIP Facility", as the context provides or permits) attached as an exhibit to the DIP Motion. Certain defaults and events of default under the Charlesbank DIP Facility are conditioned upon the Debtors' pursuing confirmation of the Charlesbank Plan and meeting certain deadlines and achieving certain results in connection therewith.

19. The proceeds of the Charlesbank DIP Facility are to be used to: (a) immediately pay in full in cash the outstanding balance of the Lender DIP Facility, as required by the conditions of the fiduciary out clause in the Lender Interim DIP Order; and (b) fund the Chapter 11 Cases through the confirmation of the Charlesbank Plan. As set forth in the Charlesbank DIP Credit Agreement and the proposed form of order granting interim relief under the DIP Motion, the Prepetition Lenders will continue to receive under the Charlesbank DIP Facility adequate protection under section 361 of the Bankruptcy Code in form and substance substantially identical to the adequate protection they have received under the Lender DIP Facility (*i.e.*, they will retain and keep the same superpriority and adequate protection liens and claims, they will be paid interest and they will be paid reasonable attorneys' fees). Accordingly, the Prepetition

8

Lenders will remain adequately protected within the meaning of sections 361 and 363 (e) of the Bankruptcy Code.

**The Charlesbank Plan Sponsor Agreement and the Charlesbank Plan**

20. The Plan Sponsor Motion seeks entry of an order approving the Charlesbank Plan Sponsor Agreement (as defined below) and granting Charlesbank bid protection by approving the Break-Up Fee and the Expense Reimbursement (each as defined below), subject to the conditions precedent to the payment of each in the Charlesbank Plan Sponsor Agreement.

21. After lengthy, arm's-length negotiations, the Debtors and Charlesbank Equity Fund IV, Limited Partnership ("Charlesbank") entered into a Plan Sponsor Agreement, (the "Charlesbank Plan Sponsor Agreement")[4]. Among other things, the Charlesbank Plan Sponsor Agreement, which remains subject to approval of the Court: (a) outlines the terms of a plan of reorganization sponsored by Charlesbank [Docket No. 196] (the "Charlesbank Plan"); (b) establishes guidelines governing the Debtors' actions in connection with seeking confirmation of the Charlesbank Plan; and (c) under certain circumstances specifically set forth in the Charlesbank Plan Sponsor Agreement, grants to Charlesbank a Break-Up Fee in the amount of $5 million and Expense Reimbursement in the maximum amount of $2 million (as defined in the Charlesbank Plan Sponsor Agreement, the "Break-Up Fee" and the "Expense Reimbursement", respectively). (*See* Charlesbank Plan Sponsor Agreement at §10.3.) The terms of the Charlesbank Plan include satisfaction of the Prepetition Lenders Claims in full in cash on the effective date of the Charlesbank Plan.

---

[4] A copy of the Charlesbank Plan Sponsor Agreement is annexed as an exhibit to the Plan Sponsor Motion.

22. Pursuant and subject to the conditions set forth in the Charlesbank equity commitment letter, the Charlesbank Plan Sponsor Agreement and the Charlesbank Plan, Charlesbank has committeed up to $141.9 million in equity to fund the Charlesbank Plan (which includes paying Restructuring Expenses), and to assume certain specified liabilities.

23. Since the time that the Debtors filed the Plan Sponsor Motion for approval of the Charlesbank Plan Sponsor Agreement, Charlesbank has made material improvements to its offer (as improved, the "Amended Charlesbank PSA"). These enhancements came about following receipt of an offer made by H.I.G. Middle Market L.L.C., an affiliate of Dunkirk Investments I, LLC, a pre-petition lender ("HIG") to acquire the Debtors' assets on terms superior to those initially offered by Charlesbank. The Amended Charlesbank PSA provides for each general unsecured creditor to receive cash up to 90% of its allowed claim, with aggregate cash to the class not to exceed $9 million, plus the Buyer Parties (as defined in the Amended Charlesbank PSA) will issue an unsecured note due one year from the effective date of the Charlesbank Plan ( with such plan to be amended to be consistent with the Amended Charlesbank PSA). Such note shall be for 10% of the allowed general unsecured claims, not to exceed $3 million.

24. The Charlesbank Plan provides significantly greater value to the Debtors' stakeholders than the Lender Plan and pays unsecured creditors substantially more. Thus, the Charlesbank Plan provides greater certainty of equality of distributions than the Lender Plan -- *i.e.*, it provides assurance that the Prepetition Lenders will receive the cash value of their secured claims and not value in excess of the value of such claims -- and that general unsecured creditors will receive distributions that are larger than the distributions they would receive under the Lender Plan.

25. Moreover, in the Debtors' judgment, the Charlesbank Amended PSA is superior to the HIG proposal filed with the Court. Although HIG was a prepetition lender, it never made

10

an offer to purchase or invest in the Debtors. Indeed, HIG took the Charlesbank Plan Sponsor Agreement and related documents and merely substituted its name and signature pages. While the economics of the two proposals are materially the same, in the Debtors' view there is a greater degree of certainty of a closing under the transaction with Charlesbank. This judgment is based upon, among other things, the extensive due diligence performed by Charlesbank, the degree of familiarity it now has with the Debtors' business, and importantly the higher level of comfort the Debtors' employees and physician business partners have with Charlesbank.

26. As described below, in light of these events, including HIG's offer, an auction has effectively already taken place. I believe that a further auction process, other than that already in effect contained in the Amended Charlesbank PSA (and as was contained in the original Charlesbank Plan Sponsor Agreement) would risk damage to the Company and its value. As set forth below, the Amended Charlesbank PSA does not foreclose possible other offers as the Debtors' do have the ability to accept a Superior Proposal.

**The Debtors' Ability to Accept a Superior Proposal Is Sufficient**

27. Under these circumstances, the Debtors' ability to accept a Superior Proposal is sufficient to assure the Court, creditors of the Debtors and other parties in interest that the Debtors have exercised their fiduciary duties and have obtained a fair and reasonable price for their businesses and assets, without the need for further marketing or exposure.

28. A further extended auction would not only serve no purpose, the Debtors do not have sufficient funding to conduct an extended auction process with, for example, more diligence, formal bid deadlines and additional auction procedures. The attendant delay, cost and risk are unwarranted under the circumstances. The Lender DIP Facility extended financing to the Debtors in accordance with a timeline and budget that would not accommodate such an extended auction process, and that has not changed. The Debtors have terminated the Lender

11

DIP Facility, exercised their fiduciary out and now seek access to the junior Charlesbank DIP Facility, which also is conditioned on a timeline and budget that will not accommodate a traditional auction process. HIG's offer to fund a new financing facility has the same constraints. Thus no one will finance a traditional auction process in the Chapter 11 Cases, and given the nature of their businesses, such an extensive process would be harmful to Debtors.

29. Second, an extended auction process is not necessary because the Amended Charlesbank PSA provides the basis for the acceptance of a Superior Proposal, and approval of the Amended Charlesbank PSA would not foreclose HIG from making new offers. However, these offers would have to recognize that the Debtors now have a Court approved and binding contract which, in the Debtors' view, will close. In other words, parties that have a serious interest in the Company and the Debtors' assets can effectively bid under the process permitted by the Amended Charlesbank PSA, and the process will make those bids more meaningful. Imposing any further auction process is highly unlikely to lead to a result superior to that which will be achieved under the Amended Charlesbank PSA and, when considered with the lack of financing necessary for such an endeavor and the risk inherent in such a process, offers no tangible benefit to the Debtors, their creditors or other parties in interest in the Chapter 11 Cases.

30. Third, further extending the auction process is unnecessary because the Debtors, with the assistance of two investment banking firms, conducted a prepetition marketing process that spanned approximately two years. Despite the depth and breadth of this process, the Debtors did not receive any serious, binding bids for their assets or the Company and were forced to commence the Chapter 11 Cases with the Lender Plan and Lender DIP Facility, which contemplated a partial debt to equity conversion. This process did, however, generate multiple, nonbinding, highly contingent, indications of interest that failed to materialize into a transaction acceptable to the Debtors. The parties that submitted those indications of interest have received

12

notice of the Chapter 11 Cases, were made aware of their ability to submit a competing bid under the Charlesbank Plan Support Agreement, and would not be more likely to submit a competing bid if granted yet more time under an extended auction process.

31. Fourth, further extending the duration of the Chapter 11 Cases and exposing the Debtors to further uncertainty under an auction process jeopardizes the going-concern value of the Company, and thus the Debtors. The value of the Company lies in the Company's relationship with care providers, which are secured through personal services contracts with the Debtors and their non-debtor affiliates. Those contracts are easily terminable and, to the extent that one of the Debtors is a party thereto, I have been advised that cannot be assumed and assigned under section 365 of the Bankruptcy Code without consent of the non-Debtor party. The delicacy of these relationships and the potential loss of significant value to the Company from their termination has already been demonstrated in the Chapter 11 Cases; once by the modification of the automatic stay granted to Dr. Carl Stonecipher that allowed him to end his relationship with the Company and again in connection with the attempted sale of the Debtors' Canadian refractive business. A condition to the sale of the Debtors' Canadian operations was the certain doctors agree to new personal service contracts with the buyer on substantially identical terms as their existing contracts with the Debtors. The refusal of just **one** of these doctors resulted in the proposed buyer seeking to reduce its purchase price by twenty percent (20%).

32. The Debtors commenced the Chapter 11 Cases only after executing a plan support agreement with the Prepetition Lenders which provided the certainty of a speedy reorganization and exit. If the Court approves the Amended Charlesbank PSA, that goal will be met. The Debtors exercised the fiduciary out only after negotiating the Charlesbank Plan Support Agreement, which provides for a restructuring that will be consummated on the same timeline as

13

the restructuring under the Lender Plan. If the Debtors' assets are exposed to an extended auction process, then (a) Charlesbank will not be obligated to consummate a restructuring, (b) the Debtors will not have certainty of successful exit from the Chapter 11 Cases, and (c) there will be a disruption in the relationship with their medical providers and a potential loss of going-concern value.

**The Break-Up Fee and Expense Reimbursement Are Necessary to Preserve the Value of the Debtors' Estates**

33. The Amended Charlesbank PSA provides for, under certain circumstances, an Expense Reimbursement of up to $2 million and a Break-Up Fee of $5 million should, in effect, the Debtors ultimately accept a different offer. Notwithstanding the current circumstances, the Debtors still believe that both are appropriate and are reasonable and necessary costs incurred in the administration of the estates. Without Charlesbank there would never have been another offer and the Prepetition Lenders, of which HIG is one, would have acquired the Company at a price materially less than its worth. Thus, in a very real sense, the Charlesbank offer was necessary to "preserve value" for the Debtors' estates. Without the offer, the excess value now being made available to unsecured creditors would have disappeared, swallowed up as a premium to the Pre-Petition Secured Lenders.

34. Charlesbank clearly has been the cause for HIG's recent bid . Prior to Charlesbank and the Debtors' execution of the Charlesbank Plan Sponsor Agreement, the Debtors had only received highly contingent indications of interest and were unable to secure a transaction other than the Lender Plan, which was premised upon: (a) conversion of approximately $25 million of prepetition, secured debt into 100% of the equity of the reorganized Debtors; (b) burdening the reorganized Debtors with approximately $80 million of secured debt; and (c) distributions to general unsecured creditors of no more than ten percent

14

(10%) of the allowed amount of their claims. The Charlesbank Plan, however, proposes to pay the Prepetition Lenders in full in cash on its effective date and to pay general unsecured creditors, perhaps in full as well. But for the Charlesbank Plan, HIG would not have bid on the Debtors' assets (other than by its participation as a Prepetition Lender under the Lender Plan) and the value recognized for the Debtors' estates would not have increased by approximately $10 million.

35. Second, Charlesbank provided additional value to the Debtors' estates by funding the Charlesbank DIP Facility and providing the Debtors with up to $141.9 million equity commitment, both of which were prerequisite to the Debtors being able to exercise the fiduciary out and pursue the Charlesbank Plan. The Charlesbank DIP Facility is subordinate to the Lender DIP Facility and the Debtors' obligations under the Prepetition Facility. The Charlesbank equity commitment does not charge the Debtors a commitment fee, transaction fee, alternative fee, or other fee, other than the Breakup fee.

36. Third, Charlesbank has conducted extensive diligence and it is clear that HIG has piggy-back backed on this due diligence in making its offer. Charlesbank's comprehensive diligence included its preparation, with the Debtors, of comprehensive schedules which HIG used on in formulating its own offer. Charlesbank's extensive diligence, which it initiated prior to the Petition Date, allowed Charlesbank to execute a plan sponsor agreement that is not contingent on financing or additional diligence and that provides the Debtors with certainty of exit from the Chapter 11 Cases, which is in the best interests of the Debtors and their employees, patients, vendors, creditors and estates. The extensive diligence that Charlesbank conducted and the terms of the Amended Charlesbank PSA and the Charlesbank Plan also demonstrate that the value of the Company and the Debtors' is an amount in excess of the amount of the Debtors' prepetition secured debt.

15

37.     The Debtors' management participated in the long and arduous due diligence process and knows first hand the time expended and expense incurred by Charlesbank to, in effect, put the Debtors into a sales configuration mode and enhance their attraction to other bidders. In agreeing to an Expense Reimbursement and a Break Up Fee, the Debtors were mindful of both the cost of diligence and that the Debtors' business is base upon relationships and intangibles hard to quantify. Given my substantial restructuring experience, I also know that these requests were customary in transactions of this sort and within the ranges approved by bankruptcy courts. The Debtors' board of directors concluded, and hold to the conclusion, that both an Expense Reimbursement and a Break Up Fee were essential to secure value for the estates and their creditors, and have greatly benefited the Debtors.

38.     For the foregoing reasons, the Debtors respectfully request that the Court approve the Amended Charlesbank PSA and that it not require an open auction process. As set forth above, that type of process will not lead to increased offers and the time needed to complete such a process is neither available nor beneficial to the Debtors. If in fact any other entity should wish to make an offer, that offer can best be accommodated under the provisions of the Amended Charlesbank PSA.

48116/0001-6327109v3
RLF1 3537415v.3

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on February 12, 2010

**TLC Vision (USA) Corporation**
**TLC Vision Corporation**
**TLC Management Services, Inc.**

_____
Michael F. Gries
Chief Restructuring Officer

48116/0001-6327109v3
RLF1 3537415v.3